No. 20-4303

# In the United States Court of Appeals for the Sixth Circuit

---

HARRY C. CALCUTT III,
PETITIONER,

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,
RESPONDENT.

---

*ON APPEAL FROM A FINAL DECISION AND ORDER BY THE FEDERAL DEPOSIT INSURANCE CORPORATION*

---

**PETITIONER'S APPENDIX
VOLUME I OF II
A001-A519**

---

BARRY D. HOVIS
MUSICK, PEELER & GARRETT LLP
 *315 Montgomery St. 10th floor,*
 *San Francisco, CA 94104*

RYAN T. SCARBOROUGH
SARAH M. HARRIS
WILLIAM B. SNYDERWINE
HELEN E. WHITE*
WILLIAMS & CONNOLLY LLP
 *725 Twelfth Street, N.W.*
 *Washington, DC 20005*
 *(202) 434-5000*
 *sharris@wc.com*
 *Attorneys for Petitioner*
*Admitted in MA. Practice in the District of Columbia supervised by D.C. bar members pursuant to D.C. App. R. 49(c)(8).

# TABLE OF CONTENTS
## VOLUME I

### *Decision Under Review*

Decision and Order to Remove and Prohibit From Further Participation and Assessment of Civil Money Penalties (Dec. 15, 2020) [Record Entry No. 257] ............................. A001

Petition for Review (Dec. 16, 2020) [Record Entry No. 258] ............................................ A049

### *Relevant Record Documents*

Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and Notice of Hearing (Aug. 20, 2013) [Record Entry No. 1]............. A052

Notice of Reassignment (July 24, 2018) [Record Entry No. 175]..................................... A085

Reassignment Review and Decisions on Reconsideration (Nov. 28, 2018) [Record Entry No. 181] ...................................................................................................... A093

Order Regarding New Oral Hearing (Mar. 19, 2019) [Record Entry No. 188]............... A104

Notice of Hearing and Supplemental Prehearing Orders (Mar. 20, 2019) [Record Entry No. 189] ...................................................................................................... A114

Respondent FOIA Request Regarding the Appointment of Administrative Law Judges by the FDIC Board of Directors (Mar. 28, 2019) [Record Entry No. 190]................ A124

Second Amended Answer to Notice (May 22, 2019) [Record Entry No. 206]................. A127

Decision and Order on Motion for Interlocutory Review (June 20, 2019) [Record Entry No. 213] ...................................................................................................... A163

Order Regarding Motion to Strike Affirmative Defenses (July 3, 2019) [Record Entry No. 220] ...................................................................................................... A171

Order Regarding the Parties' Motions in Limine (Oct. 4, 2019) [Record Entry No. 235] ...................................................................................................... A180

Findings of Fact, Conclusions of Law and Recommended Decision on Remand (Apr. 3, 2020) [Record Entry No. 250] .......................................................................... A189

Respondent Harry C. Calcutt III's Exceptions to the Administrative Law Judge's Recommended Decision on Remand and Request for Oral Argument (Aug. 3, 2020) [Record Entry No. 255] .................................................................................................. A334

# TABLE OF CONTENTS
## VOLUME II

### *Relevant Transcript Excerpts from Hearings*

Continued Direct Examination of Cori Nielson (Sept. 17, 2015) [Tr. 467-69] ................. A520

Continued Cross Examination of Dennis O'Neill (Sept. 18, 2015) [Tr. 753-54]............... A526

i

Opening Comments by ALJ (Oct. 29, 2019) [Tr. 10-13] .................................................... A531

Direct and Cross Examination of Autumn Berden (Oct. 29, 2019) [Tr. 128-29, 177-79] A538

Cross Examination of Anne Miessner (statement of ALJ) (Nov. 1, 2019) [Tr. 867-69] . A546

Direct Examination of Cori Nielson (Nov. 4, 2019) [Tr. 942-45, 955-58] ......................... A552

ALJ's Examination of Michael Doherty (Nov. 5, 2019) [Tr. 1253-61].............................. A563

Direct Examination of Harry (Scrub) Calcutt (Nov. 5, 2019) [Tr. 1295-99, 1347-49] ..... A574

***Relevant Admitted Exhibits***

Resp. Ex. 194 (Office of Thrift Supervision Memorandum to J. Reich from D. Roberts)
    (Mar. 25, 2008) [Record Entry No. 479].......................................................................... A583

Resp. Ex. 15 (Bedrock Holdings Letter to Mr. Calcutt) (May 4, 2009)
    [Record Entry No. 388].................................................................................................... A584

Resp. Ex. 191 (FDIC Examination Manual) (excerpt) (Mar. 1, 2020)
    [Record Entry No. 476].................................................................................................... A585

FDIC Ex. 48 (FDIC Report of Examination) (excerpt) (Aug. 1, 2011)
    [Record Entry No. 289].................................................................................................... A586

Resp. Ex. 141 (C. Nielson email re: Update on Northwestern Bank Collateral/
    Termination of CB Richard Ellis) (Oct. 5, 2011) [Record Entry No. 509] ................. A604

Resp. Ex. 143 (A. Miessner email to G. Thielson re: RE: Update on Northwestern Bank
    Collateral/Termination of CB Richard Ellis) (Oct. 6, 2011)
    [Record Entry No. 510].................................................................................................... A605

FDIC Ex. 67 (Calcutt Memo to File re: Nielson—Key Points) (Feb. 21, 2012)
    [Record Entry No. 303].................................................................................................... A607

Resp. Ex. 185 (Order of Investigation Pursuant to 12 U.S.C. § 1820(c)) (Apr. 12, 2012)
    [Record Entry No. 471].................................................................................................... A609

FDIC Ex. 77 (Letter to FDIC & OFIR enclosing Plante Report) (excerpt)
    (Aug. 8, 2012) [Record Entry No. 308]............................................................................ A612

Resp. Ex. 205 (A. Berden's handwritten notes) (Sept. 7, 2012)
    [Record Entry No. 519].................................................................................................... A618

Resp. Ex. 202 (C. Nielson email to A. Miessner re: A little news to brighten your
    weekend) (Oct. 3, 2012) [Record Entry No. 517] ......................................................... A622

Joint Ex. 15 (Joint Stipulations of Fact) (Feb. 2, 2015) [Record Entry No. 377]............ A624

Resp. Ex. 195 (Appointment Affidavits) (July 19, 2018) [Record Entry No. 180] .......... A631

Resp. Ex. 196 (Email from V. Best re: Service of FDIC Board Resolution Appointing You
    as Administrative Law Judges for the FDIC) (July 20, 2018)
    [Record Entry No. 481].................................................................................................... A634

Resp. Ex. 197 (Email from V. Best re: Appointment Affidavit with Oath of Office for your review) (July 23, 2018) [Record Entry No. 482]............................................................ A636

Resp. Ex. 198 (Email from V. Best re: Resending draft Appointment Affidavit with Oath of Office for your review:  First initial added) (July 23, 2018) [Record Entry No. 483] ..................................................................................... A638

Resp. Ex. 199 (Approval of Organizational Realignment) (Aug. 9, 2018) [Record Entry No. 484] ..................................................................................... A640

### INDEX OF WITNESSES RELEVANT TO PETITION

| Witness | Date | Proceeding | Appendix Page |
|---|---|---|---|
| Amber Berden | Oct. 29, 2019 | Hearing | A538 |
| Harry (Scrub) Calcutt | Nov. 5, 2019 | Hearing | A574 |
| Michael Doherty | Nov. 5, 2019 | Hearing | A563 |
| Anne Miessner | Nov. 1, 2019 | Hearing | A546 |
| Cori Nielson | Sept. 17, 2015 | Hearing | A520 |
| Cori Nielson | Nov. 4, 2019 | Hearing | A552 |
| Dennis O'Neill | Sept. 18, 2015 | Hearing | A526 |

## CERTIFICATE THAT DOCUMENTS IN THE APPENDIX ARE PROPERLY PART OF THE RECORD

The undersigned hereby certifies that the documents in Petitioner's Appendix are properly part of the record.

*/s/ Sarah M. Harris*
Sarah M. Harris

APRIL 7, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2021, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Sixth Circuit and served all parties through the Court's electronic CM/ECF filing system.

*/s/ Sarah M. Harris*
Sarah M. Harris

APRIL 7, 2021

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | DECISION AND ORDER TO |
| HARRY C. CALCUTT III, Individually | ) | REMOVE AND PROHIBIT FROM |
| and as an Institution- | ) | FURTHER PARTICIPATION |
| Affiliated Party of | ) | AND ASSESSMENT OF CIVIL |
| | ) | MONEY PENALTIES |
| NORTHWESTERN BANK, | ) | |
| TRAVERSE CITY, MICHIGAN | ) | FDIC-12-568e |
| (Insured State Nonmember Bank) | ) | FDIC-13-115k |

## I.    INTRODUCTION

This matter is before the Board of Directors ("Board") of the Federal Deposit Insurance Corporation ("FDIC") following the issuance on April 3, 2020, of a Recommended Decision on Remand ("Recommended Decision" or "R.D.") by Administrative Law Judge Christopher B. McNeil ("ALJ").  The ALJ found that Respondent, Harry C. Calcutt III ("Respondent"), the President and Chief Executive Officer ("CEO") of Northwestern Bank ("Bank"), engaged in unsafe and unsound banking practices and breached his fiduciary duties to the Bank by increasing the Bank's exposure to its largest borrower relationship to enable the borrowers to make payments on their existing loans, while concealing the true nature of the transactions from the Bank's board of directors and its regulators.

The ALJ recommended that the Respondent be subject to an order of removal and prohibition pursuant to section 8(e) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1818(e), and be assessed a civil money penalty ("CMP") pursuant to section 8(i) of the FDI Act, 12 U.S.C. § 1818(i).  For the following reasons, the Board affirms the Recommended Decision and issues against Respondent an Order of Removal and Prohibition and Order to Pay a CMP in the amount of $125,000.

## II.    REQUEST FOR ORAL ARGUMENT

After considering the Respondent's Request and the entire record in this matter, the Board finds that (1) the factual and legal arguments are fully set forth in the parties' voluminous submissions, (2) no benefit would be derived from oral argument, and (3) Respondent will not be prejudiced by the lack of oral argument.  Therefore, the Board declines to exercise its discretion under section 308.40 of the FDIC's Rules (12 C.F.R. § 308.40) and denies Respondent's Request for Oral Argument.

## III.    PROCEDURAL HISTORY AND BACKGROUND

The FDIC initiated this action on August 20, 2013, when it issued against Respondent Harry C. Calcutt III, William Green, and Richard Jackson, individually, and as institution-affiliated parties of the Bank, a Notice of Intention to Remove From Office and Prohibit From Further Participation, and Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law, Order to Pay, and Notice of Hearing ("Notice").[1]  The charges in the Notice focused primarily on (a) the extension of additional credit to a group of entities controlled by the same family, the Nielsons, after the borrowers announced they were unable to service their existing loans; (b) the failure to obtain updated financial information from the Nielson entities before extending additional credit to them and renewing their maturing loans; (c) falsely stating in a loan write up for the Bank Board that a $760,000 loan to the Nielsons was to provide for working capital requirements when in fact it was to enable the Nielsons to make payments on their other loans; (d) violations of the Bank's loan policy which, among other things, requires Board approval for loans in excess of $750,000; (e) the release of cash-equivalent collateral to

---

[1]    William Green was a commercial loan officer at the Bank and Richard Jackson was an Executive Vice President and a member of the Bank's Board.  R.D. at 11.  In 2015, before the first hearing in this proceeding commenced, Messrs. Green and Jackson stipulated to the entry of Orders prohibiting them from engaging in regulated banking activity.  *Id.* at 11-12.  Mr. Jackson also consented to the assessment of a $75,000 civil money penalty.  *Id.* at 12.

allow the Nielsons to make payments on their loans; (f) the active concealment of the impaired status of the Nielson loans from bank examiners; and (g) the filing of false Call Reports that failed to recognize impairment on any of the Nielsons' loans.  R.D. at 13-118; Notice ¶¶ 7-107.[2] The Notice charged that Respondent engaged in unsafe or unsound banking practices and breached his fiduciary duties to the Bank.  Notice ¶¶ 122-23.  The Notice also alleged that, as a result, the Bank suffered financial loss or other damages, while Respondent received a financial gain or other benefit.  *Id.* ¶¶ 124-25.  The Notice further alleged that Respondent demonstrated personal dishonesty and a willful or continuing disregard for the safety or soundness of the Bank. *Id*. ¶ 126.

The FDIC sought to remove and prohibit Respondent from further participation in the banking industry.  R.D. at 2; Notice at 2.  The FDIC also sought to impose a CMP of $125,000 against Respondent pursuant to 12 U.S.C. § 1818(i).  Notice at 27.  On October 4, 2013, Respondent filed a timely answer to the Notice.  On December 9, 2014, Respondent filed a First Amended Answer, and on May 22, 2019, he filed a Second Amended Answer ("Answer"), in which he denied or attempted to minimize many of the FDIC's material allegations and advanced seven affirmative defenses.  R.D. at 2.  For example, Respondent argued that any misconduct that occurred at the Bank was perpetrated by others without his knowledge and approval, that the hearing before ALJ McNeil did not comply with the Board's remand order, that this proceeding was unconstitutional because ALJ McNeil is shielded from removal by the President, and

---

[2] The Board conducted an independent review of the record, including the underlying supporting evidentiary documents and transcripts.  The Board cites to either the numbered pages in the R.D., to the exhibits ("FDIC Exh." or "JT. Exh." (joint exhibits)), the 2019 hearing transcripts ("Tr."), and the 2015 hearing transcripts ("2015 Tr.").  Respondent's Exceptions to the R.D. are cited, respectively, as "R. Exceptions" and exhibits, as "Resp. Exh."

3

because the proceeding assertedly was barred by the statute of limitations and laches, among other contentions.

Following extensive discovery, an eight-day hearing was held in Grand Rapids, Michigan, between September 15 and 24, 2015. At the hearing, the ALJ received sworn testimony from more than 12 witnesses including Respondent, and thousands of pages of exhibits were admitted into evidence.

On June 6, 2017, the ALJ who was originally assigned to this matter, C. Richard Miserendino, issued a 102-page Recommended Decision. In 2018, before the Board issued a final decision, the case was stayed pending the Supreme Court's decision in *Lucia v. Securities & Exchange Commission*, 138 S. Ct. 2044 (2018), which challenged the Securities and Exchange Commission's ("SEC") reliance on ALJs who had not been appointed consistent with the Appointments Clause of the United States Constitution. After the Supreme Court held that the SEC's ALJs were "inferior officers" who required appointment under the Appointments Clause, 138 S. Ct. 2044, the FDIC Board adopted a Resolution appointing its ALJs and reassigned pending cases to newly appointed and different ALJs. *See* FDIC Resolution Seal No. 085172, Order in Pending Cases (July 19, 2018).

This case was reassigned to ALJ McNeil. *Id.* On March 19, 2019, ALJ McNeil issued an Order Regarding New Oral Hearing advising the parties that he would conduct a new hearing based on the transcripts from the original evidentiary hearing together with limited additional testimony from Respondent. March 19 Order, at 2. Respondent sought interlocutory review of the March 19 Order by the Board, arguing that *Lucia* entitled him to an entirely new proceeding beginning with a new or amended Notice, a new answer, new motions practice, new discovery, and a new evidentiary hearing. By Order entered June 20, 2019, the Board granted Respondent's motion for interlocutory review in part and remanded the matter with instructions to afford

4

Respondent "a new oral hearing on all issues that were considered at the prior hearing." The Board's June 20 Order denied Respondent's motion in all other respects, including his request that he be granted an entirely new proceeding.

In accordance with the June 20 Order, ALJ McNeil conducted a seven-day hearing between October 29 and November 6, 2019. Twelve witnesses, including Respondent, testified at the new hearing, and more than 1,000 pages of exhibits were admitted into evidence. On April 3, 2020, ALJ McNeil issued a Recommended Decision recommending that Respondent be subject to an order of removal and prohibition and assessing a CMP in the amount of $125,000. Respondent filed timely exceptions on August 3, 2020. Pursuant to 12 C.F.R. § 308.40(c)(2), the Executive Secretary on September 22, 2020, transmitted the record in the case to the Board for final decision.

## IV.    FACTS

The following discussion summarizes Respondent's misconduct as alleged in the Notice and corroborated by supporting testimonial and documentary evidence in the record.

### A.    General Background.

Northwestern Bank, of Traverse City, Michigan, was a state-chartered financial institution whose primary federal regulator was the FDIC. Answer ¶ 1. Respondent was President, CEO, and Chairman of the Board of Directors of the Bank from 2000 until 2013. R. Proposed FOF and Conclusions of Law at ¶¶ 3, 5. Respondent also was a member of the Bank's Senior Loan Committee ("SLC"). *Id.* ¶ 3. He retired from the Bank in 2013. *Id.*

Respondent described the Bank as having a "flat" management structure with 20 employees reporting directly to Respondent. R. Proposed FOF and Conclusions of Law at ¶ 5 (citing Tr. 249, 251, 296). Among them was Richard Jackson, who was an Executive Vice President and who served on the Bank's Board, the SLC, the Classified Assets Committee

("CAC"), and the Asset Liability Committee.  R.D. at 13; JSOF ¶ 6.  In addition, Michael

Doherty was head of Credit Administration for commercial lending and was a member of the

SLC.  R. Proposed FOF and Conclusions of Law at ¶ 5 (citing Tr. 1193).  William "Bill" Green

served as a commercial loan officer for the Bank and was a member of the CAC.  R.D. at 13;

Answer ¶ 5.

### B.     Overview of the Bank's Relationship with the Nielson Family.

The claims against Respondent arise out of the Bank's lending relationship with a group

of business entities controlled by the Nielson family ("Nielson Entities").  Answer ¶ 8.  The

Nielson Entities were centrally managed by one entity called Generations Management, LLC.

Tr. at 930 (Nielson).  Generations Management, in turn, was managed by Cori Nielson and Keith

Nielson.  R. Proposed FOF and Conclusions of Law at ¶ 6.  Autumn Berden served as the CFO

of Generations Management from 2008 to at least 2012.  Tr. at 25, 35 (Berden).  The Nielson

Entities engaged in a variety of business activities, including holding vacant and developed real

estate, engaging in commercial and residential property rentals and development, and holding oil

and gas interests.  Tr. at 29 (Berden).

As of August 2009, the Nielson Entities had $38 million in loans at the Bank ("Nielson

Loans") and collectively represented the Bank's largest loan relationship.  Answer ¶ 8.  Any

lending relationship that exceeds 25 percent of the Bank's Tier 1 capital is considered a

concentration of credit.  JT. Exh. 2, at 18.  The Bank's Reports of Examination ("ROE") for

2008 and 2009 treated the Nielson Entities as a single borrower and identified the Nielson Loans

as a concentration of credit because they exceeded the 25 percent threshold.  JT. Exh. 2, at 20,

37-39.  The 2010 ROE again identified the Nielson Loans as a concentration of credit because

together they represented approximately 47 percent of the Bank's Tier 1 capital.  FDIC Exh. 19,

at 11.

6

A concentration of credit, like a large loan to a single borrower, has the potential to threaten the safety and soundness of a bank in the event the loan or loans stop performing.  Tr. at 888 (Miessner); 2015 Tr. at 797-98 (Bird).  The Nielson Loans, in addition to making up nearly half the Bank's Tier 1 capital, posed additional risks to the Bank.  First, although the Bank's loan policy required the Bank to obtain personal guarantees from the borrowing entity's principals, the Bank did not require any members of the Nielson family to sign a personal guarantee.  Tr. at 946-47 (Nielson); FDIC Exh. 86, at 5; JT. Exh. 2, at 36-37.  Second, the Nielson Loans were not cross-collateralized, which precluded the Bank from using the collateral of one Nielson Entity to satisfy the obligation of another Nielson Entity in the event of a default.  2015 Tr. 1861-1863 (Calcutt).

### C.    The Nielson Entities Default in 2009.

In the second quarter of 2009, several of the Nielson Loans were past due, and a number of the Nielson Loans were due to mature on September 1, 2009.  FDIC Exh. 3, at 70-77; Joint Stipulation ¶ 10.  In the weeks leading up to the September 1 maturity date, representatives of the Nielsons advised the Bank that the Nielson Entities were seeing a slowdown in their respective businesses and would have trouble paying their loans for the foreseeable future.  Tr. at 932-33 (Nielson).   On August 10, 2009, Generations Management's CFO, Ms. Berden, informed the Bank that the Nielson Entities needed to restructure their loans.  FDIC Exh. 3, at 78.  When the Bank did not respond favorably to that overture, Cori Nielson sent an email to Respondent on August 21, 2009, advising that the Nielson Entities "will not make our September payment or any further payments until we have the necessary meetings and discussions to reach an overall restructuring of the relationship."  Tr. at 936-37 (Nielson); FDIC Exh. 3, at 82.  Ms. Nielson was not bluffing.  All of the Nielson Entities stopped paying their loans on September 1, 2009.  Tr. at 937 (Nielson).

During the fall of 2009, Ms. Nielson continued to communicate with the Bank about options for restructuring the Nielson Loans.  Tr. at 938-42 (Nielson).  Most of her communications were with Respondent, whom she understood to be the decision-maker for the Bank.  Tr. at 934 (Nielson).  In a September 21, 2009 email to Respondent, Ms. Nielson proposed that the Bank "suspend [the Nielson Entities'] monthly payments . . . until our cash flow improve[s]."  Tr. at 941 (Nielson); FDIC Exh. 3, at 39.  She explained that "[t]he real estate market had dropped so dramatically that a lot of our loans were underwater," with no equity left in them, and with little "potential for equity recovery in the near term."  *Id.*  Respondent testified that he thought the Nielsons merely were "posturing," and that they "did have the funds" to pay their loans.  Tr. at 1296 (Calcutt).  Yet, Respondent did not do anything to evaluate the financial condition of the Nielson Entities, Tr. at 1382 (Calcutt), and he in fact declined Ms. Nielson's offer to provide updated financial information for the Nielson Entities, Tr. at 938-39 (Nielson).

According to Ms. Nielson, a recurring theme during her discussions with Respondent about a restructuring of the Nielson Loans was that Respondent did not want the Bank to enter into any new agreements that might be "red flags" to the regulators, leading them to scrutinize the Bank's loan relationship with the Nielson Entities.  Tr. at 934-35, 986-87 (Nielson).  For example, Respondent expressed concern that any loan modifications that reduced the Nielson Entities' debt service would act as "red flags," as would a transaction in which the Bank accepted an assignment of deeds as satisfaction of certain of the loans.  Tr. at 934, 947, 987 (Nielson).

### D.    The Bank Consummates the "Bedrock Transaction" With the Nielson Entities.

While negotiating with the Bank about a restructuring of their loans, none of the Nielson Entities was making loan payments.  Joint Stipulation ¶¶ 10, 11.  By mid-November 2009, many of the Nielson Loans were about to become 90 days past due; a milestone that had important

8

ramifications for the Bank because it meant that the loans would be placed on non-accrual status. Joint Stipulation ¶ 11; Tr. at 1377 (Calcutt). Despite this pressure, the Bank and the Nielsons were unable to agree on a workout transaction until November 30, 2009, by which point most of the Nielson Loans had become 90 days past due and were placed on nonaccrual status. Joint Stipulation ¶ 17.

The workout consummated on November 30, 2009, referred to as the "Bedrock Transaction," had several components:

- **Bedrock Loan.** The Bank extended a new loan of $760,000 ("Bedrock Loan") to one of the Nielson Entities, Bedrock Holdings LLC. Answer ¶ 17. The Bedrock Loan was disbursed to Bedrock Holdings on December 1, 2009, after which the proceeds were transferred into deposit accounts that the Bank established for the Nielson Entities, with the understanding that the funds would be used to make payments on each of the Nielson Loans. Joint Stipulation ¶ 15. The Bank and the Nielsons believed that the funds from the Bedrock Loan would be sufficient to cover all loan payments for all of the Nielson Entities through April 2010. Answer ¶ 18.

- **Release of Pillay Collateral**. Pillay Trading LLC, a Nielson Entity, had previously granted the Bank a security interest in certain investment-trading funds when it obtained a loan from the Bank. As part of the Bedrock Transaction, the Bank agreed to release $600,000 of this collateral and bring current all of the past-due Nielson Loans. Answer ¶ 17.

- **Renewal of All Past-Due Nielson Loans**. The Bank granted renewals of all of the matured Nielson Loans. Joint Stipulation ¶ 20. One of the renewed loans was a $4,500,000 loan to Bedrock Holdings. Answer ¶ 30.

9

To carry out the Bedrock Transaction, the Bank released its interest in $600,000 of the Pillay Collateral, the funds from which were used to cure the arrearages on all past-due Nelson Loans. Joint Stipulation ¶¶ 13, 18. On December 1, 2009, the Nielson Loans were removed from the Bank's nonaccrual list. Joint Stipulation ¶ 19.

Respondent consented to the Bedrock Transaction and was aware of its purpose. Joint Stipulation ¶¶ 14, 16.

### E.    The Bedrock Transaction Was Tainted By Numerous Irregularities, Including Violations of the Bank's Commercial Loan Policy.

The Bank wholly disregarded its Commercial Loan Policy ("CLP") and safe and sound lending practices when it entered into the Bedrock Transaction. Section 13 of the CLP mandated that "all commercial loans are to be supported by a written analysis of the net income available to service the debt and by written evidence from the third parties supporting the collateral value of the security." FDIC Exh. 86, at 5. Even in the absence of a policy, Mr. Jackson acknowledged that prudent bankers "generally" would want to have financial statements, global cash flow analyses, and current appraisals before approving these loans. 2015 Tr. 1662-63 (Jackson). Yet, the Bank did not gather the required financial information from the Nielsons, nor did it perform the required cash flow analyses and collateral appraisals before funding the Bedrock Loan and releasing the Pillay Collateral. 2015 Tr. 1659-1661 (Jackson); Tr. at 829 (Miessner).

Section 3 of the CLP instructed that "any loans where the total aggregate exposure is between 15 and 25 percent of the Bank's Regulatory Capital, require a 2/3rd majority approval from the Board." FDIC Exh. 86, at 1-2. As of April 2009, the Nielson Loans collectively represented approximately 53 percent of the Bank's Tier 1 capital. Tr. at 733 (Miessner); JT. Exh. 2. The Bedrock Loan, which further increased the Bank's exposure to the Nielson Entities, therefore required the approval of a 2/3rd majority of the Board. 2015 Tr. at 1669 (Jackson). The

10

Bank nevertheless did not seek Board approval for the Bedrock Loan or any other part of the

Bedrock Transaction until March 2010, months after the transaction had been consummated.

Draft findings from the examiners conducting the August 1, 2011, examination flagged

the after-the-fact approval of the Bedrock Loan as a "Lending Limit Violation."  FDIC Exh. 52,

at 1.  In response to this draft finding, the Bank claimed that a "documentation oversight" had

occurred, in which "[t]he Board was fully aware of this loan prior to the disbursement of the

loan, but documentation was lacking supporting the Board's approval in 2009."  FDIC Exh. 52,

at 2.  Respondent, for his part, hewed to this explanation in his testimony.  *See* R.D. at 79-80.

ALJ McNeil found this explanation to be unworthy of credence, based on evidence that the

Bedrock Transaction was not mentioned in any Board minutes during the period September 2009

through March 2010, and based on the testimony of two Board members, Ronald Swanson and

Bruce Byl, that the Bedrock Transaction had not been discussed with them before March 2010.

R.D. at 79-81 & n.596 (citing Resp. Exhs. 22-24, Tr. at 486-87 (Swanson); *id.* at 1023-25 (Byl)).

Section 12 of the CLP provides that "it is the policy of the [Bank] to require the personal

guarantee of the debt by all parties holding a major equity interest in the business enterprise

when the borrower is other than a personal entity."  FDIC Exh. 86, at 5.  In contravention of this

provision, the Bank did not obtain a personal guarantee from any of the Nielson family members

to support the Bedrock Loan or any of the other loans to the Nielson Entities.  Tr. at 273-74

(Gomez).  During the 2019 hearing, Respondent testified that the Bank's failure to obtain

personal guarantees for the Nielson Loans was not an exception to the CLP.  Tr. at 1375

(Calcutt).  ALJ McNeil did not credit that testimony because it was squarely contradicted by the

plain language of Section 12 of the CLP.  R.D. at 70.

The loan write-up for the Bedrock Transaction, presented to the Board after the fact in

March 2010, reveals a startling lack of candor.  Answer ¶ 31.  The write-up seeks approval for

the renewal of Bedrock's existing $4,500,000 loan. *Id.* Inconspicuously placed in the middle of the description for this transaction, the loan write-up states that "[a]s part of this renewal, $600,000 of [collateral] funds will be released" and "[i]n addition a new loan of $760,000 is requested to provide for working capital requirements." JT. Exh. 6, at 2; Answer ¶ 31. The write-up does not disclose that the $4,500,000 loan already had been renewed, that the $600,000 of Pillay Collateral already had been released, and that the new loan in the amount of $760,000 already had been funded in December 2009. JT. Exh. 6. Furthermore, the write-up fails to disclose that: (i) the Nelson Entities had informed the Bank that they were having severe cash flow problems, (ii) all of the Nelson Entities had stopped making payments on their loans in September 2009, and (iii) the proceeds from the new $760,000 loan to Bedrock would be used to make payments on the various Nielson Loans through April 2010.   JT. Exh. 6; Answer ¶ 36. The statement in the write-up that the $760,000 loan would be used for "working capital requirements" was materially false because making payments on other loans does not meet the Bank's general definition of the term "working capital."  Answer ¶ 32.

Bank credit analyst Ian Hollands prepared the loan write-up.  Answer ¶ 31.  Respondent, in his capacity as a member of the SCC, received a copy of the loan write-up before it was presented to the Board, and he initialed it.  Answer ¶ 38.  At the time, Respondent knew that the Bedrock Transaction had been completed three months before the loan application was presented to the Board, and he knew that at least a portion of the proceeds from the $760,000 loan would be used to make payments on all of the Nielson Loans through April 2010.  Answer ¶¶ 33, 35.

### F.    The Nielson Entities Default Again on All of Their Loans in 2010

Many of the Nielson Loans were due to mature in September 2010 but the financial condition of the Nielson Entities had not improved during the preceding 12 months. Accordingly, Cori Nielson contacted the Bank and "tried to initiate renewal discussions."  Tr. at

12

958-59 (Nielson).  She sent a series of letters addressed to Respondent to alert him that the

Nielson Entities "cannot make their debt service payments," Tr. at 960-61 (Nielson); FDIC Exh.

3 at 31-42, and that they "needed significant loan modifications," Tr. at 958-59 (Nielson).

The Nielsons and the Bank did not reach an agreement before the Nielson Loans began

maturing in September 2010.  Tr. at 962 (Nielson).  All of the Nielson Entities stopped making

payments on their loans, effective September 1, 2010.  Answer ¶ 42; Tr. at 959 (Nielson).  In

December 2010, the parties reached an agreement pursuant to which the Nielson Loans were

renewed, the Nielson Entities were given interest rate reductions and other concessions, and the

Bank released $690,000 in additional Pillay collateral to fund five months of payments, from

September 2010 to January 2011.  Tr. at 962-64 (Nielson); FDIC Exh. 3 at 165-67; Answer ¶¶

44, 45.  In January 2011, all of the Nielson Entities stopped paying their loans a third time, and

all of the Nielson Loans, including the $760,000 Bedrock Loan, have been in default since then.

2015 Tr. 1775-1776 (Calcutt); Joint Stipulation ¶ 29.

### G.    Respondent Concealed the Problems with the Nielson Loans from the Examiners.

Respondent understood at least as early as 2009 that the Bank's regulators had rated the

Nielson relationship as a "special mention" and were closely scrutinizing the Nielson Loans.  JT.

Exh. 2, at 20, 37-39.  Instead of taking steps to address the regulators' concerns, Respondent

embarked on a course of conduct designed to conceal the deteriorating financial condition of the

Nielson Entities.  ALJ McNeil found that Respondent engaged in the following deceptive acts

and omissions, among others:

- **Direction to the Nielsons to Mask Inter-Company Transfers**.  A number of the

Nielson Entities had insufficient cash flow to cover their operating expenses.  Tr. at 36 (Berden);

FDIC Exh. 135_002.  As a result, they were required to sell assets or borrow from other Nielson

Entities.  Tr. at 37 (Berden).  Historically, these transfers would be reflected on the two

company's balance sheets as an intercompany loan.  Tr. at 39 (Berden).  During a meeting held

on April 29, 2008, however, Respondent and Mr. Green requested that the Nielson family's

representatives, Cori Nielson and Autumn Berden "not show those inter-company notes on the

Borrower's balance sheets anymore."  *Id.* at 39 (Berden).  Instead, Respondent and Mr. Green

asked Ms. Berden to report that, for example, "instead of loaning money to Artesian, [Bedrock]

would make a distribution to its members" and "the members would either loan it to Artesian or

make a capital contribution as the owners to the other entity."  Tr. at 39, 151 (Berden); *see also*

*id.* at 1277 (Calcutt).  At some point in time, Ms. Berden learned that Respondent and Mr. Green

were concerned that the Nielson Entities' inter-company loans could be construed by bank

regulators as a "common use of funds."  Tr. at 157 (Berden).  Yet Respondent testified that he

was not attempting to conceal the interrelatedness of the Nielson Entities from the Bank's

regulators; instead, he claimed he was merely providing advice to the Nielsons while wearing his

"CPA hat" and his "tax hat."  Tr. at 1277, 1308-09 (Calcutt).  ALJ McNeil rejected this

explanation on the basis of evidence showing that the Bank had a compelling reason to conceal

the common ownership of the Nielson Entities.  R.D. at 42.  For example, Mr. Green informed

Ms. Berden in a February 11, 2009 email that "[o]ne item [Respondent] noticed was the inter-

company debt was increasing[,] which was the primary item the examiners caught and had a

major problem with."  Rd. at 47 (quoting Tr. at 55-56 (Berden); FDIC Exh. 3, at 60).

- **2010 Loan Sales & Repurchases**.

On or about April 30, 2010, shortly before examiners were to arrive on site for the Bank's

2010 examination, the Bank arranged to sell a number of Nielson Loans to two affiliate banks,

State Savings Bank and Central State Bank.  Tr. at 855, 858-59 (Miessner); Resp. Exhs. 42, 44.

Respondent was the Chairman of the Board at both banks and at their respective holding

companies.  Tr. at 884 (Miessner); 2015 Tr. at 167 (O'Niell).  Mr. Jackson testified that the Bank

14

was attempting to reduce its exposure to the Nielson relationship, and he denied that the timing of the sale had any connection to the FDIC examination that was about to commence.  2015 Tr. at 1622 (Jackson).  Notwithstanding the loan sale, Mr. Green informed Ms. Berden that he and Respondent would continue to be "[the Nielson Entities'] points of contact and that we [the Nielsons] would work directly with them when it came time for renewals in September."  Tr. at 113-114 (Berden).  The fact that the Bank expected to maintain control of the loans after selling them suggested to examiners—who learned of the transactions the following year—that the loan sale was a sham.  2015 Tr. 831-832 (Bird); Tr. at 857 (Miessner).

Respondent and Mr. Jackson made the decision to sell the loans in question.  2015 Tr. 1621-1622, 1691-1693 (Jackson); 2015 Tr. at 1766 (Calcutt); Joint Stipulation ¶ 36.  In late September 2010, the Bank repurchased each of the Nielson Loans that had been sold prior to the examination.  Joint Stipulation ¶ 38.  At the time of repurchase, the loans were delinquent and past maturity.  *Id.*  The Bank's 2011 ROE cited the repurchase transaction as a violation of the Federal Reserve Act because the Bank was acquiring low quality assets from affiliates despite the borrowers' lengthy history of financial problems and delinquent loan payments.  FDIC Exh. 48, at 27-29; 2015 Tr. at 163 (O'Niell).

- **2010 Officer's Questionnaire**.  In preparation for its 2010 examination of the Bank, the FDIC required Respondent to complete an Officer's Questionnaire.  The first question requested a list of "all extensions of credit and their corresponding balances which, since the last FDIC examination, have been renewed or extended . . . without full collection of interest due[,] [or],  with acceptance of separate notes for the payment of interest."  FDIC Exh. 18, at 2.  Respondent answered, "None to the best of my knowledge."  *Id.*; Answer ¶ 79.  That response was false because, through the Bedrock Transaction, loan proceeds were "used specifically to make interest payments on . . . all of the entities' loans within that relationship."  Tr. at 745

(Miessner).  Question 3 required Respondent to "[l]ist all extensions of credit made for the accommodation or direct benefit of anyone other than those whose names appear either on the note or on other related credit instruments."  FDIC Exh. 18, at 2.  Respondent answered, "None to the best of my knowledge."  *Id.*  This answer also was false because the Bedrock Loan was made for the benefit of other Nielson Entities.  Tr. at 746 (Miessner).  Respondent conceded that his answers to Questions 1 and 3 were incorrect, but he asserted that the misstatements were "inadvertent[] and unintentional[]."  Tr. at 1311 (Calcutt).

- **September 14, 2011 Meeting with Examiners**.  On September 14, 2011, FDIC and Michigan examiners met with Respondent and other Bank officials to discuss a number of issues, including the Bedrock Loan.  Tr. at 1334-35 (Calcutt); FDIC Exh. 110.  During the meeting, the examiners asked Respondent to describe his understanding of how the proceeds of the $760,000 Bedrock Loan were to be used.  Respondent told them that Bedrock had purchased Team Services, which had been a Bedrock customer, and that "Bedrock then needed working capital, which was what the loan was for."  JT. Exh. 11, at 3.  Respondent's explanation was false because he knew that the Bedrock Loan was not going to be used for working capital in connection with an acquisition but, rather, to make payments on the Nielson Loans.  Joint Stipulation ¶¶ 14, 16.

During the September 14 meeting, the examiners also asked Respondent to state when the Bank released the Pillay Collateral and to identify the purpose for which the funds were to be used.  Respondent answered, "I thought we still had them."  JT. Exh. 11, at 4; 2015 Tr. at 591-92 (O'Niell).  That statement also was false.  Respondent authorized the release of $600,000 in Pillay Collateral in December 2009 and he authorized the release of an additional $690,000 in December 2010.  Tr. at 623-24 (Smith); Joint Stipulation ¶¶ 14, 16; Answer ¶¶ 44, 45.

16

Finally, the examiners asked Respondent where the Nielson Entities obtained the necessary funds to bring current all of their past due loans in December 2010. JT. Exh. 11, at 4. Respondent had authorized the release of $690,000 of the Pillay Collateral in December 2010 so that the Nielson Entities could bring their loans current. Answer ¶¶ 44, 45. Nevertheless, Respondent falsely told the examiners that the Nielson Entities satisfied the arrearages using "[t]heir vast resources between oil, gas, and rentals." JT. Exh. 11, at 4. While testifying during the 2015 hearing, Respondent admitted that his statement was untrue. 2015 Tr. at 1794-95 (Calcutt).

**Inaccurate Call Reports**. The Bank's 2011 ROE noted that the Bank's Call Reports from December 2009 forward were misstated because they failed to appropriately report the Nielson Loans as nonaccrual since December 2009 and they failed to analyze these loans for impairment, "result[ing] in a material overstatement in earnings both in the form of falsely inflated interest income and of grossly understated provision expense." FDIC Exh. 48, at 42. The 2011 ROE explains that the "Nielson relationship should have been reported as nonaccrual on quarterly Call Reports beginning no later than December 2009 with no interest income recognized subsequent to the payments made in August 2009. *Id.* Respondent signed each of the Call Reports in question. 2015 Tr. at 1724, 1757 (Calcutt). He claimed that he had no involvement in preparing them, Tr. at 1300 (Calcutt); 2015 Tr. at 1724, 1757 (Calcutt), but Respondent could not delegate his responsibility for ensuring the accuracy of the Call Reports, Tr. at 861-62 (Miessner). As a result of the 2011 examination, the Bank was required to restate its earlier Call Reports going back to December of 2009. 2015 Tr. 1082 (Smith).

17

## V.    ANALYSIS

### A.    A Removal and Prohibition Order is Warranted.

The Board may impose a prohibition order if a preponderance of the evidence shows that Respondent engaged in prohibited conduct (misconduct); the effect of which was to cause the Bank to suffer financial loss or damage, to prejudice or potentially prejudice the Bank's depositors, or to provide financial gain or other benefit to the Respondent (effects); and that Respondent acted with personal dishonesty or a willful or continuing disregard for the safety and soundness of the Bank (culpability).  12 U.S.C. § 1818(e)(1); *Dodge v. Comptroller of Currency*, 744 F.3d 148, 152 (D.C. Cir. 2014) (citing *Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000)). The Board finds that Respondent's actions during the relevant period satisfy each of these three elements and concludes that a prohibition order is warranted.

### 1.    Misconduct

As noted in the Recommended Decision, misconduct under section 8(e) encompasses participation in activity deemed to be an unsafe and unsound banking practice or in breach of a party's fiduciary duty. 12 U.S.C. § 1818(e)(1)(A); R.D. at 122.  The record clearly establishes Respondent's unsafe and unsound practices and breaches of fiduciary duty.

### a.    Unsafe and Unsound Conduct

An unsafe or unsound banking practice is one that is "contrary to generally accepted standards of prudent operation" whose consequences are an "abnormal risk of loss or harm" to a bank.  *Michael v. FDIC*, 687 F.3d 337, 352 (7th Cir. 2012); *see also Seidman v. Office of Thrift Supervision*, 37 F.3d 911, 932 (3d Cir. 1994) ("imprudent act" posing an "'abnormal risk of [financial] loss or damage to an institution, its shareholders, or the agencies administering the insurance funds'" is an unsafe and unsound practice) (citation omitted).  Because of their inherent danger, breaches of fiduciary duty also constitute unsafe and unsound practices.  *See*

18

*Hoffman v. FDIC*, 912 F.2d 1172, 1174 (9th Cir. 1990). As noted in the Recommended Decision, the record in this matter overwhelmingly establishes that Respondent engaged in numerous unsafe or unsound practices while serving as the Bank's President and CEO.

i.    Violations of the Commercial Loan Policy ("CLP")

Extending credit in violation of the institution's loan policy constitutes an unsafe or unsound practice. *See Matter of Haynes*, FDIC-11-370e, 11-371k, 2014 WL 4640797 (July 15, 2014); *Matter of Stephens Security Bank*, FDIC-89-234b, 1991 WL 789326 (Aug. 9, 1991); *see also Matter of * * * Bank (Insured State Nonmember Bank)*, FDIC-87-203b, 2 FDIC Enf. Dec. ¶ 5120.3 (1988) (upholding FDIC examiner's classification of two loans that, in violation of the Bank's loan policy, were not collateralized). In violation of Section 13 of the CLP, Respondent approved the Bedrock Transaction without performing (or even reviewing) a written analysis of the net income available to service the debt and without obtaining an appraisal or other evidence from third parties supporting the collateral value of the security. *See* Section IV.E, *supra*. In violation of Section 3 of the CLP, Respondent authorized and funded the Bedrock Loan without securing the approval of a two-thirds majority of the Board, notwithstanding the fact that the Nielson relationship already exceeded 25 percent of the Bank's Tier 1 capital. *See id.* And in violation of Section 12 of the CLP, Respondent did not solicit or obtain personal guarantees from any of the Nielson family members, nor did he document his rationale for failing to do so. *See id.* ALJ McNeil found Respondent's explanations and justifications for these acts and omissions to be insubstantial as a matter of law and belied by the greater weight of the evidence. *See id.*

ii.    Imprudent Lending Practices

Even if the CLP did not establish minimum requirements for the approval of commercial loans, Respondent's management of the Nielson borrowing relationship entailed numerous acts and omissions that consistently have been found to be unsafe or unsound lending practices. For

19

example, extending credit without adequate credit analysis, extending credit without evaluating the borrower's ability to repay the loan, extending credit without assessing the value of the collateral, extending credit to pay off past due loans, and capitalizing unpaid interest (*i.e.*, extending additional credit for the amount of interest owed when loans are renewed), all have been determined to be unsafe or unsound practices. *See First State Bank of Wayne Cty. v. FDIC*, 770 F.2d 81, 82 (6th Cir. 1985) (recognizing that "extending unsecured credit without first obtaining adequate financial information" and "extending secured credit without obtaining complete supporting documentation" constitute unsafe and unsound practices); *Gulf Fed. Sav. & Loan Ass'n v. FHLBB*, 651 F.2d 259, 264 (5th Cir. 1981) (concluding, based on the legislative history of section 1818(e), that "disregarding a borrower's ability to repay" is an unsafe and unsound practice); *Matter of Grubb*, FDIC-88-282k & 89-111e, 1992 WL 813163, at *29 (Aug. 25, 1992) (approving loans without determining the borrower's ability to repay constitutes an unsafe and unsound practice); *Matter of * * * Bank (Insured State Nonmember Bank)*, FDIC-85-42b, 1 FDIC Enf. Dec. ¶ 5062.3 (1986) (recognizing that "[i]mprudent practices include ... the propensity to permit borrowers to capitalize unpaid interest, that is to extend additional credit for the amount of interest owed when loans are renewed"); *Matter of Stephens Security Bank*, FDIC-89-234b; 1991 WL 789326 (Aug. 9, 1991) (capitalizing interest and failing to adequately analyze and document loan transactions are unsafe or unsound practices).

As discussed above, and as described in greater detail in the Recommended Decision, Respondent jeopardized the safety and soundness of the Bank by failing to properly manage the risks posed by the Nielson borrowing relationship. Respondent allowed the Nielson relationship to grow from approximately $31 million in 2008 to approximately $36 million in 2009, even though it already was the Bank's largest borrower. JT. Exh. 2, at 38; Joint Stipulation ¶ 11. In the summer of 2009, the Nielsons informed Respondent that they were in financial distress and

that many of the Nielson Entities would be unable to continuing making loan payments.  R.D. at 19-21.  A prudent lender would have investigated the matter, but when the Nielsons offered to provide their financial information to the Bank, Respondent, remarkably, declined their offer.  R.D. at 21.  In September 2009, all the Nielson Entities stopped paying their loans.  R.D. at 20 (citing Tr. at 937 (Nielson)). Once the Nielson Loans were 90 days past due, as many of them were by November 30, 2009, they should have been placed on non-accrual status, Tr. at 1377 (Calcutt), and a prudent lender would have begun collection efforts, Tr. at 1296 (Calcutt).

Respondent did not begin collection efforts.  He testified that he had every confidence that the Nielson Entities would pay off their loans in full, explaining that he felt certain that the Nielsons "did have the funds" and that they were merely "posturing."  R.D. at 23 (quoting Tr. 1296 (Calcutt)).  Instead of calling their bluff, however—by, among other things, reviewing the financial records they offered to provide—Respondent approved an additional loan to Bedrock Holdings in the amount of $760,000 and he authorized the release of Pillay Collateral worth $600,000.  Answer ¶¶ 17, 18, 20.  Again, prior to approving the Bedrock Transaction, Respondent did not perform or review any analysis of the Nielson Entities' ability to repay their loans, he did not obtain appraisals of the collateral securing the loans, and he did not obtain personal guarantees from any of the Nielson Entities' principals.  Respondent's acts and omissions were unsafe or unsound by any standard.

### iii.    Efforts to Mislead Regulators

It is well settled that concealing information from bank examiners and attempting to mislead them constitute unsafe or unsound practices.  *See Dodge v. Comptroller of Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014) (misrepresenting bank's financial condition to regulators was unsafe or unsound practice); *Lindquist & Vennum v. F.D.I.C.*, 103 F.3d 1409, 1417 (8th Cir. 1997) (recognizing that lying to bank examiners is an unsafe or unsound practice); *De La Fuente*

21

*II v. FDIC*, 332 F.3d 1208, 1224 (9th Cir. 2003) (failing to disclose information concerning problem loans is an unsafe or unsound practice).

As summarized above, and as described in greater detail in the Recommended Decision, the record in this matter confirms that Respondent repeatedly concealed material information about the Nielson Loans from the Bank's regulators. *See* Section IV.G, *supra*; R.D. at 38-39, 41-49, 73-81. Among other deceptive acts and omissions, Respondent failed to inform the examiners that the Nielson Entities had stopped making loan payments in September 2009 and again in September 2010; he arranged for the Bank to sell some of the Nielson loans to affiliate banks shortly before the examiners arrived to conduct the 2010 examination, and he arranged for the Bank to repurchase the loans shortly after the examiners left; he directed the Nielsons to disburse the proceeds of the Bedrock Loan to individual Nielson principals instead of making distributions to other Nielson Entities and recording them as inter-company loans; he made misleading statements to examiners during meetings and in his response to the 2010 Officer's Questionnaire, and he caused the Bank to file inaccurate Call Reports that later had to be amended. *See* Section IV.G, *supra*. An FDIC examiner testified that "through his actions of concealing facts about the Nielson Loans, [Respondent] did materially obstruct our ability to effectively supervise an examination in the institution." Tr. at 808 (Miessner).

Respondent attempted to avoid responsibility for the false and misleading statements he made and the deceptive actions he took by attributing them to a failure of memory, inadvertence, or to his reliance on other Bank employees. *See* Tr. at 1300, 1308 (Calcutt); R.D. at 36 (citing Respondent's testimony). ALJ McNeil did not find Respondent's explanations to be credible or legally sufficient, R.D. at 42, 73-77, 84-85, 99-101, and the Board also is unpersuaded. To the extent Respondent sought to lay the blame on other Bank employees, such deflection is not a colorable defense. *See Matter of Leuthe*, FDIC-95-15e, 95-16k, 1998 WL 438324, at \*39 (Feb.

22

**A022**

13, 1998) (explaining that "abdication of duty by directors to officers is not a defense," and that "Respondent's duty as a board member, and particularly as Chairman of the Board, was to monitor the activities of bank management, to ensure compliance with laws, regulations, cease and desist orders and the Bank's own loan policy").

### c.    Breach of Fiduciary Duty

As President and CEO, Respondent owed a duty of care, a duty of loyalty, and a duty of candor to the Bank. *See Seidman*, 37 F.3d at 933. At their most basic, these duties include an obligation to act in good faith and in the best interests of the Bank. *See Matter of \*\*\**, FDIC-85-356e, 1988 WL 583064, at \*9 (Mar. 1, 1988). As President and CEO, Respondent was also required to adequately supervise his subordinates. *Id.* "The greater the authority of the director or officer, the broader the range of his duty; the more complex the transaction, the greater the duty to investigate, verify, clarify and explain." *Matter of \*\*\**, 1988 WL 583064, at \*9; *Matter of Baker*, FDIC-92-86e, 1993 WL 853599 (July 27, 1993). The duty of candor requires a corporate fiduciary to disclose "everything he knew relating to the transaction," even "if not asked." *De La Fuente II v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003) (fiduciary duty breached by failure to disclose relevant information to bank's board of directors when it was considering a loan even though the bank's board did not ask); *Michael*, 687 F.3d at 350; *Seidman*, 37 F.3d at 935 n.34.

### i.    Duty of Care

The record in this case establishes that during the relevant period, Respondent engaged in multiple breaches of his duty of care by failing to properly manage the Bank's relationship with the Nielson Entities and by failing to ensure the employees who worked directly for him were not engaging in unsafe or unsound practices in connection with the Nielson Loans. In the summer of 2009, Cori Nielson informed Respondent and others at the Bank that the Nielson

23

Entities were having financial difficulties and that they would not be able to continue paying all of their loans. *See* Section IV.C, *supra.* In September 2009, all of the Nielson Entities stopped paying their loans, and by the end of November, many of the loans were at least 90 days past due. *See* Section IV.D, *supra.* Instead of initiating collection efforts, Respondent authorized the Bedrock Transaction, which increased the Bank's exposure to what already was its largest borrower relationship. *See id.* While negotiating the Bedrock Transaction with the Nielsons, Respondent failed to comply with the Bank's loan policy. Specifically, he did not perform any credit analysis, he did not secure the approval of the Bank's board, and he did not obtain personal guarantees from the Nielson Entities' principals. *See* Section IV.E, *supra.* Respondent did not demonstrate a higher level of care and attention when the Nielson Entities stopped paying their loans again in September 2010. Without making any effort to evaluate the Nielson Entities' ability to service their loans, Respondent authorized the renewal of all of their loans, the release of additional Pillay Collateral, and granted them lower interest rates and other concessions. *See* Section IV.F, *supra.*

Respondent attempted to shift responsibility for the mishandling of the Nielson Loans onto his subordinates, including Mr. Green (the lender assigned to the Nielson relationship) and the Credit Administration department. *See*, *e.g.*, Tr. at 1281, 1304-05 (Calcutt) (arguing that Mr. Green and the Credit Administration department were responsible for reviewing the Nielson Entities' financial statements); Tr. at 1353 (Calcutt) (denying that he had any responsibility for ensuring that the Bank's loan files were maintained in a safe and secure manner despite having previously admitted that this was his responsibility during the first evidentiary hearing in 2015); Tr. at 1270 (Calcutt) (arguing that overall responsibility for regulatory compliance rested with a number of people in the Commercial area, Credit Administration, and the individual lenders). Even if one were to accept the premise that certain of these activities were not Respondent's

direct responsibility, Respondent's duty of care obligated him, at a minimum, to ensure that his subordinates were handling these tasks in a competent and careful way. The record amply shows that Respondent failed to do even that much.

ii.    <u>Duty of Candor</u>

Respondent breached his duty of candor by failing to provide the Bank's board with timely, accurate, and complete information about the status of the Nielson Loans. Given their concentration of credit, the Nielson Entities represented the Bank's largest borrower relationship. When the Nielsons announced in the summer of 2009 that they were having financial difficulties that would prevent their companies from making loan payments, the problem was a big one for the Bank, and Respondent should have disclosed it to the Bank's board. Instead he kept silent. Tr. at 778-79 (Miessner) (Bank board members stated that they were not aware of the problems with the Nielson Loans described in the 2010 ROE); Tr. at 1026-27 (Byl) (stating that, prior to March 2010, no one discussed the Nielson Loans at any of the Bank board meetings he attended, nor did anyone speak with him individually about them); FDIC Exh. 48, at 40 (concluding that "management has actively concealed the accurate condition of [the Nielson] relationship from regulators and from the Bank's board through the failure to maintain complete loan files and through false or misleading verbal and written statements"). When the Nielson Entities stopped paying their loans in September 2009, Respondent did not inform the Bank's board. *See id.* When many of the Nielson Loans became more than 30 days past due, Respondent failed to inform the Bank's board. *See id.* These are all violations of Respondent's duty of care and candor. *See De La Fuente II*, 332 F.3d at 1222 (recognizing that the duty of candor requires a corporate fiduciary to disclose "everything he knew relating to the transaction," even "if not asked"); *Matter of Massey*, FDIC-91-211e, 1993 WL 853749, at *11 (May 24, 1993) (concealment of information from bank's loan committee constituted breach of fiduciary duty).

25

Respondent's lack of candor in connection with the Bedrock Transaction was particularly egregious. The transaction required Bank board approval, but Respondent did not seek it. In March 2010, months after the new Bedrock Loan had been funded, the Pillay Collateral released, and the original $4.5 million loan to Bedrock renewed, Respondent approved a Bank board presentation concerning the Bedrock Transaction that was materially misleading. In particular, the document did not inform the Bank's board that, in violation of the CLP, the Bank already had consummated the transaction. In addition, the presentation falsely stated that the proceeds of the Bedrock Loan would be used for "working capital" when, as Respondent well knew (having negotiated the transaction with the Nielsons), the funds would be routed to the other Nielson Entities so that they could make payments on their loans. Third, the presentation failed to disclose that all of the Nielson Entities had stopped paying their loans in September 2009 and had refused to resume making payments unless the Bank entered into the Bedrock Transaction. These facts were material, and Respondent's failure to disclose them to the Bank's board was a breach of his duty of candor. *See, e.g.*, *Matter of \*\*\**, 1988 WL 583064, at *9.

### 2.    Effects

To show that misconduct had the required "effect" to impose a prohibition order, the evidence must establish that (1) the bank "has suffered or will probably suffer financial loss or other damage;" (2) the interests of the bank's depositors "have been or could be prejudiced;" or (3) the respondent "received financial gain or other benefit" from his misconduct. 12 U.S.C. § 1818(e)(1)(B)(i)-(iii). An actual loss is not required; a potential loss is sufficient so long as the risk of loss to the Bank was "reasonably foreseeable" to someone in Respondent's position. *See Pharaon v. Bd. of Governors*, 135 F.3d 148, 157 (D.C. Cir. 1998); *De La Fuente II*, 332 F.3d at 1223; *Kaplan v. Office of Thrift Supervision*, 104 F.3d 417, 421 (D.C. Cir. 1997). There may be more than one cause of harm to a bank; an individual respondent need not be the proximate

26

cause of the harm to be held liable under section 8(e).  *See Landry*, 204 F.3d at 1139 (explaining that the fact that other IAPs may have been "more guilty" does not absolve respondent from responsibility for his actions); *Matter of Adams*, 1997 WL 805273, at *5 (recognizing that "multiple factors, and individuals, may contribute to a bank's losses," and that a respondent cannot escape liability simply because others have contributed to the bank's loss as well).

The Board finds ample evidence in the record to support a determination that, as a result of Respondent's misconduct, the Bank suffered or likely will suffer financial loss or other damages, and that Respondent received gain or other financial benefit from his misconduct. First, the Bank recorded a $30,000 charge-off against the $760,000 Bedrock Loan as of July 31, 2012.  R.D. at 88 (citing FDIC Exh. 81, at 70).  Respondent argues in his Exceptions that "a $30,000 charge-off does not mean that the Bank 'has suffered' a financial loss" within the meaning of 12 U.S.C. § 1818(e)(1)(B).  R. Exceptions, at 133.  But the Board previously has held that loan charge-offs represent a loss to the bank as a matter of law.  *See Matter of Leuthe*, FDIC-95-15e, FDIC-95-16k; 1998 WL 438323, *15 (June 26, 1998); *Matter of Sunshine*, 1 P-H FDIC Enf. Dec. (Bound) at A-581-2 (Aug. 19, 1985).  As a fallback, Respondent contends that ALJ McNeil violated his procedural rights by failing to tether the $30,000 charge-off (and other actual and potential losses) to specific acts of misconduct by Respondent.  R. Exceptions, at 133. The Board is unpersuaded.  The $760,000 Bedrock Loan was one of the main focuses of the 2019 hearing, and the Recommended Decision described at length Respondent's multiple acts of misconduct in approving the loan.  *See* R.D. at 5-6, 14, 36-38, 59-63, 69-70, 75-77, 111-12, 123.

The Recommended Decision found that Respondent's misconduct also caused the Bank to suffer $6.443 million in losses on other Nielson Loans.  R.D. at 4-5; FDIC Exh. 48 (2011 ROE), at 43, 52, 83-93, and 124; Tr. at 147-48 (Berden).  Respondent argues that the $6.443 million in losses on Nielson Loans should not be held against him because the amount merely

represents charge-offs that the FDIC "ordered the Bank" to recognize following the 2011 examination. R. Exceptions at 135. According to Respondent, the charge-offs do not necessarily equate to an "amount owed to the Bank that it was unable to collect from the Neilson [sic] Entities." *Id.* The Board is unpersuaded by this contention. First, as discussed above, the Board has recognized that loan charge-offs constitute a loss to the Bank as a matter of law. Second, Respondent's argument—that charge-offs do not represent losses—leads to the absurd result that banks may avoid losses, and bankers may avoid the consequences for making unsafe and unsound loans, through the simple expedient of not charging off uncollectible loans. At the end of the day, examiners' decision to classify loans as loss is an expert judgment that receives significant deference from the Board and from the courts. *See Sunshine State Bank v. FDIC*, 783 F.2d 1580, 1584 (11th Cir. 1986). Given that the Nielson Loans have been in default since January 2011, Joint Stipulation ¶ 29, Respondent has not presented the Board with any colorable justification for second-guessing the examiners' classifications of the Nielson Loans.

A portion of the $6.443 million in losses could have been avoided had Respondent not released the $1.2 million in Pillay Collateral that secured some of the loans. Specifically, in 2011, $190,000 of the Bank's loans to a Nielson entity called AuSable LLC were classified as loss, as were $712,000 of the Bank's loans to Moxie, LLC, another Nielson entity. FDIC Exh. 48, at 83, 90. The AuSable and Moxie loans were secured by the Pillay Collateral. R.D. at 4-5, 49-51 (citing FDIC Exh. 3, at 59; Tr. 155 (Berden); Resp. Exh. 3). Thus, had Respondent not authorized the release of Pillay Collateral, it would have been available to mitigate the Bank's losses on the AuSable and Moxie loans. Respondent calls this conclusion "specious[]," arguing that because the Bank *received* the proceeds of the Pillay Collateral when other Nielson Entities used the funds to make loan payments, it necessarily follows that the release of the Pillay Collateral could not have caused the Bank to *lose* money. Although Respondent's argument has

28

a certain superficial appeal, the fact remains that the Bank suffered losses on the AuSable and

Moxie loans that it could have mitigated if the Pillay Collateral had not been released.  The

AuSable and Moxie losses are sufficient to satisfy the effects element.

ALJ McNeil found that the effects prong also was satisfied by evidence showing that

Respondent's misconduct in connection with the Bedrock Transaction caused the Bank to incur

other damages in the form of investigative and auditing expenses.  *See* R.D., Findings of Fact 4.a

& 4.b; R.D. at 5 & nn.20, 21; R.D. at Part II, Sections 5.P–V; Conclusion of Law 6; R.D. at 122.

Respondent initially objects to this finding on the ground that "there are no allegations in the

Notice that Respondent caused 'other damage' to the Bank."  R. Exceptions at 138.  In fact,

however, the Notice specifically alleges that Respondent's misconduct caused the Bank to

"suffer[] significant investigation expense costs and defense costs," Notice ¶ 113, including the

retention of a "third-party consulting firm," *id.* ¶ 114, and "nearly $1.7 million in legal fees and

expenses," *id.* ¶ 115.  At the 2019 hearing, FDIC Enforcement Counsel introduced evidence

showing that the Board hired the regional CPA firm of Plante & Moran to perform an

"independent loan review of the Nielson relationship," Tr. at 588, 590 (Smith) & FDIC Exh. 77,

which cost $281,121, Tr. at 610-614 (Smith) & FDIC Exh. 116, at 1.  In addition, FDIC

Enforcement Counsel established that the Bank paid $171,122 to the Kus, Ryan law firm for

legal services provided to the Bank with respect to regulatory issues involving the Nielson

Loans.  Tr. at 610-614 (Smith) & FDIC Ex. 116, at 1.  Respondent cannot claim to have been

surprised that these expenses would be used to establish that the Bank suffered losses as a result

of his misconduct; after all, the same evidence was introduced during the 2015 hearing for the

same purpose.  Furthermore, when the evidence was offered during the 2019 hearing,

Respondent did not object that the Plante & Moran and Kus, Ryan expenses were outside the

scope of the Notice.  *See* 12 C.F.R. § 308.20(b) ("When issues not raised in the notice or answer

29

are tried at the hearing by express or implied consent of the parties, they will be treated in all respects as if they had been raised in the notice or answer, and no formal amendments are required.").

Respondent also contends that the investigative expenses and legal fees incurred by the Bank "were caused directly by the Consent Order issued by the FDIC and the threats of Civil Money Penalties made by the FDIC to the Bank's board and not by any lack of candor by the Respondent." R. Exceptions, at 139-140. But the Consent Order, by its terms, required only that the Bank commission a management study, *see* FDIC Exh. 70, at 5-7, a project undertaken by the FinPro firm, *see* Tr. at 594-95 (Smith) & FDIC Exhs. 83-84. The Consent Order did not require the Bank to hire a CPA firm to perform a loan review nor did it mandate the retention of counsel. The Board previously has recognized that similar types of professional fees constitute losses within the meaning of Section 8(e). *See Matter of Shollenburg*, FDIC-00-88e; 2003 WL 1986896, at *12 (Mar. 11, 2003) (concluding that additional auditing costs and fees paid to tax consultants as a result of the Respondent's misconduct were cognizable losses). The Board rejects Respondent's reliance on *Matter of Proffitt*, 1998 WL 850087, at *10 n.11 (Oct. 6, 1998), for the proposition that the expenses incurred by the Bank "are not legally cognizable as effects because they are simply the normal cost of investigating conduct that has not yet been determined to be wrongful." R. Exceptions, at 140. In that matter, the Board explained that the payment of legal fees "standing alone cannot be assumed to be enough to support a removal action" because legal fees presumptively are a normal cost of doing business. *Matter of Proffitt*, 1998 WL 850087, at *9 n.11 (Oct. 6, 1998). That presumption of regularity drops away, however, when the legal fees are coupled with other "non-neutral indicia of loss." *Id.* Here, the legal fees incurred by the Bank were accompanied by other losses, including the fees of a CPA firm (an expense that was not a normal business expense for the Bank) and loan charge-offs.

The applicable test, as Respondent is the first to point out, is that the "effect be a reasonably foreseeable consequence of the misconduct."  R. Exceptions, at 139 (citing cases).  In the criminal law context, courts applying the felony murder rule have not hesitated to find that it is reasonably foreseeable to a common criminal that when an armed robbery occurs, the police may be called to investigate, the intended victim of the crime may resist, and someone may be fatally shot in the ensuing fracas.  *See Santana v. Kuhlmann*, 232 F. Supp. 2d 154, 158 (S.D.N.Y. 2002) (concluding that the evidence was sufficient to support felony murder conviction notwithstanding the fact that "neither the defendant nor his co-defendant fired the gun that killed the police officer"); *Dixon v. Moore*, 318 Fed. Appx. 316, 319 (6th Cir. 2008) (unpublished) ("[e]very robber or burglar knows when he attempts his crime that he is inviting dangerous resistance," and therefore, the death of the appellant's accomplice at the hands of the putative victim "was a natural, logical, and reasonably foreseeable consequence of the armed robbery that Dixon and Lightfoot were committing at the time, when viewed in the light of ordinary human experience").  "As every bank director should reasonably be aware, federal and state regulation of the banking industry is intense," requiring banks to "constantly be dealing with the government and with government inquiries."  *Gimbel v. FDIC*, 77 F.3d 593, 600 (2d Cir. 1996).  Furthermore, every banker is "deemed to understand that if his bank becomes insolvent or is operated in violation of laws or regulations," the regulators not only will investigate but also may seize control of the institution.  *Branch v. U.S.*, 69 F.3d 1571, 1575 (Fed. Cir. 1995).  If it is foreseeable to a robber that his crime may result in the death of an innocent person, surely it was foreseeable to Respondent—the President and CEO of a bank—that his misconduct might trigger an investigation that in turn would cause the Bank to incur professional fees.

ALJ McNeil determined that the effects requirement was satisfied for the independent reason that Respondent received a financial benefit from his misconduct in the form of dividends

that would not have been paid, or which would have been reduced in amount, if the true condition of the Nielson Loans had been properly reported.  For example, the funds disbursed through the Bedrock Transaction and the second release of Pillay collateral artificially increased the Bank's earnings and resulted in the issuance of a dividend to the Bank's holding company in 2011 that otherwise would not have been warranted.  Tr. at 783-87, 895 (Miessner); FDIC Exh. 48, at 65; FDIC Exh. 105, at 9.  Respondent, as a large shareholder in the holding company, benefited from the payment of this dividend.  Tr. at 895 (Miessner)

In sum, the Board concurs with ALJ McNeil's determination that the Bank suffered losses and Respondent derived personal benefits as a result of Respondent's misconduct.

### 3.    Culpability

Culpability, for purposes of section 1818(e), can be shown by "personal dishonesty" or a "willful or continuing disregard" for the safety and soundness of the financial institution.  12 U.S.C. § 1818(e)(1).  "Personal dishonesty" can be established through evidence that an IAP disguised wrongdoing from the institution's board and regulators, or failed to disclose material information.  *See Dodge v. Comptroller of Currency*, 744 F.3d 148, 160 (D.C. Cir. 2014) (citing *Landry*, 204 F.3d at 1139-40; *Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 171 (2d Cir. 1992); *Van Dyke v. Bd. of Governors of the Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir. 1989)).  "Willful disregard" is "deliberate conduct that exposes 'the bank to abnormal risk of loss or harm contrary to prudent banking practices.'"  *Michael*, 687 F.3d at 352 (quoting *De La Fuente II*, 332 F.3d at 1223).  "Continuing disregard" is "conduct that has been 'voluntarily engaged in over a period of time with heedless indifference to the prospective consequences.'"  *Id*. at 353 (quoting *Grubb v. FDIC*, 34 F.3d 956, 962 (10th Cir. 1994)).  "Although inadvertence alone is not sufficient to establish culpability, recklessness suffices."  *Id*.

32

(citation omitted).  An IAP "cannot claim ignorance by turning a blind eye to obvious violations of his statutory and fiduciary duties."  *Id*. at 352.

ALJ McNeil made the following findings with respect to Respondent's personal dishonesty:

> Respondent persistently concealed from both the Bank's Board and its regulatory examiners the true common nature of the Nielson Entities Loan portfolio, problems with that portfolio, and Respondent's efforts in dealing with the Nielson Family's decision to stop making payments on the loans in that portfolio, first in 2009, then in 2010, and finally in 2011. Respondent falsely answered questions presented to him during examinations in 2009, 2010, and 2011, concealed documents showing the true condition of the loans during that period, and falsely testified that Board members had been fully apprised of the nature of the Nielson Loan portfolio.

> Respondent envisioned and then implemented the means by which proceeds apparently earmarked for the Bedrock Fund LLC would in fact be distributed to multiple Nielson Entities, using bookkeeping protocols that would withhold from the Bank's own auditors and its examiners the true common nature of the Entities and their loan portfolio.

R.D. at 6.  The Board concludes that these findings are well supported by the testimony and exhibits in the record.

Respondent's exceptions to these findings are not well taken.  For example, Respondent admits that he advised the Nielsons to "upstream" payments to the principals of other Nielson Entities instead of reporting inter-company transfers on the companies' respective books.  R. Exceptions, at 146-147.  Respondent argues that because he made this recommendation in April 2008, it could not have been his intention to mask how the Nielson Entities distributed the proceeds of future transactions with the Bank, such as the 2009 Bedrock Transaction.  *See id.* The fact that this was a standing instruction to the Nielsons, rather than a directive specific to the Bedrock Transaction, is immaterial.  Respondent also renews his arguments that the misstatements and acts of concealment attributed to him were either unintentional or the fault of other bank personnel on whom Respondent relied.  *See id.* at 145-154.  ALJ McNeil determined

33

that Respondent's testimony in support of these points was not credible and was squarely
contradicted by other record evidence.  The Board reaches the same conclusion.

The Board also finds that Respondent's behavior exhibited willful and continuing
disregard for the safety and soundness of the Bank.  During the relevant period, Respondent took
steps to conceal the interrelatedness and the precarious financial condition of the Nielson Entities
from the Bank's board, thereby frustrating its efforts to perform its oversight role.  Similarly,
Respondent actively concealed the same information from the examiners, thereby obstructing
them from performing their supervisory role.  In violation of the Bank's CLP, Respondent
authorized the release of Pillay Collateral and the disbursement of the Bedrock Loan without first
obtaining the approval of a 2/3rd majority of the Bank's board.  This course of conduct, spanning
a period of years, undertaken by the President and CEO of the Bank, constitutes a continuing and
willful disregard for the safety and soundness of the Bank.

### B.    The CMP Assessment is Appropriate.

The ALJ recommended a second tier CMP of $125,000,[3] and the Board concludes that
the evidence in the record supports a CMP in that amount.  Respondent has not taken exception
to the amount of the CMP, arguing only that there is no legal basis for a CMP order for the same
reasons that there is no legal basis for a prohibition order.  R. Exceptions, at 156-58.  The Board
rejects that argument for the reasons set forth previously.

A second tier CMP may be imposed against a party who (1) commits any violation of
law, regulation, or certain orders or written conditions imposed by regulators; (2) recklessly
engages in an unsafe or unsound practice in conducting the affairs of the institution; or (3)
breaches any fiduciary duty, and whose "violation, practice, or breach . . . is part of a pattern of
misconduct; causes or is likely to cause more than a minimal loss" to the institution; or "results

---

[3] *See* R.D. at 125.

34

**A034**

in pecuniary gain or other benefit" to the party. 12 U.S.C. § 1818(i)(2)(B).  The FDI Act

authorizes up to $25,000 for each day the violation, practice, or breach continues, subject to

adjustments for inflation.  12 U.S.C. § 1818(i)(2)(B); 12 C.F.R. § 509.103.

The Board already has discussed Respondent's breaches of fiduciary duty and unsafe or

unsound banking practices, as well as the effects of those acts and omissions.  Respondent is

subject to a second tier CMP as a result of his breaches of fiduciary duty.  Although the breaches

of fiduciary duty standing alone would be sufficient to support the recommended CMP, the

Board also finds that Respondent's unsafe and unsound practices were committed recklessly,

providing an independent basis to support a second tier CMP.

Recklessness is established by acts committed "in disregard of, and evidencing conscious

indifference to, a known or obvious risk of a substantial harm."  *Cavallari v. OCC*, 57 F.3d 137,

142 (2d Cir. 1995); *see also Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1425 (9th Cir.

1994) (similar definition of "reckless[ness]").  Conduct that demonstrates willful or continuing

disregard under Section 8(e) has been held to satisfy the recklessness requirement.  *See Dodge*,

744 F.3d at 162.  For the reasons set forth previously, the Board finds that Respondent's conduct

reflected a willful or continuing disregard for the safety and soundness of the Bank.

Because Respondent's misconduct persisted throughout the relevant period, the $125,000

penalty recommended by the ALJ is well within the authorized limit.  The Board agrees with the

ALJ's analysis of the statutory mitigating factors in 12 U.S.C. § 1818(i)(2)(G), which include:

(1) the gravity of the violation, (2) history of previous violations, and (3) the Respondent's

financial resources and lack of good faith.  R.D. at 7.  The gravity of the violations and

Respondent's efforts to conceal them support a significant CMP, and the record does not support

a finding that Respondent acted in good faith.  The Board therefore adopts the ALJ's

recommendation of a $125,000 CMP.

**C.    Respondent's Remaining Exceptions**

Respondent has challenged virtually every aspect of the ALJ's findings of fact and legal conclusions.  The Board has addressed many of Respondent's exceptions in the relevant sections above and concludes that they lack merit or have no impact on the Board's decision.  The Board also is unpersuaded, as discussed below, by Respondent's remaining exceptions.  Any exceptions not addressed here or previously are denied.

**1.    The ALJ Is Not Improperly Shielded from Removal.**

Respondent argues that the ALJ is unconstitutionally shielded from removal by the President of the United States.  R. Exceptions, at 158-59.  As Respondent recognizes, the Board rejected this argument in *Matter of Sapp*, 2019 WL 5823871 (Sept. 17, 2019).  R. Exceptions, at 158.  Specifically, in *Matter of Sapp*, the Board found:

> In *Lucia*, the Supreme Court remanded the enforcement proceeding to the agency with instructions to reassign the matter to an ALJ directly appointed by the SEC itself—a constitutionally appointed ALJ—and that the ALJ not be the same ALJ who presided over the original proceeding.  *Lucia*, 138 S. Ct. at 2055.  That is precisely what the FDIC did here.  The FDIC Board directly appointed ALJ McNeil and reassigned this matter to him (as noted earlier, a different ALJ had presided over the original hearing). ALJ McNeil then afforded the parties ample time to request a rehearing, which neither party did, and then proceeded to decide the case on the papers.  Regardless of whether or not the *Lucia* decision applies to FDIC-appointed ALJs, the FDIC's actions following *Lucia* are entirely consistent with that opinion.

**\*19**

> Moreover, the ALJ was appointed by a vote of the FDIC Board, the governing body of the FDIC.  The FDIC Board possesses the authority to appoint its ALJs, and the FDIC is not subordinate to or contained within any other component of the Executive Branch.  12 U.S.C. § 1812(a) ("The management of the [FDIC] shall be vested in a Board of Directors …."); 12 U.S.C. § 1819 (prescribing corporate powers, including the power to appoint officers); 5 U.S.C. § 3105 (permitting agencies to appoint their own ALJs). Thus, the FDIC is a "Department" for purposes of the Appointments Clause.  *See Free Enter. Fund*, 561 U.S. at 510-11 (a component of the Executive Branch that is "not subordinate to or contained within any other such component … constitutes a 'Departmen[t]' for the purposes of the Appointments Clause"); 5 U.S.C. § 105 (an "Executive Agency" under Title 5 includes a Government corporation and an independent establishment, such as the FDIC).

*Id.* at *19. Respondent has not shown that *Matter of Sapp* was wrongly decided. Accordingly, the Board rejects Respondent's argument for the reasons set forth in *Matter of Sapp*.

### 2.    The Hearing on Remand Complied with *Lucia*.

After the Supreme Court decided *Lucia*, the Board adopted a Resolution appointing its ALJs and reassigned this case from ALJ Miserendino to ALJ McNeil. Respondent asserts that he was "'entitled' to a 'new hearing' before a constitutionally-appointed ALJ." R. Exceptions, at 164 (quoting *Lucia*, 138 S. Ct. at 2055). Although he was granted a new hearing before ALJ McNeil—who had been appointed by the FDIC Board and who had not presided over the earlier proceeding—Respondent argues that he should have been afforded "the full panoply of procedures for a hearing to which he was entitled the first time," including document discovery and depositions. R. Exceptions, at 164-66. Respondent's primary grievance seems to be that that ALJ McNeil considered his testimony from the 2015 hearing along with that of certain other witnesses, and also considered a joint stipulation of facts that the parties entered into in 2015. *See* R. Exceptions, at 18-24. According to Respondent, ALJ McNeil's consideration of these materials "irreparably tainted Respondent's supposedly new hearing." *Id.* at 20. The Board rejects this argument for three reasons.

*First*, the same argument was presented in *Matter of Sapp* and, as Respondent acknowledges, the Board rejected it there. *See* R. Exceptions, at 162. Respondent has not persuaded us that *Matter of Sapp* was wrongly decided.

*Second*, Respondent previously presented his demand for an entirely new proceeding to ALJ McNeil, who denied it on November 28, 2018. *See* Decision and Order on Interlocutory Review, at 5 (FDIC June 20, 2019). Four months later, Respondent sought interlocutory review of ALJ McNeil's decision, but the Board denied that portion of his motion as untimely. *See id.* at 5-6. Although the Board has discretion to reconsider its previous rulings in the same matter, it

37

exercises that power sparingly in deference to the "strong policy favoring finality" of such rulings. *U.S. v. Adegbite*, 877 F.2d 174, 178 (2d Cir. 1989); *accord LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (observing that "the same issue presented a second time in the same case in the same court should lead to the same result"); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court."). Here, the policy favoring finality weighs against reconsideration of the Board's prior ruling.

*Third*, Respondent's "entirely new proceeding" argument cannot be reconciled with the Federal Rules of Evidence nor the FDIC's own rules. *See* 12 C.F.R. § 308.36(a)(3) (permitting the introduction of evidence that would be inadmissible under the Federal Rules of Evidence so long as it is "relevant, material, reliable and not unduly repetitive"). Respondent complains, for example, that ALJ McNeil discounted his 2019 testimony that he "may have signed" a Call Report "once in a blue moon," by "impermissibly reach[ing] back to Respondent's 2015 testimony" that Call Reports were prepared by others and "simply presented to me for signature." R. Exceptions, at 19. In other words, Respondent contends that he should have been free to present a new and different narrative in 2019, unencumbered by his prior testimony at a hearing where he was under oath and represented by counsel. Respondent emphasizes that he did not consent to the use of his 2015 testimony, R. Exceptions, at 19, but his consent was not required. When a case is remanded for a new trial, it is well established that the defendant may be impeached with his prior testimony and the prior testimony also can be used as substantive evidence against him. *See Harrison v. U.S.*, 392 U.S. 219, 222 (1968) (finding it unnecessary to "question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings"); *U.S. v. Daniels*, 377 F.2d 255, 258 (6th Cir. 1967)

38

("Statements which are contradictory to statements given in an earlier trial or in a deposition are clearly admissible."); *see also Bondie v. Bic Corp.*, 947 F.2d 1531, 1534 (6th Cir. 1991) (recognizing that, under Federal Rule of Evidence 801(d)(2)(A), "a party's own statement offered against the party is, by definition, not hearsay").

Along the same lines, Respondent complains that, over his objection, ALJ McNeil "improperly admitted and relied upon the Joint Stipulation of Fact entered into between Respondent, former respondents Bill Green and Dick Jackson, and Enforcement Counsel prior to the 2015 hearing." R. Exceptions, at 22. Respondent argues that when the Board remanded this matter for a new hearing, it "necessarily" intended that the parties enter into new stipulations. *Id.* No Order of the Board expresses such an intention, however, and Respondent conspicuously fails to cite any authority for the proposition that stipulations of fact entered into before the first trial of a case become inadmissible in the event of a retrial. Federal courts consistently have held to the contrary. *See*, *e.g.*, *U.S. v. Boothman*, 654 F.2d 700, 703 (10th Cir. 1981) (holding that the district court did not abuse its discretion by admitting, over the defendants' objection, a joint stipulation of facts that the parties entered into before the first trial of the case); *U.S. v. Marino*, 617 F.2d 76, 82 (5th Cir. 1980) ("No authority is cited for the proposition that such a stipulation may not be used in a subsequent trial. We find none.").

Next, Respondent takes exception to ALJ McNeil's use of the 2015 testimony of another witness, Michael Doherty, while questioning Mr. Doherty. R. Exceptions, at 21. Respondent does not cite any cases holding that this use of prior testimony was improper, whether ALJ McNeil was refreshing Mr. Doherty's recollection or, as Respondent would have it, cross-examining him. *See id.* Mr. Doherty's prior testimony properly could be used to refresh his recollection or to impeach him. *See Freudeman v. Landing of Canton*, 702 F.3d 318, 329 (6th Cir. 2012) (recounting district court's explanation to the jury that a witness may be referred to

39

**A039**

prior testimony "to refresh the witness's recollection or to impeach the witness's credibility"); *U.S. v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004) (recognizing that Federal Rule of Evidence 613(b) permits the impeachment of a witness by "[e]xtrinsic evidence of a prior inconsistent statement" if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon"); *see also U.S. v. Smith*, 776 F.2d 892, 897 (10th Cir. 1985) (holding that prior inconsistent statement was admissible as substantive evidence Federal Rule of Evidence 801(d)(1)(A) because it was originally given under oath and the witness was subject to cross-examination concerning the statement). In the event of a conflict between Mr. Doherty's 2015 testimony and his 2019 testimony, it would be perfectly reasonable for the finder of fact to give more credence to the former. *See U.S. v. Bigham*, 812 F.2d 943, 946 (5th Cir. 1987) (explaining that the drafters of Federal Rule of Evidence Rule 801 believed that the prior statement of a witness "is more likely to be true as it was made closer in time to the event"); *U.S. v. Distler*, 671 F.2d 954, 959 (6th Cir. 1981) (observing that the Senate, when discussing the adoption of Federal Rule of Evidence Rule 801(d)(1)(A), emphasized the benefits of "allowing the jury to consider testimony given 'nearer in time to the events, when memory was fresher and intervening influence had not been brought into play'") (internal citation omitted).

In sum, the Board finds that Respondent received the new hearing contemplated by the Board's July 19, 2018, Order in Pending Cases.

### 3.    This Proceeding Was Commenced Within the Statute of Limitations.

Respondent argues that this proceeding should be dismissed as untimely because it supposedly was not commenced within the applicable five-year statute of limitations. R. Exceptions, at 166-167. This exception borders on the frivolous. The premise is that many commencement statutes have only one requirement, such as Federal Rule of Civil Procedure 3,

which provides that "[a] civil action is commenced by filing a complaint with the court."  R.

Exceptions, at 166 (quoting Fed. R. Civ. P. 3).  By contrast, according to Respondent, "[t]o

commence an enforcement proceeding" under the FDIC's regulations, the FDIC must comply

with *three* requirements; it "must issue a Notice, serve the Notice upon Respondent, and file the

Notice with OFIA."  *Id.* (citing 12 C.F.R. § 308.18(a)).  ("OFIA" is the acronym for Office of

Financial Institutions Adjudication).  That is simply incorrect.  By its terms, Section 308.18(a)(i)

expressly provides that "a proceeding governed by this subpart *is commenced by issuance of a*

*notice by the FDIC*."  12 C.F.R. § 308.18(a)(i) (emphasis added).  The notice must be served on

the respondent and filed with OFIA, *see* 12 C.F.R. § 308.18(a)(ii), (iii), just as a federal

summons and complaint must be served on the defendant in a civil case, but an FDIC

enforcement proceeding "is commenced" upon the FDIC's issuance of the notice, just as a civil

case "is commenced" when the complaint is filed with the court.  In other words, the FDIC's

regulation is not "[u]nlike other commencement statutes."  R. Exceptions, at 166.  It is

effectively just like them for this purpose in the sense that only one requirement must be fulfilled

to commence an FDIC enforcement action.[4]

---

[4] Respondent does not argue, nor could he, that because Section 308.18(a) is entitled
"Commencement of Proceeding," it necessarily follows that all three subparts of that section—
the FDIC's issuance of a notice, service of the notice on the respondent, and filing of the notice
with OFIA—must be accomplished to "commence" a proceeding.  Such an argument would run
afoul of the settled rule that section headings in a statute or regulation "cannot undo or limit that
which the text makes plain."  Brotherhood of R. R. *Trainmen v. Baltimore & O.R. Co.,* 331 U.S.
519, 528-29 (1947) (explaining that section headings are merely "a short-hand reference to the
general subject matter involved," and "are not meant to take the place of the detailed provisions
of the text); accord *Spurr v. Pope, 936 F.3d 478, 488* (6th Cir. 2019) ("[A] title or heading should
never be allowed to override the plain words of a text.") (quoting Antonin Scalia & Bryan A.
Garner, Reading Law: The Interpretation of Legal Texts 222 (2012).  Here, the text of 12 C.F.R.
§ 308.18(a)(i) makes plain that an FDIC enforcement proceeding "is commenced by issuance of
a notice by the FDIC."  12 C.F.R. § 308.18(a)(i).  Section 308.18(a)'s heading cannot be used to
undo those plain words.

When Section 308.18(a)(i) is applied according to its terms, it is apparent that Respondent's statute of limitations argument is wholly without merit. The Bedrock Transaction took place in December 2009. The FDIC issued its Notice with respect to Respondent's misconduct on August 13, 2013. Because the Notice was issued well within the five-year limitations period, this proceeding was timely "commenced" within the meaning of Section 308.18(a)(i). Even if the Board were to accept Respondent's suggestion that an FDIC enforcement action is not commenced until the notice is issued, served on the respondent, and filed with OFIA, *see* R. Exceptions, at 166, it is undisputed that all of those steps took place within the five-year limitations period.

As ALJ McNeil noted in the Recommended Decision, Respondent's limitations defense attempts to engraft an additional provision onto Section 308.18(a) that purportedly requires the FDIC to file the Notice with a "valid tribunal." R.D. at 121-22. According to Respondent, because the FDIC's ALJs were not "constitutionally appointed when the Notice was issued, served, and filed on August 28, 2013," the proceeding was not "commenced" at that time. R. Exceptions, at 166-67. During the proceedings before ALJ McNeil, Respondent did not cite any authority for the proposition that the status of the FDIC's ALJs in 2013, when the Notice was issued, has some bearing on the statute of limitations. Respondent did not address that omission in his Exceptions. Furthermore, he has not offered authority for the proposition that a defect in the appointment process for the ALJs somehow negated the existence of the OFIA as a whole.

The Board notes that Respondent does not attempt to bolster his limitations defense with a policy argument extolling the important purposes served by statutes of limitations. The Supreme Court has explained that statutes of limitations protect defendants from being surprised by "the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett v. New York Cent. R. Co.*, 380

U.S. 424, 428 (1965).  Here, Respondent cannot claim to have been unfairly surprised by the FDIC's Notice because it is undisputed that he received it in 2013 long before the statute of limitations expired.  R. Exceptions, at 167.  Nor could Respondent claim that he was disadvantaged because evidence was lost, memories faded, or witnesses disappeared.  To the contrary, his grievance is that documentary and testimonial evidence was *preserved* during the 2015 hearing and then used against him during the 2019 hearing.  In short, no public policy interest would be advanced by accepting Respondent's statute of limitations defense.

For all of the above reasons, the Board concludes that the proceeding against Respondent was "commenced" within the limitations period.

### 4.    The ALJ's Evidentiary Rulings Were Not an Abuse of Discretion.

A substantial number of Respondent's exceptions focus on ALJ McNeil's evidentiary rulings.  *See* R. Exceptions, at i-iii (Nos. 1-9, 23).  Among other things, Respondent argues that the ALJ admitted certain exhibits, excluded other exhibits, allowed certain testimony, limited other testimony, permitted FDIC witnesses to offer expert testimony, and denied Respondent's motions *in limine*.  *See id.*  As a threshold matter, FDIC Rule 308.5 provides the ALJ with broad authority to oversee the proceedings in a fair, impartial, and efficient manner.  *See* 12 C.F.R. § 308.5.  In particular, the ALJ has broad discretion to "rule upon the admission of evidence and offers of proof."  12 C.F.R. § 308.5(b)(3).  When ruling on the admissibility of evidence, the ALJ is not bound by the Federal Rules of Evidence.  *See Matter of Michael*, 2010 WL 3849537, at *15 (FDIC Aug. 10, 2010).  Instead, the ALJ may receive evidence that would be inadmissible under the Federal Rules of Evidence, provided it is, in the ALJ's estimation, "relevant, material, reliable and not unduly repetitive."  12 C.F.R. § 308.36(a)(3) (permitting the introduction of evidence that would be inadmissible under the Federal Rules of Evidence so long as it is "relevant, material, reliable and not unduly repetitive").  The Board reviews the ALJ's

evidentiary rulings for abuse of discretion.  *See Matter of Haynes*, 2014 WL 4640797, at \*13-17 (FDIC July 15, 2014).  Upon review of Respondents' specific exceptions, the Board is not convinced that ALJ abused his discretion in making any of the evidentiary rulings to which Respondent objected.

### 5.    ALJ McNeil Was Not Biased Against Respondent.

Respondent contends that he was denied a fair hearing for the independent reason that ALJ McNeil was biased against him.  R. Exceptions, at 5, 15, 62-77.  Respondent raised this issue in the post-hearing brief that he filed with the ALJ on January 31, 2020, and he renews the issue in his Exceptions.  Under the Administrative Procedure Act, claims of bias against a "presiding or participating employee" must be supported by the "filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification."  5 U.S.C. § 556(b)(3).  Because Respondent did not file such an affidavit, his claim of bias is "not entitled to consideration on the merits by the Board."  *Matter of The Bartlett Farmers Bank*, 1994 WL 711717, at \*3 (FDIC Nov. 8, 1994); *accord Keating v. Office of Thrift Supervision*, 45 F.3d 322, 327 (9th Cir. 1995) (declining to consider claim that agency head should have recused himself because appellant "failed to accompany his request with a timely and sufficient affidavit stating the grounds for recusal"); *Pfister v. Director, Office of Workers' Compensation Progs.*, 675 F.2d 1314, 1318 (D.C. Cir. 1982) (refusing to consider claim that ALJ was biased because "no affidavit setting forth specific evidence of prejudice [on the part of the ALJ] was ever filed"); *Gibson v. Federal Trade Comm'n*, 682 F.2d 554, 565 (5th Cir. 1982) ("[F]ailure to submit affidavits is thus an independently sufficient basis to deny [the] petitions [alleging bias].") (internal citation omitted).

Even if Respondent had filed the required affidavit, the Board would reject his claim of bias.  Respondent, in his exceptions, does not identify any credible evidence demonstrating that

ALJ McNeil harbored some unfair bias against him. Instead, Respondent complains that the ALJ reached "unsupported" conclusions, misstated facts, "discounted or outright ignored evidence supportive of Respondent," raised and sustained objections, elicited testimony adverse to Respondent, and made credibility determinations that Respondent regards as unnecessary or improper. R. Exceptions, at 5. At bottom, the contention is that "because the ALJ ruled against [Respondent], he had to have been biased" against him. *Matter of The Bartlett Farmers Bank*, 1994 WL 711717, at *3 (FDIC Nov. 8, 1994); *accord Marcus v. Director, Office of Workers' Compensation Progs.*, 548 F.2d 1044, 1051 (D.C. Cir. 1976) ("The mere fact that a decision was reached contrary to a particular party's interest cannot justify a claim of bias, no matter how tenaciously the loser gropes for ways to reverse his misfortune. While this proposition may appear self-evident, petitioner's enumerated contentions collapse to little more.").

## V.    CONCLUSION

After a thorough review of the record in this proceeding, and for the reasons set forth previously, the Board finds that an Order of Removal and Prohibition and Assessment of a CMP is warranted against Respondent. The record demonstrates that Respondent put the Bank at risk by failing to prudently manage the Bank's relationship with its largest borrower. The record further demonstrates that Respondent actively concealed the borrower's financial problems and loan defaults from the FDIC and the Bank's board and that he made material misrepresentations to both the FDIC and the Bank's board. In light of Respondent's unsafe and unsound practices and breaches of his fiduciary duties, the Board is persuaded that Respondent should be barred from the banking industry. In addition, and also in light of the record, the Board finds that the CMP imposed is appropriate and consistent with the statute's purpose.

## ORDER TO REMOVE AND PROHIBIT

The Board of Directors ("Board") of the Federal Deposit Insurance Corporation

("FDIC"), having considered the entire record of this proceeding and finding that Respondent

Harry C. Calcutt III, formerly the Chief Executive Officer and President of Northwestern Bank

("Bank"), Traverse City, Michigan, engaged in unsafe or unsound banking practices and

breaches of his fiduciary duties resulting in loss to the Bank, and that his actions involved willful

and continuing disregard for the safety and soundness of the Bank, hereby ORDERS and

DECREES that:

1.  Harry C. Calcutt III shall not participate in any manner in any conduct of the affairs of

any insured depository institution, or any other institution, credit union, bank or agency

enumerated in section 8(e)(7)(A) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. §

1818(e)(7)(A), without the prior written consent of the FDIC and the appropriate Federal

financial institutions regulatory agency as that term is defined in section 8(e)(7)(D) of the FDI

Act, 12 U.S.C. § 1818(e)(7)(D).

2.  Harry C. Calcutt III shall not solicit, procure, transfer, attempt to transfer, vote, or

attempt to vote any proxy, consent or authorization with respect to any voting rights in any

insured depository institution, or any other institution, credit union, bank or agency enumerated

in section 8(e)(7)(A) of the FDI Act, 12 U.S.C. § 1818(e)(7)(A), without the prior written

consent of the FDIC and the appropriate Federal financial institutions regulatory agency, as that

term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. § 1818(e)(7)(D).

3.  Harry C. Calcutt III shall adhere to all voting agreements with respect to any insured

depository institution, or any other institution, credit union, bank or agency enumerated in

section 8(e)(7)(A) of the FDI Act, 12 U.S.C. § 1818(e)(7)(A), except as otherwise permitted, in

writing, by the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. § 1818(e)(7)(D).

4. Harry C. Calcutt III shall not vote for a director, or serve or act as an institution-affiliated party, as that term is defined in section 3(u) of the FDI Act, 12 U.S.C. § 1813(u), of any insured depository institution, or any other institution, credit union, bank or agency enumerated in section 8(e)(7)(A) of the FDI Act, 12 U.S.C. § 1818(e)(7)(A), without the prior written consent of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. § 1818(e)(7)(D).

5. This ORDER shall be effective thirty (30) days from the date of its issuance.

6. The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the FDIC.

SO ORDERED.

IT IS FURTHER ORDERED that copies of this Decision and Order shall be served on Harry C. Calcutt III, FDIC Enforcement Counsel, the Administrative Law Judge, and the Office of Financial and Insurance Regulation for the State of Michigan.

By Order of the Board of Directors.

Dated at Washington, D.C. this 15th day of December, 2020.

Robert E. Feldman
Executive Secretary
Federal Deposit Insurance Corporation

**086871**

47

## ORDER TO PAY CIVIL MONEY PENALTY

The Board, having considered the entire record in this proceeding, and taking into account the appropriateness of the penalty with respect to the size of the financial resources and good faith of Respondent, the gravity of the violations, and such other matters as justice may require, hereby ORDERS and DECREES that:

1. A civil money penalty is assessed against Harry C. Calcutt III in the amount of $125,000 pursuant to 12 U.S.C. § 1818(i).

2. This ORDER shall be effective and the penalty shall be final and payable thirty (30) days from the date of its issuance.

The provisions of this ORDER will remain effective and in force except to the extent that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended, or set aside by the FDIC.

IT IS FURTHER ORDERED that copies of this Decision and Order shall be served on Respondent Harry C. Calcutt III, FDIC Enforcement Counsel, the Administrative Law Judge, and the Office of Financial and Insurance Regulation for the State of Michigan.

By Order of the Board of Directors.

Dated at Washington, D.C. this 15th day of December, 2020.



Robert E. Feldman
Executive Secretary
Federal Deposit Insurance Corporation

**086871**

48

**A048**

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Harry C. Calcutt III,

        Petitioner,

v.

Federal Deposit Insurance Corporation,

        Respondent.

Case No. 20-_____

## PETITION FOR REVIEW

Pursuant to 12 U.S.C. § 1818(h) and Federal Rule of Appellate Procedure 15(a), Harry C. Calcutt III, individually and as an institution-affiliated party of Northwestern Bank, Traverse City, Michigan (Insured State Nonmember Bank), hereby petitions the Court for review of the Federal Deposit Insurance Corporation Board of Directors' Decision and Order to Remove and Prohibit from Further Participation and Assessment of Civil Money Penalty, dated December 15, 2020, in FDIC docket numbers 12-568e and 13-115k.  Attached as Exhibit A is a copy of the order to be reviewed.  Attached as Exhibit B is Petitioner's Disclosure of Corporate Affiliations and Financial Interest.

WHEREFORE, Petitioner respectfully requests that the Court, on review, vacate or modify, in whole or in part, the foregoing order for which Calcutt has

A049

petitioned for review, or, in the alternative, render judgment in favor of Calcutt.

Calcutt also requests such other and further relief to which he may be justly

entitled.

Dated: December 16, 2020

Respectfully submitted,


*/s/ Ryan T. Scarborough*
Ryan T. Scarborough
Sarah M. Harris
William B. Snyderwine
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
rscarborough@wc.com
sharris@wc.com
wsnyderwine@wc.com

*Attorneys for Petitioner Harry C.*
*Calcutt III*

2

A050

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), I hereby certify that on December 16, 2020, true and correct copies of the foregoing **Petition for Review** was served by electronic mail and first class mail, in addition to filing the **Petition for Review** electronically with the Clerk.

Robert Feldman, Executive Secretary
Valerie J. Best, Assistant Executive Secretary
Andrea Winkler, Acting Assistant General Counsel
Seth Rosebrock, Assistant General Counsel
Nicholas S. Kazmerski, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, D.C. 20429
rfeldman@fdic.gov, vbest@fdic.gov, awinkler@fdic.gov, srosebrock@fdic.gov, nkazmerski@fdic.gov

David Beck, Esq.
Marry Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, IL 60606
dbeck@fdic.gov, mbenden@fdic.gov

Gabrielle A. J. Beam, Esq.
Federal Deposit Insurance Corporation
1200 Walnut Street, Suite 2100
Kansas City, MO 64106
gabeam@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
bsup@fdic.gov

*/s/ William B. Snyderwine*

**A051**

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of<br><br>HARRY C. CALCUTT III, WILLIAM GREEN, AND RICHARD JACKSON, individually<br>and as institution-affiliated parties of<br><br>NORTHWESTERN BANK<br>TRAVERSE CITY, MICHIGAN<br><br>(INSURED STATE NONMEMBER BANK) | NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION, NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER TO PAY, AND NOTICE OF HEARING<br><br>FDIC-12-568e<br>FDIC-13-115k |

The Federal Deposit Insurance Corporation ("FDIC") has determined that Harry C. Calcutt III, William Green, and Richard Jackson (collectively, "Respondents"), individually and as institution-affiliated parties of Northwestern Bank, Traverse City, Michigan ("Bank"), have directly or indirectly participated or engaged in unsafe or unsound banking practices and breaches of their fiduciary duties; that Respondents' actions were part of a pattern of misconduct; and that their unsafe and unsound practices and breaches of fiduciary duties: (1) caused the Bank to suffer financial loss or other damage; (2) with respect to Respondent Calcutt, provided financial gain or other benefit; and (3) evidence personal dishonesty and

**A052**

demonstrate Respondents' willful or continuing disregard for the safety or soundness of the Bank.

The FDIC, therefore, instituted this proceeding for the purpose of determining whether appropriate orders should be issued against Respondents under the provisions of section 8(e), removing them from office and prohibiting them from further participation in the conduct of the affairs of the Bank, and any other insured depository institution or organization listed in section 8(e)(7)(A) of the Act, 12 U.S.C. § 1818(e)(7)(A), without the prior written approval of the FDIC and such other appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the Act, 12 U.S.C. § 1818(e)(7)(D), and under the provisions of 8(i)(2) of the Federal Deposit Insurance Act ("Act"), 12 U.S.C. §§ 1818(e) & 1818(i)(2), ordering them to pay civil money penalties.

The FDIC hereby issues this NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION pursuant to section 8(e) of the Act, 12 U.S.C. § 1818(e) and the FDIC's Rules of Practice and Procedure ("FDIC's Rules"), 12 C.F.R. Part 308; and NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTIES, FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER TO PAY pursuant to section 8(i)(2)(B) of the Act, 12 U.S.C. § 1818(i)(2)(B), and

2

the FDIC's Rules, 12 C.F.R. Part 308.[1]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   Preliminary Allegations

A.   Jurisdiction

1.   At all times pertinent to this proceeding, the Bank was a corporation existing and doing business under the laws of the State of Michigan, having its principal place of business at Traverse City, Michigan.  The Bank was, at all times pertinent to this proceeding, an insured State nonmember bank, subject to the Act, 12 U.S.C. §§ 1811-1831aa, the Rules and Regulations of the FDIC, 12 C.F.R. Chapter III; and the laws of the State of Michigan.

2.   At all times pertinent to this proceeding, each of the Respondents was an "institution-affiliated party" as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of sections 8(e)(7), 8(i) and 8(j) of the Act, 12 U.S.C. §§ 1818(e)(7), 1818(i) and 1818(j).

3.   The FDIC has jurisdiction over the Bank, Respondents, and the subject matter of this proceeding.

B.   Respondents

4.   At all times pertinent to this proceeding, Harry C. Calcutt III ("Calcutt") served as the Bank's president and chief

---

[1] The NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER PARTICIPATION and the NOTICE OF ASSESSMENT OF CIVIL MONETARY PENALTIES are collectively referred to in this document as the "NOTICE."

executive officer and as the chairman of the Bank's board of directors. He was also at all times a member of the Bank's senior loan committee.

5.    At all times pertinent to this proceeding, William Green ("Green") served as a commercial loan officer for the Bank and a member of the Bank's classified asset committee.

6.    At all times pertinent to this proceeding, Richard Jackson ("Jackson") served as the Bank's executive vice president and as a member of the Bank's board of directors.  He was also a member of the Bank's senior loan committee, classified assets committee, and asset liability committee.

**II.   Respondents' Handling of Troubled Loan Relationship**

A.    Beginning of Troubled Loan Discussions

7.    Beginning in August 2009, a representative of a group of the Bank's loan customers, collectively controlled by the Nielson family of Traverse City (the "Nielson Entities"), made the Bank aware of significant financial difficulties they were facing.

8.    The Nielson Entities consisted of nineteen separate limited liability companies.  Between them, the various entities had approximately $38,000,000 in loans at the Bank, representing close to 50% of the Bank's Tier One capital, as of August 2009

4

(collectively, "Nielson Loans"), representing by far the Bank's largest loan relationship.

9.   The Nielson Entities represented a long-standing loan relationship for the **Bank,** having been customers of the Bank for several years prior to 2009.

10.   Green was the loan officer assigned to all of the Nielson Entities.

11.   In an August 2009 email to Green, a representative of the Nielson Entities advised the Bank that the Nielson Entities were facing significant financial difficulties and needed to restructure their loans.

12.   Several of the Nielson Loans were due to mature on September 1, 2009, and as of that date, the Nielson Entities stopped making payments on all of the Nielson Loans.

13.   Between August 2009 and December 2009, Green and Calcutt participated in extensive discussions and negotiations in an effort to reach an agreement on loan terms for each of the Nielson Entities.

14.   During this time period, Jackson also participated in internal Bank discussions with Calcutt and/or Green, as Respondents attempted to reach an agreement on loan terms for each of the Nielson Entities.

5

**A056**

15.   In November 2009, Respondents were aware that the Bank's largest lending relationship, the Nielson Entities, were approaching 90 days past due, at which time they would automatically be placed on non-accrual status.

16.   In late November 2009, Respondents finally reached an agreement with the Nielson Entities.

17.   Pursuant to the agreement, consented to by each of the Respondents, the Bank agreed to extend to one of the Nielson Entities, Bedrock Holdings, LLC, an additional $760,000 loan and to release $600,000 in certain investment-trading funds in which the Bank held a collateral interest (collectively, the "Bedrock Transaction").

18.   The purpose of the Bedrock Transaction was to provide the funding necessary to bring current all of the past-due loans to the Nielson Entities and to provide a reserve sufficient to make payments for all of the loans to extend well into 2010.

19.   Respondents agreed to establish deposit accounts for the Nielson Entities with the understanding that the proceeds of the Bedrock Transaction would be deposited in such accounts and that the funds would thereafter be used to fund payments on each of the Nielson Loans.

20.   Each of the Respondents consented to the Bedrock Transaction and was aware of its purpose.

6

**A057**

21.   On November 30, 2009, just prior to the finalization of the Bedrock Transaction, a majority of the Nielson Loans reached 90 days past due and were automatically placed on nonaccrual.

22.   The same day, the Nielson Entities paid $600,000, the amount of collateral released by the Bank, for the September, October, and November payments due on the outstanding Nielson Loans, thus bringing all loans current.

23.   On December 1, 2009, the Nielson Loans were taken off nonaccrual.

24.   Between November 25, 2009 and December 3, 2009, Respondents agreed to renew all of the matured Nielson Loans. To avoid any gaps in the loan documentation, the renewal documents were backdated to September 1, 2009.

25.   The Bank funded the loan to Bedrock Holdings on December 14, 2009.

26.   Respondents completed the Bedrock Transaction and the renewal of approximately $30 million in loans to the Nielson Entities without obtaining any updated appraisals or financials from the Nielson Entities and without performing a global cash flow analysis or a global collateral analysis.  In doing so, Respondents ignored well-documented criticism from regulators

7

during April 2008 and April 2009 examinations regarding the
failure to obtain such information.

B.   Failure to Follow Bank Policy Regarding Loan Approvals

27.   It is the Bank's policy and practice to require loans
in excess of $750,000 to be approved by the Bank's senior loan
committee and the board of directors.

28.   Respondents did not submit the Bedrock Transaction to
the board of directors in December 2009 or discuss the Bedrock
Transaction with board members at the Bank's December 2009 board
meeting.

29.   Likewise, Respondents did not present the renewals of
all the matured Nielson Loans in late November/early December
2009 to the board for review or discuss them at the November
2009 or December 2009 board meetings.

30.   One of the renewed loans was a $4,500,000 loan to
Bedrock Holdings.

31.   In March 2010, based on information that Green
provided, the Bank's credit manager prepared a belated loan
write-up for presentation to the board of directors regarding
the $4,500,000 loan renewal.   Inconspicuously placed in the
middle of the description for this transaction, the loan write-
up stated that "[a]s part of this renewal, $600,000 of
[collateral] funds will be released" and "[i]n addition a new

8

**A059**

loan of $760,000 is requested to provide for working capital requirements …."

32. The assertion in the loan write-up that the $760,000 loan was to provide for working capital requirements was false.

33. Respondents knew that the Bedrock Loan was not going to be used for "working capital requirements" and that, along with the proceeds of the collateral released, it was being, and would continue to be, used to keep all of the Nielson Loans current.

34. The March 2010 loan write-up also failed to state that the $4,500,000 existing loan renewal, the $760,000 loan, and the $600,000 collateral release had all, in fact, been completed three months earlier.

35. Respondents knew that the $4,500,000 existing loan renewal, the $760,000 loan, and the $600,000 collateral release had all been completed three months earlier.

36. The loan materials presented to the board in March 2010 made no reference to any of the underlying circumstances that led to the Bedrock Transaction.

37. Thus, as of March 2010, the board had not been made aware, either in writing or at any of the preceding monthly board meetings, that: (i) the Nielson Entities, the Bank's largest loan relationship, were having significant financial

9

difficulties; (ii) they had gone several months without making any payments on any of their loans; (iii) lengthy negotiations had taken place between senior bank management and the Nielson Entities during that time; and (iv) the only reason the Nielson loans were current at that time was because the Bank, through the Bedrock Transaction, had provided, either directly or through the release of the Bank's collateral, the funds to make all of the payments dating back to September 1, 2009.

38.  Calcutt and Jackson, as members of the senior loan committee, approved the March 2010 loan write-up.

C.    Continued Difficulties for Nielson Entities

39.  After the Bedrock Transaction, and with the aid of the proceeds it generated, the Nielson Entities continued to make payments on the Nielson Loans through August 2010.

40.  Several of the Nielson Loans were scheduled to mature again on September 1, 2010.

41.  At or around that time, the Nielson Entities again advised the Bank that they were still suffering financial difficulties and that they were unable and unwilling to continue making loan payments on several of their loans.

42.  As of the September 1, 2010 maturity date, the Nielson Entities stopped making payments on all of the Nielson Loans.

10

43.   Between September 2010 and December 2010, Respondents all participated in negotiations with the Nielson Entities regarding the outstanding loans, including in-person meetings with representatives of the Nielson Entities.

44.   In December 2010, Respondents reached agreement with the Nielson Entities to an additional release of approximately $690,000 in investment-fund collateral ("December 2010 Transaction"), and the Nielson Loans were renewed and brought current.   In renewing the Nielson Loans, Respondents granted the Nielson Entities interest-rate reductions and other concessions.

45.   As in the prior year, the released funds were again used to make payments on all of the past-due Nielson Loans and to bring them current.

46.   Although in December 2010 the board of directors approved a short-term renewal of each of the matured Nielson Loans, Respondents did not make the board aware that several of the Nielson Entities were continuing to experience significant financial difficulties.

47.   Respondents also did not disclose to the board that they had agreed to release additional collateral in connection with the December 2010 Transaction or that the released collateral would serve as the payment source for all of the renewed loans.

11

**A062**

48.   Despite the fact that the Bank had restructured several of the Nielson Loans, and despite Respondents' knowledge that the Nielson Entities were experiencing financial difficulties, the Bank never internally classified or recognized any impairment for the Nielson Loans.

49.   Throughout 2010, up to and including the completion of the December 2010 Transaction, Respondents failed to perform any form of global financial analysis or global collateral analysis with respect to the Nielson Entities.

50.   In January 2011, the Nielson Entities stopped making payments for a third time, and all of the Nielson Loans, including the $760,000 Bedrock loan, have been in default since that time.

51.   Since January 2011, the Bank has been involved in ongoing negotiations and collection efforts with the Nielson Entities and has initiated several foreclosure proceedings in an effort to collect the amounts owed on the Nielson Loans.

52.   To date, more than $27,000,000 remains uncollected.

53.   Beginning in August 2009, the overall value of the collateral securing the Nielson Loans has significantly deteriorated, due to declining market conditions and the failure of the Nielson Entities to maintain properties that were no longer of value to them.

12

### III. Misrepresentations, Material Omissions, and Other Efforts to Deceive Bank Regulators

54.  Beginning in late 2009, Calcutt, Green, and Jackson, acting in concert, engaged in a course of conduct that was designed to prevent regulatory authorities from discovering the impaired status of the Bank's numerous loans to the Nielson Entities and to conceal the fact that the Nielson Entities were interrelated.

A.   Routing of Funds to Aid Concealment

55.  With the knowledge and consent of Calcutt and Jackson, Green took affirmative steps to conceal the true nature of the Bedrock Transaction from the FDIC and the Office of Financial and Insurance Regulation for the State of Michigan ("OFIR").

56.  Green did this by directing the Nielson Entities not to transfer the proceeds of the Bedrock Transaction directly into the various deposit accounts that had been set up for the payment of the Nielson Loans.

57.  Rather, Green advised the Nielson Entities to route the proceeds indirectly.

58.  Following that advice, the Nielsen Entities broke down the Bedrock Transaction funds into various amounts and moved the funds in numerous transactions before depositing them in the various deposit accounts for payment on each of the Nielson Loans.

13

**A064**

59.  As a result, when examiners subsequently reviewed the Nielson Entities' loan files, they did not detect that the Bedrock Transaction funds were used to make payment on all of the Nielson Loans.

60.  Likewise, the complex routing of funds concealed the fact that the Nielson Loans had all become interdependent and had been negotiated collectively by Respondents and the Nielson Entities.

61.  In setting up the transactions as they did, Respondents thus concealed the fact that the Nielson Entities were all interrelated.

B.   Missing Loan Documentation

62.  Green was responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans.

63.  The Bank's loan files for the Nielson Entities did not contain the significant amount of pertinent correspondence that addressed:  (i) the Nielson Entities' stated financial difficulties; (ii) the negotiations that occurred over a period of several months, both in 2009 and again in 2010 and into 2011; or (iii) the fact that the payments which brought and kept the loans current in December 2009 and thereafter were made possible through the use of Bank funds and cash collateral that the Bank had released.

14

64.   The absence of such documentation further concealed the nature and purpose of the Bedrock Transaction.

65.   Pertinent documentation regarding the problems facing the Nielson Entities and the Bank were kept out of the loan files during regulatory examinations and/or visitations in June 2010, February 2011, and August 2011.

C.   Officer File Memoranda

66.   Though pertinent correspondence was kept out of the Bank's files relating to the Nielsen Loans, in June 2010, Green drafted a number of memoranda and placed them in the loan files for certain Nielson Entities.

67.   The memoranda purported to provide status updates and loan histories, yet none of them mentioned any of the significant difficulties or negotiations that had taken place in fall 2009 leading up to the Bedrock Transaction.

68.   The memoranda also misrepresented the loan histories by making statements such as, "The loan has always performed" when, in fact, the loans had been in default with no payments being made for several months in fall 2009.

69.   Green drafted a file memorandum relating to Bedrock Holdings that misrepresented the purpose of that transaction, suggesting that it was for working capital to be used by one of Bedrock Holdings' subsidiaries.   The memorandum also failed to

15

state that the actual purpose was for making payments on all of the Nielson Loans.

70. Green placed each of these officer file memoranda in its respective loan file shortly before the FDIC's June 2010 regulatory examination began.

D.    False Call Reports

71. The Bedrock Transaction and the December 2010 Transaction were completed shortly before the end of the 2009 and 2010 calendar years, respectively.

72. Both transactions disguised the true condition of the Nielson Entities' loan portfolio and gave the false appearance that all of the Nielson Loans were unimpaired, performing loans.

73. As a result of Respondents' concerted acts and omissions, including their failure to recognize impairment on any of the Nielson Loans, the Bank filed false Call Reports throughout the time period from late 2009 through mid-2012.

E.    November 2009 Letter to Bank's Regulators

74. In a November 14, 2009 letter from Jackson to OFIR and copied to the FDIC, Jackson provided the Bank's formal response to an OFIR examination report, which had listed several of the Nielson Loans for Special Mention.

16

75. Jackson sought input from Calcutt and Green regarding Nielson loans for the letter to the OFIR.

76. In the letter, Jackson described several of the Nielson Loans as "performing" loans despite the fact that they were in default at the time.

77. Although Jackson's letter purported to be a status update for the Nielson Loans, among other loans, Jackson made no mention of the fact that, at the time: (i) the Nielsen Entities had stopped payments on all of their loans; (ii) the Bank was in the midst of extensive workout negotiations that had been ongoing for more than two months; or (iii) the Nielson Entities had described significant financial difficulties, including poor or non-existent cash flow and the reduction in value of numerous properties that served as the Bank's collateral, to the point that the Nielson Entities were willing to give the Bank a deed in lieu of foreclosure with respect to several such properties.

78. Green and Calcutt were both aware of the false representations contained in Jackson's letter.

F.   Officer's Questionnaires

79. In May 2010 and again in July 2011, Calcutt signed an Officer's Questionnaire, each time affirming, among other things, that he was not aware of any loans since the last exam

17

that had been renewed or extended with acceptance of separate notes for the payment of interest.

80.   At the time, Calcutt knew such statements were false.

G.   Temporary Sale of Nielson Loans

81.   In May 2010, the Bank sold almost $2 million of the Nielson Loans to two affiliates of the Bank.

82.   The Bank sold the loans shortly before FDIC examiners arrived for a June 2010 examination.

83.   Jackson, Calcutt, and Green participated in the decision to sell the loans to the affiliate banks.

84.   Jackson communicated with the affiliate banks about the loans being sold.

85.   At the time of the sale, Green assured the Nielson Entities that they would continue to deal with himself and Calcutt on the renewals of the loans being sold.

86.   Green also told the Nielson Entities that the Bank could end up buying the loans back from the affiliate banks.

87.   In late September 2010, the Bank repurchased each of the Nielson Loans that had been sold prior to the examination. At the time of repurchase, all of the loans were in default.

88.   Both the sale and the repurchase of the loans were completed without the knowledge or approval of the Bank's board of directors.

H.   Nielson Loans Excluded From External Loan Review

89.   On an annual basis, the Bank contracted with a third party consultant to perform external loan review of the Bank's loan portfolio.

90.   In December 2009, Calcutt and Jackson agreed to pull all of the Nielson Loans from the sample of loans to be reviewed, even though the Nielson Entities represented the Bank's largest lending relationship.

I.   Management's Response to August 2011 Examination

91.   In December 2011, the Bank issued a written response, signed by Calcutt, Jackson, and other members of Bank management, to the FDIC's August 2011 examination findings.

92.   In the response, management made a number of statements that Calcutt and Jackson knew to be false, including the assertion that the board of directors was "fully aware of [the Bedrock Transaction] prior to the disbursement of the loan …" and that, in December 2010, management "had every reason to believe that the Nielsons were not experiencing financial difficulty …."

J.   Other Communications with Examiners

93.   During the June 2010 FDIC examination, the examiners had numerous discussions with Green regarding the Nielson Entities, but Green never disclosed the true nature and purpose

19

**A070**

of the Bedrock Transaction or the fact that the Nielson Entities had stopped paying on all of the Nielson Loans for a period of months in Fall 2009 due to financial difficulties.

94.   During the August 2011 joint examination by the FDIC and OFIR, examiners specifically asked Green and Jackson about the purpose of the Bedrock Transaction, the December 2010 transaction, and whether the Nielson Entities had been experiencing financial difficulty.   Green and Jackson responded that they did not know or did not remember.

95.   Throughout the August 2011 examination, examiners repeatedly asked Calcutt and other members of management if there were any additional documents or correspondence relating to the Nielson Entities, and after several such requests, Calcutt's colleague produced a separate folder of documents, which contained select correspondence from 2010 and 2011.   Even though this constituted only a small portion of the pertinent correspondence from the 2009 to 2011 time period, when asked if there was any additional correspondence, Calcutt stated that there was not.

96.   Jackson and Green, who were all present, did not dispute Calcutt's statement or offer any further response.

97.   At the time, each of the Respondents had additional relevant correspondence and documentation in his possession.

20

98.   In September 2011, a memorandum from Green was presented to examiners which stated that the purpose of the Bedrock Transaction was to provide working capital for a subsidiary of Bedrock Holdings and further stated that it was unknown how the funds were used by the borrower.

99.   This stated purpose was consistent with the purpose identified in Green's June 2010 officer memorandum that was placed in the Bedrock Holdings loan file shortly before the FDIC's June 2010 examination.

100. Calcutt and Jackson ratified Green's September 2011 memorandum in subsequent communications with the FDIC and OFIR on more than one occasion.

101. For example, at a September 14, 2011 meeting, Calcutt represented to the FDIC and OFIR that the purpose of the Bedrock Transaction was for working capital for use by Bedrock Holding's subsidiary.

102. At that same meeting, examiners specifically asked Calcutt if he had any correspondence to or from the Nielson Entities regarding the proposed use of the $760,000 loan, and Calcutt stated, "No, I don't recall any."

103. Calcutt knew this statement was false, as there had been extensive correspondence between the parties leading up to the $760,000 loan.

21

**A072**

104. Calcutt also stated that examiners had been given all pertinent correspondence during the examination, when, in fact, substantially all correspondence relating to the Nielson Entities had been kept out of the loan files and had not been provided to examiners.

105. When asked by examiners where the funds came from to bring all of the loans current in December 2010, Calcutt falsely stated that the funds came from the Nielson Entities' "vast resources between oil, gas, and rentals."

106. When asked if there were any discussions with the Nielson Entities regarding the source of funds for such payments, Calcutt said that there were no such discussions, even though such issues had been discussed extensively over the course of several months.

107. Green and Jackson were present at the September 2011 meeting, and they did not dispute any of the statements made by Calcutt or offer any other explanations.

**IV.   Respondents Caused Financial Loss to the Bank**

108. Respondents' handling of the Nielson Loans in 2009 and 2010 caused the Bank to suffer financial loss and placed the Bank at risk of suffering substantial additional loss.

109. Financial loss to the Bank as result of Respondents' misconduct includes the $760,000 in loan proceeds that the Bank

22

lent to the Nielson Entities in connection with the Bedrock
Transaction.   To date, the Bank has charged off $30,000 against
the $760,000 Bedrock loan and is in the process of attempting to
collect a foreclosure judgment.

110. By delaying efforts to address the specific problems
facing each of the Nielson Entities, without conducting any
global financial or collateral analyses, Respondents allowed the
Bank's collateral position to deteriorate for more than two
years in a declining real estate market.   In addition, the
Nielson Entities advised the Bank in 2009 that they were not
interested in continuing to incur maintenance expenses with
respect to certain properties that served as collateral for the
Nielson Loans.

111. During 2009 and 2010, a number of the Nielson
properties significantly deteriorated after the Nielson Entities
stopped maintaining them, thereby negatively impacting the
Bank's collateral position.

112. As of the joint September 2012 examination by the FDIC
and OFIR, the Bank had recognized close to $8.5 million in loss
on the Nielson Loans, while $777,000 was doubtful, and
approximately $25 million was deemed substandard.

113. In addition, the Bank has suffered significant
investigation expense costs and defense costs, which directly

23

resulted from Respondents' intentional concealment of the true

condition of the Nielson Loans and the nature and purpose of the

Bedrock Transaction and the December 2010 Transaction.

114. Because Respondents had misrepresented the condition

of the Bank to the board and the regulators, the board

determined that it needed to hire a third-party consulting firm

to investigate the handling of the Nielson relationship.

115. The Bank incurred nearly $1.7 million in legal fees

and expenses in connection with the investigation and in defense

of Respondents, including approximately $281,000 in

investigation costs paid to the third-party consulting firm.

116. Finally, the Bank suffered loss as a result of having

paid excessive bonus compensation to Calcutt for 2009 and 2010.

### V.   Financial Gain to Calcutt

117. Pursuant to his employment agreement with the Bank,

Calcutt annually earned a bonus equal to 4% of the Bank's net

after-tax income.

118. As a result of Respondents' effort to conceal the

Nielson Entities' troubled financial condition and their failure

to recognize any impairment on any of the Nielson Loans, the

Bank's reported after-tax income was falsely inflated for 2009

and 2010.

119. The Bank's net income calculations for 2009 and 2010

24

were inflated due to:    (a) interest income that was improperly claimed on troubled Nielson Loans that should have been on nonaccrual at the time, and (b) inadequate provisions for loan and lease losses (ALLL), which, based on the true condition of the Nielson loan portfolio, should have been significantly higher.

120. In 2009 and 2010, Calcutt's bonus compensation was approximately $95,000 more than it should have been, as a result of the Bank's inflated net income figures.

121. Calcutt, as a major shareholder of the Bank's holding company, also benefited when the Bank issued substantial dividends in 2010 and 2011 based on the board of directors' false perception regarding the Bank's performance and overall financial condition.

### VI.    Grounds for Section 8(e) Orders

122. As a result of the foregoing acts, omissions and/or practices, Respondents have engaged in unsafe or unsound banking practices in conducting the affairs of the Bank.

123. As a result of the foregoing acts, omissions and/or practices, Respondents breached their fiduciary duty to the Bank.

124. By reason of the foregoing acts, omissions and/or practices, the Bank has suffered financial loss or other damage.

25

**A076**

125. By reason of the foregoing acts, omissions and/or practices, Calcutt received financial gain or other benefit.

126. The acts, omissions and/or practices of the Respondents alleged herein evidence the Respondents' personal dishonesty and/or demonstrate a willful or continuing disregard for the safety and soundness of the Bank.

127. By reason of the foregoing acts, omissions and/or practices, the interests of the Bank's depositors have been prejudiced.

### VII. Grounds for Assessment of Civil Money Penalties

128. As a result of the foregoing facts and conclusions, the FDIC concludes that Respondents recklessly engaged in unsafe or unsound practices in conducting the affairs of the Bank.

129. Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents breached their fiduciary duty to the Bank.

130. Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents' reckless unsafe or unsound practices and/or breaches of fiduciary duty to the Bank were part of a pattern of misconduct.

131. Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents' reckless

26

unsafe or unsound practices and/or breaches of fiduciary duty to the Bank caused more than a minimal loss to the Bank.

ORDER TO PAY

By reason of the unsafe or unsound practices and/or breaches of fiduciary duty set forth in the NOTICE OF ASSESSMENT, the FDIC has concluded that a civil money penalty should be assessed against each Respondent pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2). After taking into account the appropriateness of the penalties with respect to the size of financial resources and the good faith of each Respondent, the gravity of the unsafe or unsound practices and/or breaches of fiduciary duty, and such other matters as justice may require, IT IS HEREBY ORDERED THAT:

By reason of the unsafe or unsound practices and/or breaches of fiduciary duty set forth above, a penalty of $125,000 be, and hereby is, assessed against Respondent Harry C. Calcutt III pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2); a penalty of $100,000 be, and hereby is, assessed against Respondent William Green pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2); and a penalty of $100,000 be, and hereby is, assessed against Respondent Richard Jackson pursuant to section 8(i)(2) of the Act, 12 U.S.C. § 1818(i)(2).

FURTHER ORDERED, that the effective date of this ORDER TO PAY be, and hereby is, stayed with respect to each Respondent until 20 days after the date of receipt of the NOTICE OF ASSESSMENT by each such Respondent, during which time each such Respondent may file an answer and request a hearing pursuant to section 8(i)(2)(H) of the Act, 12 U.S.C. § 1818(i)(2)(H), and section 308.19 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.19.

If any Respondent fails to file a request for a hearing within 20 days of receipt of this NOTICE OF ASSESSMENT, the penalty assessed against such Respondent, pursuant to this ORDER TO PAY, will be final and shall be paid within 60 days after the date of receipt of this NOTICE OF ASSESSMENT.

If any Respondent requests a hearing, such Respondent is also hereby directed to file an answer to the NOTICE OF ASSESSMENT within twenty (20) days from the date of service, as provided by section 308.19 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.19.

<u>NOTICE OF HEARING</u>

Regardless of whether any Respondent requests a hearing on the NOTICE OF ASSESSMENT and ORDER TO PAY, notice is hereby given that a hearing will be held in Grand Rapids, Michigan, commencing sixty (60) days from the date of service of the

28

**A079**

NOTICE OF INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM

FURTHER PARTICIPATION or on such date and at such place as may

be set by the Administrative Law Judge appointed to hear the

matter, for the purpose of taking evidence on the charges

specified in the NOTICE OF INTENTION TO REMOVE FROM OFFICE AND

PROHIBIT FROM FURTHER PARTICIPATION and to determine whether an

appropriate order should be issued under the Act.

If any Respondent requests a hearing with respect to the

charges specified in the NOTICE OF ASSESSMENT and ORDER TO PAY,

evidence shall also be taken on the charges specified therein at

the same time and place for the purpose of determining whether

said Respondent shall be ordered to forfeit and pay a civil

money penalty in accordance with section 8(i)(2) of the Act, 12

U.S.C. § 1818(i)(2).

The hearing will be held before an Administrative Law Judge

to be appointed by the Office of Financial Institution

Adjudication pursuant to 5 U.S.C. § 3105.  The hearing will be

public, and in all respects will be conducted in compliance with

the Act, the Administrative Procedures Act, 5 U.S.C. §§ 551 –

559, and the FDIC Rules of Practice and Procedure, 12 C.F.R.

Part 308.

Respondents are directed to file an answer to the NOTICE OF

INTENTION TO REMOVE FROM OFFICE AND PROHIBIT FROM FURTHER

29

PARTICIPATION within twenty (20) days from the date of service, as provided in 12 C.F.R. § 308.19 of the FDIC Rules of Practice and Procedure.

All papers to be filed or served in this proceeding shall be filed with the Office of Financial Institution Adjudication, 3501 N. Fairfax Drive, Suite VS-D8113, Arlington, VA 22226-3500, pursuant to section 308.10 of the FDIC Rules of Practice and Procedure, 12 C.F.R. § 308.10. Respondents are encouraged to file any answer electronically with the Office of Financial Institution Adjudication at ofia@fdic.gov.

Copies of all papers filed or served in this proceeding shall be served upon the Office of the Executive Secretary, Federal Deposit Insurance Corporation, 550 17th Street, N.W., Washington, D.C. 20429-9990; A.T. Dill, III, Assistant General Counsel, Enforcement Section, Federal Deposit Insurance Corporation, 550 17th Street, N.W., Washington, D.C. 20429-9990; and Timothy E. Divis, Regional Counsel, Federal Deposit Insurance Corporation, 300 S. Riverside Drive, Suite 1700, Chicago, Illinois 60606.

PRAYER FOR RELIEF

WHEREFORE, the FDIC prays for relief in the form of the issuance of an ORDER OF REMOVAL AND PROHIBITION pursuant to 12 U.S.C. § 1818(e) against Respondents Harry C. Calcutt III, William

30

Green, and Richard Jackson, and an ORDER TO PAY CIVIL MONEY

PENALTY pursuant to 12 U.S.C. § 1818(i) in the amount of $125,000

against Harry C. Calcutt III, $100,000 against William Green, and

$100,000 against Richard Jackson.

Pursuant to delegated authority.

Dated at Washington, D.C., this *20th* day of *August*,

2013.

Christopher J. Newbury
Associate Director
Division of Risk Management
Supervision

31

**A082**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the Notice of Intention to Remove From Office and Prohibit From Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and Notice of Hearing, Docket No. FDIC-12-568e and FDIC-13-115k, were served by Certified Mail - Return Receipt Requested to the following individuals:

Mr. Harry C. Calcutt, III
6223 Peninsula Drive
Traverse City, Michigan  49686

Mr. Michael J. Lavoie
Butzel Long
150 West Jefferson Avenue, Suite 100
Detroit, Michigan  48226

Mr. Richard Jackson
141 Rivers Edge Drive, Suite 301
Traverse City, Michigan  49684

Mr. Lyle D. Russell, Jr.
Russell & Stoychoff  PC
4468 W. Walton Boulevard
Waterford, Michigan  48329

Mr. William H. Green
8555 Wheeler Pine Road
Williamsburg, Michigan  49690

Mr. Roger Wotila
McCurdy Wotila & Porteous PC
120 West Harris Street
Cadillac, Michigan  49601

The Board of Directors
Northwestern Bank
625 South Garfield Avenue
P.O. Box 809
Traverse City, Michigan  49685

Honorable Kevin Clinton
Commissioner
Michigan Office of Financial and Insurance Regulation
Ottawa Building, 3rd Floor
611 West Ottawa Street
Lansing, Michigan  48933-1070

DATED: August 28, 2013

_____
Thomas E. Nixon
Counsel
Federal Deposit Insurance Corporation
550 17th Street, N.W., NYA-5054
Washington, D.C.  20429

# FEDERAL DEPOSIT INSURANCE CORPORATION

## WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III,** individually and as an
institution-affiliated party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN

(STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-12-115k

## <u>NOTICE OF REASSIGNMENT</u>

By a Resolution (copy attached) dated July 19, 2018, the Board of Directors of the
Federal Deposit Insurance Corporation (FDIC) appointed the undersigned as an administrative
law judge for the FDIC, pursuant to the appointment power granted to it as the Head of a
Department by Article II of the United States Constitution, and by 12 § 1819(a)(Fifth) and 5
U.S.C. § 3105.

Further, in an Order in Pending Cases accompanying the Resolution, the FDIC remanded
the above-captioned matters, and reassigned them to the undersigned. The Order directed a new
hearing and a fresh reconsideration of all prior actions in these matters, including any summary
disposition determinations that had been taken before the hearing held in this case.

In furtherance of that Order, the following orders are issued:

1. Any party may by not later than September 28, 2018 file objections to any of the
actions taken by the prior Administrative Law Judge (C. Richard Miserendino) prior to the
evidentiary hearing held in this case. Unless sufficient cause is shown through a motion filed not
later than September 10, 2018, objections shall not exceed 75 pages, not counting appendices.

2. Any party opposing such objections may by not later than November 14, 2018 file a
response to such objections. Unless sufficient cause is shown through a motion filed not later
than October 24, 2018, memoranda filed in opposition to such objections shall not exceed 75
pages, not counting appendices.

Pursuant to the Order in Pending Cases, this Notice, any Objections filed, and any
Responses thereto shall be retained in the record of this case. Upon review of any Objections and
Responses submitted, the undersigned shall issue a decision on reconsideration of the prehearing
actions to which an Objection has been filed. With respect to prehearing actions to which no

Objection has been filed, the undersigned shall review the prehearing action and adopt or revise the action as appropriate.

Further, after issuing a decision on reconsideration of the prehearing actions, the undersigned shall issue a Notice of Intention to conduct a written hearing on remand. The written hearing shall consist of a review of the existing record plus any other evidence that is allowed; and thereafter the undersigned shall issue a recommended decision based on this paper proceeding.[1]

Pursuant to the Order in Pending Cases, if no party objects to a paper review, the undersigned shall proceed with such review. If any party objects to the paper review, then the undersigned shall conduct a new oral hearing in accordance with 12 C.F.R. § 308.35, except that the parties may agree to the use of written transcripts of prior testimony, and upon such agreement the undersigned will use such transcripts.

So ordered.

Dated: July 24, 2018

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

---

[1] Pursuant to the Order in Pending Cases, objections or comments addressing the Notice of Intention to proceed through the use of this paper review will be permitted. The deadline for such objections or comments shall be set forth in the Notice of Intention, and shall be subject to the terms set forth in the Order in Pending Cases, at 3.

## CERTIFICATE OF SERVICE

On July 24, 2018, I served by electronic mail the foregoing Notice of Reassignment with attached Order in Pending Cases, upon:

Valerie J. Best, Assistant Executive Secretary,
Nicholas J. Kazmerski
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov, nkazmerski@fdic.gov, adill@fdic.gov

Timothy E. Divis, Esq.
Bryan R. Sup, Esq.
David Beck, Esq.
Lisa A. Price, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
tdivis@fdic.gov, bsup@fdic.gov, dbeck@fdic.gov,
liprice@fdic.gov

Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com
Counsel for Respondent Harry C. Calcutt, III

Emmanuel Monteau
Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Suite D8116
Arlington, Virginia 22226-3500
ofia@fdic.gov (e-mail)
(703) 562-6070 (telephone)

FEDERAL DEPOSIT INSURANCE CORPORATION

CERTIFIED COPY OF RESOLUTION OF THE BOARD OF DIRECTORS

I, Valerie Jean Best, Assistant Executive Secretary of the Federal Deposit Insurance Corporation, do hereby certify that the attached is a true and correct copy of a resolution duly adopted by the Board of Directors of said Corporation, on the 19th day of July, 2018, by notational vote, and that the same has not been amended or rescinded and is now in full force and effect.

> IN WITNESS WHEREOF, I have hereunto subscribed my name and caused the seal of the Corporation to be affixed hereto, in the City of Washington and District of Columbia, this 19th day of July, 2018.



Assistant Executive Secretary
Federal Deposit Insurance Corporation

(SEAL)

085172

Page 4 of 8

A088

## RESOLUTION

WHEREAS, the Board of Directors ("Board") of the Federal Deposit Insurance

Corporation ("FDIC"), by resolution bearing Seal No. 085152, dated July 19, 2018, appointed

C. Richard Miserendino and Christopher B. McNeil as administrative law judges for the FDIC

pursuant to the appointment power granted to it as the Head of a Department by Article II of the

United States Constitution, and by 12 U.S.C. § 1819(a) (Fifth) and 5 U.S.C. § 3105; and

WHEREAS, the Board has the power to "perform, direct the performance of, or waive

performance of, any act which could be done or ordered by the administrative law judge" (12

C.F.R. § 308.4).

NOW, THEREFORE, BE IT RESOLVED, that the Board adopts the following:

## ORDER IN PENDING CASES

(1) the three cases listed on Exhibit A, Part 1, which have been stayed by the Executive

Secretary of the FDIC's Board pending the Supreme Court's decision in the *Lucia* case, are

hereby remanded and reassigned to a different administrative law judge ("ALJ") for a new

hearing and a fresh reconsideration of all prior actions, including summary dispositions, taken

before the hearing, as set forth below;

(2) the two cases listed on Exhibit A, Part 2, which are currently pending before the U.S.

Court of Appeals for the Fifth Circuit, upon remand from that Court, be reassigned to a different

ALJ, for a new hearing and a fresh reconsideration of all prior actions, including summary

dispositions, taken before the hearing, as set forth below; and

(3) the cases listed on Exhibit A, Part 3, which are pending before an ALJ and in which a

hearing has not yet occurred, are hereby reassigned to the other ALJ for a fresh reconsideration

of all prior actions, including summary dispositions, and for all other purposes going forward,

including for hearing, as set forth below.

This ORDER expresses no opinion on the merits of each case but is issued in an abundance of caution in light of the Supreme Court's recent decision in *Lucia v. SEC*. Thus, an ALJ may, after an appropriate process, reach the same conclusions as the prior ALJ, but the ALJ is also free to reach completely different conclusions than the prior ALJ. This ORDER likewise should not be interpreted as an opinion that an ALJ's earlier appointment was not made or approved by the Head of a Department. Rather, the Board issued this ORDER to remove any doubt and eliminate continued litigation over the issue. Nor should this ORDER be interpreted as indicating that any of the steps required by this Order are mandated by *Lucia*.

**ORDERED FURTHER**, that promptly after reassignment, in all cases except those stayed because of parallel criminal proceedings, the newly-assigned ALJ should issue a Notice (with a copy of this Order attached) informing the parties of this ORDER and providing each party an opportunity to file an Objection (with supporting law and facts) to any of the actions taken by the prior ALJ in the case before the hearing ("pre-hearing actions"). The Notice should provide an objecting party with a reasonable time (no less than 30 days after the issuance of the Notice) within which to file the Objection, and a page limit. The Notice should also provide any party opposing the Objection with an equivalent reasonable time period and page limit to file a Response to the Objection. The Notice, Objection and Response (if any) should be retained in the record of the case. The ALJ should thereafter issue a decision on reconsideration of the pre-hearing actions to which an Objection was filed, including any summary dispositions, taken by the prior ALJ. With respect to pre-hearing actions to which no Objection is filed, the ALJ shall review the pre-hearing action and adopt or revise the action as the ALJ deems appropriate. In cases stayed because of parallel criminal proceedings, to the extent that the ALJ had issued any pre-hearing actions (other than an order staying the action because of parallel criminal

A090

proceedings) prior to the stay, the ALJ should proceed with the Notice and procedure described in this paragraph either upon reassignment or after the lifting of the stay related to parallel criminal proceedings. If, in such cases, there were no pre-hearing actions other than a stay order, the ALJ should process the action as called for in the FDIC's Rules, 12 C.F.R. Part 308.

**ORDERED FURTHER**, for the cases that have also been remanded for a new hearing (see Exhibit A, Parts 1 and 2), that the ALJ, after issuing the decision(s) on reconsideration of the pre-hearing actions, should issue a Notice of Intention to conduct a written hearing on remand— a paper proceeding consisting of a review of the existing record plus any other evidence that the ALJ may decide to allow—and issue a recommended decision at the conclusion of that review. Any such Notice should allow a reasonable period for comments and or/objections to the Notice (no less than 30 days) by any party. The Notice should provide that any commenting or objecting party must identify in its comments to the Notice specific examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record, or on evidence or witness testimony that should have been included or excluded from the record. In addition, the Notice should provide that any objecting party must confer with the other parties and identify in its comments whether there are any witnesses for which the parties agree to rely on the written transcript of their prior testimony.

**ORDERED FURTHER**, that if no party objects to a paper hearing, the ALJ is free to proceed with it. If any party objects to a paper hearing, then the ALJ must conduct a new oral hearing in accordance with 12 C.F.R. § 308.35, except that the ALJ may accept the written transcript of prior testimony of any witnesses for which the parties agreed to accept such testimony.

## Exhibit A

### Part I

1. Thomas Shiu-Kit Wu, et al. United Commercial Bank, San Francisco, CA, FDIC-11-294e and FDIC-11-295k. Reassigned from ALJ Miserendino to ALJ McNeil.

2. Harry C. Calcutt, III. Northwestern, Bank, Traverse City, Michigan, FDIC-12-568e and FDIC-13-115k. Reassigned from ALJ Miserendino to ALJ McNeil.

3. Michael R. Sapp, Tennessee Commerce Bank, Franklin, Tennessee, FDIC-13-477e and 13-478k. Reassigned from ALJ Miserendino to ALJ McNeil.

### Part II

1. Burgess v. FDIC, Fifth Circuit No. 17-60579. Reassigned from ALJ McNeil to ALJ Miserendino.

2. Bank of Louisiana v. FDIC, Fifth Circuit No. 16-60837. Reassigned from ALJ Miserendino to ALJ McNeil.

### Part III

1. Diana Yates, The Bank of Oswego, Lake Oswego, Oregon, FDIC-14-0217k, reassigned from ALJ Miserendino to ALJ McNeil.

2. Gregg Ward and Susan Ward, The First State Bank, Camargo, OK, FDIC-16-0248e, FDIC-13-034e, FDIC-16-0243b, FDIC-16-0194k, FDIC-16-0205k. Reassigned from ALJ McNeil to ALJ Miserendino.

3. Bank of Louisiana, New Orleans, Louisiana, FDIC-17-0086k. Reassigned from ALJ McNeil to ALJ Miserendino.

4. Donald V. Watkins, Sr., Alamerica Bank, Birmingham, Alabama, FDIC-17-0154e and FDIC-17-0155k. Reassigned from ALJ Miserendino to ALJ McNeil.

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**WASHINGTON, D.C.**

In the Matter of

**HARRY C. CALCUTT III, et al.**
Individually and as Institution-Affiliated Parties
of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

## REASSIGNMENT REVIEW AND
## DECISIONS ON RECONSIDERATION

    The administrative hearing requested by Harry C. Calcutt III, William Green, and Richard Jackson, Respondents in this administrative enforcement action, was conducted in Grand Rapids, Michigan by presiding Administrative Law Judge, C. Richard Miserendino, between September 15 and 24, 2015. Shortly before the hearing, Respondents Green and Jackson consented to orders of prohibition being entered against them, and the ALJ approved orders terminating the enforcement action against both Mr. Green and Mr. Jackson.[1] After the hearing ended and following submission of post-hearing briefs, ALJ Miserendino on June 6, 2017 issued a recommended decision for consideration by the Board of the FDIC, adverse to Respondent Calcutt.

    While the recommended decision was pending before the FDIC Board but before the Board issued its final order, the Supreme Court issued its opinion in *Lucia*.[2] Upon its review of the *Lucia* opinion, the Board through a Resolution and an Order in Pending Cases remanded the enforcement action to the Office of Financial Institution Adjudication (OFIA) with instructions that the matters be reassigned to the undersigned Administrative Law Judge.[3] Pursuant to that Order, upon remand from the Board of Governors, the reassigned ALJ was to provide a new hearing and a fresh reconsideration of all prior actions taken before the hearing.

    The Board's July 19, 2018 Order in Pending Cases directed that upon remand and reassignment, the reassigned ALJ was to issue a Notice of Reassignment informing the parties of the reassignment order, and providing each party an opportunity to file an objection to any of the actions taken by the prior ALJ in the case before the hearing ("pre-hearing actions"). After providing an opportunity to file responses to any such objections, the reassigned ALJ was to issue

---

[1] See Order on Termination of Proceedings dated September 14, 2015 (regarding Respondent Jackson) and Order on Termination of Proceedings dated September 15, 2015 (regarding Respondent Green).
[2] *Lucia v. Securities and Exchange Commission*, 138 S.Ct. 2044 (2018).
[3] A copy of Resolution No. 085172 and Order in Pending Cases dated July 19, 2018, was attached as an appendix to the Notice of Reassignment, dated July 24, 2018.

A093

a decision on reconsideration of the pre-hearing actions and adopt or revise the action as the reassigned ALJ deemed appropriate. This Reassignment Review will reflect decisions on reconsideration of the prehearing orders entered by ALJ Miserendino.

On July 24, 2018, the Notice of Reassignment was issued and the parties were directed to address pre-hearing objections or comments by September 28, 2018. Responses to objections or comments would be considered if filed by November 14, 2018. Respondent Calcutt filed his objections to the prehearing actions on September 28, 2018,[4] and Enforcement Counsel filed a response in opposition on November 14, 2018.[5]

The Board's Order in Pending Cases directed that after issuing the decision on reconsideration of the pre-hearing actions, the reassigned ALJ was to issue a Notice of Intention to Conduct a Written Hearing on Remand – a paper proceeding consisting of a review of the existing record plus any other evidence that the ALJ may decide to allow. The Order further provided that if no party objected to a paper hearing, then the reassigned ALJ was to proceed with a review of that record. If any party objected to a paper hearing, however, then the ALJ was to conduct a new oral hearing in accordance with 12 C.F.R. § 308.35, except that the ALJ may accept the written transcript of prior testimony of any witness for which the parties agreed to accept such testimony.

The Notice of Reassignment that was issued on July 24, 2018 did not provide the parties with an opportunity to request an oral hearing – instead, the Notice was limited to providing the parties with an opportunity to bring attention to prehearing orders that had been issued by the prior ALJ. Nevertheless, Respondent Calcutt expressly requested "a new evidentiary hearing".[6]

Inasmuch as the Board's Resolution and Order in Pending Cases directed the convening of an oral hearing upon receipt of such objections, I will proceed without issuing a Notice of Intention to Conduct a Written Hearing, and will instead issue an order providing for an oral hearing.

Among the other purposes of the Notice of Intention mandated by the FDIC through its Order in Pending Cases, however, was that the parties were to be given the opportunity to submit comments or objections, *with the specification that any commenting or objecting party identify specific examples where the party believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record, or on evidence or witness testimony that should have been included or excluded from the record*. Nothing like this has been filed to date, which is understandable inasmuch as the Board's Order in Pending Cases and my Notice of Reassignment did not require such a filing. Nevertheless, the Board's Order in Pending Cases makes it clear that the parties are to be called upon to make such a filing, and as such the parties will be directed to do so, in a Notice that will be issued subsequent to the issuance of this Reassignment Review.

Further, the Notice of Intention was to require that any objecting party be directed to confer with the other parties and identify whether there are any witnesses for which the parties agree to rely on the written transcript of their prior testimony. Assuming such a conference has

---

[4] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing.

[5] Federal Deposit Insurance Corporation's Response to Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for New Hearing.

[6] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 11.

not yet taken place, the parties will be directed to take this action forthwith.

### Respondent's Assertion that the Proceedings Must Begin Anew

Respondent has stated that he does not consent to the reassignment review as provided for by the FDIC's Order in Pending Cases.[7] Respondent's objections are noted and have been preserved in the record as part of his response to the Notice of Reassignment. This particular objection, however, is beyond the scope of the Reassignment Review. The Order in Pending Cases established the scope of this Review, providing that each party has "an opportunity to file an Objection (with supporting law and facts) to any of the actions taken by the prior ALJ in the case before the hearing ("pre-hearing actions")."[8]

The factual predicate to Respondent's assertion that the proceedings are void and thus must begin anew is that the prior ALJ was an inferior officer whose appointment did not comport with requirements found in the Appointments Clause of the United States Constitution. Respondent asserts that "[t]he Supreme Court's *Lucia* decision clearly establishes that ALJ Miserendino's appointment violated the Constitution from Day One."[9] According to Respondent, "one raising Appointments Clause violations with respect to ALJs is 'entitled' to a new proceeding before a different ALJ, *Lucia*, 138 S. Ct. at 2055, and 'all the possibility for relief that review by a properly constituted [ALJ] would have given him,' Ryder, 515 U.S. at 188."[10]

There is, however, no legal authority supporting the proposition that all one has to do is raise an issue based on a putative Appointments Clause violation to be entitled to all the relief a properly appointed ALJ would or could have given him. Rather, those seeking a remedy based on a putative Appointments Clause violation have the burden of establishing the applicability of the Clause to the individual in question.

Respondents seek to have a finding that the factors that led the Supreme Court to hold SEC ALJs to be "Officers" are also present here. The record, however, does not permit this factual conclusion.

First, the Board's July 19, 2018 Resolution and Order in Pending Cases expressly directed that the Order should not "be interpreted as indicating that any of the steps required by this Order are mandated by *Lucia*." This directive is consistent with the limited scope of the Board's Order now before me: The Board has directed not that I determine whether prior orders were void; instead, the mandate is that I "issue a decision on reconsideration of the prehearing actions" – reviewing those actions to which an objection was filed, and reviewing those orders to which no objection had been filed and "adopt or revise the action as the ALJ deems appropriate." From this mandate, there is no basis to conclude this Reassignment Review should treat the prior prehearing orders as though they were void *ab initio*. Respondent is not precluded from making an argument regarding whether the prior ALJ's orders were void; but such an argument is beyond the scope of the FDIC Board's Order in Pending Cases, and thus beyond the scope of this Review.

Second, the Court in *Lucia* made it clear that its determination was limited to SEC ALJs,

---

[7] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 2.
[8] Order in Pending Cases dated July 19, 2018 at 2 (copy attached).
[9] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 3.
[10] *Id.* at 6.

where it noted SEC ALJs "receive[ ] a career appointment.").[11] If there is a comparable statute or regulation establishing the FDIC provides a career appointment to its ALJs, Respondent had the obligation to cite to it, but has not done so. This is not a trivial distinction, as the Supreme Court expressly limited its opinion by stating "[t]he sole question here" is whether the Commission's ALJs are "Officers of the United States" or simply employees of the Federal Government.[12] Reference to the Commission, that is, to the SEC, and not to all federal agencies, indicates a significant limitation by the Court, one that cannot be overlooked here.

Next, the record presented to the Court in *Lucia* included specific proof that functions performed by SEC ALJs were akin to those of Special Trial Judges serving the United States Tax Court – thus leading the Court to draw from *Freytag*[13] (which addressed the duties STJs performed in finding them to be officers under the Appointments Clause). Such proof included the Court's reference to codified powers of the SEC ALJs to take testimony, receive evidence, and examine witnesses at hearings, and take pre-hearing depositions;[14] conduct trials, administer oaths, rule on motions, and generally regulate the course of a hearing, as well as the conduct of parties and counsel;[15] rule on the admissibility of evidence;[16] issue document subpoenas;[17] and the power to enforce compliance with discovery orders, and punish all contemptuous conduct, including violations of those orders, by excluding the offender from the hearing.[18]

The purpose of noting the Court's referral to SEC regulations is not to determine whether or not some or all of the same functions are also performed by FDIC ALJs. Doubtlessly ALJs appointed by the FDIC perform duties like those performed by SEC ALJs, and like those performed by ALJs appointed by myriad other federal agencies. The purpose, rather, is to reflect that the Court's decision was directly pointed at the SEC ALJs and the regulations that authorized the performance of their job duties. While he presented excerpts from the record reflecting functions performed by the prior ALJ,[19] Respondent has not provided reference to comparable authorities applicable in this administrative proceeding, electing instead to rely on a casual and informal description of those functions – however incomplete or inaccurate that description may be.

For example, in *Lucia* the Court noted that among the SEC ALJ's powers is the authority to take pre-hearing depositions, and cited 17 C.F.R. §§ 201.111(c), 200.14(a)(4) and 5 U.S.C. § 556(c)(4).[20] The last reference, to the "Hearings" provisions of the Administrative Procedure Act, authorizes ALJs to take depositions, but only "subject to published rules of the agency and within its powers".[21] The SEC's Rules of Practice expressly permit discovery depositions upon oral examination;[22] the FDIC's Uniform Rules do not.[23] While Respondent presented portions of

---

[11] *Lucia v. S.E.C.*, 138 S. Ct. at 2053, quoting 5 C.F.R. § 930.204(a).

[12] 138 S. Ct. at 2051.

[13] *Freytag v. Commissioner*, 501 U.S. 868 (1991),

[14] *Lucia v. S.E.C.*, 138 S. Ct. at 2053 quoting 17 C.F.R. §§ 201.111(c), 200.14(a)(4).

[15] 138 S. Ct. at 2053 quoting 17 C.F.R. § 201.111 and §§ 200.14(a)(1), (a)(7).

[16] 138 S. Ct. at 2053 quoting 17 C.F.R. § 201.111(c),

[17] 138 S. Ct. at 2053 quoting 17 C.F.R. § 201.111(b).

[18] 138 S. Ct. at 2053 quoting 17 C.F.R. § 201.180(a)(1).

[19] See Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at Exs. 3-9.

[20] 138 S.Ct. at 2053.

[21] 5 U.S.C.A. § 556(c)(4).

[22] 17 C.F.R. § 201.233: "In any proceeding under the 120–day timeframe designated pursuant to § 201.360(a)(2), depositions upon written notice may be taken as set forth in this paragraph."

A096

the record reflecting the role ALJ Miserendino played in presiding over this administrative review of the FDIC's enforcement action,[24] he made no attempt to show that the statutes and regulations applied by the Supreme Court in *Lucia* were those controlling the present administrative enforcement action.

Again, the purpose of this review is not to attempt to determine whether the functions of FDIC ALJs are sufficiently similar or dissimilar to those of the SEC in order to determine whether *Lucia* controls the issue presented. The purpose here is to note Respondent bore the burden of presenting a sufficient factual and legal basis that would permit such a determination. The Supreme Court's determination in *Lucia* was limited to the application of regulations controlling the action of SEC ALJs. Having considered Respondent's brief in support, and having found no effort to establish that the regulations presented to the Court in *Lucia* also were in force here, I find an insufficient basis has been made to support Respondent's contention that *Lucia* controls the determination of this issue.

For the foregoing reasons, I reject Respondent's argument that the prior ALJ's rulings were invalid or are void as a whole.[25] Respondent's blanket objection to those rulings is overruled as it is dependent on premises that fall beyond the scope of this Reassignment Review and as it is not supported by a sufficient factual or legal basis.

Respondent next posits that this administrative enforcement action "must begin anew with the filing of a new or amended Notice of Charges."[26] The authority to make such a determination belongs exclusively to the FDIC Board of Directors. Accordingly, while the record now includes Respondent's assertion, the relief sought will not be granted through this Reassignment Review.

### Decisions on Reconsideration of Pre-Hearing Orders

In accordance with the provisions appearing in the FDIC's Order in Pending Cases, upon reassignment the parties have been provided the opportunity to file objections to any of the pre-hearing actions taken by ALJ Miserendino. Regardless of whether an objection was filed with respect to such actions, I have examined each of the orders entered by the prior ALJ.

#### Procedural Orders

With respect to procedural orders – those addressing how, when, and in what manner the evidentiary hearing requested by Respondent would be conducted – I found the determinations to be in accordance with provisions of the FDIC's Uniform Rules of Practice and Procedure,[27] with provisions of 12 U.S.C. § 1818 (pertaining to the enforcement of provisions of the Federal

---

[23] 12 C.F.R. § 308.107 "Parties to proceedings set forth at § 308.1 of the Uniform Rules and as provided in the Local Rules may obtain discovery only through the production of documents. No other form of discovery shall be allowed."

[24] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 3-4, citing the Notice of Designation and Order Requiring Electronic Filing, issued August 28, 2013 (Respondent's Ex. 3), Prehearing Procedural Order, issued May 14, 2015 (Resp. Ex. 4), Orders on Termination of Proceedings as to Respondent Jackson (Resp. Ex. 5) issued September 14, 2015 and as to Respondent Green (Resp. Ex. 6) issued September 15, 2015.

[25] See at Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 7-9.

[26] *Id*. at 9.

[27] 12 C.F.R. Part 308.

Deposit Insurance Act), and with provisions of the Administrative Procedure Act.[28] Orders examined and included under this subheading are identified in the appendix attached to this Order. Upon finding that cause to revise these orders has not been shown, I adopt them in this Reconsideration Review, as if fully rewritten here.

Respondent next identifies specific issues presented in the following orders entered by the prior ALJ:

1. Notice of Designation[29]

2. Prehearing Procedural Order[30]

3. Orders on Termination of Proceedings as to Respondents Jackson and Green[31]

4. Notice of Reassignment[32]

5. Subpoenas to Cori Nielson and Northwest Bank,[33] Order on Extension of Time to Respond to Subpoenas,[34] and Order Denying Motion to Quash as Moot Because of Agreement[35]

### Determination Regarding Specific Orders by the Prior ALJ

### 1. Notice of Designation[36]

The Notice of Designation, issued on December 18, 2017, appears to have been issued *sua sponte* by the prior ALJ shortly after the enforcement action was referred to the Office of Financial Institution Adjudication (OFIA) for the purpose of providing the evidentiary hearing to which Respondent was entitled. It identifies ALJ Miserendino as the presiding Administrative Law Judge, it describes the manner of presentation and the means by which documents were to be filed with OFIA, it establishes the starting date for the discovery period, it imposes duties on the parties regarding discovery and the obligation to confer, and it directs the parties to ensure documents presented to OFIA are presented with confidential or sensitive information redacted.[37]

While not identifying an objection specific to this Notice, Respondent presented his argument regarding the Notice adjacent to the proposition that the Supreme Court's decision in *Lucia* "clearly establishes that ALJ Miserendino's appointment violated the Constitution from Day One."[38] For the reasons set forth above, specifically that any objection to the Notice of Designation is dependent on premises that fall beyond the scope of this Reassignment Review and is not supported by a sufficient factual or legal basis, I find no basis has been advanced warranting

---

[28] 5 U.S.C. Pt. I, Ch. 5, Subch. II.

[29] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 3.

[30] *Id*. at 4.

[31] *Id*. at 5.

[32] *Id*.

[33] *Id*.

[34] *Id*. at 9.

[35] *Id*. at 10.

[36] *Id*. at 3.

[37] Designation Notice and Order Requiring Electronic Filing, issued December 18, 2017.

[38] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 3.

any modification of or the rejection of this Notice and the terms presented therein.

### 2. Prehearing Procedural Order[39]

Like the Notice of Designation, the Prehearing Procedural Order appears to have been issued *sua sponte* as part of the prior ALJ's duties to control the course of the evidentiary hearing requested by Respondent. It set forth the protocols to be followed during the hearing, including use of electronic equipment, production of copies of proposed exhibits, the sequencing of witnesses, and limits on opening and closing statements.

In his Objections, Respondent again identified no specific objection to this Order.[40] Instead, he presented the Order as further evidence of the role ALJ Miserendino played in serving as the presiding officer in the prior administrative hearing. As the Procedural Order was presented solely to show how the functions of the prior ALJ were comparable to those of the ALJ in *Lucia*, and (for the reasons set forth above) as such a proffer does not establish *Lucia's* applicability here, I find no basis has been advanced warranting any modification of or rejection of this Order and the terms presented therein.

### 3. Orders on Termination of Proceedings as to Respondents Jackson and Green[41]

In his Objections, Respondent identified orders by which the prior ALJ recognized that two of the three original respondents had consented to the issuance of prohibition orders against them.[42] The two orders were issued shortly after Enforcement Counsel submitted notices of settlements regarding claims against Respondents Jackson and Green.[43] Thus, it appears the two Orders on Termination were entered to memorialize the circumstances under which enforcement actions against these two respondents were concluded.

Respondent identified no specific objection to these orders.[44] Instead, he noted that after these two Orders were entered by the prior ALJ, the FDIC "did not amend its notice of Charges to focus only on Mr. Calcutt."[45] Elaborating on this point, Respondent stated:

> Furthermore, the case is different today than it was three years ago when ALJ Miserendino held the first evidentiary hearing. Then, a broad Notice of Charges [*sic*] that included allegations against Messrs. Jackson and Green (who have now settled out of the case) framed and shaped the scope of requests, discovery, discussions, and eventually the evidentiary hearing. Neither Mr. Calcutt nor the newly appointed ALJ should have to parse the charges against Mr. Calcutt from the joint charges in the prior Notice. To the contrary, a new or amended Notice of Charges tailored to Mr. Calcutt individually ought to govern the scope of the pre-hearing process and the evidentiary hearing, particularly given the fact that Mr. Calcutt is on trial for

---

[39] *Id*. at 4.

[40] *Id*. at 4-5.

[41] *Id*. at 5.

[42] *Id*. at 5, citing Order on Termination of Proceedings as to Respondent Jackson, issued September 14, 2015, and Order on Termination of Proceedings as to Respondent Green, issued September 15, 2015, both presented as Resp. Ex. 5.

[43] Notice of Settlement as to Richard Jackson, and Notice of Settlement as to William Green, both dated September 14, 2015.

[44] See Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 5.

[45] *Id*.

one specific transaction—the Bedrock Transaction—and not the overall Nielson relationship.[46]

To the extent Respondent's objection is that the settlements involving Mr. Jackson and Mr. Green may have a material impact on the course of proceedings, the objection is noted. That objection, however, does not identify a basis for modifying or rejecting the two Orders of Termination. While Enforcement Counsel may elect to file an amended Notice of Intention, whether they do so or not is wholly within their sound discretion. If an amended Notice of Intention is not issued, then surplusages in the extant Notice of Intention may be addressed through motion either prior to the hearing or at any time prior to the closing of the record. Similarly, and as Respondent has noted, under the FDIC's Uniform Rules, Respondent may file an amended Answer at any stage of the proceeding.[47]

Accordingly, I find no basis has been advanced warranting any modification of or rejection of the two Orders of Termination and the terms presented therein.

### 4. Notice of Reassignment[48]

Respondent presents the Notice of Reassignment in his Objections, apparently for the proposition that – in executing the FDIC Board's directive to review the prior ALJ actions – the Notice fails to provide a sufficient remedy under *Lucia*.[49] To this end, Respondent asserted:

> The FDIC's July 19 Resolution allows the ALJ to simply consider objections, review ALJ Miserendino's orders, and possibly "adopt" them. Ex. 6, at 6 (Notice of Reassignment). But reviewing objections and prior orders is not the same as "consider[ing] the matter as though he had not adjudicated it before." *Lucia*, 138 S. Ct. at 2055. Instead, everything must start over.[50]

As previously noted, the scope of this Reassignment Review is limited to a review of the actions of the prior ALJ. Whether the July 19 Resolution (and Order in Pending Cases) constitutes a sufficient remedy is an issue that is beyond the scope of this Review. Inasmuch as the Notice of Reassignment is not an action of the prior ALJ, objections thereto are not properly presented in this Review.

### 5. Subpoenas to Cori Nielson and Northwest Bank,[51] Order on Extension of Time to Respond to Subpoenas,[52] and Order Denying Motion to Quash as Moot Because of Agreement[53]

Respondent identified two subpoenas, one to Cori Nielson and the other to Northwestern Bank, as evidence that the prior ALJ authorized non-party document discovery and "shaped the responses to those subpoenas by issuing deadlines and response times."[54]

---

[46] *Id.* at 10 (footnote omitted).
[47] 12 C.F.R. § 308.20(a).
[48] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 5.
[49] *Id.* at 11.
[50] *Id.*
[51] *Id.*
[52] *Id.* at 9.
[53] *Id.* at 10.
[54] *Id.* at 9.

Beyond noting that in one instance the prior ALJ "set a short deadline for the production of documents from key third parties" Respondent offers no legal or factual basis to either reject or amend the subpoenas as issued. The only reference offered in his Objections in this regard is that "[w]hile new counsel was not privy to the negotiations over the requests, a review of confidential communications suggests that the scope of documents produced may have been narrowed in part because of time constraints."[55]

Respondent's overarching objection – that "there are countless other ways in which ALJ Miserendino shaped the pre-trial process"[56] – does not serve as a basis for rejecting or modifying the cited subpoenas nor the orders issued pertaining to those subpoenas. Respondent asserts that "the new hearing thus cannot be built on the actions and decisions of an unconstitutional adjudicator," and that "everything must start over".[57]  I find, however, that an insufficient legal and factual basis has been advanced to support Respondent's objections to the actions of the prior ALJ.

**Report on Reassignment Review**

Having examined with a fresh set of eyes the prehearing actions by the prior ALJ, and having taken into consideration Respondent's objections to those actions, along with Enforcement Counsel's responses to those objections, I find the foregoing shall serve as the Reassignment Review commissioned by the FDIC Board in its July 19, 2018 Order in Pending Cases.

As directed by the Order in Pending Cases, after the issuance of this Reassignment Review, a Notice of Intention to Conduct a Hearing on Remand shall be issued. That Notice shall set forth the procedures that will be followed to facilitate the evidentiary hearing requested by Respondents.

So ordered.

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution
Adjudication

---

[55] *Id*. at 9-10, citing Resp. Ex. 9 (Order Denying Motion to Quash Because of Agreement).
[56] Respondent's Objections to All Pre-Hearing Actions Taken by ALJ C. Richard Miserendino and Request for a New Hearing at 10.
[57] *Id*. at 11.

Page 9 of 11

**A101**

## CERTIFICATE OF SERVICE

On November 28, 2018, I served by electronic mail the foregoing Reassignment Review and Decisions on Reconsideration, upon:

**FDIC Executive Staff**
Valerie J. Best, Assistant Executive Secretary,
Nicholas J. Kazmerski
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov, nkazmerski@fdic.gov, adill@fdic.gov

**FDIC Enforcement Counsel**
Timothy E. Divis, Esq.
Bryan R. Sup, Esq.
David Beck, Esq.
Lisa A. Price, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
tdivis@fdic.gov, bsup@fdic.gov, dbeck@fdic.gov, liprice@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Suite D8116
Arlington, Virginia 22226-3500
ofia@fdic.gov (e-mail)

A102

**Appendix**

September 12, 2013 2:59:00 PM Order Extending Time to Answer
October 24, 2013 2:36:00 PM Scheduling Order & Sample Protective Order
November 21, 2013 10:17:00 AM Order on Motion to Adjourn Hearing Date & Change Venue
November 18, 2013 11:05:00 AM Protective Order
March 21, 2014 2:53:00 PM Order on Motion to Amend Scheduling Order and Adjourn Hearing
April 03, 2014 1:30:00 PM Status Conference Order
April 04, 2014 11:17:00 AM Amended Protective Order
April 07, 2014 10:08:00 AM Second Amended Protective Order
April 14, 2014 12:53:00 PM Status Conference Order
April 18, 2014 9:33:00 AM Order on Bedrock & the Nielsons' Motion to Quash
April 23, 2014 9:39:00 AM Third Amended Protective Order
May 02, 2014 9:09:00 AM Amended Scheduling Order
June 19, 2014 3:49:00 PM Status Conference Order
June 24, 2014 11:08:00 AM Order of Substitution
September 08, 2014 9:27:00 AM Order Granting Motion to Amend Scheduling Order
September 24, 2014 9:54:00 AM Amended Scheduling Order
October 31, 2014 9:41:00 AM Status Conference Order
November 12, 2014 4:48:00 PM Conference Order
November 21, 2014 4:01:00 PM Order Correcting Caption
March 31, 2015 7:53:00 AM Order Postponing Hearing Date
May 06, 2015 3:41:00 PM Notice of Hearing Venue
June 12, 2015 8:53:00 AM Status Conference Order
June 12, 2015 9:03:00 AM Status Conference Order
August 17, 2015 10:17:00 AM Issuance of Respondent's (Joint) Hearing subpoenas
August 20, 2015 1:54:00 PM Issuance of FDIC's Hearing subpoenas
August 25, 2015 4:39:00 PM Reissuance of FDIC's Hearing Subpoenas
Thursday, August 27, 2015 3:36:00 PM Notice of Prehearing Conference
August 31, 2015 11:50:00 AM Status Conference Order
October 22, 2015 9:58:00 AM Order Removing Pages from FDIC Exhibit 3
November 30, 2015 11:57:00 AM Order to Withdraw and Resubmit Redacted Exhibits
December 08, 2015 11:04:00 AM Order on Errata and Post-Hearing Briefing
December 18, 2015 2:05:00 PM Order Granting Motion to Modify Post-Hearing Briefing Schedule
December 23, 2015 4:12:00 PM Order Granting Motion to Withdraw and Resubmit Redacted Exhibits

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**WASHINGTON, D.C.**

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

## ORDER REGARDING NEW ORAL HEARING

By an Order dated November 29, 2018, the parties were advised that the new oral evidentiary hearing requested by Respondent would be scheduled pursuant to the FDIC's July 19, 2019 Resolution and Order in Pending Cases.[1] The November 29, 2018 Order recognized that Respondent objected to proceeding through a paper review and asked that the matter be adjudicated through a new oral evidentiary hearing.[2] Upon this request the November 29, 2018 Order determined that the paper review described by the FDIC Board in the Order in Pending Cases would not be conducted, and instead, an oral evidentiary hearing would be scheduled to permit the parties to present evidence regarding the issues and claims raised in the Notice of Intention and in the Respondent's Answer.[3]

The FDIC's Order in Pending Cases further required that any party who objected to proceeding through a paper review of the prior hearing would be required to "identify specific examples where the party believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record, or on evidence or witness testimony that should have been included or excluded from the record."[4]

By the November 29, 2018 Notice, Respondent, as the only party objecting to a paper review, was directed to identify specific examples where he believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record, or on evidence or witness testimony that should have been included or excluded from the record.[5] Respondent has submitted a Memoranda [*sic*] of Specific

---

[1] Notice of Intention to Conduct a Hearing, issued November 29, 2018, citing Resolution No. 085172 and Order in Pending Cases dated July 19, 2018, attached as an appendix to the Notice of Reassignment, dated July 24, 2018
[2] Notice of Intention to Conduct a Hearing at 1.
[3] *Id*. at 2.
[4] See Resolution No. 085172 and Order in Pending Cases dated July 19, 2018 at 7.
[5] *Id* at 7 (emphasis added).

Examples,[6] and Enforcement Counsel have submitted a Response.[7] Upon review of these submissions and the record as a whole, the following determinations are made and orders entered.

At the outset, Respondent objected to the requirement that he provide specific examples from the original hearing.[8] He averred the produced examples were irrelevant, and would "inject error into this second proceeding by reintroducing events before and decisions by an unconstitutionally-appointed ALJ".[9] Respondent argued that such a listing "has no relevance nor ability to affect the second hearing because the original proceeding was void *ab initio*."[10]

The second hearing is being conducted under the mandate from the FDIC Board. The mandate is clear in that it provides Respondent with a new hearing by a new and properly appointed ALJ; but the hearing is not *de novo*. The prior proceedings have not been deemed void *ab initio*, but instead serve as the primary source of the evidentiary record, subject to review and reconsideration by the new ALJ – and Respondent offers no authority for finding otherwise.[11]

Respondent argues that the case "turns entirely on credibility assessments."[12] He avers the case against him is "circumstantial," and that "[t]here is no document, considered alone or with other documents, that proves that Respondent misled the FDIC about the nature of the Nielson borrowing relationship (much less that he intentionally did so), benefitted from the alleged misconduct, or caused Northwestern Bank to incur a loss."[13] Respondent avers that the "credibility, demeanor, and truthfulness of Respondent's witnesses are critical."[14] Without citing to the record, Respondent asserts that "Cori Nielson contacted the FDIC to make good on her threat to harm the Bank and destroy Respondent and enlist the FDIC's help to forestall the Bank's collection efforts."[15] There is, however, no reference to the record identifying the testimony supporting Respondent's averments. As such, Respondent's memorandum does not "identify specific examples" as required under the Order in Pending Cases.

Although asserting the need to "assess each witness's credibility in a new proceeding," Respondent identified by name only Cori and Keith Nielson, Autumn Berden, Mark Smith, Ronald Swanson, and Ann Miessner as witnesses whose testimony falls within the scope of the FDIC mandate due to credibility issues.[16] Rather than identifying specific passages of witness testimony, however, Respondent posits in general terms the factual bases in support of his claim that all witness testimony must be presented through a new oral evidentiary hearing.

The scope of the Board's Order, and the boundaries of the presentation of evidence in the new oral hearing, are more limited than that proposed by Respondent. In Respondent's memorandum, he offers a series of examples (without reference to actual testimony) that support the proposition that the witness's credibility must be determined.

---

[6] Respondent's Memoranda of Specific Examples, filed December 31, 2018.
[7] Federal Deposit Insurance Corporation's Response to Respondent's Memoranda of Specific Examples, filed January 18, 2019.
[8] Respondent's Memoranda of Specific Examples at n.1.
[9] *Id*.
[10] *Id*.
[11] See *id*.
[12] Respondent's Memoranda of Specific Examples at 2.
[13] *Id*.
[14] *Id*. at 2, 4.
[15] *Id*. at 3.
[16] *Id*. at 3-4.

Respondent stated that during the first hearing, Cori Nielson's demeanor revealed her "palpable bias and desire to destroy Respondent in retribution for the Bank's refusal to capitulate to her unreasonable demands that the Bank modify Nielson family loans."[17] Respondent supplements this with a narrative asserting that Ms. Nielson then contacted the FDIC, used the FDIC to "make good on her threat to harm the Bank and destroy Respondent,"[18] again without reference to the record providing support for this assertion. He then states "[Ms. Nielson's] credibility was further undermined at the hearing by her insistence that her actions were motivated by patriotism rather than revenge."[19]

It is, according to Respondent, "these same biases, hostilities, and self-serving statements [that] were shared by other Nielson family witnesses, including Keith Nielson and Autumn Berden," whom Respondent averred "were angered by the Bank's insistence that they repay the outstanding loans and were motivated to exaggerate Respondent's role."[20] Respondent asserted that through this proffer, he has demonstrated that "[c]ollectively, the motivation, credibility, and demeanor of the Nielson Family will be a key element for the trier of fact that cannot be assessed on a paper record."[21]

The proffers here, however, do not establish instances where the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record – which is the test employed by the FDIC Board in its July 19, 2018 Resolution and Order in Pending Cases. Respondent's averments do not attempt to distinguish from among the many credibility factors he identifies – there is, specifically, no effort in his Response to identify in the transcripts of the testimony of these witnesses where and how *demeanor* evidence played a role or could play a role in determining the merits of the issues and claims presented; or, if demeanor was not at issue, how the original proceeding turned on elements that are not readily determined from a review of the written record.

While it may be true, for example, that Ms. Nielson's credibility was undermined at the hearing by her insistence that patriotism motivated her actions, determining the weight to be given this statement would not require observing Ms. Nielson's *demeanor* on the witness stand. Instead, it would be determined by using all of the tools traditionally used when determining such weight. Respondent offers no support for the proposition that evaluating the credibility of Ms. Nielson's statements turns on watching her or listening to her speak at a hearing.

Without question, it is true that credibility is a significant factor in this proceeding. Ms. Nielson's biases, and those of each witness, will need to be considered when weighing conflicting factual claims. But reliance on demeanor evidence is rare, and rarely trumps the less subjective and more reliable credibility markers.

Demeanor evidence refers to the "non-verbal cues given by a witness while testifying, including voice tone, facial expressions, body language, and other cues such as the manner of testifying, and the witnesses' attitude while testifying."[22] While demeanor evidence is regarded as

---

[17] *Id*. at 3.
[18] *Id*.
[19] *Id*.
[20] *Id*.
[21] *Id*.
[22] Professor Gregory L. Ogden, The Role of Demeanor Evidence in Determining Credibility of Witnesses in Fact Finding: The Views of ALJs, 20 J. Nat'l Ass'n Admin. L. Judges 1, 2 (2000), citing Olin Guy Wellborn III, Demeanor, 76 Cornell L. Rev. 1075 (1991).

an important basis for determining the credibility of a witness,[23] it is not an exclusive basis, and its limits are well documented. Psychological studies show that "the non-verbal cues associated with demeanor evidence do not provide increased accuracy in making credibility determinations, either in detecting whether a witness is telling the truth or lying, or in assessing the believability of a witness who may be sincere but inaccurate or mistaken in their testimony."[24]

Experience teaches that included among credibility factors contributing to the assessment of weight to be given to a witness's testimony are:

- whether the witness had the opportunity to see or hear the events about which he or she testified;

- whether the witness had the ability to recall those events accurately; whether the testimony of the witness was plausible and likely to be true (or implausible and not likely to be true);

- whether the testimony was consistent or inconsistent with other testimony or evidence in the case (or made in previous cases);[25]

- whether a witness failed to state a fact at a prior time, when it would have been reasonable and logical for the witness to have stated the fact;[26]

- the extent to which the witness's background, training, education, or experience affected the believability of the witness's testimony;

- whether the witness had a bias, hostility, or some other attitude that affected the truthfulness of the testimony;[27]

- whether the witness had (or did not have) a motive to lie – and where such a motive was shown, whether that motive affected the truthfulness of that witness's testimony;

- whether the witness hoped for or expected to receive a benefit for testifying;

- whether the witness had any interest in the outcome of the case (and in all regulatory enforcement cases, respondent individuals have such an interest);[28] and

---

[23] Ogden, 20 J. Nat'l Ass'n Admin. L. Judges at 2–3 (2000).

[24] *Id*. at 4 (2000), citing Wellborn at 1079-1081; Jeremy A. Blumenthal, A Wipe of the Hands, A Lick of the Lips: The Validity of Demeanor Evidence in Assessing Witness Credibility, 72 Neb. L. Rev. 1157, 1190-1191 (1993).

[25] See *People v. Duncan*, 46 N.Y.2d 74, 80, 385 N.E.2d 572 (1978) ("As a general rule, the credibility of any witness can be attacked by showing an inconsistency between his testimony at trial and what he has said on previous occasions" (Richardson, Evidence [10th ed-Prince], § 501)).

[26] *People v. Rosario*, 9 NY2d 286, 289-290, quoting *Jencks v. United States*, 353 U.S. 657, 667.) ("the test of inconsistency, we have said, is not limited to outright contradictions between a witness' prior statements and his trial testimony; it includes, as well, omitting to mention critical facts at the prior time, which facts are later related at trial.")

[27] See *People v. Jackson*, 74 N.Y.2d 787, 790, 543 N.E.2d 738 (1989).

[28] *People v. Agosto*, 73 N.Y.2d 963, 967, 538 N.E.2d 340 (1989).

- whether a witness has been convicted of a crime and, if so, whether and to what extent this affects the truthfulness of that witness's testimony.

Each of these factors will be considered when evaluating the weight to be given to the testimony presented at the first hearing. But the examples presented by Respondent do not depend on demeanor evidence.

Having examined each of the examples relied upon by Respondent,[29] I find no basis has been shown to conclude that the testimony concerns facts that "are not readily determined from a review of the written record," as provided for by the FDIC's Order in Pending Cases.

The above analysis determines the outcome rejecting Respondent's assertion that live testimony is warranted with respect to testimony from Cori Nielson, Keith Nielson, Autumn Berden, Mark Smith, and Ronald Swanson.[30] In the case of Mr. Smith, for example, Respondent asserted that as the Bank's former Director of Global Risk, Mr. Smith's credibility had been undermined by the fact that he recanted positions he had previously taken during the 2011 FDIC examination; and further undermined by his admission on cross-examination that he had no first-hand knowledge to support the assertion that the Bank lost money on the Bedrock Loan.[31]

No doubt the admission and the inconsistent or recanted statements weigh on the credibility of the witness – and without question the Board's Order in Pending Cases requires a fresh calibration of the weight to be given to such testimony. But nothing in this proffer establishes that witness demeanor – how Mr. Smith appeared or sounded during his testimony – would affect the weight to be given to these statements.

To much the same end, Respondent asserts there was evidence of bias on the part of the FDIC's Case Manager, Ann Miessner – bias that according Respondent is "not readily ascertainable from the paper record alone."[32] In support, however, Respondent relies not on demeanor evidence, but on the fact that her testimony included "wide-ranging opinions, outside the scope of the Notice of Intention, and with the purpose of providing argument for the FDIC."[33] Nothing in this proffer suggests demeanor evidence would be a factor relevant to the weight to be given to Ms. Miessner's opinions.

Inasmuch as Respondent failed to provide citations to the record to support his factual claims, it is not possible to determine the weight to be afforded Respondent's assertion that "Miessner also directed the entrapment of Calcutt in violation of his constitutional right to due process [by concealing] information from the Bank."[34] It is sufficient for these purposes, however, to determine the factual premises Respondent relies upon in this context do not establish that there was a role demeanor played in the testimony of this witness (or in the hearing generally).

Respondent avers each witness must be brought forward to testify anew.[35] Testimony was taken from Respondent, Cori Nielson, Keith Nielson, Dennis O'Neill, Ann Miessner, Charles Bird, Autumn Berden, Ian Hollands, Richard Jackson, Michael Doherty, Mark Smith, and Robert

---

[29] Respondent's Memoranda of Specific Examples at 1-4.
[30] *Id*. at 3.
[31] *Id*.
[32] *Id*. at 4.
[33] *Id*.
[34] *Id*.
[35] *Id*. "These examples illustrate why it is necessary to assess each witness's credibility in a new proceeding."

Swanson. Having examined the factual and legal premises advanced by Respondent, I find an insufficient basis in fact and law has been advanced to establish that the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record. Upon this finding, and with one exception, testimony from these witnesses shall be that which had been presented during the initial evidentiary hearing.

In his Memorand[um], Respondent avers that in order to make adverse findings against him, his testimony constituted "first-hand knowledge about the central events in this case," that the trier of fact "must discount or ignore" when determining whether there was any wrongdoing or dishonesty.[36] Respondent then identified four parts of the record that support this point: that he testified that the Bank's Board approved the Bedrock Loan; that Ian Holland's explanation about the delay had been supported by contemporaneous emails; that Respondent himself had testified regarding his lack of involvement in negotiations with the Nielsons in late 2010; and that Respondent had testified regarding his memory about these events and the attention he paid to other aspects of the Bank's operations.[37]

In this respect, I agree – as it concerns the four points raised in his Memorand[um],[38] Respondent shall be permitted to provide live testimony, notwithstanding that he has already testified in this regard. Any such testimony will be in the record as a supplement to, and not as a substitute for, Respondent's prior testimony. Further, and beyond the scope of that articulated by Respondent's four parts of the record regarding his own credibility, the parties shall be permitted to present new testimonial and documentary evidence regarding the order of assessment of a civil money penalty, including evidence regarding aggravating and mitigating circumstances that presently exist (which may, or may not have existed when the matter was first heard).

Apart from determining whether a sufficient showing has been made regarding the need for demeanor evidence, the parties also addressed whether evidence that had been presented should be excluded in the new proceeding, and whether evidence not admitted before should be admitted now.[39]

Enforcement Counsel made no objection to the prior ALJ's determinations in admitting or excluding proffered exhibits and testimony.[40] Respondent now objects to any present consideration of two reports that had been admitted as exhibits at the first hearing.[41] In presenting his objection, Respondent states only that the prior ALJ "allowed two reports authored by Plante Moran and FinPro, without requiring any witness to testify as to the accuracy of the report."[42] Other than noting the prior ALJ permitted the reports as evidence without a sponsoring witness, the only other basis for excluding these reports, as presented by Respondent, is that "[t]hese reports were not without substantial doubt as to their veracity at the time they were created."[43] Respondent, however, offered no citation to the record establishing "substantial doubt" with respect to the veracity of the two reports.

The record reflects that the Bank's global risk manager, Mark Smith, assisted the CPA firm of Plante & Moran in gathering information needed to assist the Bank's special Directorate

---

[36] Respondent's Memoranda of Specific Examples at 2.
[37] *Id*.
[38] *Id*. at 2, last full paragraph.
[39] *Id*. at 4-5.
[40] Federal Deposit Insurance Corporation's Response to Respondent's Memoranda of Specific Examples.
[41] *Id*. at 4-5, citing Tr. at 1078-77, 1081.
[42] *Id*.
[43] *Id*. at 5.

committee.[44] The committee had asked the firm to assist the Bank in its due diligence efforts, to perform a review (independent of the review by bank regulators) of the Nielson's banking relationship, and then examine other commercial relationships that might be similar to the Nielsons'.[45] In this way, Mr. Smith both assisted the firm in making the report, and then as a member of the special committee he saw the report, reviewed it, and agreed with the committee in finding that the report was completed when received by the committee.[46]

After establishing that the report had been accepted and kept in the ordinary course of the Directors' business records, Enforcement Counsel moved for the admission of the report.[47] Respondent's Counsel responded:

> I have no objection to it coming in as a business record. I do have an objection related to it being considered for the truth of the matters stated therein. The document is hearsay. There is no one in court for me to cross-examine with regard to the accuracy of any of the statements. So as a document of the Bank, I have no objection. As to the truth of the matter, I have objection.[48]

There was in this objection an insufficient basis presented to exclude the report. As Enforcement Counsel have noted in their Response, even assuming that Respondent's contemporaneous objection was sufficiently stated (an assumption I find not warranted), if the report constituted objectionable hearsay under the Federal Rules of Evidence, as Respondent averred during the hearing, it would not on that ground alone be inadmissible.[49] Examining the proffered exhibit, and noting the testimony offered when seeking to have the exhibit admitted, I find the contents of the Plante Moran report (as communicated throughout the attachments accompanying the August 8, 2012 letter from Michael A. Kus, of Kus, Ryan & Associates, PLLC) to be relevant, material, reliable, and not unduly repetitive. As such, there is no basis shown now, nor was there a basis shown during the first hearing, that warrants excluding FDIC Exhibit 77.

To the same effect, Respondent seeks exclusion of a report generated in response to a Consent Order, under which the Bank was required to do a study of the Bank's management and management's ability to run the Bank.[50] FinPro produced the report, and the Bank shared the results with the Bank's regulators.[51] After establishing that the report had been maintained in the ordinary course of the Bank's business, Enforcement Counsel sought the report's admission as an exhibit.[52] Respondent's Counsel offered the same objection as had been made regarding the Plante Moran's admissibility; and the prior ALJ overruled the objection, admitting the exhibit.[53]

As was the case with the Plante Moran report, from my review of the record of hearing and after considering the averments now presented in Respondent's memorandum, I find the

---

[44] Tr. at 1073-74.
[45] *Id*. at 1074-76.
[46] *Id*. at 1075.
[47] *Id*. at 1076, offering FDIC Exhibit 77(FDICPROD0011917- into evidence.
[48] Tr. at 1076-77.
[49] Federal Deposit Insurance Corporation's Response to Respondent's Memoranda of Specific Examples at 9, citing 12 C.F.R. § 308.36(a)(3).
[50] Tr. at 1078.
[51] *Id*.
[52] *Id*. at 1078-79.
[53] *Id*. at 1079-81, regarding FDIC Ex. 84.

FinPro report to be relevant, material, reliable, and not unduly repetitive. There being no substantial basis in either fact or law presented on Respondent's behalf at the time the exhibit was presented, nor any such basis advanced in Respondent's Memoranda of Specific Examples, there is no basis shown then, nor now, that warrants excluding FDIC Exhibit 84.

The foregoing two examples of evidence Respondent seeks to exclude from consideration are characteristic of thirteen other examples included in Respondent's Memorand[um]. Having examined each example, I find an insufficient basis has been presented warranting exclusion – both at the time the objections were raised during the hearing, and through the present memorandum.

While the Order on Pending Hearings permitted an objecting party to seek exclusion of evidence that previously had been admitted, it did not do away with the requirement that movants have the burden of identifying with particularity the factual basis supporting exclusion, and supporting the same with citation to appropriate authority. In each of the remaining thirteen examples, the record reflects that when presented during the hearing, each document was relevant, material, reliable, and not unduly repetitive, and as such exclusion was not warranted.

In the first example, Respondent seeks the exclusion of the "Nielson Binder," referred to on page 20 of the transcript, on the basis of "foundation and relevance".[54] The Nielson Binder is described by Dennis O'Neill, a Commissioned FDIC Bank Examiner, as documents he recognized as having been supplied by officers of the Nielson Entities, consisting of correspondence between the borrower and the Bank at least through late 2009.[55] After accepting an examiner's role that succeeded a prior FDIC examiner (Robert Bush), Mr. O'Neill stated he reviewed the contents of the binder and used it in his review of the Nielson credit relationship with the Bank.[56]

Respondent objected on the basis that Mr. O'Neill did not create the binder, nor did the FDIC, that it "contains no risk documents that have no [sic] relevance or bearing on this case."[57] Noting that the contents included "numerous documents that in and of themselves would not be admissible," Respondent argued that "the binder itself is a group of documents that should not be admitted."[58] Upon this objection, the prior ALJ overruled Respondent and admitted the exhibit. There was at the time of the hearing an ample showing that the requested evidence was relevant, material, reliable, and not unduly repetitive, which are the salient legal and factual requirements extant in the FDIC's Uniform Rules regarding the exclusion of evidence.

Having considered the legal and factual premises advanced both during the hearing and now, I find in each case sufficient indicia establishing that the admitted evidence was relevant, material, reliable, and not unduly repetitive; and that an insufficient basis has been presented either during the hearing or now that would warrant the exclusion of the contents of the Nielson Binder, FDIC Exhibit 3.

The same is true with respect to the remaining specific examples presented by Respondent.[59] None of the remaining objections presented in Respondent's memorandum are supported by a sufficient articulation of the legal and factual bases (either during the hearing or

---

[54] Respondent's Memoranda of Specific Examples at 5.
[55] Tr. at 16-17.
[56] *Id*. at 17-19.
[57] *Id*. at 20.
[58] *Id*.
[59] Respondent's Memoranda of Specific Examples at 5.

now) that would justify excluding the evidence admitted during the first hearing.[60] Accordingly, Respondent's objections to the testimony identified in his Memorand[um] are overruled.

SO ORDERED.

Dated: March 19, 2019

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

---

[60] *Id*., citing Tr. at 81-87, on foundation grounds; Tr. at 124-25, on foundation; Tr. at 478-90, on foundation; Tr. at 588-90, on foundation; Tr. at 849, on foundation and speculation; Tr. at 1071, on foundation and on unspecified hearsay grounds; Tr. at 1087, on unspecified hearsay grounds; Tr. at 1099-103, on foundation, unspecified hearsay, and the "best evidence rule"; Tr. at 1103-06, on foundation and "best evidence rule"; Tr. at 1150-58, on "Daubert, biased witness, and unreliability"; Tr. at 1234-35, based on unspecified hearsay; and Tr. at 1283, based on relevance.

## CERTIFICATE OF SERVICE

On March 19, 2019, I served by electronic mail the foregoing Order Regarding New Oral Hearing upon:

**FDIC Executive Staff**
Valerie J. Best, Assistant Executive Secretary,
Nicholas J. Kazmerski
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov, nkazmerski@fdic.gov, adill@fdic.gov
ESSEnforcementActionDocket@FDIC.gov

**FDIC Enforcement Counsel**
Timothy E. Divis, Esq.
Bryan R. Sup, Esq.
David Beck, Esq.
Mary Anne Benden
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
tdivis@fdic.gov, bsup@fdic.gov, dbeck@fdic.gov, mbenden@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

Ryan T. Scarborough
William Snyderwine
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com: wsnyderwine@wc.com

_____
Denise J. Stewart
Program Assistant
Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Suite D8116
Arlington, Virginia 22226-3500
ofia@fdic.gov (e-mail)
(703) 562-6070 (telephone

Page 10 of 10

**A113**

# FEDERAL DEPOSIT INSURANCE CORPORATION
# WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

## NOTICE OF HEARING AND SUPPLEMENTAL PREHEARING ORDERS

By an Order dated March 19, 2019, the parties were advised that the new oral evidentiary hearing requested by Respondent would be scheduled, all pursuant to the FDIC's July 19, 2019 Resolution and Order in Pending Cases.[1]

### Notice of Hearing

By this Notice, the parties are advised that the evidentiary hearing requested by Respondent Harry C. Calcutt III has been set to commence on **Tuesday, August 20, 2019** at a location to be determined, within the geographic jurisdiction of the United States District Court for the Southern Division, Western District of Michigan. The hearing will begin at 9 a.m. and daily thereafter beginning at 8:30 a.m. and will continue from day to day until completed.

### Supplemental Prehearing Orders

The parties have in preparation for the hearing held in 2016 submitted to OFIA and exchanged among each other all or most of the material likely to be brought forward for the hearing set for August 20, 2019. To the extent such an exchange and submission serves the parties' respective interests and cause to proceed otherwise is not shown, the prior submission should be identified by document title and submission date, and need not be re-submitted or exchanged.

All transcripts from the 2016 hearing shall be admitted as evidence and included in the review leading to the Recommended Decision, as will all jointly submitted exhibits and any exhibit that was placed into the record without objection. All of these shall, however, be subject to challenge through motions seeking orders *in limine*, particularly given the absence of Respondents Green and Jackson. Further, the parties shall submit prehearing statements that

---

[1] Order Regarding New Oral Hearing, issued March 19, 2019; see also Notice of Intention to Conduct a Hearing, issued March 13, 2019, citing Resolution No. 085172 and Order in Pending Cases dated July 19, 2018, attached as an appendix to the Notice of Reassignment, dated July 24, 2018

acknowledge and take into account the effects of the post-*Lucia* procedural orders, so that the record reflects the parties' respective positions given the state of the record.

**Prehearing Submissions**

The parties' prehearing submissions shall be filed no later than **May 15, 2019**, and shall include:

1. A prehearing statement which states, in three separate articulations, (1) the party's position with respect to the legal issues remaining to be determined following the termination of proceedings against Respondents Green and Jackson in this enforcement action, (2) the statutory and case law upon which each party's position relies, and (3) the facts that each party expects to prove at the hearing;

2. A list of exhibits the party expects to introduce, sequentially numbered and formatted as reflected in Attachment "A" to this Order. In light of the termination of proceedings regarding Respondents Green and Jackson, the parties are directed to examine the exhibits already admitted and make an affirmative declaration whether those exhibits should remain as hearing exhibits or should be retained in the record solely as proffered exhibits. The parties are directed to confer prior to May 8, 2019 and identify all joint exhibits, and identify those exhibits as such. All Joint Exhibits stipulated by the parties to be admitted in evidence at the hearing shall be listed separately as reflected in Attachment "B" to this Order. The purpose of this Order is to permit the parties to identify those documents the parties agree no longer are relevant. All documents already admitted will remain part of the record, but only those that are shown to be relevant will be included in the post-hearing review leading to the Recommended Decision. Whether or not the parties agree that a document is no longer relevant, the post-review hearing leading to the Recommended Decision will not consider an exhibit if no reference is made to the document, either during the initial or post-*Lucia* hearing or in any post-hearing briefs (including those briefs submitted after the initial hearing).

> Throughout this proceeding all exhibits shall be identified and referred to as "FDIC Exh. __" or "R. Exh. ___" or "Jt. Exh. ___" only. Each page of each exhibit containing more than one page shall be individually and sequentially numbered.

3. As a part of their pre-hearing submission, each party shall serve on each other party and on OFIA a copy of their exhibits, unless the exhibit has already been provided to OFIA and the other parties. Counsel should discuss and agree upon whether they will exchange copies of their prehearing submission exhibits via disc, electronically, or a combination thereof. Enforcement Counsel shall be responsible to serve on each other party and on OFIA a copy of the joint exhibits.[2] Two paper copies of each exhibit intended to be presented to a witness shall be presented at the time of the hearing, one for use by the

---

[2] Note that the FDIC provides OFIA with server space by which documents and proposed exhibits may be securely stored. Parties wishing to submit motions accompanied by documents not exceeding 3 Mb in size may attach those documents to an email-based submission. When submitting documents that exceed 3 Mb, the parties may wish to use the Secure File Transfer Protocol (SFTP) maintained by the FDIC for OFIA's use, rather than attempting to make the submission using either email or surface mail. At the conclusion of these proceedings, the record certified to the FDIC will be made using electronically stored documents, rather than print or CD-based media.

witness, to be retained by the Court Reporter, and the other for use by the presiding ALJ, with the latter copy to be returned to the party at the conclusion of the hearing.

4. Note that each proposed exhibit must be stored as a separate document on the medium the party elects to use. In this way, should a party inadvertently submit a document that contains personally identifiable information or information that is confidential or that must be submitted under seal, that document could, prior to the hearing, be removed and a properly redacted copy submitted in its place. Pursuant to this Order, if one or both parties elect to provide the prehearing exhibits via disc, the disc(s) should be mailed to the attention of my Program Assistant at:

> Office of Financial Institution Adjudication
> c/o Program Assistant to ALJ Christopher B. McNeil
> 3501 N. Fairfax Drive, Suite D8111
> Arlington, Virginia 22226

Note that no document may be submitted to OFIA or provided to opposing counsel unless the document is in electronic form and is encrypted (through password protection or comparable security). Discs or other media being presented to OFIA will be destroyed unread unless the presentation establishes that the contents have been stored using encrypted password protection.

Encryption is already included in submissions that use the FDIC's secure file transfer protocol (SFTP). If a party elects to serve copies of their documents on OFIA using the designated SFTP, the party should, *at least two business days prior to the date of your planned submission,* send an email message to OFIA (ofia@fdic.gov) requesting the necessary single-use credentials that will be used to authorize this submission.

Please be mindful that these credentials will expire within a designated period of time, which will be set forth in the credentialing email that you will receive from OFIA. Note also that the SFTP permits only the inbound delivery of documents to OFIA; it is not available for outbound transmissions, and thus cannot be used by one party for the transmission of documents to another party. The submitting party and the receiving party each have the obligation to maintain documents submitted for this administrative proceeding in a secure encrypted environment.

5. Information regarding each witness, including fact, hybrid fact/expert and expert, who may be called to testify, including:

   a.   The name and address of each witness;

   b.   A short summary of the expected testimony of each witness, e.g., "This witness will testify that …." Note that during the evidentiary hearing, witness testimony will be limited to the descriptions provided in this summary. In order to ensure the efficient and orderly presentation of witness testimony, the parties are directed to identify, in their prehearing submissions, by exhibit number or numbers, and page number or numbers, the documents relied upon by each witness, whether fact witness, expert witness, or hybrid expert and fact witness**. During the direct examination of the witness and absent sufficient cause to vary from this provision, only those exhibits and page numbers identified in this prehearing submission may be presented to the witness by the party calling the witness.**

c.      In the case of a hybrid fact/expert witness, a statement of all expert opinions the witness will express, the bases and reasons for them, the facts or data considered by the witness in forming them, and any exhibits that will be used to summarize or support them.

d.      A statement of disputed issues and claims to be resolved at the hearing; and

e.      All stipulations agreed upon by the parties.

Absent sufficient cause shown to vary from this provision, documentary and testimonial evidence not disclosed through the prehearing submissions will not be permitted during the hearing. In this case, Respondent may seek the opportunity to testify. This hearing shall serve as the Respondent's opportunity to do so.

Absent sufficient cause shown to vary from this provision, the facts stipulated to by the parties in their Joint Stipulations of Fact dated February 2, 2015 shall be regarded as established facts of the case. Further, absent sufficient cause shown to vary from this provision, the documents identified in the parties' Stipulated List of Joint Exhibits shall be regarded as admitted exhibits, as will all exhibits admitted without objection during the prior hearing.

**Supplementation**

Supplementation of the prehearing submissions after May 15, 2019 shall be only upon motion and such motion will be granted only upon sufficient cause shown (e.g., that the identity of the witness, the content of the requested testimony, or the need for the witness's testimony could not have been previously determined upon the exercise of due diligence by counsel) and upon a determination regarding the potential prejudicial effect of such proffered evidence.

**Motions**

Prehearing submissions shall not include motions; motions shall be submitted separately. All prehearing motions, including motions for orders in limine, shall be filed by **June 7, 2019**. By prior order, dispositive motions, including motions seeking plenary or partial summary disposition were due by September 5, 2014.[3] Accordingly, dispositive motions shall not be considered timely if filed as a prehearing motion under this Order.

**Duty to Confer**

Before any motion is filed in this proceeding, counsel for the movant shall confer with all other parties in an attempt to resolve their differences. Only after such efforts have been made may counsel move for relief, and in such motion counsel shall describe in writing the efforts undertaken to resolve the matter. Any motion that does not contain a certification of sufficient efforts will be subject to summary denial.

**Oral Opening and Closing Statements**

The parties are advised that absent sufficient cause shown, I will not permit oral opening or closing statements, determining (a) that the parties' pre-hearing filings sufficiently permit me to appreciate what the evidence is likely to be in advance of the hearing; and (b) upon a finding that post-hearing briefs will sufficiently permit me to appreciate what the evidence established during the hearing.

---

[3] Scheduling Order issued October 24, 2013 at 1; Order on Respondents' Motion to Amend Scheduling Order and Adjourn Hearing issued March 21, 2014 at 3; Amended Scheduling Order issued May 2, 2014 at 1

**A117**

**Hearing Location**

Pursuant to 12 USC § 1818(h), the hearing will be conducted at a state or federal hearing or trial facility in the federal judicial district in which the home office of the depository institution is located. In this case, the depository institution is located within the jurisdiction of the United States District Court for the Southern Division, Western District of Michigan. The parties will be notified once a hearing facility has been located.

**Notice of Hearing Date**

The hearing in this matter will be held starting on Tuesday, **August 20, 2019**, at 9:00 a.m., and will continue from day to day, starting at 8:30 a.m. thereafter, until completed. I presently anticipate the hearing will require three days to complete. The parties should not, however, use any date other than August 26, 2019 when stating witness appearance dates in praecipes for subpoenas. This Office will endeavor to secure access to the hearing facility on Monday, August 19, 2019 to permit the parties and any trial consultant or consultants to prepare for the hearing.

**Hearing Subpoenas**

Subject to provisions of the Order Regarding New Oral Hearing and pursuant to 12 CFR § 308.34, a party may apply for a hearing subpoena at any time before the commencement of a hearing. The parties are cautioned, however, that pursuant to 12 CFR § 308.34(b)(2), any person to whom a hearing subpoena is directed may file a motion to quash or modify the subpoena, and may do so at any time prior to the time specified in the subpoena (but not more than ten days after the date of service of the subpoena on the movant); and further, any party may respond to such motion at any time within ten days of service of the motion.

Accordingly, requests for the issuance of hearing subpoenas and subpoenas duces tecum should be presented in sufficient time before the start of the hearing to permit such motion and response. Applications for hearing subpoenas filed with OFIA after **July 19, 2019,** may be denied pursuant to 12 CFR § 308.34(a)(3) if I find the terms of the subpoena, including the timing of issuance, are unreasonable or for any other reason set forth in such regulation.

**Depositions Subpoenas of Witnesses Unavailable for Hearing**

If a witness will not be available for the hearing, a party desiring to preserve that witness's testimony for the record may apply under the provisions at 12 CFR § 308.27 for the issuance of a subpoena requiring the attendance of the witness at a deposition in lieu of appearing at the scheduled hearing. Proposed subpoenas should utilize the format reflected in Attachment "C" to this Order. Such requests will be considered only if supported by a demonstration of sufficient cause meeting the requirements found in 12 CFR § 308.27 and are filed no later than **July 19, 2019,** and shall be scheduled so as to be completed by **August 2, 2019**. The parties shall confer in regard to any such deposition dates and schedules prior to filing such application with OFIA.

**Use of Trial Consultant**

In order to efficiently present testimony in which witnesses are shown documents for their review, the parties must, in advance of the hearing, confer with one another to ensure the sufficiency and compatibility of all presentation equipment (including both hardware and

**A118**

software). The FDIC does not maintain its own hearing facility, and instead relies upon facilities maintained by state and federal courts and agencies, like those maintained by a U.S. District Court. Each such facility has unique presentation equipment, and each party is responsible for ensuring their presentation equipment is compatible with the presentation equipment available in the facility chosen for this hearing.

Failure to take effective steps in advance of the hearing to ensure such compatibility will not constitute sufficient cause to delay the hearing and may result in the witness or witnesses not being presented with the requested documents during the hearing. The parties may wish to associate, either individually or collaboratively, with a trial consultant who can coordinate the presentation of evidence in conjunction with the courtroom facilities manager. The fees associated with obtaining and utilizing the trial consultant shall be determined by the parties, as OFIA is not responsible for such costs.

By no later than **July 19, 2019**, the parties shall confer on the use of a trial consultant to manage the electronic presentation of exhibits for both parties at the hearing, and report on the same by **August 2, 2019**.

**Deadline Extension Requests**
Requests for extensions of deadlines appearing in Orders of this tribunal, including those requests jointly submitted by the parties, must be accompanied by a certification describing what steps were taken to comply with the deadlines and, when such steps were taken. Such requests, including those jointly submitted by the parties, will be granted only upon a sufficient demonstration of the party's, or parties', timely efforts to comply with these deadlines. Any request that does not contain such a certification will be subject to summary denial.

SO ORDERED.

Dated: March 20, 2019

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

## CERTIFICATE OF SERVICE

On March 20, 2019, I served by electronic mail the foregoing Notice of Hearing and Supplemental Prehearing Orders upon:

**FDIC Executive Staff**
Valerie J. Best, Assistant Executive Secretary,
Nicholas J. Kazmerski
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov, nkazmerski@fdic.gov, adill@fdic.gov
ESSEnforcementActionDocket@FDIC.gov

**FDIC Enforcement Counsel**
Timothy E. Divis, Esq.
Bryan R. Sup, Esq.
David Beck, Esq.
Mary Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
tdivis@fdic.gov, bsup@fdic.gov, dbeck@fdic.gov, mbenden@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

Ryan T. Scarborough, Esq.
William Snyderwine, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com: wsnyderwine@wc.com

_____
Denise J. Stewart
Program Assistant
Office of Financial Institution Adjudication
3501 N. Fairfax Drive, Suite D8116
Arlington, Virginia 22226-3500
ofia@fdic.gov (e-mail)
(703) 562-6070 (telephone)

**Attachment A**

## FEDERAL DEPOSIT INSURANCE CORPORATION
## WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

### LIST OF (FDIC's OR RESPONDENT'S) EXHIBITS TO BE INTRODUCED AT HEARING

| Exhibit No. | Date | Document Description | Sequential Page Nos. | Offered | Admitted/Not Admitted |
|---|---|---|---|---|---|
| FDIC Exh. 1 | | | | | |
| R. Exh. 1 | | | | | |

Page 8 of 10

**Attachment B**

## FEDERAL DEPOSIT INSURANCE CORPORATION
## WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

## LIST OF JOINT EXHIBITS TO BE INTRODUCED AT HEARING

    The parties hereby stipulate, pursuant §§ 308.35(a)(4) and 308.36(e) of the FDIC's Rules of Practice and Procedure, that the following documents are admissible in evidence.

| Exhibit No. | Date | Document Description | Sequential Page Nos. | Offered | Admitted/Not Admitted |
|---|---|---|---|---|---|
| Jt. Exh. 1 | | | | | |
| Jt. Exh. 2 | | | | | |

**Attachment C**: Deposition Subpoena of Witness Unavailable for Hearing (must be accompanied by a certification meeting the requirements of 12 C.F.R. § 308.27)

## FEDERAL DEPOSIT INSURANCE CORPORATION
## WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

### <u>Deposition Subpoena of Witness Unavailable for Hearing</u>

To:      [WITNESS NAME AND ADDRESS]

Pursuant to Title 12, United States Code, § 1818(n), and Title 12, Code of Federal Regulations, § 308.27, you are required to testify at a deposition at the following place:

[Location Name and address]

Date and Time: _____ at _____ .

Willful failure to comply with this subpoena is a misdemeanor, and may be punishable by a fine of up to $1,000, imprisonment of up to one year, or both. *See* 18 U.S.C. § 1818(n).

In testimony whereof, the undersigned has hereunto set his hand, this _____ day of _____, 2019.

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

LAW OFFICES

# WILLIAMS & CONNOLLY LLP

725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

(202) 434-5000

FAX (202) 434-5029

WILLIAM SNYDERWINE
(202) 434-5322
wsnyderwine@wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

March 28, 2019

<u>Via Email and U.S. Mail</u>

Valerie J. Best
Assistant Executive Secretary
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
vbest@fdic.gov

Legal Division, FOIA/PA Group
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
efoia@fdic.gov

Re:   *Freedom of Information Act Request Regarding the Appointment of*
      *Administrative Law Judges by the FDIC Board of Directors*

Dear Ms. Best:

Williams & Connolly LLP and Musick Peeler & Garrett LLP represent Mr. Harry C. Calcutt III in connection with an enforcement action brought against him by the FDIC.  *See In the Matter of Calcutt*, FDIC-12-568e, FDIC-13-115k.  Mr. Calcutt challenged the appointment of ALJ Miserendino, who presided over the original action.  In the wake of the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018), the FDIC Board issued an order reassigning this enforcement action to ALJ McNeil and ordering a new hearing.

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the FDIC's implementing regulation, 12 C.F.R. § 309.1 *et seq.*, I make the following request for information about the FDIC's appointment, oversight, and administration of its administrative law judges and the FDIC's relationship with the Office of Financial Institution Adjudication ("OFIA").  This information is intended to be used in connection with the pending enforcement action referenced above.

I request that I be sent copies of the documents requested below via email to wsnyderwine@wc.com.  If the documents are too large to send via email, then please contact me

**A124**

WILLIAMS & CONNOLLY LLP

Valerie J. Best & FDIC FOIA/PA Group
March 28, 2019
Page 2

and I will arrange another form of electronic transmission.  If electronic transmission is not possible, then I request you send documents to Williams & Connolly, LLP, Attn: William Snyderwine, 725 Twelfth Street, N.W., Washington, D.C., 20005.  I am not making this request on behalf of an educational institution, noncommercial scientific institution, or news media outlet.  I also agree to pay the applicable fees up to and including $500.  If the fees exceed $500, then please notify me.

**Documents Requested**

1.  Documents relating to the appointment of ALJ Christopher B. McNeil and ALJ C. Richard Miserendino as ALJs to hear FDIC proceedings, including but not limited to the act of appointment, documents reflecting the oath or affirmation to uphold the Constitution administered, the Commission signed by the Board and delivered to ALJ McNeil and ALJ Miserendino, and any other Order authorizing them to act as ALJs.

2.  Documents relating to the re-appointment or ratification of ALJ Christopher B. McNeil and ALJ C. Richard Miserendino by the FDIC Board of Directors or head of department, including but not limited to the act of re-appointment or ratification, documents reflecting the oath or affirmation to uphold the Constitution administered, the Commission signed by the Board and delivered to ALJ McNeil and ALJ Miserendino, and any other Order authorizing them to act as ALJs.

3.  Documents, letters, and/or memoranda relating to, provided to, and/or considered by the FDIC Board of Directors in adopting the Resolution bearing Seal No. 085152 and Order in Pending Cases, dated July 19, 2018.

4.  Minutes from any meeting during which the FDIC Board of Directors discussed the appointment of administrative law judges, the impact of *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) on enforcement proceedings, and/or the constitutionality of the OFIA.

5.  Documents relating to or demonstrating the relationship between the FDIC, on the one hand, and OFIA or the administrative law judges employed by OFIA, on the other hand. This request includes but is not limited to documents, manuals, or materials discussing or demonstrating (i) the FDIC Board's mechanisms for oversight over OFIA; (ii) the hiring process for administrative law judges employed by OFIA; (iii) the process for disciplining or firing administrative law judges employed by OFIA; (iv) the people or person responsible for hiring, disciplining, and firing the administrative law judges employed by OFIA; (v) internal procedures governing OFIA; (vi) the establishment of OFIA; (vii) code of conduct and organizational structure of administrative law judges employed by OFIA; and (viii) FDIC infrastructure, administrative, personnel, and technology resources shared by OFIA.

**A125**

WILLIAMS & CONNOLLY LLP

Valerie J. Best & FDIC FOIA/PA Group
March 28, 2019
Page 3

6. Any FDIC Manual of Examination Policies in effect from 2009 to 2012.

7. Documents and/or manuals governing the FDIC's decision on whether to bring an enforcement action to remove and/or prohibit a person from banking that was in effect from 2009 to 2012.

If the requested materials are not within the FDIC's possession, custody, or control but are, instead, within the possession, custody, or control of another federal agency, please notify me promptly. Likewise, if you deem this request defective, please notify me as soon as possible pursuant to 12 C.F.R. § 309.5(c). Otherwise, please consider this request for expedited processing in your discretion and acknowledge receipt of this request pursuant to 12 C.F.R. § 309.5(d). In responding to this request, please identify any documents withheld under a FOIA exception. Thank you in advance for your timeliness, and I look forward to your response.

Respectfully yours,

William B. Snyderwine

cc:
Barry Hovis, Esq.
Ryan Scarborough, Esq.

**A126**

## FEDERAL DEPOSIT INSURANCE CORPORATION

Washington, D.C.

| | |
|---|---|
| In the Matter of:<br><br>**HARRY C. CALCUTT III**, individually, and as an Institution-Affiliated Party of<br><br>NORTHWESTERN BANK<br>TRAVERSE CITY, MICHIGAN<br><br>(Insured State Nonmember Bank) | FDIC 12-568e<br>FDIC 13-115k<br><br>**SECOND AMENDED ANSWER**<br><br>**Date:** May 22, 2019<br>**ALJ:** Christopher B. McNeil |

## <u>SECOND AMENDED ANSWER TO NOTICE</u>

Pursuant to 12 C.F.R. § 308.20(a), Respondent Harry C. Calcutt, III respectfully submits this Second Amended Answer to the FDIC's Notice of Intention to Remove from Office and to Prohibit Further Participation, Notice of Assessment of Civil Money Penalty, and Findings of Fact and Conclusions of Law (collectively, the "<u>Notice</u>").

## <u>PRELIMINARY STATEMENTS</u>

A.     Mr. Calcutt respectfully denies all factual allegations in the Notice's headings and unnumbered paragraphs, and further denies any fact that is not specifically admitted or otherwise responded to herein for lack of knowledge or information sufficient to form a belief in the truth of the allegation.

B.     Mr. Calcutt further states that he submits this Second Amended Answer on behalf of himself only, as the other Respondents have settled with the FDIC and are not parties to the case.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I.  Preliminary Allegations

**A.  Jurisdiction**

**1.**     At all times pertinent to this proceeding, the Bank was a corporation existing and doing business under the laws of the State of Michigan, having its principal place of business at Traverse City, Michigan.  The Bank was, at all times pertinent to this proceeding, an insured State nonmember bank, subject to the Act, 12 U.S.C. §§ 1811-1831aa, the Rules and Regulations of the FDIC, 12 C.F.R. Chapter III; and the laws of the State of Michigan.

**ANSWER:**     Admitted.

**2.**     At all times pertinent to this proceeding, each of the Respondents was an "institution-affiliated party" as that term is defined in section 3(u) of the Act, 12 U.S.C. § 1813(u), and for purposes of sections 8(e)(7), 8(i) and 8(j) of the Act, 12 U.S.C. § 1818(e)(7), 1818(i) and 1818(j).

**ANSWER:**     Admitted.

**3.**     The FDIC has jurisdiction over the Bank, Respondents, and the subject matter of this proceeding.

**ANSWER:**     Admitted.

**B.  Respondents**

**4.**     At all times pertinent to this proceeding, Harry C. Calcutt III ("Calcutt") served as the Bank's president and chief executive officer and as the chairman of the Bank's board of directors.  He was also at all times a member of the Bank's senior loan committee.

**ANSWER:**     Admitted.

- 2 -

A128

5. At all times pertinent to this proceeding, William Green ("Green") served as a commercial loan officer for the Bank and a member of the Bank's classified asset committee.

**ANSWER:** Admitted.

6. At all times pertinent to this proceeding, Richard Jackson ("Jackson") served as the Bank's executive vice president and as a member of the Bank's board of directors. He was also a member of the Bank's senior loan committee, classified assets committee, and asset liability committee.

**ANSWER:** Admitted.

## II. Respondents' Handling of Troubled Loan Relationship

A. Beginning of Troubled Loan Discussions

7. Beginning in August 2009, a representative of a group of the Bank's loan customers, collectively controlled by the Nielson family of Traverse City (the "Nielson Entities"), made the Bank aware of significant financial difficulties they were facing.

**ANSWER:** Admitted that the Nielson family of Traverse City manages multiple business entities, that certain of those entities are loan customers of the Bank, and that a member of the Nielson family discussed with the Bank loans to certain entities controlled by the Nielson family throughout 2009. Further admitted that the FDIC has defined "Nielson Entities" to mean all business entities managed by the Nielson family, but denied that each reference in the Notice to "Nielson Entities" includes all such business entities. Denied for lack of knowledge or information sufficient to form a belief in the truth of the allegations in all other respects.

8. The Nielson Entities consisted of nineteen separate limited liability companies. Between them, the various entities had approximately $38,000,000 in loans at the Bank,

- 3 -

representing close to 50% of the Bank's Tier One capital, as of August 2009 (collectively, "Nielson Loans"), representing by far the Bank's largest loan relationship.

**ANSWER:**    Admitted that, if viewed collectively, the Nielson Entities represented the Bank's largest loan relationship and that the Nielson Entities had approximately $38,000,000 in loans with the Bank. Denied that the Nielson Entities consisted of nineteen separate limited liability companies. On information and belief, the Nielson Entities consisted of twenty separate business entities. Further denied that the Nielson Entities as defined in the allegation represented "close to 50% of the Bank's Tier One Capital" as that misconstrues the Bank's Tier One Capital position. Further denied for lack of knowledge or information sufficient to form a belief in the truth of the allegations in all other respects.

9.    The Nielson Entities represented a long-standing loan relationship for the Bank, having been customers of the Bank for several years prior to 2009.

**ANSWER:**    Admitted.

10.    Green was the loan officer assigned to all of the Nielson Entities.

**ANSWER:**    Admitted.

11.    In an August 2009 email to Green, a representative of the Nielson Entities advised the Bank that the Nielson Entities were facing significant financial difficulties and needed to restructure their loans.

**ANSWER:**    Admitted that in or about August 2009 the Nielson Entities claimed they were facing significant financial difficulties and wanted to restructure their loans. Denied in all other respects.

12.    Several of the Nielson Loans were due to mature on September 1, 2009, and as of that date, the Nielson Entities stopped making payments on all of the Nielson Loans.

**ANSWER:**  Admitted.

**13.**     Between August 2009 and December 2009, Green and Calcutt participated in extensive discussions and negotiations in an effort to reach an agreement on loan terms for each of the Nielson Entities.

**ANSWER:**   Admitted that Mr. Calcutt engaged in discussions regarding loans to certain Nielson entities in 2009 and Green was the point person for those discussions.  Denied in all other respects.

**14.**     During this time period, Jackson also participated in internal Bank discussions with Calcutt and/or Green, as Respondents attempted to reach an agreement on loan terms for each of the Nielson Entities.

**ANSWER:**   Admitted that Jackson participated in internal Bank discussions with Calcutt and/or Green regarding an agreement for the Nielson Loans.  Denied in all other respects.

**15.**     In November 2009, Respondents were aware that the Bank's largest lending relationship, the Nielson Entities, were approaching 90 days past due, at which time they would automatically be placed on non-accrual status.

**ANSWER:**   Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**16.**     In late November 2009, Respondents finally reached an agreement with the Nielson Entities.

**ANSWER:**   Admitted that the Bank and the Nielson Entities reached an agreement on loan terms with certain Nielson Entities in November 2009.  Denied in all other respects.

**17.**     Pursuant to the agreement, consented to by each of the Respondents, the Bank agreed to extend to one of the Nielson Entities, Bedrock Holdings, LLC, an additional $760,000

loan and to release $600,000 in certain investment-trading funds in which the Bank held a collateral interest (collectively, the "Bedrock Transaction").

**ANSWER:**    Admitted that the Bank extended a loan of $760,000 to one of the Nielson Entities, Bedrock Holdings, LLC, and released $600,000 in certain investment-trading funds in which the Bank held a collateral interest.   Denied that Paragraph 17 fully and accurately describes the transaction (in that it omits the valuable additional collateral that was provided to the Bank as part of this transaction and the collateral released from the Bank's security interest was paid to the Bank).

18.    The purpose of the Bedrock Transaction was to provide the funding necessary to bring current all of the past-due loans to the Nielson Entities and to provide a reserve sufficient to make payments for all of the loans to extend well into 2010.

**ANSWER:**  Admitted that the Nielson's used the $600,000 collateral released from the Bank's security interest to bring current all past-due loans to the Nielson Entities and used the proceeds of the $760,000 loan to establish a reserve sufficient to payments for all loans through April 2010.  Denied in all other respects, including the paragraph's characterization that this was the "purpose" of the Bedrock Transaction and that the loans extended "well into 2010."  This characterization ignores that the Bank also obtained valuable additional collateral from the Nielson's as part of the Bedrock Transaction.

19.    Respondents agreed to establish deposit accounts for the Nielson Entities with the understanding that the proceeds of the Bedrock Transaction would be deposited in such accounts and that the funds would thereafter be used to fund payments on each of the Nielson Loans.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**20.**    Each of the Respondents consented to the Bedrock Transaction and was aware of its purpose.

**ANSWER:**    Admitted that Mr. Calcutt consented to the Bank loaning a Nielson entity $760,000, transferring $600,000 of collateral to the Bank, and obtaining valuable additional collateral as part of the Bedrock Transaction.  Denied in all other respects.

**21.**    On November 30, 2009, just prior to the finalization of the Bedrock Transaction, a majority of the Nielson Loans reached 90 days past due and were automatically placed on nonaccrual.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**22.**    The same day, the Nielson Entities paid $600,000, the amount of collateral released by the Bank, for the September, October, and November payments due on the outstanding Nielson Loans, thus bringing all loans current.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**23.**    On December 1, 2009, the Nielson Loans were taken off nonaccrual.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**24.**    Between November 25, 2009 and December 3, 2009, Respondents agreed to renew all of the matured Nielson Loans.  To avoid any gaps in the loan documentation, the renewal documents were backdated to September 1, 2009.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**25.**    The Bank funded the loan to Bedrock Holdings on December 14, 2009.

**ANSWER:**    Denied.  On information and belief, the Bank funded the loan to Bedrock Holdings on December 3, 2009.

**26.**    Respondents completed the Bedrock Transaction and the renewal of approximately $30 million in loans to the Nielson Entities without obtaining any updated appraisals or financials from the Nielson Entities and without performing a global cash flow analysis or a global collateral analysis.  In doing so, Respondents ignored well-documented criticism from regulators during April 2008 and April 2009 examinations regarding the failure to obtain such information.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

B.    Failure to Follow Bank Policy Regarding Loan Approvals

**27.**    It is the Bank's policy and practice to require loans in excess of $750,000 to be approved by the Bank's senior loan committee and the board of directors.

**ANSWER:**    Admitted that the Bank had a practice of requiring certain loans to be approved by either the Senior Loan Committee, the Board of Directors, or both depending upon the size of the loan.  Denied that in practice or policy all loans in excess of $750,000 required approval by the Senior Loan Committee and Board of Directors.  Further denied for lack of knowledge or information sufficient to form a belief that there was a formal policy requiring such approvals.

**28.**    Respondents did not submit the Bedrock Transaction to the board of directors in December 2009 or discuss the Bedrock Transaction with board members at the Bank's December 2009 board meeting.

**ANSWER:**    Denied that the Bedrock Transaction was not discussed with board members in December 2009, and further denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

29.    Likewise, Respondents did not present the renewals of all the matured Nielson Loans in late November/early December 2009 to the board for review or discuss them at the November 2009 or December 2009 board meetings.

**ANSWER:**    Denied that the renewals were not discussed with Board members in November/December board meetings and further denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

30.    One of the renewed loans was a $4,500,000 loan to Bedrock Holdings.

**ANSWER:**    Admitted.

31.    In March 2010, based on information that Green provided, the Bank's credit manager prepared a belated loan write-up for presentation to the board of directors regarding the $4,500,000 loan renewal.  Inconspicuously placed in the middle of the description for this transaction, the loan write-up stated that "[a]s part of this renewal, $600,000 of [collateral] funds will be released" and "[i]n addition a new loan of $760,000 is requested to provide for working capital requirements . . . ."

**ANSWER:**    Admitted that in March 2010, based on information that Green provided, Ian Hollands prepared a loan write up for presentation to the Board regarding the loans to Bedrock.  Denied in all other respects.

32.    The assertion in the loan write-up that the $760,000 loan was to provide for working capital requirements was false.

**ANSWER:**    Admitted that the characterization of working capital for the $760,000 loan did not meet the general definition of that term.  Denied in all other respects.

33.    Respondents knew that the Bedrock Loan was not going to be used for "working capital requirements" and that, along with the proceeds of the collateral released, it was being, and would continue to be, used to keep all of the Nielson Loans current.

**ANSWER:**    Admitted that Respondents knew part of the reason for the Bedrock loan was to fund loan payments on the Nielson Loans through April 2010.  Denied in all other respects.

34.    The March 2010 loan write-up also failed to state that the $4,500,000 existing loan renewal, the $760,000 loan, and the $600,000 collateral release had all, in fact, been completed three months earlier.

**ANSWER:**    Denied.

35.    Respondents knew that the $4,500,000 existing loan renewal, the $760,000 loan, and the $600,000 collateral release had all been completed three months earlier.

**ANSWER:**    Admitted.

36.    The loan materials presented to the board in March 2010 made no reference to any of the underlying circumstances that led to the Bedrock Transaction.

**ANSWER:**    Admitted that the loan write up did not refer to the use of loan proceeds to pay Nielson Loans through April 2010.  Denied in all other respects.

37.    Thus, as of March 2010, the board had not been made aware, either in writing or at any of the preceding monthly board meetings, that: (i) the Nielson Entities, the Bank's largest loan relationship, were having significant financial difficulties; (ii) they had gone several months without making any payments on any of their loans; (iii) lengthy negotiations had taken place

between senior bank management and the Nielson Entities during that time; and (iv) the only reason the Nielson Loans were current at that time was because the Bank, through the Bedrock Transaction, had provided, either directly or through the release of the Bank's collateral, the funds to make all of the payments dating back to September 1, 2009.

**ANSWER:**    Denied.

38.    Calcutt and Jackson, as members of the senior loan committee, approved the March 2010 loan write-up.

**ANSWER:**    Admitted that Respondents initialed the loan write-up, which reflected prior approval of the loan and loan extension.  Denied in all other respects.

C.    Continued Difficulties for Nielson Entities

39.    After the Bedrock Transaction, and with the aid of the proceeds it generated, the Nielson Entities continued to make payments on the Nielson Loans through August 2010.

**ANSWER:**    Admitted.

40.    Several of the Nielson Loans were scheduled to mature again on September 1, 2010.

**ANSWER:**    Admitted, except denied for lack of knowledge or information sufficient to form a belief in the truth of the allegations as to the specific Nielson Loans were scheduled to mature on September 1, 2010.

41.    At or around that time, the Nielson Entities again advised the Bank that they were still suffering financial difficulties and that they were unable and unwilling to continue making loan payments on several of their loans.

**ANSWER:**  Admitted that the Nielson Entities claimed they had financial difficulties and were unwilling to continue making loan payments.  Denied in all other respects.

- 11 -

**A137**

42.     As of the September 1, 2010 maturity date, the Nielson Entities stopped making payments on all of the Nielson Loans.

**ANSWER:**    Admitted.

43.     Between September 2010 and December 2010, Respondents all participated in negotiations with the Nielson Entities regarding the outstanding loans, including in-person meetings with representatives of the Nielson Entities.

**ANSWER:**    Admitted that Jackson and Green participated in negotiations.  Admitted that Calcutt attended one meeting regarding the outstanding loans in December 2010.  Denied that Calcutt "participated in negotiations" with the Nielson Entities between September 2010 and December 2010.   Denied in all other respects.

44.     In December 2010, Respondents reached agreement with the Nielson Entities to an additional release of approximately $690,000 in investment-fund collateral ("December 2010 Transaction"), and the Nielson Loans were renewed and brought current.  In renewing the Nielson Loans, Respondents granted the Nielson Entities interest-rate reductions and other concessions.

**ANSWER:**    Admitted that the Bank released $690,000 in investment-fund collateral in December 2010 to bring the Nielson Loans current.  Otherwise denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

45.     As in the prior year, the released funds were again used to make payments on all of the past-due Nielson Loans and to bring them current.

**ANSWER:**    Admitted.

**46.**    Although in December 2010 the board of directors approved a short-term renewal of each of the matured Nielson Loans, Respondents did not make the board aware that several of the Nielson Entities were continuing to experience significant financial difficulties.

**ANSWER:**    Denied.

**47.**    Respondents also did not disclose to the board that they had agreed to release additional collateral in connection with the December 2010 Transaction or that the released collateral would serve as the payment source for all of the renewed loans.

**ANSWER:**    Denied.

**48.**    Despite the fact that the Bank had restructured several of the Nielson Loans, and despite Respondents' knowledge that the Nielson Entities were experiencing financial difficulties, the Bank never internally classified or recognized any impairment for the Nielson Loans.

**ANSWER:**    Denied.

**49.**    Throughout 2010, up to and including the completion of the December 2010 Transaction, Respondents failed to perform any form of global financial analysis or global collateral analysis with respect to the Nielson Entities.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**50.**    In January 2011, the Nielson Entities stopped making payments for a third time, and all of the Nielson Loans, including the $760,000 Bedrock loan, have been in default since that time.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**51.**     Since January 2011, the Bank has been involved in ongoing negotiations and collection efforts with the Nielson Entities and has initiated several foreclosure proceedings in an effort to collect the amounts owed on the Nielson Loans.

**ANSWER:**     Admitted that after the Bank had negotiations with the Nielsons in early 2011 and initiated foreclosure proceedings after the loans went into default.  Otherwise denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**52.**     To date, more than $27,000,000 remains uncollected.

**ANSWER:**     Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**53.**     Beginning in August 2009, the overall value of the collateral securing the Nielson Loans has significantly deteriorated, due to declining market conditions and the failure of the Nielson Entities to maintain properties that were no longer of value to them.

**ANSWER:**     Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

### III.     Misrepresentations, Material Omissions, and
### Other Efforts to Deceive Bank Regulators

**54.**     Beginning in late 2009, Calcutt, Green, and Jackson, acting in concert, engaged in a course of conduct that was designed to prevent regulatory authorities from discovering the impaired status of the Bank's numerous loans to the Nielson Entities and to conceal the fact that the Nielson Entities were interrelated.

**ANSWER:**     Denied.

- 14 -

**A140**

A.      Routing of Funds to Aid Concealment

**55.**      With the knowledge and consent of Calcutt and Jackson, Green took affirmative steps to conceal the true nature of the Bedrock Transaction from the FDIC and the Office of Financial and Insurance Regulation for the State of Michigan ("OFIR").

**ANSWER:**    Denied.

**56.**      Green did this by directing the Nielson Entities not to transfer the proceeds of the Bedrock Transaction directly into the various deposit accounts that had been set up for the payment of the Nielson Loans.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**57.**      Rather, Green advised the Nielson Entities to route the proceeds indirectly.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**58.**      Following that advice, the Nielsen Entities broke down the Bedrock Transaction funds into various amounts and moved the funds in numerous transactions before depositing them in the various deposit accounts for payment on each of the Nielson Loans.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**59.**      As a result, when examiners subsequently reviewed the Nielson Entities loan files, they did not detect that the Bedrock Transaction funds were used to make payment on all of the Nielson Loans.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

- 15 -

**A141**

**60.** Likewise, the complex routing of funds concealed the fact that the Nielson Loans had all become interdependent and had been negotiated collectively by Respondents and the Nielson Entities.

**ANSWER:** Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**61.** In setting up the transactions as they did, Respondents thus concealed the fact that the Nielson Entities were all interrelated.

**ANSWER:** Denied.

B.    Missing Loan Documentation

**62.** Green was responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans.

**ANSWER:** Admitted that Green or his assistant was responsible for placing the relevant documents in the Bank's loan file.

**63.** The Bank's loan files for the Nielson Entities did not contain the significant amount of pertinent correspondence that addressed: (i) the Nielson Entities' stated financial difficulties; (ii) the negotiations that occurred over a period of several months, both in 2009 and again in 2010 and into 2011; or (iii) the fact that the payments which brought and kept the loans current in December 2009 and thereafter were made possible through the use of Bank funds and cash collateral that the Bank had released.

**ANSWER:** Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**64.** The absence of such documentation further concealed the nature and purpose of the Bedrock Transaction.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

65.    Pertinent documentation regarding the problems facing the Nielson Entities and the Bank were kept out of the loan files during regulatory examinations and/or visitations in June 2010, February 2011, and August 2011.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

C.    Officer File Memoranda

66.    Though pertinent correspondence was kept out of the Bank's files relating to the Nielsen Loans, in June 2010, Green drafted a number of memoranda and placed them in the loan files for certain Nielson Entities.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

67.    The memoranda purported to provide status updates and loan histories, yet none of them mentioned any of the significant difficulties or negotiations that had taken place in fall 2009 leading up to the Bedrock Transaction.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

68.    The memoranda also misrepresented the loan histories by making statements such as, "The loan has always performed" when, in fact, the loans had been in default with no payments being made for several months in fall 2009.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

- 17 -

69.     Green drafted a file memorandum relating to Bedrock Holdings that misrepresented the purpose of that transaction, suggesting that it was for working capital to be used by one of Bedrock Holdings' subsidiaries.  The memorandum also failed to state that the actual purpose was for making payments on all of the Nielson Loans.

**ANSWER:**   Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

70.     Green placed each of these officer file memoranda in its respective loan file shortly before the FDIC's June 2010 regulatory examination began.

**ANSWER:**   Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

D.      False Call Reports

71.     The Bedrock Transaction and the December 2010 Transaction were completed shortly before the end of the 2009 and 2010 calendar years, respectively.

**ANSWER:**   Admitted.

72.     Both transactions disguised the true condition of the Nielson Entities loan portfolio and gave the false appearance that all of the Nielson Loans were unimpaired, performing loans.

**ANSWER:**   Denied.

73.     As a result of Respondents' concerted acts and omissions, including their failure to recognize impairment on any of the Nielson Loans, the Bank filed false Call Reports throughout the time period from late 2009 through mid-2012.

**ANSWER:**   Denied.

- 18 -

**A144**

E.    November 2009 Letter to Bank's Regulators

**74.**    In a November 14, 2009 letter from Jackson to OFIR and copied to the FDIC, Jackson provided the Bank's formal response to an OFIR examination report, which had listed several of the Nielson Loans for Special Mention.

**ANSWER:**    Admitted.

**75.**    Jackson sought input from Calcutt and Green regarding Nielson Loans for the letter to the OFIR.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**76.**    In the letter, Jackson described several of the Nielson Loans as "performing" loans despite the fact that they were in default at the time.

**ANSWER:**    Admitted that certain of the Nielson Loans listed for Special Mention were described as "performing," but denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

**77.**    Although Jackson's letter purported to be a status update for the Nielson Loans, among other loans, Jackson made no mention of the fact that, at the time: (i) the Nielsen Entities had stopped payments on all of their loans; (ii) the Bank was in the midst of extensive workout negotiations that had been ongoing for more than two months; or (iii) the Nielson Entities had described significant financial difficulties, including poor or non-existent cash flow and the reduction in value of numerous properties that served as the Bank's collateral, to the point that the Nielson Entities were willing to give the Bank a deed in lieu of foreclosure with respect to several such properties.

**ANSWER:**    Admitted that Jackson's letter made no mention of the alleged facts stated in this Paragraph, but denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

**78.**    Green and Calcutt were both aware of the false representations contained in Jackson's letter.

**ANSWER:**    Denied that the representations were false and that Calcutt was aware of false representations, and further denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

F.    Officer's Questionnaires

**79.**    In May 2010 and again in July 2011, Calcutt signed an Officer's Questionnaire, each time affirming, among other things, that he was not aware of any loans since the last exam that had been renewed or extended with acceptance of separate notes for the payment of interest.

**ANSWER:**    Admitted.

**80.**    At the time, Calcutt knew such statements were false.

**ANSWER:**    Denied.

G.    Temporary Sale of Nielson Loans

**81.**    In May 2010, the Bank sold almost $2 million of the Nielson Loans to two affiliates of the Bank.

**ANSWER:**    Admitted.

**82.**    The Bank sold the loans shortly before FDIC examiners arrived for a June 2010 examination.

**ANSWER:**    Admitted.

**83.**    Jackson, Calcutt, and Green participated in the decision to sell the loans to the affiliate banks.

**ANSWER:**    Admitted.

**84.**    Jackson communicated with the affiliate banks about the loans being sold.

**ANSWER:**    Admitted.

**85.**    At the time of the sale, Green assured the Nielson Entities that they would continue to deal with himself and Calcutt on the renewals of the loans being sold.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**86.**    Green also told the Nielson Entities that the Bank could end up buying the loans back from the affiliate banks.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**87.**    In late September 2010, the Bank repurchased each of the Nielson Loans that had been sold prior to the examination.  At the time of repurchase, all of the loans were in default.

**ANSWER:**    Admitted that the Bank repurchased certain loans to certain Nielson Entities that had previously been sold.  Denied for lack of knowledge or information sufficient to form a belief in the truth of the allegation in all other respects.

**88.**    Both the sale and the repurchase of the loans were completed without the knowledge or approval of the Bank's board of directors.

**ANSWER:**    Denied.

H.    Nielson Loans Excluded From External Loan Review

**89.**    On an annual basis, the Bank contracted with a third party consultant to perform external loan review of the Bank's loan portfolio.

**ANSWER:**    Admitted that the Bank contracted with a third party consultant to perform an external loan review of the Bank's portfolio, but denied for lack of knowledge or information sufficient to form a belief in the truth of the allegation that it has done so annually.

**90.**    In December 2009, Calcutt and Jackson agreed to pull all of the Nielson Loans from the sample of loans to be reviewed, even though the Nielson Entities represented the Bank's largest lending relationship.

**ANSWER:**    Denied.

I.    Management's Response to August 2011 Examination

**91.**    In December 2011, the Bank issued a written response, signed by Calcutt, Jackson, and other members of Bank management, to the FDIC's August 2011 examination findings.

**ANSWER:**    Admitted.

**92.**    In the response, management made a number of statements that Calcutt and Jackson knew to be false, including the assertion that the board of directors was "fully aware of [the Bedrock Transaction] prior to the disbursement of the loan …" and that, in December 2010, management "had every reason to believe that the Nielsons were not experiencing financial difficulty . . . ."

**ANSWER:**    Denied.

J.    Other Communications with Examiners

**93.**    During the June 2010 FDIC examination, the examiners had numerous discussions with Green regarding the Nielson Entities, but Green never disclosed the true nature and purpose of the Bedrock Transaction or the fact that the Nielson Entities had stopped paying on all of the Nielson Loans for a period of months in Fall 2009 due to financial difficulties.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**94.**    During the August 2011 joint examination by the FDIC and OFIR, examiners specifically asked Green and Jackson about the purpose of the Bedrock Transaction, the December 2010 transaction, and whether the Nielson Entities had been experiencing financial difficulty.  Green and Jackson responded that they did not know or did not remember.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**95.**    Throughout the August 2011 examination, examiners repeatedly asked Calcutt and other members of management if there were any additional documents or correspondence relating to the Nielson Entities, and after several such requests, Calcutt's colleague produced a separate folder of documents, which contained select correspondence from 2010 and 2011.  Even though this constituted only a small portion of the pertinent correspondence from the 2009 to 2011 time period, when asked if there was any additional correspondence, Calcutt stated that there was not.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

- 23 -

**A149**

**96.**    Jackson and Green, who were all present, did not dispute Calcutt's statement or offer any further response.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**97.**    At the time, each of the Respondents had additional relevant correspondence and documentation in his possession.

**ANSWER:**    Denied as to Mr. Calcutt.  Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

**98.**    In September 2011, a memorandum from Green was presented to examiners which stated that the purpose of the Bedrock Transaction was to provide working capital for a subsidiary of Bedrock Holdings and further stated that it was unknown how the funds were used by the borrower.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**99.**    This stated purpose was consistent with the purpose identified in Green's June 2010 officer memorandum that was placed in the Bedrock Holdings loan file shortly before the FDIC's June 2010 examination.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**100.**    Calcutt and Jackson ratified Green's September 2011 memorandum in subsequent communications with the FDIC and OFIR on more than one occasion.

**ANSWER:**    Denied.

**101.**    For example, at a September 14, 2011 meeting, Calcutt represented to the FDIC and OFIR that the purpose of the Bedrock Transaction was for working capital for use by Bedrock Holding's subsidiary.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**102.**    At that same meeting, examiners specifically asked Calcutt if he had any correspondence to or from the Nielson Entities regarding the proposed use of the $760,000 loan, and Calcutt stated, "No, I don't recall any."

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**103.**    Calcutt knew this statement was false, as there had been extensive correspondence between the parties leading up to the $760,000 loan.

**ANSWER:**    Admitted that Mr. Calcutt corresponded with several representatives of the Nielson entities two years earlier prior to the Bank making the $760,000 loan.  Denied that Mr. Calcutt made a knowingly false statement to the FDIC or OFIR, and further denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

**104.**    Calcutt also stated that examiners had been given all pertinent correspondence during the examination, when, in fact, substantially all correspondence relating to the Nielson Entities had been kept out of the loan files and had not been provided to examiners.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all respects, except specifically denied that Mr. Calcutt "kept out" "substantially all" correspondence relating to the Nielson Entities.

**105.** When asked by examiners where the funds came from to bring all of the loans current in December 2010, Calcutt falsely stated that the funds came from the Nielson Entities' "vast resources between oil, gas, and rentals."

**ANSWER:** Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations, except that Mr. Calcutt specifically denies the allegation that he made a false representation to examiners.

**106.** When asked if there were any discussions with the Nielson Entities regarding the source of funds for such payments, Calcutt said that there were no such discussions, even though such issues had been discussed extensively over the course of several months.

**ANSWER:** Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations, except that Mr. Calcutt specifically denies the implied allegation that he made a false representation to examiners.

**107.** Green and Jackson were present at the September 2011 meeting, and they did not dispute any of the statements made by Calcutt or offer any other explanations.

**ANSWER:** Admit that Green and Jackson were present at the meeting but otherwise denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

### IV.    Respondents Caused Financial Loss to the Bank

**108.** Respondents' handling of the Nielson Loans in 2009 and 2010 caused the Bank to suffer financial loss and placed the Bank at risk of suffering substantial additional loss.

**ANSWER:** Denied.

**109.** Financial loss to the Bank as result of Respondents' misconduct includes the $760,000 in loan proceeds that the Bank lent to the Nielson Entities in connection with the

Bedrock Transaction.  To date, the Bank has charged off $30,000 against the $760,000 Bedrock loan and is in the process of attempting to collect a foreclosure judgment.

**ANSWER:**    Denied that any misconduct occurred as to Mr. Calcutt, denied that any conduct alleged in this Notice caused financial loss to the Bank, and denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations in all other respects.

110.    By delaying efforts to address the specific problems facing each of the Nielson Entities, without conducting any global financial or collateral analyses, Respondents allowed the Bank's collateral position to deteriorate for more than two years in a declining real estate market. In addition, the Nielson Entities advised the Bank in 2009 that they were not interested in continuing to incur maintenance expenses with respect to certain properties that served as collateral for the Nielson Loans.

**ANSWER:**    Denied as to the first sentence, and denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations as to the second sentence.

111.    During 2009 and 2010, a number of the Nielson properties significantly deteriorated after the Nielson Entities stopped maintaining them, thereby negatively impacting the Bank's collateral position.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

112.    As of the joint September 2012 examination by the FDIC and OFIR, the Bank had recognized close to $8.5 million in loss on the Nielson Loans, while $777,000 was doubtful, and approximately $25 million was deemed substandard.

- 27 -

A153

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**113.**    In addition, the Bank has suffered significant investigation expense costs and defense costs, which directly resulted from Respondents' intentional concealment of the true condition of the Nielson Loans and the nature and purpose of the Bedrock Transaction and the December 2010 Transaction.

**ANSWER:**    Denied.

**114.**    Because Respondents had misrepresented the condition of the Bank to the board and the regulators, the board determined that it needed to hire a third-party consulting firm to investigate the handling of the Nielson relationship.

**ANSWER:**    Admitted that the board hired a third-party consulting firm to investigate the handling of the Bank's relationship with Nielson Entities, but denied in all other respects.

**115.**    The Bank incurred nearly $1.7 million in legal fees and expenses in connection with the investigation and in defense of Respondents, including approximately $281,000 in investigation costs paid to the third-party consulting firm.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations as regarding the amounts identified, and specifically denied as to the implied allegation that such sums constitute a loss to the Bank or that it was because of any misrepresentations by Mr. Calcutt.

**116.**    Finally, the Bank suffered loss as a result of having paid excessive bonus compensation to Calcutt for 2009 and 2010.

**ANSWER:**    Denied.

## V.    Financial Gain to Calcutt

**117.**    Pursuant to his employment agreement with the Bank, Calcutt annually earned a bonus equal to 4% of the Bank's net after-tax income.

**ANSWER:**    Admitted that Mr. Calcutt received a bonus in certain years of his employment with the Bank based on 4% of the Bank's net after tax income, but denied that the specific amount was dictated by his employment agreement.

**118.**    As a result of Respondents' effort to conceal the Nielson Entities' troubled financial condition and their failure to recognize any impairment on any of the Nielson Loans, the Bank's reported after-tax income was falsely inflated for 2009 and 2010.

**ANSWER:**    Denied.

**119.**    The Bank's net income calculations for 2009 and 2010 were inflated due to: (a) interest income that was improperly claimed on troubled Nielson Loans that should have been on nonaccrual at the time, and (b) inadequate provisions for loan and lease losses (ALLL), which, based on the true condition of the Nielson loan portfolio, should have been significantly higher.

**ANSWER:**    Denied for lack of knowledge or information sufficient to form a belief in the truth of these allegations.

**120.**    In 2009 and 2010, Calcutt's bonus compensation was approximately $95,000 more than it should have been, as a result of the Bank's inflated net income figures.

**ANSWER:**    Denied.

**121.**    Calcutt, as a major shareholder of the Bank's holding company, also benefited when the Bank issued substantial dividends in 2010 and 2011 based on the board of directors' false perception regarding the Bank's performance and overall financial condition.

**ANSWER:**    Denied.

## VI.    Grounds for Section 8(e) Orders

**122.**    As a result of the foregoing acts, omissions and/or practices, Respondents have engaged in unsafe or unsound banking practices in conducting the affairs of the Bank.

**ANSWER:**    Denied.

**123.**    As a result of the foregoing acts, omissions and/or practices, Respondents breached their fiduciary duty to the Bank.

**ANSWER:**    Denied.

**124.**    By reason of the foregoing acts, omissions and/or practices, the Bank has suffered financial loss or other damage.

**ANSWER:**    Denied.

**125.**    By reason of the foregoing acts, omissions and/or practices, Calcutt received financial gain or other benefit.

**ANSWER:**    Denied.

**126.**    The acts, omissions and/or practices of the Respondents alleged herein evidence the Respondents' personal dishonesty and/or demonstrate a willful or continuing disregard for the safety and soundness of the Bank.

**ANSWER:**    Denied.

**127.**    By reason of the foregoing acts, omissions and/or practices, the interests of the Bank's depositors have been prejudiced.

**ANSWER:**    Denied.

### VII.    Grounds for Assessment of Civil Money Penalties

**128.**    As a result of the foregoing facts and conclusions, the FDIC concludes that Respondents recklessly engaged in unsafe or unsound practices in conducting the affairs of the Bank.

**ANSWER:**    Admitted that the FDIC has reached this conclusion, but denied that the FDIC's conclusion is correct and specifically denied that Mr. Calcutt recklessly engaged in any unsafe or unsound practices in conducting the affairs of the Bank.

**129.**    Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents breached their fiduciary duty to the Bank.

**ANSWER:**    Admitted that the FDIC has reached this conclusion, but denied that the FDIC's conclusion is correct and specifically denied that Mr. Calcutt breached his fiduciary duty to the Bank.

**130.**    Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents' reckless unsafe or unsound practices and/or breaches of fiduciary duty to the Bank were part of a pattern of misconduct.

**ANSWER:**    Admitted that the FDIC has reached this conclusion, but denied that the FDIC's conclusion is correct and specifically denied that any conduct by Mr. Calcutt was part of a pattern of misconduct.

**131.**    Further, as a result of the foregoing facts and conclusions, the FDIC concludes that Respondents' reckless unsafe or unsound practices and/or breaches of fiduciary duty to the Bank caused more than a minimal loss to the Bank.

**ANSWER:**    Admitted that the FDIC has reached this conclusion, but denied that the FDIC's conclusion is correct and specifically denied that any conduct by Mr. Calcutt caused any loss to the Bank.

### FIRST AFFIRMATIVE DEFENSE

(Violation of FDIC Board's Order)

This proceeding should be dismissed because it fails to comply with the Board's Order in Pending Cases, issued on July 19, 2019.  The supplemental proceeding established by the March 19 Order Regarding New Oral Hearing and the March 20 Notice of Hearing and Supplemental Prehearing Orders sets what amounts to a modified paper review, rather than the full, new oral hearing required by the Board's Order.  The supplemental hearing accepts witness testimony on the paper without the agreement of the parties.  It has also limited Respondent's ability to call witnesses and introduce exhibits.  This failure to follow the agency's own procedure requires that this proceeding be dismissed and a new, full oral hearing be set.

### SECOND AFFIRMATIVE DEFENSE

(Violation of Appointment Power)

This proceeding should be dismissed because it fails to cure the Appointments Clause violation that occurred when ALJ Miserendino presided over an adversarial hearing alleging Mr. Calcutt violated Section 8(e).  ALJ Miserendino was not appointed in accordance with the Appointments Clause, and every action he took from the moment the Notice of Charges was filed is void *ab initio*.  This conclusion is compelled by the Supreme Court's decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018); *see also Ryder v. United States*, 515 U.S. 177, 182 (1995).  When ALJ Miserendino presided over Mr. Calcutt's adversarial hearing, it violated Mr. Calcutt's constitutional right to a properly-appointed adjudicator.

- 32 -

**A158**

This remanded proceeding does not pass constitutional muster because it builds upon actions taken and decisions reached as part of the prior, constitutionally-infirm proceeding that are now void *ab initio*.  Specifically, ALJ McNeil has ruled that Respondent's objection "is beyond the scope of this Review" and that the "Board has directed not that I determine whether prior orders were void….From this mandate, there is no basis to conclude this Reassignment Review should treat the prior prehearing orders as though they were void *ab initio*.  Respondent is not precluded from making an argument regarding whether the prior ALJ's orders were void; but such an argument is beyond the scope of the FDIC Board's Order in Pending Cases, and thus beyond the scope of this Review."  Order, Reassignment Review and Decisions on Reconsideration, at 3 (Nov. 28, 2018).

## THIRD AFFIRMATIVE DEFENSE

### (Violation of Removal Power)

This proceeding should be dismissed because the ALJ presiding over Mr. Calcutt's adversarial hearing is unconstitutionally shielded from removal by the President of the United States.  The ALJ may be removed only "for good cause" as determined by the Merit Systems Protection Board.  This leaves the FDIC Board unable to properly supervise the ALJ's actions. Because the FDIC is an independent agency, the President's ability to supervise the actions of the Executive Branch is therefore unconstitutionally impaired.

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

This proceeding is barred by the statute of limitations.  FDIC enforcement actions under 12 U.S.C. § 1818 are subject to the catch-all, five-year limitations period established in 28 U.S.C. § 2462.  *See*, *e.g.*, *Proffitt v. FDIC*, 200 F. 3d 855, 862 (D.C. Cir. 2000).  Because none of the ALJs

employed by the Office of Financial Institution Adjudication had been constitutionally appointed when the Notice of Charges was issued on August 20, 2013, the entire proceeding—including the Notice of Charges—is time-barred.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

This proceeding is barred by laches. Nearly a decade has elapsed since the underlying conduct that forms the basis for the FDIC's Notice of Charges. The delay in providing Mr. Calcutt with a constitutional proceeding has unfairly prejudiced his ability to mount a defense. Recollections have dimmed and witnesses have become unavailable. Because deposition testimony is not permitted, it is impossible to recreate the recollections that are now a decade old.

## SIXTH AFFIRMATIVE DEFENSE

### (Entrapment)

The FDIC should be barred from asserting its claims because of entrapment. The FDIC set out to prove that Mr. Calcutt was dishonest by demanding a meeting on short notice two years after the events in question, concealing from Mr. Calcutt the reasons for its inquiries regarding certain loans and transactions with Nielson-related entities, and withholding documents Mr. Calcutt had either not seen or been given an opportunity to refresh his recollection. The purpose of this conduct was to elicit incorrect answers to questions the examiners posed to Mr. Calcutt, deprive Mr. Calcutt of the opportunity to consult with counsel, and to do so in a manner documented only by the examiners' subjective and biased recollections. Had FDIC Examiners made Mr. Calcutt aware of their reasons or these documents and given Mr. Calcutt adequate notice and time to prepare, including by consulting counsel, then Mr. Calcutt would have had an opportunity to investigate and refresh his recollection prior to answering the Examiners' questions.

## SEVENTH AFFIRMATIVE DEFENSE

(Violation of the *Accardi* Principle and Due Process)

The FDIC should be barred from asserting its claims because the FDIC questioned Mr. Calcutt as part of an investigation seeking his removal and prohibition that was initiated without compliance with 12 CFR § 308.145, without notifying him of the existence of the investigation, or without giving him the opportunity to consult with legal counsel before questioning him in a manner intended to elicit statements documented only by the examiners' subjective and biased recollections. This violates the *Accardi* principle, which obligates the FDIC to comply with its own procedural rules, as well as Respondent's constitutional right to due process.

## ADDITIONAL AFFIRMATIVE DEFENSES

Mr. Calcutt respectfully reserves the right to amend his Answer to incorporate affirmative defenses that may become known to him. 12 C.F.R. § 308.20(a).


WHEREFORE, Respondent Harry C. Calcutt, III, respectfully requests that all relief sought by the FDIC be denied in all respects.

Dated: May 22, 2019

Respectfully submitted,


*/s/ Barry D. Hovis*
Barry D. Hovis
MUSICK, PEELER & GARRETT LLP
601 California Street, Suite 601
San Francisco, CA 94108
Telephone: (415) 281-2000
Facsimile: (415) 281-2010
B.Hovis@musickpeeler.com

*/s/ Ryan T. Scarborough*
Ryan T. Scarborough
William B. Snyderwine
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
rscarborough@wc.com
wsnyderwine@wc.com


*Attorneys for Respondent*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that true and correct copies of the foregoing **SECOND AMENDED ANSWER** was served on May 22, 2019 by electronic mail upon the following persons:

Hon. Christopher B. McNeil, Administrative Law Judge
Office of Financial Institution Adjudication
3501 N. Fairfax Dr., Suite D8116
Arlington, VA 22226
ofia@fdic.gov

Valerie J. Best, Assistant Executive Secretary
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, D.C. 20429
vbest@fdic.gov
adill@fdic.gov

David Beck, Esq.
Marry Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, IL 60606
dbeck@fdic.gov
mbenden@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
bsup@fdic.gov


        _/s/ William Snyderwine_
        William B. Snyderwine

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**WASHINGTON, D.C.**

|  |  |
|---|---|
| In the Matter of | DECISION AND ORDER |
| | ON MOTION FOR |
| HARRY C. CALCUTT III, individually, and | INTERLOCUTORY REVIEW |
| as an Institution-Affiliated Party of | |
| | FDIC-12-568e |
| NORTHWESTERN BANK | FDIC-13-115k |
| TRAVERSE CITY, MICHIGAN | |
| (Insured State Nonmember Bank) | |

## I.   INTRODUCTION

On April 2, 2019, Respondent Harry C. Calcutt III (Respondent) filed a Motion for

Interlocutory Review of the Order Regarding New Oral Hearing Issued by Administrative Law

Judge (ALJ) Christopher B. McNeil (McNeil), Request for Stay Pending Interlocutory Review,

and Request for Oral Argument (Respondent's Motion) with the Board of Directors (Board) of

the Federal Deposit Insurance Corporation (FDIC).  This matter is currently pending before ALJ

McNeil after the Board remanded and reassigned it for a new hearing pursuant to the Board's

July 19, 2018, Resolution (Resolution).

Respondent objects to the limited scope of the oral hearing ordered by ALJ McNeil in his

March 19, 2019, Order Regarding New Oral Hearing (March 19 Order).  Respondent argues that

the limited oral hearing provided for in the March 19 Order contravenes the Board's Resolution.

Respondent's Motion at 7-10.  Relying on the Supreme Court's decision in *Lucia v. Securities &*

*Exchange Commission*, 138 S. Ct. 2044 (2018), Respondent also argues that he is entitled to an

entirely new proceeding, including a new notice of charges.  Respondent's Motion at 10-15.

Finally, Respondent seeks a stay pending interlocutory review and oral argument before the

1

Board. *Id.* at 16-17. Based on the record, Respondent's request for a new oral hearing is granted, but his request for an entirely new proceeding is denied.

## II.    BACKGROUND

Following the Supreme Court's decision in *Lucia*, the Board evaluated the cases then pending before the FDIC's ALJs and issued a Resolution on July 19, 2018. The Resolution reassigned the present case from ALJ C. Richard Miserendino (Miserendino) to ALJ McNeil, "for a new hearing and a fresh reconsideration of all prior actions, including summary dispositions, taken before the hearing." Resolution at 1. The Resolution also stated that in cases that had been remanded for a new hearing, the ALJ may proceed with a paper hearing so long as no party objects. *Id.* at 3. The Resolution directed the objecting party to provide specific examples "where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from review of the written record, or on evidence or witness testimony that should have been included or excluded from the record." *Id.* The Resolution further provided that "[i]f any party objects to a paper hearing, then the ALJ must conduct a new oral hearing in accordance with 12 C.F.R. § 308.35, except that the ALJ may accept the written transcript of prior testimony of any witnesses for which the parties agreed to accept such testimony." *Id.*

Pursuant to the Resolution, ALJ McNeil issued a Notice of Reassignment, giving parties until September 28, 2018, to file "objections to any of the actions taken by [ALJ Miserendino] prior to the [original] evidentiary hearing held in this case." Notice of Reassignment at 1. On September 28, 2018, Respondent filed Respondent's Objections to All Pre-Hearing Actions Taken By ALJ C. Richard Miserendino and Request for New Hearing (Respondent's Objections). Respondent's Objections argued that every prior action of ALJ Miserendino, "an unconstitutionally appointed" ALJ, should be declared void *ab initio* and, pursuant to *Lucia*,

2

Respondent should be given an entirely new proceeding including a new or amended notice of charges, motions practice, and discovery. Respondent's Objections at 1-2, 9. Enforcement Counsel filed its response on November 14, 2018.

Two weeks later, on November 28, 2018, ALJ McNeil issued a Reassignment Review and Decisions on Reconsideration (Reassignment) permitting a new oral hearing pursuant to the Resolution, but denying Respondent's request for an entirely new proceeding. Reassignment at 2, 3-5. In his response, ALJ McNeil found that Respondent provided insufficient legal and factual support for his argument that *Lucia* applies to FDIC ALJs—the predicate for his demand that he be given a new proceeding. *Id.* at 5. ALJ McNeil also found that Respondent's demand for a new proceeding was beyond the scope of the review set out in the Board's Resolution and only the Board had the authority to determine whether Respondent's case should begin anew. *Id.* Thereafter, on November 29, 2018, the ALJ issued a Notice of Intention to Conduct a Hearing (Hearing Notice) pursuant to the Resolution and directed the parties to set out examples where the parties believed the outcome of the original proceeding turned on elements not readily determined from a review of a written record or on the inclusion or exclusion of evidence or testimony from the record. Hearing Notice at 2.

On December 31, 2018, Respondent filed Respondent's Memoranda of Specific Examples (Respondent's Memoranda) setting forth the requested examples but also objecting that doing so had the effect of reintroducing the same error that tainted the underlying proceedings. Respondent reasserted that this proceeding was insufficient to cure the constitutional error that had occurred the moment ALJ Miserendino presided over the first proceeding. Respondent's Memoranda at 1. Enforcement Counsel filed a response to Respondent's Memoranda on January 18, 2019.

3

On March 19, 2019, ALJ McNeil issued an Order Regarding New Oral Hearing (March 19 Order), in which he construed the Board's Resolution to mean that the prior proceedings "serve as the primary source of the evidentiary record, subject to review and reconsideration by the new ALJ." March 19 Order at 2. Over Respondent's objections, ALJ McNeil determined that the new hearing in this matter would be based on the written transcripts from the original evidentiary hearing for all witnesses except one. The next day, March 20, 2019, ALJ McNeil issued a Notice of Hearing and Supplemental Prehearing Orders (March 20 Order).

Respondent's Motion argues that the limited oral hearing ordered by ALJ McNeil over Respondent's objections contravenes the Board's Resolution. Moreover, Respondent insists that *Lucia* entitles him to not only a new hearing but a new proceeding beginning with a new or amended Notice, a new answer, new motions practice, new discovery, and a new evidentiary hearing. Respondent's Motion at 13. Enforcement Counsel filed its opposition to Respondent's Motion on April 17, 2019.

## III.    ANALYSIS

The Board has discretion to exercise interlocutory review of an ALJ's ruling under section 308.28(b) of the FDIC's Rules of Practice and Procedure (FDIC Rules), 12 C.F.R. § 308.28(b), upon finding that at least one of four criteria is satisfied. The four criteria are:

> (1) The ruling involves a controlling question of law or policy as to which substantial grounds exist for a difference of opinion;
> (2) Immediate review of the ruling may materially advance the ultimate termination of the proceeding;
> (3) Subsequent modification of the ruling at the conclusion of the proceeding would be an inadequate remedy; or
> (4) Subsequent modification of the ruling would cause unusual delay or expense.

*Id.* § 308.28(b)(1)-(4). Here, Respondent's challenge involves a controlling question of policy—namely, whether the ALJ's Order is consistent with the Board's Resolution. Further, subsequent modification of ALJ McNeil's March 19 Order may cause unusual delay or expense in not only

4

this matter but other similar matters. *See In the Matter of Randolph W. Lenz*, No. FDIC-02-174e,

2003 WL 23273837, at *2 (Dec. 4, 2003) (granting interlocutory review where subsequent

modification of the ruling would cause unusual delay); *In the Matter of Donald E. Thompson*,

No. FDIC-91-246jj, 1992 WL 812806, at *2 (Mar. 10, 1992). Accordingly, the Board chooses to

exercise its discretion under Section 308.28 of the FDIC Rules and permit interlocutory review.

Respondent argues that he is entitled to a new oral hearing pursuant to the Board's

Resolution but insists that ALJ McNeil's March 19 and March 20 Orders effectively deny him

that hearing. Respondent's Motion at 4. The Board agrees with Respondent. The Resolution

states:

> If any party objects to a paper hearing, then the ALJ must conduct a new oral
> hearing in accordance with 12 C.F.R. § 308.35, except that the ALJ may
> accept the written transcript of prior testimony of any witnesses for which the
> parties agreed to accept such testimony.

Resolution at 3. Respondent initially sought a new proceeding on September 28, 2018 (*See*

Respondent's Objections). On November 28, 2018, ALJ McNeil denied Respondent's request

for a new proceeding, but granted him a new oral hearing pursuant to the Resolution.

Reassignment at 1-2, 3, 5. Later, ALJ McNeil limited the scope of the new hearing. *See* March

19 and March 20 Orders. Contrary to the ALJ's March 19 and March 20 Orders, Respondent is

entitled to a new oral hearing in accordance with 12 C.F.R. § 308.35 on all issues that were

considered at the prior hearing. Resolution at 1. Further, because Respondent also objected to

admitting the prior written testimony of witnesses from the initial hearing (*See* Respondent's

Memoranda), the Board finds that any objected-to witnesses should be permitted to testify in the

new oral hearing consistent with the Resolution.

Respondent's remaining requests are denied. The Board finds that Respondent's request

for interlocutory review of ALJ McNeil's denial of his request for an entirely new proceeding is

untimely. ALJ McNeil rejected this argument in his November 28, 2018, Reassignment, but

Respondent did not request interlocutory review until April 2, 2019, more than four months later. Respondent thus failed to request interlocutory review within ten days in accordance with the FDIC's rules. *See* 12 C.F.R. § 308.23; Reassignment at 3, 5. Respondent's request for oral argument is also denied as unnecessary to the disposition of this matter, and his stay request is moot in light of the fact that the hearing is not scheduled until July 16, 2019.

## VI.    CONCLUSION

Respondent's Motion is granted in part and denied in part. Pursuant to the Board's Resolution, Respondent is granted a new oral hearing on all issues that were considered at the prior hearing. The Board denies Respondent's remaining requests.

## ORDER

For the reasons set forth previously, it is hereby ORDERED that Respondent's Motion for Interlocutory Review is GRANTED IN PART and the ALJ is directed to conduct a new oral hearing on all issues that were considered at the prior hearing. The remaining portions of Respondent's Motion are DENIED.

Pursuant to delegated authority, upon the advice and recommendation of the Deputy General Counsel, Litigation and Resolutions Branch.

Entered at Washington, D.C. this 20th day of June 2019.

Robert E. Feldman
Executive Secretary

(SEAL)

**085823**

7

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 20, 2019, the Decision and Order on Respondent's Motion for Interlocutory Review was served by e-mail upon the following parties in interest:

Honorable Christopher B. McNeil
Office of Financial Institution Adjudication
3501 North Fairfax Drive, Suite VS-D-8118
Arlington, Virginia 22226
ofia@fdic.gov

A. T. Dill III, Esq.
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C.  20429-9990
adill@fdic.gov,

Monica Tynan, Esq.
Bryan R. Sup, Esq.
Mary Ann Benden, Esq.
David Beck, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois  60606
Mtynan@FDIC.gov; BSup@FDIC.gov; DBeck@fdic.gov; Mbenden@FDIC.gov

Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Suite 1250
San Francisco, CA  94108
b.hovis@mpglaw.com

William Snyderwine, Esq.
Ryan Scarborough, Esq
Williams & Connolly, LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com; wsnyderwine@wc.com

Nicholas S. Kazmerski
Counsel, Executive Secretary Section
Federal Deposit Insurance Corporation, F-1072
550 17th Street, N.W.,
Washington, D.C. 20429

**A170**

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**WASHINGTON, D.C.**

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

### ORDER REGARDING MOTION TO STRIKE AFFIRMATIVE DEFENSES

On May 22, 2019, Respondent filed his Second Amended Answer to Notice, which included seven affirmative defenses.[1] On June 7, 2019, Enforcement Counsel for the FDIC filed a Motion seeking to strike each affirmative defense.[2] On July 1, 2019, Respondent filed his memorandum in opposition.[3]

Respondent's first affirmative defense is premised on the legal claim that the present proceeding "should be dismissed because it fails to comply with the Board's Order in Pending Cases, issued on July 19, 2019."[4] Enforcement Counsel aver the defense was "improperly pled as an affirmative defense as the perceived procedural deficiency would not void the Respondent's liability for the charged misconduct."[5] Respondent responded by noting the legal claim had been addressed by the FDIC Board in its June 20, 2019 Order on Respondent's Motion for Interlocutory Review, "granting in part Respondent's Motion on the same basis as alleged in the First Affirmative Defense."[6] Upon this premise, Respondent asserts the motion to strike is moot.[7]

Inasmuch as the Board's June 20, 2019 controls the procedures to be followed in this administrative enforcement action, the motion to strike is denied as moot. For the same reason, Enforcement Counsel's motion with respect to Respondent's Second, Third and Fourth Affirmative Defenses (addressing constitutional issues also raised in Respondent's Motion for Interlocutory Review) is denied, given the Board's clear instruction that the issues raised are to be addressed during the hearing.

---

[1] Second Amended Answer to Notice at 32-35.
[2] Motion to Strike Affirmative Defenses, dated June 7, 2019.
[3] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer.
[4] Second Amended Answer to Notice at 32.
[5] Motion to Strike Affirmative Defenses at 3.
[6] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 4.
[7] Id.

Respondent's Fifth Affirmative Defense is based on a claim that the "proceeding is barred by laches because the FDIC has failed to provide Respondent with a constitutional hearing for over five years."[8] Enforcement Counsel counter with the legal premise that laches, or "neglect of duty on the part of officers of the government" is "no defense to a suit to enforce a public right or protect a public interest."[9]

Enforcement Counsel advance their argument by noting the application of what both parties refer to as the *Summerlin* rule.[10] Under *Summerlin*, the Court established that the equitable doctrine of laches is not available in proceedings involving the preservation of "public rights, revenues, and property from injury and loss," against claims of the "negligence of public officers."[11]

Respondent asserts the question "is not as simple as the FDIC claims."[12] While not disputing the applicability of the *Summerlin* rule here, Respondent cites to *Gregor*[13] by noting that in that holding, the trial court found the question of whether laches existed as a defense was "an open and disputed question of law that the Court declines to decide" at that time.[14]

I find unpersuasive Respondent's assertion that the question presented is more complicated than it at first appears. In *Hatchett*,[15] the Sixth Circuit made plain the point, thus:

> It is well established that the Government generally is exempt from the consequences of its laches. See *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940) ("It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights."); *Guar. Trust Co. v. United States*, 304 U.S. 126, 132, 58 S.Ct. 785, 82 L.Ed. 1224 (1938) (noting the continuing vitality of the rule that the sovereign is exempt from its own laches); *United States v. Peoples Household Furnishings, Inc.*, 75 F.3d 252, 254 (6th Cir.1996) ("The ancient rule ... 'that the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations'—has enjoyed continuing vitality for centuries.") (citation omitted); *United v. Weintraub*, 613 F.2d 612, 618 (6th Cir.1979) ("The principle [that the Government is exempt for the consequences of its own laches] is well established in this country.").[16]

---

[8] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 8.

[9] Motion to Strike Affirmative Defenses at 6, quoting *Utah Power & Light Co. v. United States*, 243 US. 389, 409 (1917).

[10] Motion to Strike Affirmative Defenses at 6, quoting *US. v. Philip Morris, Inc.*, 300 F. Supp.2d 61, 64 (D.D.C. 2004), which quotes *United States v. Summerlin*, 310 US. 414, 416 (1940); Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 9.

[11] Motion to Strike Affirmative Defenses at 6, quoting *US. v. Philip Morris, Inc.*, 300 F. Supp.2d at 64, which quotes *Summerlin*, 310 US. at 416.

[12] "); Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 9.

[13] *Resolution Tr. Corp. v. Gregor*, 1995 WL 931093 (E.D.N.Y. Sept. 29, 1995).

[14] *Id.*, quoting *Gregor*, 1995 WL 931093 at *4.

[15] *Hatchett v. United States*, 330 F.3d 875 (6th Cir. 2003).

[16] *Hatchett*, 330 F.3d at 887.

Page 2 of 9

Cases relied upon by Respondent (*Gladstone,*[17] *Clearfield Trust,*[18] *Occidental Life,*[19] *Herman,*[20] *PIE,*[21] *Admin. Enters.,*[22] *Vanderweele,*[23] *Lenz,*[24] *Roldan Fonesca,*[25] *O'Melveny & Myers,*[26] *PowerPick Player's Club,*[27] *and Royal Oak*[28])[29] do not compel a contrary finding.

*Gladstone* construed Massachusetts common law, and held that "[t]he defense of laches is not available to the defendants where the proceeding is brought by an authorized public agency to enforce the law of the Commonwealth."[30]  The legal claims presented in *Clearfield Trust* did not include an application of *Summerlin*, instead involving an analysis of the rights and duties of the United States on commercial paper which it issues, claims that are inapplicable here, being governed by federal rather than state equitable principles.[31]

The Court in *Occidental Life* addressed *Summerlin*, but only through Justice Rehnquist's dissent, in which the dissenters restated the general rule that "the decisive fact which excepts the general applicability of these statutes is that the United States is suing to enforce '"its rights."'"[32]

Also unpersuasive is Respondent's assertion that "[b]ecause the FDIC Board has held that a removal and prohibition order is in the "form of equitable or remedial relief, in the nature of an injunction," the equitable doctrine of laches should be fully applicable."[33] Given the limiting instructions provided by the Sixth Circuit in *Hatchett*, above, and finding no language in *Lenz* addressing the *Summerlin* rule, I find no legal basis to conclude that the FDIC's decision in *Lenz* somehow extended the doctrine of laches to these enforcement proceedings.

References to holdings in the First, Seventh, and Eleventh Circuits (*Roldan Fonesca*, *Vanderweele*, *Admin. Enters.*, *PIE*, and *Herman*) do not provide a substantial legal basis to abrogate the Court of Appeals' holding in *Hatchett*.

Upon review of the authorities presented by the parties regarding Respondent's presentation of the laches affirmative defense, I find the claim is not properly before this Tribunal; specifically, that the *Summerlin* Rule applies to this administrative enforcement action, and that under that Rule Respondent's Fifth Affirmative Defense insufficient as a matter

---

[17] *F.D.I.C. v. Gladstone*, 44 F. Supp. 2d 81 (D. Mass. 1999).

[18] *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366 (1943).

[19] *Occidental Life Ins. Co. of California v. E.E.O.C.*, 432 U.S. 355, 382 (1977).

[20] *Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1427 (11th Cir. 1998).

[21] *N.L.R.B. v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 893–94 (7th Cir. 1990).

[22] *United States v. Admin. Enters., Inc.*, 46 F.3d 670, 673 (7th Cir. 1995).

[23] *Resolution Tr. Corp. v. Vanderweele*, 833 F. Supp. 1383, 1388 (N.D. Ind. 1993).

[24] *In re Lenz*, 2003 WL 23273837 (FDIC Dec. 4, 2003).

[25] *F.D.I.C. v. Roldan Fonseca*, 795 F.2d 1102 (1st Cir. 1986).

[26] *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 83 (1994).

[27] *Att'y Gen. v. PowerPick Player's Club of Mich., LLC*, 783 N.W.2d 515, 535–36 (Mich. Ct. App. 2010).

[28] *Royal Oak Twp. v. Sch. Dist. No. 7, Royal Oak Twp.*, 33 N.W.2d 908, 911 (Mich. 1948).

[29] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 9-00 and cases cited therein.

[30] *Gladstone*, 44 F. Supp. 2d at 90, quoting *Board of Health of Holbrook v. Nelson*, 351 Mass. 17, 217 N.E.2d 777 (1966) (citing *Town of Lincoln v. Giles*, 317 Mass. 185, 57 N.E.2d 554 (1944)).

[31] *Clearfield Tr. Co.*, 318 U.S. at 366.

[32] *Occidental Life Ins. Co.*, 432 U.S. at 382, quoting *Summerlin,* 310 U.S. at 416.

[33] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 10, quoting *In re Lenz*, 2003 WL 23273837, at *2.

of law and shall be stricken. Accordingly, Enforcement Counsel's Motion with respect to that Defense is GRANTED.

In Respondent's Sixth Affirmative Defense, Respondent asserts the FDIC should be barred from asserting its claims because of entrapment.[34] In support, Respondent identifies the following factual premises:

> "The FDIC set out to prove that Mr. Calcutt was dishonest by demanding a meeting on short notice two years after the events in question";

> That the FDIC "conceal[ed] from Mr. Calcutt the reasons for its inquiries regarding certain loans and transactions with Nielson-related entities";

> That the FDIC "with[eld] documents Mr. Calcutt had either not seen or been given an opportunity to refresh his recollection";

> That the purpose of this conduct "was to elicit incorrect answers to questions the examiners posed to Mr. Calcutt";

> That a further purpose was to "deprive Mr. Calcutt of the opportunity to consult with counsel";

> And that the FDIC did so "in a manner documented only by the examiners' subjective and biased recollections."[35]

The Affirmative Defense is coupled with the following speculative statement:

> Had FDIC Examiners made Mr. Calcutt aware of their reasons or these documents and given Mr. Calcutt adequate notice and time to prepare, including by consulting counsel, then Mr. Calcutt would have had an opportunity to investigate and refresh his recollection prior to answering the Examiners' questions.[36]

As presented, the Sixth Affirmative Defense fails to state the elements required when presenting an entrapment defense. Such a defense is properly stated when it alleges the government agents either engage in impermissible conduct that would induce a law-abiding person situated similarly to the respondent to commit the crime, or engage in conduct so reprehensible that it cannot be tolerated by a civilized society.[37] "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play."[38]

Respondent's factual allegations are that FDIC investigators required Respondent meet with them on short notice, without providing him with sufficient time to prepare for the meeting, intending to present questions that regarded information contained on documents he had not seen so as to permit him to provide correct responses. Nothing in this recitation of alleged facts suggests efforts by the Government to deceive Respondent, nor is it suggested that

---

[34] Second Amended Answer to Notice at 34.
[35] *Id.*
[36] *Id.*
[37] *People v. Williams*, 196 Mich. App. 656, 661, 493 N.W.2d 507, 510 (1992).
[38] *United States v. Russell*, 411 U.S. 423, 436 (1973).

by their conduct the Examiners induced or sought to induce Respondent to engage in unsafe or unsound banking practices.

Without more, the defense is insufficient on its face. Accordingly, Enforcement Counsel's Motion that Respondent's Sixth Affirmative Defense be stricken is GRANTED.

Respondent's Seventh Affirmative Defense alleged the Examiner's conduct violated the FDIC's own procedural rules.[39] Specifically, Respondent alleged Examiners questioned Mr. Calcutt in a manner that did not comply with 12 CFR § 308.145.[40]

The cited regulation provides as follows:

> An investigation shall be initiated only upon issuance of an order by the Board of Directors; or by the General Counsel, the Director of the Division of Risk Management Supervision, the Director of the Division of Depositor and Consumer Protection, or their respective designees. The order shall indicate the purpose of the investigation and designate FDIC's representative(s) to direct the conduct of the investigation. Upon application and for good cause shown, the persons who issue the order of investigation may limit, quash, modify, or withdraw it. Upon the conclusion of the investigation, an order of termination of the investigation shall be issued by the persons issuing the order of investigation.[41]

Respondent avers the FDIC's examiners proceeded in the investigation "without notifying him of the existence of the investigation, or without giving him the opportunity to consult with legal counsel before questioning him in a manner intended to elicit statements documented only by the examiners' subjective and biased recollections."[42] He asserts that "[t]his violates the *Accardi* principle, which obligates the FDIC to comply with its own procedural rules, as well as Respondent's constitutional right to due process."[43]

Nothing in the regulation relied upon by Respondent, however, required the FDIC to notify Respondent of the existence of the investigation (if in fact what is alleged in the Notice of Charges can be characterized as an investigation, instead of an examination); nor does the regulation provide Respondent with the right to consult with counsel before questioning begins. On its face, therefore, the affirmative defense is insufficiently pleaded.

Enforcement Counsel responded by asserting the absence of any factual claim that establishes the provisions of 12 CFR § 308.145 apply in this enforcement action.[44] They assert that "Calcutt's meetings and conversations with examiners were part of the supervisory examination of the Bank", a process not within the scope of 12 CFR § 308.145 – because that regulation applies only to investigations conducted pursuant to Section 10(c). According to Enforcement Counsel, 12 CFR § 308.145 describes conduct during investigations "conducted

---

[39] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 35.
[40] Id.
[41] 12 CFR § 308.145.
[42] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 35.
[43] Id.
[44] Motion to Strike Affirmative Defenses at 10.

pursuant to 10(c) of the FDIA."[45] An examiner asking questions of the highest officer of the Bank, Enforcement Counsel assert, "does not involve any of the hallmarks of a Section 10(c) [12 U.S.C. 1820(c)] investigation."[46]

Enforcement Counsel noted the provisions of 12 CFR § 308.145 apply only in those instances described in 12 CFR § 308.144:

> The procedures of this subpart shall be followed when an investigation is instituted and conducted in connection with any open or failed insured depository institution, any institutions making application to become insured depository institutions, and affiliates thereof, or with other types of investigations to determine compliance with applicable law and regulations, pursuant to section 10(c) of the FDIA (12 U.S.C. 1820(c)) or section 5(d)(1)(B) of HOLA (12 U.S.C. 1464(d)(1)(B)). The Uniform Rules and subpart B of the Local Rules shall not apply to investigations under this subpart.[47]

The Notice of Charges sets forth the statutory and regulatory basis for this enforcement action, where Respondent is notified that the FDIC seeks a prohibition order pursuant to Section 8(e) of the FDI Act, along with a monetary penalty pursuant to Section 8(1)(2) of that Act. There is in the record no factual basis for finding the provisions of 12 CFR § 308.145 apply.

Respondent asserts the following in support of his Seventh Affirmative Defense:

> The FDIC's argument that it is allowed to surreptitiously investigate Respondent is dangerously circular. The argument's premise is that the FDIC need only comply with investigatory procedures after it decides to launch an investigation but may use such procedures (or any other procedures) whether or not it has instituted an investigation. This cannot be correct. If the FDIC wants to use investigatory procedures and take Respondent's deposition for the record, then it must begin an investigation and afford Respondent the right to due process.[48]

Respondent offers no authority for this proposition, and from my review of the legal and factual premises presented by the parties I find the claim to be without merit.

Respondent asserted that "[u]nder *Accardi* and its progeny, it 'is an elemental principle of administrative law that agencies are bound to follow their own regulations.'"[49] There being

---

[45] *Id.*
[46] *Id.*
[47] 12 C.F.R. § 308.144.
[48] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 17.
[49] *Id.*, quoting *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545 (6th Cir. 2004); *Morton v. Ruiz,* 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Accardi v. Shaughnessy,* 347 U.S. 260, 267 (1954). "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process"; *Sameena Inc. v. U.S. Air Force,* 147 F.3d 1148, 1153 (9th Cir. 1998) (quotation omitted) (holding government violated due process rights in failing to comply with binding regulations that require an evidentiary hearing).

no showing that the FDIC has failed to follow 12 CFR § 308.145 or any other regulation, the affirmative defense fails.

Respondent further asserts that his Seventh Affirmative Defense "requires this Court to resolve numerous difficult factual and legal issues," implicating Respondent's Fifth and Sixth Amendment rights.[50] This argument, based on Respondent's assertion that the FDIC has in some way failed to follow its own regulations, is rejected for the reasons set forth above.

Accordingly, Enforcement Counsel's Motion that Respondent's Seventh Affirmative Defense be stricken is GRANTED.

Respondent supplemented his responses to the specific affirmative defenses by asserting that through Enforcement Counsel's Motion to Strike, they are, in effect, "ask[ing] for partial summary disposition without allowing for any factual development."[51] The record does not support this assertion. The Motion on its face addresses only those claims presented by Respondent in his amended answer as affirmative defenses. The Motion (and Respondent's responses thereto) reflect the parties' intention that only those affirmative defenses that are properly pleaded should be addressed during the hearing.

Also included in his Response is the assertion that Enforcement Counsel's Motion is untimely.[52] Seeking to apply Federal Rule of Civil Procedure 12(f), Respondent asserts that motions to strike insufficient defenses must be presented within 21 days after service.[53] Reasoning that his First and Second Affirmative Defenses in his Second Amended Answer were "the same allegations" as had been presented in his First Amended Answer, Respondent asserts that inasmuch as Enforcement Counsel made no objection to these defenses when they first were raised, "the FDIC waited over four-and-a-half years to move to strike," rendering its Motion untimely.[54]

I find Respondent's reasoning to be unsound and unpersuasive. Respondent extended affirmative defenses in his Second Amended Answer, and Enforcement Counsel promptly raised objections to those defenses. Inasmuch as Respondent has provided no authority for the proposition that this administrative tribunal operates under the provisions of Fed. R. Civ. P. 12(f), and upon the finding that Enforcement Counsel's present motion was timely, Respondent's claim with respect to the timely objection to these defenses is without merit and is rejected.

For the foregoing reasons, Enforcement Counsel's Motion to Strike Respondent's First, Second, Third, and Fourth Affirmative Defenses is DENIED. Enforcement Counsel's Motion to Strike Respondent's Fifth, Sixth, and Seventh Affirmative Defenses is GRANTED.

---

[50] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 16.
[51] Respondent's Opposition to the FDIC's Motion to Strike Affirmative Defenses from Respondent's Second Amended Answer at 12.
[52] *Id*. at 13.
[53] *Id*.
[54] *Id*.

SO ORDERED.

Dated: July 3, 2019

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

## CERTIFICATE OF SERVICE

On July 3, 2019, I served by electronic mail the foregoing Order Regarding Motion to Strike Affirmative Defenses upon:

**FDIC Executive Staff**
Valerie J. Best, Assistant Executive Secretary,
Nicholas J. Kazmerski
A.T. Dill, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov, nkazmerski@fdic.gov,
ESSEnforcementActionDocket@FDIC.gov

**FDIC Enforcement Counsel**
David Beck, Esq.
Mary Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
bsup@fdic.gov, dbeck@fdic.gov, mbenden@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
Telephone: (972) 761-8592
BSup@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

Ryan T. Scarborough, Esq.
William Snyderwine, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com; wsnyderwine@wc.com

Page 8 of 9

**A178**

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| In the Matter of<br><br>**HARRY C. CALCUTT III**<br>Individually and as an Institution-Affiliated party of<br><br>NORTHWESTERN BANK<br>TRAVERSE CITY, MICHIGAN<br>(INSURED STATE NONMEMBER BANK) | FDIC-12-568e<br>FDIC-13-115k<br><br>ALJ McNeil |

## ORDER REGARDING THE PARTIES' MOTIONS IN LIMINE

Pursuant to a Prehearing Scheduling Order, the parties on September 6, 2019 filed motions seeking orders in limine, in advance of the evidentiary hearing scheduled to take place beginning October 29, 2019. Responses to the motions were timely submitted on October 2, 2019, so the issues presented are now ready for determination.[1]

### Respondent's Motion

In his Omnibus Motions, Respondent first seeks limitations regarding evidence of conduct attributed to two subordinate officers of the Bank. During Respondent's service as the Bank's President, Chief Executive Officer, chairman of the Bank's Board of Directors, and on the Bank's Senior Loan Committee, William Green was a commercial loan officer of the Bank and a member of the Bank's classified asset committee.[2] Also during Respondent's service at the Bank, Richard Jackson served as the Bank's Executive Vice President, was a member of the Bank's Board of Directors, and was a member on each of the Board's Committees, including the Bank's Classified Asset Committee.[3]

The parties have presented detailed prehearing statements identifying the issues presented and the evidence they seek to introduce at the hearing.[4] From these statements, the parties have used their motions in limine to identify testimony and documents that they believe should not be included in the evidentiary hearing scheduled for October 29, 2019. In his Omnibus Motions, Respondent first asserts that all testimony from Green and Jackson should be excluded.[5] In support, Respondent avers the "vast majority of the allegations in the Notice [of Intention to

---

[1] See Respondent's Omnibus Motions in Limine and Memorandum of Law in Support Thereof, filed September 6, 2019; [FDIC's] Motions in Limine, filed September 6, 2019; FDIC's Response to Respondent's Omnibus Motions in Limine and Proposed Order, filed October 2, 2019; Respondent's Opposition to the FDIC's Motions in Limine, filed October 2, 2019.
[2] See Harry C. Calcutt, III Answer to Notice (hereafter Answer) at ¶¶4, 5.
[3] See *id.* at ¶¶4, 6.
[4] See FDIC's Prehearing Statement, dated August 23, 2019; Respondent's Prehearing Statement for the Supplemental Hearing Scheduled for October 29, 2019.
[5] Respondent's Omnibus Motions at 6-10.

Prohibit, etc.] relate to actions taken by Bill Green," and that "all of this evidence is irrelevant, immaterial, and prejudicial because none of it relates to actions taken by Respondent, and the FDIC has failed to produce any evidence demonstrating an agreement between Respondent, Green, and Jackson to mislead regulators."[6]

The evidence Respondent refers to here includes testimony taken during a hearing conducted before ALJ Miserendino – a hearing that has been succeeded by an order from the FDIC's Board remanding the matter for a new hearing.[7] Thus, the hearing set to take place later this month is not a supplemental hearing (which is how Respondent described it in his prehearing statement), but instead is a new hearing. The merits of Respondent's motion in limine will be determined based on that premise.

The issue of whether testimony or other evidence should be permitted or excluded through a motion in limine is to be determined by first referring to the FDIC's Uniform Rules of Practice and Procedure – in this case the provision that "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedures Act and other applicable law."[8] If the evidence (either documentary or testimonial) meets this standard, an order prohibiting its introduction at the hearing is inappropriate.

Respondent avers the testimony regarding the actions of Green or Jackson "are neither relevant nor material, because they have no bearing on whether Respondent himself 'engaged or participated' in any 'practice' that could be considered 'unsafe or unsound.'"[9]

My review of the Notice of Intention to Prohibit compels a determination that allegations in the Notice, along with disclosures presented in the parties' prehearing submissions, establish the potential relevance of this evidence. The Notice of Intention refers to Respondent's direct participation in actions alleged to be unsafe or unsound, his joint participation in such actions, and his failure to act when such actions became known to him.[10] The FDIC's prehearing statement sufficiently articulates issues arising from these allegations to present a legal basis to permit the gathering of evidence related to the claims in the Notice.[11] To the extent evidence concerning Green or Jackson relates to Respondent's action or failure to act, the evidence is relevant and will be permitted.

Accordingly, Respondent's motion for an order prohibiting the FDIC from arguing that (i) Respondent engaged in an unsafe practice and breached his fiduciary duty to the Bank based on an alleged failure to supervise; (ii) Respondent engaged in an unsafe practice by not correcting issues with the Nielson lending relationship; (iii) Respondent breached his fiduciary duty by failing to heed regulatory criticism; (iv) Respondent breached his fiduciary duty by engaging in the Bedrock Transaction; (v) Respondent breached his fiduciary duty by failing to

---

[6] *Id*. at 6-7.

[7] See Decision and Order on Respondent's Motion for Interlocutory Review issued June 20, 2019 ("Respondent is entitled to a new oral hearing in accordance with 12 C.F.R. § 308.35 on all issues that were considered at the prior hearing.")

[8] 12 C.F.R. § 308.36(a)(1).

[9] Respondent's Omnibus Motion at 7, citing 12 U.S.C. §1818(e)(1)(A)(ii); accord *Kim v. Office of Thrift Supervision*, 40 F.3d 1050, 1055 (9th Cir. 1994) ("a few relatively minor and technical violations of certain banking regulations [that] occurred while [respondent] was at [the bank's] helm" do not show scienter).

[10] See Notice of Intention at, *e.g.* ¶¶13-20, 24, 26-29, 33, 35, 37-38, 46-49, 54-61, 66-70, 73-80, 83, 90-93, 95-97, 100-10, 114, 118, 122-24, 128-31

[11] See FDIC's Prehearing Statement at 14-25, 29-39.

use ordinary diligence regarding the condition of the Bank; (vi) Respondent's reliance on lower level employees breached his duty of supervision; and (vii) Respondent caused the Bank financial loss as a result of the release of the Pillay Collateral, is DENIED, as is his motion to exclude evidence relating to Green's and Jackson's conduct (as specified at pages 9 and 10 of Respondent's Omnibus Motion in Limine).

Respondent further seeks orders that would exclude the introduction of testimony and documents to be offered through FDIC examiners Anne Miessner, Dennis O'Neill, and James Gomez. Specifically referring to Examiner Miessner, Respondent avers her opinions are "unreliable and highly prejudicial, as they conflate what Calcutt did with what Green and Jackson did."[12] Upon review of the factual premises presented in Respondent's Motion, I find no legal basis to exclude the testimony. As has been noted, the Notice of Intention alleges both direct involvement by Respondent in unsafe and unsound practices, and his indirect involvement with actions attributed to Green and Jackson. The testimony proposed by this witness, as described in Enforcement Counsel's prehearing statement and her supplemental report of August 23, 2019, establishes that the proposed testimony would be relevant and not otherwise subject to exclusion. I also reject (for the second time) Respondent's assertion that the examination described in Respondent's Omnibus Motion violated FDIC's regulations or was in any other way inappropriate.[13]

With respect to limitations of Examiner O'Neill, the record reflects that the parties entered into a stipulation through which Mr. O'Neill's prior testimony would be introduced and received as evidence during the upcoming hearing.[14] Through that stipulation, the parties agreed as follows:

> 1. The testimony in the transcript from the hearing held in September 2015 of FDIC Examiners: a) Dennis P. O'Neill, as set forth in Volume I, pages 10 -209; Volume III, pages 584 – 692; and Volume IV, pages 702 – 757; and b) Charles H. Bird, Volume IV, pages 758 - 916, including all admitted exhibits, subject to the provisions of paragraph 2. hereunder, shall be received into evidence and become part of the record for the new oral hearing in this matter presently scheduled to commence on October 29, 2019;

> 2. The testimony of FDIC Examiners Dennis P. O'Neill and Charles H. Bird described in paragraph 1. above, including all admitted exhibits, and subject to all objections made at the prior hearing that are hereby renewed shall be subject to prehearing motions (e.g., motions in limine) to exclude portions thereof from the record for the new oral hearing and

> 3. Any exhibit previously admitted through the testimony of Dennis P. O'Neill or Charles H. Bird that is excluded from their admitted testimony as a result of a motion in limine by Respondent, may be offered into evidence by the parties through other witnesses who will testify at the new oral hearing.

---

[12] Respondent's Omnibus Motion at 20.
[13] Order Regarding Motion to Strike Affirmative Defenses issued July 3, 2019, at 5-9 and references therein, incorporated by reference into this Order.
[14] Joint Stipulation Regarding Testimony of FDIC Examiners O'Neill and Bird dated July 29, 2019.

Respondent opposes the continued reliance on these stipulations.

In support, Respondent stated:

> Respondent is not denying the accuracy of the previously agreed facts, but rather challenges the relevance of certain stipulations given Green and Jackson are no longer Respondents. As the Board has granted Respondent a full, new oral hearing and given that Respondent objects to the prior Joint Stipulation of Fact, it is inappropriate to unilaterally bind Respondent to the Joint Stipulation from the prior hearing.[15]

Inasmuch as the relevance of the evidence being offered by Examiner O'Neill has been established (see above) over Respondent's objection, there is no legal basis to disregard the parties' stipulation. No different outcome is warranted by the fact that the FDIC Board issued its Decision and Order on a Motion for Interlocutory review, stating: "Contrary to the ALJ's March 19 and March 20 Orders, Respondent is entitled to a new oral hearing in accordance with 12 C.F.R. § 308.35 on all issues that were considered at the prior hearing."[16] The stipulation is, by all accounts, an accurate reflection of the events described therein – which, Respondent has asserted, are no longer relevant. Finding the contrary to be the case here, and finding no claim that the facts as stipulated are other than accurate, I find that evidence the introduction of which was agreed to in this Stipulation will be part of the record.

Regarding Examiner in Charge Gomez, Respondent asserts the testimony should be excluded upon questions regarding EIC Gomez's "reliability and methodology."[17] Elaborating, Respondent argues that the statements in Gomez's Expert Report "are nothing but conclusions, many of which the bank categorically denied."[18] Similar circumstances are presented whenever a report such as this is offered as evidence; but that said, there is no legal basis shown to exclude the Report or the testimony associated with it. To the contrary, the report is presumed to be admissible, even without supporting testimony.[19]

Last, Respondent seeks an order excluding a timeline (FDIC Demonstrative Exhibit 134). In support, Respondent avers that it appears the FDIC "created this timeline for the purposes of this hearing," and has "cherry-picked certain correspondence and events, often taking the description out of context."[20]

The FDIC's Uniform Rules permit demonstrative evidence like that presented through this timeline, and Respondent has presented no legal or factual basis to prevent its introduction at the hearing.[21]

---

[15] Respondent's Opposition to the FDIC's Motions in Limine at 2.
[16] *Id*.
[17] Respondent's Omnibus Motion at 22.
[18] *Id*.
[19] 12 C.F.R. § 308.36 (2) Subject to the requirements of paragraph (a) of this section, any document, including a report of examination, supervisory activity, inspection or visitation, prepared by an appropriate Federal financial institution regulatory agency or state regulatory agency, is admissible either with or without a sponsoring witness.
[20] Respondent's Omnibus Motion at 23.
[21] 12 C.F.R. § 308.36(c)(3) "Witnesses may use existing or newly created charts, exhibits, calendars, calculations, outlines or other graphic material to summarize, illustrate, or simplify the presentation of testimony. Such materials may, subject to the administrative law judge's discretion, be used with or without being admitted into evidence."

Without determining the weight to be given to testimony by these witnesses or to the exhibits at issue, I find an insufficient legal basis has been presented warranting the exclusion of their testimony or the exhibits identified by Respondent. Accordingly, Respondent's motion seeking an order in limine excluding EC Demonstrative Exhibit 134 and testimony from Miessner, O'Neill, and Gomez is DENIED.

**Enforcement Counsel's Motion**

The FDIC through Enforcement Counsel seeks orders authorizing the admission of the Joint Stipulations (addressed above) and precluding reference to Reports of Examinations from institutions other than Northwestern Bank; reference to Respondent's conduct at banks other than Northwestern; evidence related to Affirmative Defenses already ruled stricken in this enforcement action; and "improper expert opinions from the proposed testimony of Thomas Levi."[22]

For the reasons articulated above, Enforcement Counsel's Motion to Admit the Joint Factual Stipulations from the Prior Hearing as Evidence in the New Oral Hearing is GRANTED.

Enforcement Counsel support their motion regarding evidence of Respondent at banking institutions other than Northwestern by noting first that Respondent proposes to introduce a 2017 Report of Examination from Central State Bank of Beulah, Michigan (as Respondent's Exhibit 186), and the 2019 ROE from State Savings Bank of Frankfort, Michigan (as Respondent's Exhibit 187).[23] In his prehearing submission, Respondent indicates that he intends to testify regarding these Reports, and would be the only witness doing so.[24] In Respondent's summary of anticipated testimony of witnesses to be called during the hearing, he makes no reference to either Exhibit 186 or 187 – except to request that judicial notice be taken of both reports.[25] Instead, upon providing notice that he intends to rely on these exhibits, Respondent makes the following statement:

> Calcutt continued as a Director at Central State Bank and State Savings Bank except for a time when he hoped his resumption would result in more fair treatment by the FDIC. In 2019, the FDIC approved the merger of the two banks. Calcutt is a director of the successor. In the most recent examination the successor State Savings Bank received high grades overall, including management.[26]

Having reviewed the allegations, claims, and issues presented in the Notice of Intention to Prohibit and Respondent's Answer thereto, I find no legal basis for the introduction of either Exhibit 186 or 187. No claim is presented in the Notice of Intention regarding the operation of any bank other than Northwestern. The factual claim – that the recently merged banks "received high grades overall, including management" bears no clear relation to the allegations and issues presented in the Notice of Intention and Respondent's Answer.

---

[22] Federal Deposit Insurance Corporation's Motions in Limine at 1.

[23] *Id*. at 6, citing Respondent's List of Exhibits to be Introduced at Hearing, dated August 23, 2019, at 18.

[24] See Respondent's List of Witnesses and Proposed Exhibits at 21.

[25] *Id*. at 24.

[26] *Id*. at 19.

Respondent responds in opposition to Enforcement Counsel's Motion by averring that his "exemplary conduct involving these two institutions is relevant both to the assessment of a civil money penalty and whether the FDIC Board should exercise its discretion to remove Respondent from banking"[27] neither of which were identified or in any way presented in Respondent's prehearing submission. While there is no impediment to Respondent providing testimony in support of the mitigating factors to be considered during the hearing, his prehearing disclosures regarding Exhibits 186 and 187 in the List of Witnesses and Exhibits provided an insufficient factual basis that would justify the introduction of reports of examinations relating to banks other than Northwestern. Upon this basis, Enforcement Counsel's motion to exclude Respondent's Exhibits 186 and 187 is GRANTED.

Enforcement Counsel next refer to Respondent's intention to present evidence on the issue of whether the equitable principle of laches applies here, whether the FDIC entrapped Respondent, and whether the FDIC failed to follow its own regulations in the course of its determination of whether Respondent and others engaged in unsafe or unsound banking practices.[28] As the parties have noted, the factual and legal claims supporting Respondent's offer of proof regarding these three defenses have been addressed and determined in a prior Order of this tribunal.[29] They will not be revisited here, and Respondent's motion for reconsideration of the same is DENIED as insufficiently supported by the legal and factual premises presented and on the basis that the motion has not been properly presented.[30]

Incorporating by this reference the determinations presented in the July 3, 2019 Order Regarding Motion to Strike Affirmative Defenses, I find cause has been shown to preclude the presentation of evidence described in Respondent's Prehearing Statement for the Supplemental Hearing Scheduled for October 29, 2019 at subsections II H (This Proceeding is Barred by Laches), II I (This Proceeding Should be Dismissed Because the FDIC Entrapped Respondent), and II J (The FDIC's Failure to Follow its own Regulations Violates the *Accardi* Principle and Due Process). Accordingly, Enforcement Counsel's Motion to exclude this evidence is GRANTED.

Last, Enforcement Counsel seek an order limiting the testimony of Thomas Levi. In support, Enforcement Counsel aver the proposed testimony from Levi "goes beyond that of a factual witness . . . to offer opinions based upon his specialized knowledge as an accountant about the materiality of the restatements."[31] Respondent proposes to present the witness to discuss the following:

> He was the Chief Financial officer of Northwestern Bank and had overall responsibility for financial reporting. Call Reports were prepared by the accounting

---

[27] Respondent's Opposition to the FDIC's Motions in Limine at 3.

[28] See Enforcement Counsel's Motions in Limine at 9, citing Respondent's Prehearing Statement at 46-49.

[29] See *id.* at 9-10; and Respondent's Prehearing Statement for the Supplemental Hearing Scheduled for October 29, 2019, at 42, 43, and 46.

[30] See 12 C.F.R. § 308.23, providing at (1) Except as otherwise provided herein, an application or request for an order or ruling must be made by written motion, and at (2) All written motions must state with particularity the relief sought and must be accompanied by a proposed order; and see Notice of Hearing and Supplemental Prehearing Orders issued March 20, 2019, providing that "Prehearing submissions shall not include motions; motions shall be submitted separately."

[31] Enforcement Counsel's Motions in Limine at 11.

manager and submitted to him. He attended Board of Directors meetings, including the meetings of October-December 2009 and October-December 2010.

At the Board meetings he would present the financials to the Board. He observed the Nielson delinquency in October 2009 as part of his financial review for the November presentation. He recalls Scrub Calcutt discussing the Nielson delinquency at the November 2009 Board meeting, and that the bank was working to resolve the issues. Mr. Calcutt said he viewed the refusal to pay as a negotiating tactic. He recalls the delinquency resolution was discussed at the December Board meeting but not the details thereof.

He prepared a financial analysis of the FDIC required changes to the December 2009 and December 2010 Call Reports related to the Nielson loans, concluding the results were immaterial and had the effect of increasing earnings in 2011.

He became aware that the relationship with examiners became especially hostile in the 2010 and 2011 examinations.

The substance presented here indicates Mr. Levi is being presented as a witness to events relevant to the charges in the Notice of Intention and in Respondent's Answer. Enforcement Counsel assert "[t]he materiality of misstatements on a financial reporting document is a technical accounting concept and solely within the purview of an expert witness" and, inasmuch as Respondent proposed to present Mr. Levi's testimony on this point, Enforcement Counsel argue his Levi's testimony constitutes expert opinion testimony that should have been, but was not, disclosed in prehearing submissions.

I find an insufficient basis to conclude the testimony described in Respondent's prehearing submission establishes the witness's testimony will meet the standards applicable for expert testimony. Rather, the proffer appears to suggest the witness will offer opinions based on his exposure to the events described in the prehearing submission – as a lay witness, not an expert. Accordingly, finding an insufficient factual basis has been presented to limit the witness's testimony (as described in the prehearing submission), Enforcement Counsel's motion is DENIED with respect to Mr. Levi.


SO ORDERED.

Dated: October 4, 2019


_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

## CERTIFICATE OF SERVICE

On October 4, 2019, I served by electronic mail the foregoing Order Regarding the Parties' Motions in Limine upon:

**FDIC Executive Staff**
Valerie J. Best, Assistant Executive Secretary,
Andrea Winkler, Acting Assistant General Counsel
Nicholas J. Kazmerski, Counsel
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429
vbest@fdic.gov
nkazmerski@fdic.gov
AWinkler@FDIC.gov
ESSEnforcementActionDocket@FDIC.gov

**FDIC Enforcement Counsel**
David Beck, Esq.
Mary Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
bsup@fdic.gov, dbeck@fdic.gov, mbenden@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
Telephone: (972) 761-8592
BSup@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

Ryan T. Scarborough, Esq.
William Snyderwine, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com: wsnyderwine@wc.com

Page 8 of 9

**A187**

_____
Christopher B. McNeil
Administrative Law Judge
Office of Financial Institution Adjudication

A188

## FEDERAL DEPOSIT INSURANCE CORPORATION
## WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
## RECOMMENDED DECISION ON REMAND

**FDIC Enforcement Counsel**
David Beck, Esq.
Mary Anne Benden, Esq.
Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606

Gabrielle A. J. Beam, Senior Regional
Federal Deposit Insurance Corporation
1100 Walnut Street, Suite 2100
Kansas City, Missouri 64106

**Counsel for Harry C. Calcutt III,
Respondent**
Barry D. Hovis
Walter J.R. Traver
MUSICK, PEELER & GARRETT
LLP
1 Post Street, Suite 600
Ryan T. Scarborough, Esq.
William Snyderwine, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005

**Part I. Introduction and Summary**

**1. Nature of the Case**

The Federal Deposit Insurance Corporation (FDIC) has alleged that Harry C. Calcutt III, the Respondent in this administrative enforcement action, engaged in unsafe or unsound banking practices while serving at the President and Chief Executive Officer of Northwestern Bank of Traverse City, Michigan.[1] The allegations involve conduct attributed to Mr. Calcutt concerning a loan portfolio held by the Bank in 2009 and 2010, and involve allegations that he and others under his direction caused the Bank to suffer financial loss and placed the Bank at risk of suffering substantial additional loss.[2] Further, the FDIC alleged that conduct attributable to Mr. Calcutt constituted breaches of fiduciary duties he owed to the Bank; that the unsafe practices provided him with financial gain or other benefit; and that there was evidence of his personal dishonesty and his willful or continuing disregard for the safety or soundness of the Bank.[3]

Upon these allegations, the FDIC proposes to issue an order removing Mr. Calcutt from any banking office he currently may hold and prohibiting him from further participation in regulated banking activity.[4] In addition, upon alleging that he recklessly engaged in a pattern or practice of breaches of fiduciary duties or unsafe or unsound practices in conducting the affairs of the Bank causing more than a minimal loss to the Bank, the FDIC has assessed against Mr. Calcutt a $125,000 civil money penalty.[5]

Mr. Calcutt through his Second Amended Answer has admitted the FDIC has jurisdiction of the subject matter presented in the Notice of Intention,[6] but has denied that his actions constituted unsafe or unsound practices or breaches of fiduciary duties he owed to the Bank.

**2. Procedural History**

This enforcement action had been before the Board of Governors on a prior occasion, and is being presented now on remand. A hearing had been conducted by presiding Administrative Law Judge Miserendino in September 2015. Following that hearing, ALJ Miserendino recommended that the Board of Governors issue the proposed removal and prohibition order and impose the proposed $125,000 assessment.[7]

While ALJ Miserendino's Recommended Decision was pending before the FDIC Board of Directors, the United States Supreme Court rendered its decision in *Lucia v. SEC*.[8] Thereafter, the Board issued Resolution 085172, through which it appointed the undersigned to serve as an Administrative Law Judge; and it issued an Order in Pending Cases, through which it remanded this administrative enforcement action to me, with instructions that I provide the parties with "a new hearing and a fresh reconsideration of all prior actions".[9]

---

[1] Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and Notice of Hearing dated August 20, 2013 at 1.

[2] *Id*. at 22.

[3] *Id*. at 1-2.

[4] *Id*. at 2.

[5] *Id*. at 26-27.

[6] Second Amended Answer dated May 22, 2019 at ¶¶1-6.

[7] Recommended Decision issued June 6. 2017 at 102.

[8] *Lucia v. Securities and Exchange Commission*, 138 S.Ct. 2044 (2018).

[9] FDIC Board Resolution No. 085172, dated July 19, 2018.

The second evidentiary hearing requested by Mr. Calcutt was conducted between October 29, 2019 and November 6, 2019, in Grand Rapids, Michigan.

### 3. Summary

Preponderant evidence presented in this enforcement proceeding has established that Mr. Calcutt willfully withheld from the public and from the Bank's regulators material information regarding the true nature of the Bank's relationship with the Bank's largest interrelated group of borrowers. Mr. Calcutt authorized and participated in a scheme that concealed the interrelationship of the borrowers; and he failed to ensure loan documentation reflecting the true nature of that relationship was maintained in the Bank's records. He approved loan and collateral release transactions that led the Bank to file false Call Reports in which the Bank's income was overstated. When regulatory examiners questioned Mr. Calcutt regarding the true nature and purpose of transactions with the interrelated group of borrowers, he knowingly provided false and misleading answers in an attempt to conceal from the examiners the nature and purpose of the transactions.

Preponderant evidence also established that once the true nature of the Bank's relationship with the group of borrowers became known to examiners, corrective actions were called for, including the restatement of Call Reports and supplemental analyses of the Bank's lending operations. Coupled with these costs to the Bank, Mr. Calcutt by his actions in concealing the true nature of a series of lending transactions profited by being paid a bonus that was based on the Bank's income figures that were later shown to be erroneous.

Preponderant evidence established that Mr. Calcutt engaged in a course of conduct that included unsafe and unsound banking practices and that constituted breaches of fiduciary duties Respondent owed to the Bank. By reason of such conduct, he received financial gain while prejudicing the interests of the Bank's depositors and demonstrating personal dishonesty and a willful and continuing disregard for the safety and soundness of the Bank. Such evidence supports a recommendation that the FDIC issue an order removing Mr. Calcutt from regulated banking activity and prohibiting his further participation in such activity, as provided for by section 8(e) of the Federal Deposit Insurance Act.

Further, preponderant evidence established that Mr. Calcutt's actions were reckless and were part of a pattern of misconduct that caused more than a minimal loss to the Bank. Upon this evidence and by reason of such misconduct, after considering all relevant evidence in mitigation, cause has been shown to recommend Mr. Calcutt be assessed a $125,000 civil money penalty, as provided for by section 8(i) of the FDI Act.

### 4. Findings of Fact

1. As President and CEO of Northwestern Bank, Respondent Harry C. Calcutt III engaged in and participated in unsafe and unsound banking practices, and did so recklessly and as part of a pattern of continuing misconduct. These practices included:

   a. Respondent authorized the 2009 Bedrock Loan transaction, knowing that the proceeds would be paid to entities that lacked the ability to repay the funds as disbursed.[10]

---

[10] See Part II, §§ 5.A, C.1, G-L *infra*, and references to the record cited therein.

Page 3 of 145

b. Respondent authorized the December 2010 transaction by which funds held as collateral for the Bank were to be paid to entities that lacked the ability to repay the funds as disbursed.[11]

c. Respondent repeatedly and knowingly failed to disclose to the Bank's Board and its regulatory examiners accurate and complete information about the Bank's condition and about the true nature of the Nielson Entities loan portfolio, including the 2009 Bedrock Loan transaction and the 2010 collateral release transaction benefitting the Nielson Entities.[12]

Respondent also engaged in conduct that breached fiduciary duties he owed to the Bank. That conduct included:

d.  The duty of care concerns an employee's responsibility to act prudently and diligently in conducting business for the employer. Respondent breached this duty by failing to exercise reasonable control and supervision over the Bank's affairs when he led the negotiations that resulted in the 2009 Bedrock Loan and the 2010 collateral release.[13]

e. Respondent also failed to heed and effectively respond to repeated regulatory warnings regarding the Bank's Nielson Entities portfolio, including concerns about the increasing concentration of the Nielson Loans, the failure to conduct a global cash flow analysis and global collateral analysis, and the persistent and deliberate failure to obtain updated financial statements and appraisals of the collateral securing the Nielson Entities Loans.[14]

f. The duty of candor concerns the responsibility of an employee to disclose material information to the employer, even if not asked. Respondent withheld from the Bank's Board and its regulatory examiners the true nature of the Nielson Entities, the true condition of the entities that were to benefit from the 2009 Bedrock Loan transaction and the 2010 collateral release transaction, the true course of the payment of the 2009 Bedrock Loan prior to Board approval of the loan, and the true course of the condition of the Entities that would benefit from the 2010 collateral release transaction.[15]

2. Respondent's actions identified in the above findings caused the Bank to suffer financial loss and other damage. The damages the Bank sustained due to Respondent's conduct include:

a. The Bank suffered financial loss from the Bedrock transaction, including a $30,000 charge-off on the $760,000 loan.[16]

b. The Bank has taken a $6.443 million loss on the other Nielson Loans.[17]

---

[11] See Part II, §§ 5C, F, L, P-R *infra*, and references to the record cited therein.

[12] See Part II, §§ 5F-G, O-R, T *infra*, and references to the record cited therein.

[13] See Part II, §§ 5N-P, T *infra*, and references to the record cited therein.

[14] See Part II, §§ 4, 5B-D, I, K-P. *infra*, and references to the record cited therein.

[15] See Part II, §§ 5A-B, E-M. *infra*, and references to the record cited therein.

[16] See Part II, § 5Q. *infra*, and references to the record cited therein.

[17] *Id.*

    c. The Bank at Respondent's direction released $1.2 million in Pillay collateral that had supported the Nielson Loans.[18]

3. Respondent's actions created a significant risk of loss to the Bank from the Bedrock Loan transaction and the 2010 collateral release. That risk includes risk occasioned by the Bank's entering into both transactions without conducting reasonable or prudent underwriting or credit administration practices – as by not requiring financial statements or timely collateral appraisals prior to loan disbursement to the Nielson Entities.[19]

4. Respondent's actions in concealing the true nature of the Bedrock Loan Transaction caused other damage to the Bank:

    a. Respondent's lack of candor with both the Board and the Bank's examiners caused the Bank to incur investigative and auditing expenses the Bank in response to the disclosure of the true nature of the Nielson Entities, the disclosure of the unauthorized disbursement of Bank funds for the 2009 Bedrock Loan transaction, and the unauthorized 2009 release of Pillay collateral.[20]

    b. Respondent's concealment from both the Bank's Board and its regulators of the true nature of the Nielson Entities as a common group, and the true purpose of both the 2009 Bedrock Loan transaction and the 2010 collateral release, prevented both the Board and the Bank's regulators to take timely action in 2009 to address the risks occasioned by such concealment.[21]

5. Respondent's actions identified above gave him financial gain and other benefits, including:

    a. Funds disbursed through the 2009 Bedrock Loan transaction and the two Pillay collateral disbursements artificially increased the Bank's income, causing the Bank to overstate its earnings by concealing the fact that the Bank's largest credit relationship (the Nielson Entities loan portfolio) was on non-accrual – resulting in the issuance of a dividend not warranted had the true nature of the disbursements been shown. Respondent received the benefit of that artificially inflated dividend in 2010 and 2011. As owner of 10% of the Bank's holding company, Respondent would benefit from the Bank Board's approval of a $462,950 dividend, representing approximately 9.87% of net income, in 2011.[22]

    b. The same funds also resulted in conditions with the Bank's net income that permitted Respondent to benefit from an artificially inflated bonus that was based on the Bank's net after-tax income. Once the Bank's Call Reports were restated to reflect the true nature of the Nielson Entities Loan portfolio, the

---

[18] See Part II, §§4, 5L-N, P, *infra*, and references to the record cited therein.

[19] See Part II, §§5N-R, *infra*, and references to the record cited therein.

[20] See Part II, §§5S-V, *infra*, and references to the record cited therein.

[21] See Part II, §§5P-U, *infra*, and references to the record cited therein.

[22] See Part II, §§4, 5T, *infra*, and references to the record cited therein.

Bank established Respondent had been overpaid $68,841 in 2009 and $59,858 in 2010.[23]

6. Respondent's actions identified above involved his personal dishonesty. Those actions include:

   a. Respondent persistently concealed from both the Bank's Board and its regulatory examiners the true common nature of the Nielson Entities Loan portfolio, problems with that portfolio, and Respondent's efforts in dealing with the Nielson Family's decision to stop making payments on the loans in that portfolio, first in 2009, then in 2010, and finally in 2011. Respondent falsely answered questions presented to him during examinations in 2009, 2010, and 2011, concealed documents showing the true condition of the loans during that period, and falsely testified that Board members had been fully apprised of the nature of the Nielson Loan portfolio.[24]

   b. Respondent envisioned and then implemented the means by which proceeds apparently earmarked for the Bedrock Fund LLC would in fact be distributed to multiple Nielson Entities, using bookkeeping protocols that would withhold from the Bank's own auditors and its examiners the true common nature of the Entities and their loan portfolio.[25]

7. Respondent's actions identified above demonstrated both willful and continuing disregard for the safety or soundness of the Bank. Those actions include:

   a. Respondent throughout 2009 to 2011 persistently ensured the true group nature of the Nielson Entities would be hidden from examiners and the Bank's own auditors, creating a risk to the Bank's safety and soundness. He willfully directed the disbursement of Bedrock loan proceeds and Pillay collateral without first securing Board approval, in direct and knowing violation of the Bank's loan policies.[26]

   b. Respondent's conduct – notably the continued concealment from the Bank's auditors, its Board, and its examiners, facts regarding the true condition of the Nielson Entities loan portfolio from September 2009 (when all payments stopped) throughout 2011 – hid the extent of the problems of the portfolio over an extended period of time. The concealed facts were exposed only when a representative of the *borrower* provided the Bank's regulators with copies of documents that should have been in the Bank's loan files for this portfolio. These disclosures established that Respondent had actively prevented the filing and maintenance of relevant borrower correspondence showing the truly fraught condition of the portfolio as it truly existed in 2009 and then throughout  2010 and 2011.[27]

---

[23] See Part II, §§5U-V  *infra*, and references to the record cited therein.

[24] See Part II, §§5F-I, O-U  *infra*, and references to the record cited therein.

[25] See Part II, §§4, 5A-G, I-K, P, *infra*, and references to the record cited therein.

[26] See Part II, §§5A, E-I, P, *infra*, and references to the record cited therein.

[27] See Part II, §§4, 5A, E-L, O-R, T, *infra*, and references to the record cited therein.

8. Respondent's actions created a reasonably foreseeable risk to the Bank. Those actions include:

    a. It was reasonably foreseeable that the Bank's release of collateral securing impaired loans that lacked personal guarantees would lead to financial loss to the Bank, where the borrowers made it clear there were no other available repayment sources.[28]

    b. It was reasonably foreseeable that personal guarantees would be needed to protect the Bank against the risk of loss when maintaining a portfolio of loans secured only by illiquid collateral, where individual borrowers lacked cash flow sources, and when collateral values diminish in a recessionary economy.[29]

9. Factors in Mitigation Regarding the $125,000 Civil Penalty

    a. Conditions proved during the evidentiary hearings in this matter established the lack of Respondent's good faith, that the violations threatened the institution, and that Respondent had notice of prior violations that threatened the safety of the Bank.[30]

    b. Mitigation factors under the Federal Financial Institutions Regulatory Agency – Interagency Policy Regarding the Assessment of Civil Money Penalties include whether Respondent's misconduct was intentional or committed with a disregard for either the law or the consequences to the Bank, the duration and frequency of the conduct, the degree to which Mr. Calcutt was either cooperative or uncooperative, whether Mr. Calcutt either voluntarily disclosed breaches or concealed the same, the threat of loss or actual loss or other kinds of harm to the Bank, whether Mr. Calcutt realized any financial gain or other benefit from his misconduct, whether the evidence showed a "tendency to engage in unsafe or unsound practices or breaches of fiduciary duty," and whether there is an agreed upon order in place during the period of misconduct.[31] Upon considering these mitigating factors, the assessed penalty is warranted.

## 5. Conclusions of Law

1. The Bank is subject to the provisions of the Federal Deposit Insurance Act set forth in 12 U.S.C. §§ 1811 through 1831aa and the FDIC's Rules and Regulations, 12 C.F.R. Chapter III.

2. Respondent, Harry C. Calcutt III is an institution-affiliated party of the Bank. 12 U.S.C. § 1813(u).

3. The FDIC is the "appropriate Federal banking agency" with respect to the Bank. 12 U.S.C. § 1813(q)(2).

4. The FDIC has jurisdiction over the Bank, Calcutt, and the subject matter of this proceeding. 12 U.S.C. §§ 1818(e)(1) & (i).

---

[28] See Part II, §§5D, P, Part III §2, *infra*, and references to the record cited therein.
[29] See Part II, §§4, 5O-P *infra*, and references to the record cited therein.
[30] See Part II, §6 *infra*, and references to the record cited therein.
[31] Id.

5. As Chief Executive Officer and President of the Bank and as a director of the Bank, Respondent, Harry C. Calcutt III, owed fiduciary duties to the Bank and its depositors.

6. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III, has engaged in unsafe or unsound banking practices in connection with the Bank within the meaning of Section 8(e)(1)(A)(ii) of the FDIA, 12 U.S.C. § 1818(e)(1)(A)(ii),

7. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III, has breached his fiduciary duties as an executive officer and director of the Bank within the meaning of Section 8(e)(1)(A)(iii) of the FDIA, 12 U.S.C. § 1818(e)(1)(A)(iii).

8. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Bank suffered actual financial loss and faced the probability of suffering financial loss or other damage within the meaning of Section 8(e)(1)(B)(i) of the FDIA, 12 U.S.C. § 1818(e)(1)(B)(i).

9. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, Respondent, Harry C. Calcutt III's received a financial gain or other benefit within the meaning of Section 8(e)(1)(B)(i) of the FDIA, 12 U.S.C. § 1818(e)(1)(B)(iii).

10. The Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, involved personal dishonesty within the meaning of Section 8(e)(1)(C)(i) of the FDIA, 12 U.S.C. § 1818(e)(1)(C)(i).

11. The Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, demonstrate his willful and continuing disregard for the safety or soundness of the Bank within the meaning of Section 8(e)(1)(C)(ii) of the FDIA, 12 U.S.C. §§ 1818(e)(1)(C)(ii).

12. Based on the foregoing findings, Respondent, Harry C. Calcutt III, has engaged in conduct satisfying the requirements of 12 U.S.C. § 1818(e) and is subject to the imposition of an order removing him from employment with a federally insured depository institution and prohibiting him from future participation in the affairs of a federally insured depository institution or organization listed in 12 U.S.C. § 1818(e)(7) without prior written approval of the FDIC and any other appropriate Federal financial institution regulatory agency.

13. Based on the foregoing findings, the Respondent, Harry C. Calcutt III, has engaged in conduct satisfying the requirements of Section 8(i)(2)(B) of the FDIA, 12 U.S.C. § 1818(i)(2)(B), and is subject to the imposition of an order assessing a Second Tier civil money penalty.

14. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III, has recklessly engaged in unsafe or unsound practices in conducting the affairs of the Bank within the meaning of Section 8(i)(2)(B)(i)(II) of the FDIA, 12 U.S.C. § 1818(i)(2)(B)(i)(II).

15. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III's, has breached his

fiduciary duties to the Bank within the meaning of Section 8(i)(2)(B)(i)(III) of the FDIA, 12 U.S.C. § 1818(i)(2)(B)(i)(III).

16. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III's, practices constitute a pattern of misconduct within the meaning of Section 8(i)(2)(B)(ii)(I) of the Act, 12 U.S.C. § 1818(i)(2)(B)(ii)(I).

17. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III's, practices caused more than a minimal loss to the Bank within the meaning of Section 8(i)(2)(B)(ii)(II) of the FDIA, 12 U.S.C. § 1818(i)(2)(B)(ii)(II).

18. By reason of the Respondent, Harry C. Calcutt III's, acts, omissions, and practices as fully described in the foregoing findings, the Respondent, Harry C. Calcutt III's, practices resulted in a pecuniary gain or other benefit to him within the meaning of Section 8(i)(2)(B)(ii)(III) of the FDIA, 12 U.S.C. § 1818(i)(2)(B)(ii)(III).

19. Upon consideration of mitigating factors, a civil money penalty in the amount of One Hundred and Twenty-five Thousand Dollars ($125,000) is recommended.

## Contents

**Part I. Introduction and Summary** .......................................................... 2

    **1. Nature of the Case** ............................................................................ 2

    **2. Procedural History** ........................................................................... 2

    **3. Summary** .......................................................................................... 3

    **4. Findings of Fact** ............................................................................... 3

    **5. Conclusions of Law** ......................................................................... 7

**Part II. Evidentiary Proceedings** ........................................................... 11

    **1. Background** .................................................................................... 11

    **2. Findings of Fact Regarding Jurisdiction** ....................................... 12

    **3. Conclusions of Law Regarding Jurisdiction** ................................. 12

    **4. Plenary Findings of Fact** ............................................................... 13

    **5. Controverted Claims** ..................................................................... 17

    **A. Nature of the Bank's Relationship with the Nielson Entities, Generations Management, and Bedrock Holdings LLC** ........................................ 18

    **B. History of Regulators' Concern** .................................................... 26

    **C. The FDIC's 2010 Examination** ..................................................... 29

    1. Findings of Fact Regarding Respondent's Obstruction of FDIC Examiners: .................. 38

    **D. Nature of the 2011 Examination** ................................................... 39

**E. The Bedrock Holdings** ......................................................................... **39**

**F. Respondent's Direction to Generations Management Regarding Accounting for Loan Proceed Distributions** ................................................................ **40**

**G. Respondent's Role in Concealing the Common Unit and his Directions to Generations Management Due to the Bank's Lending Limit** ......................... **41**

1. Findings of Fact Regarding Respondent's Actions in Concealing the Nature of the Nielson Entities as a Common Group ................................................... 43

**H. The Bank's Concerns Regarding the Nielson Entities' Lines of Credit** .................. **43**

**I. Respondent's Responses to Regulators' Concerns about Loans to Entities that Lacked Positive Cash Flow** ........................................................... **45**

**J. The Bedrock 2009 Loan and the Bank's Legal Lending Limit** ................................. **46**

**K. Regulatory Issues in 2009 with the Loans to Five Nielson Entities** ........................... **47**

**L. Respondent's Authorization of the Use of Funds from Pillay Trading LLC to Service Nielson Entity Loans** .............................................................. **49**

**M. The Distressed State of the Nielson Entities Loan Portfolio in August 2009** ........... **50**

**N. Using Pillay Trading LLC Funds and the New Bedrock Loan to Service Existing Loans in 2009** .................................................................................. **52**

**O. Bank Management's Misrepresentation of the Condition of the Nielson Entities** .. **57**

**P. Bank Management's Misrepresentations Presented in the Commitment Review for the 2009 Bedrock Loan** ............................................................ **60**

1. Misrepresentation Regarding "Working Capital" in the Bedrock Loan ......................... 60

2. Evaluating the Merits of Conflicting Testimony Regarding When the Bedrock Loan was Approved ......................................................................................... 67

3. Findings of Fact Regarding Respondent's Failure to Inform the Board Prior to Disbursing the Bedrock Loan Funds: ............................................................ 69

    a. Failure to Fully Disclose the Sources of Funding for Bedrock Loan Service ....... 69

    b. Material Misrepresentations in Respondent's Responses to Questions Presented to the Bank's Officers in September 2011 ................................... 73

    c. Missing Loan Documentation ................................................................ 77

    d. Findings of Fact Regarding Missing Loan Documentation .................................. 79

    e. Failure to Fully Disclose the Effect of the Release of Pillay Trading Collateral .. 81

    f. Failure to Timely Obtain Financial Statements from the Recipients of Pillay Disbursements and Bedrock Loan Proceeds ........................................... 81

    g. Transfer of Loans to Affiliate Banks in May 2010 ............................................. 82

**Q. The Distressed State of the Nielson Entities Loan Portfolio in 2010** ....................... **86**

**R. Impact of the Bank's Failure to Document and Disclose the Status of the Nielson Entity Loans** ................................................................................. **89**

A198

**S. Regulator Concerns Regarding Respondent's Role in Bank Management** .............. **92**

**T. Concerns Regarding Limited Loan Presentations to the Board** ................................ **98**

**U. Respondent's Impact on the Bank's Call Reporting** .................................................. **99**

1. Findings of Fact Regarding Respondent's Impact on the Bank's Call Reporting .......... 100

2. Findings of Fact Regarding Respondent's Knowledge that the Purpose Stated in the Bedrock Loan Application was Misleading .................................................................... 111

3. Findings Related to the Costs Associated with Respondent's Misrepresentations ......... 113

**V. Costs Associated with Respondent's Misconduct** ...................................................... **113**

**6. Issues Pertaining to the Civil Money Penalty** ............................................................. **115**

**7. Respondent's Allocution** ................................................................................................ **119**

**Part III - Analysis** ............................................................................................................... 119

**1. Respondent's Affirmative Defenses** ............................................................................. **119**

**2. Grounds for Section 8(e) Orders - Prohibition** ........................................................ **122**

**3. Grounds for Section 8(i) Orders – Civil Money Penalty** ........................................ **124**

**4. Recommendation** ............................................................................................................ **125**

**Appendix 1 – Proposed Orders** ........................................................................................ 127

**Appendix 2 - Respondent's Offers of Proof** ................................................................... 129

Offer of Proof No. 1: Respondent's Cross-examination of Autumn Berden .................. **130**

Offer of Proof No. 2 – Respondent's Cross-Examination of Anne Miessner ................ **135**

Offer of Proof No. 3 – Respondent's Cross-Examination of Cori Nielson ..................... **137**

Offer of Proof No. 4: Direct Examination of Harry C. Calcutt, III ................................. **144**

## Part II. Evidentiary Proceedings

### 1. Background

The case presented in 2019 differs in some respects from that presented in 2015. As originally drafted, the FDIC's Notice of Intention alleged Mr. Calcutt, as the President and CEO of Northwestern Bank, collaborated with the Bank's commercial loan officer, William Green, and Richard Jackson, the Bank's executive vice president and Bank Board member.[32] The collaboration that was described in the Notice of Intention addressed actions attributed to all three Bank employees with respect to a Bank loan portfolio controlled by the Nielson family of Traverse City, Michigan.[33]

Shortly before the hearing began in 2015, Mr. Green and Mr. Jackson no longer disputed the truth of these allegations, and consented to orders prohibiting them from engaging in

---

[32] Notice of Intention at ¶¶4-6.
[33] *Id*. at ¶¶7-26.

regulated banking activity; and Mr. Jackson consented to the assessment of a $75,000 civil money penalty, all based on the claims presented in the Notice of Intention.[34]

Also, by the time the matter was presented for a second hearing, issues not present in 2015 had been raised and need to be addressed in this Recommended Decision. Those issues include Mr. Calcutt's new claims challenging the FDIC's Order in Pending Cases, and a new affirmative defense regarding whether the claims in the Notice of Intention are barred either by the five year statute of limitations found at 28 U.S.C. § 2462 or the doctrine of laches.[35]

The record now being forwarded to the FDIC's Board of Directors consists of those exhibits presented in both the 2015 and 2019 hearings, along with the transcripts of testimony taken during those hearings and the briefs and arguments of counsel.

**2. Findings of Fact Regarding Jurisdiction**

Respondent has admitted the FDIC and its Board of Directors has jurisdiction over the subject matter presented in the Notice of Intention.

**Jurisdictional Finding of Fact No. 1:** At all times pertinent to this proceeding, Northwestern Bank was a corporation existing and doing business under the laws of the State of Michigan, having its principal place of business at Traverse City, Michigan. The Bank was, at all times pertinent to this proceeding, an insured State nonmember bank.[36]

**Jurisdictional Finding of Fact No. 2:** At all times pertinent to this proceeding Harry C. "Scrub" Calcutt III served as the Bank's president and chief executive officer and as the chairman of the Bank's board of directors. He was also at all times a member of the Bank's senior loan committee.[37] He also was CEO of Northwest Bancorp, the Bank's holding Company.[38]

**3. Conclusions of Law Regarding Jurisdiction**

**Jurisdictional Conclusion of Law No. 1:** As an insured State nonmember bank, the Bank was at all times pertinent to this proceeding subject to the FDI Act, 12 U.S.C. §§ 1811-1831aa, the Rules and Regulations of the FDIC, 12 C.F.R. Chapter III; and the laws of the State of Michigan.[39]

**Jurisdictional Conclusion of Law No. 2:** At all times pertinent to this proceeding, Mr. Calcutt was an "institution-affiliated party" as that term is defined in section 3(u) of the Act, 12

---

[34] See Notice of Settlement as to William Green, dated September 14, 2015; Notice of Settlement as to Richard Jackson, dated September 14, 2015.

[35] *Cf.* Harry C. Calcutt III, First Amended Answer to Notice at 39 (raising affirmative defenses of entrapment and Due Process violation); and [Harry C. Calcutt III,] Second Amended Answer to Notice at 32-33.

[36] Second Amended Answer to Notice at ¶1; Respondent's Proposed Findings of Fact and Conclusions of Law at ¶2 and citations to the record therein; Joint Ex. 15 (Joint Stipulations of Fact) at ¶1.

[37] Second Amended Answer to Notice at ¶2; Respondent's Proposed Findings of Fact and Conclusions of Law at ¶3 and citations to the record therein; Joint Ex. 15 (Joint Stipulations of Fact) at ¶4.

[38] Respondent's Proposed Findings of Fact and Conclusions of Law at ¶4 and citations to the record therein. See also Mr. Calcutt's testimony that currently he is the "Chairman of the Board of a small community bank [State Savings Bank] and the Chairman and CEO of the holding company [CS Bancorp]" and is not going to return to any management function in banking. Tr. at 1350-51 (Calcutt).

[39] Second Amended Answer to Notice at ¶1; Respondent's Proposed Findings of Fact and Conclusions of Law at ¶2 and citations to the record therein.

U.S.C. § 1813(u), and for purposes of sections 8(e)(7), 8(i) and 8(j) of the Act, 12 U.S.C. § 1818(e)(7), 1818(i) and 1818(j).[40]

    **Jurisdictional Conclusion of Law No. 3:** The FDIC has jurisdiction over the Bank, Mr. Calcutt, and the subject matter of this proceeding.[41]

## 4. Plenary Findings of Fact

    Through stipulations[42] and through answers given by Mr. Calcutt in his Second Amended Answer, the following factual claims presented in the Notice of Intention are established:

    **Plenary Findings of Fact No. 1:** The Nielson family of Traverse City, Michigan, manages multiple limited liability companies (LLCs), some of which are loan customers of the Bank. Throughout 2009, a member of the Nielson family, Cori Nielson, had discussions with the Bank regarding loans to certain LLCs controlled by the Nielson family.[43] The FDIC has defined "Nielson Entities" to mean all business entities managed by the Nielson family.[44] If viewed collectively, during the relevant period the Nielson Entities represented the Bank's largest loan relationship, in that the Nielson Entities had approximately $38 million in loans with the Bank.[45] The Nielson Entities represented a long-standing loan relationship for the Bank, having been customers of the Bank for several years prior to 2009.[46]

    **Plenary Findings of Fact No. 2:** At all times pertinent to this proceeding, William Green served as a commercial loan officer for the Bank and a member of the Bank's classified asset committee.[47] Green was the loan officer assigned to all of the Nielson Entities.[48]

    **Plenary Findings of Fact No. 3:** In or about August 2009, the Nielson Entities claimed they were facing significant financial difficulties and wanted to restructure their loans.[49] Several of the Nielson Loans were due to mature on September 1, 2009, and as of that date, the Nielson Entities stopped making payments on all of the Nielson Loans.[50] Mr. Calcutt personally engaged in discussions regarding loans to certain Nielson Entities in 2009; Mr. Green also participated in those discussions.[51]

    **Plenary Findings of Fact No. 4:** At all times pertinent to this proceeding, Richard Jackson served as the Bank's executive vice president and as a member of the Bank's board of directors. He was also a member of the Bank's senior loan committee, classified assets committee, and asset liability committee.[52] Between August 2009 and December 2009, Mr. Jackson participated in internal Bank discussions with Mr. Calcutt or Mr. Green (or both)

---

[40] Second Amended Answer to Notice at ¶2; Respondent's Proposed Findings of Fact and Conclusions of Law at ¶2 and citations to the record therein; Joint Ex. 15 (Joint Stipulations of Fact) at ¶2.

[41] Second Amended Answer to Notice at ¶3; Joint Ex. 15 (Joint Stipulations of Fact) at ¶3.

[42] See Joint Ex. 15 (Joint Stipulations of Fact).

[43] Second Amended Answer to Notice at ¶7.

[44] Id.

[45] *Id.* at ¶8.

[46] *Id.* at ¶9.

[47] *Id.* at ¶5.

[48] *Id.* at ¶10; Joint Ex. 15 (Joint Stipulations of Fact) at ¶5.

[49] Second Amended Answer to Notice at ¶11.

[50] *Id.* at ¶12.

[51] *Id.* at ¶13.

[52] *Id.* at ¶6; Joint Ex. 15 (Joint Stipulations of Fact) at ¶6.

regarding an agreement for the Nielson Loans.[53] Under the Bank's organizational structure, Mr. Jackson reported directly to Mr. Calcutt.[54]

**Plenary Findings of Fact No. 5:** The Nielson Entities consisted of nineteen separate limited liability companies. Between them, the various entities had approximately $38 million in loans at the Bank (collectively, Nielson Loans).[55]

**Plenary Findings of Fact No. 6:** The Bank and the Nielson Entities reached an agreement on loan terms with certain Nielson Entities in November 2009.[56] As part of this agreement, the Bank extended a loan of $760,000 to one of the Nielson Entities, Bedrock Holdings LLC (referred to here as the Bedrock Loan), and also released $600,000 in certain investment-trading funds in which the Bank held a collateral interest.[57] Mr. Calcutt consented to the Bank loaning a Nielson entity $760,000, transferring $600,000 of collateral held by Pillay Trading LLC (the Pillay Collateral) to the Bank, and obtaining additional collateral as part of the Bedrock Transaction.[58] The Nielsons used the $600,000 Pillay Collateral released from the Bank's security interest to bring current all past-due loans to the Nielson Entities and used the proceeds of the $760,000 loan to establish a reserve sufficient to payments for all loans through April 2010.[59]

**Plenary Findings of Fact No. 7:** The Bank had a practice of requiring certain loans to be approved by the Senior Loan Committee, the Board of Directors, or both, depending upon the size of the loan.[60]

**Plenary Findings of Fact No. 8:** One of the renewed loans was a $4,500,000 loan to Bedrock Holdings.[61]

**Plenary Findings of Fact No. 9:** Several of the Nielson Loans were due to mature on September 1, 2009, and as of that date, the Nielson Entities stopped making payments on all of the Nielson Loans.[62] In November 2009, Mr. Calcutt, Mr. Jackson, and Mr. Green all were aware that the loans comprising the Bank's largest lending relationship, the Nielson Entities, were approaching 90 days past due.[63]

**Plenary Findings of Fact No. 10:** In a November 14, 2009 letter from Mr. Jackson to the Office of Financial and Insurance Regulation for the State of Michigan (OFIR) and copied to the FDIC, Mr. Jackson provided the Bank's formal response to an OFIR examination report, which had listed several of the Nielson Loans for Special Mention.[64] In this letter, certain of the Nielson Loans listed for Special Mention were described as "performing".[65] Mr. Jackson's letter did not disclose the fact that at the time: (i) the Nielsen Entities had stopped payments on all of their

---

[53] Second Amended Answer to Notice at ¶14.
[54] Transcript of 2019 testimony (Tr.) at 1421 (Calcutt).
[55] Joint Ex. 15 (Joint Stipulations of Fact) at ¶7.
[56] Second Amended Answer to Notice at ¶16.
[57] *Id.* at ¶17
[58] *Id.* at ¶20
[59] *Id.* at ¶18.
[60] *Id.* at ¶27.
[61] *Id.* at ¶30.
[62] *Id.* at ¶10.
[63] *Id.* at ¶11.
[64] *Id.* at ¶74; Joint Ex. 15 (Joint Stipulations of Fact) at ¶31.
[65] Second Amended Answer to Notice at ¶76; Joint Ex. 15 (Joint Stipulations of Fact) at ¶32.

loans; (ii) the Bank was in the midst of extensive workout negotiations that had been ongoing for more than two months; or (iii) the Nielson Entities had described significant financial difficulties, including poor or non-existent cash flow and the reduction in value of numerous properties that served as the Bank's collateral, to the point that the Nielson Entities were willing to give the Bank a deed in lieu of foreclosure with respect to several such properties.[66]

**Plenary Findings of Fact No. 11:** "Nonaccrual status" is when a loan is past due for 90 days.[67] On November 30, 2009, the day a majority of the Nielson Loans reached 90 days past due and were automatically placed on nonaccrual, the Nielson Entities paid $600,000, the amount of collateral released by the Bank, for the September, October, and November 2009 payments due on the outstanding Nielson Loans, thus bringing them all current.[68] On or about December 1, 2009, the Nielson Loans were taken off nonaccrual.[69] The Bank funded the Bedrock Holdings Loan on or about December 14, 2009.[70]

**Plenary Findings of Fact No. 12:** To avoid any gaps in the loan documentation, the renewal documents were backdated to September 1, 2009.[71]

**Plenary Findings of Fact No. 13:** Deposit accounts were established for the Nielson Entities with the understanding that the proceeds of the Bedrock Transaction would thereafter be used to fund payments on each of the Nielson Loans.[72] Mr. Calcutt, Mr. Jackson, and Mr. Green each consented to the Bedrock Transaction and were aware of its purpose.[73]

**Plenary Findings of Fact No. 14:** In March 2010, based on information that Mr. Green provided to him, Bank credit analyst Ian Hollands prepared a loan write up for presentation to the Board regarding the loans to Bedrock.[74] The loan write up did not disclose that the loan proceeds were intended to pay Nielson Loans through April 2010.[75] Instead, Hollands wrote that the loan would be used for "working capital," notwithstanding that the true purpose of the $760,000 loan did not meet the Bank's general definition of the term "working capital".[76] Mr. Calcutt, Mr. Green, and Mr. Jackson each knew part of the proceeds from the Bedrock Loan would fund loan payments on all of the Nielson Loans through April 2010.[77] They also knew that the $4,500,000 existing loan renewal, the $760,000 loan, and the $600,000 collateral release had all been completed three months *before* the loan application was presented to the Bank's Board for its approval.[78] Mr. Calcutt and Mr. Jackson initialed the loan write-up, which reflected prior approval of the loan and loan extension.[79]

---

[66] Second Amended Answer to Notice at ¶77; Joint Ex. 15 (Joint Stipulations of Fact) at ¶33.
[67] Tr. at 1377 (Calcutt).
[68] Joint Ex. 15 (Joint Stipulations of Fact) at ¶18.
[69] *Id.* at ¶19.
[70] *Id.* at ¶21.
[71] Joint Ex. 15 (Joint Stipulations of Fact) at ¶20.
[72] *Id.* at ¶15.
[73] *Id.* at ¶16.
[74] Second Amended Answer to Notice at ¶31.
[75] *Id.* at ¶36.
[76] *Id.* at ¶32.
[77] *Id.* at ¶33.
[78] *Id.* at ¶35.
[79] *Id.* at ¶38; Joint Ex. 15 (Joint Stipulations of Fact) at ¶13.

**Plenary Findings of Fact No. 15:** After the Bedrock Loan transaction, and with the aid of the proceeds it generated, the Nielson Entities continued to make payments on the Nielson Loans through August 2010.[80]

**Plenary Findings of Fact No. 16:** Several of the Nielson Loans were scheduled to mature again on September 1, 2010.[81] At or around this time, the Nielson Entities, through Cori Nielson and Autumn Berden, claimed the Entities had financial difficulties and were unwilling to continue making loan payments.[82] As of the September 1, 2010 maturity date, the Nielson Entities once again stopped making payments on all of the Nielson Loans.[83]

**Plenary Findings of Fact No. 17:** Between September 2010 and December 2010, Mr. Calcutt, Mr. Green, and Mr. Jackson directly participated in negotiations with the Nielson Entities, including one meeting in December 2010 attended by Mr. Calcutt regarding the outstanding loans.[84] In December 2010, the Bank released $690,000 in investment-fund collateral held by Pillay Trading LLC.[85] As in the prior year, the released funds were again used to make payments on all of the past-due Nielson Loans and to bring them current.[86] The Bank, through Mr. Calcutt and others, negotiated with the Nielsons in early 2011 and then initiated foreclosure proceedings after the loans went into default.[87]

**Plenary Findings of Fact No. 18:** Mr. Calcutt, Mr. Jackson, and Mr. Green agreed to renew all of the matured Nielson Loans. To avoid any gaps in the loan documentation, the renewal documents were backdated to September 1, 2009.[88] After the Bedrock Transaction, payments on the Nielson Loans were made through August 2010.[89]

**Plenary Findings of Fact No. 19:** In May 2010 and again in July 2011, Mr. Calcutt signed an Officer's Questionnaire, each time affirming, among other things, that he was not aware of any loans since the last exam that had been renewed or extended with acceptance of separate notes for the payment of interest.[90]

**Plenary Findings of Fact No. 20:** In May 2010, the Bank sold almost $2 million of the Nielson Loans to two affiliates of the Bank.[91] This sale was the result of a discussion between Mr. Calcutt, Mr. Green, and Mr. Jackson, and occurred shortly before FDIC examiners arrived for a June 2010 examination.[92] Mr. Calcutt and Mr. Jackson participated in the decision to sell the loans to the affiliate banks.[93] The Bank sold the loans shortly before the FDIC examiners arrived for the June 2010 examination. In late September 2010, shortly after the FDIC's examination concluded, the Bank then repurchased from the two affiliate banks the loans that

---

[80] Second Amended Answer to Notice at ¶39.
[81] *Id.* at ¶40.
[82] *Id.* at ¶41.
[83] *Id.* at ¶42.
[84] *Id.* at ¶43.
[85] *Id.* at ¶44; Joint Ex. 15 (Joint Stipulations of Fact) at ¶14.
[86] Second Amended Answer to Notice at ¶45.
[87] *Id.* at ¶ 51.
[88] *Id.* at ¶20.
[89] *Id.* at ¶22.
[90] Second Amended Answer to Notice at ¶79.
[91] *Id.* at ¶81; Joint Ex. 15 (Joint Stipulations of Fact) at ¶34.
[92] Second Amended Answer to Notice at ¶82.
[93] Joint Ex. 15 (Joint Stipulations of Fact) at ¶36.

had previously been sold.[94] At the time of repurchase, the loans were delinquent and past maturity.[95]

**Plenary Findings of Fact No. 21:** The Bank had in the past contracted with a third party consultant to perform an external loan review of the Bank's portfolio.[96] The Bank's Board also hired a third-party consulting firm to investigate the handling of the Bank's relationship with the Nielson Entities.[97]

**Plenary Findings of Fact No. 22:** Several of the Nielson Loans were scheduled to mature again on September 1, 2010.[98] As of the September 1, 2010 maturity date, the Nielson Entities stopped making payments on all of the Nielson Loans.[99]

**Plenary Findings of Fact No. 23:** In January 2011 the Nielson Entities stopped making payments; all of the Nielson Loans, including the $760,000 Bedrock Loan, have been in default since that time.[100]

**Plenary Findings of Fact No. 24:** The 2009 Bedrock Loan transaction and the December 2010 Pillay Trading LLC Transaction were completed shortly before the end of the 2009 and 2010 calendar years, respectively.[101]

**Plenary Findings of Fact No. 25:** In December 2011, the Bank issued a written response, signed by Mr. Calcutt, Mr. Jackson, and other members of Bank management, to the FDIC's August 2011 examination findings.[102]

**Plenary Findings of Fact No. 26:** Mr. Calcutt received a bonus in certain years of his employment with the Bank; the bonus was based on 4% of the Bank's net after-tax income.[103]

**Plenary Findings of Fact No. 27:** In the event that a Final Order to Pay Civil Money Penalties is entered in this case, Mr. Calcutt has stipulated that he has the financial ability to pay a civil money penalty of up to $125,000, the amount set forth in the Notice.[104]

## 5. Controverted Claims

Through its Notice of Intention, the FDIC alleged that as of March 2010, the Bank's Board of Directors had not been made aware, either in writing or at any of the preceding monthly Board meetings, that the Nielson Entities were the Bank's largest loan relationship and were having significant financial difficulties, that they had gone through several months without making payments on any of their loans, that senior bank management (including Mr. Calcutt) had been directly negotiating with the Nielson Entities during that time, and that the only reason the Nielson Entity loans were current in March 2010 was that the Bank, through the Bedrock

---

[94] Second Amended Answer to Notice at ¶87; Joint Ex. 15 (Joint Stipulations of Fact) at  ¶38.
[95] Joint Ex. 15 (Joint Stipulations of Fact) at  ¶38
[96] Second Amended Answer to Notice at ¶89; Joint Ex. 15 (Joint Stipulations of Fact) at  ¶39.
[97] Second Amended Answer to Notice at ¶114.
[98] Joint Ex. 15 (Joint Stipulations of Fact) at  ¶23.
[99] *Id.* at  ¶24.
[100] Joint Ex. 15 (Joint Stipulations of Fact) at  ¶29.
[101] Second Amended Answer to Notice at ¶71.
[102] *Id.* at ¶91.
[103] *Id*. at ¶117.
[104] Joint Ex. 15 (Joint Stipulations of Fact) at  ¶40.

Loan transaction, had provided the funds used to make all of the payments dating back to September 2009.[105]

In his Second Amended Answer, Mr. Calcutt denied these factual claims, without elaboration.[106]

### A. Nature of the Bank's Relationship with the Nielson Entities, Generations Management, and Bedrock Holdings LLC

Cori Nielson (now Chekhovskiy) testified that Generations Management manages the assets for the various Nielson Family Trusts.[107] During the relevant period, here specifically in 2009 and 2010, Generations had various assets, including vacant land and commercial rental real estate.[108] Included in the assets managed by Generations were Frontier, an oil and gas company, and Team Services, an oil and gas well servicing company.[109] Throughout this period, the assets managed by Generations had loans with Northwestern Bank.[110]

Autumn Berden served as the chief executive officer for Generations Management, between at least 2008 and 2012.[111] The Nielson Entities, as identified in the record in a Loan Summary Report issued by the Bank, consisted of 35 limited liability companies, and are referred to in this record interchangeably[112] as the Nielson Entities or entities of the Waypoint Management Group.[113] Ms. Berden stated that these companies were Bank borrowers during this period, and included Bedrock Holdings LLC.[114]

Ms. Berden testified that the Nielson Entities were companies that engaged in multiple related businesses, including holding vacant and developed real estate, engaging in commercial

---

[105] Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and Notice of Hearing at ¶37.

[106] Second Amended Answer to Notice at ¶37.

[107] Tr. at 930 (Nielson).

[108] *Id.*

[109] *Id.* at 930-31 (Nielson).

[110] *Id.* at 931 (Nielson); FDIC Enforcement Counsel Exhibit (EC Ex.) 133 (chart identifying Nielson Entities with loans at Northwestern Bank).

[111] Tr. at 25-26 (Berden).

[112] EC Ex. 64 at 3 (1/19/12 letter from Scrub Calcutt to David K. Mangian, Assistant Regional Director FDIC: "The manager of Bedrock is Waypoint Management LLC . . . [and] is managed by members of the Nielson family, namely Cori Nielson, Keith Nielson, and Jonathan Crosby. When the 2009 Loan was made to Bedrock, Northwestern also had other outstanding loans with various entities managed by Waypoint Management or other (entity) managers that were managed by all or some of the managers of Waypoint Management." See also testimony of Mr. Calcutt at Tr. 1369, recognizing that the Nielson Entities was sometimes referred to as the Waypoint Management relationship, as the Bank's largest loan or credit relationship throughout 2008 to 2011.

[113] Tr. at 27 (Berden); Tr. at 227 (Gomez); EC Ex. 3_0002: EC Ex. 3 is a binder of documents that had been sent to the FDIC. Tr. at 153 (Berden). The record reflects that Ms. Berden compiled the documents found in EC Ex. 3, having done so in response to a request from Ms. Gillerlain. See Tr. at 179-80 (Berden). The record reflects that FDIC Chicago Regional Case Manager Anne Miessner sent an email to Theresa Gillerlain asking: "I was wondering if you should just ask Cori if the $600M in 2009 and $687M in 2010 Pillay funds were deposited into the bank to make the loan payments, and if so, which account(?). This may make our tracing job easier. Also, did the bank & borrower sign a collateral release agreement each time? If so, would she be willing to provide us with copies?" Resp. Ex. 98.3.

[114] Tr. at 27 (Berden). Mr. Calcutt testified that during a meeting he had with Cori Nielson in April 2008, he determined that the Nielsons had "roughly $140 million of fair market value assets, but $112 million of book value assets, and they had $39 million in debt," with $7 to $9 million in cash or cash equivalents. Tr. at 1274 (Calcutt).

and residential property rental and home-building, holding oil and gas interests, and more.[115] Each company had different owners, including limited liability companies, trusts, and foundations.[116]

Ms. Berden stated that during the relevant period, the holdings' value was approximately $112 million, with $32 million held by various foundations and charitable trusts, and $80 million available for collateral purposes or for payment on loans.[117] Generally, the entities comprising the $80 million would not hold liquid assets (that is, assets that could be used in less than 30 days) – but would, instead, consist of real estate assets and oil and gas assets, managed by Generations Management.[118]

Ms. Nielson testified that many of the Nielson Entity loans were due to mature in September 2009, causing her to "initiate discussions with the Bank . . . regarding renewals of those loans and communicate with the Bank that we needed to have significant loan modifications in order to be able to continue to service the debts."[119] She testified that there was a significant economic recession affecting real estate, and that "[o]ur ability to sell real estate was nearly zero, and [Team Services], which had been historically a lot of cash flow was also going through a big question as far as its future cash flow because the price of oil had significantly plunged."[120]

Describing how she and Generations Management would work with members of the Bank's senior management, Ms. Nielson testified that she "primarily communicated with Scrub Calcutt as the decision-maker"; and Ms. Berden would have communications with Bill Green "sort of on a more administrative level."[121]

Describing his own role with the Bank and his background in banking, Mr. Calcutt testified that beyond an undergraduate degree he holds a Master's degree in business, became a certified public accountant, worked for Touche Ross, now Deloitte and Touche, for about seven years, and then moved to northern Michigan, formed a firm and was a CPA for over 20 years.[122] While working in that firm he was on the board of directors for several banks, and went to Northwestern Bank full time at the end of the 1990s.[123]

Ms. Nielson said that initially when she discussed the need for loan modifications with Mr. Calcutt, "[t]he Bank wanted renewals but they did not want to give any loan modifications to reduce any debt service. They felt that they could not do that because it would cause red flags to the regulators who reviewed their loans," adding that Mr. Green "said similar things to Autumn Berden".[124]

Elaborating on what she understood "red flags" meant in this context, Ms. Nielson testified that Mr. Calcutt expressed concerns about state and federal bank regulators "coming in

---

[115] *Id.* at 29 (Berden).
[116] *Id.*
[117] *Id.* at 31 (Berden).
[118] *Id.* at 31-32 (Berden).
[119] *Id.* at 932 (Nielson).
[120] *Id.* at 933 (Nielson).
[121] *Id.* at 934 (Nielson).
[122] *Id.* at 1263 (Calcutt).
[123] *Id.*
[124] *Id.* at 934 (Nielson).

and looking over their loan portfolio on a regular basis, so red flags were things that the regulators would look at and cause them to scrutinize our loan relationship more closely".[125] She added that where she was seeking forbearance, Mr. Calcutt was unwilling to give forbearance because that would be a red flag.[126] She agreed with the premise that as the two parties discussed interest, forbearance, and deeds-in-lieu between September and November 2009, a resolution that involved deeds-in-lieu was also regarded by Mr. Calcutt as unacceptable as it, too, would be a red flag to regulators,.[127]

Asked for further details about Mr. Calcutt's report to her that with red flags there may be further scrutiny to the banking relationship, Ms. Nielson testified:

> So what he was saying was that the Regulators then would look deeper into the loan relationship, all the loan relationships between the Nielson Entities and the Bank. And I think it primarily all went back to the idea of the legal lending limit. And the Regulators trying to consolidate things. And he was trying to argue that they are separate. And so any red flag would cause more looking and more . . . scrutiny of the loan relationship. And to the extent that they might sort of figure out that how closely related these entities are or the fact that if one of them is having an issue, it's really related to, to all of them having issues.[128]

Included in the exchange between Mr. Calcutt and Ms. Nielson was an email Ms. Nielson sent to Mr. Calcutt on August 21, 2009, by which Ms. Nielson said she "was trying to initiate discussions with the Bank regarding the September 1st maturities of a substantial number of our portfolios' loans".[129] In her message to Mr. Calcutt, referring to the loans between the Bank and the Nielson Entities, Ms. Nielson wrote that "We will not make our September payment or any further payment until we have the necessary meetings and discussions to reach an overall restructuring of the relationship."[130]

Providing context to this message, Ms. Nielson testified:

> I'm trying to warn him ahead of time so that we can make some progress on negotiating renewals, and I was not going to be able to make the maturity payments, nor for whatever loans were not maturing I wasn't able to continue making monthly payments because most of those entities also had loans that would be maturing and so clearly they would be in default.[131]

Ms. Nielson testified that as of September 1, 2009, none of the Nielson Borrowing Entities had the ability to pay off the debts owed to the Bank, so at that time the Entities stopped making payments on those loans.[132]

---

[125] *Id.* at 935 (Nielson).
[126] *Id.* at 986 (Nielson).
[127] *Id.* at 987 (Nielson).
[128] *Id.* at 1022 (Nielson).
[129] *Id.* at 935 (Nielson); EC Ex. 3 at 82.
[130] *Id.* at 936-37 (Nielson); EC Ex. 3 at 82.
[131] Tr. at 937 (Nielson).
[132] *Id.* at 937 (Nielson).

Continuing to deal directly with Mr. Calcutt, on September 21, 2009, Ms. Nielson sent him an email asking that the Bank "suspend monthly payments until our cash flow returns" with the expectation that once that flow returned "our entities would resume payments until Northwestern is completely paid in full including back interest."[133] She wrote that "[t]he fact is that our entities do need a serious restructuring of their loan payments for the next period of time."[134] She wrote that "[a]t this point, some real estate values are so poor that some properties may not have any equity left in them, and some properties may not have good potential for equity recovery in the near term," explaining that "[t]he real estate market had dropped so dramatically that a lot of our loans were underwater."[135]

She wrote that cash flow from "a lot" of the Nielson Entities was negative, and that she needed was a "[s]ignificant reduction in loan service payments."[136] She testified that she offered to share financial information with the Bank, hoping that "any information we shared would be in the context of settlement discussions," but that Mr. Calcutt declined at that time to seek any financial information Ms. Nielson cared to offer.[137]

Ms. Nielson agreed with the premise that the purpose of her letter to Mr. Calcutt was that she was asking for debt forbearance to get the Nielson Entities through the recession and, if the Bank (through Mr. Calcutt) would work with her, it was her intention and objective to make sure the Bank got fully repaid.[138] She also agreed that at the time she wrote this letter, no one knew whether it would take six months, or shorter, or longer, to reach that goal.[139] She explained that whereas she sought to have the Bank accept a *reduction* of payments on these loans, Mr. Calcutt wanted *increases* in payments.[140]

Ms. Nielson added that the Nielson Entities through Generations Management was looking at another way out of their difficulties – by trying to make investments in other cash-flow businesses – but that at no time in the relationship had either Generations Management or Ms. Nielson every made any promises that Nielson *family* money would be used to pay back loans owed by the borrowing entities.[141] Ms. Nielson said "We had no intention to do things that were not part of the documentation of the loans," and generally there were no guarantees on the loans in the Nielson Entities loan portfolio.[142] She testified that at no point prior to 2009 did Mr. Calcutt ever ask for guarantees for these loans, and even if he had asked for guarantees, none would have been given.[143]

Ms. Nielson testified that the concern here was *not* that the loans may go unpaid – but whether conditions might arise whereby the Bank's regulators would learn the true nature of the

---

[133] EC Ex. 3 at 89.
[134] *Id.*
[135] *Id.* at 943 (Nielson); EC Ex. 3 at 89.
[136] Tr. at 940-41 (Nielson). See also testimony of Mr. Jackson, confirming that some of the Nielson Entities held vacant land in 2009, and stating that he could not recall ever seeing a global cash flow analysis. Transcript of 2015 hearing (Tr. (2015)) at 1659-60 (Jackson).
[137] *Id.* at 938-39 (Nielson).
[138] *Id.* at 982 (Nielson).
[139] *Id.*
[140] *Id.* at 983 (Nielson).
[141] *Id.* at 943-45 (Nielson).
[142] *Id.* at 946 (Nielson).
[143] *Id.* at 946-47 (Nielson).

common set of loans that had been extended to the Nielson Entities. According to Ms. Nielson, Mr. Calcutt's responses to her request to address these loans "all relate[d] to red flags" – not that his "hands were tied" because regulators were "actually requiring them to do certain things" but rather "it was that the regulators were not aware of the loan relationship issues and . . . the Bank didn't want red flags to be thrown to cause the regulators to scrutinize the loan relationship."[144] She said Mr. Calcutt rejected Ms. Nielson's offer to deed properties over to the Bank – testifying that Mr. Calcutt "did not want that to happen because that would be a red flag to the regulators."[145]

Continuing in their discussions about the loans in question, on October 12, 2009 Ms. Nielson sent a letter to Mr. Calcutt describing an offer Mr. Calcutt made to her regarding the Nielson Entities:

> You have offered to release Pillay LLC as collateral and extend our loans for up to one year with interest-only payments at the current mixture of 4% (floor) and 2.62% (variable). The blended rate of this offer averages out to 3.7%. We have determined that our companies are able to accept this offer on the properties our companies desire to keep in their portfolio.[146]

The Pillay collateral was, according to Ms. Nielson, an asset of the Nielsons the nature and value of which "varied through the years," and she could not say whether at that point "they were simply cash, but in prior years they had been stock market investments."[147] Ms. Nielson testified that at this point, financially "it did not make any logical sense for the Borrowing Entities that had loans underwater to continue to service those loans.[148]

Mr. Calcutt described the solution involving the Pillay collateral as one that Mr. Green had presented to the Senior Loan Committee: "I don't recall the specifics of the proposal other than it in part involved the taking of some additional mortgages, security for the Bank and also the release, a partial release of Pillay funds, which were their funds," along with a new $760,000 loan.[149] At that amount, however, the Senior Loan Committee lacked the authority to approve the loan, but "would need to approve it before it would go to the Board for approval."[150] Similarly, the Senior Loan Committee lacked the authority to approve the release of the Pillay funds – such a release required the Board's approval.[151]

On October 26, 2009, in the continuing course of her discussions with Mr. Calcutt, Ms. Nielson sent him an email in anticipation of a meeting set to take place the following day.[152] Attached to the email was a spreadsheet showing "a list of properties [that had been pledged to the Bank to secure repayment of loans] that are underwater that have negative cash flow."[153] Included in the transmission was a section "showing capital improvement requirements that

---

[144] *Id.* at 941–42 (Nielson).
[145] *Id.* at 947 (Nielson).
[146] EC Ex. 3 at 8.
[147] Tr. at 991 (Nielson).
[148] *Id.* at 952 (Nielson).
[149] *Id.* at 1285 (Calcutt).
[150] *Id.* at 1286 (Calcutt).
[151] *Id.*; see also Joint Ex. 4 (11/16/09 email from Mr. Green to Mr. Calcutt and other members of the Senior Loan Committee regarding the Nielson Entities Loans).
[152] Tr. at 953 (Nielson); EC Ex. 3 at 101-02.
[153] Tr. at 953-54 (Nielson); Ex. Ex.3 at 102.

those buildings urgently need in order to not start losing tenants."[154] Ms. Nielson testified that these were properties "that we felt the Bank could take back. The loans were matured. We were underwater."[155]

Mr. Calcutt, on the other hand, testified that he had no doubt that the Bank would be repaid, opining that statements to the contrary by Ms. Berden or Ms. Nielson constituted nothing more than "posturing" because "they did have the funds."[156] When asked, however, whether he did anything to determine whether or not Ms. Nielson was or was not posturing – as by asking for financial information – Mr. Calcutt responded: "I personally, no. But that wouldn't be my responsibility. It would be the lender's [i.e., Mr. Green's] responsibility and Credit administration to follow up on financial statements".[157] He stated that had he believed otherwise, "I would have done what I did in 2011," which was to "[p]ut them on non-accrual and undertaken collection efforts."[158]

Mr. Calcutt explained why this negotiation approach was, in his opinion, good for the Bank:

> Well, because it left the door open for them finding another bank which we had requested, to refinance some of these loans. It gave us time in hope that they would repay, pay off some of these loans or sell the underlying collateral for some of these loans and use the proceeds to pay the loan off. And also they had Team Services' cash flow that we knew was there and that would have been available to service the debt, not to mention their oil and gas cash flow. So there were a number of reasons that this loan made sense but it comes back to the fact that they had financial resources and ability and they did follow through on some of these things.[159]

Ms. Nielson testified that "Scrub was not interested in discussing any loan renewals or deeds-in-lieu individually. Everything had to be part of a global discussion."[160] In fact, she said

---

[154] Tr. at 954 (Nielson).

[155] *Id.*

[156] *Id.* at 1296 (Calcutt). See also testimony of Mr. Jackson, that the Nielsons "stated on several occasions that they intended to make us whole, and I believe that they had resources available that they were choosing not to use. We felt they were posturing." Tr. (2015) at 1668 (Jackson).

[157] Tr. at 1382 (Calcutt).

[158] Tr. at 1296 (Calcutt).

[159] *Id.* at 1297 (Calcutt).

[160] *Id.* at 956 (Nielson). See also testimony by William Calcutt regarding his advice to the Bank in January 2012. Although he testified that he was not part of developing the Bank's strategy in its negotiations with the Nielson Entities, he wrote "During the last year, Northwestern has unfortunately discovered the character of the current managers of Bedrock, who are also managing other entities which Northwestern has financed (Nielson-Related Entities) is less than acceptable. If it had been previously known what it has since discovered, it would have altered the judgment in the negotiation and renewal of that financing. Among other things, Northwestern would perhaps not have, as a negotiation tactic, cajoled those managers into the renewal of loans by informing them that pressure would be brought to bear by Northwestern's regulators if their loans became non-performing which would result in Northwestern having to play 'hardball.' Although Northwestern believed, and still believes, that they have the financial capacity to perform their loans, Northwestern now realizes that such threats did not have their intended effect. Instead, those managers have tried to unscrupulously contend, in an attempt to renegotiate and renege on their loan obligations, that those threats were part of some scheme to mislead Northwestern's regulators. That certainly was not the case. Those threats were only intended to compel them to honor their loan obligations." Tr. at 1156, 1178 (W. Calcutt); Resp. Ex. 69. See also testimony of Mr. Doherty that in the course of negotiations, the Nielsons

the discussion did lead to a "one year renewal" that would be funded from three different sources:

> One is some of our cash flow -- one, some of our cash reserves, excuse me. And by "our," I mean the broader Nielson Groups' cash reserves. And also it would be funded partially by a new loan to Northwestern Bank by Bedrock. And it would also be partially funded by Northwestern Bank releasing some collateral. It had collateral on some liquid cash, basically. And so Northwestern would lift its security on that so that we could then use that cash to also make the debt service.[161]

Ms. Nielson confirmed that at the time this deal was struck, the Nielson Borrowing Entities owed the Bank approximately $38.7 million, and that under the deal, the loans could be serviced for a total of twelve months, with eight months paid by the loan and four months self-funded.[162]

Ms. Nielson acknowledged that in May 2009 she and her brother, Keith Nielson, sent letters to the Bank at Mr. Calcutt's request.[163] She explained her reason for doing so thus:

> [Scrub] spoke to us a lot about Regulators and when they were visiting. And he had told us that Regulators were coming and that they had flagged certain borrowers as potentially related at potentially [sic] to consolidate their loan balances together, and so he had requested that we provide something to put into the loan files saying about how they are, they are separate from other borrowers and potentially also commenting about principal pay-down which was another thing that he said the Regulators had commented about. These loans a lot of them were interest-only and not actually seeing any loan pay-down so he wanted us to comment about future potential for loan paying, loan pay-downs.[164]

Keith and Cori Nielson complied with Mr. Calcutt's request. In Keith Nielson's May 1, 2009 letter regarding NRJ LLC, for example, Mr. Nielson wrote to Mr. Calcutt that "[a]lthough this economy is not a favorable environment, our business is holding up quite well. We have always serviced our loans with Northwestern Bank on time, and we plan to continue to do as we have always done."[165] Similarly, Cori Nielson wrote a letter to Mr. Calcutt, also dated May 1, 2009, regarding Jade Venture Group LLC, stating "We have always made our loan payments on time and would continue to do so."[166]

---

"had given us financial information that indicated that they had substantial liquidity. Millions of dollars. They gave us a plan that indicated that they did not expect any sales, real estate sales, for five years. And, you know, they were not going to make payments but rather use their liquidity to buy other businesses." Tr. at 1206 (Doherty).

[161] Tr. at 957 (Nielson). See also EC Ex. 133, representing the agreement showing a loan of $760,000 along with the release of $600,000 in collateral.

[162] Id. at 957-58 (Nielson).

[163] Id. at 969 (Nielson); Resp. Ex. 12.

[164] Tr. at 969 (Nielson).

[165] Resp. Ex. 12.

[166] Tr. at 968-75 (Nielson). Resp. Ex. 13. See also, to the same effect, Resp. Ex. 14 (regarding Blueridge Holdings LLC), Resp. Ex. 15 (regarding Bedrock Holdings LLC), and Resp. Ex. 16 (regarding Immanuel LLC).

According to Ms. Nielson, when September 2010 came around, "it was much the same as the prior year, where we tried to initiate renewal discussions, and we let the Bank know we needed significant loan modifications."[167] With the exception of Generations Holding, the real estate market had not improved.[168] Once again the Nielson Entities stopped making payments on the loans, effective September 1, 2010.[169]

Ms. Nielson acknowledged that it had been her intention to trigger the Bank's reaction to red flags that the FDIC would recognize with respect to these loans: she identified a series of letters addressed to Mr. Calcutt, which she testified she sent in September 2010 for two reasons: first, to communicate to Mr. Calcutt that "these entities cannot make their debt service payments," and second "to get paperwork in the [Bank's] file that would sort of throw red flags . . . because our loan negotiations were so hampered by the fact that Northwestern Bank didn't want to throw any red flags were regulators would pick up on".[170]

Elaborating, she testified: "So: We sent these letters thinking the letters would go in the file and that would in and of itself throw any red flags or cause whatever scrutiny it caused, but it would free our negotiations to be able to, to come to reasonable loan modifications."[171] Notwithstanding that these letters would likely constitute red flags, Ms. Nielson said they did not actually lead to any sort of agreement with the Bank prior to the loans' maturity date.[172] She said no agreement was reached until after Bill Green's December 11, 2010 email to Autumn Berden, which provided for additional release of Pillay collateral to fund five months of payments, from September 2010 to January 2011.[173]

Ms. Nielson testified that eventually she determined to provide banking regulators with copies of the exchanges between herself and Ms. Berden (acting on behalf of the Nielson Entities) and Mr. Green and Mr. Calcutt (acting for the Bank).[174] In July 2011, she assembled a binder with approximately 267 pages of copies of emails recording the discussions between these parties, highlighted parts of those emails, and sent the binder to the FDIC.[175] This became what is shown in the record as FDIC Exhibit 3. She testified that she did this unprompted by the regulators, and supplemented the original email copies with highlighting that she hoped would reflect "different categories of things I was trying to point out to the regulators."[176]

---

[167] Tr. at 958-59 (Nielson).
[168] See testimony of Ms. Nielson that the extreme difficulty in the summer of 2009 to sell real estate "did not apply to homes Generations Development was building. . . . Generations Development was never a company that was having trouble." Tr. at 994. Team Services, owned in part by Bedrock, likewise, had positive cash flow for some of this period. Ms. Nielson testified that she offered to renew on some loans, including the Generations and Bedrock loans, but the Bank wanted a global deal. Tr. at 1000 (Nielson).
[169] Tr. at 959 (Nielson).
[170] Tr. at 960-61 (Nielson); EC Ex. 3 at 31-42 regarding Nielson Entities Immanuel, Sunny, Bedrock Holdings, Tall Timber, Moxie, Frontier Energy, Blueridge Holdings, Jade Venture, and NRJ. See EC Ex. 3 at 31 regarding the date of September 2010 and Tr. at 961-62 (Nielson).
[171] Tr. at 960 (Nielson).
[172] Id. at 962 (Nielson).
[173] Id. at 962-64 (Nielson); EC Ex. 3 at 165-67.
[174] Tr. at 967 (Nielson).
[175] Id. at 968 (Nielson).
[176] Id. at 967-68 (Nielson).

Inasmuch as the contents of this binder were predominantly emails from Ms. Nielson as a Bank borrower, Mr. Calcutt testified that he would have assumed that the emails "were in the loan file."[177] As will be discussed below, however, the record reflects otherwise.

### B. History of Regulators' Concern

The Bank's lending relationship with the Nielson Entities had been a subject of review by the FDIC's examiners since at least 2008. According to the FDIC's 2011 Report of Examination,[178] the relationship had been a cause of regulatory concern in each of the three prior reports (2008, 2009, and 2010).[179]

Mr. Calcutt advanced a theory, however, suggesting regulatory action came only when the FDIC's Case Manager, Anne Miessner, became involved with the Bank's examination. Mr. Calcutt testified that Northwestern is referred to as a community bank, which means that the Bank "believes in . . . taking care of our customers but building relationships with our deposit customers and our borrowers. Strong, personal relationships."[180] Consistent with his theory that regulatory conflict arose only when Ms. Miessner began participating in the Bank's supervision, Mr. Calcutt testified that given his experience as a CPA, he understood that the Bank's examiners "had a job to do," and that "all went well until 2010."[181] The record, however, does *not* support Mr. Calcutt's testimony that "all went well" until 2010.

In his own testimony, Mr. Calcutt acknowledged that the Bank's examiners started to become concerned about the aggregate size of the Nielson relationship before 2010:

> I can't recall whether it was in 2006 or '07 that they aggregated the Nielson Loans in their Report of Examination and ultimately became a unit borrowing issue; and there was, of course, a conflict with the federal and the state rules on unit borrowing or loans to one borrower. They were aggregated from then on. From the beginning, and I can't say which year exactly, 2006 or '07 every year the Nielson Loans were listed in the Report of Examination.[182]

As the FDIC's Case Manager responsible for supervising the Bank, Anne Miessner testified that in her review of reports of examinations conducted in 2006 and 2007, she saw that examiners found no significant basis for regulatory concern regarding Bank Management (i.e., the *Management* component in the Bank's Capital adequacy, Assets, Management capability, Earnings, Liquidity, and Sensitivity – its CAMELS rating), and that the same was true with respect to the Bank's Composite rating.[183] She testified that she had reviewed the FDIC's 2008

---

[177] *Id.* at 1313 (Calcutt).
[178] EC Ex. 48 (Start Date: 8/1/11; As of Date: 6/30/11).
[179] Tr. 725-27, 750-53 (Miessner); ED Ex. 48 (2011 Joint ROE) at 40; EC Ex. 22 (7/23/10 Joint Management Exit Meeting with Management Responses); EC Ex. 19 (2010 FDIC ROE); Joint Ex. 2 (2009 Michigan ROE). See also Tr. at 813 (Miessner); Resp. Ex. 77 (2006 ROE)
[180] Tr. at 1264 (Calcutt).
[181] *Id.*
[182] *Id.* at 1275 (Calcutt).
[183] *Id.* at 814-15 (Miessner); Resp. Ex. 77 at 5 and Resp. Ex. 78 at 3. See also testimony of Examiner O'Neill, that Bank management ratings were high in 2006 through 2008, with the executive team being described by Michigan examiners as "experienced and knowledgeable" when examined by the State as of April 13, 2009. Tr. (2015) at 609-12 (O'Neill); Resp. Exs. (2015) 77, 78; Joint Ex. (2015) 2.

Report of Examination, which indicated the Bank was in satisfactory condition overall but also reflected that as of the December 31, 2007 Examination Date, Bank management had been alerted to regulatory concerns pertaining to Part 323 of the FDIC's Rules and Regulations due to repeated instances where the Bank did not obtain an appraisal or accepted an appraisal prepared for the borrower, in violation of Part 323 of the FDIC's Rules and Regulations.[184]

Further demonstrating that regulatory supervision was a concern of the Bank prior to Ms. Miessner's entry into the scene, Mr. Calcutt wrote a letter dated August 4, 2008, to the attention of the FDIC's Division of Supervision, to Allen E. Clark, Jr., with respect to the FDIC's 2008 Report of Examination.[185] In his letter to Mr. Clark, Mr. Calcutt took angry exception to "several of the ratings set forth in that Report," averring that "some of the comments or criticisms in that Report are erroneous or misleading, and overall manifest an excessive 'bureaucratic,' rather than a substantive 'performance' analysis."

Elaborating on this point, Mr. Calcutt wrote:

> Based on its observations during the examination, Northwestern was left with the impression that the ratings and criticisms of Northwestern were spawned by your examination team's lack of: 1) professionalism; 2) knowledge of the banking market in northern Michigan; and 3) business or economic experience. The unprovoked hostility of one or more of the examiners, as reflected by many comments made during the examination, made it clear to Northwestern and its personnel that the FDIC, or its examiners, had some sort of negative attitude before undertaking this examination. Although Northwestern marshaled substantial performance review documentation for the examiners' review, it was simply ignored. While the FDIC's policies prohibit abuse, retaliation or retribution, your examination team appeared to have a "preconceived" agenda.[186]

The record thus reflects that all was *not* well between Mr. Calcutt and the FDIC in 2008, notwithstanding Mr. Calcutt's testimony to the contrary.[187] Mr. Calcutt's use of *ad hominem* invective in 2008 may have been characteristic of the ordinary tenor of his relationship with the Bank's regulators over the years, but it is clear his sense of antipathy towards regulators preceded Ms. Miessner's arrival.

Ms. Miessner testified that she also reviewed the 2009 Report of Examination by the Michigan OFIR (reflecting an examination as of April 13, 2009), which, while finding the Bank "fundamentally sound," nevertheless "listed the Nielson relationship as special mention and included several credit administration and underwriting weaknesses that were indicative of a deteriorating financial condition."[188]

Elaborating, the 2009 Michigan ROE reported that although the Bank's overall financial performance "has deteriorated due to the adverse economic conditions as evident by the

---

[184] Tr. at 816 (Miessner); Joint Ex. 1; Tr. at 728 (Miessner); Joint Ex. 1 at 20.
[185] Resp. Ex. 79.
[186] *Id.* at 1.
[187] Tr. at 1363 (Calcutt).
[188] *Id.* at 726, 818-19 (Miessner); Joint Ex. 2. Note that in his testimony, Mr. Calcutt is shown Resp. Ex. 81 and identified it as the State of Michigan Exam from April 13, 2009. Tr. at 1354 (Calcutt). There is no Resp. Ex. 81, but the Exam is in the record as Joint Ex. 2.

declining level of earnings and rising amount of problem credits, management has been able to maintain the financial condition of the institution at a satisfactory level."[189]

In addition to the findings of the Michigan examiners, the FDIC had by December 2009 identified concerns that led Ms. Miessner to identify Special Mention loans at the Bank related to the Nielson Entities (through Waypoint Management[190]) totaling $38 million, where the write-ups for the relationships "describe the inability of the borrowers to make interest payments and express that the lack of monitoring may be allowing the extension of funds under one entity to keep another entity current."[191]

Ms. Miessner testified that the Michigan examiners noted that the "Bank had implemented improper repayment structures on many of the [Waypoint] loans. That it appeared there were draws being made on loans to keep other loans current."[192] The Michigan report also raised concerns that seven of nineteen of the entities within the Waypoint relationship "did not produce enough cash flow to service their own debt," and that the Bank "had not appropriately documented the use of loan proceeds or the source of repayment on the loans."[193]

Also of concern based on the 2009 Michigan Report was the finding that through the Waypoint Management relationship, the Nielson Entities represented 53 percent of the Bank's Tier 1 capital.[194] Ms. Miessner testified that "anytime there's a concentration of over 25 percent of capital to an inter-related group of borrowers, that gives the FDIC [cause] for concern and we have specific guidance on how to manage concentrations of that size".[195]

Through a letter dated November 19, 2010, the FDIC's Regional Director put Mr. Calcutt and members of the Bank's Board of Directors on notice that the FDIC "is concerned with the manner in which the bank is being operated and the failure of the Board to correct problems, which could ultimately pose a threat of loss to the Deposit Insurance Fund."[196] Because of these concerns, the Regional Director proposed that the Bank and the FDIC enter into a Consent Order pursuant to section 8(b) of the Federal Deposit Insurance Act.[197]

For his part, Mr. Calcutt dismissed the regulator's concerns regarding the Bank's failure to ensure recent appraisals were supplied in conjunction with loans to the Nielson Entities, telling the Bank's regulators in 2010 that "[Bank] management is not concerned with appraised

---

[189] Tr. at 820 (Miessner); Joint Ex. 2 at 8.
[190] Ms. Miessner identified Resp. Ex. 37 as a chart showing "the various Nielson or Waypoint loans or credits". Tr. at 730 (Miessner).
[191] Tr. 726-27 at (Miessner); EC Ex. 9.
[192] Tr. at 729 (Miessner).
[193] Id. at 729-30 (Miessner).
[194] Id. at 733 (Miessner); Joint Ex. 2.
[195] Tr. at 733 (Miessner). Also raised prior to the 2011 Examination were concerns, expressed by James Russell, Examiner in Charge for the FDIC's 2010 ROE, that the Bank's management, in Ms. Miessner's words, was "siloing the exam process". Tr. at 746-50 (Miessner); Resp. Ex. 84 at 5. As Ms. Miessner put it, "If we do not have access to the Bank's records, then we're not able to do our jobs. If we do not have access to the Bank's other employees, that impedes our ability to do our jobs." Tr. at 751 (Miessner). See also Tr. at 779-80 (Miessner); EC Ex. 36 (2/23/11 email from Dick Jackson to Denise Keely, responding to Ms. Keely's email regarding questions presented by an FDIC examiner concerning the contents of the file for North Park Holdings, where Mr. Jackson wrote to Ms. Keely "This is a credit that they should discuss wit [sic] mike Denise, same on all the Nielsons. Be careful what you say on any of these.")
[196] EC Ex. 27.
[197] Id.

values and relies primarily on guarantor strength and character."[198] Echoing this dismissive reaction, in response to questions by regulators during a conference reflected in the 2010 ROE, responding to the examiners' questions regarding the adequacy of risk management policies and practices, the Bank's Chief Credit Officer, Mike Doherty, added that the FDIC "has changed the appraisal regulations since the last examination, and that the Bank's underwriting will continue to focus on principals and guarantors."[199]

### C. The FDIC's 2010 Examination

FDIC Examiners from the Chicago Regional Office conducted the Bank's 2010 Examination.[200] Examiner Charles Bird served as a loan examiner for that Examination.[201] In preparation for this examination, Mr. Bird reviewed the 2009 Report of Examination prepared by the State of Michigan (examination as of April 13, 2009).[202]

Mr. Bird noted that the Michigan examiners reported that the Bank's Waypoint Management relationship referred to "a lot of money lent to the interrelated group in relation to the Bank's capital."[203] He testified that the Waypoint Management relationship "was listed for special mention in the Examination Report and these would have been all of the borrowing entities under the Waypoint Management relationship and the amounts that were outstanding to the different entities at that time."[204]

In conducting the loan review for this ROE, Mr. Bird met with Mr. Green during the second week of the examination, during which time he and Mr. Green discussed the Waypoint and Nielson Entity loans.[205] Mr. Bird noted in particular that with respect to the Waypoint relationship, "there was a lack of guarantee from the borrowing entities. There was some concessionary type of financing. Interest-only that was extended" and instances "of some loans that had been unreduced for some time."[206] He stated that as of June 21, 2010, the loan line-sheet reflected Waypoint's current note balance was $4.5 million.[207]

Mr. Bird testified that in the course of his examination of the Bank's loans, he expected to find for each loan documentation in the *credit file* for the loan that included financial

---

[198] Tr. at 772-73; EC Ex. 19 at 11. Given the lack of personal guarantees supporting the Nielson Entities portfolio, it is not clear what "guarantor strength and character" Mr. Calcutt is referring to in this context.

[199] EC Ex. 19 at 11 (page 9 of the ROE).

[200] Tr. (2015) at 762 (Bird).

[201] Mr. Bird has been a Commissioned Bank Examiner for the FDIC since 1989. Over the nearly 30 years of his service with the FDIC he has participated in close to 200 bank examinations and has been the examiner in charge in close to 100 examinations. His education includes an undergraduate degree in 1981, attendance at on the job training programs throughout his service at the FDIC, covering the basics of examination, analytical and loan schools, continuing education in specialty examinations, schools focusing on fraud and interest rate risk, experience in serving as examiner for problem banks, and experience in circumstances that led to enforcement actions being taken against officers of banks under sections 8(e) and 8(i) of the FDI Act. Tr. (2015) at 758-61 (Bird).

[202] Tr. (2015) at 763 (Bird); Joint Ex. (2015) 2. Mr. Bird's role in the examination was limited to the review of the Nielson credits. Tr. (2015) at 885 (Bird). Mr. Bird testified that with approximately 48 Nielson loans to review, his schedule permitted about one hour of review time per loan. Tr. (2015) at 890 (Bird).

[203] Tr. (2015) at 764 (Bird); Joint Ex. (2015) 2 at 20-21 (ROE pages 18-19).

[204] Tr. (2015) at 765 (Bird). Mr. Bird testified that Mr. Green was not at the Bank during the first week of the examination. Tr. (2015) at 787 (Bird).

[205] Tr. (2015) at 781 (Bird).

[206] *Id.* at 767-68 (Bird).

[207] *Id.* at 773 (Bird).

statements of the borrowing entity and any other financial information needed to assess the credit; and in the *collateral file* he expected to find items like a deed of trust, mortgage, title insurance, or other documentation showing the Bank had perfected its liens with respect to the loan.[208] In instances where an officer corresponded with a customer regarding a loan, Mr. Bird said he would expect the proper file would contain that correspondence, including email transmissions, regarding the meeting.[209] He said he would expect that this would include both positive and negative information as it relates to a loan.[210]

Mr. Bird testified that included in the Bedrock loan file was the Officer's Memo to the File, by Mr. Green, dated June 4, 2010.[211] In this Memo, Mr. Green stated that "the loan continues to perform. All payments are current and have been current."[212] In his discussion with Mr. Green about this loan and the Memo, Mr. Bird found the file contained no negative credit information regarding the Bedrock Holdings loan, nor was any negative information presented by Mr. Green.[213] He "passed" the loan, meaning that – based on Mr. Green's positive memo and the recent Board approval – all were "indicative of a credit relationship that was moving in a positive direction" and thus did not need to be classified as "substandard," "doubtful," or "loss".[214]

Mr. Bird testified that he did so *not knowing* that both the release of the Pillay collateral and the new loan of $760,000 had occurred in December 2009, not March 2010, or that the proceeds of both were used to pay past amounts due on the Bedrock loan and on other loans to Nielson-related entities.[215] He testified that had this information been provided at the time of this

---

[208] *Id.* at 772-73 (Bird). For the collateral files, Mr. Bird testified that "[i]f I was covering a piece of property on that that secures that credit, and the current insurance on that credit file is on the top; seeing they go chronologically, I would not look at the rest of the insurance that's underneath that insurance tab. So going back to your first point, there would be no need for me to flip through that. So I will retract my statement, if you will, on flipping every single page in that file." Tr. (2015) at 892 (Bird). Asked about this during cross-examination, Mr. Bird testified that although he needed to go through the file very carefully and determine the financial characteristics of the borrower and the collateral, "I had adequate time in order to look at the files" and did so with all of the files, including the Bedrock Loan file. Tr. (2015) at 894, 896 (Bird).

[209] Tr. (2015) at 773 (Bird).

[210] *Id.*

[211] Tr. (2015) at 780 (Bird); FDIC Enforcement Counsel Exhibit from 2015 hearing (EC Ex. (2015)) 20 at 28-30.

[212] Tr. (2015) at 783 (Bird); EC Ex. (2015) 20 at 29.

[213] Tr. (2015) at 789 (Bird).

[214] *Id.* See also testimony of Mr. Jackson, that the assets discussed during Classified Assets Committee meetings were assets "that are having, experiencing difficulties or delinquencies." Tr. (2015) at 1686 (Jackson).

[215] Tr. (2015) at 791-92 (Bird). Mr. Bird identified Respondent's 2015 Exhibit (Resp. (2015)) Ex. 136 at 38 as a document that had not been shared with him, but that details the use of Pillay Funds that had been released on November 30, 2009 for use in servicing the Nielson Entity loans. Tr. (2015) at 793 (Bird). Also not disclosed to Mr. Bird during this meeting was information describing the proposed use of $738,000 in Bedrock loan proceeds to fund principal payments on other loans. Tr. (2015) at 793-94 (Bird); EC Ex. (2015) 3 at 113. Also not provided to him during the 2010 exam was the November 16, 2009 memo from Mr. Green to Mr. Calcutt that reflects that Northwestern would propose "a loan of $760,000 to be used to cover principal payments" of the Nielson loans. Tr. (2015) at 795-96 (Bird); Joint (2015) Ex. 4. Mr. Bird testified that had he seen this memo to Mr. Calcutt, "it would have been a serious red flag that the Bank is extending additional credit to pay on other Notes inside this relationship." Tr. (2015) at 796 (Bird).

examination, "it would have given [him] serious concern, first of all, that the Borrowing Entities are demonstrating an inability to repay their debts."[216]

Mr. Bird testified that documents that had been concealed from him during the 2010 examination – including the November 16, 2009 memo from Mr. Green to Mr. Calcutt reflecting the plan to use proceeds from the $760,000 Bedrock Loan to service other Nielson Entity loans, showed the Nielson lending relationship "in a much different light as far as what's the inability to pay under contractual terms".[217] He stated the Nielsons had a "significant lending relationship to the Bank," adding that "it's a concentration of credit. And if these lending relationships have an inability to pay their debt, we would classify the credit and it would, you know, it could lead to loss for sure."[218]

Elaborating on this point, Mr. Bird testified that while the $760,000 loan was "large enough" on its own, "collectively it's supporting a concentration that was in 2009 [between] $35 and $37 million."[219] With respect to the safety and soundness of the Bank, Mr. Bird testified, "you're trying to measure risk in relation to the Bank's capital. So when that risk gets larger as this credit relationship and the whole Waypoint relationship is, it exposes the Bank to a significant risk to its capital account if something were to go wrong with the credit relationship."[220]

Mr. Bird testified that although the Commitment Review presented to the Board for the Bedrock Loan showed December 3, 2009 as the loan date, and the detailed write-up in the Review showed a nine-month loan with a maturity date of September 1, 2010, he did not notice the discrepancy in the March 16, 2010 write-up. "I did not correlate the Application date with the Note date when I reviewed it."[221] Further, he testified that while he understood that Pillay funds were released as noted in the Review, he did not gather information about *why* they were released.[222] He said that had he been provided documents during the 2010 examination showing how the Bedrock Loan and Pillay Collateral funds were to be distributed among the Nielson entities, documentation that showed how the entities' loans were being serviced, that would have indicated an unsafe and unsound transaction.

---

[216] Tr. (2015) at 795 (Bird). To the same effect, see testimony from Mr. Bird regarding Frontier Energy LLC, Tr. (2015) at 852-54 (Bird); Generations Development LLC, Tr. (2015) at 853-55 (Bird); Immanuel LLC, Tr. (2015) at 855-56 (Bird); Jade Venture LLC, Tr. (2015) at 8856-57 (Bird); North Park Holdings, Tr. (2015) at 858-61 (Bird); Tall Timbers LLC, Tr. (2015) at 859-61 (Bird); all of the Nielson loans, Tr. (2015) at 860 (Bird); EC Ex. (2015) 20.
[217] Tr. (2015) at 796-97 (Bird).
[218] *Id.* at 798 (Bird).
[219] *Id.* at 797 (Bird).
[220] *Id.* at 798 (Bird). But see Mr. Calcutt's testimony that "for some years the [Bank's] holding company not only had its own assets that generated some income but it had a line of credit so it had capacity to make dividend payments to shareholders" such that the roughly $38 million amount of the Nielson relationship was "absolutely not" sufficient to put the Bank at risk of failure. Tr. at 1349 (Calcutt). According to Mr. Calcutt, "each of the Nielson Loans was individually underwritten. It had sufficient collateral, sufficient cash flow. And obviously the Bank, I wasn't there, but obviously we had plenty of collateral and cash flow to go after, and so no, I seriously question whether it would have suffered any loss." Tr. at 1349 (Calcutt).
[221] Tr. (2015) at 898-99 (Bird).
[222] *Id.* at 900-01 (Bird).

Page 31 of 145

A219

According to Mr. Bird:

> If I would view this in the entirety of the Waypoint transaction, my review of it would be, my analysis right now would be that you've got a distressed relationship that can't pay their debts; and this transaction that is basically trying to just pay for an extended period of time, to me it's a very large interest capitalization and a reduction in the collateral protection. I would say that this is a hazardous transaction.[223]

When regulators met with members of the Bank's Board of Directors to discuss both the 2010 ROE and the proposed Consent Order, Board members reported, according to Ms. Miessner, that "they were not aware of the ongoing nature of these weaknesses that we were citing in the 2010 report."[224] Upon considering the Board members' commitment to increase their oversight over the Bank's management, "the FDIC decided instead of pursuing a Consent Order [it would] pursue a Section 39 Compliance Plan which is designed more specifically to address safety and soundness concerns as set forth in Part 364 of the FDIC's Rules and Regulations."[225]

Apparently overlooking the antipathy against the Bank's regulators that he had displayed in 2008, discussed above, Mr. Calcutt described the tenor of the 2010 Examination "a total change from our past history in the sense of strong ratings, but that relationship ended, deteriorated during that exam on a couple of very emotional issues. One is that several of our female long-term employees were made to cry and that filtered throughout the organization, so we had some very upset people."[226]

According to Mr. Calcutt, the examiners at this time "told us just to get rid of" customers who were struggling to make payments.[227] He offered the example of an 80 year-old widow who was "making some sort of payment" but "the Examiner didn't care and wanted us to just throw her out in the street. And again, that resonated throughout the Bank and was very upsetting."[228] Mr. Calcutt testified that unlike prior exams, while he had asked the examiners to communicate "as to what issues or concerns you have so that we can discuss them," "none of that took place. So in having these emotional events related to throwing customers out in the street and crying people, the meeting did not go well."[229]

---

[223] *Id.* at 800 (Bird).

[224] Tr. at 778-79 (Miessner).

[225] *Id.* at 778 (Miessner); EC Ex. 40.

[226] Tr. at 1265 (Calcutt).

[227] *Id.*

[228] *Id.* Apart from this testimony, there is no evidence supporting Mr. Calcutt's factual claim regarding the example presented.

[229] *Id.* at 1266 (Calcutt). See also Mr. Calcutt's testimony regarding the exit meeting he had with the FDIC's examiners, including David K Mangian, FDIC Assistant Regional Director, in which he stated that Mr. Mangian told him the Bedrock Loan made "economic sense" and that "[t]he other thing that struck me, that kind of comes back to throwing people on the street which the FDIC forced on us is that we had a couple employees during the Great Recession who were really struggling financially. In one case, one of our female employees inherited a couple of baby grandchildren because their daughter got thrown in jail, and they had no money, they had no bedding, no sheets, clothes, nothing. So some of us personally reached into our pockets. And then the Bank threw some money into the pot and we received bloody hell criticism for that from the FDIC." Tr. at 1340-41 (Calcutt). Apart from this testimony, there is no evidence in the record supporting the factual claims attested to here by Mr. Calcutt.

Before beginning the examination that would produce the 2011 ROE, FDIC examiners conducted a visit that produced Visitation Findings and a summary in February 2011.[230] In answering those findings, on June 30, 2011 the Bank (over Mr. Jackson's signature) responded to findings concerning the Nielson/Waypoint loans. Where the Findings reported that the Bank's "Board continues to allow management to administer loans related to the Waypoint Management Group/Nielson family in a manner inconsistent with prudent banking practices," Mr. Jackson responded by stating, in pertinent part, that "[t]his relationship has existed with the lending officer for more than twenty years, and with the bank in excess of ten years during which the relationship has always performed without exception."[231]

Ms. Meissner testified that this was not an accurate statement, and explained that "the loans to this Borrower had all become past due in 2009 after the Borrowers notified the Bank that they would no longer make their payments. Those loans remained past due past the 90-day mark."[232] She added that after the Bank placed the loans in a non-accrual status, "a new loan was made and collateral was liquidated in order to make it appear that those loans were current."[233] Further, by the time Mr. Jackson had written the letter responding to the February 2011 Visitation Findings, the loans "went past due again . . . [and] more collateral was released to again bring the appearance of those loans being current."[234]

One example of correspondence seen as material to the examiners' supervision over the Bank, found in the binder provided by Ms. Nielson to the FDIC, was a September 22, 2009 email sent first from Ms. Nielson to Mr. Calcutt, and then by Mr. Calcutt to Mr. Green, a day later, regarding "Confidential Settlement Discussions".[235] Among several threads of this discussion, Ms. Nielson stated that "[a]t this point, some real estate values are so poor that some properties may not have any equity left in them, and some properties may not have good potential for equity recovery in the near term. That being the case, it would be prudent for the owners to deed them over to you."[236]

---

[230] Tr. at 781 (Miessner).
[231] EC Ex. 44 at 4. See also testimony by Examiner O'Neill regarding Mr. Green's written Memo to the File, maintained in the Bank's loan file and dated June 4, 2010, regarding Bedrock Holdings LLC stating "The loan has always performed", which Mr. O'Neill opined was a false statement because "by this time we had already seen in 2009 a default. We had only seen the loans brought current and kept current because new bank funds were advanced to do so." Because the document was in the Bank's loan file, and based on his experience as an examiner, Mr. O'Neill opined that Mr. Green maintained the false statement in the loan file knowing that examiners would see it, thus it was "an effort at concealment of a problem loan." Tr. (2015) at 603-04 (O'Neill); EC Ex. (2015) 51 at 215. To the same effect, see testimony of Examiner Bird regarding the sale and repurchase of the Sunny LLC loan in 2010. Tr. (2015) at 815-16 (Bird); EC Ex. (2015) 20 at 759-62, and of the NRJ LLC loan. Tr. (2015) at 825-28 (Bird); EC Ex. (2015) 20 at 732; Tr. (2015) at 840-43 (Bird); EC Ex. (2015) 92; and of the Blueridge loans, Tr. (2015) at 844 (Bird); EC Ex. (2015) 92; Resp. (2015) Ex. 44. Mr. Bird further testified that in none of the conversations he had with Mr. Green during the 2010 examination did Mr. Green disclose the fact of loan sales to Central State Bank or State Savings Bank, nor did the Bank have copies of the Loan Purchase and Assignment Agreements to Central State Bank or State Savings Bank in the loan files. Tr. (2015) at 831-39 (Bird); Resp. Exs. (2015) 42 and 43.
[232] Tr. at 781-82 (Miessner).
[233] Id. at 782 (Miessner).
[234] Id.
[235] EC Ex. 3 at 5-7 (also at EC Ex. (2015) Ex. 3 at 5-7).
[236] EC Ex. 3 at 6.

Although clearly material to the Bank's lending relationship with this borrower, this email exchange was *not* produced by the Bank during the 2011 examination. The 2011 ROE's Loan Examiner, Mr. O'Neill, was asked about the significance he attached to the document:

> I attach great significance to it because it shows the extent of the problems that the Nielson borrowings -- the Nielson Borrower had at the time and would have raised red flags about, first of all, is this a problem loan? Should it be recognized as such both in our Examiner Reports and in our reports to the Board of Directors? What's the underlying causes [*sic*]? If there's discussions involved which in this case indicated the CEO of the Bank, and the primary account officer, and Cori Nielson that if that's not found in the loan files? This would have been a key, a key correspondence that we would have expected to see.[237]

Mr. O'Neill testified that this "is essentially an admission on the part of the borrower that there may be substantial loss incurred by Northwestern Bank."[238] Asked why he would expect to see such a document in the Bank's loan file, Mr. O'Neill testified thus:

> Because it talks about, number one, it's between the CEO of the Bank and the primary account officer, the largest borrowing relationships in the Bank. And it talks about, well, how do we deal with this September 30th reporting issue. But then it goes on to talk about the fact that they were in negotiations and, and how non-accrual would be handled, and so on. So those are very key points that we would expect to see on a loan review.[239]

Ms. Miessner was asked for her opinion regarding Mr. Calcutt's concealment of facts showing the condition of the Bank's loan portfolio pertaining to the Nielson Entities.[240] She identified as among such facts: the material misstatements of fact in the Bank's November 14, 2009 letter to Michigan examiners and copied to the FDIC, where the Bank specifically responded to the examiners' request for a status update of the Nielson credits.[241] Also, she identified the Bank's false Call Reports for 12/31/09 and 3/31/10 and she identified the Bank's false reporting of the portfolio's performance:

> Then also they concealed it by not putting the documentation regarding the correspondence between the Borrower and the Bank in the files. They concealed it by having loan memos in the files saying things that would indicate that the loans were performing[242] instead of having memos in there

---

[237] Tr. (2015) at 78 (O'Neill); EC Ex. (2015) 3.

[238] Tr. (2015) at 78 (O'Neill).

[239] *Id.*; EC Ex. (2015) 3. Mr. O'Neill expressed similar concerns about several documents that were included in the binder but were not produced by the Bank's management during the 2011 examination. See Tr. (2015) at 78-160 (O'Neill); EC Ex. (2015) 3 at 4, 8-9, 12-14, 16-19, 22, 24-27, 29-30, 51-52, 55-56, 60-65, 72-23, 80-87, 93-96, 98-101, 105-08, 110-13; 117-19, 123-27, and 134-40.

[240] Tr. at 809 (Miessner).

[241] *Id.* at 810.

[242] Asked during cross examination whether the term "performing loan" is defined in bank regulations, Ms. Miessner said no, but "in the regulatory world a performing loan is a loan that is performing per its contractual terms," and "the International Monetary Fund defines performing loans as a loan . . . that is performing within its contractual terms, and a non-performing loan is defined as a loan that is not making its principal and/or interest payments within its contractual terms, and it specifically states that it doesn't have to be 90 days past due to be considered non-

that actually described the status of the loans and the status of the relationship and the actions that were being taken in the, you know, effort to work with the Borrowers, as you put it. That should all have been documented in memos.[243]

Ms. Miessner further stated that the Bank concealed material facts by "selling participations to their affiliates, which is prohibited by law. And with the specific intent of reducing the . . . concentration to make it appear that there was . . . performance and reduction in the overall relationship."[244]

Asked whether, in her opinion, Mr. Calcutt misrepresented the condition of the Bank's loan portfolio pertaining to the Nielson Entities and failed to disclose material facts regarding the Bank's loans to the Nielson Entities at the 2010 Examination in a way that obstructed the FDIC's ability to thoroughly and effectively examine and supervise the Bank, Ms. Miessner answered in the affirmative, stating that "through his actions of concealing facts about the Nielson Loans, [Mr. Calcutt] did materially obstruct our ability to effectively supervise an examination in the institution."[245]

When asked during cross-examination to identify who at the Bank would be expected to ensure loan files were accurately maintained and contained the necessary documents, Ms. Miessner testified that the "loan officer has first-line responsibility. Then the Credit Administrator would have second-line responsibility. And the ultimate responsibility lies with the CEO."[246] She said while she would not expect Mr. Calcutt, as CEO, to be physically placing documents in these files, the CEO needed "to be ensuring that they had complete loan files" and would do so by having both appropriate policies and procedures in place, and by having appropriate external loan review in place.[247] In this context, however, where, as CEO, Mr. Calcutt was himself corresponding directly with the borrowers and was directly involved in negotiating with the borrowers, it would be *his* responsibility to put "any of the correspondence that came directly to Mr. Calcutt" directly into the loan file himself.[248]

During the first evidentiary hearing Mr. Calcutt acknowledged that as the CEO and Chairman of the Bank's Board of Directors, he had a responsibility to see that the Bank's loan files were maintained in a safe and prudent manner, so that auditors and examiners coming into the Bank could understand what had taken place.[249] During the second evidentiary hearing he

---

performing, it simply has to be the fact that the lender has reason to believe that principal and interest will not be collected per the contractual terms." As such, the loans became non-performing "as soon as the Borrower notified the Bank that they were not going to make their payments, that they couldn't make their payments and that they wanted this restructure". Tr. at 846-47 (Miessner). See also testimony by Mr. Doherty that a loan that's past due by more than 30 days is not a performing loan. Tr. at 1250 (Doherty).

[243] Tr. at 840 (Miessner).

[244] *Id.* at 841-42 (Miessner).

[245] *Id.* at 808 (Miessner).

[246] *Id.* at 842 (Miessner).

[247] *Id.* at 842 (Miessner).

[248] *Id.* at 843 (Miessner). See also testimony of Cori Nielson, when asked about Mr. Calcutt's presence or absence at meetings, Ms. Nielson testified that "while we might have had meetings with Dick Jackson or Mike Doherty, they were, they were along the lines of what I will call an employee versus Scrub to me along the lines of the CEO. . . . . [E]ven if he wasn't at a meeting, I do recall that he ended up back at the meetings . . . [so] I don't believe that he was not involved just because he was not at the meeting." Tr. at 1019 (Nielson).

[249] Tr. (2015) at 1815 (Calcutt).

Page 35 of 145

changed that answer, "clarifying" it, by denying that he had any direct responsibility to see that the Bank's loan files were maintained in a safe and prudent manner.[250]

Asked whether Mr. Calcutt submitted inaccurate information in answers he provided to an Officer's Questionnaire as part of the 2010 Examination, Ms. Miessner opined that he had, with respect to the actual use of the proceeds of the Bedrock Loan.[251]

Mr. Calcutt acknowledged that he could not delegate his responsibility to provide true and correct answers to the questions in the Officer's Questionnaire, which he submitted prior to the FDIC's 2010 Examination.[252] He testified, however, that his practice when preparing responses to Officer's Questionnaires would be to "take the previous years' questionnaires and review them and see if there's something in them that I should recall to put in the one that I'm currently signing."[253] He said he would "not go to the trouble to review thousands of loans" or deposit accounts, but would submit answers that were "based on what I'd done before, reflect and then sign them."[254] He stated that looking back at them now, "on reflection, I answered [two of] them incorrectly. Inadvertently and unintentionally incorrectly."[255]

Asked whether Mr. Calcutt's concealment of the condition of the Bank's loan portfolio pertaining to the Nielson Entities obstructed the FDIC's ability to effectively supervise the Bank through off-site monitoring tools, including supervisory review of the Bank's Call Reports, Ms. Miessner opined that yes, he had obstructed the FDIC, stating that at the end of 2009, if the Bank had truthfully disclosed the status of the Nielson loans in its responses to the 2009 State Examination and truthfully disclosed the Bank management's course of action towards those loans and that relationship, then "that would have significantly changed the way that we proceeded after learning that information."[256] Ms. Miessner added that the Bank's inaccurate Call Reports prevented the FDIC from receiving "accurate data to determine whether we needed to change our supervisory strategy at that point."[257]

Asked to report on how well-secured the Bedrock Loan was at the time it was made, Ms. Miessner responded that at the time, the Bank "did not obtain an appraisal," such that "Examiners couldn't appropriately analyze the value of the collateral, nor could the Bank."[258]

As noted in the loan write-up, the Bank's loan officer, Mr. Green, stated that the collateral securing the Bedrock Loan was a second real estate mortgage on 121 acres located on 60 U.S. 31 in Traverse City and a first mortgage on a one-acre lot on East Shore Road in Traverse City.[259] Also in the collateral description is the statement "LTV 59%", which

---

[250] Tr. at 1353. (Calcutt).
[251] *Id.* at 808-09 (Miessner).
[252] *Id.* at 1356 (Calcutt); EC Ex. 18. To the same effect, see Mr. Calcutt's testimony regarding the answers he provided through the Officer's Questionnaire prior to the 2011 Joint Examination. Tr. at 1356 (Calcutt); EC Ex. 47 at 1.
[253] Tr. at 1311 (Calcutt).
[254] *Id.*
[255] *Id.*
[256] *Id.* at 810 (Miessner).
[257] *Id.* at 809-10 (Miessner).
[258] *Id.* at 829 (Miessner).
[259] Joint Ex. 6 at 1. See also testimony of Mr. Jackson, when asked "Do you remember receiving this write-up [Joint Ex. 6] in mid-March 2010?" he responded: "I don't recall specifically the circumstances regarding this. When it was provided to me, I was asked to sign it. I think it was probably an administrative thing where they were looking for

compares with the 58 percent loan to value as determined by the FDIC's loan examiner, Mr. Bird.[260]

Asked to explain in terms of risk what it means to have a loan-to-value range of 58 to 59 percent, Ms. Miessner testified that if that LTV was true and accurate based on a current appraisal, it would mean that the "loan balance is only 58 percent of the total collateral value, which would indicate that if the Bank had to take a loan back because of foreclosure, then there would be equity there."[261] The loan-to-value metric is, however, according to Ms. Miessner, "at the bottom" of the asset quality analysis, because "that's looking at liquidation of collateral."[262] Before LTV, examiners first "look at repayment capacity of the borrower, character of the borrower. So basically their ability and willingness to repay. And then, secondarily, we look at the collateral protection," and in this context, repayment ability means cash flow.[263]

Reminded during cross-examination that Pillay funds were used in conjunction with the issuance of the Bedrock Loan, Ms. Miessner was asked that since "the Bank is releasing collateral but it's allowing the Borrower to use that collateral to pay down debt, and so that is money coming into the Bank; it's not going anywhere else, right?" Ms. Miessner responded thus:

> I can't agree with your specific question because they didn't use it to pay down debt specifically, which would, which that could have been an appropriate thing to do in a situation, but instead they used it to bring loans, you know, and in quotes "current," and a lot of that was used to pay interest payments then to falsely boost the Bank's earnings position. So I can't

---

all the signatures on it, and I believe it was brought to me and I was asked to sign it and I signed it" but did not recall spending any time reviewing the writeup. Tr. (2015) 1613-14 (Jackson). He later testified that while his general practice is to review carefully such an application, he did not review this one carefully. Tr. (2015) at 1675 (Jackson).
[260] *Id.* See also testimony by Mr. Bird, confirming that one of the things he took into account when reviewing the loan during the 2010 examination was how well collateralized the loan was, and arrived at a 58 percent loan –to-value. Tr. (2015) at 902 (Bird). He further testified that had he known the Bedrock Loan had been used to provide money to entities other than Bedrock, he would have adversely classified the loan, agreeing that if defined as substandard, that would mean it was "inadequately protected by the current sound worth and paying capacity of the obligor or of the collateral pledged." Tr. (2015) at 902-05 (Bird). He said this was true even though the LTV was high – because "you would have to look at the interrelationships between those loans." Tr. (2015) at 905 (Bird). According to Mr. Bird, when you look at collateral as a repayment source, "that's when you would take a closer look at the repayment capacity and the collateral structure." Tr. (2015) at 905 (Bird). He opined that the loan was hazardous, notwithstanding the 58 percent LTV, "because it was a loan that was not paying as agreed," in that "once the loan was made, it wasn't paying on its own. It wasn't paying from its original repayment source." Tr. (2015) at 906 (Bird).
[261] Tr. at 829-30 (Miessner).
[262] *Id.* at 882-83 (Miessner).
[263] *Id.* See also testimony of Examiner O'Neill, when asked whether the reason for collateral is to ensure payment of the loan, he responded: "That's not the primary source. The primary source of repayment is what's usually what's stated in the loan service but typically it's cash flow from operations. Collateral is only looked to as a secondary source of repayment oftentimes in case of default." Tr. (2015) at 648-49 (O'Neill). In the case of interest-only loans, collateral may not repay the loan, but "it may well be that only interest is being paid on all or multiple parts of the notes. So if all you are getting are your interest payments and none of the principal back, it's typically the principal at least at the point of default that you are looking to the collateral to collect." Tr. (2015) at 649 (O'Neill).

agree specifically with what you said to pay down debt because that's not exactly, that's a mischaracterization of what the situation was.[264]

Following up on this response, Ms. Miessner was asked about the Bank's rationale – that the purpose of the Bedrock Loan and release of Pillay collateral funds was "to buy time to see if the economy would improve." Ms. Miessner responded thus:

Mr. Calcutt had said that to me not specifically in the context of the Bedrock Transaction but specifically regarding the Nielson credits. It seemed like his whole idea was to just wait until the economy improved. So instead of taking prudent action towards working out a troubled borrower and recognizing them appropriately as a troubled borrower, reporting those loans as troubled loans appropriately, instead they took actions to hide the fact that this was a troubled borrower in hopes that eventually the economy would turn around to the point that the Borrower became not a troubled borrower anymore.[265]

Asked whether, in her opinion, the Bank "was better off foreclosing in the depths of the Recession toward the end of 2009 or extending that period as occurred as a result of the Bank working with the Borrower until June of 2011," Ms. Miessner testified that she could not answer that "because I would have to have information that shows the collateral values that existed at the time in 2009 when the Borrowers said that they didn't want to continue making payments and wanted to do deeds in lieu of foreclosure. . . . Either way, the Bank should have been reporting the loans appropriately and notifying the regulators of what they were doing."[266]

Ms. Miessner said that in her opinion, Mr. Calcutt's active concealment of the condition of the Bank's loan portfolio pertaining to the Nielson Entities did cause loss or risk of loss to the Bank, because as the Nielson credits continued to deteriorate, had Mr. Calcutt "actually been working on identifying the problems instead of concealing the problems, then the Bank could have been working towards actually resolving" the problems.[267]

### 1. Findings of Fact Regarding Respondent's Obstruction of FDIC Examiners:

Preponderant evidence as reported above, including substantial evidence showing Mr. Calcutt's active involvement in all communication flowing between the Bank and its regulators with respect to the Nielson loan portfolio, establishes that Respondent was aware of the June 30, 2011 letter from Mr. Jackson, was actively involved in contributing to the response, and knew at the time the letter was issued that it

---

[264] Tr. at 832 (Miessner).

[265] *Id.* at 833 (Miessner).

[266] Tr. at 835 (Miessner). See also testimony of Examiner O'Neill, after confirming that he was familiar with the concept of a banker working with a borrower during difficult economic times to help the borrower with the income stream and make it easier for them to repay the debt: after noting Ms. Nielson's proposal (at Resp. (2015) Ex. 122 at 2) that the bank put a "temporary hold on monthly debt payments," Mr. O'Neill was asked whether this is the kind of relief the Bedrock Loan provided, Mr. O'Neill responded: "No, sir. What Bedrock provided was a manner in which we had restricted deposit accounts to cover monthly regular payments. There is no batching here tied to lumps of cash flow at different intervals as properties sell. That's quite separate and apart – two different things." Tr. (2015) at 655 (O'Neill).

[267] Tr. at 810 (Miessner). But see Mr. Calcutt's testimony that the risks associated with the Nielson relationship was "absolutely not" sufficient motivation for him to conceal the details of the Bedrock Transaction from either the Bank's Board of Directors or the Bank's regulators: "There would be no basis to do that." Tr. at 1350 (Calcutt).

contained false and misleading information regarding the performance of the Nielson Entities loan portfolio.

Such evidence, summarized above, establishes that Respondent knowingly engaged in misrepresentations, making material omissions, and engaged in other efforts to deceive Bank regulators, including the routing of funds to aid concealment, concealing loan documentation and office file memoranda, knowingly issuing false Call Reports, issuing false statements in the November 2009 letter to the Bank's regulators, making false answers in Officer's Questionnaires, through the temporary sale of Nielson loans, through exclusion of the Nielson loans from the Bank's external loan review, making materially false statements in response to the August 2011 examination, and through communications with Bank examiners, as alleged in Paragraphs 54 through 107 in the Notice of Intention.

### D. Nature of the 2011 Examination

At the time of the 2011 ROE, i.e., as of June 30, 2011, the Nielson banking relationship had 35 loans to 20 different entities, with loan balances of $38.8 million – equaling 48 percent of the Bank's Tier 1 Capital.[268] In the Management/Administration review in the 2011 ROE, examiners described the concerns that had already been brought to the Bank's attention in the three preceding years. These included:

- Lack of complete financial information

- Lack of a global cash flow analysis

- Lack of documentation on the use of proceeds or source of payments

- The improper repayment structure – where most of the loan terms were interest-only

- The inability of several entities to service existing debt

- The lack of personal guarantees

- The failure to obtain current collateral values prior to renewal of several credits within the relationship.[269]

Among the new findings presented in the 2011 ROE were determinations that this time, "management actively concealed the accurate condition of this relationship from regulators and from the Board through the failure to maintain complete loan files and through false or misleading verbal and written statements."[270]

### E. The Bedrock Holdings

From among the Nielson Entities, Bedrock Holdings LLC "primarily owned vacant land."[271] Of Bedrock's $30 million in assets, approximately $15 million was based on real estate directly owned by Bedrock, with the remaining $15 million owned through Bedrock's

---

[268] ED Ex. 48 at 40.
[269] ED Ex. 48 at 40.
[270] *Id.*
[271] Tr. at 32 (Berden).

investment in Immanuel LLC.[272] Unlike those Nielson Entities that produced cash flow (*i.e.*, those that owned real estate rentals, oil and gas entities, and the home-building company), some did not produce a positive cash flow. These included entities, such as Bedrock, that held either vacant land or unrented residential properties.[273]

Ms. Berden, Generations Management CEO, testified that entities that did not produce a positive cash flow nevertheless generally had expenses, including property taxes, assessments, and insurance.[274] Without positive cash flow, these entities would pay for the related expenses either by borrowing from other Nielson Entities or through the sale of company assets.[275] She referred to borrowing under these conditions as inter-company lending – where loan proceeds from the Bank would be disbursed to one Nielson Entity to be used to benefit another non-producing Nielson Entities company.[276]

Bedrock, for example, had a line of credit with the Bank, and would at times draw on that line of credit and then loan that money to another Nielson Entity – frequently Artesian Investments LLC – which would then, in turn, loan the money to another Entity.[277] In this way, Artesian would hold both the note receivable and the note payable for the related Nielson Entities.[278]

According to Mark Smith, the Bank's Director of Global Risk, without doing an internal audit, he had no way of knowing that the Nielson Entities were related "when they all were titled differently," so from a layman's perspective, you "wouldn't know . . . one entity was related to the next".[279]

Also of concern, according to the FDIC's Case Manager, Ms. Miessner, was the finding that the Bedrock Loan was being carried on the Bank's books as a $4.5 million interest-only loan – a practice that Ms. Miessner said "is indicative to me of a deteriorating financial condition of the Borrower" – where the "Borrower doesn't really have the ability to service those loans appropriately."[280]

### F. Respondent's Direction to Generations Management Regarding Accounting for Loan Proceed Distributions

Ms. Berden explained that initially under these conditions, and using Bedrock as an example, Bedrock would show on its balance sheet that it had made a loan to another related Nielson Entity.[281] She said, however, that this practice changed at the Bank's request, following a meeting held on April 29, 2008 involving herself, Scrub Calcutt, Mr. Green, and Cori Nielson.[282] During that meeting, Mr. Calcutt and Mr. Green asked that Ms. Berden "not show

---

[272] *Id.* at 34 (Berden); EC Ex. 135_002.
[273] *Id.* at 37 (Berden).
[274] *Id.*
[275] *Id.*
[276] *Id.* at 37-38 (Berden).
[277] *Id.* at 38 (Berden).
[278] *Id.* at 39 (Berden).
[279] *Id.* at 399 (Smith).
[280] *Id.* at 731-32 (Miessner). The $4.5 million loan was used, according to Mr. Calcutt, for the purchase of Team Services, an oil and gas company. Tr. at 1397-98 (Calcutt).
[281] Tr. at 39 (Berden).
[282] *Id.* at 41 (Berden); Resp. Ex. 127.2

those inter-company notes on the Borrower's balance sheets anymore".[283] Instead, Mr. Calcutt and Mr. Green asked her to report that, for example, "instead of loaning money to Artesian, [Bedrock] would make a distribution to its members" and "the members would either loan it to Artesian or make a capital contribution as the owners to the other Entity."[284]

### G. Respondent's Role in Concealing the Common Unit and his Directions to Generations Management Due to the Bank's Lending Limit

Also discussed during the April 29, 2008 meeting were concerns that regulators had brought to the attention of Mr. Calcutt and Mr. Green. Ms. Berden testified that Mr. Green and Mr. Calcutt "were bringing to our attention some concerns they had after meetings with the regulators. They were informing us that they had a $10 million legal lending limit."[285] The lending limit was again discussed during a phone call with Mr. Green on May 27, 2008, regarding a pledge agreement from Pillay Trading LLC, "to use their units as collateral on some of the loans with Northwestern Bank."[286] She noted that "[w]e had been told that the Bank may be prohibited from doing any further loans with us pursuant to that April 2008 meeting where they told us about their lending limit. However, on this date they said that they would do a new loan" and "will worry about Examiners later."[287]

In this regard, Ms. Berden stated that Mr. Calcutt and Mr. Green "were discussing with us the way that we were transferring draws from the lines of credit" and instructed her that the balance sheets from Nielson Entities should no longer show inter-company notes receivable and notes payable submitted to the Bank.[288] She explained that under this revised accounting approach, "draws on the line of credit, transferring the cash to other Entities, should be shown as distributions to the owners of Bedrock rather than loans to the other Nielson Entities."[289]

Ms. Berden gave the following illustration:

> As an example, perhaps Sunny LLC needed to pay some bills. So we would have Bedrock draw on the line of credit and deposit those funds directly into the Sunny LLC, bank account. The Bank asked us to not do that anymore but to have the funds go into the Bedrock bank account, if Bedrock was the one drawing on the line of credit, and then do further transfers from that point.[290]

Ms. Berden added that while she believed there was nothing improper or illegal about the original inter-company loan process, she learned through Mr. Calcutt and Mr. Green that such a practice could be construed, by bank regulators, as a "common use of funds."[291] She identified notes she took from when the Bank "first started talking to us about regulatory issues," in an email to FDIC employee Teri Gillerlain dated September 11, 2012.[292]

---

[283] *Id.* at 39 (Berden).
[284] *Id.*
[285] *Id.* at 41 (Berden).
[286] *Id.* at 45 (Berden).
[287] *Id.*
[288] *Id.* at 42 (Berden).
[289] *Id.*
[290] *Id.* at 44 (Berden).
[291] *Id.* at 150 (Berden).
[292] *Id.* at 152-53 (Berden); Resp. Ex. 127.

Although this correspondence appears to be dated in 2012, the exchanges described above occurred in 2008 through 2010.[293] In her testimony, Ms. Berden agreed with the proposition that Mr. Calcutt suggested that rather than have one entity loan funds to another, the best way to do what the Bank and the Nielson Entities wanted to do was to have the money flow to the owner of the LLC, and the owner would then do with the funds what it deemed appropriate – loan it out again, distribute it, or whatever.[294]

For his part, Mr. Calcutt defended the Bank's position regarding this approach to inter-company lending in these terms:

> And at some period I met with the lender [Mr. Green] and the Nielsons and informed them that the Borrower, funds should be disbursed to the Borrower; the Borrower could downstream them to the owners and the owners could do what they wished. They could upstream them to some other entity, but they should not be moving money back and forth between entities.
>
> Q. And why did you believe that was inappropriate?
>
> A. Well, I was wearing my CPA hat. The tax hat. And that is that I didn't want to see these entities collapsed, in a sense. And when you have enough inter-entity borrowing, it is easy to make the argument that they should be collapsed. So funds, as I say, should go to the borrowing entity but then distributed to the owners of that entity.[295]

In later testimony, when asked whether he knew at the time of funds being routed from the Pillay collateral to the Nielson Entities that the loan proceeds were routed through various deposit accounts, Mr. Calcutt responded "No. As I said: I was never involved in the disbursement of any funds from any loan, including this loan. So no. I wouldn't have any idea where the funds would have gone or how they would have gone from Bedrock."[296] I found this inconsistent testimony eroded Mr. Calcutt's credibility. He denied that the funding process described here was intended to conceal the transaction from the Bank's regulators, stating "there would just be no reason to do that."[297] The record, however, establishes a clear reason for attempting to conceal the common ownership of the Nielson Entities from the Bank's regulators. That record materially erodes the reliability and credibility of Mr. Calcutt's testimony in this enforcement action.

Testimony from the Bank's Director of Risk Assessment, Mark Smith, supported the premise that the Nielson Entities constituted a common group and that its common status was hidden from the Bank's auditors, its Board members, and its regulators. Mr. Smith testified that he joined the Bank in May of 2011, and one of his first responsibilities was to identify (in

---

[293] Tr. at 152 (Berden). See Resp. Ex. 126 (email from Ms. Berden to the FDIC's Ms. Gillerlain dated September 8, 2012, stating that Mr. Calcutt "asked us to change the way we handled our inter-company loans to move them from the borrower LLC to the parent entity during a phone call on 2/11/09.")
[294] Tr. at 151 (Berden).
[295] Tr. at 1277 (Calcutt).
[296] *Id.* at 1308 (Calcutt).
[297] *Id.* at 1308-09 (Calcutt).

advance of the exam set to begin in August 2011) whether there were commercials loans having "outside normal interest rates."[298]

In the course of this work, Mr. Smith found "a group of loans that were all I believe lower than the rest of the commercial loans, at a lower interest rate than the other commercial loan portfolio; I believe it was half a point below prime at that time."[299]  He explained that when he pursued this, "somebody from the credit area said "That's the Nielson Loans. The whole group is the Nielson Loans."[300]

As he became familiar with the group, he described it as "a large group, a lot larger than I would have expected for a bank the size of Northwestern to lend to one kind of group of companies."[301] He opined that by "the sheer volume of the number of loans that were interrelated, I believe at the time it was about $35 million, that they led me to believe that they had the bargaining power to get down to that level where no other loans in the commercial portfolio were that low of an interest rate."[302]

### 1. Findings of Fact Regarding Respondent's Actions in Concealing the Nature of the Nielson Entities as a Common Group

Upon this testimony (and upon the witnesses' references to exhibits presented during the hearing), preponderant evidence establishes Mr. Calcutt's active, knowing, and willful participation in directing the Bank's management of the Nielson Entity Loans throughout the period relevant to this administrative enforcement action, actions that were designed to conceal the nature of the Nielson Entities as a common group of borrowers.[303]

### H. The Bank's Concerns Regarding the Nielson Entities' Lines of Credit

In the fall of 2008, one of the Bank's concerns, raised during a meeting on October 9, 2008 with Mr. Calcutt, Mr. Green, Cori Nielson, and Ms. Berden, was that lines of credit held by Nielson Entities were not being paid down.[304] Ms. Berden testified that during the meeting, Mr. Calcutt and Mr. Green were "suggesting that some of our lines of credit, the balances would only increase; they were never paid back down."[305]

Ms. Berden explained that typically a line of credit "is used to have advances in payments, used back and forth for temporary cash flow needs."[306] The Nielson Entities' lines of credit, on the other hand, "would just get drawn upon and max out, and stay there at that full principal balance, so [Mr. Calcutt and Mr. Green] were asking if we might be able to pay some of them down for a period of 15 to 30 days to show that they were being used more as a traditional line of credit."[307] Further, if the Entities were not able to pay down the lines of

---

[298] *Id.* at 397 (Smith).

[299] *Id.*

[300] *Id.*

[301] *Id.* at 397-98 (Smith).

[302] *Id.* at 398-99 (Smith).

[303] See also testimony of the Bank's Director of Risk Management, Mark Smith: "asset quality meetings would typically involve Scrub, Dick, myself, and Mike Doherty." Tr. at 396 (Smith).

[304] Tr. at 44 (Berden).

[305] *Id.* at 46 (Berden).

[306] *Id.*

[307] *Id.* at 46-47 (Berden).

credit, Mr. Green and Mr. Calcutt wanted the Entities "to convert them into term loans that would have principal and interest amounts."[308]

For the 2011 Joint Examination, FDIC Examiner Dennis O'Neill[309] had responsibility for reviewing the Nielson loan relationship, assuming that role upon the departure of FDIC Examiner Robert Bush.[310] He had received from Mr. Bush a binder of documents consisting of "key correspondence between the Bank and the Borrower of the Nielson Entities during the period at least through late 2009."[311] He testified the binder had been given to Mr. Bush shortly before the 2011 Examination by FDIC Case Manager Anne Miessner, who had received the binder from officers of the Nielson Entities.[312]

Mr. O'Neill testified that upon receiving the binder, he read through its contents, in order to "become familiar enough with the correspondence so that I could then review the Bank's own records and loan files and compare it and see whether those records, those that were most important, that were most revealing in terms of the conditions of the loans, were actually kept in the records that were being presented to the Bank Examiners during the Exam."[313] Generally the correspondence consisted of emails that had not been written by Mr. Calcutt – most had been written by Cori Nielson, and from time to time Mr. Calcutt would forward transmissions to from Ms. Nielson to Mr. Green.[314]

Asked whether he disclosed his access to the documents in the binder to anyone at the Bank prior to the start of the 2011 examination, Mr. O'Neill said no, he had not: "The goal was both through reviewing records and interviewing bank management to see what was available and what they were disclosing to us, both written records supplied and statements made to us in response to specific questions about the communications with the Borrower."[315]

Mr. O'Neill found cause to believe the Nielson Entities loan folders that the Bank provided during the 2011 examination were incomplete.[316] Mr. O'Neill asked Mike Doherty for *all* of the correspondence between the Bank and the Nielsons "since there was none in the files," adding that this was "very unusual . . . especially for the largest borrowing relationship in the Bank."[317] He said the examiners made additional requests – including a written request – providing the Bank with additional opportunities to supply the examiners with records – including those records contained in the binder that Ms. Nielson had sent to the FDIC.[318]

---

[308] *Id.* at 47 (Berden).

[309] Examiner O'Neill holds an accounting degree, became an Examiner with the FDIC in 1985, and has 30 years of experience with the FDIC. He is a Commissioned Examiner, has attended courses and received on the job training in testing bank records "for the safety and soundness of the institution in compliance with laws and regulations." Tr. (2015) at 11-12 (O'Neill). He has participated in over 300 bank examinations, serving as the Examiner in Charge in over 100 such examinations. Tr. (2015) at 12 (O'Neill). He had been assisting in the examinations of Northwestern for approximately seven years, in the Trust Department and in Loan Review in the context of at least five of the Bank's safety and soundness examinations. Tr. (2015) at 14 (O'Neill).

[310] Tr. (2015) at 15 (O'Neill).

[311] *Id.*; EC Ex. (2015) 3.

[312] Tr. (2015) at 17 (O'Neill).

[313] Tr. (2015) at 19 (O'Neill).

[314] *Id.* at 20-21 (O'Neill).

[315] *Id.* at 21 (O'Neill).

[316] *Id.* at 24-25 (O'Neill).

[317] *Id.* at 25 (O'Neill).

[318] *Id.* at 26 (O'Neill).

The documents Mr. O'Neill was seeking were the kind he said he expects to find in any loan file: information stating the purpose of the loan, its use, its sources, the borrower's request, and the like.[319] In cases where a loan is "in distress" he would expect the file to have correspondence stating "the cause of the problem that led it to be in distress," and if the loan had been in a non-accrual state and then restored to accrual, he would expect documentation showing "what has changed to allow it to be restored to accrual status."[320] Further, he said he would expect to see in the file "timely payments of six months or more and other changes in the fundamental ability of the borrower to keep those payments current."[321] Given that this was the Bank's largest borrowing relationship, he expected to see, where appropriate, a history of where the loans had been delinquent and ultimately placed on non-accrual status.[322]

Mr. O'Neill testified that the binder provided by the Nielsons contained "significantly more" correspondence than had been stored in the Bank's loan folders.[323] He said the binder included documents that addressed "the reasons for the original problems and also the arrangements that were made to restore them to accrual status."[324] For the Bedrock folder, for instance, Mr. O'Neill expected to find information describing the loan review presentation to the Board, because as a loan that reached "over fifteen percent of the common stock and surplus of the capital of the Bank . . . that loan has to go to the Board of Directors, for at least two-thirds of the Board has to vote approval of it."[325] This documentation, according to Mr. O'Neill, "was absent here for the Bedrock Holdings' new loan".[326]

## I. Respondent's Responses to Regulators' Concerns about Loans to Entities that Lacked Positive Cash Flow

During their October 9, 2008 meeting with the Nielsons, the bankers also had expressed concern about "issues they were having with their Regulators and asking us if there were things that we could do to help their position."[327] These things included "more cash deposits to be held" at the Bank, and they wanted "statements to explain entities that did not have any income or cash flow."[328] Ms. Berden said that Bedrock was one such entity, and Mr. Calcutt and Mr. Green told her that Bedrock had been "brought to their attention by the Regulators in looking at

---

[319] Tr. (2015) at 26-27 (O'Neill). See also testimony of Mr. Doherty regarding the process used by the Bank regarding its loan files: "credit write-ups, financial information, any related documents outside of loan documents were kept in one file and that was up to the lender/assistant to do those files. Then, once the loan was made, the executed documents were put in a loan file, a separate file." If new material information regarding the loan came in, that was supposed to go into the credit file. He added that between 2009 and 2011, he had no reason to suspect that files did not contain complete information. Tr. at 1213-14 (Doherty).

[320] Tr. (2015) at 27 (O'Neill).

[321] Id. See also testimony of Mr. Hollands regarding the contents of the Nielson Entities loan files as of January 14, 2010, where Mr. Green forwarded to Mr. Hollands financial statements from Nielson Entities for year-end 2008, demonstrating, according to Mr. Hollands, that there were no year-end 2008 financial statements in the files prior to January 14, 2010, and had not been in the files at the times the loans were extended in December 2009; adding that the files still lacked up to date rent rolls. Tr. at 1119-21 (Hollands).

[322] Tr. (2015) at 27 (O'Neill).

[323] Id. at 28 (O'Neill).

[324] Id. at 29-30 (O'Neill).

[325] Id. at 40 (O'Neill).

[326] Id.

[327] Tr. at 47 (Berden).

[328] Id. at 48 (Berden).

the financial statements that these entities appeared not to have any cash flow or income to support their loan payments."[329]

According to Ms. Berden, while "trying to brainstorm ways to make some of these things happen," the parties agreed to "change[] the procedure where . . . [a] line of credit draw from Bedrock would go directly to Bedrock's checking account first and then from there it [would be] distributed to partners or owners of Bedrock. We would actually move the cash to those bank accounts and then make further transfers as needed from there."[330] With these changes to the Nielson Entities' accounting practices pertaining to inter-company transfers, while such transfers were still taking place, they wouldn't show up on the financial statements the Entities gave to the Bank because the transfers were being made at the "ownership" level.[331]

### J. The Bedrock 2009 Loan and the Bank's Legal Lending Limit

By January 2009 it became clear to both the bankers and Ms. Berden that by the time it was preparing to extend a loan of $1.15 million based on vacant land held by Bedrock, the Bank was "over our legal lending limit."[332] Elaborating on this point, Mr. Berden testified that the Bank had "informed us previously that they had a $10 million legal lending limit and that they exceeded that, and so this loan [Mr. Green is] saying needs to be capped at a certain amount because they are already over their legal lending limit."[333]

Describing the interactions between herself, Mr. Green, and Mr. Calcutt, Ms. Berden stated that typically correspondence between her and Mr. Green reflected Mr. Green's communication with Mr. Calcutt, and that while Mr. Green would "often negotiate terms with me," he would then "get approval from [Mr. Calcutt] before we could finalize."[334] She testified that as she understood it, both Mr. Calcutt and Mr. Green were the Bank's decision-makers in relation to the Nielson Entities loans.[335] Further, it was Ms. Berden's experience that both Mr. Calcutt and Mr. Green often would bring up as a concern the subject of what the Bank's examiners might think of a given proposal.[336]

She agreed with the premise that Mr. Calcutt did not attend *all* of the meetings held regarding the Nielson Entities. She specifically stated he was not present during a meeting held in November 2010 where Ms. Berden and Cori Nielson met with Mr. Green, Mike Doherty and Dick Jackson, to discuss plans regarding all of the Nielson loans, and identified other similar meetings where Respondent was not present.[337]

---

[329] *Id.*

[330] *Id.* at 49 (Berden).

[331] *Id.* at 50-51 (Berden).

[332] *Id.* at 52 (Berden); EC Ex. 3_0053.

[333] Tr. at 52; EC Ex. 3_0053 (1/6/09 email from Mr. Green to Ms. Berden re: Bedrock Vacant Land). See also testimony from Mr. Jackson, that the FDIC had "ignored" the claims "that we were, would be placing against both the $10 million that the Nielsons had received from the OILN claim and future payments that they anticipated as a result of the OILN claim." Tr. (2015) at 1647 (Jackson).

[334] Tr. at 52-53 (Berden).

[335] *Id.* at 78 (Berden).

[336] *Id.*.

[337] *Id.* at 165 (Berden); Resp. Ex. 169. See also Resp. Ex. 204 (Mr. Calcutt not present at a meeting on November 29, 2010 regarding, inter alia, short sales and a five-year cash plan; not present at a meeting on November 11, 2010 regarding possible foreclosure action and deeds-in-lieu); EC Ex. 3 at 173 (not present at a meeting on December 15, 2010 regarding loan renewals and agreements). See also testimony of Ms. Nielson confirming that Mr. Calcutt did

Page 46 of 145

**A234**

### K. Regulatory Issues in 2009 with the Loans to Five Nielson Entities

The Bank (through Mr. Green and Mr. Calcutt) continued through the spring of 2009 to address with Ms. Berden its legal lending limit practices and the Bank's regulators' responses to those practices. In an email exchange between Ms. Berden and Mr. Green on February 11, 2009, Mr. Green explained that "the Examiners were wanting to aggregate all of these loans into one relationship which put them over the legal lending limit," and indicated that the loan to Blueridge Holdings LLC was an example of that.[338] In this instance, the loans the Regulators said should be aggregated were those attributed to Bedrock LLC, Blueridge LLC, Immanuel LLC, NRJ LLC, and Jade LLC.[339]

Ms. Berden explained that in the February 11, 2009 email, Mr. Green relayed to her something Mr. Calcutt had noticed about the Blueridge account: In an email among those sent on February 11, 2009, Mr. Green explained to Ms. Berden that "One item Scrub noticed was the inter-company debt was increasing[,] which was the primary item the examiners caught and had a major problem with."[340] Mr. Green then reminded Ms. Berden that funds disbursed by the Bank were not to go directly to Blueridge from the Entity borrowing money, but she was expected instead to transfer the funds to the owners, and let the owners complete the inter-company loan.[341]

As previously noted, an email message dated February 19, 2009, reflects that Mr. Green identified five accounts Bank examiners "tried to tie together" – Bedrock, Blueridge, Immanuel, NRJ, and Jade.[342] By abiding in making the accounting change requested by Respondent and Mr. Green – that is, by "moving the loans out to the owners so that they did not appear on the borrower's balance sheet," the balance sheets she submitted to the Bank would no longer list any inter-company loans made to other Nielson Entities.[343] Ms. Berden stated that as a result of this change, in order to fully understand what sorts of transfers were being made, one would need more information than what was shown in the balance sheets she submitted to the Bank.[344] This was information that could only be provided by the owners – but the owners were in no way obligated to the Bank (in terms of guarantees on the Bedrock note) to provide this information; and the Bank did not systematically request periodic financial statements as part of the ongoing relationship between the Bank and Bedrock.[345]

In another similar example, when Ms. Berden found a need for funds to go to Lake Miona LLC, she stated the LLC "didn't have an account that I can deposit" loan proceeds into,

---

not attend a meeting on November 12, 2010, nor one on November 29, 2010. Tr. at 1006 (Nielson). Asked whether she agreed that the negotiations between the parties between October through December 2010 actually did not involve Mr. Calcutt, Ms. Nielson said "I don't think I could agree that he was not involved, but it does refresh my recollection that we had a few meetings here with" Mr. Doherty, Mr. Jackson, and Mr. Green." Tr. at 1008 (Nielson). She testified that even if Mr. Calcutt was not at certain meetings, "I don't believe that he was not involved." *Id.* at 1020 (Nielson).

[338] Tr. at 55 (Berden).
[339] *Id.* at 56-7 (Berden); EC Ex. 3 at 62.
[340] Tr. at 55-56 (Berden); EC Ex. 3 at 60.
[341] Tr. at 55 (Berden).
[342] Tr. at 56-7 (Berden); EC Ex. 3 at 62.
[343] Tr. at 58 (Berden); Resp. Ex. 126.
[344] Tr. at 58 (Berden).
[345] *Id.*

as it was an LLC owned by Blueridge.[346] She explained that Mr. Green was willing to help (and said so in an email dated February 27, 2009 to Ms. Berden), but told her:

> [The deposits] will be loan proceeds from an entity and [would] go directly into Blueridge, and the examiners will be all over Blueridge and the deposit accounts in a month. They will see it. I am concerned it will cause another 'co-mingling of funds issue.' Is there another way to do it? Can you get the check and then cash it and make a separate deposit?"[347]

Ms. Berden testified that by proceeding as directed by Mr. Green, if the check was cashed as Mr. Green proposed, no one would know what the source of the cash was, without tracing it.[348]

The lending-limit issue remained a topic of discussion throughout 2009. At one point in April, 2009, Ms. Berden offered to help the Bank as it responded to concerns raised by the Bank's regulators. In an email to Ms. Berden on April 19, 2009, Mr. Green wrote to Ms. Berden stating "the examiners are here and they are reviewing every loan with us. My guess is that we will certainly be required to have you move most of the loans. I will keep you posted."[349]

Later that day, Ms. Berden responded by asking if there was anything she could do to help.[350] Specifically, she stated that "[t]here are good arguments for a lot of these to show the separation of ownership and the reasons why they do not have common use of funds because of fiduciary relationships, etc."[351] Her response carried with it signs of consternation, where she asked what the result would be if the examiners found a common use of funds among these Entities – that the examiners may require the Entities to leave the Bank at a time when few banks were lending money on land properties, while relating that she had been trying to "reach out to other banks" without success, having been "turned down due to our loyalties to [Northwestern]," and asking "[w]hat if we simply can't find alternatives due to industry and market conditions at this time?"[352]

Ms. Berden testified that through an email sent on March 2, 2009, Mr. Green told her that Mr. Calcutt had met with FDIC staff members in 2008 and learned that the FDIC examiners raised the issue of whether the Nielson Entities were tied together, but "decided to wait for the State examiners to review it," adding that the State examiners would be at the Bank in April 2009.[353] She testified that Mr. Green and Mr. Calcutt "were still arguing at the time that these loans should not be grouped together, but in anticipation of the fact that they weren't sure that they could prevail on that issue they wanted us to try to move some of the loans to other banks."[354]

---

[346] *Id.* at 59 (Berden).
[347] *Id.* at 60 (Berden); EC Ex. 3 at 63.
[348] Tr. at 60-61 (Berden).
[349] Resp. Ex. 10.
[350] *Id.*
[351] *Id.*
[352] Tr. at 156-57 (Berden); Resp. Ex. 10.
[353] EC Ex. 3 at 66.
[354] Tr. at 63 (Berden).

Ms. Berden testified that in responding to these concerns, and at Mr. Calcutt's request and that of Mr. Green, she attempted to move some of the Entity loans to other banks, but had no success – partly because the loans were not guaranteed by the owners, and partly because many of the loans were secured by vacant land that had no cash flow.[355] She added that the request that she try to move some of these loans came "at a time when the real estate market was crashing and most of the banks were not even interested in looking at real estate loans of any type."[356]

Ms. Berden agreed with the premise that early in 2009 the Bank, through Mr. Calcutt and Mr. Green, had made it clear that it was absolutely necessary, because of regulatory concerns, to move some of the Entity loans out of the Bank.[357] She also agreed with the premise that due to the economic effects of the Great Recession, both the Nielson Entities and the Bank were adversely impacted – with the Bank wanting the Entities to move out these loans, and the Entities being unable to do so.[358] Ms. Berden clarified, however, that as of May 2009, the Nielsons were still making their loan payments, so the reason for moving the loans elsewhere wasn't because of performance issues, but was instead a response to the Bank's *regulatory* concerns regarding the common use of funds and the Bank's lending limit.[359]

For his part, when asked to describe why the Bank wanted the Nielson Entities to "look for other financing," Mr. Calcutt testified as follows:

> Q. [W]hat was the nature of the concern that was being raised by the Examiners over the Michigan unit rule? What was the Borrower doing that was of concern?
>
> A. Well, it was the aggregate amount of debt, that it was beyond our lending limits and but the state statute was so vague that they were clearer on the federal rule but the state statute was very unclear. So it actually got dropped as a discussion item after, I don't know if it was 2007 or '08. In other words, it was brought up. Discussed. We discussed it with the Nielsons, suggested they look for another bank but ultimately that discussion was dropped.[360]

**L. Respondent's Authorization of the Use of Funds from Pillay Trading LLC to Service Nielson Entity Loans**

Apart from moving existing Nielson Entity loans to other banks, Mr. Green and Ms. Berden also discussed using funds in Pillay Trading LLC.[361] In an email dated January 21, 2009, Ms. Berden broached the subject with Mr. Green, stating that "with the current condition of the market," the Pillay funds were "sitting on the sidelines with our trading activity – meaning that the funds are still in Pillay, but we're not actively trading them, it's just sitting there in cash and T-bills."[362]

---

[355] *Id.*
[356] *Id.* at 54 (Berden).
[357] *Id.* at 152 (Berden).
[358] *Id.*
[359] *Id.* at 158-59 (Berden).
[360] *Id.* at 1276 (Calcutt).
[361] *Id.* at 153 (Berden); Resp. Ex. 3.2.
[362] EC Ex. 3 at 59.

Although the assets in Pillay were currently being used as collateral for Nielson Entity loans, Ms. Berden asked Mr. Green: "We're wondering what options we have to release some of the security that [the Bank] has on these Pillay units. Could we use a portion of the funds to pay down on principal to release the security interest?"[363] Breaking down the proposal, Ms. Berden stated the Bank held a $1 million security interest for the Bedrock Holdings LLC loan, a $500,000 security interest for Moxie LLC, and a $100,000 security interest for AuSable LLC.[364]

The Bank initially rejected Ms. Berden's proposal to use these funds to service Nielson Entity loans. Mr. Green advised, in a March 16, 2009 email to Ms. Berden, that "The Pillay funds were used to cover down payment and/or cash flow shortages on the loans to Moxie, Bedrock, and AuSable. We cannot release those funds. It could be used to pay down the loans provided there is existing cash flow to cover the remaining loan."[365]

As will be reported below, however, Mr. Green later abandoned this position and, according to Ms. Berden, agreed "to release Pillay funds which they had previously said they would not do," even arranging funding for a new loan – the $760,000 Bedrock Loan – even though previously they had told Ms. Berden and Cori Nielson there would be no new loans.[366]

### M. The Distressed State of the Nielson Entities Loan Portfolio in August 2009

In a memo dated April 22, 2009, in which the subject is "Nielsons," Mr. Green wrote to Mr. Calcutt that "[t]he examiners are looking at every loan they have at NW. The four they claim may be tied together are as follows", listing Bedrock Holdings, Blueridge Holdings, Jade Venture, and Immanuel.[367] After acknowledging that the handwritten notes on the April 22, 2009 memo were his, Mr. Calcutt explained what his note "Money sent directly. Your issue" meant in context:

> Well, this comes back again to earlier testimony where I made it clear wearing my CPA hat that money should be disbursed from a loan to the Borrower. What the Borrower does then, they downstream it to the owners. The owners may upstream it somewhere, but it came back to not, not recommending that there be inter-company movement of money. That's what that note is probably referring to is my thoughts concerning how, you know, loan proceeds -- and this would have been clear to our team, the loan proceeds should go to the Borrower.[368]

The record reflects that at least in January 2009, assets in Pillay Trading LLC had been pledged to the Bank as collateral for three Nielson Entities; Bedrock, AuSable, and Moxie.[369] Pillay was seen as a valuable asset, one that (in 2008) earned 18.77% between 1/1/08 and 4/25/08 (for an annualized return of 59/23%).[370] The record also, however, includes evidence

---

[363] *Id.*
[364] *Id.*
[365] Tr. at 65, 155 (Berden); EC Ex. 3 at 69; Resp. Ex. 8.
[366] Tr. at 87 (Berden).
[367] EC Ex. 80 at 35.
[368] Tr. at 1372 (Calcutt).
[369] *Id.* at 155 (Berden); Resp. Ex. 3.
[370] Tr. at 163 (Berden); Resp. Ex. 2.

that "[i]t was difficult to determine what [the Pillay Trading Units] would be worth."[371] This evidence came from Frederick Bimber, Esq., who served as co-counsel to the Bank in cases in which the Bank sued Bedrock and other Nielson Entities, seeking foreclosure of Nielson assets held as collateral to the Entities' loans with the Bank.[372]

Mr. Bimber described the Pillay Units as "illiquid," adding that there were questions regarding whether the Bank actually had perfected its own lien against the Units "because you in effect would be asking one Nielson-controlled entity to do the Bank's bidding with respect to the pledge of the Pillay Units, which were themselves simply membership/ownership interests in Pillay Trading."[373] As Mr. Bimber put it, Pillay "traded stocks according to some procedures that the Nielsons thought were very clever and likely profitable, but I suspect Pillay Trading wasn't worth very much as we got into the early years after 2008."[374]

Ms. Berden agreed with the premise that by August 2009, three negative factors were in play: first, the Bank wanted the Nielsons to refinance and move their debt out of the Bank; next, the Bank wanted to improve its position with regard to the loans by getting greater debt service on the loans; and third, the Great Recession presented problems that prevented the Nielson Entities from making the sought-after debt service payments because of vacancies in the properties held by the Entities and difficulties in the Entities' cash flow.[375]

By late summer 2009 it was clear to Ms. Berden that conditions had changed – both because of the increased attention being paid by the FDIC's examiners regarding common use of funds among the Nielson Entities, and because of market conditions that were hurting the Entities' cash flow. Although Mr. Green and Ms. Berden engaged in ongoing email discussions about loan repayment, by mid-August 2009 Ms. Berden made it clear that repayment of loans held by the Nielson Entities was not assured, writing:

> In conjunction with the problems Northwestern Bank is experiencing with your regulators, we find ourselves also having to take a hard look at our financing situation. Due to the continued extreme low prices of natural gas, the complete lack of real estate developers purchasing development land in Michigan, and the drop in all real estate values due to the glut of foreclosures on the market, the current recession/Michigan depression is causing us increased need to restructure our loans.[376]

Through this email correspondence, Ms. Berden explained that upon finding that the Nielson Entities had been unable to move its loans to other banks, "we were facing a situation where our overall cash flow portfolio was unsustainable."[377] The Entities' weakening position also was described in an email sent on August 21, 2009, from Cori Nielson to Mr. Calcutt, where Ms. Nielson stated she "could not understand why you are delaying scheduling to meet

---

[371] Tr. at 377 (Bimber).
[372] *Id.* at 354 (Bimber).
[373] *Id.* at 378 (Bimber).
[374] *Id.*
[375] *Id.* at 163-64 (Berden). See also testimony of Examiner O'Neill confirming that the FDIC had issued a report stating "The economic condition throughout the state remains weak. Real estate values are depressed." Tr. (2015) at 614 (O'Neill); EC Ex. (2015) 49 at 2.
[376] EC Ex. 3 at 78.
[377] Tr. at 67 (Berden).

with" Ms. Nielson and her attorneys and advisors, and informed Mr. Calcutt that the Entities "will not make our September payment or any further payments until we have the necessary meetings and discussions to reach an overall restructuring of the relationship."[378]

Cori Nielson followed this with a more detailed email message on September 21, 2009, in which she informed Mr. Calcutt that the Entities "need a serious restructuring of their loan payments for the next period of time," and asked that the Bank "suspend monthly payments" due "until our cash flow returns".[379] She advised that some of the real estate securing the Bank's loans have values "so poor that some properties may not have any equity left in them, and some properties may not have good potential for equity recovery in the near term."[380]

### N. Using Pillay Trading LLC Funds and the New Bedrock Loan to Service Existing Loans in 2009

Following the news that the Entities had stopped making payments on any of the Bank's loans, Mr. Green extended to Ms. Berden the possibility that, notwithstanding what he had stated earlier that year, he and Mr. Calcutt now agreed to allow the Entities to use Pillay funds to make payments on the loans.[381] When combined with a new loan from the Bank, the funding would pay "a little bit more than eight months" of loan service – and would bring the loans current for an entire year from September 1, 2009 (when the Entities had stopped making payments on the loans).[382]

Ms. Berden explained that funds from the Pillay account and from the new loan would be deposited into a special reserve account to be on hold for the payments, – all "in the name of Bedrock, but pursuant to their previous request [from as early as April 2009] about line of credit draws, [Mr. Calcutt and Mr. Green] didn't want any of those funds to go directly into the other Borrower accounts."[383]

Through this process of negotiation between Mr. Calcutt (with Mr. Green's assistance) and representatives of the Nielson Entities, $600,000 was drawn from the Pillay LLC funds, and the new "Bedrock Loan" of approximately $760,000 was issued by the Bank, leading to $1.36 million being made available to bring the Entities' loans current and fund payments for eight months.[384]

In a memo dated November 16, 2009, Mr. Green presented to Mr. Calcutt a plan which he hoped would close by November 30, 2009, wherein the Bank would disburse a loan of $760,000 "to be used to cover principal payments", and accept from the Entities a pledge a second mortgage on the real estate currently held for the Bedrock loan.[385] The plan also called

---

[378] EC Ex. 3 at 82.
[379] *Id.* at 89.
[380] *Id.* at 89-90.
[381] Tr. at 71-72 (Berden);EC Ex. 3 at 93.
[382] Tr. at 88 (Berden); EC Ex. 3 at 116.
[383] Tr. at 88-89 (Berden); EC Ex. 3 at 122-23.
[384] Tr. at 90 (Berden); EC Ex. 3 at 126-27.
[385] Resp. Ex. 6 (which included a provision for the Bank to receive a "junior secured position" in equipment securing the Bedrock loan, but with the caveat that this "may not be possible as it's a lease transaction with 5/3 and therefore owned by 5/3").

for the loan to be "interest only" with a floor of 4%; and for one of the loans (the Eighty Eight Investments loan) to be amended to permit repayment over 36 months instead of 12 months.[386]

Ms. Berden testified that Mr. Green's November 16, 2009 proposal to Mr. Calcutt (which did not include releasing any Pillay Trading assets from the collateral position held by the Bank) would be an acceptable arrangement to try to deal with the "perfect storm" the Bank and the Nielson Entities were facing in late 2009.[387] Use of the Pillay Trading LLC's funds came into the picture only after Ms. Berden requested and received the Bank's permission to use funds presently held as collateral to pay down some of the Entities' debt.[388]

As the negotiations concluded, Mr. Green wrote to Ms. Berden on November 27, 2009, advising that "At this time, we can't do transactions online so I will need you to help by making the deposit. I am not sure where the money is coming from, but try to remember not to leave the paper trail. In other words, try not to deposit a check from Bedrock into Immanuel, etc."[389]

Ms. Berden then identified the documents showing that proceeds from the Pillay fund, which was owned by Artesian Investments, went first from Pillay into Artesian, and then "Artesian would disburse out to various Nielson entities. Those first set of transactions are the owners of the LLCs. They would receive the funds first."[390] From there, the owners would transfer these Pillay proceeds and loan disbursements into the Nielson Entities.[391]

Mr. Jackson explained the negotiations in these terms:

> [I]n November and December of 2009 following a series of meetings with members of the senior management committee that included myself, we came to a solution which we thought would help us continue discussions with the Nielsons and to keep the door open for us to work towards some amicable agreement as far as the resolution of their debt, and we agreed to do a new loan for them which is referred to as the Bedrock Loan of $760,000. We also agreed to release some funds called Pillay funds which was 600- or $680,000 which had been pledged by the Nielsons, and it was questionable as far as the validity of the lien that we had against that. So we thought, well, we can use that money to reduce the debt, which we did. It was the Borrower's money given to us ultimately for debt service and that's what we used it for.[392]

According to Ms. Berden, total principal indebtedness to the Bank by the Nielson Entities at the time of this transaction was approximately $38.7 million.[393] Ms. Berden explained that although initially Mr. Calcutt and Mr. Green sought to have the proceeds of the

---

[386] Resp. Ex. 6.
[387] Tr. at 165 (Berden).
[388] *Id.* at 167 (Berden).
[389] *Id.* at 92-93 (Berden); EC Ex. 7 at 1.
[390] Tr. at 94 (Berden); Resp. Ex. 136.38-136.42.
[391] Tr. at 94-95 (Berden); Resp. Ex. 136.38-136.42.
[392] Tr. (2015) at 1600 (Jackson).
[393] Tr. at 97 (Berden); Resp. Ex. 37, EC Ex. 133. See also testimony of Ms. Miessner, who testified that EC Ex. 133 concerns the Bedrock transaction "where the Bank made a new loan and released collateral – liquid assets that were held as collateral in order to bring all the loans within the Waypoint Nielson relationship current, take them off non-accrual and set up payment reserve accounts going into several months of 2010." Tr. at 739 (Miessner).

$760,000 Bedrock loan used only for principal and interest payments, they ultimately accepted Ms. Berden's proposal that those funds be allocated "based on the monthly payment so that . . . all of the loans would cover the same number of payments."[394]

Ms. Berden also acknowledged that by June 2010 she had reported positive results – including receipt of more than $10 million by Frontier LLC awarded in a civil lawsuit, along with indications that Team Services (a recently-acquired source of cash flow for Bedrock) would be responsible for positive cash flow for Bedrock, and an improving market for sales of new houses by Generations Development.[395] When asked why, with these positive factors, the Nielson Entities once again stopped paying on their loans in the fall of 2010, Ms. Berden clarified that the $10 million could not be spent because "we were being counter-sued for that $10 million."[396] She explained that while the Entities ultimately were able to use those funds for cash flow purposes, that did not occur until "several years later when that litigation was settled."[397] Mr. Calcutt apparently was not aware of this restriction on the use of the proceeds of the lawsuit, testifying that he expected the Entities to use the proceeds to pay the Entities' debts "because they were already doing it in other situations."[398] He stated that "some Entities . . . had very strong cash flow, including Frontier, so I didn't have any doubt that they could use that money if they so chose."[399]

Mr. Calcutt testified that he generally absented himself from discussions in the early stages of negotiations from October to December 2010, but did send a letter on December 1, 2010 to Dale Nielson, hoping that Mr. Nielson would "step in here and see that we needed to work out some kind of resolution going forward here".[400] In the letter, Mr. Calcutt let Mr. Nielson know that the suggestion that the Bank should "simply accept deeds in lieu of foreclosure of the properties" was "disappointing in light of our past relationship."[401]

In response, in December 2010 Dale Nielson met with Mr. Calcutt in what Mr. Calcutt described as a "very unusual meeting":

> We talked just broadly because I hadn't seen him in years, about the economy and the market and their businesses and their success and, and

---

[394] Tr. at 100 (Berden); EC Ex. 3 at 134.

[395] Tr. at 169 (Berden).

[396] *Id.* at 170 (Berden).

[397] *Id.* at 170-71 (Berden). See also testimony from Cori Nielson to the effect that in the summer of 2010, there was a $10 million mineral lease payment related to the Olin lease: "Our burn, our cash burn at that time for the portfolio was around $6 million per year. So $10 million doesn't go very far when you are burning $6 million a year, and we did use some of that money for some debt service, and we did use some of that money for investing in a cash flow in a new investment that we had been looking for." Tr. at 1020 (Nielson). She denied, however, that there was a claim made against that $10 million. *Id.* See also testimony from William Calcutt, with respect to the claim against Chesapeake Energy which the Bank considered when determining the Nielson Entities' capacity to repay the group of Nielson Entities loans – "The Nielsons had a claim on one or more oil and gas leases I think it was against Chesapeake Energy, okay. I think they claimed that they were going to get at least $10 million from this. And if my recollection is right, there was, that somehow that they would apply some of this recovery – as I say, it was either $10 million or more, [and] use it to help bring down the loans, you know, reduce the loans." Tr. at 1180-81 (W. Calcutt). There is, however, no evidence that the Nielson Entities had any legal obligation to apply funds available to one entity for the benefit of another entity.

[398] Tr. at 1321 (Calcutt).

[399] *Id.*

[400] *Id.* at 1322 (Calcutt); EC Ex. 28.

[401] Tr. at 1323-24 (Calcutt); EC Ex. 28 at 1.

then I asked him point blank, you know, "Will you help us resolve this situation going forward?" And what I'll never forget about this meeting is he turned his back on me and he walked up to a board and he said "We intend to pay you in full. But after we buy some more businesses." And I was just, I was dumbfounded. And I was polite, but that was pretty much the end of the meeting because I was just shocked that "That's not why I'm here, Dale. I am here to try and resolve this."[402]

Mr. Calcutt testified that the solution the Bank reached after the loans were again delinquent in December 2010 involved the use of the Pillay Funds "which were used to bring the loans current".[403] Mr. Calcutt explained why this solution served the Bank's purposes:

Well, the same thing we did with, with Bedrock and that is we were hopeful because this was a short-term solution, we were hopeful for a long-term solution and for the reasons I cited earlier with Bedrock. But it also corrected obviously a delinquency that would have been reflected in the Board Reports and that everybody was aware of because the loans had gone delinquent.[404]

Mr. Calcutt confirmed that the meeting minutes for the Board's December 17, 2010 meeting included this entry: "The Board was advised that the renewals for the various matured Nielson related loans would be completed shortly. This action will eliminate the temporary increase of the delinquency ratio and provide benefit to net interest income for December."[405] The minutes, however, are silent with respect to the fact that the loan proceeds and released collateral had already been paid out and would be the basis for bringing the renewed loans current.

Also in these minutes is an entry by which the Board approved the renewals of eleven Nielson Entities, including Bedrock.[406] Although the minutes are silent with respect to any details of the approval process that involved the release of the Pillay Collateral, Mr. Calcutt testified that he was "confident it was discussed" – based on his belief that "I shared information with the Board consistently. Every month we shared plenty of information with the Board. And obviously the spike in delinquencies would have been worthy of addressing."[407] Again, although no mention of this is found in the minutes, Mr. Calcutt was confident that the Board also discussed how the spike in delinquencies occurred and how they were being cured.[408] Preponderant evidence does not, however, support Mr. Calcutt's testimony in this regard.

Mr. Calcutt described a similar meeting, this time with Cori Nielson, held at the Bank in early 2011, in which, according to Mr. Calcutt, "Cori Nielson threatened me. Threatened to

---

[402] Tr. at 1324 (Calcutt).
[403] Id.
[404] Id. at 1325 (Calcutt).
[405] Id. at 1327 (Calcutt); Resp. Ex. 58 at 2.
[406] Tr. at 1327-28 (Calcutt); Resp. Ex. 58 at 4.
[407] Tr. at 1328 (Calcutt). See also testimony of Mr. Jackson: "I recall at some point I asked Mr. Green, 'We did receive Board approval for this loan, is that correct?' And I don't recall his response, but I did question whether or not we had received it." Tr. (2015) 1612 (Jackson).
[408] Tr. at 1329 (Calcutt).

destroy me." [409] It is not clear what weight Mr. Calcutt actually gave to this position, as he testified he found the threat to be "unbelievable". [410] According to Mr. Calcutt, his brother Bill regarded the Bank's negotiating position to include its use of "a 'club' to encourage [the Nielsons] to come to some resolution here." [411] The "club," according to Scrub Calcutt, was to cajole the Nielson managers "into the renewal of loans by informing them that pressure would be brought to bear by Northwestern's regulators if their loans became non-performing which would result in Northwestern having to play 'hardball'." [412]

Elaborating on this "tactic," Scrub Calcutt testified: "From time to time we had used the regulators as a – as you would call it – a 'club' to encourage them to come to some resolution here. So I could use another word, but yes; we were using them as a club. A hammer." [413] Part of this strategy, according to Mr. Calcutt, was to identify "red flags" and use these as a way to say no to Ms. Nielson if there were things she wanted to do "that just couldn't be done," as "[t]hey wouldn't be acceptable to us or potentially the regulators" if the Bank did things her way. [414]

Mr. Calcutt denied, however, any suggestion that he was actually concerned about increased regulator scrutiny over the Nielson loans – because "the regulators were well aware of all of these loans. They had access to them. They were reviewing them every year, not to mention that they had access to all of our information in the Bank, so no. I was not concerned about that at all." [415] Given the record before me, little weight is given Mr. Calcutt's claim that the regulators were between "well aware of" the true nature of the Nielson Entities loans.

When Mr. Smith, the Bank's Director of Global Risk, reviewed the proposal to use the Pillay Trading Units as collateral, he was concerned about "whether or not we could perfect our interest in those units." [416] At the time, in 2011 when he was writing his report, Mr. Smith was not aware there were questions about the perfection of the Bank's interests, and stated that had he known this, he would have responded differently when preparing his response to the Bank's Examiners during the 2011 exam. [417]

Mr. Smith testified that once he became aware of the problems with using the Pillay Units in this way, he knew that it "wouldn't be used as collateral, so additional losses, they couldn't be used to offset additional losses or the losses that the Examiners had contended." [418] As a result, Mr. Smith opined, "there would be additional losses that would need to be recorded and . . . it would impact the impairment calculations because there would be additional losses because you couldn't use the collateral." [419] Stated another way, from what he learned about the Pillay Trading Units, after comparing "your loan balance to the collateral value," "if you have

---

[409] *Id.*
[410] *Id.* at 1331 (Calcutt).
[411] *Id.*; Resp. Ex. 69.
[412] Tr. at 1325 (Calcutt); Resp. Ex. 69; Tr. at 1156, 1178 (W. Calcutt).
[413] Tr. at 1331 (Calcutt).
[414] *Id.* at 1331-32 (Calcutt).
[415] *Id.* at 1332 (Calcutt).
[416] *Id.* at 413 (Smith).
[417] *Id.*
[418] *Id.* at 413-14 (Smith); Resp. Ex. 168.
[419] Tr. at 414 (Smith).

less collateral here in this instance, the Pillay Trading Units, it would be a higher loss because you have less collateral to offset the loan balance."[420]

### O. Bank Management's Misrepresentation of the Condition of the Nielson Entities

Ms. Berden provided insight into potential discrepancies between the condition of the Nielson Entities as described in correspondence between the Bank and its regulators, and as actually existed during the time relevant to this enforcement proceeding. Writing on behalf of the Bank, Executive Vice President Richard Jackson addressed a letter to the state regulator – Michigan's Office of Financial and Insurance Regulation, with a copy to the FDIC, dated November 14, 2009.[421] In it, Mr. Jackson wrote that the Bank's Board of Directors had reviewed and discussed the April 13, 2009 Report of Examination, and offered responsive information – including information about the status of the Nielson Entity loans.[422]

According to Mr. Jackson:

[The 2009 Report of Examination] would cover several different areas of the Bank which I might have a high-level knowledge of but not a working detail of. And if there were items contained within the Report of Examination that I did not have intimate knowledge of, I would go to the various department heads within the Bank that did have responsibility for the area being addressed and I would say "I have to respond to the Examination. Please help me come up with a response."[423]

Mr. Jackson opined that a loan that showed nonpayment for "90 days or less" would nevertheless be considered a "performing loan".[424] He added that by January 2010, there would not have been any discussion within the Classified Assets Committee regarding the classification of the Nielson Loans.[425]

With respect to the issue of whether the Bank had reason to question whether the Nielson borrowers had in 2009 raised any issue concerning their ability or intention to service these debts, the FDIC's Case Manager Ms. Miessner testified:

[W]e know now that the borrowers had notified the Bank in writing in August of 2009 that they did not intend to continue making payments beginning with their September 1, 2009 payment. We know that they had asserted that many of their properties were underwater, that they no longer

---

[420] *Id.*

[421] Joint Ex. 3. See also testimony of Ms. Miessner regarding information presented by the Bank at page 2, Mr. Jackson's November 14, 2009 letter to Mr. Thielsen of the Michigan OFIR and the FDIC's Chicago Regional Office: that the information was not accurate where it "indicated that there were no problems with the relationship, you know; through the statement that the loan was performing, that would indicate to me that all the loans were current and that they were paying, paying in the way that their contractual terms were laid out." Tr. at 738 (Miessner). "At the time that letter was written, the majority of the loans within the Waypoint Nielson management relationship were 74 days past due." Tr. at 739 (Miessner). See also testimony of Mr. Jackson, stating that "most likely" Mr. Calcutt reviewed the letter. Tr. (2015) at 1683 (Jackson).

[422] Joint Ex. 3 at 2-3. Mr. Jackson became vice president of administration at the Bank in 1980; and Executive Vice President in the 1990s. Tr. (2015) at 1590 (Jackson).

[423] Tr. (2015) at 1616 (Jackson).

[424] *Id.*

[425] *Id.* at 1620-21 (Jackson).

had equity in them and didn't want to keep them and had offered deeds in lieu of foreclosure and requested significant restructure on the loans on properties that they intended to keep.[426]

Ms. Miessner noted that in his letter, Mr. Jackson identified two kinds of performing loans – one kind was performing "as agreed," and the other was just identified as a performing loan.[427] In Mr. Jackson's November 14, 2009 letter, the status of loans to non-Nielson entities – including, for example, the Bay Meadows Development relationship – was described as "performing as agreed," whereas the Nielson Entity loan status was reported as simply "performing".[428] Ms. Miessner testified that while she had not before now noticed this difference, she now regarded it as a "red flag," and that had Mr. Jackson used the same phrase for the Nielson loans as he used with Bay Meadows, that response would have been patently false.[429]

Asked in particular about the Immanuel LLC loan, Ms. Berden testified that "loan payments were not made starting September 1st until this restructuring plan was in place in December," and that the only payments that would have been made were those made available after the release of the Pillay Funds and the Bedrock Loan proceeds.[430]

As noted above, the November 14, 2009 letter was signed not by Mr. Calcutt, but by the Bank's Executive Vice President, Mr. Jackson.[431] When asked if she knew whether Mr. Calcutt reviewed the letter, Ms. Miessner testified thus:

> Mr. Jackson was the executive vice president as well as the Board secretary, and as far as everything that we know is that nothing happened at that bank if Scrub didn't know about it. So while I don't know specifically and while I don't have exact personal knowledge of Scrub reviewing this document, given what I know about the Bank, it would be reasonable to expect that Mr. Jackson would have never sent a letter to the FDIC without Mr. Calcutt seeing it and knowing what was being communicated on behalf of his bank.[432]

From the record, I find preponderant evidence establishes that Mr. Calcutt was fully aware of the contents of Mr. Jackson's November 14, 2009 letter, and approved the letter being sent to the FDIC.

Ms. Miessner also noted answers Mr. Calcutt provided in the Officer's Questionnaire at Question 1, in May 2010, regarding the Bank's extension of credit since the last FDIC examination, where he was asked whether any of those loans had been renewed or extended.[433] Ms. Miessner described as "inaccurate" Mr. Calcutt's responses to questions pertaining to the

---

[426] Tr. at 740 (Miessner).
[427] *Id.* at 883-84 (Miessner); Joint Ex. 3 at 2.
[428] Joint Ex. 3 at 2.
[429] Tr. at 885 (Miessner).
[430] *Id.* at 102-03 (Berden). See also Tr. at 792-94 (Miessner); EC Ex. 66, reflecting a summary of circumstances identified by Ms. Miessner as misrepresentations regarding the Nielson loan portfolio attributed to Mr. Calcutt and other senior bank managers.
[431] Joint Ex. 3.
[432] Tr. at 845 (Miessner).
[433] *Id.* at 745 (Miessner); EC Ex. 18.

Bedrock Loan and the Nielson Entities, because upon being asked to disclose extensions of credit that were renewed "with acceptance of separate notes for the payment of interest," he failed to disclose that through the Bedrock transaction, loan proceeds were "used specifically to make interest payments on . . . all of the Entities' loans within that relationship."[434]

When asked to characterize his own facility for remembering facts and details of events pertaining to the Bank during the Great Recession (said to be from 2008 through 2011), Mr. Calcutt answered that "[g]iven the climate, the business climate, I would have been very tuned into that period of time and what was going on and, of course, once it passed and moved on to the future worrying about where the Bank was at that time in the future."[435] He also testified, however, that he does not have a computer, but has an assistant with a computer, so that when emails are sent to him "she would alert me and then I would look at it sometimes over her shoulder and say 'this needs to go to so and so in the retail area because it relates to a retail customer.'"[436] He said he did not maintain a file with emails from the Nielson lending relationship, but would instead forward emails from the Nielsons to Mr. Green or others in senior management.[437] He also testified that had no contact with loan files, and was never involved in processing loans or answering emails.[438]

Further questions that Ms. Miessner found to be inaccurately answered in this May 2010 response by Mr. Calcutt included his answer to Question 3 (concerning extensions of credit that "directly benefit someone other than the person named in the Note") – where the Bank's records established that the "Bedrock Loan was made for the direct benefit of all of the entities within the Waypoint Management credit."[439]

A detailed account of false or misleading statements attributed to senior bank officers is included in the 2011 ROE.[440] Drawing from this ROE, and from the 2010 ROE[441] a Visitation Report dated March 2, 2011 (based on an examination that began on February 22, 2011 reporting on conditions as of December 31, 2010),[442] and discussions between Examiners and

---

[434] Tr. at 745 (Miessner); EC Ex. 18 at 2. See also Ms. Miessner's testimony that "some of the $760,000 loan proceeds were made to make payments on the same $760,000 loan, so that would be 'with capitalization of interest to the balance of the note. So that would count on (c) as well." Tr. at 745-46 (Miessner).

[435] Tr. at 1262 (Calcutt). But see also Mr. Calcutt's testimony regarding his practice that affects his ability to recall the contents of email messages presented to him during the hearing: "My emails, I would scan them to who should receive them and then I would have my assistant send them on so this [Resp. Ex. 17] is refreshing my memory; obviously I received the email but then forwarded it on to Bill Green and probably to others at the Bank." Tr. at 1281 (Calcutt).

[436] Tr. at 1312 (Calcutt).

[437] *Id.*

[438] *Id.* at 1312-13 (Calcutt). Given evidence in the record including emails sent by Mr. Calcutt to others, I attribute no weight to Mr. Calcutt's claim that he was never involved in the answering of emails.

[439] Tr. at 746 (Miessner); see also EC Ex. 10 at 2, Acknowledgement of Pledge dated 11/25/09 granting the Bank a security interest in $400,000 in Pillay Trading Units naming Bedrock Holdings LLC as the borrower, and testimony by Ms. Miessner that "For Question Number 3 to have been answered accurately, it would have said something along the lines of "A loan was made to Bedrock Holdings LLC, for the benefit of . . .", and then it would list the rest of the Waypoint Management and Nielson-related entities that received payments on their loans through the Bedrock Loan proceeds." Tr. at 748 (Miessner).

[440] EC Ex. 48 at 40.

[441] (Start date: 6/7/10; As of Date: 3/31/10).

[442] EC Ex. 38.

Respondent and other Bank officers and employees held on September 14, 2011,[443] FDIC and Michigan Examiners found the following categories of misconduct attributed to Mr. Calcutt, Mr. Green, and Mr. Jackson:

> A. Routing of Funds to Aid Concealment[444]
>
> B. Missing Loan Documentation[445]
>
> C. Office File Memoranda[446]
>
> D. False Call Reports[447]
>
> E. False Representations in November 2009 Letter to Bank's Regulators[448]
>
> F. Officer's Questionnaires[449]
>
> G. Temporary Sale of Nielson Loans[450]
>
> H. Nielson Loans Excluded from External Loan Review[451]
>
> I. Management's Response to August 2011 Examination[452]
>
> J. Other Communication with Examiners[453]

Beyond these claims of concealment, Examiners also concluded Mr. Calcutt (and his subordinates) failed to follow Bank policy regarding obtaining loan approvals from the Bank's Board of Directors.[454]

### P. Bank Management's Misrepresentations Presented in the Commitment Review for the 2009 Bedrock Loan

#### 1. Misrepresentation Regarding "Working Capital" in the Bedrock Loan

As described in the Bank's Commitment Review for the Bedrock Loan, the purpose of the new $760,000 loan was to "[p]rovide for working capital requirements" for Bedrock Holdings LLC.[455] Bedrock Holdings LLC was owned by three trusts: Dana Nielson Perpetual Alaska Trust, Cori Nielson Perpetual Alaska Trust, and Keith Nielson Perpetual Alaska Trust.[456] Cash flow for Bedrock Holdings was supposed to be provided by Team Services, but,

---

[443] Joint Ex. 11.

[444] Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and Notice of Hearing at ¶¶55-61.

[445] *Id.* at ¶¶62-65.

[446] *Id.* at ¶¶66-70.

[447] *Id.* at ¶¶71-73.

[448] *Id.* at ¶¶74-78.

[449] *Id.* at ¶¶79-80.

[450] *Id.* at ¶¶81-88.

[451] *Id.* at ¶¶89-90.

[452] *Id.* at ¶¶91-92.

[453] *Id.* at ¶¶93-107.

[454] *Id.* at ¶¶27-38.

[455] Joint Ex. 6 at 1.

[456] Tr. at 110 (Berden).

as Ms. Berden recounted, "Team Services [was] having a bad year in 2009," realizing only an actual net negative cash flow.[457]

Understanding that "working capital" means, generally, "your liquid assets, your cash, your receivables, net of your payables," Ms. Berden testified that while a "small portion of" the loan proceeds were intended for Bedrock's working capital, the "majority of the funds were disbursed out to other entities for their working capital."[458]

For his part, when asked whether he believed that "working capital" adequately described what the proceeds of the loan were to be used for, Mr. Calcutt equivocated, responding "Yes and no. They may have captured a portion of it, but no. I also say no, it did not capture the entire, didn't describe it entirely."[459]

James Gomez served as the FDIC's Examiner in Charge for the 2011 examination conducted jointly by the FDIC and Michigan Office of Financial and Insurance Services.[460] Through his testimony, Mr. Gomez identified features of the 2011 examination that gave rise to the charges now pending against Respondent.

In the 2011 ROE, Examiners stated that with the exception of Generations Development, on November 30, 2009, the majority of the 35 loans to the 20 Nielson Entities had reached 90 days past due and were placed on nonaccrual status.[461] This was notable in part because only 16 days earlier, Mr. Jackson signed a letter to the state regulators reporting that all of the Nielson loans cited in the Bank's formal response to the April 2009 Report were either "performing" loans or were in "renewal in process" status.[462] It was also notable because on November 30, 2009, at the request of Mr. Calcutt and Mr. Green, the Bank released $600,000 in collateral assets held by Pillay Trading LLC, and at that point "the funds were broken down into numerous denominations and moved in 61 separate transactions before being applied to the agreed upon loan accounts."[463]

The Nielson loans were placed back on accrual on December 1, 2009 because the Bank "recognized all previously reversed interest as income."[464] Two days later a new note was executed and on December 14, 2009, the Bank disbursed proceeds of the new $760,000 loan to one of the Nielson Entities, Bedrock Holdings LLC.[465]

The 2011 ROE then reports the following:

Again, upon the request of Loan Officer Green and President and CEO Calcutt, with the knowledge of EVP Jackson, the funds were broken down

---

[457] *Id.*

[458] *Id.* at 104. (Berden).

[459] *Id.* at 1307 (Calcutt).

[460] Without objection, Mr. Gomez qualified and testified as an expert witness – specifically, as a banking examination and supervision expert witness on the subjects of bank examination, prudent banking practices, including loan underwriting practices, standards of care and duties of directors to FDIC-insured financial institutions, FDIC supervisory and enforcement matters and actions. Tr. at 218 (Gomez). Credentials supporting this designation are set forth in the transcript of proceedings. Tr. at 187-219.

[461] EC Ex. 48 at 40.

[462] *Id.*.

[463] *Id.*

[464] *Id.*

[465] *Id.*

into numerous denominations and moved in 54 separate transactions to place the funds in deposit accounts set up specifically for the purpose of funding monthly payments on all 36 loans. The Bedrock proceeds were first used to pay the December 1, 2009 payments with the remainder funding monthly payments through April 1, 2010.[466]

Mr. Gomez described this set of transactions as a straw loan – i.e., a loan "made to a borrower that's not used for the intended purpose or stated purpose."[467] The regulatory concerns about the Bedrock Loan include the inability for regulators to determine what the source of the loan's repayment will be (i.e., "if it's not an income-generating property to begin with and there is no inventory, there's no apparent way this loan is going to get repaid").[468]

This was true, in Mr. Gomez's opinion, notwithstanding that one of the Bedrock holdings was Team Services, an oil and gas services company that Ms. Berden described as "poised for an excellent 2010," which she said would, in turn, help with Bedrock's cash flow.[469] Presented with this report, Mr. Gomez responded that he could not confirm whether in fact Team Services could contribute to Bedrock's cash flow, stating "I'd like to see the proof. I mean, people can write things all the time."[470]

Along these same lines, FDIC Case Manager Ms. Miessner testified that based on her review of examination records leading up to the 2011 examination, she had specific questions about whether weaknesses relating to the Waypoint/Nielson Entities loans had been cleared up.[471] She testified that "previous Examinations had stated that management was allowing the Waypoint group, the Nielson group, to do equity pulls," which she stated "is where a borrower is allowed to take equity out of a property in the form of a loan and then do something with the proceeds that's other than what's stated in the purpose of the loan."[472]

In addition to the work of Case Manager Ms. Miessner and EIC Gomez, as the FDIC Examiner charged with reviewing the Nielson Loan portfolio for the 2011 examination, Mr.

---

[466] *Id.* at 41.

[467] Tr. at 270 (Gomez). See also testimony of FDIC Examiner O'Neill, when asked whether "working capital" includes the use of loan proceeds to make payments to other non-borrowing entities, after answering that it does not include such use, Mr. O'Neill stated "That would be a classic case of diversion. If you state one purpose on a loan proposal to the Board and then use it for an entirely different purpose . . . in that case, bringing other loans current or keeping them current . . . we actually review for that. It's to avoid the case of a shell game, essentially . . . if there's multiple entities involved and one loan is given to one entity, to then turn around and bring a whole slew of loans current, it's essentially a concealment effort," one that conceals "the true source of the payments." Tr. (2015) at 44 (O'Neill).

[468] Tr. at 271 (Gomez).

[469] *Id.* at 307 (Gomez); Resp. Ex. 48.

[470] Tr. at 309 (Gomez).

[471] *Id.* at 768 (Miessner); EC Ex. 25 at 2.

[472] Tr. at 768-69 (Miessner). See also testimony by Examiner Bird: an equity pull is "a situation where a borrower is adding additional leverage to a financial transaction to extract cash out of that financial transaction. . . . You would be adding debt to a transaction. That's adding leverage, and the proceeds would go back out to the borrower. So you would add to your outstanding loans payable to the bank. And typically when you'll see an equity pull, it will be done with the same collateral and so your loan-to-value would be higher. Just signed as a cash-out kind of transaction." Tr. (2015) at 872 (Bird). When asked if Mr. Bird had seen this happen during the 2010 exam, he said no, because "I did not have the full characteristics of the Bedrock transaction." Tr. (2015) at 873 (Bird). Knowing now that the Bedrock transaction included the $760,000 loan and $600,000 Pillay transactions, Mr. Bird stated this would be an equity pull loan. Tr. (2015) at 873-74 (Bird).

O'Neill also participated in the 2011 exam. Mr. O'Neill explained that the distribution of proceeds from the Bedrock Loan to multiple Nielson Entities concealed the true source of the payments that brought those loans current, threatening the "integrity of the records."[473]

> If they had wanted to conceal that information because the true extent of the problems were worse for the borrowing entity itself did not have the cash flow or means to bring those payments in, bank giving out new funds of its own to then turn around and bring those loans current, there is a potential risk that we examine for is whether or not there is good money following bad.[474]

Mr. Gomez agreed with the premise that there is no regulation or other law that, to Mr. Gomez's knowledge, prohibits a bank from making a loan to pay principal and interest payments for a few months while the borrower is then going to pick up the payments after those months.[475] Here, however, the outcome is different because of the way the Bedrock Loan was described – "the way the transaction was made had not [been] disclosed," and thus "tells a different story."[476]

As Mr. Gomez explained, while the loan document that Mr. Calcutt signed approving the Bedrock Loan indicated the purpose of the $760,000 loan was for "working capital," "we [know] now" that the purpose was to pay interest and principal on the Nielson Loans.[477]

Testimony from Bank board members persuasively established that neither Mr. Calcutt nor any other senior bank manager disclosed to the Bank's Board the true purpose of the Bedrock Loan. Former Board Members Bruce Byl and Ronald Swanson recalled approving the Bedrock Loan after reviewing the application for the loan in March 2010.[478]

Bruce Byl served on the Bank's Board from 2006 to 2012, having first served the Bank as a consultant, helping the Bank work on real estate projects.[479] Mr. Calcutt testified that Mr. Byl was on the board because Mr. Calcutt was a family member, and "I thought that the family should be represented other than [by] myself on the Board."[480] Mr. Byl testified that Mr. Calcutt had in the past sought out Mr. Byl to work on "opportunities he saw that he wanted

---

[473] Tr. (2015) at 45 (O'Neill).

[474] *Id.*

[475] Tr. at 303 (Gomez).

[476] *Id.* at 304 (Gomez).

[477] *Id.* at 306 (Gomez); Joint Ex. 6 at 1. EC Ex. 133 is an FDIC-created illustration showing the November 2009 Bedrock Transaction Disbursement, including funds flowing from the Pillay collateral release and the new $760,000 Bedrock Loan. See also Testimony of FDIC Examiner O'Neill: working capital "generally [is] for purposes of, it could be seasonal or in some cases it's ongoing if a business has accounts receivable or inventory being financed, that's the classic accounts receivable financing." It does not, however, include the use of loan proceeds to make payments to other non-borrowing entities. Tr. (2015) at 43-45 (O'Neill). See also testimony by Examiner Bird, describing working capital as funds to be distributed only to Bedrock LLC, and would be used only for Bedrock's general business purposes, not used by any other entity – because "this request is discussing working capital for the Borrowing Entity." Tr. (2015) at 778 (Bird).

[478] Tr. at 456, 484 (Swanson).

[479] *Id.* at 901, 908 (Byl).

[480] *Id.* at 1272 (Calcutt). Mr. Calcutt also testified that Mr. Byl is no longer on the Board and that he no longer has a relationship with Mr. Byl "because we discovered he embezzled over a quarter million dollars from the Bank, and he betrayed confidences of the Board." Tr. at 1272 (Calcutt).

more research done on, problem facilities that he needed to have resolved."[481] He testified that Mr. Calcutt ran the Board meetings as "the quarterback of that team."[482] He acknowledged that now he has no personal relationship with Mr. Calcutt, and that it has been many years since the two talked.[483]

Asked to describe Mr. Calcutt's style in running those meetings, Mr. Byl testified:

> Very business-like. He was professional. He, he would listen to, you know, our comments, our thoughts. I found him to be fair, honest, you know, a, a, a, a good person to be on the Board of. I thought he was doing the right things; and again not having any prior bank board experience, I didn't have anything to compare it to, so I, I felt it was functioning well. I mean there were some things that I would have personally liked to see change but it wasn't my meeting.[484]

When asked whether Mr. Byl ever got the impression that Mr. Calcutt perceived questions by Board members to be a question of his authority, Mr. Byl responded, yes, explaining: "Well, Scrub was the brightest guy in the room, and it was hard to, hard to approach him or challenge him on something that you thought you might have a better, better knowledge of, better angle of, more information about. So I didn't very often."[485]

For his part, Mr. Calcutt testified that there was open discussion at board meetings, and denied that he tried to curtail any inquiry by any board member.[486]

He testified the meetings were conducted as follows:

> We had monthly board meetings, and before the board meeting there would be detailed materials sent out to each of the directors for a review before the meeting. And then quarterly we will embellish the monthly reporting with additional documents and so they had time to study them and bring them to the board meeting and discuss them. And obviously the CFO was at every board meeting to help discuss and address questions.[487]

Although he testified that he knew of no instance where Mr. Calcutt expressed an intention to withhold information from the Bank's examiners, Mr. Byl said Mr. Calcutt had expressed some animosity about what he saw as overreaching by the examiners, telling Mr. Byl that "'This isn't a normal bank. We want to do some other things that are going to generate revenue outside of a normal bank,' and he was very frustrated that he was being challenged with those ideas and those thoughts and that direction."[488]

Mr. Byl testified that in preparing for Board meetings, if he had questions about loan applications, he would present the questions to whoever the loan officer was; and thereafter "you would form your own decision and you would email back what you thought, whether you

---

[481] Tr. at 902 (Byl).
[482] Id. at 906 (Byl).
[483] Id. at 1045 (Byl).
[484] Id. at 907 (Byl).
[485] Id. at 908 (Byl).
[486] Id. at 1271 (Calcutt).
[487] Id.
[488] Id. at 909-10 (Byl).

Page 64 of 145

were for or against" the proposed loan.[489] Although Mr. Calcutt testified that "[t]he directors had open access to anybody at the Bank anytime,"[490] Mr. Bly testified that he contacted only two loan officers Scott Ashcroft and Dan Druskovich – but never Mr. Green, whom he described as "very elusive . . . you just never saw him."[491]

Board Member Swanson testified that upon reviewing the Bedrock application, he understood the purpose of the loan was to provide Bedrock LLC with working capital, which he understood would not include supporting vacant land, but would instead be "funds available to the business in their operation," in "a business that has accounts receivable and . . . accounts payable, and typically their current asset liquidation is not timed right with when their payables are do, and so this is to take the peaks and valleys out of the flow of funds".[492]

Also in his review of the application, Mr. Swanson understood that there would be a release of $600,000 in the Bank's collateral interest in Pillay Trading Funds – although he stated he could not tell how the released funds were to be used.[493] Indeed, he testified that there was nothing in the loan application that would have indicated either the loan proceeds or the released collateral would be used for the benefit of any entity other than Bedrock Holdings LLC.[494]

Mr. Swanson also testified that he was not aware that at the time he and other Board members approved the loan the loan had in fact already closed, the $760,000 had been funded, and the Pillay collateral had been released.[495] Had this been brought to his attention, Mr. Swanson stated he would have "contacted management and asked them why we were just seeing that loan now."[496] Elaborating, Mr. Swanson testified: "It would appear to me that the Term/Maturity column there [*i.e.* in the Bedrock Loan Commitment Review documentation] is not correct, that the loan should not have been funded or available for funding until the Board had approved it, which would have been March, so the nine-month number is not correct."[497]

---

[489] *Id.* at 911 (Byl).

[490] *Id.* at 1291 (Calcutt).

[491] *Id.* at 912 (Byl).

[492] *Id.* at 485, 549-50 (Swanson). See also testimony of Board Member Byl, who stated that while he did not recall reviewing the Bedrock Loan application, he believes he must have done so, because his initials are on the document and "typically something, a million dollars or in the million dollar area, I'm guessing those were forwarded to us for review and approval." Tr. at 915-16 (Byl); Resp. Ex. 36.5 (3/25/10 email from Byl to Hollands et al. re Bedrock Holdings and Generations Devl. "Both have been reviewed and approved."

[493] *Id.* at 486 (Swanson).

[494] *Id.* See also Examiner O'Neill's testimony, agreeing with the premise that a board member could be expected – upon seeing that $600,000 of Pillay collateral had been released by the Bank – to ask "Why are we releasing these funds," responded further that "the first one I would expect to ask would be Mr. Calcutt, who is also on this document as signing his initials, but I would expect the other board members as well to ask that question." Tr. (2015) at 643 (O'Neill).

[495] Tr. at 486-87 (Swanson).

[496] *Id.* at 487 (Swanson).

[497] *Id.* at 533-34 (Swanson). See also testimony of Examiner O'Neill regarding the contents of the Commitment Review, noting "the extent of exposure that was created by granting the new loan and then compar[ing] it . . . to the state law requirement that there's a threshold upon which the full board has to vote on it and at least two-thirds of that Board has to vote in favor of it in order to comply. And then . . . the fact that although it's described to the Board of Directors as a new loan, in fact the loan was closed and fully disbursed three months earlier. No attempt to ratify. And then once again the concerns with working capital when in fact the purpose was to keep existing loans current." Tr. (2015) at 594-95 (O'Neill). When asked, given that the Review's report that this is a nine-month loan

Page 65 of 145

Further, Mr. Swanson testified that he could recall no mention of the Bedrock Loan in any of the Board's meeting minutes for the last quarter of 2009. [498] He testified that although members of the Board were informed when the Nielson Entities first stopped paying on their credits, there is no mention of this in the Bedrock Loan application – that is, the application does not disclose that the borrower had not paid on its loans since September 2009. [499]

To much the same effect, Board member George Kausler sent an email to Sharon July, one of the Bank's credit analysts, dated March 29, 2010, in which he reported that he would approve the Bedrock Holdings Loan under these conditions: "I would approve the renewal of the existing LOC and its release of collateral. However, given the request for the new loan I recommend we retain the collateral until cash flow is proven, not pro forma." [500] This suggests without ambiguity that Board Member Kausler had not been told the proceeds of the loan had already been disbursed and the collateral released.

Mr. Swanson testified that he and other Board members had not been told during the Bedrock Loan Application presentation that the combined funds ($760,000 and $600,000) were to be distributed among *multiple* entities other than Bedrock LLC that were controlled by the Nielson family. [501] He testified to the same effect regarding the Commercial Loan Special Request that the Board approved in December 2010, by which the Bedrock Loan, which matured on September 1, 2010, was to be extended to January 20, 2011. [502] In that Request, there was no mention of collateral being released, and nothing describing how such a release would be utilized. [503]

Similarly, Mr. Byl testified that when he was presented with the Bedrock loan for Board approval, he was not aware that the loan, being approved in March 2010, had already been closed by the Bank and the loan proceeds distributed. [504] Further, he testified that when this was presented for his approval, he did not know that a large group of loans, including loans shown in the loan application, had stopped paying as of September 1, 2009, nor was he aware that the released collateral described in the application was to be used to bring current that large loan relationship that had stopped paying in September 2009. [505] Further, when presented with a

---

with a maturity of September 1, 2010, whether that disclosed the loan had been extended in 2009, Mr. O'Neill testified that this "doesn't tell me when the funds were already disbursed, sir. It simply says it's new and that this is the maturity date." The citation here is due to the fact that the loan proceeds were disbursed prior to receiving Board approval. Tr. (2015) at 641-42 (O'Neill).

[498] Tr. at 489 (Swanson).

[499] *Id.* at 490 (Swanson).

[500] *Id.* at 1413 (Calcutt); EC Ex. 16.

[501] Tr. at 490; 497-98 (Swanson).

[502] *Id.* at 495 (Swanson); EC Ex. 30.

[503] Tr. at 496 (Swanson).

[504] *Id.* at 1023-25 (Byl).

[505] *Id.* at 1025 (Byl). See also Mr. Byl's testimony, when presented with the Report of Examination from 2008, wherein the examiners in 2008 identify the Waypoint Management Relationship as an interrelated borrower group – Mr. Byl testified that he was not aware of the relationship until the meeting with examiners after the 2011 examination. Tr. at 1049-50, 1052-53 (Byl); Joint Ex. 1 at 43; and to the same effect regarding borrower concentrations that were described in the 2009 State Examination but which Mr. Byl had no recollection of ever reading. Tr. at 1054-55 (Byl); Joint Ex. 2 at 20. Explaining his lack of understanding of or appreciation for the significance of the information contained in the Reports of Examinations, Mr. Byl testified that "I obviously didn't read the complete examination because there were no red flags in 2008 or 2009, I would have read through the

chart showing the interrelated Nielson entities, Mr. Byl testified that he was not aware that there was this interrelationship that owed the Bank $38 million, nor that the $760,000 loan proceeds would be distributed for use as a reserve for all of those separate entities' loans.[506] Equally significant, Mr. Byl testified that at no time before the Bedrock loan application was presented to him did anyone at the Bank ever discuss the Nielson loans at any of the board meetings he attended, or with him separately as a board member.[507]

Mr. Byl described a similar lack of understanding regarding the Commercial Loan Special Request dated December 20, 2010, which extended the maturity on the Bedrock loans.[508] He testified that the Request was presented during the December 21, 2010 board meeting – something Mr. Byl described as "very atypical."[509] He said Mr. Calcutt was at that board meeting, and that throughout the approval process, Mr. Byl was unaware that going forward with the Request would mean the release of collateral held by the Bank, nor that the Bank's $34 million relationship with the Nielson entities had stopped paying on their loans as of September 2010, nor that the proceeds of $689,000 in released collateral would be used for a variety of entities not party to the Bedrock renewal.[510]

### 2. Evaluating the Merits of Conflicting Testimony Regarding When the Bedrock Loan was Approved

Upon my review of the record, I reject as not supported by credible evidence Mr. Calcutt's testimony that the Bedrock Loan had been approved in December 2009.[511] Mr. Calcutt testified that while the Commitment Review (Long Form) for the Bedrock Holdings LLC Loan wasn't signed until March 2010, this loan did not follow normal procedure – it "would have been an exception," but that since he "never had any involvement in the processing of any loan, including this loan," nor in the "closing of any loan or disbursing of any loan," he "can't recall" why this write-up was not prepared in December 2009: "I certainly was made aware of it but I can't recall the reasons."[512] He testified he did not read the Review prior to signing it, that he "wasn't paying attention" to whether the write-up accurately stated the terms of the loan, that he did not know the stated purpose of the loan, and that he approved it "because the loan had already been made and we were moving down the road."[513]

In this respect the competing claims call for a determination of whether the true nature of the Nielson Entities' relationship with the Bank was explained to Board members, and whether the Board approved the Bedrock Loan in December 2009, as testified to by Mr. Calcutt. Finding neither to be the case, I rely first on my review of contemporaneous records

---

summary and maybe a little bit further but that was all because to me there was no reason to continue on." Tr. at 1057 (Byl).

[506] Tr. at 1026-27 (Byl); EC Ex. 133.

[507] Tr. at 1026-27 (Byl). Mr. Byl acknowledged receiving a December 3, 2010 email from Mr. Jackson stating that the Bank "sent a demand letter to the Nielson family yesterday," but testified that at the time he did not know what the Nielson loans were and that while he was "concerned on behalf of the Bank, [ ] I had no idea how large this relationship was or what impact it really would have on the Bank." Tr. at 1027-28 (Byl).

[508] Tr. at 1025 (Byl); EC Ex. 30.

[509] Tr. at 1029 (Byl).

[510] Id. at 1029-32 (Byl).

[511] See Tr. at 1305 (Calcutt).

[512] Id.

[513] Id. at 1306-07 (Calcutt).

identified above, including the Board packages provided by the Bank to its Board members for the October through December Board meetings, which are silent regarding both questions; and testimony from Bank staff indicating no one other than Mr. Green or Mr. Calcutt would be present to address these two questions; along with testimony from Board Members Byl and Swanson, to the effect that no discussion on these questions was held before March 2010. Documentary evidence supports this finding, whereas Mr. Calcutt offered conclusory testimony that is not supported by contemporaneous documentation.

Mr. Calcutt has raised a factual question – whether he discussed with fellow Board members the true nature of the Bedrock Loan prior to March 2010 – averring that he is sure he did, notwithstanding testimony to the contrary from his colleagues on the Board. In broad terms, once the record presents such a conflict, the core tests include corroboration, inherent believability, internal consistency and reliability of other parts of the evidence, clouded or clear recollection, and (in very limited circumstances) witness demeanor.

Here, Board minutes would have been the normal source for corroboration to support Mr. Calcutt's factual claim, but those minutes are silent with respect to the Bedrock Loan prior to March 2010. Inasmuch as Mr. Calcutt was actively participating in the key Board meetings and clearly was managing how the Bedrock loan was to be used, he had both the incentive and the opportunity to ensure these minutes reflected the true course of this transaction. Silence in this instance erodes Mr. Calcutt's credibility.

Next, I find the testimony from Board Members Byl and Swanson to be inherently believable, inasmuch as there was little or no evidence that suggested a motive to lie on their part, versus evidence in the record that Mr. Calcutt was repeatedly willing to testify in a way that deflected responsibility off of him and onto any subordinate he could point a finger at.

There was a lack of internal consistency, wholly attributable to Mr. Calcutt's testimony, where in one moment he acknowledges an active role as the Bank's principle negotiator with the Nielson family and in the next moment he has no role in responding to emails or reading Call Reports. Throughout the evidence-gathering part of this action, documentation and witness testimony other than that offered by Mr. Calcutt consistently showed that Mr. Calcutt and others under his supervision withheld this vital information from both the other members of the Board and the Bank's regulators. From the record as a whole, I found Mr. Calcutt's testimony on this point to be materially inconsistent and thus unreliable, where the same cannot be said of the testimony of Mr. Byl or Mr. Swanson.

Next, I found no evidence that recollections by either Mr. Byl or Mr. Swanson had been clouded by time – this may be due in part to the fact that both gave almost exactly the same sworn testimony in 2015, when events presumably were fairly fresh in their minds. In contrast, Mr. Calcutt testified he was not personally involved in writing up the Bedrock Loan application and cannot recall now why the application was funded before it was signed by the Bank's Board members. I found the recollection testimony of both Board members to be sufficiently clear and consistent that when they reported not being advised about the Nielson relationship and the Bedrock Loan, the testimony was credible and reliable.

Last, I found nothing remarkable in the demeanor of any of the witnesses in this enforcement action that would support or take away from reliance on their testimony. I did, however, find Mr. Calcutt evasive in response to some questions, notably regarding who would

be presenting information to members of the Board during Board meetings; and found the responses of Mr. Byl and Mr. Swanson relatively free of traits that would lead one to question how candidly and thoroughly the witness was answering while on the stand.

### 3. Findings of Fact Regarding Respondent's Failure to Inform the Board Prior to Disbursing the Bedrock Loan Funds:

Upon these factors, I find preponderant and persuasive evidence exists that establishes that Mr. Calcutt did not secure Board approval of the Bedrock loan until March 2010, and obtained that approval without disclosing to members of the Board the true nature of the Nielson Entities' relationship with the Bank. His testimony to the effect that made these disclosures is in my view entitled to no weight.

#### a. Failure to Fully Disclose the Sources of Funding for Bedrock Loan Service

Another concern addressed by Mr. Gomez during the 2011 examination was that the loan's published purpose was to supply Bedrock Holdings LLC with working capital – but the proceeds were distributed to multiple Nielson Entity loans to keep those loans current.[514] This use does not establish a source for repayment of the Bedrock Loan, adding to the risk of the loan.[515] As Ms. Gomez explained:

> Well, several of the entities, they were land loans. They weren't income-producing, [so] where is the cash flow going to come from? The cash flow will have to come from other Nielson Entities or the sale of land. And when you are lending in that type of situation and you are relying on other entities to repay a loan, you will - I'll go back to the lack of a global cash flow analysis: You don't know if any of those other entities can pay back and how, and you don't want to rely on the liquidation of collateral to sell your, to repay your loan. Now you're in a bad situation.[516]

Mr. Gomez explained that the loan documentation presented to the Bank's Board that supported the Bedrock Loan transaction identified new collateral taken in conjunction with the $760,000 loan.[517] The Commitment Review supporting the Bedrock Loan reflected two forms of collateral: a "Second [Real Estate Mortgage, or REM] on 121 acres located at 60 US-31 S, Traverse City MI" and a "First REM on a 1 acre lot on East Shore Road, Traverse City, MI, List Price $330M".[518] In Mr. Gomez's opinion, however, the Review relied upon an outdated collateral analysis, as the collateral's appraisal was over a year old.[519] Notwithstanding this, however, Mr. Gomez did not dispute that the LTV analysis the Bank presented to its examiners was not criticized in the 2010 ROE.[520]

Also of concern to the regulators, according to Mr. Gomez, was the fact that, from the outset and throughout the terms of the loans, the Bank did not secure personal guarantees in

---

[514] Tr. at 270 (Gomez).
[515] *Id.*
[516] *Id.* at 272 (Gomez).
[517] *Id.* at 311 (Gomez).
[518] *Id.* at 32-13 (Gomez); Joint Ex. 6 at 1.
[519] Tr. at 312 (Gomez).
[520] *Id.* at 312-13 (Gomez). See also testimony of Examiner Bird, to the effect that he could not tell, by looking at the Commitment Review, the extent of the role Ian Hollands, rather than Mr. Green, played in preparing the form. Tr. (2015) at 894 (Bird); EC Ex. (2015) 20 at 15-21.

conjunction with the multiple Nielson Entities loans.[521] He testified that this is of particular concern in loans secured by land that is intended to be developed but has not yet been developed.[522]

Mr. Calcutt testified that the Bank acquired no personal guarantees from the Nielson Entities because when "the relationship came to us from a prior bank, there were no guarantees at the time. So there was a history of no guarantees."[523] He denied that the lack of a personal guaranty would be seen as an exception to the Bank's loan policy at the time the Bedrock loan was issue.[524]

The Bank's loan policy does not, however, support Mr. Calcutt's testimony on this point, as it provides that loans lacking personal guarantees "are to be regarded as an exception to the institution's policy and must be treated accordingly as provided for under the loan approval authority section of this policy."[525] Mr. Calcutt's answer also directly contradicts the loan documentation – which expressly stated in the section headed "Exceptions to Normal Underwriting Guidelines" "No personal guarantees."[526] Elaborating on this answer, Mr. Calcutt testified that while not an exception, "it would have been unusual. It is not an exception in the sense that we did have other loans where there were no guarantees, but it was unusual, yes."[527] Accordingly, no weight is given to Mr. Calcutt's factual claim that loans lacking personal guarantees need not be regarded as exceptional at the Bank. His answer also calls into question whether Mr. Calcutt has been fully candid with this Tribunal.

Mr. Calcutt added that he did not believe guarantees would have improved the position of the Bank, although he offered no basis for this belief[528] – and from the record there is no apparent basis in fact, logic, or banking practice that gives credence to or support for this belief.[529] His testimony on this point materially calls into question whether Mr. Calcutt has the requisite skill and knowledge to provide regulated banking services in any environment protected under the FDI Act.

Mr. Gomez acknowledged that the Entity Loans had been in place for several years, and could not say whether Examiners had ever criticized the Bank for not securing guarantees for

---

[521] Tr. at 273-74 (Gomez).

[522] See also testimony of Examiner O'Neill regarding the collateral of the Nielson Entities, when asked "They were secured loans, were they not?" Mr. O'Neill responded "They were very under-secured loans" and that the debt "proved to be remarkably short in terms of collateral and multiple of millions of dollars in losses in shortfall of that collateral." Tr. (2015) at 619 (O'Neill). See also testimony of Mr. Calcutt upon examining Mark Smith's October 25, 2011 email to James Gomez and Lisa Thompson regarding 6/30/11 Safety and Soundness Exam Open Issues, where Mr. Calcutt observed that "there were concerns from legal counsel about how well secured we were on those Pillay funds." Tr. at 1418 (Calcutt); Resp. Ex. 174 at 3.

[523] Tr. at 1275 (Calcutt).

[524] Id. at 1375 (Calcutt).

[525] Tr. at 1375-76 (Calcutt); EC Ex. 86 at 5.

[526] Joint Ex. 6 at 1.

[527] Tr. at 1375 (Calcutt).

[528] Id. at 1275 (Calcutt).

[529] See also testimony of Mr. Jackson, that without personal guarantees, the Bank had no legal recourse against Keith Nielson, Cori Nielson, Melvin Nielson, or Dal Nielson. Tr. (2015) at 1666 (Jackson).

these loans.[530] He also could not say whether the individual stand-alone LLCs had indicated at the outset of their relationships with the Bank that they would not offer personal guarantees.[531]

What was clear, however, was that for these loans, until the land is sold, there would be no source of income. Requiring personal guarantees on this kind of loan, Mr. Gomez explained, prevents the borrowers from walking away from the loan without any obligation to repay the loan.[532] A personal guaranty, he stated, "makes [the borrower] have some skin in the game."[533]

Related to this concern is the premise, as stated by Mr. Gomez, that if one of the Nielson Entities were to come into a windfall, the Bank would nonetheless not be able to collect from such windfall to make payments to satisfy any of the other debts.[534] Further, by servicing the multiple loans with proceeds from the Bedrock Loan, the need arises to determine the financial condition of each of the multiple accounts *receiving* these loan proceeds. That need was not met here, as the Bank did not call for anyone from either Bedrock or the other Nielson Entities to obtain current collateral values of the Nielson Entities prior to the Bedrock Loan disbursements to these Entities.[535]

According to Mr. Gomez, there were two problems in this respect: first, when new loan money was disbursed to the multiple accounts, if over a certain amount, there would be a need to "get an appraisal or at least [an] updated evaluation" related to the property.[536] Second, adverse economic conditions in force at the relevant time led, according to Mr. Gomez, to "big decreases, changes in the value of real estate" requiring updated collateral values.[537]

The Bank's Director of Global Risk, Mark Smith, confirmed the negative impact on appraised values between 2008 and 2011. Mr. Smith identified instances where examiners cited the Bank for apparent appraisal violations – for outdated appraisals at the time the Nielson Loans were renewed.[538] For example, one loan, benefitting AuSable LLC, had been renewed on December 22, 2010 but AuSable's most recent appraisal was in October 2007.[539] According to Mr. Smith, Examiners at this time required appraisals to be within one year of when the loan was renewed.[540]

Mr. Smith explained that in the process of the Bank's attempts to settle with the Nielson Entities, disputes between the Examiners and the Bank's officers arose regarding the FAS 114 analysis – i.e., the analysis required under Financial Accounting Standard (FAS) 114, that applies generally accepted accounting principles (GAAP) when calculating the Bank's reportable allowance for loan and lease losses (ALLL).[541] He identified a spreadsheet that reflected the FAS 114 analysis he received from the Bank's Examiners, showing the Examiners' analysis of the ALLL losses attributable to the Nielson Entities that would be

---

[530] Tr. at 290-91 (Gomez).
[531] *Id.* at 291-92 (Gomez).
[532] *Id.* at 273 (Gomez).
[533] *Id.*
[534] *Id.* at 273-74 (Gomez).
[535] EC Ex. 48 at 40.
[536] Tr. at 274 (Gomez).
[537] *Id.*
[538] *Id.* at 422 (Smith).
[539] *Id.*, citing EC Ex. 54 at 11-12.
[540] Tr. at 422 (Smith).
[541] *Id.* at 419 (Smith).

realized under terms of a proposed settlement that the Bank had presented to the Nielsons, versus the estimated losses that the Bank itself had calculated.[542] He explained, however, that the Bank's estimated losses were based on "the most current appraisals that we had at the time," adding that, "[i]n general terms, a lot of [the Bank's appraisals] were outdated."[543]

That the appraisals were outdated is sufficiently established by the record. Mr. Smith identified, without contradiction, the Examiners' list of loans that had been renewed in December 2010 using appraisals of the Entities' assets dating back to 2001 through early 2008,[544] under conditions where the Examiners called for appraisals that were no older than one year prior to the loan renewal.[545] The Bedrock Loan, for example, was renewed on December 22, 2010 based on appraisals from November 2007 and October 2008.[546] Examiners further noted that there had been no appraisal at all for one of the Bedrock properties (the one-acre lot identified as collateral for the loan).[547]

The resulting dispute between the Examiners' analysis and the analysis advanced by the Bank reflected the Examiners' determination that the losses related to the Nielson Entities amounted to $7.3 million, whereas the Bank contended the ALLL would be only $3.8 million – a difference of $3.5 million.[548] The stale appraisals were of concern, according to Mr. Smith, because at the time, "real estate values were declining, so data appraisals would have made the real estate values higher than they should have been; and when we ultimately obtained current appraisals, I believe in early 2012, the values had decreased quite a bit from these 2007 and 2008 appraisals."[549] Mr. Calcutt, however, considered the $3.5 million difference "absolutely unwarranted."[550]

Mr. Gomez testified that Examiners expected the Bank to take appropriate measures to assess the level of risk associated with the Nielson Entities loan portfolio: the Bank needed to secure and should have secured from the borrowers financial statements for the companies, as well as updated collateral analyses.[551]

This perspective did not vary when Mr. Gomez was presented with the proposition, on cross examination, that $760,000 was roughly one-tenth of one percent of the Bank's overall loan portfolio at that time.[552] Mr. Gomez expressed the concern that the proceeds of the Bedrock Loan "were used to impact 47 percent of capital of the Bank,"[553] referring to the total Nielson Entities Loan portfolio that benefitted from the Bedrock Loan. Even if $760,000 was

---

[542] Tr. at 417 (Smith); EC Ex. 75.
[543] Tr. at 418 (Smith).
[544] *Id.* at 421-22(Smith); EC Ex. 54 at 11-12.
[545] Tr. at 422 (Smith).
[546] *Id.*; EC Ex. 54 at 11.
[547] Tr. at 422 (Smith); EC Ex. 54 at 11.
[548] Tr. at 421 (Smith); EC Ex. 54 at 14. See also testimony from Examiner O'Neill regarding the Bank's "global settlement offer with the Nielsons" that ultimately fell through. Tr. (2015) at 743 (O'Neill); Resp. Ex. (2015) 159.
[549] Tr. at 423 (Smith).
[550] *Id.* at 1337 (Calcutt).
[551] *Id.* at 278 (Gomez).
[552] *Id.* at 310 (Gomez).
[553] *Id.*

Page 72 of 145

modest in relation to the Bank's overall loan portfolio, when the Bedrock Loan "impacts so many others," he could not view the loan "all by itself."[554]

Mr. Gomez testified that this was particularly true given that by September 2009 the borrowers (through both Ms. Berden and Cori Nielson) had expressed their intention *not* to pay back the amounts due on their loans.[555] At the very minimum, Mr. Gomez opined, once the borrowers made that position known in September 2009, the portfolio of loans needed, at a minimum, to be graded as substandard, and the Bank needed to be prepared to take back the collateral associated with the various Nielson Entities, do an assessment of that collateral, and then write off any shortfall.[556]

Mr. Gomez agreed that when dealing with a difficult or declining real estate market, or a recession, banks can give concessions, but only upon the borrower demonstrating both the "ability and willingness" to pay.[557] Preponderant evidence in the record establishes that by September 2009, Mr. Calcutt was on notice that the Nielson Entities' ability and willingness to pay had been called into question in a manner that was material to Mr. Calcutt's fiduciary obligations to the Bank.

### b. Material Misrepresentations in Respondent's Responses to Questions Presented to the Bank's Officers in September 2011

As noted above, discussions between Examiners and Mr. Calcutt and other Bank officers and employees led to Examiner determinations that Mr. Calcutt had not been fully candid during a meeting held on September 14, 2011. That meeting followed a meeting Lisa Thompson, Michigan's lead examiner, had with Mr. Calcutt on September 7, 2011 (which is memorialized in an email Ms. Thompson sent to Gary Thielsen later that day).[558]

During the September 7, 2011 meeting, Ms. Thompson discussed directly with Mr. Calcutt her concerns about the Nielson loans – noting that the Bank had not yet put those loans on a non-accrual basis based on "a judgment call" by the Bank's management that the Nielsons have had a "20-year relationship" with the Bank, that the Nielson family has "substantial resources," and that – according to Scrub Calcutt – "we would get paid and on we would go."[559] There is in the record substantial reliable evidence that through Ms. Thompson, Mr. Calcutt knew by not later than September 7, 2011, that the Bank's examiners were looking for information about how the Bank was managing the Nielson Entity Loans.

Leading up to the September 14, 2011 meeting, FDIC Case Manager Anne Miessner[560] asked EIC Gomez to seek additional information from the Bank regarding the use of the funds

---

[554] *Id.* at 310-11 (Gomez). See also EC Ex. 79 (Call Report Restatements Proposed by the Bank through December 31, 2011); and testimony of Ms. Miessner: "The Nielson credits represented approximately 50 percent of the Bank's capital. And so 50 percent of the Bank's capital in loans would indicate a significantly higher risk profile."

[555] Tr. at 277 (Gomez).

[556] *Id.*

[557] *Id.* at 278 (Gomez).

[558] Resp. Ex. 100.1. See also testimony of Examiner O'Neill regarding the process the examiners followed when reducing their hand-written notes about the September 14, 2011 meeting. Tr. (2015) at 718-22 (O'Neill); Resp. Ex. 105

[559] Tr. (2015) at 722-24 (O'Neill); Resp. Ex. (2015) 100.1.

[560] Ms. Miessner was commissioned as an Examiner in 2007, has extensive training regarding regulatory guidance and rules, and policy statements. Her formal post-graduate education includes attendance at courses on financial analysis, call reports, asset liability management, loan analysis, examination management, bank risk identification,

of the December 2009 Bedrock Loan.[561] Specifically, Ms. Miessner asked whether Mr. Calcutt had gone on record with the Examiners affirmatively stating that there was no more correspondence relating to the Nielson Entities loans – asking this after Mr. Gomez advised her that earlier that day (September 7, 2011), Mr. Gomez had explained to Mr. Calcutt and others at the Bank why the Examiners needed all of the Bedrock Holding Company's materials.[562]

Among the defensive claims is one that depends on Mr. Calcutt being surprised about the scope of what was discussed during the September 14, 2011 meeting. During the hearing, responding on cross-examination to the question "[P]rior to the meeting of September 14th, you were very careful not to alert Mr. Calcutt about your interest in the Bedrock Loan, were you not?", Mr. Gomez responded "I guess asking for transaction information regarding specifically the Bedrock Loan, I don't know how that's very hidden; and we were asking for documents regarding the Bedrock Loan, I'm not sure how that's hidden, either."[563]

Mr. Calcutt testified during the second hearing that the first notice that he received that there was going to be a discussion about the Bedrock Loan at the September 14, 2011 meeting was through Mr. Smith's email, sent at 10:58 a.m., relating to the meeting that was set to begin at 3 p.m.[564] The record, however, does not support this statement, which I find to be false, although not on a point material to this enforcement action. Even if it were true, however, by Mr. Calcutt's own testimony had the email been his first notice that the Bedrock Loan was going to be discussed, he would have deflected the message. When asked what occurred during the four hours between the time he got the message and the start of the meeting, Mr. Calcutt testified that "I don't know what occurred."[565]

Elaborating on his lack of involvement, Mr. Calcutt testified:

> Again, as I said, I would have turned this e-mail over to Bill Green and others saying this loan's in foreclosure. I mean we're beyond this. It's a loan that represents one-tenth of one percent of our loan portfolio; he'll have to answer these questions. I don't know the answers to these questions. I don't have access to loan files.[566]

---

and all coursework required to sit for the examination required of all commissioned examiners. She also has experience as an FDIC instructor in the Examination Management School where she helped design and teach Case Manager training, and helped updated the Applications portion of the FDIC Case Manager's Procedures Manual. She served as a Commissioned Examiner in between 100 and 150 bank examinations, and was Examiner in Charge in fourteen examinations. Although Respondent objected to Ms. Miessner's testimony for reasons stated in his Motion in Limine (having to do with claims of bias on Ms. Miessner's part), Respondent did not object to finding her qualified as a banking examination regulation and supervision expert witness on the subjects  of FDIC bank supervision, regulatory requirements and guidance, prudent banking practices, standards of care and duties of directors to FDIC-insured financial institutions, FDIC supervisory and enforcement matters and actions, violations of banking laws and regulations, and the imposition of civil money penalties. Tr. at 684-724 (Miessner).

[561] Resp. Ex. 98.1.

[562] *Id.*

[563] Tr. at 326 (Gomez). See also testimony of FDIC Examiner O'Neill, referring to EC Ex. (2015) 110 (9/14/11 email from Mark Smith to Mr. Calcutt and others, identifying topics that would be discussed during the upcoming meeting), Tr. (2015) at 194.

[564] Tr. at 1335 (Calcutt); EC Ex. 110.

[565] Tr. at 1335 (Calcutt).

[566] *Id.*

From the record, notably from the contents of the September 14, 2011 email from Mark Smith, then the Bank's Director of Global Risk,[567] it appears that going into the meeting, *all* the participants in the September 14, 2011 meeting understood that the Examiners wanted to discuss directly with Mr. Calcutt details concerning the Bedrock Loan, including Mr. Calcutt's understanding as to how the $760,000 loan was used, how complete the Bank's documentation is with respect to correspondence between the Bank and the Nielsons, how the Pillay funds were used (and Mr. Calcutt's knowledge regarding the Bank's release of those funds as loan collateral), and Mr. Calcutt's understanding of what the source of funds was that brought the Nielson Entities' loans current in December 2010.[568] Mr. Smith added that he told FDIC Examiner O'Neill that "we would like to further discuss our position on the restoration of the Nielson loans to accrual status back in December 2010."[569]

Mr. Calcutt's advance knowledge of the topics to be discussed during the September 14, 2011 meeting also is evidenced by an email message dated September 13, 2011, from Mr. Green to Mr. Calcutt and others.[570] In this message, Mr. Green copied Mr. Smith's September 13, 2011 email to Mr. Green and others – describing in significant detail the Bank's management of the Nielson-related entities, specifically with respect to the loans' being placed into non-accrual status during October 2010.[571]

Through this memo, Mr. Smith raised with Mr. Calcutt the *same* points that were to be raised by the Examiners during the September 14, 2011 meeting, regarding the possibility that the Bank falsified the December 31, 2010 and March 31, 2011 Call Reports "by not classifying these loans as nonaccrual and by recording interest income related to these loans on those reports."[572] While Mr. Calcutt may have been unaware of the agenda for the September 14, 2011 meeting, he clearly had been fully briefed the day before, on the subjects that were raised during that meeting.[573]

Indeed, Mr. Calcutt appeared to be well up to the task, during the September 14, 2011 meeting.[574] Consistent with what the participants understood would be the case, the September 14, 2011 meeting gave Mr. Calcutt the opportunity to describe his understanding of how the $760,000 Bedrock Loan proceeds were to be used. According to Mr. O'Neill, at no time did

---

[567] *Id.* at 385 (Smith).

[568] ED Ex. 110 (email sent at 10:58 a.m. on 9/14/11 from Mark Smith to Mr. Calcutt, Mike Doherty, Tom Levi, Bill Green and Dick Jackson, recounting Mr. Smith's conversation with the FDIC's Dennis O'Neill, in anticipation of the meeting set for 3 p.m. later that day). See also testimony of Examiner O'Neill regarding the time of the meeting and the advance time – roughly between 11 a.m. and 3 p.m. Tr. (2015) at 712-15 (O'Neill); and Mr. Jackson, who testified that he did not recall there being any conversation in which he participated after the receipt of the email. Tr. (2015) at 1642 (Jackson).

[569] ED Ex. 110.

[570] Resp. Ex. 60.

[571] Tr. at 429 (Smith); Resp. Ex. 60.2.

[572] Tr. at 429-30 (Smith); Resp. Ex. 60.

[573] Testifying to the same effect, Mr. Jackson likewise stated that at the time of the September 14, 2011 meeting, he did not know, nor did other members of senior management know, that they were being investigated by the FDIC for possible removal violation actions. Tr. (2015) at 1649 (Jackson).

[574] See testimony of Mr. Jackson, where he recalled what Mr. Calcutt's response was at the meeting on September 14, 2011, when asked what the proceeds of the Bedrock Loan were used for, he responded "I believe he stated it was working capital." Tr. (2015) at 1645 (Jackson).

anyone from the Bank say that the proceeds were used to bring other loans current.[575] Instead, Mr. Calcutt told Mr. O'Neill that Bedrock had purchased Team Services, which had been a Bedrock customer; and that "Bedrock then needed working capital, which was what the loan was for."[576] According to Mr. O'Neill, it was only by securing imaged copies of the disbursement checks to see where the proceeds went to that Mr. O'Neill could ascertain how the funds actually were disbursed.[577]

The record establishes without doubt that the only thing Mr. Calcutt was unaware of prior to that meeting was the fact that Ms. Nielson had provided to the Bank's examiners her copies of correspondence between herself and Mr. Calcutt directly discussing the Bedrock Loan proposal.[578] From the record now before me, I find the answers Mr. Calcutt gave to examiners during the September 14, 2011 meeting were material, knowing, and willful misrepresentations by Mr. Calcutt regarding his knowledge of the purpose for the Bedrock Loan proceeds.[579] For the foregoing reasons, notwithstanding Mr. Calcutt's testimony that his answers were not intended to conceal the details of a Bedrock Loan that he remembered full well, I reject as false Mr. Calcutt's testimony that at the time he received Mr. Smith's September 14, 2011 email (FDIC Ex. 110) he had no independent recollection of the Bedrock Loan transaction.[580]

Similarly, in response to Mr. O'Neill's question whether Mr. Calcutt had any correspondence either to or from the Nielsons regarding their proposed use of the $760,000 loan proceeds that were disbursed in December 2009, Mr. Calcutt stated he did not recall any

---

[575] Tr. (2015) at 49 (O'Neill). See also testimony by Mr. O'Neill regarding information gathered from correspondence provided by Ms. Nielson: "The correspondence which we received directly from the Borrower and between the Borrower and bank officials demonstrated that Mr. Calcutt knew that the proceeds in the loan were to keep existing loans current." Tr. (2015) at 589 (O'Neill).

[576] Joint Ex. 11 at 3. Note that through testimony, Examiner O'Neill clarified that at page 4 of Joint Ex. (2015) 11, at subparagraph (f), that although "the focus of much of what was my work in December of 2009 and the new funds were disbursed. There is a separate question that was asked to be part of this series of questions," and those questions related to 2010, as stated. Tr. (2015) at 729 (O'Neill). See also Tr. (2015) at 46 (O'Neill): in the first week or two of August 2011, "I observed a meeting in which Bob Bush posed the question to Bank management and received a response that it was working capital. I was also asking the question myself in a subsequent meeting in September, I believe it was September 14, [2011] in which it was provided in writing as to what the purpose was."

[577] Tr. (2015) at 50 (O'Neill) "Not all recipients were Bank customers: There were entities that were not borrowing at all at the Bank. Alaska Perpetual Trust entities, entities that we would otherwise have no knowledge about that had been created, checking accounts created to hold these funds to pass through, so it became something of a visual spider web where I would not know to go to the next step until I had actually gotten to that statement." Tr. (2015) at 51, 53 (O'Neill); Joint Ex. 13 (2015) (flowchart of Bedrock Loan proceeds from initial disbursement to ultimate use concluding "Of the $760,000 in loan proceeds, $541,661 was promptly transferred to other Nielson Entities."). See also testimony by Mr. O'Neill that prior to the September 14, 2011 meeting, examiners had "already established through the actual tracing of bank records that the proceeds were used primarily to bring existing loans current and not in any fashion for working capital for Team Services or Bedrock." Tr. (2015) at 587 (O'Neill).

[578] See Tr. at 1341 (Calcutt).

[579] The parties have stipulated, subject to certain reserved rights, to the use of the following testimony in the transcript from the hearing held in September 2015 of FDIC Examiners: a) Dennis P. O'Neill, as set forth in Volume I, pages 10 -209; Volume III, pages 584 – 692; and Volume IV, pages 702 – 757; and b) Charles H. Bird, Volume IV, pages 758 - 916, including all admitted exhibits. See Joint Ex. 17 (Joint Stipulation Regarding Testimony of FDIC Examiners O'Neill and Bird), dated July 29, 2019; and Joint Ex. 18 (Joint Stipulation Regarding Testimony of Richard Jackson), September 30, 2019.

[580] Tr. at 1336, 1339 (Calcutt). See also EC Ex. 67, Mr. Calcutt's memo to the file recalling the Nielson Loans "were discussed in many Board meetings going back years. (See 2009 loan concentration reports handed out at Board meetings.)"

such correspondence, and that if there had been such correspondence "[i]t would be in the credit files if any, because all the other officers here are copied on whatever I would have."[581] From the record now before me, I find this to have been a material, knowing, and willful misrepresentation by Mr. Calcutt regarding his knowledge of relevant correspondence between the Nielsons (and Ms. Berden acting on behalf of the Nielson Entities) related to the proposed use of the $760,000 Bedrock Loan proceeds.

Similarly, in response to Mr. O'Neill's question about Mr. Calcutt's understanding of when the Pillay funds were released as Bank collateral and the purposes those funds were put to, Mr. Calcutt stated "I thought we still had them."[582] When Mr. O'Neill noted that the Bank Board's approval of the 2009 Bedrock Loan referred to a $600,000 release of Pillay Funds, and asked about the December 2010 release of $687,000 in Pillay collateral, Mr. Calcutt responded only "The numbers are so close maybe we are talking about the same thing."[583] The record reflects that the Bank under Mr. Calcutt's express direction released $600,000 in Pillay collateral in December 2009 and $689,000 in December 2010.[584] Again, from the record now before me, I find Mr. Calcutt's statements were material, knowing, and willful misrepresentations regarding his knowledge of the two stages of release of the Pillay Funds collateral.

Similarly, in response to Mr. O'Neill's question "Where does the CEO state that the funds came from to bring all the Nielson loans current in December 2010," Mr. Calcutt responded "Their vast resources between oil, gas, and rentals."[585] From the record before me, I find this statement to be a willful, knowing, and material misrepresentation by Mr. Calcutt regarding his knowledge of the source of funds used to bring the Nielson loans current in December 2010.

### c. Missing Loan Documentation

The 2011 ROE identified significant documentation lapses relating to the Nielson Entities loan portfolio.[586] The record reflects that the loan files for the Nielson Entity loans "did not contain any evidence of, or reference to, the release of" Pillay Trading LLC units that had been serving as collateral for three of the Entity loans.[587] Further, the record reflects the release of these funds was not approved by the Bank's Board of Directors before its release – indeed,

---

[581] Joint Ex. 11 at 3; Tr. (2015) at 195 (O'Neill); Joint Ex. (2015) 11 at 3. See also testimony from Mr. O'Neill regarding Respondent's answer to the question "Does the CEO have correspondence to or from the Nielsons regarding their proposed use of the $760,000 in loan proceeds disbursed in December 2009?" where Mr. O'Neill determined Mr. Calcutt knowingly and falsely responded "No, I don't recall any." Tr. (2015) at 590 (O'Neill), basing that determination on correspondence between Mr. Calcutt and Ms. Nielson found in EC Ex. (2015) 3 at the pages noted above, demonstrating that he had such knowledge. Tr. (2015) at 590 (O'Neill).

[582] Joint Ex. 11 at 4; Tr. (2015) at 591-92 (O'Neill) "By the time this meeting had been held and his response was recorded, the Pillay funds had already been released. In fact, that was one of the conditions for granting the new loan to Bedrock, long, long before this." Tr. (2015) at 592 (O'Neill).

[583] Joint Ex. 11 at 4.

[584] Tr. at 623-24 (Smith); EC Ex. 67.

[585] Tr. (2015) at 205 (O'Neill); Joint Ex. 11 at 4. See also testimony of Mr. O'Neill, opining that Mr. Calcutt's answer was false because the examiners already had "examined and have copies of bank documents indicating it was new bank funds being advanced to the Borrower which brought the loans current. And this is December 2010. Again, December of 2009 was when the new Bedrock loans were done." Tr. (2015) at 593 (O'Neill).

[586] EC Ex. 48 at 41-42 (ROE p. 38-39).

[587] *Id.* at 41.

substantial evidence establishes the Board was not even made aware of the release prior to or at the time of the release.[588]

According to 2011 by EIC Mr. Gomez, because of this flat organizational structure, and because Mr. Calcutt would in this structure serve as the Bank's senior lender, Mr. Calcutt would have the overall responsibility for credit administration.[589] Not included in the senior lender duties, according to Mr. Gomez, would be actually putting documents into loan files – those duties would fall to Mr. Green, as the lending officer for the Nielson Entities, and Mike Doherty, as the Credit Administrator.[590] Echoing the perspective given by Ms. Miessner regarding Mr. Calcutt's obligations regarding placing emails he sent and received into the proper Bank folders, Mr. Gomez testified that with respect to the emails found in the Nielson folio (identified as FDIC Exhibit 3 – *i.e.*, the folio of email records retained by Cori Nielson and sent by her to the FDIC) – it would have been Mr. Calcutt's *direct* responsibility to ensure those exchanges were found in the appropriate Bank files.[591]

It should be noted that for reasons that appear to be directly related to the withholding of material information from the Bank's Examiners on this point, draft Examiner findings from the August 1, 2011 examination included a statement concerning the Board's presumptive understanding and knowledge of the disbursement of the 2009 Bedrock Loan several months before the Loan was actually presented for Board approval.[592]

In the draft Report, the Examiners state the premise, regarding a line item in the report pertaining to a "Lending Limit Violation," that a two-thirds approval of the Bank's Board would be required on any loan "exceeding 15% capital and surplus."[593] The draft Report stated that the line item "is in reference to the Bedrock Holdings loan, dispersed [*sic*] December 2009 and Board approved March 2010."[594]

The Report responded to this line item with the following explanation:

> This was a documentation oversight by management. A memo from loan officer Green was provided to the examination teams while on-site

---

[588] *Id.*

[589] Tr. at 297 (Gomez). See also Examiner O'Neill's testimony that under this organizational structure, he would expect Mr. Calcutt would have his attention pulled in many directions, and would expect Mr. Calcutt to give that attention "towards those of the highest risk." Tr. (2015) at 622 (O'Neill).

[590] Tr. at 297-98(Gomez).

[591] *Id.* at 298 (Gomez).

[592] See testimony of Examiner O'Neill upon review of Resp. Exs. (2015) 22 and 23, agreeing with the premise that board members or examiners could be expected to ask "why have our delinquencies jumped from $17 million to $57 million" based on the contents of the Board packages for November 24, 2009 and December 17, 2009. Tr. (2015) at 627-28 (O'Neill). When asked about the premise that this documentation shows there was no concealment regarding delinquencies in these reporting periods, Mr. O'Neill disagreed, testifying that in order to understand the data, the reader would need to know more about the relationship of the borrowers to the Bank. Examiners or board members presented with this information – upon learning that the data concerned Nielson-related debt, would be expected to ask about the change, but only "if they knew it was Nielson debt" and not just " a block of home loans that had gone 31 days that month. You're building a presumption in there that they asked and found out it was the Nielsons. I don't see a detail delinquency report that lists the Nielsons' loans individually." Tr. (2015) at 633-34 (O'Neill).

[593] EC Ex. 52 at 1. See also Tr. (2015), testimony by Examiner O'Neill at 40 " When a loan reaches over fifteen percent of the common stock and surplus of the capital of the Bank, under state law here in Michigan, that loan has to go to the Board of Directors, for at least two-thirds of the Board has to vote approval of it."

[594] EC Ex. 52 at 1.

regarding the circumstances surrounding this oversight. The Board was fully aware of this loan prior to the disbursement of the loan, but documentation was lacking supporting the Board's approval in 2009. It has always been Bank policy that all loans which require board approval are indeed approved by the Board prior to the loan being disbursed.[595]

### d. Findings of Fact Regarding Missing Loan Documentation

Preponderant evidence in the record, including Board member testimony and the absence of any reference to this matter in the Board's meeting minutes for the months between September 2009 and March 2010,[596] establishes that the explanation supplied to the Examiners by Mr. Green that led the Examiners to reach this conclusion failed to fully disclose the material circumstances that are documented herein, relating to actions taken by Mr. Calcutt and others, that withheld from the Bank's Board of Directors salient and material information regarding the Bedrock loan and the 2009 disbursement of the loan proceeds. For these reasons, I find unsupported by preponderant evidence Respondent's factual claim that the Board ""verbally approved the [Bedrock Loan] Transaction in late 2009."[597]

This finding is not contradicted by Mr. Calcutt's testimony regarding disclosures made to members of the Bank's Board through the November 24, 2009 Board Report.[598] Included in that Report is a "scorecard" which, according to Mr. Calcutt, would reveal trends and "key numbers" for the Board's consideration.[599] Asked who would present this score card during Board meetings, Mr. Calcutt avoided answering the question, responding instead that the accounting department would prepare the scorecard, and "our comptroller, our CFO [and] our Classified Assets Committee would be aware" of it, and "other people in the Bank . . . would be aware of these numbers also," but did not identify anyone who would discuss this scorecard with members of the Board during a Board meeting.[600] Pressed on the point, when asked again "did someone in particular present the scorecard at the Board meetings?" Mr. Calcutt responded

---

[595] Id. at 2. See also testimony by Board Member Bruce Byl establishing that the Bank's Commercial Loan Policy, as it existed in October 2009, required (under Michigan Section 487.3432, State Bank Act of 1996, that "any loans where the total aggregate exposure is between 15 and 25 percent of the Bank's Regulator Capital, require a 2/3rd majority approval from the Board. The total aggregate exposure is not to exceed 25% of the Bank's Regulatory Capital." Tr. at 1043 (Byl); EC Ex. 86 at 2.

[596] Including Resp. Ex. 22 (Scorecard, included in Board Report, November 24, 2009); Resp. Ex. 23 (Scorecard, included in Board Report, December 17, 2009); and Resp. Ex. 24 (12/3/09 email from Bill Green to Ian Hollands, stating that the "Nielson loans we need to get approved"). As Mr. Gomez testified, Scorecard entries, presented in this context, identified the percentages of delinquent loans and non-performing assets, but the Board meeting minutes reflect no discussion of the delinquent loan percentages for November or December. In this way, Mr. Gomez opined, the reporters are "minimizing the need or the desire to actually look at the reports. If they are providing a summary of a big spreadsheet and by reading this short narrative, the belief is there's nothing in the spreadsheet to read, that would cause a concern." Tr. at 352 (Gomez). Also in the record is Mr. Green's account, presented in September 2011 to Mr. Smith stating: "The new loan of $760,000 was extended in 12/09. It had been agreed to following several meetings between the bank and borrower. It was verbally approved at those meetings (after discussions at the bank with approving group). I had been tied up with several other loan requests at year end so the approval followed the verbal ok. The actual approval was probably completed in 3/ 10." EC Ex. 55; Tr. at 446 (Smith).

[597] Respondent's Post-Hearing Brief at 7.

[598] Resp. Ex. 22.

[599] Tr. at 1290 (Calcutt).

[600] Id. at 1291 (Calcutt).

"We would just, we would look for trends in and pick up numbers, and our CFO would certainly make that clear on any significant changes he might point that out. Or if he didn't I would."[601] There is, however, no evidence that this was done with respect to the November 24, 2009 Board Report.

According to Mr. Calcutt, the November 24, 2009 Board Report and Reports from December 17, 2009 included data that revealed "what was transpiring with the Nielsons" and disclosed the delinquent portfolio loans and non-performing assets month by month".[602] According to Mr. Calcutt, data included in these Reports reflected that by December 2009, delinquencies "went down from the $59 million in the previous month and the $17 million the month before" to roughly $20 million.[603] This showed, according to Mr. Calcutt, "a big change in the delinquencies."[604] There was, however, nothing in the two reports that describe the steps Mr. Calcutt had taken to precipitate this big change.

Although the Reports and Board Minutes for October through December 2009 were silent regarding the release of the Pillay collateral and the $760,000 Bedrock Loan, Mr. Calcutt testified that he recalled discussing with the Board in December 2009 what led to the delinquencies being resolved:

> Q. Do you recall discussing with the Board what it was that had occurred that resulted in these delinquencies being resolved?
>
> A. Well, the Bedrock Loan had been closed. And that would have been discussed. If that's what your question is, the Bedrock Loan would have been discussed at the Board and received approval.
>
> Q. Okay. I want to ask you, is this the first occasion that, here in the period of November, December 2009 that any board member would have learned about the nature of the Nielson relationship and the size of that relationship?
>
> A. No, absolutely, because each, all the board members approved of the Nielson Loans. Each was individually underwritten and each board member would have approved those loans.[605]

Given the substantial evidence establishing that the Board members were not told about the Nielson Entities loan relationship and did not approve the Bedrock Loan until March 2010, I reject as false Mr. Calcutt's claim that the Bedrock Loan had been discussed and approved at any meeting in 2009. To the contrary, preponderant evidence establishes that Respondent and other senior Bank managers violated Bank policy by disbursing Bedrock Loan proceeds before

---

[601] Id.; Resp. Ex. 22 at 2-4. Mr. Jackson testified that "The scorecard was really kind of a high-level overview of the Bank's performance. It touched on a number of different items that we felt to be of importance to Board members. It's talking about net revenues, financial performance. Talking about loan portfolio sizes, delinquencies, non-performing assets. Growth levels and other key ratios." Tr. (2015) at 1609 (Jackson).

[602] Tr. at 1292-93 (Calcutt); Resp. Exs. 22 and 23.

[603] Tr. at 1292-93 (Calcutt).

[604] Id. at 1293 (Calcutt).

[605] Id. at 1294 (Calcutt); see also EC Ex. 101 (Board Minutes for August 20, 2009, September 22, 2009, October 22, 2009, November 24, 2009, and December 17, 2009); Tr. (2015) 1611 (Jackson).

seeking or securing approval of the Bank's Board of Directors, and thereafter misled the Bank's Examiners in this regard.[606]

Mr. Calcutt's argument – that each Board member had "a duty or an oath" to review the Reports of Examinations going back to 2006 or 2007, and would thereby know of the true nature of the Nielson Entities loan portfolio – is unavailing here.[607] Preponderant evidence, including the above-referenced testimony of Board members Byl and Swanson, establishes that Board members had not been advised of the true nature of the Nielson loan portfolio – by Mr. Calcutt, by Examiners, or by any Bank employee – until after 2009. Also unavailing is Mr. Calcutt's claim that it was "impossible" that Board members in 2009 lacked full knowledge of the Nielson relationship because, according to Mr. Calcutt, "The CFO is there. I am there. This all would have been explained and there would have been an approval process undertaken."[608] Preponderant evidence establishes no Board approval was sought or given until March 2010.

### e. Failure to Fully Disclose the Effect of the Release of Pillay Trading Collateral

Another significant feature of the disclosures made in the Bedrock Loan Commitment Review concerned the effect the transaction would have on collateral securing the Loan. After the release of the $600,000 Pillay Trading LLC proceeds, there would be approximately $400,000 remaining from Pillay to serve as collateral.[609]

### f. Failure to Timely Obtain Financial Statements from the Recipients of Pillay Disbursements and Bedrock Loan Proceeds

Another significant feature of the Bedrock Loan transaction concerns the state of the Bank's information regarding the recipients of the loan proceeds: According to Ms. Berden, when the $600,000 in Pillay funds was released and used to make current the Nielson Entity Loans, it was Ms. Berden's understanding that the Bank lacked current financial statements for fifteen Nielson Entities identified in the email Mr. Green sent to her on January 13, 2010.[610]

An example of this was shown in the North Park LLC account. According to Ms. Berden, the Bank did not typically require financial information when gathering loan documents, but instead Mr. Green would contact Ms. Berden saying "that they are getting ready

---

[606] See also testimony of Mr. Jackson, confirming that Bank policy required the Bank's Board of Directors to approve the Bedrock Loan renewal transaction. Tr. (2015) at 1669 (Jackson).

[607] See Tr. at 1294 (Calcutt): "Secondly, these loans were in every Report of Examination, as I said, going back to, I can't recall exactly, 2006 or '07; and each director reviewed the Exam Reports, was required to; they had a duty to or an oath that they signed that they reviewed the Report of Examination. So not only would they approve each of the loans, they would have seen these loans every year, not to mention just discussions in general about the Nielsons that would have been at the Board level or any discussions they may have had with individuals in the Bank." Tr. at 1294 (Calcutt).

[608] Tr. at 1295 (Calcutt).

[609] Id. at 106 (Berden); Joint Ex. 6 at 1.

[610] Tr. at 106-07 (Berden); Resp. Ex. 29.1-2. See also testimony of Mr. Jackson to the effect that Mr. Green's January 13, 2010 email to Ms. Berden seeking financial statements from fifteen Nielson Entities suggested that at that time Mr. Green did not have these statements. Tr. (2015) at 1622 (Jackson). He testified that "we wanted to get these [Nielson Entities Loans] renewed by the end of the year," although prudent bankers "generally" would want to have financial statements, global cash flow analyses, and current appraisals before approving these loans. Tr. (2015) at 1622-23 (Jackson).

for Examiners to come again and he's going to be needing some financial statements" from her.[611]

One such request came in the form of an email from Mr. Green to Ms. Berden dated June 2, 2010, in which Mr. Green requests "the 12/31/09 financials and the most recent interim financial on North Park."[612] Ms. Berden explained North Park was one of the Entities that had insufficient cash flow, and that the Nielson Entities had been trying to sell North Park, but that the "real estate market there was still pretty rough".[613] Notwithstanding these negative attributes, when North Park received the partial proceeds from the Bedrock Loan, there were, according to Ms. Berden, no limitations on how North Park used the proceeds of the loan.[614]

### g. Transfer of Loans to Affiliate Banks in May 2010

Noting that Examiners were due to arrive at the Bank in 30 days, Mr. Green advised Ms. Berden in a May 10, 2010 email message that the Bank intended to sell some of the Nielson Entity loans to affiliate banks – State Savings Bank of Frankfort was to buy two loans, and Central State Bank was to buy four loans.[615] (Mr. Calcutt was the Chairman of the Board for both Central State and State Savings and for both banks' holding companies, and was the principal shareholder of the parent company of those banks.[616])

Ms. Berden testified that this news was of concern to her, because "we didn't know who [State Savings Bank of Frankfort] was or who our contacts would be or what would happen when the loans matured [on] September 1st of 2010."[617] Responding to these concerns, Ms. Berden said Mr. Green assured her that he and Mr. Calcutt would continue to be "our points of contact and that we would work directly with them when it came time for renewals in September."[618] She said the same was true regarding the loans being sold to Central State Bank.[619]

Ms. Berden testified that when the Bank sold these loans, it did so at a value discount – which struck her as odd.[620] In response to questions by Ms. Berden about who owned State Savings and Central State Bank, Mr. Green wrote that while he knew the affiliate banks have "some common ownership" with Northwestern, they were privately held and as such he had "no idea what the exact ownership is".[621] Contradicting Ms. Berden's testimony, he wrote that the Bank did not sell the loans at a discount, but that the purchasing banks "may have the right to ask us to buy them back."[622]

Mr. Jackson testified that "[w]e sold loans or participations to the affiliates quite often and, in turn, we would purchase participations or loans from the affiliates, so it was a common

---

[611] Tr. at 107-08 (Berden).
[612] Tr. at 108 (Berden); EC Ex. 3 at 27.
[613] Tr. at 108-09 (Berden).
[614] *Id.* at 100 (Berden).
[615] EC Ex. 3 at 140-41.
[616] Tr. at 884 (Miessner); Tr. (2015) at 167 (O'Neill). See also Examiner O'Neill's opinion that Mr. Calcutt was "a dominant policy-maker in those two banks." Tr. (2015) at 623 (O'Neill).
[617] Tr. at 113 (Berden).
[618] *Id.*
[619] *Id.* at 114 (Berden).
[620] *Id.* at 118 (Berden).
[621] EC Ex. 3 at 146.
[622] *Id.*

practice."[623] He denied, however, that the timing of the sale had any bearing on the fact that there was an examination by the FDIC pending.[624] "The sales were in an effort to reduce our exposure," meaning the Bank's exposure  due to the "outstanding balances of loans that we had with the Nielson relationship."[625]

> Elaborating on this point, Mr. Jackson testified:

> > There had been discussions from both the FDIC and the State of Michigan that questioned the unit borrowing requirements and whether or not we were in compliance with those, and I believe the FDIC may have felt we had a unit borrowing issue, and they deferred to the State in 2009 to review that, and I believe the State concluded that we did not have a unit borrowing issue, but that's really the only regulatory concerns that I was aware of.[626]

> When asked why he thought it would be a good idea to reduce the Bank's exposure to the overall Nielson debt, Mr. Jackson testified that "it was a large concentration in, you know, one group of borrowers and it's always good to reduce that if you can. It represented a significant part of our capital."[627]

> FDIC Case Manager Ms. Miessner was asked about Respondent's efforts regarding the sale and repurchase of these loans – specifically about her opinion that Respondent's conduct was misleading in regard to these transactions.[628] She agreed that one way for the Bank to come into compliance with its lending limit would be to sell debt like these loans, that is, to refinance the debt to a different bank, providing the transactions were "true sales."[629] She agreed that the record includes a July 10, 2009 memo from Mr. Green to Mr. Calcutt suggesting that as part of an "action plan" to "immediately reduce loan exposure," the North Park LLC loan of $1.8 million and the $1.07 Waypoint Acquisitions credit "and others could also be participated in 100% of the loan amount."[630] According to Ms. Miessner, what Mr. Green was proposing was not a loan sale – even at 100 percent, "participating them out [is] different than selling them."[631] She said "we know in this case" the Bank did not truly sell these loans.[632]

---

[623] Tr. (2015) at 1622 (Jackson). A loan "participation" would "be a sale of a portion of a loan. A whole loan sale would be a sale of the entire loan." These were loan sales, not loan participations. Tr. (2015) at 1624-25 (Jackson). See Resp. Exs. 42-43 (Central State Bank Loan Purchase Agreements); Resp. Exs. 44-45 (State Savings Bank Loan Purchase Agreements). Despite the timing of these loan sales, Mr. Jackson testified that "this was an opportunity for Northwesten to reduce its exposure to the Borrowers," and were not sham sales. Tr. (2015) at 1629-30 (Jackson). The Bank repurchased these loans even though they were non-performing – "Borrowers had once again stopped making payments and requested additional concessions before they would again renew them," after Mr. Jackson "was contacted by president of one of the affiliate banks who asked what the status was of the September payment, and I indicated to them that the relationship had soured. We were continuing to negotiate a settlement with the Borrowers on that and that if they'd like, I would repurchase the loans." Tr. (2015) at 1629-30 (Jackson).
[624] Tr. (2015) at 1622 (Jackson).
[625] Id.
[626] Id. at 1623 (Jackson).
[627] Id..
[628] Id. at 849-50 (Miessner).
[629] Id. at 850, 852 (Miessner).
[630] Resp. Ex. 206 at 3.
[631] Tr. at 853 (Miessner).
[632] Id. Per the 2011 ROE at Bates page 27 (i.e., page 24-25 of the Report), "Sections 23A and 23B of the Federal Reserve Act contain restrictions on transactions between member banks and their affiliates. Sections 23A and 23B

Page 83 of 145

**A271**

Later on, however, in May 2010, the Bank did sell some of these loans to Central State and State Savings Bank.[633] Ms. Miessner determined that Mr. Calcutt intentionally concealed information about these transactions because "the Bank sold those loans right before the Examination started and then bought them back right after the examiners left."[634] She opined that it was "obvious" based on the timing of the sales that Mr. Calcutt did not have any intention of leaving them actually sold, "which means that as of the Call Report date they still should have been reported as assets out of the Bank, and management did not disclose to the examiners that they had just sold participations in their largest relationship which they knew we would be reviewing while on-site."[635]

Mr. Calcutt testified that Mr. Green suggested the Bank sell the North Park $1.8 million loan and the Waypoint $1.07 million loan – doing so in a memo dated July 10, 2009.[636] He said such a transaction was "common":

> It was a common occurrence for Northwestern and the affiliate banks because they were always looking for additional loans to sell and participations in loans, and sometimes they would have loan customers that would exceed their lending limits and we would participate when we buy a participation.[637]

Although Mr. Jackson testified that both he and Mr. Calcutt made the decision to approve the loan sales,[638] Mr. Calcutt could not recall these two loan sales, nor did he recall any particular reason why the loans were sold at that particular time.[639] He did recall the affiliate banks were "eager to buy participations" in these two loans, because "they were looking for additional revenue," but offered no evidence to support this testimony.[640] He denied that the loans were sold at a time when the loans were not performing – "We couldn't and wouldn't."[641] He denied these were sham loans, testifying that he did not intend to repurchase the loans at the

---

are made applicable to insured non-member banks by Section 18(j) of the FDI Act. Northwestern Bank, Central State Bank, and State Savings Bank are controlled through the common ownership of the Calcutt family. Accordingly, the three banks meet the definition of affiliate in Section 23A(b)(1(C)(i) and 23A(b)(3)(A)(i)." See also testimony of Examiner O'Neill regarding his recommendation that a charge under Section 23A be pursued. Tr. (2015) at 605 (O'Neill); EC Ex. (2015) 90.

[633] Tr. at 855, 858-59 (Miessner); Resp. Ex. 42, 44. Mr. Jackson testified that EC Ex. 42, his message to Ms. Meissner dated May 12, 2011 regarding "3/31 performance questions" was written "in conjunction with a pending shareholder dividend request that we had submitted to the Federal Reserve for Northwestern Bank". Tr. (2015) at 1636 (Jackson). See also testimony by Examiner Bird, reporting that an email dated May 17, 2010 from Mr. Green to Autumn Berden disclosing that "Central State Bank has been reviewing some of the loans and has purchased 3 loans from NRJ . . . 1 loan from Sunny . . . and 1 loan from Waypoint" was not provided during his 2010 examination, which began on June 7, 2010. Tr. (2015) at 803-04 (Bird).

[634] Tr. at 855 (Miessner).

[635] *Id.* at 856 (Miessner). See also testimony of Examiner O'Neill, testifying that the 2010 Call Report "needed to be amended" with respect to the non-accrual status of the Nielson Loans, stating the failure to report that status "was such a huge omission, being the largest single borrowing relationship in the Bank that it should have been disclosed as on non-accrual status and had such an impact on anyone attempting to use the Call Reports, it was so material that it amounted to the filing of false Call Reports." Tr. (2015) at 661 (O'Neill).

[636] Tr. at 1316 (Calcutt); Resp. Ex. 206 at 3.

[637] *Id.* at 1317 (Calcutt).

[638] Tr. (2015) at 1693 (Jackson).

[639] Tr. at 1317 (Calcutt).

[640] *Id*. at 1318 (Calcutt).

[641] *Id.* at 1319 (Calcutt).

time he sold them, "because we thought these loans would perform."[642] Mr. Calcutt has offered, however, no factual basis for this thinking.

Mr. Calcutt could not, moreover, explain why Ms. Berden understood Mr. Green to have told her she would continue to work with him, because, according to Mr. Calcutt, Ms. Berden "would have to work with the CEOs of those two banks."[643] Mr. Calcutt denied having any role with the loans after the sale to the two banks, and could not recall who made the decision to repurchase the loans, other than to say "It wouldn't have been me."[644] He admitted the loans were delinquent when Northwestern repurchased them, explaining that "it just made more sense administratively for Northwestern to deal with this issue than to have multiple parties dealing with it."[645] Mr. Calcutt offered no evidence to support this claim.

Mr. Jackson's memory was better than Mr. Calcutt's on this point. Mr. Jackson testified that the Bank repurchased the two loans "to make it more efficient in part to have all of them under one roof so we would not have to consult with . . . two other banks in this case, to get their concurrence as far as decisions, administrative decisions on how to manage the accounts in the future."[646]

In their 2011 ROE, examiners identified as a violation of the Federal Reserve Act the participation loans purchased from an affiliate bank.[647] Mr. O'Neill testified that the examiners were concerned when it was shown that the Bank purchased participations in what were clearly troubled loans (i.e., loans to Nielson entities that had only recently been sold to the Bank's affiliates, under Mr. Calcutt's direction). Mr. O'Neill explained that the Bank was being cited for repurchasing the loans shortly after the 2011 examination was completed.

As Mr. O'Neill explained the matter, there was evidence of:

> a rather lengthy history of problems being admitted to by the Borrower and their inability to pay and the Borrower stating how short the collateral would be or the equity would be in the properties. And all the series of problems and correspondence already being well documented, nonetheless, Northwestern Bank bought those loans back. And that's the purchase of a low quality asset from an affiliate.[648]

---

[642] *Id.* at 1319 (Calcutt).

[643] *Id.*

[644] *Id.* at 1319-20 (Calcutt).

[645] *Id.* at 1320 (Calcutt).

[646] *Id.* (2015) at 1694 (Jackson).

[647] ED Ex. (2015) 48 at 27-29.

[648] Tr. (2015) at 163 (O'Neill). See also Examiner O'Neill's testimony that when the loans were repurchased on September 29, 2011, the group of loans were low quality as a whole because, in part, Mr. Calcutt acknowledged that they were low quality at the time they were repurchased, and because they "had payments being provided to them by the new funds that were being given from the Bedrock Loan. If you want to call that renegotiated" as that term is used in the definition of a low-quality asset includes an asset "whose terms have been renegotiated or compromised due to the deteriorating financial condition of the obligor." Tr. (2015) at 672-75 and 678-86 (O'Neill); Resp. (2015) Exs. 90 at 6 and 157 at 1-2; EC Ex. (2015) 48 at 28 (26 of the ROE). Put more bluntly, Mr. Bush editorialized that if "I were Frankfort I would want to get rid of this garbage." Resp. (2015) Ex. 157 at 1. As Mr. O'Neill elaborated on the point, "the loans were 29 days past due and past maturity at the time of repurchase and subsequently were placed on non-accrual on November 30, 2010. As of the date of repurchase, Northwestern Bank management had already engaged in correspondence and negotiations for restructuring all of these loans based on cash flow problems,

Mr. O'Neill described the transactions – both selling the participations and then repurchasing them – as "an act of concealment, in my experience, by the management of the Bank that sold them before the Exam and then repurchased them after the Examiners had left."[649] Further, Mr. O'Neill opined that Mr. Calcutt had, and breached, his fiduciary responsibility to tell the Board at State Savings Bank "the full extent of the problems that he was aware of based, among other things, [on] the correspondence that we have been reviewing here today".[650]

Asked what facts led her to conclude that Mr. Calcutt intended to have the loans returned to the Bank immediately following the examination, Ms. Miessner testified thus:

> So we were not aware of this sale or repurchase until during the 2011 Exam, and they told us that they bought them back because of the deteriorating credit quality of the Nielson credits, but yet they still didn't identify them internally as problem credits in 2010 when they bought them back. So their statements contradict each other as far as -- it was contradictory to what their actions would have done.[651]

### Q. The Distressed State of the Nielson Entities Loan Portfolio in 2010

The $760,000 Bedrock Loan and the first release of Pillay Funds collateral permitted the Nielson Entities to bring current each of their loans – but only through September 1, 2010.[652] On October 4, 2010, Mr. Green sent an email message to Ms. Berden, reporting that all Nielson Entity loans, other than those associated with Immanuel LLC (which had filed for relief in bankruptcy) were "matured and all are due".[653] In this message, Mr. Green stated that the Bank "may agree to use the Pillay funds held as collateral to make the monthly payments on loans which Cori indicates cannot be made either directly or indirectly by its owners or from other sources."[654]

Ms. Berden confirmed this, testifying that most of the loans to Nielson Entities had matured on September 1, 2010, and were "due in full."[655] Describing the circumstances in 2010 as similar to those in previous fall, Ms. Berden testified that the Nielson Entities "didn't have the cash to pay those loans in full" so "we stopped making payments on any of the loans,

---

vacancies and other evidence of financial distress." Tr. (2015) at 687 (O'Neill). See also testimony of Examiner Bird regarding the 29 day delinquency status of the Nielson Entity loans: "I had inquired about some past dues that occurred in the timeframe that you're talking about." Although unable to recall whether the response was provided by Mr. Green, Mr. Jackson, or Mr. Doherty, Mr. Bird testified that "I was told that they were administrative past dues, that loans had matured and that they were waiting for all parties to get together for signatures and closing." There was, however, "never a communication that the payments had stopped." Tr. (2015) at 886-87 (Bird).

[649] Tr. (2015) at 168 (O'Neill).

[650] Id. See also testimony of Examiner Bird regarding the sale and repurchase of these loans: "In my experience, a transaction such as this, a sale just before the exam and a purchase a few months after the exam, would be highly questionable and dubious as far as the legitimacy of the initial sale." Tr. (2015) at 849 (Bird).

[651] Tr. at 857 (Miessner).

[652] Excepting Immanuel LLC's loan, which had been included in that company's bankruptcy.

[653] EC Ex. 3 at 148. See also testimony of William Calcutt, Esq., who worked with Fred Bimber, Esq. challenging the Immanuel LLC Chapter 11 bankruptcy, that the Bank and Immanuel's other major creditor, Oleson Foundation, discovered "there were a number of fraudulent transfers of I think about 20 properties by Immanuel." Tr. at 1143 (W. Calcutt).

[654] EC Ex. 3 at 148.

[655] Tr. at 126 (Berden).

including the ones that were matured and the ones that were not yet matured."[656] She also confirmed the contents of the email message dated October 19, 2010, in which she told Mr. Green that the Nielson Entities "simply don't have access to enough cash to continue making payments on the specified properties without running out of cash in the near future, which would put them and the bank in the same spot."[657]

Responding to Mr. Green's suggestion that the remaining Pillay Trading funds again be used to service these loans, Ms. Berden stated: "it doesn't make sense for these entities to borrow Pillay's cash to make loan payments. That cash would only cover a short period of time, and then the entities and the bank would be in the same boat at that time."[658]

Beyond rejecting Mr. Green's suggestion regarding the use of Pillay collateral, Ms. Berden countered his proposal with a proposal that the Bank offer "either a period of time with no payments, or there's a proposal in here about PIK interest", where PIK was described as having the loans "accrue interest and increase the principle balance.[659] She testified that she also expressed an interest in short sales of the properties – "trying to unload the properties as quickly as possible still in a depressed real estate market, but knowing that if we needed to sell them quickly we would need to drastically lower prices," provided the Bank included deficiency waivers as part of the deal.[660]

Ms. Berden testified that Mr. Green rejected these proposals in an undated memo that referred back to his email message of October 4, 2010 and Ms. Berden's responsive email dated October 12, 2010.[661] According to Ms. Berden, the Bank "didn't like any of our suggestions. They weren't planning to do any new loans. They didn't want to accept any deeds-in-lieu. We were kind of at a standstill."[662]

That standstill appears to have remained in effect through most of the last quarter of 2010. In an email message to Ms. Berden dated December 6, 2010, Mr. Green proposed to have the Nielson Entities "utilize the Pillay funds to help you make payments if we can extend the maturity date to 4/15/2011," allowing the "deposit accounts [to be] funded through the payment period and all property taxes remain current."[663]

There is evidence that Cori Nielson offered a "2 month renewal until January 31, 2011," informed in part by Ms. Nielson's observation that "maturity dates don't seem all that critical to the Bank, and it only becomes urgent when there are deadlines for quarter-end reporting."[664] Ms. Berden explained (in an email to Mr. Green dated December 6, 2010) that she sought the

---

[656] *Id.*
[657] EC Ex. 3 at 151.
[658] *Id.*
[659] Tr. at 129 (Berden); EC Ex. 3 at 151.
[660] Tr. at 129 (Berden). See also testimony of Mr. Doherty, reflecting that the Nielsons "wanted permission to do short sales and have the Bank absorb any losses that would incur. . . . And they just expected to walk away from it, not contribute any of their own resources that they had. Some of the millions." Thus, Mr. Doherty agreed that if a property that was collateral for a loan was sold and the sale price was below that what was owed on the loan so that the Bank wasn't repaid in full, the Nielsons were asking the Bank to just absorb the difference. Tr. at 1209-10 (Doherty).
[661] Tr. at 129-30 (Berden); Resp. Ex. 51.
[662] *Id.* at 130 (Berden).
[663] EC Ex. 3 at 162.
[664] *Id.* at 165-66.

shorter two month renewal, rather than the period suggested by Mr. Green, only because "your group doesn't want to work out the details for short sales and deficiency waivers, saying those are 'for later'".[665]

By mid-December, it appeared negotiations were likely to result in a plan that once again depleted Pillay Trading funds for use in servicing the outstanding Nielson Entity loans. In an email message dated December 15, 2010, Ms. Berden presented a proposal where $686,646.07 would be released from Pillay and used to pay the Nielson Entity loans directly.[666] The proposal, however, would only "get loan payments current up to and including payments . . . due on January 1, 2011," in some cases covering principle and interest, and in others covering interest only.[667] There is no evidence in the record that the individual Nielson Entity loans had demonstrated there was sufficient cash available to continue to service these loans, at least not without relying on cash from other Nielson Entities.[668]

Proceeding in this fashion, the Bank and Ms. Berden executed revised loan documents that, at Ms. Berden's request, included the release of "Bernard's guaranty of $400,000 on 067406662" followed by the release of "the remaining $289,779.11 from Bernard's guaranty on 067406690."[669] In this context, Bernard was "the entity that was holding the Pillay units," and the guaranty had been for the Bank's benefit as security for the two loans identified in the email to Mr. Green.[670] Upon completion, total indebtedness of the Nielson Entities in December 2010 was $34.2 million, and the 2010 Pillay disbursement to the Entities' loans was just under $690,000.[671] The Bank issued the agreed-upon releases on August 5, 2011.[672]

Ultimately, after a July 31 2012 $30,000 charge-off against the $760,000 Bedrock Loan,[673] and loan losses against the Nielson Loans of at least $6.44 million,[674] the Bank secured an order in foreclosure against the Bedrock collateral.[675] In the order, Notes shown as being owed to the Bank as of April 18, 2012, totaled more than $8.2 million.[676] By stipulation entered

---

[665] EC Ex. 3 at 162; Tr. at 1004 (Nielson) (stating that a short sale is when "the Bank approves releasing its collateral for a sale to a third party that results in less proceeds than is owed the Bank.")

[666] EC Ex. 3 at 170.

[667] Tr. at 134-35 (Berden); EC Ex. 3 at 170.

[668] See also testimony by Examiner O'Neill regarding the failure of Bank management to fully disclose the terms of the proposal regarding Pillay collateral: Asked with respect to the Commitment Review for the Bedrock Loan (EC Ex. (2015) 51 at 160) whether the explanation for the purpose of the loan was unusual, Mr. O'Neill answered that there was no description of the use to which the Pillay funds would be used, which, he opined,  meant that the Board members were not being told why the funds were being released. He testified that using released funds to make payments on several unrelated loans or loans not identified in the Commitment Review "usually a red flag that the underlying cash flow from operations is insufficient to be paying these loans. It would also raise into question the stated purpose as working capital because if in fact we are having to release collateral to make payments, well, that's not an accounts receivable, not inventory, the normal type of things dealing with a working capital loan." Tr. (2015) at 599 (O'Neill); EC Ex. (2015) 51 at 160. Note that Joint Ex. (2015) 6 is a copy of the Commitment Review Mr. O'Neill refers to as EC Ex. (2015) 51 at 160, without the notes he attached to the Review.

[669] EC Ex. 3 at 177.

[670] Tr. at 136-37 (Berden).

[671] Id. at 140 (Berden); EC Ex. 147.

[672] Tr. at 142-43 (Berden); EC Ex. 53.

[673] EC Ex. 81 at 70.

[674] EC Ex. 48 (2011 ROE) at 43, 52, 83-93, and 124.

[675] Tr. at 146 (Berden); EC Ex. 183.

[676] Resp. Ex. 183.004.

on November 4, 2013, the deficiency owed by Bedrock to the Bank was $1,023,557.56.[677] According to Ms. Berden, to date, the amounts Bedrock owed to the Bank have never been fully paid.[678]

### R. Impact of the Bank's Failure to Document and Disclose the Status of the Nielson Entity Loans

Following the 2010 examination, FDIC Examiner in Charge James Russell met with Mr. Calcutt and Mr. Jackson to conduct an exit conference and record the initial reactions of the Bank's managers.[679] Meeting with the managers was the Michigan Regional Supervisor for OFIR, Al Clark, and the FDIC's Case Manager, Anne Miessner.[680]

Included in the 2010 exit meeting was a discussion about the regulators' concern regarding Waypoint/Nielson-entity loans that were maintained as interest-only loans (rather than loans amortizing principal and interest), where the loans were for the benefit of income-producing property.[681] Ms. Miessner testified that at this time, the regulators were not aware of the nature, scope, and details of the Bedrock Loan transaction, which had occurred in late 2009.[682] During the exit conference, when the regulators raised questions about this concern, Bank management offered no response and did not disclose the terms of the Bedrock Loan transaction.[683]

During the 2010 exit conference, regulators discussed with Mr. Calcutt the potential finding that the Bank's composite rating and its Earnings rating was going to be adversely affected based on the findings in the ROE.[684] According to Ms. Miessner, Mr. Calcutt objected:

> So during the exit meeting, Mr. Calcutt and Mr. Jackson were talking about how their performance was better than other banks' performance and that given the economic downturn, that they thought that we should, you know, that our ratings should be different than what they were based on the fact that they were performing better than other banks given the economic downturn, which of course now we know that the performance numbers that they were using to present to us to argue that case were falsified and in fact when they were adjusted appropriately they were performing lower than those banks that they were trying to say they were performing better than.[685]

To the same effect, when the Bank through Mr. Jackson offered a written response to the concerns raised by EIC Russell, no mention was made of the nature of the Bedrock Loan or the fact that the loan proceeds had been disbursed without Board approval – instead, Mr. Jackson wrote that "[t]he Board is well informed of all activities of the Bank and all major

---

[677] EC Ex. 129. See also testimony of Mr. Bimber: following the foreclosure action against Bedrock Holdings LLC, who set the "money that the Bank never actually collected from any source" at $1.8 million. Tr. at 381-82 (Bimber).
[678] Tr. at 147-48 (Berden).
[679] EC Ex. 22.
[680] *Id.*
[681] Tr. at 758 (Miessner).
[682] *Id.*
[683] *Id.* at 759-60 (Miessner); EC Ex. 22 at 3.
[684] Tr. at 821 (Miessner).
[685] *Id.* at 822-23 (Miessner).

decisions are reviewed and discussed openly with the Board."[686] Although beyond the scope of this recommended decision (because it concerns only Mr. Jackson), preponderant evidence set forth above makes it plain that this was a material misrepresentation by Mr. Jackson of conditions related to the Board's knowledge and approval of the Bedrock Loan.

Mr. Gomez explained that the 2011 Examination established the Bank's management had "actively concealed the accurate condition of [the Nielson Entities credit] relationship from regulators and from the Board through the failure to maintain complete loan files and through false or misleading verbal and written statements."[687] He identified a series of documentation lapses – notably with respect to the use loan proceeds were to be put to, and the source of payments in service to the loans.[688] "When a loan is made, you want to know what the proceeds are being used for. Is it to buy land? Is it to buy equipment? You don't want the borrower using the proceeds to buy something or engage in something that the Bank would consider . . . inappropriate activity."[689]

Specifically with respect to the Bedrock Loan, Mr. Gomez stated the regulators' concern was "where is the actual source for repayment going to be?"[690] The borrower lacked income-generating property, it lacked inventory, and there was no apparent source for repayment.[691] Equally of concern to Mr. Gomez were the absence of personal guarantees by the borrowers, and the lack of current and complete financial information from the borrower.[692] Without this information, the Bank held off "identifying troubled debt restructures," such that "the Bank's financial overall condition is not being properly recognized" in Call Reports.[693]

Mr. Gomez offered his expert opinion that the $760,000 Bedrock Loan transaction was an imprudent banking practice, one that was contrary to the generally accepted standards of safe and sound banking operations.[694] Specifically, he opined that using "proceeds on loans to make current and keep current other notes," while lacking current appraisals, financial reports, and title searches, exposed the Bank to those risks arising when a borrower hides the true condition of the loans. By failing to properly identify the condition of the loans and by using the release of collateral to keep other loans current, the Bank through Mr. Calcutt engaged in practices that were contrary to generally accepted standards of safe and sound banking operations.[695]

Mr. Gomez also expressed an opinion regarding that part of the Bedrock transaction that involved acquiring a second mortgage. This feature, in his opinion, could not alleviate the regulators' concern about the release of the Pillay collateral.[696] He explained that there were no updated appraisals to support the second mortgage, so the regulators "don't know what the current values are."[697] Further, while the instrument securing the loan was spoken of as though

---

[686] EC Ex. 23 at 9.
[687] Tr. at 270 (Gomez); EC Ex. 48 at 40.
[688] Tr. at 270 (Gomez).
[689] *Id.*
[690] *Id.* at 271 (Gomez).
[691] *Id.*
[692] *Id.* at 279 (Gomez).
[693] *Id.* at 280-81 (Gomez).
[694] *Id.* at 283-84 (Gomez).
[695] *Id.* at 285-86 (Gomez).
[696] *Id.* at 286 (Gomez).
[697] *Id.*

it was a second mortgage, there had been no title search, and as a result this may have been other than a second mortgage, possibly third or fourth line – because no one had examined for prior liens.[698] There was, indeed, testimony establishing that upon foreclosure in 2012 of the $760,000 promissory note secured by the Bedrock properties, the Order of Foreclosure reflected the presence of five secured mortgages, and the Bank sustained a deficiency in the amount of $1.8 million.[699]

Further, and here specifically referring to Mr. Calcutt's decision to permit the release of the Pillay collateral, the decision created "a temporary mask over a bigger problem because there's no continued source of where all these payments are going to come from."[700] The Bank "essentially [did] the same action twice. Once in 2009, and again in 2010, to try to keep the hiding of this condition going, which is not a prudent practice, especially due to the . . . amount of the loans and [the] amount of the capital that it represented."[701]

Presented with the Nielson's notice that the entities were going to cease making payments in September 2010, Mr. Calcutt concluded only that "here we go again, more posturing, more negotiating."[702]

Mr. Jackson was asked "if you didn't feel that they were being forthright with you about their ability to pay the loans, why do you feel that they had any credibility with respect to negotiating with you for paying the loans at any point in time?"[703]

He answered thus:

> No, we had a relationship with the Nielson family for years and years and years. It went back to another bank, and there was a very good relationship and a history of, you know, dealing with these things honorably and this was just totally contrary to the relationship that we had or the experience or the expectations that we had with them. We thought we had new young management that had come in to take the company over. We felt as though they were kind of flexing their muscles, pushing their limits to see how much they could get away with with the lender. Again, we felt that they were posturing, that they had the ability. And that if we would take the time

---

[698] *Id.* at 286-87 (Gomez). See also testimony from William Calcutt regarding the Bank's security interest in the Pillay Fund, that "at some point I looked at the loan documents or loan documentation. I suspect that it was in late 2010 I will guess, and I think that's when I first saw the Security Agreement. I think it was a Pledge Agreement. . . . Just going through it, I saw it, and I said 'What, what's this? Do they have a valid security interest in these Pillay Trading Units?' which were membership interests in another LLC . . . . I thought it was really problematic, and at some point I'm guessing I wrote an email or memorandum about it because the problem I had was the description I didn't think was sufficient perhaps under Article 9 or Article 8 of the U.C.C."  Upon his review, William Calcutt found this ambiguity "very troublesome and I think I advised the Bank to say this may not be enforceable. We may not have a security interest in these Pillay Trading Units." Tr. at 1152-53 (W. Calcutt). To the same effect, see testimony of Mr. Jackson that, based on William Calcutt's legal opinion, he had particular concerns that the Bank was unable to perfect its security interest in the Pillay collateral. Tr. (2015) at 1664 (Jackson).
[699] Tr. at 380-81 (Bimber); Resp. Ex. 183.
[700] Tr. at 287 (Gomez).
[701] *Id.* But see the testimony of William Calcutt, expressing the opinion that, given the uncertainty over whether the Bank had a perfected security interest in the Pillay Fund Trading Units, "I was of the opinion that if you get any money for this Pillay Trading Units it's like getting something for nothing." Tr. at 1154 (W. Calcutt).
[702] Tr. at 1320-21 (Calcutt).
[703] Tr. (2015) at 1687 (Jackson).

to work with them in good faith, you know, we could get over this and get them to see the light and come back and do what they had committed to do for us.[704]

### S. Regulator Concerns Regarding Respondent's Role in Bank Management

Mr. Gomez described the Bank's organizational structure as "very flat," in that "[e]ssentially everyone reported" to Mr. Calcutt.[705] He agreed that this was an "odd" structure, and agreed with the premise that this meant Mr. Calcutt was responsible for far more aspects of the Bank, rather than having vice presidents be responsible for some of these duties.[706]

Mr. Calcutt confirmed that he "wore several hats" but rather than agree that he served as the focal point of the Bank's management described the Bank as having a "very decentralized organization".[707] In his testimony, however, Mr. Calcutt acknowledged having "at least 20" people directly reporting to him – a convergent structure that does not suggest decentralization of management within the Bank.[708]

Also of concern with respect to the Bank's organization was Mr. Calcutt's apparent reluctance to acknowledge that he had all of these senior managers directly reporting to him. When asked whether Bill Green was one of the employees who reported directly to him – a question that called for a yes or no answer, Mr. Calcutt deflected, answering "He reported to the Senior Loan Committee. He reported to Credit Administration. He would have reporting responsibility to a number of people."[709] This answer was neither complete nor true, as it withheld from the record the truth – that Mr. Green did, in fact, report directly to Mr. Calcutt. So determined was Mr. Calcutt's effort to mislead this Tribunal during his current testimony that the only way a true and complete answer could be secured from Mr. Calcutt was for Enforcement Counsel to refer Mr. Calcutt to his sworn testimony from the hearing conducted in 2015, and upon seeing what he testified to in 2015, Mr. Calcutt now "clarified" his testimony by directly acknowledged that Mr. Green reported to him.[710]

Similarly, when asked "who was overall responsible for regulatory compliance," rather than acknowledge his own responsibility as the Bank's CEO and President, Mr. Calcutt testified, fatuously in my opinion, that overall responsibility for compliance was with a committee that evaluated the Bank's classified assets, as well as "a number of people in the Commercial area. Credit Administration, the individual lenders. And obviously we had a

---

[704] *Id.* at 1687-88 (Jackson).

[705] Tr. at 296 (Gomez). See also testimony of Mark Smith, at Tr. 391: "My observation was that it was a very flat organization, meaning that there was (*sic*) a lot of direct reports directly to Scrub. It may not have been . . . documented that way, but it seemed like all of senior management, which was a great number of individuals, all reported directly to Scrub." See also testimony of Ms. Miessner describing as "very unusual" for only the two top executives – i.e., Mr. Calcutt and Mr. Jackson – to participate in Examiners' exit meetings, but that was the case for the exit meeting following Michigan's examination in 2009. Tr. at 735-36 (Miessner). See also testimony of Examiner O'Neill noting that the Bank did not have a Chief Lending Officer and regarding examiner criticism prior to and during the 2011 examination that "Normally by the time a bank reaches the size of Northwestern Bank, it is unsustainable to have a CEO and president also wearing the hat of a senior lender. The task to each deserves its own undivided attention." Tr. (2015) at 608 (O'Neill).

[706] Tr. at 296 (Gomez).

[707] *Id.* at 1263 (Calcutt).

[708] *Id.* at 1360-61 (Calcutt).

[709] *Id.* at 1362 (Calcutt).

[710] *Id.*, and Tr. (2015) 1818 (Calcutt).

security department, internal audit department, compliance department".[711] The term "overall responsibility" should have required no definition or interpretation: as the Bank's CEO and its President, "overall" responsibility was placed with him. To the same effect, where uncontroverted evidence established that when the $760,000 loan funds were disbursed to it, the Bank had no current financial statements for Bedrock Holdings, I find unavailing Mr. Calcutt's assertion that responsibility for advancing this loan was with the Bank's Credit Administration department, and not with him.[712]

Also of concern is testimony by Mr. Calcutt that the Bank's Board of Directors gave "verbal approval" of the 2009 loan to Bedrock before the $760,000 had been disbursed.[713] The record reflects that there are no notes to that effect, "other than the ultimate write-up which was signed off on by the Board and the Senior Loan Committee."[714] Board Minutes from December 17, 2009, and testimony by Board Members Byl and Swanson noted above, constitute preponderant, credible, reliable, and substantial evidence that no such Board approval had been given prior to the disbursement of these funds.[715] Mr. Jackson expressly testified that any verbal discussion took place before the loan was approved, "it's not documented" in December 2009; nor was there any documentation showing the Board's approval of money being disbursed out of the Bank in December 2009.[716] Given the nature of his testimony, including his statement that he could not remember the conversation when the Board members were informed, I give little weight to Mr. Jackson's testimony that the Bank's Board of Directors had been well-informed "through verbal discussions that we were having ongoing conversations with the Nielsons."[717]

Given that the parties have stipulated that the Bank funded the Bedrock Holdings Loan on or about December 14, 2009, and given that the December Board meeting was held on December 17, 2009, even Mr. Calcutt's assertion that the Board gave its "verbal approval" on December 17, 2009, indicates the funds were paid out through Mr. Calcutt's direct approval, *before* the Board gave its approval.[718]

Further, Mr. Calcutt's cause is not aided by his admission that when the actual Bedrock Loan documentation was presented for Board approval in March 2010, while he signed or initialed it, he did not read it, "because the loan was already made."[719] He agreed that by not reading the documentation, he would not know whether the sources of repayment shown in the

---

[711] Tr. at 1270 (Calcutt). According to Mr. Jackson, "Typically, what would happen is the loan review would be approved or rejected by the Senior Loan Committee. If it were approved and it required a higher level of approval, following the Senior Loan Committee it would go back to the Credit Administration Department. The Credit Administration Department would put the loan review form out on the secure website and notify the independent directors that there was a loan available to be reviewed and ask them to take a look at it and provide their responses, approval, questions, or disapproval back to the Credit Administration Department." Tr. (2015) at 1607 (Jackson). Mr. Jackson testified that with respect to the Bedrock Loan approval through November and December 2009, these normal policies were not followed. *Id.*
[712] Tr. at 1380-81 (Calcutt).
[713] *Id.* at 1377-78 (Calcutt).
[714] *Id.* at 1377-78 (Calcutt).
[715] EC Ex. 101 at 16-18.
[716] Tr. (2015) at 1670-71 (Jackson).
[717] *Id.* at 1673 (Jackson).
[718] Tr. at 1378-80 (Calcutt).
[719] *Id.* at 1383 (Calcutt).

documentation were accurate, nor would he know if the net income attributed to the Borrower could service the debt.[720] Nor is his cause aided by testimony that he could recall no instance of the Board of Directors ever turning down a loan that had been presented by management, nor by his statement that he was never involved in processing or closing loans, or disbursing funds.[721]

Of further concern is Mr. Calcutt's testimony that he did not agree with the premise that as a Bank Director and as its CEO that he cannot delegate responsibilities of the greater authority he held in those capacities.[722] As Mr. Jackson opined, as Board Chairman Mr. Calcutt is ultimately responsible for keeping the Board informed.[723]

When shown the State of Michigan Examination from April 13, 2009, which bears his signature, Mr. Calcutt agreed that he could not delegate his responsibility to personally review the contents of the Report.[724] Somewhat troubling was Mr. Calcutt's response to the question "Is it your normal practice to sign loan approval requests without reading them carefully?"[725] Where "no" would seem to be the only suitable answer, Mr. Calcutt responded: "It would depend. Typically I would read them, yes. But in this situation where the loan was already closed, there was no reason for me to review it."[726] Similarly, when asked whether he was familiar with Financial Institution Letters that the FDIC issues from time to time, Mr. Calcutt said simply, "no."[727]

Testimony by Board Member Swanson established that in the ordinary course of the Board operations, when Board members were asked to approve loans, if questions arose the Board member would not discuss the questions during board meetings but would instead contact either Sharon July or Ian Hollands, both of whom were credit analysts at the Bank.[728] The analyst would then respond to the Board members' questions, with the understanding that prior to responding he or she would have forwarded the question to Mr. Calcutt and possibly Dick Jackson; after which either Ms. July or Mr. Hollands would reply to the members' question by email.[729]

Testimony from Ian Hollands provided details about his responsibilities at the Bank and his interaction with Board members.[730] Serving as a credit analyst at the Bank between 1999 and 2004, he was promoted to credit manager in 2004.[731] As credit manager during the relevant

---

[720] *Id.* at 1389-90 (Calcutt).
[721] *Id.* at 1444 (Calcutt).
[722] *Id.* at 1354 (Calcutt).
[723] Tr. (2015) at 1678 (Jackson).
[724] Tr. at 1355 (Calcutt); Joint Ex. 2.
[725] *Id.* at 1384 (Calcutt).
[726] *Id.*
[727] Tr. at 1418 (Calcutt); e.g., Policy Statement on Prudent Commercial Real Estate Loan Workouts, at EC Ex. 150, which Mr. stated "I don't recall reading it. It doesn't mean I didn't". Tr. at 1418 (Calcutt).
[728] Tr. at 456, 484, 492, 517 (Swanson). See also testimony of Mr. Hollands Tr. at 1135-37(Hollands); EC Ex. 119 (email from Mr. Swanson asking, inter alia, whether "corporate financial statements for f/y/e 2009 for [Blue Ridge Holdings, Moxie, and AuSable] be received and reviewed by loan officer prior to finalization or renewal?"), and EC Ex. 120 (email from Mr. Swanson asking Mr. Hollands or Ms. July to address in further detail, inter alia, the lack of personal guarantees on the Frontier Energy LLC loan).
[729] Tr. at 492-93 (Swanson).
[730] *Id.* at 1080 (Hollands).
[731] *Id.*

time period, Mr. Hollands reported to Mike Doherty and was both performing credit work and supervising and training analysts.[732] He explained that the credit analyst would look at financial statements and balance sheets, prepare cash flow statements, examine prior financial performance and collateral – all relating to the proposed loan.[733] This information would then be presented through a credit write-up.[734]

Mr. Hollands testified about performing these duties with respect to the Nielson Entities, which he said was the Bank's "largest overall relationship" and was also "the most complicated relationship we had."[735] He said he worked directly with Mr. Green as the Bank's lender for the Nielsons throughout the relevant period.[736]

Mr. Hollands identified a series of emails between himself and Mr. Green regarding Mr. Green's direction that the Nielson loans "need to get approved."[737] Between December 3, 2009 and January 4, 2010, as the Bank was preparing for an external loan review that ordinarily would take about two weeks of his time, Mr. Hollands alerted Mr. Green to the fact that the Nielson renewals "will get pulled come next exam, so it would be good to get moving on them now so we can have everything done before they get here."[738] He explained that apart from the external loan review, the Bank's regulatory examiners would look at these loans – the Nielson loans in particular, because as he already stated, they "were the largest relationship the Bank had so they got pulled every year."[739]

In an email he sent on January 13, 2010, when he had yet to receive from Mr. Green the financial information he needed to prepare for the external loan review and the examiner's review, Mr. Hollands reminded Mr. Green that "we still need to get together to talk about on what we need to do with respect to what happened on all of the Nielson loans."[740] Mr. Hollands testified that his concern about this was that the loans "had already been renewed on the [Bank's operating] system," but that "we needed to get the approvals done."[741] Also of concern to Mr. Hollands was the fact that the borrowers had not yet provided financial statements the Bank needed to provide to its reviewers and examiners.[742]

Mr. Hollands identified the Board Information Sheet reflecting the February 8, 2010 application for Immanuel LLC, seeking to "renew an existing loan that matured 9/1/09 for another 12 months."[743] He testified that this was an example of one of the loans that was

---

[732] Id. at 1081 (Hollands).
[733] Id. at 1082 (Hollands).
[734] Id.
[735] Id. at 1084 (Hollands).
[736] Id. at 1085 (Hollands): "The lender is the face to the customer. They are the ones talking to the customer, getting the deals, talking about their business. The lender then portrays that information to us."
[737] Tr. at 1085 (Hollands); Resp. Ex. 24.
[738] Tr. at 1087 (Hollands); Resp. Ex. 25.
[739] Tr. at 1088 (Hollands).
[740] Id. at 1089 (Hollands); Resp. Ex. 26.  See also Resp. Ex. 27, in which Mr. Green provided to Mr. Hollands a list of fifteen Nielson loans that were the subject of Mr. Hollands' emails to Mr. Green.
[741] Tr. at 1089 (Hollands).
[742] Id. at 1095-96 (Hollands); see also Resp. Ex. 29, 1/14/10 email from Ms. Berden for Generations Management responding to Mr. Green's 1/13/10 request for financial statements from the entities, in which Ms. Berden is unable to produce the December 31, 2009 statements but supplies instead statements from December 31, 2008.
[743] Tr. at 1100-01 (Hollands); Resp. Ex. 32 at 1.

approved in 2009 but that he only started writing an application for in 2010.[744] Mr. Hollands said it was his understanding that the loans had been extended because they were already on the Bank's books, but he did not know how that extension or approval process had occurred.[745] He stated that the document he prepared was used "to obtain approval," but these loans had already been approved and booked prior to year-end 2009.[746]

Mr. Hollands added that although he knew what the term "ratification" meant, "that wasn't common language for us to use" and was not a term he would use for a loan write-up.[747] For his part, Mr. Doherty testified that when Mr. Hollands brought to his attention that there was no loan write-up for the Bedrock loan, Mr. Doherty "told him we immediately needed to get a new write-up done and have it ratified."[748] Nothing in the loan write-up, however, reflects that the purpose of the Bedrock Review document was to ratify any prior action of the Senior Loan Committee or any other entity at the Bank.

Mr. Hollands also identified the Commitment Loan Review Form that was presented to the Board as the credit write-up for the Bedrock loan.[749] He said he prepared this Review starting on March 16, 2010, explaining that Mr. Green told him the purpose of the loan was that "we were restructuring this as a line of credit and the assumption is that that would be for working capital requirements" because "ninety-nine percent of line of credits are for working capital requirements, so we make that assumption unless we are told otherwise."[750]

Mr. Hollands testified that he was not aware that the actual purpose of the $760,000 loan was to make payments on the Nielson-related entities going forward into 2010, nor did he know how the released collateral was to be used.[751] Upon completing the Review, Mr. Hollands then sent it to Mr. Green, who would then present it to the Bank's Senior Loan Committee, which included Mr. Calcutt, Mr. Jackson, Mr. Teachout, and Mr. Doherty.[752]

Mr. Calcutt explained the role of the Senior Loan Committee:

> We were just one step in the process for approving loans. Any loan under an individual commercial lender's loan authority could be approved by that lender without the Senior Loan Committee. When the loan amount exceeded their loan authority, then it would go to the Senior Loan Committee; and if it exceeded the Senior Loan Committee, then it would go on to the Board of Directors. We had very low loan authorities for a bank

---

[744] Tr. at 1101-02 (Hollands). See also to the same effect Resp. Ex. 33 (Blueridge Holdings).
[745] *Id.* at 1102 (Hollands).
[746] *Id.*
[747] *Id.* at 1103-04 (Hollands).
[748] *Id.* at 1198 (Doherty).
[749] *Id.* at 1104-05 (Hollands); Joint Ex. 6 (which is the same as the withdrawn Resp. Ex. 35).
[750] Tr. at 1106 -07 (Hollands). See also testimony by Mr. Doherty that "unless the lender would specify to the analyst working on the write-up anything different, it was always put as "working capital" on lines of credit." It would, according to Mr. Doherty, be presented this way "unless the lender [here Mr. Green] would specifically notify the analyst and put in the write-up that it's for other purposes." Tr. at 1203, 1235 (Doherty). Mr. Doherty added, however, that because the definition of working capital is "very vague," proceeds from the loan could be "used for distributions," and "if the owner took distributions, that's still working capital to the borrower." Tr. at 1237 (Doherty). He confirmed however, that if proceeds are distributed to an entity that was not a Bedrock owner, it would not qualify as working capital. Tr. at 1255 (Doherty).
[751] Tr. at 1125 (Hollands).
[752] *Id.* at 1109, 1123-24 (Hollands); Tr. at 1193 (Doherty).

our size. So the Senior Loan Committee saw a lot of loans and so did the Board of Directors.[753]

Mr. Doherty testified that he started working at the Bank around 2002, after working for the Farmers Home Administration for 10-plus years, with terms of service in other commercial settings, leading to his service as the Bank's Commercial Loan Officer.[754] Reporting directly to Mr. Calcutt, Mr. Doherty supervised the Bank's Credit Administration Department – Mr. Hollands and Mona Alpers.[755] He testified that when the Nielson loans (including the Bedrock loan) were under negotiation for renewal and payments, Mr. Green was the person engaged in those negotiations.[756] He added that given the size of the Nielson relationship, the members of the Senior Loan Committee would have discussed the Nielson delinquencies in October 2009.[757] He could not, however, recall whether the Bedrock loan was proposed to cure the Nielson delinquencies.[758]

Mr. Hollands testified that although Board members did from time to time contact him with questions about write-ups regarding loans being presented for approval, those requests were infrequent: "I can probably count on one hand the amount of times the Board of Directors would come back with questions," but when that happened, Mr. Swanson was the member who most often would ask him questions.[759]

Mr. Swanson testified that although he believed he could contact Mr. Green directly (and could do so without having to go through Mr. Calcutt), if he did so no other Board member would be informed about the question or the information provided in response.[760] Further, according to Mr. Swanson, loan presentations generally did not occur during Board meetings – it would be an unusual occurrence for Board members to actually be present for such presentations.[761]

The lack of Board discussions regarding Bank loans led Mr. Swanson at one point to suggest that there be a loan officer's presentation regarding loans and that the presentations be held during board meetings, explaining that he had "an interest in learning more about that credit than what was just in the Loan Presentation Sheet."[762] Although Mr. Calcutt told Mr. Swanson the Bank managers "would give it some thought," he never heard about the proposal again.[763]

Similarly, Mr. Swanson described the limited disclosure provided to Board members with respect to regulatory actions. Upon the Bank's receipt of the regulators' Reports of Examinations, Mr. Swanson would not be provided with his own copy – instead, he was told that the Report "had been received by the Bank and was available for our review because we

---

[753] *Id.* at 1284 (Calcutt).
[754] *Id.* at 1186 (Doherty).
[755] *Id.*
[756] *Id.* at 1190 (Doherty).
[757] *Id.* at 1192 (Doherty); Resp. Exs. 18 and 20.
[758] Tr. at 1194 (Doherty).
[759] *Id.* at 1109-11 (Hollands).
[760] *Id.* at 493, 517 (Swanson).
[761] *Id.* at 494 (Swanson).
[762] *Id.* at 502 (Swanson).
[763] *Id.* at 502-03 (Swanson).

also had to sign that report."[764] This meant Mr. Swanson had to "go to Traverse City and request a conference room where I could look at the Report in detail," but could do so only on site.[765] He added that the Board members offered "no real comment" about the Reports, and played no role in shaping the Bank's response to the Reports – having not received the draft responses until after the final response had been sent to the Examiners.[766]

Mr. Swanson stated that he felt that he served as an independent member of the Bank's Board, exercising what he believed to be his responsibilities to the Bank as an independent board member throughout his tenure there.[767] Nevertheless, Mr. Swanson testified that "Scrub was very open about his adversarial relationship with the Bank Examiners," and ultimately, he (Mr. Swanson) resigned from the Bank's Board (in December 2011) having become "frustrated with the lack of progress on resolving the issues between Bank management and the regulators."[768]

### T. Concerns Regarding Limited Loan Presentations to the Board

The record also reflects that under Mr. Calcutt's direction, loan presentations before the Bank's Board of Directors did not include in-depth discussions regarding the proposed loans. According to the Bank's Director of Global Risk, Mark Smith, Board meetings were "relatively brief," and loans "weren't discussed at board meetings."[769] Instead, the "regular practice at Northwestern [was] to approve the loans via email with the Board members separately."[770]

This, in Mr. Smith's experience, was not customary in banks smaller than Northwestern – where typically loans "would be reviewed by the board members in person, all together, and discussed."[771] For banks the size of Northwestern and bigger, "you typically see a board-level committee discuss those, those new loan deals, or loans, in person also."[772] He added that while the Bank had a senior management level loan committee, he was not aware that the committee ever appeared before the Board, except through email transmissions.[773]

Mr. Gomez noted that the Bedrock Loan was funded by the Bank, with Mr. Calcutt's knowledge and approval, in December 2008, but the Loan was not actually presented to the Board for its approval until March 2009.[774] Mr. Gomez stated the evidence demonstrated that

---

[764] Tr. at 505 (Swanson). See also testimony from Board Member Byl to the same effect, that while Mr. Calcutt would make the Board members aware of upcoming examinations, this would be in the form of "in passing or in a meeting we may have that 'Oh, by the way, the Examination is here.'" Tr. at 1036 (Byl). Mr. Byl described actually meeting with examiners, but those meetings occurred after the 2011 Examination. Tr. at 1037-38 (Byl).
[765] Tr. at 505-06 (Swanson).
[766] Id. at 507 (Swanson). See also testimony from Board Member Byl indicating that Board members would not know if other board members had questions about the loans, and didn't know there was a process by which he could ask questions of the credit analyst, Ian Hollands. Tr. at 913 (Byl).
[767] Tr. at 516 (Swanson).
[768] Id. at 509-10 (Swanson). See also testimony of Board Member Bruce Byl, to the effect that he knew of no loan application that was ever declined, and that Mr. Calcutt hated anyone who questioned his authority at the bank. Tr. at 909, 913 (Byl). Mr. Byl testified that "I felt that we were making decisions in silence. There was no opportunity to discuss. We were never encouraged to discuss this between us." Tr. at 914 (Byl).
[769] Id. at 393 (Smith).
[770] Id.
[771] Id.
[772] Id. at 393-94 (Smith).
[773] Id. at 394 (Smith).
[774] Id. at 289 (Gomez).

Mr. Calcutt failed to seek approval of the Bank's Board of Directors before completing the loan, thereby (in Mr. Gomez's opinion) breaching the fiduciary duty of candor, behaving in a self-serving way (protecting his bonus and dividends), and failing to abide by the responsibilities he owed to the Board to disclose what was happening with the Bedrock Loan transactions.[775]

Referring specifically to dividends paid under conditions affected by Respondent's failure to disclose material circumstances pertaining to the Nielson Entities loan portfolio, Ms. Miessner noted that the Bank paid a $463,000 shareholders dividend during the second quarter of 2011.[776] She said regulator approval of that dividend was based on insufficient information, as the information the Bank provided to the FDIC in support of the dividend "did not disclose the fact that on April 20, 2011 the Bank had placed the Nielson loans on non-accrual and reversed all of the income that they had . . . accrued throughout 2011 to that point."[777] She added that under these circumstances, the Bank paid the dividend without disclosing that the Nielson loans were no longer performing and therefore should not have been incurring interest."[778] Ms. Miessner testified that as a result, with earnings overstated, because a portion of the capital calculation reflects current period retained earnings, "the capital numbers were overstated. The earnings numbers were overstated. And then the asset quality was misrepresented as well."[779]

By concealing from the FDIC the true state of the Nielson loan portfolio, the Bank paid a dividend that, according to Ms. Miessner, "exceeded year-to-date earnings and also violated the provisions in the Section 39 Compliance Plan that required Tier 1 capital to be 8.5 percent in conjunction with the asset growth plan, and [the provision that] the ALLL that was supposed to make the ALLL adequate and make sure that the Tier 1 capital doesn't go below 8.5 percent."[780]

### U. Respondent's Impact on the Bank's Call Reporting

According to Ms. Miessner, with respect to asset quality metrics, banks must use Call Reports to disclose "the number of days [a loan is] past due, whether or not a loan is on non-accrual, and whether or not the loan is a troubled restructured debt and, of course, charge-offs."[781] She said the Bank's CFO, Tom Levi, prepared the Bank's Call Reports, and that while

---

[775] *Id.* at 288 (Gomez).

[776] *Id.* at (Miessner); EC Ex. 48 at 65.

[777] *Id.* at 785 (Miessner). See also testimony of Mr. Jackson, confirming that the loans went on nonaccrual status in April 2011. Tr. (2015) at 1703 (Jackson).

[778] Tr. at 785-86 (Miessner).

[779] *Id.* at 786 (Miessner). See also testimony by Examiner O'Neill describing examiner concerns during the 2011 examination that by the Nielsons withholding payments, their actions threatened the overall financial health of the Bank, inasmuch as "they were the single largest borrowing relationship at Northwestern Bank. Their default would have had a very material impact on the institution." Tr. (2015) at 620 (O'Neill).

[780] *Id.* at 786-87 (Miessner); EC Ex. 105 at 9: "Following discussion [during the March 2011 Board meeting] a shareholder dividend in the amount of $462,950, representing approximately 9.87 of net income, was approved, the same amount paid since 2007."

[781] *Id.* at 861 (Miessner).

she did not know what Mr. Calcutt's actual role was in preparing these reports, "Mr. Calcutt is ultimately responsible for the information that's in the Call Reports".[782]

Notwithstanding Mr. Calcutt's testimony that he had "no involvement" in deciding what should or should not be reported in the Bank's Call Reports, and that the reports were "simply presented to me for signature,"[783] Mr. Calcutt had an affirmative obligation to certify the accuracy of those reports.

Testifying in 2019, Mr. Calcutt revised his answer to the question regarding his involvement in processing Call Reports, after stating he had "no involvement in the Call Reports," adding that "I had a CFO; I had a comptroller, and I had some very experienced people."[784] In testimony from neither hearing, however, is there any evidence that Mr. Calcutt actually consulted with those experienced people or took any steps to ensure that the information presented in the Reports was accurate.

### 1. Findings of Fact Regarding Respondent's Impact on the Bank's Call Reporting

Preponderant evidence establishes that Mr. Calcutt was actively involved in the review of the Bank's Call Reports, and was aware of the contents of those reports throughout the relevant reporting period.[785] The record reflects that Mr. Calcutt was adamantly opposed to the idea that the Bank's 2010 Call Reports needed to be restated.[786] The opposition was presented in the written response from Mr. Calcutt to Examiners following the Bank's receipt of the draft 2011 Report of Examination.[787] In responding to the Examiner's draft findings that there was a need to restate the 12/31/10, 3/31/11, and 6/30/11 Call Reports due to false or misleading reports of information, the Bank's response was "Management strongly disagrees with this violation" and refers the Examiners to the Bank's "memo dated 9/13/11 related to the restoration of loans to accrual status pertaining to the Nielson relationship loans."[788]

---

[782] *Id.* at 861-62 (Miessner) and transcript from the prior hearing at 1356-57 (Miessner). Also drawn from the witness's testimony at the prior hearing was her answer, in the affirmative, to the question whether her opinion would change if Mr. Calcutt "had absolutely no input into the decision as to what the contents of the classifications of the Bank were going to be in the Call Reports." Prior hearing testimony at 1450 (Miessner); and that she did not know what role Mr. Calcutt played in preparing answers to the examiners' questionnaires, testifying now that "I don't know his process. The process doesn't really matter, though, because it asks the question and he did not answer the question truthfully." Tr. at 865 (Miessner).

[783] Tr. 1757 (Calcutt).

[784] *Id.* at 1424 (Calcutt).

[785] *Id.* at 861-62, 865 (Miessner).

[786] *Id.* at 336 (Gomez).

[787] EC Ex. 53 at 3.

[788] EC Ex. 53 at 3. See also, EC Ex. 22 (7/26/10 File memo from Al Clark, FDIC Michigan Territory Field Supervisor re: July 23, 2010 Management Exit Meeting, Management Responses regarding Mr. Clark's and Ms. Miessner's observations during the exit meeting, when asked "How did Mr. Scrub Calcutt seem to respond to the FDIC's guidance or positions that were proposed during the exit meeting?" Ms. Miessner responded, "He disagreed with most of our recommendations. He disagreed with most of the apparent violations. And he disagreed with our analysis of the Bank's deteriorating financial condition", describing the FDIC's reference to the Examiners' interest rate risk analysis – i.e. the regulatory policy statement that sets forth what appropriate risk management practices are regarding interest rate risk – as "a bunch of crap." Tr. 754-55 (Miessner); Resp. Ex. 84 at 6 (7/30/10 email from EVP Jackson to Ms. Miessner reiterating "we strongly object to the findings and recommendations that were presented" during the Exit meeting; and Mr. Calcutt's testimony that the adjustments reflected "an insignificant amount, less than one-third of one percent adjustment in our Capital Ratio," Tr. at 1347 (Calcutt), and Resp. Ex.

Mr. Calcutt testified that while he knew generally what kind of information is contained in Call Reports, the reports were prepared by "our accounting people," adding "I had nothing to do with the preparation of Call Reports. Had no input in them, never offered any input."[789] He testified, unconvincingly in my view, that he never reviewed information in the Bank's Call Reports, leaving preparation of the reports to the Bank's comptroller and her staff, adding that he had nothing to do with the 2009 Call Report.[790] But whether or not Mr. Calcutt actually read the Call Reports he signed, he had a fiduciary duty to the Bank to do so, and as such breached that duty by not familiarizing himself with what he was signing.

Elaborating on this point, Mr. Calcutt testified that on those occasions where he actually signed a Call Report, even though by doing so he was certifying that he had examined the income reported and that the Report was prepared in conformance with the Report's Instructions, "[i]t would be no different if this were JPMorgan or Northwestern Bank; any director signing a report of condition like this would be relying on a team of people, the CFO, the comptroller, a number of accounting people in signing this."[791] Mr. Calcutt has offered no legal support for the proposition that if the Call Report concerned JPMorgan and its signer failed to read the Report before submitting it, such failure would somehow not constitute a breach of fiduciary duties owed to the institution.

Under Mr. Calcutt's direction, Mr. Smith participated in making the Bank's response to Examiners' determination that the December 31 2010 Call Report be restated: Mr. Smith testified that the examiners contended that the Nielson Loans should have stayed on the Bank's books in non-accrual status, dating back to the fourth quarter of 2010. Bank management, however, had determined to end the Loans' non-accrual status in April 2011, whereas the examiners determined the non-accrual status should have remained unchanged, and that the Loans "should never had been put back on an accrual basis of accounting."[792] Key to the disagreement was Mr. Calcutt's position that "the Nielsons had brought all their loans current and . . . had showed or had the ability to repay so [the loan] should be moved back to accrual status."[793]

At issue, from the examiners' perspective, were the circumstances known to the Bank's management relating to whether the Nielson Entities had *documented the capacity to repay loans* that had been renewed at the end of 2010.[794] Mr. Smith testified that senior Bank management members had directed him to look into whether the Bank could restore the Nielson Loan portfolio in 2011 in the same way the portfolio was restored to accrual status in 2010.[795]

---

182, Bank's Comments Regarding Exam Report for 6/30/11 Examination: "Even without Restatement the total net effect of all the Examination adjustments on reported Capital ad December 31, 2011 is a reduction of approximately 2.8M, which would reduce the reported Tier 1 Capital Ratio by only about 30 basis points. The impact on December 31, 2011 is much smaller than the impact on June 30, 2011 because many of the Examination adjustments were recorded in the third and fourth quarter of 2011."

[789] Tr. at 1300 (Calcutt).

[790] at 1300-01 (Calcutt). See also Mr. Calcutt's further testimony that "I had no involvement in preparing [Call Reports], reviewing them, and I may have signed one, again relying on other people, once in a blue moon, but I had not involvement in the Call Reports." *Id.* at 1337 (Calcutt).

[791] *Id.* at 1358 (Calcutt); EC Ex. 132.

[792] *Id.* at 427 (Smith).

[793] *Id.* at 582 (Smith).

[794] *Id.* at 429 (Smith).

[795] *Id.*

In resisting the examiners' direction to restate the Bank's 12/31/10 Call Report, Mr. Smith testified that – acting under Mr. Calcutt's direction – he questioned whether it was "really necessary to restate the fourth quarter" report.[796] Mr. Smith's first point was that the minimal nature of any accounting error would make a restatement of the Report unwarranted. He had reasoned that "taking the loans from an accrual basis to non-accrual would have reduced income by about $250,000 which, after taxes, [would be] $165,000, which we thought for a bank our size was not significant or material to have to restate the Call Report."[797]

The examiners, on the other hand, regarded the correction to be material.[798] Ultimately, amended Call Reports for the quarters ending December 31, 2009 through December 2011 were filed on July 10, 2012, and an amended Call Report for the quarter ending March 31, 2012, was filed on July 26, 2012, all as had been directed by the examiners.[799]

In support of the Bank's position and in response to the request from senior Bank management (including Mr. Calcutt), Mr. Smith produced a memorandum drawing guidance from Federal Financial Institutions Examination Council (FFIEC) Guidance (at FFIEC 031 and 041) that the Examiners had provided to the Bank, which stated:

> As a general rule, a nonaccrual asset may be restored to accrual status when (1) none of its principal and interest is due and unpaid, and the bank expects repayment of the remaining contractual principal and interest, or (2) when it otherwise becomes well secured and in the process of collection.[800]

Also included in Mr. Smith's memo to Bank management was this FFIEC Guidance:

> [F]or purpose of meeting the first test, the bank must have received payment of the past due principal and interest unless, as discussed below . . . the borrower has resumed paying the full amount of the scheduled contractual interest and principal payments on a loan that is past due and in nonaccrual status, even though the loan has not been brought fully current, and the following two criteria are met. These criteria are, first, that all principal and interest amounts contractually due (including arrearages) are reasonably assured of repayment within a reasonable period, and, second, that there is a sustained period of repayment performance (generally a minimum of six months) by the borrower in accordance with the contractual terms involving payments of cash or cash equivalents. A loan that meets these two criteria

---

[796] Tr. at 428 (Smith).

[797] *Id.*; see also testimony by Examiner O'Neill recalling "there was an argument by Mark Smith that the income that would have been foregone on the credits being placed on non-accrual would not have been large enough in relation to the total income, and the response very much made clear by those Regulators present, including myself, was that the principal balance of the Nielson relationship was so large that anyone attempting to follow trends would not have seen the large bump up in principal of things put on non-accrual as a form of red flag about asset quality concerns. So, yes. It had importance beyond the earnings foregone. That's my recollection of, at least my contribution to this, and there were others that ultimately contributed to the final examination findings that are presented in our Report of Examination on this topic." Tr. (2015) at 734-35 (O'Neill).

[798] Tr. at 428 (Smith).

[799] *Id.* at 598-599 (Smith); EC Exs. 78, 79. See also Mr. Doherty's testimony that he did not recall whether anyone from the FDIC instructed the Bank to classify the Nielson loans, but does not believe the Bank's examiners had instructed the Bank to classify the loans before the Bank did so. Tr. at 1212-13 (Doherty).

[800] Tr. at 429-31;(Smith); Resp. Ex. 60.2.

may be restored to accrual status but must continue to be disclosed as past due in Schedule RC-N until it has been brought fully current or until it later must be placed in nonaccrual status.[801]

Mr. Smith testified that senior Bank management had taken the position that it was "justifiable to restore the Nielson Loans back to accrual status after they went non-accrual in the fourth quarter of 2010."[802] He agreed that the test, stated above, is whether the Bank "expects repayment of the remaining contractual principal and interest."[803] He explained, however, that Management's position was in conflict with the examiners' position because the examiners felt the Nielsons "hadn't shown us a sustained period of repayment." He added that the Nielsons "made one payment and brought the loans all current and immediately moved them to accrual status without showing six months of payments first."[804]

During examination on behalf of Respondent, Mr. Smith agreed that the question then at issue was whether circumstances were such that the Bank expected repayment.[805] When presented with the factual premise that the borrower negotiated to pay down the debt with liquidation of some of the Pillay assets, Mr. Smith agreed that this one instance did not mean the Bank did not expect full repayment.[806] He added, however:

> Well, if you're extending credit for them to make their own loan payments and lead management to believe they are struggling to fulfill or expect repayment of all remaining contractual principal and interest, then yes, I think management should have a concern or doubt their ability to do that.[807]

Elaborating further on this point, when presented with the premise that Cori Nielson had written to Bank management and stated "If you will work with us through this recession/depression, it must end eventually, and it would be our intention to pay Northwestern fully 100 percent cash back," Mr. Smith was asked "would that have ameliorated your concern about whether management expected repayment in full?"[808] Mr. Smith responded:

> No. Their history of loan payments didn't show that they intended to pay off on their own. They only repaid us the end of 2009 through early 2011 with release of Pillay funds and funding of loans from us to repay their loans.[809]

---

[801] Resp. Ex. 60.2-60.3.
[802] Tr. at 431 (Smith).
[803] *Id.* at 648 (Smith).
[804] *Id.* at 432 (Smith); Resp. Ex. 60.3.
[805] *Id.* at 649 (Smith).
[806] *Id.*
[807] *Id.* at 649 (Smith).
[808] *Id.* at 652 (Smith).
[809] *Id.* at 653 (Smith). See also testimony of Examiner O'Neill, who was asked, based on Resp. Ex. (2015) 122 at 2, whether he would have taken consolation about the good faith of the borrower. Mr. O'Neill testified that he would not take consolation in this: "Actually it would be in a long line of traditions in any prudent banking that you would not look to this to be anything other than a recovery prospect. You would charge it off at a point in time when it is probable to be a loss, particularly if they are defaulted and you are starting to look for things like collateral with it releasing it, or by August 2011 there were already foreclosure proceedings, you are already looking to collateral at that point. At that point there is specific guidance that we have that says, no, you recognize the loss." Tr. (2015) at 654-54 (O'Neill).

Bank management's written response to regulators, which Mr. Smith gathered by talking with Mr. Calcutt, Mr. Doherty, Bill Green, and Dick Jackson, [810] was premised on senior management's representations to Mr. Smith that "the Bank expects repayment of the remaining contractual principal and interest, which I was told was true by senior management."[811] Further, Mr. Smith said that while he did not perform an independent analysis regarding the expectation of repayment by the Nielson Entities, he relied not only on the representations of Mr. Calcutt and others, but also on guidance from a CPA Mr. Smith reached out to – Kelly Bebow, a Principal at Rehmann, the Bank's external auditors.[812]

Without telling Ms. Bebow who the loan client was, Mr. Smith gave her details about the loans, and asked for her understanding of the above-cited FFIEC Guidance in the context described above.[813] Upon his presentation of the relevant facts as he saw them, Ms. Bebow told Mr. Smith that she interpreted the FFIEC Guidance on "Restoration to Accrual Status" to provide that "if all principal and interest is brought current and we expected full repayment of remaining principal and interest, we may restore the credit to accrual status."[814]

In his testimony, Mr. Smith agreed with the premise that because Immanuel LLC was in bankruptcy, there was no intent by the borrower to bring Immanuel current, so that would be an exception to his September 13, 2011 memo to Mr. Calcutt.[815] He also agreed with the premise that new, material concerns about his analysis arose when he became aware of correspondence by Cori Nielson, sent to the Bank prior to December 31, 2010, where Ms. Nielson indicated she could no longer make payments on these loans.[816]

Mr. Smith testified that he became aware of the existence of (but apparently not the contents of) correspondence from Ms. Nielson through a response sent to him on September 13, 2011, by Mr. Green, copied to Mr. Calcutt.[817] In it, Mr. Green wrote in response to Mr. Smith's request for input, to help Mr. Smith prepare to meet with the Examiners the next day.[818] In this email message, Mr. Green wrote: "I have no additional input. I would expect that the examiners may refer to two issues. One is that Cori Nielson had sent letters to the bank prior to 12/31/10 where she indicated she could no longer make payments."[819] Mr. Green apparently considered this to be less than significant, as he followed that statement with the statement that Ms. Nielson "had done this (verbally) on a prior occasion but then continued to make payments."[820]

---

[810] Tr. at 429-30 (Smith).

[811] *Id.* at 432 (Smith).

[812] *Id.* at 433 (Smith).

[813] *Id.*

[814] *Id.*; Resp. Ex. 60.3. In her September 1, 2011 email to Mr. Smith, Ms. Bebow elaborated: "It appears that the 6 months criteria is ONLY for those instances where the borrower has resumed paying but is not fully current. I will say, however, that in practice the bright line test of at least 6 months of consistent payment is generally followed. (Also, you will not find any such bright lines in GAAP.)" Resp. Ex. 66.1.

[815] Tr. at 435 (Smith).

[816] *Id.* at 435.

[817] *Id.* at 434-35; Resp. Ex. 178.

[818] Resp. Ex. 178.

[819] *Id.*

[820] *Id.*

The other issue was with respect to the Immanuel bankruptcy, where Mr. Green acknowledged that because there was no intent by Immanuel to repay, that loan would not fall within the scope of Mr. Smith's analysis.[821]

Mr. Smith testified regarding the context of this message:

> So [Mr. Green is] telling me even though the Examiners may say, "Well, the Nielsons say they don't have the ability to pay and won't repay," he was leading me to believe that they, this is more, this is them: They've said this in the past but they always continue to pay.[822]

At the time (*i.e.*, prior to the September 14, 2011 meeting with the examiners), Mr. Smith had seen none of the Nielson folio of correspondence between Cori Nielson (and Ms. Berden) and Mr. Calcutt and other Bank managers, and had seen no letters in the loan file reflecting statements, past or present, by anyone on behalf of the Nielson Entities, concerning an unwillingness or inability to repay these loans.[823]

Mr. Smith acknowledged that there were concerns about whether the Bank's security interest in the Pillay collateral was properly perfected; and agreed with the premise that it would be reasonable, under such circumstances, for the Bank to let the Nielsons use the collateral to pay down their debt, in both 2009 and 2010.[824] He also stated, however, that at the time of writing his memo to Mr. Calcutt he was unaware of how the Nielson Entity loans had been brought current in December 2010, and particularly was not aware of the role releasing the Pillay collateral played in bringing those loans current.[825] He testified that had he known about these details, he "would have come to a different conclusion – that they shouldn't have been moved back to accrual status" – "[b]ecause the customer[s] themselves hadn't shown the ability to repay on the loans without our release of collateral that they were paying on the loans." [826]

Elaborating, Mr. Smith testified:

> So in this instance, they were paying down on the loans but our collateral balance was less, so really . . . you're in the same situation; and they aren't showing the ability to bring in external money to pay on those loans.
> . . .

---

[821] *Id.*

[822] Tr. at 435-36 (Smith).

[823] *Id.* at 436 (Smith).

[824] *Id.* at 645-46.

[825] *Id.* at 441 (Smith).

[826] *Id.* See also testimony from Examiner O'Neill who noted that in the September 13, 2011 analysis, Mr. Smith advanced the premise that in December 2010, "the Bank had no reason not to expect repayment" from the Nielson related entities, and in support of this premise noted that "Frontier Energy, a Nielson related entity, had recently received a $10 million lawsuit settlement" which was believed to be unencumbered. Mr. O'Neill explained that through this analysis, the Bank was presuming the commingling of these funds: "In other words, whether Frontier Energy gets some sort of windfall, how does that help Bedrock? How does that help NRJ? It had been the Bank's representation to us all along that these are separate entities, that we shouldn't be lumping them together into one borrower. That was inappropriate." Tr. (2015) at 665 (O'Neill). See also testimony of Mr. Jackson, confirming that he did not know if Frontier had any obligation whatsoever to send the $10 million in funds to any other Nielson Entity. Tr. (2015) at 1666 (Jackson).

> You kind of have . . . using collateral from one loan and then repaying on multiple loans, so those additional loans, those loans themselves don't show the ability to repay. Those entities themselves don't show the ability to pay on those separate loans, so it leads you to believe that it's really just one large entity that you're lending to, not multiple entities.[827]

Knowing now what he did not know when he wrote the memo preceding the September 14, 2011 meeting with the examiners, Mr. Smith testified that he no longer agrees with the conclusion in his memo, and offered the opinion that the loans described in the memo should not have been returned to accrual status "because the Nielsons had brought 'em current . . . through the release of collateral and through the extension of credit by . . . the Bank."[828] He added that this change of opinion was based solely on what he learned regarding the use of the Pillay collateral – and that he did not learn about the Bedrock Loan's role in servicing the Nielson loans until January 2012.[829]

To much the same effect, Mr. Smith testified that the Bank's more formal response to examiners, in the form of a memo to Mr. Gomez and Ms. Thompson dated December 13, 2011, was "basically the same" as the Bank's response to the draft Report of Examination, and again, was the product of a collaboration with Mr. Calcutt and other members of the Bank's senior management team.[830] Here again, Mr. Smith noted that the response – which gave a four-point argument that the Nielson Entities "had the wherewithal to pay on the loans" came directly from Mr. Calcutt, Mr. Jackson, and Mr. Doherty.[831]

Mr. Calcutt testified to the same effect – recalling his email message to Mr. Green dated September 22, 2009, in which Mr. Calcutt forwarded Ms. Nielson's September 21, 2009 email in which she stated her intention to "pay Northwestern fully 100% cash back."[832] According to Mr. Calcutt, "knowing that they had significant financial resources, we expected them to repay their loans. With interest."[833]

While testifying that Mr. Calcutt never told him to withhold information from the Examiners,[834] Mr. Smith testified that "I believe [Bank] management knew the Nielsons were experiencing financial difficulty and it wasn't just posturing. [That they] had extended credit and a release of collateral so the customer could make payments on their loans is really the definition of an entity experiencing financial difficulty."[835]

Mr. Smith began inquiring about the Bedrock Loan transaction in a January 9, 2012 email message he sent to Mr. Green and other senior Bank managers.[836] He did so in response to an email inquiry by the FDIC's Case Manager Miessner dated December 15, 2011.[837] In her email to Mr. Smith, Ms. Miessner noted that Mr. Green had "provided a memo to examiners re:

---

[827] Tr. at 442-43 (Smith).
[828] *Id.* at 445 (Smith).
[829] *Id.* at 445-47 (Smith); EC Ex. 55.
[830] Tr. at 584-85 (Smith); EC Ex. 60.
[831] Tr. at 587 (Smith).
[832] Tr. at 1283 (Calcutt); Resp. Ex. 17 at 2.
[833] Tr. at 1283 (Calcutt).
[834] *Id*. at 639 (Smith).
[835] *Id.* at 583 (Smith).
[836] *Id.* at 448 (Smith); EC Ex. 55.
[837] Tr. at 446 (Smith); EC Ex. 55.

failure to document Nielson loan approval in Dec 2009."[838] She told Mr. Smith that she hadn't seen Mr. Green's memo and asked Mr. Smith to provide her with a copy.[839] Mr. Smith provided a copy of the memo, which is not dated,[840] but which provided Mr. Green's version of the circumstances surrounding the Bedrock Loan.[841]

Mr. Smith testified that he sought input from Mr. Green after the Bank's examiners had asked for an explanation for why the approval of the loan had not occurred until three or four months after the loan funds were disbursed.[842] In accounting for the length of time from when "the new loan of $760,000 was extended in 12/09," to the time of the loan's "actual approval" in March 2010, Mr. Green made no mention of approval by the Bank's Board of Directors during this period, but instead wrote that the loan had been "verbally approved" at meetings "between the bank and the borrower" after "discussions at the bank with the approving group," inferring that the delay was because he had been "tied up with several other loan requests at year end so the approval followed the verbal ok."[843]

Mr. Green added that the Bedrock Loan "was for working capital purposes" but stated "I cannot say exactly how the borrower or members used the money."[844] He added that disbursement "mostly would have been in the Team Services business but they may have disbursed funds to members as they are allowed to do. Members could do many things with it including invest in other borrowers they have an ownership in."[845] There is in the record, however, no evidence that proceeds of the Bedrock Loan mostly went to the Team Services business.

Mr. Smith also identified a January 19, 2012 letter from Mr. Calcutt to David K. Mangian, Assistant Regional Director for the FDIC.[846] Mr. Smith testified that working with his brother, attorney Bill Calcutt, Respondent Scrub Calcutt provided these responses to the FDIC's questions about the 2009 Bedrock Loan.[847]

In the attachment accompanying this letter, Scrub Calcutt stated that "some of the proceeds [from the Bedrock Loan] were used for loans with Other Entities" and before the 2009 Bedrock Loan "a partial release of the pledged Pillay Units was granted by Northwestern, with the understanding that the funds, as a result of that partial release, would be used by Bedrock to cover principal or interest payments on Bedrock loans and loans to some of the Other Entities" (where "Other Entities" was described as outstanding loans Northwestern had with "various

---

[838] EC Ex. 55-002.

[839] *Id.*

[840] Mr. Smith testified Mr. Green's memo was prepared "probably in September 2011." Tr. at 446 (Smith)

[841] EC Ex. 55-001.

[842] Tr. at 446 (Smith).

[843] EC Ex. 55-001.

[844] *Id.* See also testimony by Examiner O'Neill stating that examiners had "demonstrated through the tracing of bank records that the $760,000 was largely used for the purpose of keeping existing loans current, not for working capital" and upon that premise opining that Mr. Green's response here was not a true statement, nor was his statement that he "cannot say exactly how the Borrower or members used the money" because Mr. Green "was intimately involved in how the funds were disbursed, how restricted deposit accounts were created and the arrangements in which those restricted deposit accounts were used to continually make monthly loan payments on existing loans." Tr. (2015) at 600-01 (O'Neill); EC Ex. (2015) 55.

[845] EC Ex. 55-001.

[846] Tr. at 566 (Smith); EC Ex. 64.

[847] Tr. at 567 (Smith).

entities managed by Waypoint Management or other (entity) managers that were managed by all or some of the managers of Waypoint Management.")[848]

Upon reviewing this explanation, Mr. Smith testified:

> After reading this and, and further analysis, that included this and I'm aware of the proceeds of the 2009 loan and the release of the Pillay Collateral, my conclusion would have been not to put it back to accrual status from the fourth quarter 2009 forward. To leave it in non-accrual status, I mean, from fourth quarter 2009 forward.[849]

Mr. Smith testified that it was clear to him during the 2011 Examination that an examiner had begun tracing the Bedrock Loan proceeds from December 2009, along with the release of the Pillay funds.[850] He testified that "I was aware or I assumed that's what the Examiner was doing, based on the deposit histories and the loan histories that he requested to look at the timeframes that he was looking at."[851] This raised concerns with Mr. Smith, and he in turn raised the matter during "regular meetings" with Mr. Calcutt and other senior Bank managers.[852]

One of those concerns involved a lending limit violation: In the August 1, 2011 draft Examination Findings, examiners wrote that there was a lending limit violation: "2/3 Board approval required on loan exceeding 15% capital and surplus. (State Law)  This is in reference to the Bedrock Holdings loan, dispersed [sic] December 2009 and Board approved March 2010."[853]

Upon consulting with Mr. Calcutt and other senior Bank managers, Mr. Smith responded to the examiners by writing that "this was a documentation oversight by management."[854] He said that this answer came from his understanding of the circumstances as Mr. Green had explained them, in the memo attributing the delay in obtaining Board approval to the fact that (Mr. Green) had "been tied up with several other loan requests at year end".[855] With respect to the claim that the Bank's Board "was fully aware of this loan prior to disbursement of the loan," Mr. Smith said he had been told this "by Scrub Calcutt, Dick Jackson, Mike Doherty, and Bill Green, most likely," while "we would have all been sitting around the table discussing our response to these, and this is the response that management wanted drafted."[856]

When presented with a copy of the Bank's Management Responses to the draft summary of Examination Findings for the August 1, 2011 examination, Mr. Calcutt denied recognizing it, notwithstanding that it bore his signature under the certification that each person signing the Responses "attests to the responses contained therein".[857] Mr. Calcutt refused to

---

[848] EC Ex. 64 at 3.
[849] Tr. at 568 (Smith).
[850] *Id.* at 572 (Smith).
[851] *Id.*
[852] *Id.* at 573 (Smith).
[853] EC Ex. 52 at 1.
[854] *Id.* at 2.
[855] Tr. at 580; EC Ex. 55 at 1.
[856] Tr. at 580-81 (Smith).
[857] *Id.* at 1359; EC Ex. 52 at 17.

agree to the premise that he cannot delegate his responsibilities when signing the Responses, testifying that "I would sign this, but I would be relying just as any other institution would be on other people for the appropriate response."[858]

Mr. Doherty testified on this point, agreeing that Mr. Calcutt was on the Senior Loan Committee that had before it the Bedrock loan, and agreed that the removal of the Nielson loans from the Delinquency Report in November 2009 also would have been discussed by the Senior Loan Committee members.[859] He further agreed that there would at this time have been some urgency in trying to cure delinquencies prior to the year end, and agreed that from the records presented to him – that there was the new $760,000 loan, and that as of the November 30, 2009 Delinquency Report it reflected that the Nielson loans were no longer delinquent – this indicated to Mr. Doherty that the Senior Loan Committee had approved the $760,000 loan.[860]

As noted above, following the 2011 Examination, the FDIC provided a draft summary of Examination Findings dated August 1, 2011, which included a description of violations found during the exam along with a record of the Bank's response thus far, asked for responses from Bank management in those cases where issues were noted and no response had yet been supplied by the Bank, and asked the Bank managers to note "any responses you feel are inaccurate."[861] Mr. Smith was tasked in November 2011 with providing the responses sought by the FDIC.[862]

The result was presented as an exhibit during the hearing, and bears the signature of Mr. Calcutt, the Bank's Executive Vice President, Richard Jackson, the Bank's Chief Financial Officer, Thomas Levi, its Vice President, Credit Administration, Mike Doherty, and Mr. Smith, as the Director of Global Risk.[863] From this record, preponderant evidence establishes that Respondent fully participated in making the Bank's response to the FDIC, and that he was fully aware of the contents of that response, as it had been sent at his direction.

Testimony from Board member Ronald Swanson provided additional evidence regarding the nature of the disclosures by senior Bank managers regarding the renewal of the Bedrock Loan as that loan became due on January 20, 2011. Mr. Swanson was presented with a copy of a Commercial Loan Special Request dated December 20, 2010.[864] After reviewing the document during the hearing, Mr. Swanson said he did not recognize it, and although the Request indicates it was approved at a Board meeting, Mr. Swanson did not recall it.[865] After reviewing it, he agreed with the premise that the Request makes no reference to Bank collateral (specifically the Pillay collateral) being released, nor does the Request reveal how the released collateral would be used.[866]

After being presented with a chart showing the distribution of proceeds from the 2009 Bedrock Loan (identifying each of the Nielson Entities and how the proceeds were distributed

---

[858] Tr. at 1360 (Calcutt).
[859] *Id.* at 1192 (Doherty); Resp. Exs. 18, 19 and 20.
[860] Tr. at 1194-95 (Doherty).
[861] EC Ex. 52 at 1.
[862] Tr. at 578, 579 (Smith).
[863] EC Ex. 52 at 17.
[864] EC Ex. 30.
[865] Tr. at 494 (Swanson); EC Ex. 30.
[866] Tr. at 495 (Swanson); EC Ex. 30. See also testimony of Mr. Jackson, confirming that the request does not include reference to the release of the Pillay collateral. Tr. (2015) at 1691 (Jackson).

to them[867]), Mr. Swanson testified that, with respect to the original Bedrock Loan, he could recall no time when he had been advised by the Bank's management that the $600,000 collateral release of the Pillay funds would be used to service current multiple Nielson Entity loan accounts, or that the $760,000 loan proceeds were to be held in reserve to make future loan payment not only for the Bedrock account but numerous other Nielson-controlled entities.[868]

Mr. Swanson also testified regarding Concentration Reports, which he described as a listing in the Bank's loan portfolio designed to show concentrations in a particular industry or commercial real estate credit type.[869] He explained that the Bank assembled these reports at his request, because he wanted to see what concentrations there might be within the Bank's commercial loan portfolio.[870] He sought Concentration Reports because "it seemed to me that there was a large portion of the portfolio, given the presentation sheets I was looking at, that were related to real estate, and I wanted to see if our portfolio percentage was high in relation to the total portfolio in commercial real estate."[871]

Mr. Swanson testified that the Bank's Chief Financial Officer, Tom Levi, attended each Board meeting and occasionally would comment with respect to the Report's "Score Card," which was "a snapshot of some of the highlights in the deposit and lending area as related to each month's activity."[872] He then identified the Bank's Commercial Loan Delinquency Report.[873] He noted that the Loan Delinquency Report reflected current delinquent loans in the Bank's commercial portfolio, but stated that there was nothing in that report that indicated a relationship among the multiple Neilson Entities listed.[874]

Mr. Swanson stated that by November 2009, if not before, he became aware that the Nielson aggregate debt was very substantial, in the $40 million range.[875] He said the matter came up not as "a question that I had, but Scrub Calcutt explained that this [i.e., the October 31, 2009 Commercial Loan Delinquency Report] is largely the Nielson credits."[876]

Mr. Swanson described further discussion about these delinquencies thus:

> At that point, I addressed both Scrub Calcutt and Tom Levi about the unit borrowings regulations in Michigan, about the Examiners' accepting or passing, if you will, their term on those credits. I don't recall beyond that.

---

[867] Tr. at 497-989; EC Ex. 133.
[868] Tr. at 496-97 (Swanson).
[869] *Id.* at 498-99 (Swanson).
[870] *Id.* at 499 (Swanson).
[871] *Id.* at 501 (Swanson). Mr. Swanson's concerns appear to have been well-founded. In the Board's response to the 2011 Joint ROE, the Bank wrote that its adversely classified assets "were significantly impacted by the addition of the Nielson-managed entity loans during the most recent exam period. The addition of these loans approximately doubled the Bank's adversely classified assets. Aside from this unique concentration, non-performing loans have not grown as significantly as it would appear." EC Ex. 76 at 3.
[872] Tr. at 519-20 (Swanson).
[873] *Id.* at 500 (Swanson); Resp. Ex. 18.
[874] Tr at 500 (Swanson); Resp. Ex. 18.
[875] Tr. at 523 (Swanson); Resp. Ex. 18.
[876] Tr. at 524 (Swanson); Resp. Ex. 18.

But they both responded that the Bank Examiners had passed on those credits and so that they were not considered under the unit rules.[877]

Preponderant evidence as set forth above establishes the response by Mr. Calcutt to Mr. Swanson's questions here was misleading, and that, when given, Respondent knew his answers to Mr. Swanson would be material to the performance of Mr. Swanson's role as a member of the Bank's Board of Directors, and that the answers were misleading.

While mindful of Respondent's factual claim that "the cause and cure of the $40 million jump was clearly discussed,"[878] I find preponderant evidence establishes the Board members were not told of the relationship among these borrowers – making it impossible in 2009 for the Board members to fully understand the regulatory impact of the aggregated debt.

There also is testimony that one of the steps taken by the Bank's Board of Directors after it became clear that regulators were questioning the Nielson loan relationship generally was to "do the independent loan review of the Nielson relationship" – here accomplished by retaining the regional CPA firm of Plante & Moran for this purpose.[879] Initiated during a meeting of a special committee created by the Bank's Board of Directors in January 2012, Mr. Smith explained that the review was to examine the Nielson relationship and determine if there were other relationships similar to that the Bank had with the Nielson family.[880]

The independent loan review, completed in August 2012, concluded that "the length of time between the [Bedrock] loan closing (12/3/09) and Board approval (3/16/10), 103 days, as inconsistent with stated Bank policy and based upon our experience with similar financial institutions, highly irregular."[881] The review also concluded that the "use of the term 'working capital' to describe the Bedrock loan was not accurate."[882] The review found that "[g]iven that the loan officer, Bill Green, and Scrub Calcutt were aware of how loan proceeds were to be used, the use of 'working capital' to describe the loan can be viewed as being vague."[883]

### 2. Findings of Fact Regarding Respondent's Knowledge that the Purpose Stated in the Bedrock Loan Application was Misleading

Preponderant evidence as set forth above establishes that Respondent knew the description of the purpose of the Bedrock Loan was not only vague, it was also

---

[877] Tr. at 527 (Swanson). See also testimony of Examiner O'Neill on the unit borrowing rule: "The unit borrowing rule or the part of the loan to one borrower law under Michigan law has to do with the total relationship of interrelated borrowers and whether or not there is sufficient basis for grouping those together and calling them essentially a loan to one borrower. In the case of the Bedrock loans, there is an absolute limit of 25 percent of common stock in surplus and then there is a 15 percent threshold which above you can go if you take the loan prior to it being granted to September 17, 2015 the full Board and get at least two-thirds of that Board's voting in favor of it." Tr. (2015) at 637 (O'Neill). In Mr. O'Neill's opinion, from his review of communications from the Nielson borrowers and Autumn Berden, Mr. Green set up the flow of money to the Nielson Entities "in such a way to make it untraceable" except through tracing "the disbursement of the loans through checking account images to the ultimate loan payments" which, according to Mr. O'Neill, was information that was not maintained in the Bank's loan files. Tr. (2015) at 638-39 (O'Neill).
[878] Respondent's Post-Hearing Brief at 7.
[879] Tr. at 588 (Smith).
[880] *Id.* at 589 (Smith).
[881] EC Ex. 77 at 12.
[882] *Id.* at 13.
[883] *Id.*

misleading, as it failed to fully disclose material information known to Respondent relating to the true purpose of the Bedrock Loan.

The Bank in 2012 entered into a Consent Order, following FDIC Examiners' 2011 findings of a "pattern of noncompliance with laws and regulations, noncompliance with Interagency Policy Statements, and disregard for regulatory recommendations over an extended period."[884] Also following the 2011 ROE, the Bank commissioned a management study, performed by FinPro, designed to "look at the structure of the Bank and also specifically senior management of the Bank," to determine whether or not management was "able to fulfil their capacity as the senior management, and also the structure of the Bank, whether it made sense for a bank of the size that we were."[885]

The FinPro management study was in addition to the work of an external loan reviewer, described by Mr. Smith as "an independent, fresh set of eyes outside of your Credit Administration team that goes in and reviews the credit and determines what they think the credit should be rated at, whether it's a good loan, substandard loan, and so on."[886] Mr. Smith added, however, that the Bank's examiners had expressed concern that this reviewer (JWM Consulting Services, Inc.) had not included the Nielson loan portfolio in its review, because, according to Mr. Smith, "I believe they had been instructed not to look at them because I was told the Examiners look at them every year, so no sense in paying JWM to look at them also."[887]

Mr. Smith explained that given the way the multiple Nielson Entities were interrelated, and given how the Bank maintained the accounts, where individual loans were not aggregated in the Bank's records, unless the examiners knew the Nielsons, it would not be apparent to anyone doing a loan review (either an external review or a review by regulators) that there was a relationship among these borrowers.[888] He testified that the impact of this on risks attributable to these accounts would be that if one of the accounts is struggling, "it could pull them all down, and if it pulls them all down at the time there's $35 million in loans out to the Nielson relationship, that would have been a major hit to the Bank for all of them to go bad at the same time."[889]

The record reflects that the process by which senior Bank managers, including Mr. Calcutt, facilitated the servicing of the Nielson loans through advancing new funds to keep the loans current violated Bank policy.[890] In the Material Weaknesses section of the Management Report Regarding Internal Controls and Compliance with Designated Laws and Regulations that Mr. Smith drafted (with input from the Bank's external audit firm, Rehmann), the findings (which were approved by both Mr. Calcutt and the Bank's Chief Financial Officer, Thomas Levi) include the following, concerning two loans that were not related to the Nielson Entities:

---

[884] Tr. at (Smith); EC Ex. 70.
[885] Tr. at 594-95 (Smith); EC Exs. 83-84.
[886] Tr. at 601-02 (Smith).
[887] *Id.* at 603-04 (Smith); EC Ex. 89. See also testimony of Mr. Hollands, stating the Nielson loans were excluded from credit review "because they were reviewed by Examiners every year." Tr. at 1113-14 (Hollands). To the same effect, Mr. Doherty testified the Bank "would exclude them because they were getting reviewed by Examiners during their exams." Tr. at 1215 (Doherty).
[888] Tr. at 605 (Smith).
[889] *Id.* at 606 (Smith).
[890] *Id.* at 608-09 (Smith); EC Ex. 61 at 2.

> Two loans were noted to be past due as of September 30, 2011, and became current on or before December 31, 2011 as a result of the Bank advancing new funds to keep the loans current or off the past due loan listing. While in both situations the Bank obtained additional collateral, it is against the Bank's policies and procedures to advance funds to keep loans off the books.[891]

Mr. Smith agreed that during the hearing conducted in 2015 in this administrative enforcement action, when he was asked about the Bank's policies in this regard, he testified that the language about advancing loans to keep funds current came into effect as part of the Bank's Section 39 compliance plan, which would indicate the policy was not in place before the 2010 Exam.[892]

### 3. Findings Related to the Costs Associated with Respondent's Misrepresentations

There is in the foregoing record preponderant evidence that because Respondent and other senior Bank managers had misrepresented the condition of the Bank to its Board of Directors and to Bank's regulators, the Bank needed to hire and pay for a third-party consulting firm to investigate the handling of the Nielson relationship.

### V. Costs Associated with Respondent's Misconduct

As noted above, amended Call Reports were filed for the last quarter of 2009, and each quarter of 2010 and 2011, and included what Mr. Smith described as material restatements.[893] Summarized, these amendments reflected a $2.8 million negative adjustment to the Bank's net income.[894] The Bank's external auditors, Rehmann, agreed with the conclusion that the Call Reports needed to be restated, and upon receiving updated appraisals, the result was an increase in losses that "resulted in more of an impact on retained earnings."[895] This was not, however, the only cost associated with Respondent's course of conduct.

Mr. Smith completed a study of the costs the Bank had incurred "as a result of our issues with the FDIC".[896] Included were the costs of officer legal fees that had been paid by the Bank, legal consulting fees, increased audit fees, and FDIC assessments that would increase "as a result of our CAMELS ratings" change.[897] The total increased cost associated with these

---

[891] Tr. at 608-09 (Smith); EC Ex. 61 at 2.

[892] Tr. at 634-35 (Smith). Mr. Smith also testified that while these two loans were not related to the Nielson Entities, the auditors discovered the reported loans while doing a test "to define other instances similar to the Nielson relationship where loans were extended to keep them off the past due listings." Tr. at 610 (Smith).

[893] Tr. at 599-600 (Smith); EC Exs. 78-79.

[894] Tr. at 600 (Smith); EC Ex. 79. See also EC Ex. 148 at 44-45: The Bank's Consolidated Financial Statements, prepared by Rehmann for years ending in 2011 and 2010 reported a total of $5.3 million in restated retained earnings. But see testimony of William Calcutt that during the Immanuel bankruptcy litigation, while it at first appeared the Bank would be "about a million three short", "if the alleged transfers of those properties could be brought in, we estimated the value of [approximately 20 fraudulent transfers by Immanuel] were over two million which would have made the Bank whole." He added that at the time it was estimated the properties were worth $2.2 million or more, "more than sufficient to cover that $1.3 [million] shortfall." Tr. at 1143, 1146, 1151, 1165 (W. Calcutt); Resp. Exs. 17 (confidential settlement discussions email dated 9/22/09) and 70 (Settlement agreement in the Immanuel bankruptcy proceeding).

[895] Tr. at 625-26 (Smith).

[896] *Id.* at 611 (Smith); EC Ex.116.

[897] Tr. at 611-13 (Smith); EC Ex 116.

issues was shown as $2.29 million.[898] Further, the Bank, through Mr. Levi and as reviewed by Mr. Smith, recalculated the bonus that Mr. Calcutt was entitled to, taking into account the effects of the Bank's restated Call Reports.[899] In this context, restatement was warranted because the Bank had claimed it had received interest payments on the Nielson loans, and while the Bank had in fact received the money, it was not able to claim the money as interest income.[900] Nevertheless, after restatement the Bank was still profitable each year, with $1.8589 million in profits in 2009, $2.619 million in 2010, and $4.2 million in 2011.[901]

Mr. Calcutt testified that he followed the bonus formula of his predecessor, which had been 5.5 percent, "but then I reduced it when the Great Recession came. Reduced my salary. I was the only employee in the Bank to reduce my salary and I reduced my bonus percentage" to four percent.[902] And even at that, according to Mr. Calcutt, he was "underpaid" and is "still owed the money."[903]

According to Mr. Smith, Mr. Calcutt was entitled to a bonus based on Bank income of four percent.[904] Due to the Bank's restated Call Reports, CFO Levi found that under the original reports Mr. Calcutt accrued a total bonus of $1,258,121, while under the Call Reports as restated through the third quarter of 2012 that accrual was $1,103,190, a drop of $154,931.[905]

Further, Mr. Smith testified that the Bedrock collateral ultimately was taken into the Bank's possession, and sold off, resulting in a loss to the Bank.[906]

Ms. Miessner agreed that the Bank's net income, while reduced in 2009 and 2010, increased in 2011 as a result of the adjustments in the restated Call Reports:

> And that's a result of the fact that in 2011 when the Bank recognized the Nielsons as problem credits for the first time and put in a large provision expense which is, a provision expense is an allotment of funds towards the allowances for lease losses, so they had put all of that into 2011; and so when we had to move that back to 2009 and 2010 to accurately reflect the

---

[898] EC Ex. 116 at 2.

[899] Tr. at 616-18 (Smith); EC Ex. 117.

[900] Tr. at 662-63 (Smith).

[901] *Id.* at 664 (Smith). (Tier I Capital was estimated after restatements but before auditor adjustments at 7.62 in 2009, 7.44 in 2010, and 8.67 in 2011. Per the Bank's Section 39 Plan, it was required to have capital of 8.5 percent after 2010. Tr. at 665-66 (Smith). See also EC Ex. 79 (Call Report Restatements Proposed by the Bank through December 31, 2011); testimony of Ms. Miessner: "the amount of interest that the Bank was earning on the Nielson credits was about – in 2009 was 30 percent of net income before tax based on what they reported originally at 2009. So a 30 percent decrease in their earnings, especially in a situation where they were in 2009 where earnings were already declining, that 30 percent reduction to earnings was very significant given their earnings profile or their earnings performance at that time." Tr. at 801 (Miessner).

[902] Tr. at 1347 (Calcutt).

[903] *Id.* at 1348 (Calcutt). But see EC Ex. 117, Recalculated Bonus Calculation showing Respondent had been overpaid $68,841 in 2009 and $59,858 in 2010.

[904] *Id.* at 619-20 (Smith). But see EC Ex. 79 (Call Report Restatements Proposed by the Bank through December 31, 2011); transcript of Ms. Miessner, confirming the ending balance of net income before tax fell from $6.9 million to $2.8 million. Tr. at 802 (Miessner).

[905] Tr. at 618-10 (Smith); EC Ex. 117. But see Tr. at 632-63 (Smith) confirming prior testimony by the witness that after restatement of the Call Reports, he agreed during the prior hearing that Mr. Calcutt was actually paid less than the amount he was entitled to under the restated Call Reports.

[906] *Id.* at 620-21 (Smith).

risk profile of the institution in those years, then there was less that was needed by the time you pull all of that forward to 2011.[907]

### 6. Issues Pertaining to the Civil Money Penalty

Ms. Miessner testified that civil money penalties "are analyzed on an individual, case-by-case basis."[908] She was asked whether, in her opinion, Mr. Calcutt's misconduct merited a civil money penalty of $125,000, and responded that it did, opining that the level of misconduct, the ongoing nature of the misconduct, and Mr. Calcutt's refusal to cooperate all form the basis for that opinion.[909]

Asked on cross examination whether such penalties are typically sought where the person answering examiner questionnaires simply looked at answers given in prior years and "did not give the care that he should have in answering these questions," Ms. Miessner responded that she "can't really provide an opinion on whether the FDIC would consider CMPs on a situation such as that or not."[910]

Examiner Dennis O'Neill prepared a draft recommendation for the proposed penalty, using a matrix through which a penalty analysis is conducted.[911] Ms. Miessner then reviewed the draft recommendation, and submitted it for approval through the FDIC's regional management.[912] She testified that she considered factors set forth in the applicable regulations and statute, and the factors required under the FFIEC.

With respect to Respondent's good faith, Ms. Miessner concluded that Respondent had not acted in good faith:

> . . . that throughout the time period where we were looking at this and talking to him to try to get answers, he did not fully disclose to us the nature of the Bedrock Transaction. He never took the opportunities that were given or even made opportunities of his own to come to us and explain to us what happened, why it happened. There were a lot of questions about, you know, well, how do you know his intent? Well, we don't. Because he didn't, he didn't come talk to us. He didn't share that with us. And so we determined, the FDIC determined that he had not acted in good faith both, you know, leading up to us identifying the practice; and also subsequent to us notifying him that we knew what happened, he still hadn't acted in good faith.[913]

With respect to the gravity of the violation, Ms. Miessner concluded thus:

> So in the regulatory world, having a concentration of this size that the Nielsons, that the Nielson Loans represented, just having a loan relationship that size was imprudent anyway. That presented a lot of risk to the Bank, which presents a lot of risk to the Deposit Insurance Fund which is where,

---

[907] *Id.* at 825-26 (Miessner).
[908] *Id.* at 866 (Miessner).
[909] Tr. at 811 (Miessner). Ms. Miessner further testified that it is her understanding that Mr. Calcutt "has stipulated to the fact that he has the ability to pay" a $125,000 penalty if it is assessed.  Tr. at 811-12 (Miessner); Joint Ex. 16.
[910] Tr. at 886 (Miessner).
[911] *Id.*
[912] *Id.*
[913] *Id.* at 887 (Miessner).

you know, our two interests lie: Risk to the Bank, risk to the Fund. And then on top of that, the relationship was managed imprudently for many years as far as allowing the Borrower to take draws on loans to make payments on other loans, capitalizing interest, not performing global financial analysis. So you have this huge concentration of credit that's 50 percent of the Bank's capital and yet bank management is continuing to loan them more and more and more money without ever doing a global financial analysis and really understanding the whole financial position of this borrowing group.[914]

With respect to Mr. Calcutt's history of previous violations, Ms. Miessner "was able to trace back to at least 2004" where the 2004 Examination cited several of the same types of lending practices that were still occurring in 2010. And that of course occurred in conjunction with the Bedrock Transaction."[915]

For his part, Mr. Calcutt testified that the Bedrock Transaction was not a significant transaction for the Bank in 2009: "[E]ach of the loans was individually underwritten, well-secured with mortgages and separate cash flow. They stood alone. The entire relationship amounted to less than 7 percent of our loan portfolio. Yes, it was a large relationship but less than 7 percent of our loan portfolio. A $760,000 loan is one-tenth of one percent of our whole loan portfolio at that time."[916] As noted above, however, not all of the LLCs had cash flow, and in the absence of current appraisals, it was not possible to determine whether the loans were well-secured with mortgages.

With respect to whether Respondent's breaches of fiduciary duties owed to the Bank, or his unsafe practices, were intentional or committed with a disregard for either the law or the consequences to the Bank, Ms. Miessner testified thus:

So I believe that the conduct related to the loan portfolio and the unsafe and unsound practices that, that the Bank had a history of doing, the fact that, you know, it wasn't like we just found this one time and then now we're going "Oh, my gosh, you did a bad thing." This was traced back many, many years. And so that's where we think that it was a willful disregard because they willfully disregarded the FDIC and the State when the FDIC and the State said we have concerns with capitalizing interest. We have concerns with equity pulls. We have concerns with the fact that the Bank is allowing draws on one loan to make payments on another loan and that masks the past due status of the loan, provides an appearance of a performing loan. Those types of language are in reports, again going all the way back to 2004. And so, so we believe that it's a willful disregard for safety and soundness standards that are, you know, readily available for him to look up on the internet and read them if he didn't know what they were already, right? And willful disregard for regulatory recommendations.[917]

---

[914] *Id.* at 888 (Miessner).
[915] *Id.* at 888-89 (Miessner).
[916] *Id.* at 1425-26 (Calcutt).
[917] *Id.* at 890-91 (Miessner).

With respect to the duration and frequency of both the unsafe practices and fiduciary breaches, Ms. Miessner opined that "this type of behavior" goes back many years and was not limited to the Nielson credits,[918] and continued even after the matters were brought to Mr. Calcutt's attention, continuing until 2012, at which point "the Board was more aware . . . and those types of practices stopped happening."[919]

Asked the degree to which Mr. Calcutt was either cooperative or uncooperative, Ms. Miessner opined as follows:

> Well, Mr. Calcutt instead of working with us and the Agency to help figure out how to address the Bank's problems in an effective manner, his, he always just argued with us and said we were wrong, right? And in the meantime, the financial condition of the Bank was deteriorating even further. And so then when, when we finally knew what happened and confronted him with it and asked him many questions, he still didn't open up to us and tell us what was going on and, and let us be, you know, part of the solution.[920]

Asked whether Mr. Calcutt either voluntarily disclosed breaches or concealed the same, Ms. Miessner responded "he certainly didn't voluntarily disclose it to us. If he had, the whole situation would have turned out much differently, I'm sure."[921]

Opining on the threat of loss or actual loss or other kinds of harm to the Bank, Ms. Miessner opined:

> So the situation in 2009 where they had a bank, you know, a large borrower at the Bank whose financial condition was deteriorating, lending more money to them increased the risk to the Bank. Releasing cash collateral? Increased the risk to the Bank. Then reputationally, you know, they got to the point where we had no choice but to put them under a Consent Order because of the conditions and practices that were happening at the Bank. And so -- the Consent Orders are public documents. And so anyone in the public realm can look up a Consent Order and they would be able to see it. During the crisis, there were a lot of news articles that came out that had, that would like put lists of banks sometimes. And so it did increase the risk of the Bank's reputation, right? So increased reputational risk.[922]

Asked whether she found that Mr. Calcutt realized any financial gain or other benefit from his misconduct, Ms. Miessner said she did not find any evidence of "defalcations like fraud," but inasmuch as "dividends [were] being paid based on falsely inflated earnings and capital numbers," Mr. Calcutt, as a "large shareholder of the holding company" received "direct personal benefit through the dividends."[923]

---

[918] *Id.* at 891 (Miessner).
[919] *Id.* at 892 (Miessner).
[920] *Id.* at 893 (Miessner).
[921] *Id.*
[922] *Id.* at 895 (Miessner).
[923] *Id.*. See testimony of Mr. Calcutt that "the shareholders [of the holding company] own stock in the holding company which in turn was 100 [percent] owner of . . . Northwestern Bank." Tr. at 1347-48 (Calcutt).

Page 117 of 145

Asked to comment on what she saw as Mr. Calcutt's "tendency to engage in unsafe or unsound practices or breaches of fiduciary duty," Ms. Miessner responded that the tendency "speaks to the history" in that there is a "long and well documented history of failure to address safety and soundness concerns specifically to the lending functions".[924] Beyond that, she said through the exam process, Mr. Calcutt frequently "would state his refusal to implement recommendations and would argue the validity of regulatory guidance. And so I think he did have the tendency to just, to not follow the rules."[925]

And Ms. Miessner was asked whether there is an agreed upon order in place, and responded that there is a Section 39 plan in place.[926]

During cross examination, Examiner O'Neill was presented with the premise that in 2011, Teri Gillerlain was an FDIC Investigator who was going through the files at the Bank and found a three-page document, the first page of which is an email from Ms. Gillerlain to herself at the FDIC.[927] Mr. O'Neill stated that he had no knowledge that Ms. Gillerlain was an investigator for the FDIC, and offered no explanation for why she sent an email message to herself.[928]

When asked why Ms. Gillerlain found the document but Mr. O'Neill did not, Mr. O'Neill responded

> Again, we have already seen an exhibit where Mr. Calcutt was saying he was responding at a later point to a request from the investigator in supplying things like DVDs, and so on. Mr. Gomez made a point of saying "Well, what did you give the Examiners when they asked for it in the normal course of their examination before the investigator started asking for these things?" And what was what was recorded. And I during the normal course in the normal examination did not find this in the loan files. If she found it through other materials being supplied to her at a later date? That may well be, but I can't testify to it yes or no.[929]

Mr. O'Neill testified that an examiner's role is "generally confined to the books and records of the institution and also bank staff," whereas the investigator "can go beyond the four walls of the Bank and interview bank customers, others outside the institution."[930] He said as such, he would not have been empowered to have meetings with Cori Nielson as a borrower, in order to gather information.[931]

---

[924] Tr. at 896 (Miessner).
[925] *Id.*
[926] *Id.* at 896-97 (Miessner).
[927] Tr. (2015) at 651 (O'Neill), referring to Resp. Ex. (2015) 122 at 1, by which Ms. Gillerlain sent to her own email box at the FDIC a copy of an email transmission dated September 22, 2009, from Mr. Calcutt to Mr. Green in which Mr. Calcutt provided Mr. Green, as an fyi, a copy of settlement discussions between Mr. Calcutt and Cori Nielson.
[928] Tr. (2015) at 651 (O'Neill).
[929] Tr. (2015) at 652, 775 (O'Neill); and Resp. (2015) Ex. 93 at 1 wherein FDIC Case Manager Miessner wrote to Examiner O'Neill on September 1, 2011, that "We will be sending an investigation specialist to the Bank."
[930] Tr. (2015) at 756(O'Neill).
[931] *Id.* at 756-57 (O'Neill).

Page 118 of 145

A306

**7. Respondent's Allocution**

Mr. Calcutt acknowledged that as a director and officer of an FDIC-insured bank, he has a responsibility to know what he is doing in order to operate the bank in a safe and sound manner – to act diligently, prudently, honestly, and carefully.[932] When asked whether he intended to return to any management function in banking, Mr. Calcutt said "no."[933] When asked why, then, given his age and status, he was fighting this enforcement action, Mr. Calcutt testified:

> It is absolutely unjustified and unwarranted what I have been through and what my family has been put through. So why am I fighting? Because it's a matter of right and wrong. And Northwestern Bank was an extremely successful bank, well regarded, loved by all its depositors, customers, all its customers. We made money from the day I started there right through the Great Recession. And in spite of all the Amended Call Reports, we made money. And we took care of our shareholders and this is just a shame what I've been put through, given our tremendous success.[934]

**Part III - Analysis**

**1. Respondent's Affirmative Defenses**

In his Second Amended Answer to Notice, Respondent presented seven affirmative defenses: that these proceedings are being conducted in violation of the FDIC Board's July 19, 2019 Order in Pending Cases, that the proceeding should be dismissed because it fails to cure the Appointments Clause violation; that the proceedings violate the Removal Power, that the proceeding barred by 28 U.S.C. 2462, the applicable statute of limitations; that the proceeding is barred under the doctrine of laches; that the FDIC should be barred from asserting its claims because of entrapment, and that it should be barred because the FDIC questioned Mr. Calcutt as part of an investigation seeking his removal, and did so in violation of the *Accardi* principle and Due Process.[935]

For the reasons set forth in a prior Order, the merits of the defenses based on laches, entrapment, and *Accardi* were determined and the defenses were stricken.[936] The analyses set forth in that Order are incorporated by this reference as if fully rewritten here.

Respondent's First Affirmative Defense is premised on the claim that the "supplemental proceeding established by the March 19 [2019] Order Regarding New Oral Hearing . . . sets what amounts to [be] a modified paper review, rather than the full, new oral hearing required by the Board's Order."[937] Respondent posited similar arguments in a motion seeking interlocutory review, and on June 20, 2019 the Board entered an order granting the relief sought both in the motion for review and Respondent's First Affirmative Defense. Upon considering the merits of the defense and the Board's actions through the interlocutory relief order, I find the issues presented in Respondent's First Affirmative Defense are now moot.

---

[932] Tr. at 1352 (Calcutt).
[933] *Id.* at 1350 (Calcutt).
[934] *Id.* at 1351 (Calcutt).
[935] Respondent's Second Amended Answer at 32-36.
[936] Order Regarding Motion to Strike Affirmative Defenses issued July 3, 2019.
[937] Respondent's Second Amended Answer at 32.

With respect to the affirmative defense based on the Appointments Clause, Respondent asserts that the supplemental proceeding established by the Board's July 19, 2019 Order in Pending Cases was "inconsistent with the remedy required by Lucia for Appointments Clause violations," and that a "full, new hearing must be set."[938]

In support, Respondent avers that "the FDIC has never argued nor demonstrated that ALJ Miserendino was properly appointed, despite amble reason to do so."[939] According to Respondent, upon these premises, and without citation to the record in support of his factual claims, "[t]he only issue left is remedial."[940]

Recent analyses by the FDIC Board of Directors provides the analysis called for regarding both Respondent's  Appointments Clause and Removal provisions affirmative defenses. Presented with claims invoking both defenses, and presented with similar facts and arguments, the Board of Directors in *In re Sapp* opined thus:

> In *Lucia*, the Supreme Court remanded the enforcement proceeding to the agency with instructions to reassign the matter to an ALJ directly appointed by the SEC itself—a constitutionally appointed ALJ—and that the ALJ not be the same ALJ who presided over the original proceeding. *Lucia*, 138 S. Ct. at 2055. That is precisely what the FDIC did here. The FDIC Board directly appointed ALJ McNeil and reassigned this matter to him (as noted earlier, a different ALJ had presided over the original hearing). ALJ McNeil then afforded the parties ample time to request a rehearing, which neither party did, and then proceeded to decide the case on the papers. Regardless of whether or not the *Lucia* decision applies to FDIC-appointed ALJs, the FDIC's actions following *Lucia* are entirely consistent with that opinion.

> Moreover, the ALJ was appointed by a vote of the FDIC Board, the governing body of the FDIC. The FDIC Board possesses the authority to appoint its ALJs, and the FDIC is not subordinate to or contained within any other component of the Executive Branch. 12 U.S.C. § 1812(a) ("The management of the [FDIC] shall be vested in a Board of Directors …."); 12 U.S.C. § 1819 (prescribing corporate powers, including the power to appoint officers); 5 U.S.C. § 3105 (permitting agencies to appoint their own ALJs). Thus, the FDIC is a "Department" for purposes of the Appointments Clause. See *Free Enter. Fund*, 561 U.S. at 510-11 (a component of the Executive Branch that is "not subordinate to or contained within any other such component … constitutes a "Departmen[t]' for the purposes of the Appointments Clause"); 5 U.S.C. § 105 (an "Executive Agency" under Title 5 includes a Government corporation and an independent establishment, such as the FDIC).[941]

Respondent has presented no facts that would support a conclusion other than that reached by the FDIC Board in *Sapp*. I find Respondent has not presented facts to support the affirmative defense, and by applying the rationale endorsed by the FDIC Board in *Sapp*, I find Respondent's Second Affirmative Defense to be without merit.

To the same effect, the Board in *Sapp* addressed the merits of arguments based on

---

[938] Respondent's Post Hearing Brief at 33.

[939] *Id.*at 34.

[940] *Id.* at 35, quoting Lucia, 138 S.Ct. at 2055.

[941] *In the Matter of: Michael R. Sapp*, Individually and as an Institution-Affiliated Party of Tennessee Commerce Bank, Franklin, Tennessee (Insured State Nonmember Bank), 2019 WL 5823871, at *18–19.

"restrictions on removal of the FDIC's ALJs". Citing no legal authority or reference to the record, Respondent averred in his Third Affirmative Defense that the FDIC Board is "unable to properly supervise the ALJ's actions" because the presiding ALJ "is unconstitutionally shielded from removal by the President of the United States."[942]

In *Sapp*, the Board held thus:

> The issue largely hinges on the interpretation of the Supreme Court's decision in *Free Enterprise Fund*. In *Free Enterprise*, the Supreme Court held that the dual limitation on the President's ability to remove inferior officers that served on the Public Company Accounting Oversight Board ("PCAOB") "subvert[ed] the President's ability to ensure that the laws are faithfully executed." 561 U.S. at 498. A "double removal restriction" existed because PCAOB board members were appointed by the SEC and could only be removed by the SEC "for cause." In turn, SEC members are appointed by the President and can also only be removed "for cause." Id. at 486-87. This two-level protection from "at-will" removal was what the Supreme Court held violated the Constitution's separation of powers doctrine because it overly diluted the vesting of executive power within the President. *Id*. at 484, 498.

> In deciding *Free Enterprise*, the Supreme Court's majority opinion specifically exempted ALJs from the scope of its holding, stating that the "holding also does not address that subset of independent agency employees who serve as administrative law judges." Id. at 507 n.10. The rationale for that distinction is because ALJs perform "adjudicative" not enforcement or policymaking functions like PCAOB board members do. Id. Thus, Free Enterprise does not support Respondent's arguments that the for cause removal of ALJs performing adjudicative functions for the FDIC violates the separation of powers doctrine.[943]

Finding the analysis by the FDIC Board in *Sapp* applicable here, I find Respondent's Third Affirmative Defense to be without merit.

Respondent's Fourth Affirmative Defense posits that as the Bedrock Transaction occurred in November 2009, it is too late now for the FDIC to bring an action under the FDI Act, which is subject to the five year period of limitations found in 28 U.S.C. § 2462.[944] Under Respondent's theory, the ingredients necessary to commencing proceedings were absent – specifically, the "filing of the Notice and a valid tribunal."[945]

Respondent offers no legal authority for the proposition that the status of the FDIC's ALJs in 2013, when this enforcement action began, determines the applicability of the limitations statute.[946] Instead, he cites to the requirement in the FDIC's Uniform Rules of

---

[942] Respondent's Second Amended Answer at 33.
[943] *In re Sapp*, 2019 WL 5823871 at 19.
[944] Respondent's Post-Hearing Brief at 38.
[945] *Id*.
[946] I am mindful of Respondent's reliance on *United States v. Crawford*, 60 F. App'x 520 531 (6th Cir. 2003) for the proposition that an indictment after the statute has run is not timely. That is not the case here, where the Notice of Intention was filed well within the five year period.

Practice and Procedure that an administrative enforcement hearing "shall be held before an administrative law judge" of the Office of Financial Institution Adjudication.[947]

I do not read the FDIC's Uniform Rules as narrowly as urged by Respondent. When the matter was presented to the reassigned ALJ, it was held before an administrative law judge of OFIA. No conclusion from this requirement compels a conclusion that the action when commenced was constitutionally infirm. Respondent made no claim when the proceedings commenced indicting the credential of the ALJ, and waited until after the Board had acted on its own motion to raise the matter.

## 2. Grounds for Section 8(e) Orders - Prohibition

The Federal Deposit Insurance Act authorizes the entry of a prohibition order removing and barring future "participation ... in the conduct of the affairs of any insured depository institution" when the appropriate federal banking agency finds that a party affiliated with an insured institution (1) violated "any law or regulation," "engaged or participated in any unsafe or unsound practice," or breached a fiduciary duty; (2) that either causes the bank to "suffer[ ] or ... probably suffer financial loss or other damage," prejudices or could prejudice depositors' interests, or gives the party "financial gain or other benefit;" and (3) that "involves personal dishonesty ... or ... demonstrates willful or continuing disregard ... for the safety or soundness of [the bank]."[948] These three prongs of the prohibition action are known respectively as "misconduct," "effects," and "culpability."[949] For each prong, any one of multiple alternative grounds can support an adverse finding. An order of prohibition is supportable upon proof of each prong so long as the misconduct creates a "reasonably foreseeable" risk to the financial institution.[950]

The "misconduct" prong of § 1818(e)(1)(A) may be satisfied by a finding of violation of law or regulation, unsafe or unsound practices, or breach of fiduciary duty.[951] Evidence detailed above established Respondent engaged in both unsafe and unsound banking practices, and breached fiduciary duties he owed to the Bank. Through this evidence, Enforcement Counsel met their burden regarding the misconduct prong.

The "effects" prong may be satisfied by a finding that "by reason of" the misconduct, the bank "has suffered or will probably suffer financial loss or other damage; the interests of the insured depository institution's depositors have been or could be prejudiced; or such party has received financial gain or other benefit."[952] It is satisfied by evidence of either potential or actual loss to the financial institution, and the exact amount of harm need not be proven.[953] Enforcement Counsel have by preponderant evidence established Respondent's misconduct caused the Bank to suffer, and made it probably that the Bank would suffer, financial loss and other damage; and that Respondent received financial gain because of his misconduct. Upon such evidence, Enforcement Counsel met their burden regarding the effects prong.

---

[947] *Id.,* citing 12 C.F.R. § 308(103(a).

[948] 12 U.S.C. § 1818(e)(1).

[949] *See Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C.Cir.2000).

[950] *Kaplan v. OTS*, 104 F.3d 417, 421 (D.C.Cir.1997); see *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir.1994).

[951] *Dodge v. Comptroller of Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014), citing *Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C.Cir.2000).

[952] 744 F.3d at 158, quoting 12 U.S.C. § 1818(e)(1)(B).

[953] 744 F.3d at 158, citing *Pharaon v. Bd. of Governors of the Fed. Reserve Sys.,* 135 F.3d 148, 157 (D.C.Cir.1998); *Proffitt*, 200 F.3d at 863.

The "culpability" prong may be satisfied by a finding of personal dishonesty or "willful or continuing disregard ... for the safety or soundness of" the bank.[954] The personal dishonesty element of § 1818(e) is satisfied when a person disguises wrongdoing from the institution's board and regulators, or fails to disclose material information.[955] Both the personal dishonesty and willful or continuous disregard elements "require some showing of scienter."[956] "[W]illful disregard" is shown by "deliberate conduct which exposed the bank to abnormal risk of loss or harm contrary to prudent banking practices," and "continuing disregard" requires conduct "over a period of time with heedless indifference to the prospective consequences".[957]

Enforcement Counsel by preponderant evidence established Mr. Calcutt's personal dishonesty and his willful and continuing disregard for the safety and soundness of the Bank throughout 2009 to 2011. Respondent knowingly concealed material information from the Bank's Board and its regulators, and knowingly gave false and misleading answers to questions presented during this time period. He further established a bookkeeping scheme making it difficult or impossible for the Bank's Board and its regulators to discover the true nature of the Nielson Entities loan portfolio, in order to avoid mandatory state lending limits. Upon the foregoing evidence, Enforcement Counsel has met its burden of establishing Respondent's personal dishonesty and his willful and continuing disregard for the safety and soundness of the Bank.

Respondent owed and breached his duty of care and candor to the Bank's Board of Directors. Officers and directors of financial institutions are deemed to be fiduciaries of the institution and, as such, owe the institution duties of care and loyalty.[958] The *duty of care* requires directors and officers to act as prudent and diligent business persons in conducting the affairs of the bank. Withholding relevant information constitutes a breach of the *duty of candor*, even where members of the Board do not raise questions regarding the issue.[959] Thus, a director must inform other board members of any information in his or her possession that is related to a transaction under the board's consideration. "It is well established that a person can breach a fiduciary duty by failing to disclose material information even if not asked[.]"[960]

I found Respondent's testimony on key material issues to be other than fully credible, particularly with respect to his claims of having insufficient knowledge regarding the course of the Bank's negotiations with the Nielson family representative in both 2009 and 2010; and his claim that other members of the Bank's Board of Directors had approved the Bedrock Loan prior the disbursement of funds from that loan. Respondent's testimony was internally inconsistent, inconsistent with testimony from other Bank employees (including Mr. Smith and Mr. Hollands), and inconsistent with other Bank Board members, whose testimony I found no valid reason to doubt.

---

[954] 12 U.S.C. § 1818(e)(1)(C).

[955] 744 F.3d at 159–60 citing *Landry,* 204 F.3d at 1139–40, *Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 171 (2d Cir.1992); see also *Van Dyke v. Bd. of Governors of the Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir.1989).

[956] 744 F.3d at 159–60 quoting *Landry*, 204 F.3d at 1139 (citing *Kim*, 40 F.3d at 1054–55).

[957] 744 F.3d at 160, quoting *Grubb v. FDIC*, 34 F.3d 956, 961–62 (10th Cir.1994),

[958] *Constance C. Cirino*, 2000 WL 1131919 at *4 (FDIC May 10, 2000) (citing *In the Matter of Ramon M. Candelaria,* FDIC Enf. Dec. and Orders at A-2847 (1997)).

[959] *Michael v. F.D.I.C.,* 687 F.3d 337, 351 (7th Cir. 2012) (citing *De La Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003)).

[960] *In re Bush*, 1991 WL 540753 at *6.

I found Respondent's own actions in obscuring from Bank Board members and the Bank's regulators the true nature of the Nielson Entities as a common group was a knowing, willful, and ongoing effort that used Respondent's leadership position at the Bank to obstruct both the Bank's own auditors and its regulators from fully appreciating the risks to the Bank's safety and soundness. And I found gross ineptitude on Respondent's part by his fostering a banking environment throughout the relevant time period that permitted dozens of limited liability companies known to be part of the Nielson Entities to borrow millions of dollars from the Bank without there being evidence of sufficient cash flow to support the loans, without there being timely and accurate appraisals of collateral securing the loans, and without there being personal guarantees by the borrowers as an elementary measure of protecting the Bank and through it, the FDIC Insurance Fund.

There was, in short, no valid banking reason supporting Mr. Calcutt's decision to continue to lend Bank funds to the Nielson Entities based on Mr. Calcutt's supposition that because the Nielson Family had millions of dollars that it *could* pay to the Bank, that members of the family *would* in fact do so, when there was no legal requirement calling for such payment. Preponderant evidence tends to show that the risks to the Bank central to this enforcement action could have been significantly abated had Mr. Calcutt simply required personal guarantees from the Nielson family members as support for these loans.

Through the foregoing evidence, Enforcement Counsel met their burden of establishing that Mr. Calcutt breached fiduciary duties of care and candor he owed to the Bank.

### 3. Grounds for Section 8(i) Orders – Civil Money Penalty

Accompanying the Notice of Intention is a Notice of Assessment of a second-tier penalty in the amount of $125,000.[961] Pursuant to the Debt Collection Improvement Act, a second tier penalty of up to $37,500 per day may be assessed upon cause shown.[962] At this daily rate, the $125,000 assessment would be supported upon a demonstration of cause lasting at least three days. Cause has been shown here for an assessment that would begin no later than September 1, 2009, when it became reasonable to question the Nielson Entities' intention and ability to pay the portfolio's loans. The daily rate would thereafter apply until at least July 19, 2012, when the Bank's external auditors, Plante Moran, determined that the Nielson loans "should have been classified as impaired/non-accrual during the fourth quarter of 2009".[963] With 1052 days between those dates, the potential second-tier penalty was $3.945 million. If anything, the assessment that was presented in the Notice of Intention understated the gravity of Mr. Calcutt's misconduct.

A second-tier civil money penalty may be entered for violating laws, regulations, or other requirements, "recklessly engag[ing] in an unsafe or unsound practice," or breaching a fiduciary duty, when that action is "part of a pattern of misconduct," or "causes or is likely to cause more than a minimal loss to [the bank]," or "results in pecuniary gain or other benefit to such

---

[961] Notice of Intention to Remove from Office and Prohibit from Further Participation, Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law, Order to Pay, and Notice of Hearing at 27.

[962] 12 U.S.C § 18181(i)(2)(A) & (B) (establishing a second-tier penalty); 28 U.S.C. § 2461 (directing the heads of all federal agencies to periodically adjust the civil money penalties under their jurisdiction for inflation); and 12 C.F.R. § 308.132(c)(3)(i) (73 FR 73153-01, 2008 WL 5054465 December 2, 2008) (setting the second tier maximum penalty at $37,500 per day).

[963] EC. Ex.77 at Bates pp. 7, 16 (page 9 in the report).

party.""[964]

The requirements to impose a second-tier civil monetary penalty are similar to the criteria for an order of prohibition. The only new misconduct element under 12 U.S.C. § 1818(i)(2)(B) requires evidence of "reckless" engagement in unsafe or unsound practices. "The Comptroller may satisfy the effects prong on any of the following grounds: that the misconduct was 'part of a pattern of misconduct,' that it 'causes or is likely to cause more than a minimal loss' to the Bank, or that it 'results in pecuniary gain or other benefit.'"[965]

Having considered the evidence in mitigation as reflected above, and for the reasons set forth above, I find that Enforcement Counsel have met their burden of establishing a legal and factual basis for a $125,000 civil penalty against Mr. Calcutt.

**4. Recommendation**

Upon the foregoing findings and conclusions, I recommend the Board issue a removal and prohibition order against Respondent and assess a civil penalty against Respondent in the amount of $125,000. A proposed order to this effect is appended to this Recommended Decision on Remand.

April 3, 2020

_____
Christopher B. McNeil, JD, Ph.D
Administrative Law Judge
Office of Financial Institution Adjudication

**CERTIFICATE OF SERVICE**

On April 3, 2020, I served by electronic mail the foregoing Recommended Decision, the Certified Index of Admitted Exhibits, the Certified Index of the Record of Proceedings, and the complete Administrative Record of Proceedings upon:

**FDIC Executive Staff**
Robert E. Feldman, Executive Secretary
Andrea Winkler, Acting Assistant General Counsel
Nicholas J. Kazmerski, Counsel
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429

---

[964] 12 U.S.C. § 1818(i)(2)(B).
[965] *Dodge*, 744 F.3d at 161, quoting 12 U.S.C. § 1818(i)(2)(B)(ii).

RFeldman@FDIC.gov
AWinkler@FDIC.gov
nkazmerski@fdic.gov
ESSEnforcementActionDocket@FDIC.gov

Further, on April 3, 2020, I served by electronic mail the foregoing Recommended Decision, the Certified Index of Admitted Exhibits, and the Certified Index of the Record of Proceedings, upon:

**FDIC Enforcement Counsel**
David Beck, Esq.
Mary Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, Illinois 60606
bsup@fdic.gov, dbeck@fdic.gov, mbenden@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
Telephone: (972) 761-8592
BSup@fdic.gov

**Counsel for Respondent Harry C. Calcutt, III**
Barry D. Hovis, Esq.
Musick Peeler & Garrett, LLP
601 California Street, Ste. 1250
San Francisco, CA 94108
b.hovis@mpglaw.com

Ryan T. Scarborough, Esq.
William Snyderwine, Esq.
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
rscarborough@wc.com: wsnyderwine@wc.com

_____
Christopher B. McNeil
Administrative Law Judge

Page 126 of 145

**A314**

Office of Financial Institution Adjudication

**Appendix 1 – Proposed Orders**

FEDERAL DEPOSIT INSURANCE CORPORATION
WASHINGTON, D.C.

In the Matter of

**HARRY C. CALCUTT III**
Individually and as an Institution-Affiliated
party of

NORTHWESTERN BANK
TRAVERSE CITY, MICHIGAN
(INSURED STATE NONMEMBER BANK)

FDIC-12-568e
FDIC-13-115k

ALJ McNeil

**[PROPOSED] ORDER OF PROHIBITION FROM FURTHER PARTICIPATION
AND ORDER TO PAY**

On August 20, 2013, the Federal Deposit Insurance Corporation (FDIC) issued a Notice
of Intention to Remove from Office and Prohibit from Further Participation, Notice of
Assessment of Civil Money Penalties, Findings of Fact, Conclusions of Law, Order to Pay, and
Notice of Hearing against Harry C. Calcutt, III (Respondent), individually, and as institution-
affiliated party of Northwestern Bank, Traverse City, Michigan. The Respondent filed a timely
answer to the Notice.

From October 29, 2019 through November 6, 2019, a hearing was held in Grand Rapids,
Michigan to determine: (1) whether a permanent order should be issued to prohibit the
Respondent from further participation in the conduct of the affairs of any insured depository
institution or organization enumerated in section 8(e)(7)(A) of the Federal Deposit Insurance
Act (FDI Act), 12 U.S.C. §1818(e)(7)(A), without the prior written permission of the FDIC and
the appropriate Federal financial institutions regulatory agency, as that term is defined in
section 8(e)(7)(D) of the FDI Act, 12 U.S.C. §1818(e)(7)(D); and (2) whether the FDIC's
ORDER TO PAY should be issued. The Respondent appeared, personally and through counsel,
and was given the opportunity to be heard, and evidence was taken.

Having considered the evidence presented at the hearing and the record as whole, the
arguments of both parties, and the Recommended Decision issued by the presiding
administrative law judge, pursuant to section 8(e) of the FDI Act, 12 U.S.C. § 1818(e), it is
hereby ORDERED, that:

1.      Harry C. Calcutt, III, is prohibited from participating in any manner in the
conduct of the affairs of any insured depository institution, agency, financial institution or

organization enumerated in section 8(e)(7)(A) of the FDI Act, 12 U.S.C. §1818(e)(7)(A), without the prior written consent of the FDIC and the appropriate Federal financial institutions regulatory agency as that term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. §1818(e)(7)(D); and

2.    Harry C. Calcutt, III  is prohibited from soliciting, procuring, transferring, attempting to transfer, voting, or attempting to vote any proxy, consent or authorization with respect to any voting rights in any financial institution, agency, insured depository institution or organization enumerated in section 8(e)(7)(A) of the FDI Act, 12 U.S.C. §1818(e)(7)(A), without the prior written consent of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. §1818(e)(7)(D); and

3.    Harry C. Calcutt, III  is prohibited from violating any voting agreement previously approved by the appropriate Federal banking agency, without the prior written consent of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D) of the FDI Act, 12 U.S.C. §1818(e)(7)(D); and

4.    Harry C. Calcutt, III  is prohibited from voting for a director, or serving or acting as an institution-affiliated party, as that term is defined in section 3(u) of the FDI Act, 12 U.S.C. §1813(u), without the prior written consent of the FDIC and the appropriate Federal financial institutions regulatory agency, as that term is defined in section 8(e)(7)(D), of the FDI Act, 12 U.S.C. §1818(e)(7)(D).

This ORDER will become effective thirty (30) days from the date of its issuance.  The provisions of this ORDER will remain effective and in force except in the event that, and until such time as, any provision of this ORDER shall have been modified, terminated, suspended or set aside by the FDIC.

FURTHER, pursuant to section 8(i) of the FDI Act, 12 U.S.C. §1818(i):

IT IS HEREBY ORDERED:

That the Respondent, Harry C. Calcutt, III, pay a civil money penalty in the amount of One Hundred Twenty-Five Thousand Dollars ($125,000) made payable to the Treasury of the United States.

IT IS FURTHER ORDERED that the Respondent is prohibited from seeking or accepting indemnification from any insured depository institution for the civil money penalty assessed and paid in this matter.

IT IS SO ORDERED.

Dated at Washington, D.C., this ___ day of _____, 20__.


_____
Board of Directors
Federal Deposit Insurance Corporation

### Appendix 2 - Respondent's Offers of Proof

The evidentiary hearing conducted in November 2019 afforded the parties a second opportunity to present evidence in support of their respective issues and claims. The parties prepared for that second hearing by filing pre-hearing submissions pursuant to an Order I issued on March 20, 2019.[966]

The March 20, 2019 Order required the parties to provide notice to the opposing party of the identity of witnesses the party intended to call, and of the documents the party intended to present to the witness. The parties were given a May 15, 2019 deadline by which they were to submit a prehearing statement that included copies of all exhibits the party intended to introduce at the hearing.[967] In addition, the parties were directed to identify which witnesses the party intended to present and the following order was entered regarding the presentation of testimony by a party's witnesses:

> b.   A short summary of the expected testimony of each witness, e.g., "This witness will testify that …." Note that during the evidentiary hearing, witness testimony will be limited to the descriptions provided in this summary. In order to ensure the efficient and orderly presentation of witness testimony, the parties are directed to identify, in their prehearing submissions, by exhibit number or numbers, and page number or numbers, the documents relied upon by each witness, whether fact witness, expert witness, or hybrid expert and fact witness. **During the direct examination of the witness and absent sufficient cause to vary from this provision, only those exhibits and page numbers identified in this prehearing submission may be presented to the witness by the party calling the witness.** (Emphasis *sic*)[968]

The prehearing submissions Order thus ensured that the parties would know in advance of the hearing which witnesses would be called and what exhibits the witness would be presented during the hearing.

Through this set of prehearing Orders, the parties are given the opportunity to identify the witnesses they seek to question. Respondent in his first Offer of Proof, addressed questions he sought to present to Autumn Berden. The questions, presented below, addressed matters that had not been raised in direct examination of this witness. For that reason, and for that reason alone, Enforcement Counsel's timely objection was sustained, as the questions sought to address matters that had not been raised during direct examination of the witness.

Nothing in the order sustaining this objection prevented Respondent from introducing testimony from Ms. Berden on the subjects presented. The ruling (included in the transcript excerpt here) made it plain that the questions would be permitted if they addressed subjects that had been raised during direct examination. This was not the only means by which Respondent could have introduced such testimony, however. Had Respondent wished to present testimony responsive to the First Offer of Proof, if he wished to ask the questions that he has included in his First Offer of Proof, then he needed only to include Ms. Berden in his list of witnesses and identify the topics she would be asked about and the documents she would be shown during her

---

[966] Notice of Hearing and Supplemental Prehearing Orders, issued March 20, 2019.
[967] Id. at 2.
[968] Id. at 3.

testimony. Respondent failed to do so, and offered no explanation for this failure, with counsel for Respondent baldly stating he did not need to do so.

Respondent through Counsel asserts that he is entitled to establish a witness's bias and motive through cross-examination. This is true, to the extent those traits can be developed during cross examination. But cross-examination is limited to the scope of facts presented during direct examination, so to the extent Respondent wanted to introduce testimony establishing the bias of a witness, he could do so either during cross-examination, by questions addressing matters that were raised in direct examination, or by calling the witness as his own. Here, Respondent elected to do one, but not the other.

Nothing about this analysis changes when one takes into account the limitations imposed on the parties in advance of the hearing. Through prehearing motions, Enforcement Counsel successfully argued for the exclusion of Respondent's proposed Exhibit 186, which was the FDIC's 2017 Report of Examination for Central State Bank, and Exhibit 187, which was the 2019 Report for State Savings Bank. The merits of this argument were determined when I reviewed Respondent's prehearing statement and found nothing in the statement that would justify introduction of Reports concerning banks other than Northwestern for periods of time not pertinent to the allegations appearing in the Notice of Intention.[969]

Respondent argues that "nothing in the Federal Rules of Evidence nor the Uniform Rules of Practice and Procedure required Respondent to create a witness list for cross-examination."[970] That is true; but by electing not to call the witness, Respondent's opportunity to cross-examine the witness is limited to the scope of what is presented on direct examination.

It also is a mischaracterization of events to suggest that Respondent was required to "anticipate the witnesses Enforcement Counsel would call and then have to list the documents he intended to use for impeachment."[971] That is not what occurred here.  By requiring both parties to fully disclose the scope of direct examination, the prehearing order placed the parties on a level playing field, so that they would not be surprised at the scope of a witness's testimony or the documents the witness would be shown.

Nothing prevented Respondent from identifying and calling the witnesses and covering the topics reflected in the following offers of proof, other than the strategic decision made by the  Respondent not to identify the witnesses in his prehearing statement. It is true that "documents to be use for impeachment never have to be disclosed", as Respondent noted.[972] Impeachment documents may be introduced without prior disclosure, but only to the extent the testimony regarding the documents is within the scope of direct examination of the witness.


**Offer of Proof No. 1: Respondent's Cross-examination of Autumn Berden**

Questions for Ms. Berden, cross-examination by Mr. Hovis at Tr. 178-87

Q. And there was a meeting that occurred in May 5 2009 where there were a lot of heated words exchanged. Do you recall Cori Nielson in that meeting threatening to

---

[969] Order Regarding the Parties' Motions in Limine, dated October 4, 2019, at 6.
[970] Respondent's Post-Hearing Brief at 44.
[971] Id.
[972] Id.

8 MR. BECK: Your Honor, I'm going to object. I think he's talking --

10 THE COURT: Let him finish the sentence. Let him finish the question.

12 BY MR. HOVIS: Q. Do you recall Cori Nielson in that meeting threatening to destroy the Bank?

15 THE COURT: Now.

16 MR. BECK: I am going to object, Your Honor. He's referring to a May 2012 meeting when --

18 MR. HOVIS: I misspoke if I said that.

19 MR. BECK: It went beyond the scope of direct, so I'll object. He can ask Cori Nielson about that meeting.

22 THE COURT: Your response?

23 MR. HOVIS: I meant May 2011, if I said May 2012.

25 MR. BECK: I am sorry, I misspoke. He misspoke first because he said May 2009. I misspoke when I said May 2012. For the record, it is May 2011 he's referring to.

4 THE COURT: Are you maintaining the objection or no?

6 MR. BECK: Yes, I'm still maintaining the objection.

8 MR. HOVIS: Can I respond, Your Honor?

9 THE COURT: Yes.

10 MR. HOVIS: I will be asking a series of questions to establish the bias of the Nielson representatives: Ms. Berden, Cori Nielson, and Anne Miessner, all of whom are testifying at this proceeding, and these questions are all going to go to their bias, their motive, and their efforts among themselves to destroy the Bank and Scrub Calcutt. And this witness is a principal player in that because she participated in that process and she's taking the notes. So if I don't have the opportunity to question her with regard to the notes she took of those conversations, then I'll face an objection the notes can't be used with regard to other witnesses in the case. So this is crucial to me in terms of establishing bias, motive, and impeachment.

25 THE COURT: Well, it would seem to me that that would be an appropriate thing to let us know about ahead of time by calling her as your own witness.

3 MR. HOVIS: I don't need to do that.

4 THE COURT: You do here. The objection is sustained.

6 MR. HOVIS: May I make a record?

7 THE COURT: You may.

8 MR. HOVIS: Thank you. It's held in United States versus Green, 617 F.3d 233, 251 (Third Cir. 10 2010). Proof of bias is almost always relevant. There are other citations that I'll pass over. "Because a showing of bias on the part of a witness

would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony. Bias is always relevant in assessing credibility. Indeed, evidence concerning a witness's credibility is always relevant because credibility is always at issue." Now I need not, with all due respect, designate a witness that I am going to cross-examine as my witness in order to establish the bias, the motive, and the credibility of that witness. I am entitled to do that on my cross-examination. That's what I'm asking the court to allow me to do.

25 THE COURT: I understand your record.

1 BY MR. HOVIS: Q. There has been reference this morning to a binder which is Exhibit 3 about all this questioning which Mr. Beck has addressed. Were you participatory in preparing that binder?

6 A. I was requested to provide documents that I believe went in the binder.

8 Q. And after that binder was forwarded to the FDIC, did you have a series of meetings with Teri Gillerlain, who also was addressed in questioning this morning?

11 A. Yes.

12 Q. And as you've testified, she was a representative of the FDIC?

14 A. Yes.

15 Q. Do you recall that the first of those meetings was on September 8, 2011?

17 MR. BECK: I am going to object again, Your Honor. It's going beyond the scope of direct examination.

20 THE COURT: Response?

21 MR. HOVIS: Yes, Your Honor. During the course of these meetings that the witness had with Ms. Gillerlain, she, Cori Nielson, and Anne Miessner all agreed that they would cooperate among themselves in order to remove Scrub Calcutt as a part proceeding. I have this witness's notes of those meetings of what she did in collaboration with the FDIC, and they all go to show the bias, the motive, and the lack of credibility of any of their testimony in this case.

6 THE COURT: Okay, as proffered, the objection is sustained. Ask your next question.

8 MR. HOVIS: Alright, I will make an offer of proof.

10 THE COURT: Go ahead.

11 MR. HOVIS: I am going to offer into evidence Respondent's Exhibit 98.3. This was a request for information to Ms. Berden from Anne Miessner and Teri Gillerlain. Respondent's Exhibit 125, September 8 following the meeting where Ms. Berden provided letters from the Bank regarding the transfer of loans. In fact, that was admitted into evidence this morning. How is it, with all due respect, that the FDIC gets to pick and choose what it provides to the court of the information provided by this witness to the FDIC and I do not?

Page 132 of 145

A320

23 THE COURT: You have the opportunity to present this all; just tell us ahead of time in your statement and you did not do that. You did not identify this witness as yours. That's why. End of dialogue on this point. Next question.

3 MR. HOVIS: [Continues proffer:] Respondent's Exhibit 131, more information provided by Ms. Berden. Respondent's Exhibit 136, information provided by Ms. Berden to the FDIC. Respondent's Exhibit 144, further information provided. Respondent's Exhibit 145, further information provided. Respondent's Exhibit 146, further information provided. Respondent's Exhibit 175, further information provided. I'll now move to -- those are all e-mail communications. Respondent's Exhibit 205 are this witness's notes of a conversation with Anne Miessner on March 23, 2012, in which Ms. Miessner advised this witness that the Board of Directors at the exit meeting should have fired Mr. Calcutt and gave advice to Ms. Berden that the Nielsons probably have legal standing to sue and have they consulted a lawyer, presumably to sue Scrub Calcut. Further, in Respondent's Exhibit 205 this witness's notice of a meeting of June 22 of 2012 in which Ms. Miessner advised this witness "Scrub and Jackson are out," in which another witness in this case, Mr. Byl being called by the FDIC, Ms. Miessner said to this witness, Ms. Berden "Byl, he hates Scrub." Another note that says "Don't want no Scrub." Further meeting occurred on the day of Mr. Calcutt's deposition in this case, a meeting with  Gillerlain, Mr. Sup, and Lisa Thompson. Respondent's Exhibit 126 represent that meeting, and this witness's notes of that meeting are Respondent's Exhibit 205. Respondent's Exhibit 203 is a communication from Ms. Gillerlain to this witness of March 22, 2013, further communication about status of Calcutt. "He resigned." The purpose in doing all of that is to establish the reason for this agenda was simple: An act among these people to drum Scrub out of the industry.

THE COURT: Any further questions for the witness?

19 MR. HOVIS: I request that all of those Exhibits be entered into the record, Your Honor.

21 THE COURT: Government's response?

22 MR. BECK: Well, if he's making an offer of proof, that's one thing, Your Honor. I'm going to object to receiving these Exhibits. I mean the relevant time period of this matter is from 2008 to 2012, and he's talking about events that occurred subsequent to that. I don't think under the decision in Landry by the board that bias is, is material here in this context. The focus of this case is on the allegations in the notice and if those are proved, that's all that's required under the Board's interpretation of Section 8 and so I object to the receipt of these Exhibits into evidence.

9 THE COURT: Mr. Hovis, your response?

10 MR. HOVIS: Thank you, Your Honor. This is somewhat of an extraordinary proceeding in the sense that the FDIC is able to both identify fact witnesses and hybrid witnesses that are also expert witnesses. The communications and especially those notes  involving Ms. Miessner in which she reflected such clear bias against

Mr. Calcutt are crucial to our being able to challenge her credibility both with regard to her recitation of the facts and maybe far more so in the context of her expert testimony. Her agenda from the very beginning was to entrap Mr. Calcutt. While I recognize that you've stricken our Affirmative Defense, that has nothing to do with it. And in the Motion in Limine in our response I did clearly identify that we would not try to introduce this evidence in the context of the Affirmative Defenses that you had stricken, but that we would try to introduce the evidence because of the crucial relevance of this to credibility and bias, as I cited to the court. That is always an issue and it cannot be more of an issue in this case because Ms. Miessner is their primary witness and she is the one that is giving this, this assistance to the Nielson family. I, I think that it will devastate the defense and I would suggest be reversible error if I'm not allowed to put in the evidence of this bias.

10 THE COURT: I'm not at all prepared to say one way or the other that you can or cannot get that evidence in. You just can't use this witness to do it. What's your next question for this witness?

14 MR. HOVIS: Well, then that concludes my examination.

16 THE COURT: Any rebuttal? Any further questioning of the witness?

18 MR. BECK: No, Your Honor.

19 THE COURT: May the witness be excused?

20 MR. BECK: Yes, we would ask that she be excused.

22 MR. HOVIS: Just so the record is clear, I did offer the Exhibits into evidence and I assume you are sustaining the objection.

25 THE COURT: I am making the decision to keep them as an offer of proof for the time being because I don't think you gave adequate notice to present these documents to the witness. These are documents that are beyond the scope of direct examination. And clearly, if you wanted to have them in, clearly you could have presented that to me and to adverse counsel way before we had this hearing through the prehearing submission and you declined to do that. That's the extent of my ruling. I'm not saying anything about how these documents may or may not be presented to witnesses in the future. In fact I would expect that they would be. Any questions?

14 MR. HOVIS: Well, just for my own clarification and not to further argue the point --

16 THE COURT: Sure.

17 MR. HOVIS: -- when we get to Anne Miessner and I did not for obvious reasons through me identify Anne Miessner as a witness I was going to call, I am sure that Mr. Beck is very carefully not going to go into any of these communications but nevertheless they go to the heart of her bias and of her credibility and of her motive, and none of the cases say that one needs to identify you're going to call that witness for that purpose. That is always part of cross-

examination. It is not part of my direct examination, so it never occurred to me and I think is fundamentally wrong that I would need to have identified this witness as my witness for purposes of saying I'm going to use her for bias, credibility, and motive. I, I just think that's wrong.

6 THE COURT: Understood. You made a record. Anything else you need me to consider?

8 MR. HOVIS: No, Your Honor.

9 THE COURT: Thank you very much. This witness is released.

## Offer of Proof No. 2 – Respondent's Cross-Examination of Anne Miessner

Here again, Respondent elected not to identify as witnesses those individuals he sought to gather testimony from with respect to the examination practices he attributed to the FDIC. Having not identified these witnesses, their testimony in cross-examination was limited to the subjects addressed by the witness during direct examination. Respondent could have presented testimony that went beyond direct examination by Enforcement Counsel, but if he sought to do so he was under an affirmative obligation to disclose his intention to question these witnesses and needed to identify the documents he was going to show the witnesses, if his questions exceeded the scope of direct examination. Nothing prevented Respondent from seeking to have these witnesses testify, but he did not identify them as witnesses and as such was limited in the scope of their examinations.

Tr. at 874-80

MR. HOVIS: The evidence that I would be offering if I had the ability to do so would be that an investigator was placed into the Examination, that that was not disclosed to anyone at the Bank, that that investigator then worked hand-in-glove with the Nielson family in pursuing a common objective of bringing an 8(e) action, that the motive of both Ms. Miessner as reflected in a series of e-mails, some of which were discussed with Mr. Gomez was to get Mr. Calcutt on the record in a way that would be inconsistent so as to justify an 8(e) action in e-mails that I would refer, to reference that. As I commented with regard to the testimony of Ms. Berden, she provided extraordinary information as a part of a quid pro quo where in turn this witness, Ms. Miessner, with the assistance of Ms. Gillerlain challenged the Bank's handling of collections with regard to CB Richard Ellis, that this witness instructed Mr. O'Neill to raise those questions, that when I went through what this witness did in trying to pursue the interests of the Nielsons, he characterized it as shocking, that all of that collaboration continued through the resignation of Mr. Calcutt from the Board with numerous e-mails going back and forth involving this witness and Cori Nielson about the progress with this witness in saying in one of those e-mails the Board should have fired him at the exit meeting to which she just testified; And the reason I believe that that is all appropriate evidence is because bias and motive are always an issue for cross-examination. I cited to the court a case with regard to bias, with regard to the testimony of Autumn Berden. And with regard to motive I would like to cite, this is in our Motion in Limine, United States vs. Masino, 275 F 2nd, 129, 132, 2nd Circuit, 1960. "When a witness in a criminal case is being questioned as to his possible

Page 135 of 145

motives for testifying  falsely, wide latitude should be allowed in cross-examination. Cross-examination is proper when its purpose is to reveal bias or interest on the part of the witness being examined," citing further authority. This is akin to a criminal proceeding. It is akin to a criminal proceeding because of the nature of the penalty. While Mr. Calcutt is not going to be placed in jail behind bars, he is if the Court Rules against him and the FDIC upholds that, he's going to be barred from his source of likelihood. A banking career. And he's going to face a substantial civil money penalty. My position and I believe what the law requires is that this has nothing to do with whether it's beyond the scope of the direct. That's not the issue here, even though that's the way it's being framed between the FDIC and the court. This has to do with the latitude that is given in cross-examination. I need not have designated this as a witness because she is entirely hostile to my client. I believe that just as stated in United States vs. Masino, in  cross-examination I am entitled to pursue the fact that she for years now has been trying to get Mr. Calcutt  removed, that she did so in conjunction with the Borrower, that she acted on behalf of the Borrower in a shocking fashion; And I think that, I, I raise this in a quiet fashion because that is my nature, but I wouldn't, I, I believe it rises to the level where this matter could be overturned, and I want to give the court and the FDIC every opportunity to correct what I see as an egregious error.  If I lose that, I'd like to run through just some Exhibits and pages of testimony that I would offer as my offer of proof.

11 THE COURT: You can do that now.

12 MR. HOVIS: Okay. And when he's done with that, if the Government wants to make a response to the offer of proof, it may.

15 MR. BECK: Okay, thank you, Your Honor.

16 MR. HOVIS: The Exhibits are Respondent's 97.3, which references pursuing the 8(e) action. Some of these I did go through with Mr. Gomez, but I was going to question this witness about them. Respondent's 98 about "not letting them know we're digging."  Respondent's Exhibit 99. These are all Respondent's. Respondent's Exhibit 100. Respondent's Exhibit 101 An admission by Ms. Miessner that the purpose was to use the answers from that September 14th meeting in an 18(e) action, which is at 1386 of the transcript. Respondent's Exhibit 107, which is in evidence about no clearer picture. Respondent's Exhibit 106 at page 1265, Ms. Gillerlain was an investigator appointed at the regional level. Respondent's Exhibit 102.5, right after Gillerlain was appointed she met with Cori Nielson. This is duplication with what I did with Bird, so I'll just tell you what they are: Respondent's Exhibits 127, R-131, R-136, R-144, R-145, R-146, R-175, R-128. This now relates to the quid pro quo of the help that was being provided by Ms. Miessner to the Nielsons: Respondent's Exhibit 130, CBRE, begins at 129. Respondent's Exhibit 133 is her direction to O'Neill to inquire about CBRE at the September 14th meeting. Respondent's Exhibit 135, Cori still complaining. Respondent's Exhibit 137, O'Neill attached a two-and-a-half page memo of the answers on CBRE. The acknowledgement by this witness at 1269 that nothing within those answers indicated any wrongdoing by the Bank, the Bank was acting within its rights. Respondent's Exhibit 139, Gillerlain continues to advocate. Respondent's Exhibit 140, Gillerlain alleges or asserts that Mr. Calcutt is skirting

Page 136 of 145

**A324**

criminal activity because of the position he was taking on CBRE. Her lack of experience in that area,that she's supposed to be an independent investigator. Respondent's Exhibit 141, Cori Nielson contacts Ms. Miessner directly saying "I just wish there was a fresh face to talk to." Respondent's Exhibit 143 where, going back to Exhibit 141, Cori says "Can you, is there anything the state can do? Can you forward it to the state?" Respondent's Exhibit 143 is when Ms. Miessner did forward and asked if the state could intervene on the Borrower's behalf. And I'll then run through again I did this with Ms. Berden, so I'll note them. Respondent's Exhibit 205, a Berden conversation with this witness on March 23 in which she reports her opinion that the Board should have fired Mr. Calcutt at the exit meeting. This witness suggests that has the Borrower looked into whether they have legal standing to sue Scrub presumably directly. Respondent's Exhibit 202, an e-mail exchange "A little news to brighten your weekend about the charges being filed against Mr. Calcutt." Respondent's Exhibit 203, in which Ms. Gillerlain called to report that Scrub is out.

THE COURT: Does that conclude the offer of proof?

9 MR. HOVIS: Yes, the court had indicated that in the filings that we submit we can identify parts of the transcript that we think should be considered and so I'll do that at that time to save time now.

13 THE COURT: Alright. Thank you. Any other questions for the witness?

15 MR. HOVIS: No, Your Honor.

**Offer of Proof No. 3 – Respondent's Cross-Examination of Cori Nielson**

Here again, although Respondent could have chosen to call Ms. Nielson as a witness, and would thus not have been limited to those areas developed by the witness during her direct examination, he elected not to identify her as a witness. When questions arose that were beyond the scope of direct examination, objections to those questions were sustained.

Tr. at 1012-18

Q. And do you recall that there was a Complaint that was filed by the bankruptcy trustee against the Nielson Entities in that Complaint?

14 MR. BECK: Your Honor, I'm going to object. I don't see the relevance to this inquiry down this line about what occurred in the Immanuel bankruptcy. It was one entity that went into bankruptcy. It is noted in the Report of Exam from 2011, that that entity was in bankruptcy, but I don't see where the relevancy of exploring what occurred in the bankruptcy relates to anything having to do with the Bedrock Transaction or the December 2010 transaction, particularly since Immanuel didn't receive any proceeds from the latter transaction.

THE COURT: Counsel, address both the relevancy and whether that was in the scope of direct examination.

1 MR. HOVIS: Your Honor, during the course of Enforcement Counsel's case, the question of various witnesses with regard to the Call Report and the impact of the $2.8 million adjustment to profits in the Call Report and you'll recall the note from Ms. Miessner's testimony in which it said it is the expectation of the Bank that out of the

Immanuel bankruptcy they will be able to offset what that was, and it goes to that issue.

THE COURT: Based on that proffer, I find the question outside the scope of direct examination. You do not need to answer the question. You may ask your next question.

13 BY MR. HOVIS: 14 Q. Were you involved in continuing discussions after January 1 with regard to trying to resolve the -- well, let me back up. After January 1 did the Nielson Entities cease paying the obligations?

19 THE COURT: January 1 --?

20 MR. HOVIS: 2011.

21 THE WITNESS: The timeline of specific dates are foggy to me there. I don't even know specifically which date we signed that set of renewals so I'm just not sure I can answer that specifically.

25 BY MR. HOVIS: Q. Do you recall that there were continued -- well, do you recall that in terms of the timing that it wasn't until June of 2011 that the negotiations broke down?

4 A. That sounds right.

5 Q. And were you involved in any of the meetings in that period from January to June of 2011?

7 MR. BECK: I am going to object that this is going beyond the scope of direct and I don't see the relevancy of negotiations that ensued from the end of the renewals to June. It's in the record in terms of the Examination and what they found, and I don't see that there is anything relevant about the back and forth between the Nielson parties and the Bank during that time  period, Your Honor.

15 THE COURT: Respond to both the relevance and the scope questions.

17 MR. HOVIS: Yes, Your Honor. This is going to address the issue of the bias and motive of this witness in presenting the binder to the Regulators as she did in July of 2010, and I am going to ask her about the meeting in May 2011 in which she said, quote from the prior  transcript "I can destroy your bank and I'm tempted to do it."

24 THE COURT: I will sustain the objection. You don't need to answer the question. You may ask your next question.

2 MR. HOVIS: I intend to take the witness -- well, let me ask a series of questions and I think we'll get the same result and then we'll see if I can deal with it in a summary fashion.

6 BY MR. HOVIS: Q. Do you recall after the breakdown in the negotiations the Bank began collection efforts?

9 MR. BECK: Your Honor, I'm going to object. It's beyond the scope of direct, and I don't believe the collection actions other than as we've heard from Mr. Bimber on Bedrock are pertinent or relevant.

13 THE COURT: Do you want to respond to both scope and relevance?

15 MR. HOVIS: This is going to address the issue of motive, bias, and credibility of this witness.

17 THE COURT: Based on the proffer, the objection is sustained on both bases. You may ask your next question.

20 BY MR. HOVIS:  Q. Do you recall the Bank exercising its assignment of rents clause?

23 MR. BECK: I am going to object, Your Honor. Again, this is beyond the scope. It's not relevant. It's not even mentioned in the 2011 Report of Exam, any issue regarding the assignment of rents related to the Nielson properties.

3 THE COURT: Your response to both scope and relevance?

5 MR. HOVIS: The same as before, Your Honor.

6 THE COURT: Same ruling.

7 BY MR. HOVIS: Q. Following the sending of the binder to Ms. Miessner, did you have a conversation with her with regard to the binder and the relationship between the  Nielsons and the Bank?

12 MR. BECK: I am going to object. Again, it's beyond the scope of direct. It's not relevant. She testified she sent the binder to the FDIC. There was no inquiry about who she sent it to or any subsequent conversations and again I don't think it's relevant to these proceedings.

18 THE COURT: Address both scope and relevance, please, counsel.

20 MR. HOVIS: Same basis, Your Honor.

21 THE COURT: Same ruling.

22 BY MR. HOVIS: Q. Ms. Miessner said to you "This is perfect timing as we are just starting an Examination," did she not?

25 MR. BECK: Your Honor, I'm going to object. Again, we are repeating the same -- I have the same objections. It's beyond the scope of direct and it is not relevant or pertinent to these proceedings.

4 THE COURT: Address both scope and relevance.

5 MR. HOVIS: Same basis, Your Honor.

6 THE COURT: Same ruling.

7 BY MR. HOVIS: Q. Your objective in sending the binder and providing the help that you did for over two years to Ms. Miessner and the investigator Teri Gillerlain was to make  good on your threat to destroy the Bank, was it not?

12 MR. BECK: I am going to object, Your Honor. Again, it's beyond the scope of direct and it is not relevant or pertinent to these proceedings.

15 THE COURT: Response to both scope and relevance, please.

17 MR. HOVIS: Same basis, Your Honor.

18 THE COURT: Same ruling.

19 MR. HOVIS: I have the same series of questions that have been the source of an offer of proof with regard to both Anne Miessner and Autumn Berden. In order to save time, it would seem to me appropriate if the Court deems it so that I would incorporate the proffer that I made earlier and with regard to the questions that I've just been asking, there are a few pages of this witness's deposition that I would like to add to what I proffered earlier. 553 through 559.

4 THE COURT: And that's from the prior testimony, correct?

6 MR. HOVIS: Yes, from prior testimony from the prior proceeding.

8 THE COURT: Alright.

9 MR. HOVIS: I would also like to note that again simply for the record, the court struck our Affirmative Defenses prior to the proceeding based on entrapment and due process and, therefore, I have not attempted to elicit testimony on those issues in view of the Court's  ruling, but I do want the record to reflect that the same proffer we would be making on those defenses if the court had given us the opportunity to present those.

17 THE COURT: First with respect to incorporating the earlier offers of proof in this context, any objection?

20 MR. BECK: No, Your Honor.

21 THE COURT: Alright, and any objection to my considering also the additional pages of 553 to 559 of the transcript?

24 MR. BECK: No, Your Honor.

25 THE COURT: Anything else in the proffer that, offer of proof that you care to make at this time, Mr. Hovis?

3 MR. HOVIS: No, Your Honor.

4 THE COURT: Any other questions for the witness?

5 MR. HOVIS: No, Your Honor.


1012-18

Note: what follows is the excerpted transcript referred to above, from the 2015 hearing:

553-559 (Cross examination of Cori Nielson during the 2015 hearing)

Q. And Mr. Bill Calcutt clearly stated in the September 17, 2015 paragraph that says "The foregoing settlement proposal," it's in the middle of the page "is conditioned upon all the loan documentation including, without limitation, all of the terms and conditions of the loans being satisfactory to Northwestern and its legal counsel." Do you see that?

7 A. I see that.

8 Q. Now this was not what you wanted. You wanted far greater debt relief than on two properties and that's what led then to continued discussions that occurred up until June of 2011?

12 A. Well, I'm not sure that we were only getting debt relief on two properties but, yes, we needed more debt relief than this proposal gave and, hence, we continued negotiations.

16 Q. Alright. You were asked earlier with regard to when you sent the binder to the FDIC. I have a document that will refresh your recollection, but let's set the framework. Is it your memory that negotiations broke down in June 2011?

21 A. Yeah, May or June, 2011. Probably June. Go with June.

23 Q. And you testified earlier that one of the, one of the things that the Bank did in terms of collection of the debt was to exercise its rights under the assignment of rents clause?

2 A. Yes, it did that later that summer.

3 Q. And actually they did it in June, did they not?

4 A. Oh. I, I, I could be wrong. Maybe they did it in June. It seems like it was later.

6 Q. And aside from exercising their rights under the assignment of rents clause, the Bank also immediately took whatever cash was available in the various accounts to set off against the loans, did it not?

10 A. They did do a loan set-off.

11 Q. And in addition to that, the Bank instituted foreclosure proceedings, as you testified, on all the properties?

14 A. These things you are saying happened at various dates and not all at the same time. The foreclosure proceedings definitely happened along a long-ish time span of dates but, yes, they did end up foreclosing.

18 Q. But you had been told by Mr. Calcutt in that May meeting that if you were going to insist, continue to insist on your position that the Bank was going to suffer all of the losses on these deficiencies, the Bank was going to aggressively go after collection of this debt. He made that very clear to you, did he not?

24 A. Um, I'm trying to make sure I've got the scope of your question. He was clear that he would exercise his legal remedies. I don't, I mean you're really emphasizing it (pause).

3 Q. Alright. Look at Respondent's Exhibit 85 to see if that refreshes your memory as to when you sent the binder.

6 A. Well, when I sent it to Lansing was I think a very different time than when I sent it actually to Chicago and Washington, D.C.

9 Q. Yes. Let's look at Respondent's Exhibit 85.3. It's hard to read, but it's the best copy that we could get.

Page 141 of 145

12 A. Am I looking for a date?

13 Q. Yes.

14 A. Maybe that's a 7 for the month. July. Looks like July.

16 Q. It does look like July. July --

17 A. Maybe 30th? I really don't know. It's really hard to read. You can't read the "accepted" but the delivery date looks like definitely July.

20 Q. Anyway, does it refresh your memory that it was sometime right around the end of July that you put together and sent this binder to Anne Miessner and to the OIG?

24 THE COURT: Was there a correspondence letter that goes along with this delivery? Did you put a letter in with the binder?

2 THE WITNESS: I might not have because I definitely did not put my name on anything. I might have just sent the binder. It was sort of an anonymous whistleblower thing.

6 MR. HOVIS: As the court can see, this came from the Nielson production BHN at the bottom.

8 THE COURT: Where is that?

9 MR. HOVIS: The Bates stamp.

10 THE COURT: Who is Judy Smith?

11 THE WITNESS: It's actually Julia. I don't know who miswrote that on there, but I was staying with her, a friend, a personal friend. I didn't want to put my company address on there and I was going to visit her and I just used her address.

16 THE COURT: I think I know the answer to this question, but I take it no one contacted USPS and ran that bar code number through to get the specifics on the delivery date?

20 MR. HOVIS: No. It appears to me from looking at Respondent's 85.3 it has scheduled date of delivery, and that looks to be reasonably legible as 7-20, and the addressee is Anne Miessner.

24 THE COURT: Well, I see something that could be a 7 and a slash. I don't know what the next --

1 MR. HOVIS: It might be better if you weren't looking at the screen, if you wanted to look at the document itself. I think it may be a little more legible.

5 THE COURT: Well, can we stipulate at least to the year?

7 MR. HOVIS: Oh, yes. The witness has already testified that this was 2011.

9 THE COURT: Alright. Let me see the, is that the original or is that a copy of the original?

11 MR. HOVIS: We do not have the original. It would have been in the Nielson production. All they would have provided was a copy.

14 THE COURT: This does look like the month of 7-20.

16 BY MR. HOVIS: Q. Does anything in your memory suggest a date other than July 20?

19 A. No, I don't have a specific recollection of a date.

21 Q. Following submission of this binder, you were contacted by the FDIC to enlist your help in the investigation, were you not?

24 A. Yes.

25 Q. How many times in the year 2011 did you meet with representatives of the FDIC to help in the investigation?

3 A. I really don't even remember if we met at all in 2011. We only met a few times over the course of these years.

6 Q. So let's look at Respondent's Exhibit 101.5. This is an e-mail that you authored on September 8, 2011 to -- and so that I don't continue to mess up pronunciation, is it Miessner? It is an e-mail that you sent to Anne Miessner and to Theresa Gillerlain. It says "Anne and Teri: I hope all is wrapping up well for both of your investigations/examinations. It was nice to meet you today, Teri." And then you move into a topic I'm going to pursue in a minute. CB Richard Ellis. Does this refresh your recollection?

17 A. Yes.

18 Q. And you referred to investigations/examinations. What did Ms. Gillerlain say to you was her role with regard to the investigations/examinations?

21 A. I think she had a title like investigator or something? And I felt like she was the leader of the group that came to Traverse City to conduct some kind of exam.

25 Q. What did she tell you at this meeting about what it was she was doing?

2 A. Well, I, I already had an understanding of what they were doing in general? Before they arrived? Now that you showed me this, I remember that when I ended up talking with Anne after she received the binder, she said it's perfect timing because they are going to be going there and doing an Exam. I don't know the specifics of what's included in an Exam, but -- so I already knew they were coming to do an Exam. So what exactly Teri told me she was doing different than that? I'm, I'm not sure. I think she specifically told me she had a sit-down with Scrub. I think she told me specifically that she was looking through their e-mail maybe, maybe copying, getting copies of their e-mail database or something.

17 Q. Do you recall at this meeting she began to ask you to help in providing additional information?

19 A. Well, when you say "began," I don't know about began. I was cooperative all along. I gave them this information to begin with, this binder, and, and any follow-up information if they needed any. I don't know who asked me what when, but I was always cooperative.

24 MR. HOVIS: Did I move this into evidence

Page 143 of 145

**A331**

1 THE COURT: Yes.

2 MR. HOVIS: Thank you.

**Offer of Proof No. 4: Direct Examination of Harry C. Calcutt, III**

When he testified, Mr. Calcutt was subject to the same obligations all other witnesses were subject to, specifically that during direct examination the prehearing statement describing the testimony needed to identify in advance of the hearing which documents would be presented to the witness. The following exhibits were not included in the disclosures required by the prehearing Order, and upon objection were not presented to the witness.

Tr. at  1287

Before I proceed with further questioning for Mr. Calcutt, in order to protect my record I would like to make an offer of proof with regard to what the testimony would be on the three Exhibits that you declined to let me question. With regard to FDIC Exhibit 23, that is the response of Northwestern Bank to the visitation in which Ms. Miessner had testified that the Bank did not identify reasons why the ratings that she gave were incorrect. I was going to have the witness testify regarding the violations and the insignificance of those and go through the CAMELS ratings with regard to capital and earnings to show that the Bank did demonstrate why the ratings were wrong. With regard to FDIC Exhibit 44, Ms. Miessner testified at some length about the comments made on Page 4 of that Exhibit related to the relationship has always performed without exception and that is the Northwestern Bank response of June 30, 2011. Mr. Calcutt had he been given the opportunity would have explained that those comments were in the context of the criticism about the prudent banking nature of that relationship and they were historic. They did not reflect the current position which was identified on page 8 which says that those loans are in default and are in collection. With regard to FDIC Exhibit 22, a comment was made and testimony was given regarding a statement purportedly made by Mr. Calcutt relating to blood on the pages having to do with if anybody dissented on the Board that there would be blood on the pages. I was going to have Mr. Calcutt identify that that was a sarcastic, joke-like comment made with no seriousness.

8 THE COURT: Very good. Do you want to make any response to the offer of proof at this time, counsel?

10 MR. BECK: No, Your Honor. We will reserve our response to the post-hearing briefs.

Also at page 1302:

MR. HOVIS: Yes, Your Honor, Joint Exhibit 3 was the subject of our Motion in Limine and the court overruled our Motion in Limine so it would not have been -- and we would not have put it on our Exhibit list because we filed a Motion in Limine to keep it out of the court proceeding altogether. The court has allowed it to come in, and so I believe I'm entitled to have the witness now opine on certain statements made in it and it's just inconceivable that we would put it on our list when we were trying to keep it out.

Page 144 of 145

23 THE COURT: Sustain the objection. You can ask your next question.

25 MR. HOVIS: Let me make my offer of proof.

1 THE COURT: Please.

2 MR. HOVIS: If permitted, the witness would have discussed that there was no regulatory definition of performing loan of which he was aware, that this document was prepared by Mr. Jackson, that he relied on Mr. Jackson in terms of the statement made that these were performing loans believing that that was in accordance with what was regulatorily required at the time.

9 THE COURT: Very good.


Also at page 1333:

Alright, I want you to look at FDIC Exhibit 42.

7 MR. BECK: Your Honor, I am going to object. It's not on the list of Exhibits.

9 THE COURT: Mr. Hovis, do you care to comment?

10 MR. HOVIS: Yes, Your Honor. This is another Exhibit that was the subject of our Motion in Limine and, therefore, we did not believe it appropriate or consider putting it on our Exhibit list; and because it has been a topic of the Government's case, we want to clarify issues  related to it in rebuttal.

16 THE COURT: The objection is sustained. The document will not go in. Do you want to make a further offer of proof?

19 MR. HOVIS: The witness had he been given the opportunity to have testified, that he did not see this document, that it was an e-mail exchange between Dick Jackson and Anne Miessner, that it's nothing that would have ever come to his attention.

# FEDERAL DEPOSIT INSURANCE CORPORATION

Washington, D.C.

| | |
|---|---|
| In the Matter of:<br><br>**HARRY C. CALCUTT III**, individually, and as an Institution-Affiliated Party of<br><br>NORTHWESTERN BANK<br>TRAVERSE CITY, MICHIGAN<br><br>(Insured State Nonmember Bank) | FDIC 12-568e<br>FDIC 13-115k<br><br>**RESPONDENT HARRY C. CALCUTT III'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION ON REMAND AND REQUEST FOR ORAL ARGUMENT.**<br><br>DATE: August 3, 2020 |

**A334**

## EXCEPTIONS

Respondent Harry C. Calcutt III hereby brings the following exceptions to the Recommended Decision on Remand dated April 3, 2020. These exceptions are based on the accompanying brief, the record in this proceeding, and any other written and/or oral argument that may be presented to the Federal Deposit Insurance Corporation Board.

**Exception 1**: The ALJ violated the U.S. Constitution, the Administrative Procedure Act, and the FDIC's Order in Pending Cases by relying upon and incorporating the 2015 record over Respondent's multiple objections, tainting the entire 2019 hearing and failing to provide Respondent the new hearing to which he was entitled. *See infra* Section IV.A.

**Exception 2**: The ALJ should not have admitted and relied upon the 2015 Joint Stipulations of Fact over Respondent's objection. *See infra* p. 22–23 & nn.11, 12.

**Exception 3**: The ALJ improperly allowed Enforcement Counsel to introduce evidence outside the Notice over Respondent's objections and violated the U.S. Constitution, the Administrative Procedure Act, and FDIC Board decisions by recommending removal for reasons outside the Notice. *See infra* Section IV.B.

**Exception 4**: The ALJ violated the U.S. Constitution, the Administrative Procedure Act, and the FDIC's Uniform Rules of Practice and Procedure by improperly limiting Respondent's cross-examination of Autumn Berden, Cori Nielson, and Anne Miessner. *See infra* Section IV.C.1.

**Exception 5**: The ALJ erred by improperly barring Respondent from testifying regarding admitted exhibits to rebut the testimony of FDIC witnesses, and then by relying on the FDIC witnesses' testimony and the absence of a response from Respondent. *See infra* Section IV.C.2.

**Exception 6**: The ALJ struck Respondent's affirmative defenses of laches, entrapment, and due process without any legal basis and improperly prohibited Respondent from introducing evidence to support those defenses. *See infra* Section IV.C.3.

**Exception 7**: The ALJ's denial of Respondent's motions *in limine* was unsubstantiated and contrary to law. *See infra* Section IV.C.4.

**Exception 8**: The ALJ improperly ended cross-examination on relevant, non-duplicative topics during the hearing. *See infra* Section IV.C.4.

**Exception 9**: The ALJ improperly allowed expert testimony from Anne Miessner and James Gomez that was speculative and that opined on Respondent's intent. *See infra* Section IV.C.4.

**Exception 10**: The ALJ was biased against Respondent.  *See infra* Section IV.D.

**Exception 11**:  The Recommended Decision fails to analyze and connect the facts to the statutory elements and fails to find misconduct accompanied by both an effect and scienter as required to justify removal and prohibition.  *See infra* Section V.B.

**Exception 12**:  Authorizing the 2009 Bedrock Transaction was not an unsafe and unsound practice.  *See infra* Section V.C.1.

**Exception 13**:  Authorizing the 2010 use of Pillay Collateral was an not an unsafe and unsound practice.  *See infra* Section V.C.2.

**Exception 14**:  Respondent did not intentionally conceal information about the Bank's condition, the true nature of the Nielson Entities' loan portfolio, the 2009 Bedrock Loan, and the 2010 use of Pillay Collateral from the Bank's board and regulators.  *See infra* Section V.C.2.

**Exception 15**:  Respondent did not breach his fiduciary duty of care by leading the negotiations of the 2009 Bedrock Loan Transaction or the 2010 use of Pillay Collateral.  *See infra* Section V.D.1.

**Exception 16**:  Respondent did not breach his fiduciary duty by failing to heed regulatory warnings from examiners.  *See infra* Section V.D.2.

**Exception 17**:  Respondent did not breach the duty of candor by withholding information from the Bank's board or regulatory examiners.  *See infra* Section V.D.3.

**Exception 18**:  The ALJ's conclusions that the Bank incurred an actual loss or was at risk of loss by reason of Respondent's misconduct is not supported by the evidence in the record and is contrary to law.  *See infra* Section V.E.1.

**Exception 19**:  The ALJ's conclusions that Respondent received a benefit by reason of Respondent's misconduct is not supported by the evidence.  *See infra* Section V.E.2.

**Exception 20**:  The ALJ fails to attribute any improper scienter to the Bedrock Transaction or the 2010 Transaction.  *See infra* Section V.F.1.

**Exception 21**:  Substantial evidence does not support the ALJ's finding that Respondent was personally dishonest.  *See infra* Section V.F.2.

**Exception 22**:  Substantial evidence does not support the ALJ's finding that Respondent's conduct demonstrated willful and continuing disregard for the Bank.  *See infra* Section V.F.3.

**Exception 23**:  The ALJ improperly excluded evidence related to Respondent's involvement in federally-insured banking institutions following the sale of Northwestern Bank for a substantial premium.  *See infra* p. 168 n.64.

**Exception 24**:  Civil money penalties are unwarranted in both fact and law.  *See infra* Section VI.

**Exception 25**:  ALJ McNeil is improperly shielded from removal in violation of the U.S. Constitution.  *See infra* Section VII.A.

**Exception 26**:  The hearing failed to remedy the Appointments Clause violation as required by *Lucia v. SEC*, 138 S.Ct 2044 (2018).  *See infra* Section VII.B.

**Exception 27**:  The statute of limitations bars this proceeding.  *See infra* Section VII.C.

**A337**

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ................................................................. 1

II.    FACTUAL AND PROCEDURAL BACKGROUND........................................ 11

III.   LEGAL STANDARD............................................................................. 13

IV.   A NEW HEARING IS REQUIRED BECAUSE ALJ MCNEIL EXCEEDED HIS AUTHORITY AND FAILED TO PROVIDE RESPONDENT A FAIR HEARING................. 14

   A.   ALJ McNeil Improperly Relied upon the 2015 Record................................... 15

      1.   ALJ McNeil Should Have Limited the Recommended Decision to the 2019 Record . 16

      2.   The ALJ Violated the Board's Resolution and the APA by Relying on the 2015 Record over Respondent's Objection.................................................... 18

   B.   ALJ McNeil Improperly Recommended Removing Respondent for Reasons Outside the Notice of Intent to Remove ....................................................... 24

      1.   The Notice Establishes the Boundaries in Administrative Proceedings. ..................... 25

      2.   ALJ McNeil's Findings Are Outside the Notice.......................................... 27

   C.   ALJ McNeil Made Erroneous and Prejudicial Evidentiary Rulings that Affected Respondent's Fundamental Due Process Right to a Fair Hearing ........................................... 37

      1.   ALJ McNeil Improperly Prohibited Respondent from Cross-Examining Key FDIC Witnesses Regarding Their Bias Against Respondent............................................ 38

      2.   ALJ McNeil Improperly Prohibited Respondent from Testifying about Exhibits Used by the FDIC That Were Admitted into Evidence. ............................................... 48

      3.   ALJ McNeil Improperly Struck Respondent's Affirmative Defenses and Prevented Respondent from Introducing Relevant Evidence. ............................................. 50

      4.   ALJ McNeil Made Numerous Other Evidentiary Errors. .................................... 58

   D.   ALJ McNeil Was Biased Against Respondent. ............................................ 62

      1.   ALJ McNeil Was Biased Because He Created a One-Sided Record Skewed Against Respondent............................................................................. 64

      2.   ALJ McNeil Assumed the Role of Enforcement Counsel at Times. ........................... 69

      3.   ALJ McNeil Misstated the Evidence to Inaccurately Portray the Record. ................. 72

V.    THERE IS NO BASIS TO REMOVE RESPONDENT BECAUSE THE ALJ's FINDINGS OF FACT ARE UNWARRANTED IN BOTH FACT AND LAW ........................................... 77

   A.   Legal Standard ........................................................................ 77

   B.   ALJ McNeil's Recommendation Fails to Analyze and Connect the Statutory Elements Required to Justify Removal and Prohibition for Each Act. .................................... 78

   C.   Respondent Did Not Engage in Any Unsafe and Unsound Practices.............................. 80

      1.   Authorizing the 2009 Bedrock Loan Transaction Was Not an Unsafe and Unsound Practice............................................................................... 81

iv

**A338**

2.    Authorizing the December 2010 Use of Collateral Was Not an Unsafe and Unsound Practice.................................................................................................... 92

3.    Respondent Did Not Intentionally Conceal Information About the Bank's Condition, the True Nature of the Nielson Entities Loan Portfolio, the 2009 Bedrock Loan, and 2010 Use of Collateral from the Bank's Board and Regulators. .................................................... 99

D.    Respondent Did Not Breach His Fiduciary Duties to Northwestern Bank.................... 125

1.    Leading the Negotiations of the 2009 Bedrock Loan Transaction and 2010 Use of Collateral Was Not a Breach of the Duty of Care. ........................................................... 125

2.    Respondent's Response to Regulatory Warnings Regarding the Nielson Entities Loan Portfolio Was Not a Breach of Fiduciary Duty. .................................................................. 127

3.    Respondent Did Not Breach the Duty of Candor by Withholding Information from the Board and Regulatory Examiners. ...................................................................... 128

E.    Respondent's Actions Did Not Result in an Adverse Effect on the Bank or Provide an Improper Benefit....................................................................................................... 132

1.    ALJ McNeil's Conclusions That the Bank Incurred a Loss or Was at Risk of Loss Lack Evidentiary Support. .......................................................................................... 133

2.    ALJ McNeil's Conclusions That Respondent Received a Benefit Lack Evidentiary Support....................................................................................................... 141

F.    Respondent Did Not Act with Personal Dishonesty or Willful or Continuing Disregard for Northwestern Bank.................................................................................................... 145

1.    ALJ McNeil Fails to Attribute Any Improper Scienter to the Bedrock Transaction or 2010 Transaction.................................................................................................... 145

2.    Respondent Was Not Personally Dishonest by Concealing Issues with the Nielson Loans....................................................................................................... 148

3.    Respondent's Actions Did Not Demonstrate Willful and Continuing Disregard for the Bank. ....................................................................................................... 154

VI.    CIVIL MONEY PENALTIES ARE UNWARRANTED ................................................ 156

VII.    THE ALJ FAILED TO MAKE OTHER RULINGS PROPOSED BY RESPONDENT .. 158

A.    The ALJ Is Improperly Shielded from Removal ........................................................... 158

B.    The Hearing Failed to Comply with *Lucia*. .................................................................. 162

C.    The Statute of Limitations Bars this Proceeding. .......................................................... 166

VIII. THE BOARD SHOULD EXERCISE ITS DISCRETION TO DISMISS THE PROCEEDINGS OR STAY ANY ORDER PENDING JUDICIAL REVIEW........................ 167

IX.    REQUEST FOR ORAL ARGUMENT .......................................................................... 170

**A339**

# TABLE OF AUTHORITIES

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)......................................................55, 58

*Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019) .....................161

*Atherton v. FDIC*, 519 U.S. 213 (1997).........................................................................129

*Att'y Gen. v. PowerPick Player's Club*, 783 N.W.2d 515 (Mich. Ct. App. 2010) .......53

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ...................................................50

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) ..................................................60

*Bolton v. United States*, 2013 WL 3965427 (W.D. Tenn. Aug. 1, 2013) ......................52

*Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017) ..................................................... passim

*Cavallari v. Comptroller of Currency*, 57 F.3d 137 (2d Cir. 1995) ............................157

*Davis v. Alaska*, 415 U.S. 308 (1974)......................................................................43, 44

*de la Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003) ............................................ passim

*Dickson v. Sec'y of Defense*, 68 F.3d 1396 (D.C. Cir. 1995) ........................78, 149, 157

*Dodge v. Comptroller of Currency*, 744 F.3d 148 (D.C. Cir. 2014)..............................81

*Doolittle v. Nat'l Credit Union Ass'n*, 992 F.2d 1531 (11th Cir. 1993) ........................84

*Doolittle v. Nat'l Credit Union Ass'n*, 992 F.2d1531 (11th Cir. 1993) .......................126

*Ellis v. Capps*, 500 F.2d 225 (5th Cir. 1974) ................................................................46

*FDIC v. Gladstone*, 44 F. Supp. 2d 81 (D. Mass. 1999)................................................53

*Ferguson v. FAA*, 352 F. App'x 192 (9th Cir. 2009)......................................................38

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010).................159, 161

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..........................................................46, 51, 64

*Golemine, Inc. v. Town of Merrillville*, 652 F. Supp. 2d 977 (N.D. Ind. 2009) ...........52

*Greene v. McElroy*, 360 U.S. 474 (1959) .....................................................................46

*Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320 (5th Cir. 1996)......................................60

*Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish v. Fed. Home Loan Bank Bd.*, 651 F.2d 259 (5th Cir. 1981)................................................................................................81

*Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155 (2d Cir. 2003)......................................168

*Hoffman v. FDIC*, 912 F.2d 1172 (9th Cir. 1990) ...........................................................81

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992)........................................132, 139

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................ passim

*In the Matter of William Marvin Clark, Sr.*, 1991 WL 757819 (1991) ......................................168

*Jiampietro v. Bd. of Governors*, No. 18-2806 (2d Cir. Sep. 21, 2018), ECF No. 2......................62

*Johnson v. OTS*, 81 F.3d 195 (D.C. Cir. 1996)...............................................................81

*Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018) ..............................163, 164, 165

*Kaplan v. OTS*, 104 F.3d 417 (D.C. Cir. 1997) ....................................................... passim

*Kim v. OTS*, 40 F.3d 1050 (9th Cir. 1994)............................................................. passim

*Lakin v. Bloomin' Brands, Inc.*, 2018 WL 1399226 (E.D. Mich. Mar. 19, 2018)........................52

*Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) .................................................132, 164

*Leuthe v.OFIA*, 977 F. Supp. 357 (E.D. Pa. 1997) ......................................................160

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013)....................................61

*Lucia v. SEC*, 138 S. Ct. 2044 (2018)................................................................ passim

*Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991) .........................................................56, 58

*Morrison v. Olson*, 487 U.S. 654 (1988) .................................................................162

*Morton v. Ruiz*, 415 U.S. 199 (1974)....................................................................25, 55

*Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp.*, 418 F. Supp. 798 (D.R.I. 1976).........52

*NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887 (7th Cir. 1990) ...................................53

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994)....................................................129

*Oberstar v. FDIC*, 987 F.2d 494 (8th Cir. 1993) ................................................... passim

*Pagan-Gonzalez v. Moreno*, 919 F.3d 582 (1st Cir. 2019).........................................60

*Pharaon v. Bd. of Governors*, 135 F.3d 148 (D.C. Cir. 1998)......................................64

*Proffitt v. F.D.I.C.*, 200 F.3d 855 (D.C. Cir. 2000) ............................................102, 151, 153, 167

*Quinn v. Neal*, 998 F.2d 526 (7th Cir. 1993) .................................................................................44

*Resolution Tr. Corp. v. Gregor*, 1995 WL 931093 (E.D.N.Y. Sept. 29, 1995)............................53

*Resolution Tr. Corp. v. Vanderweele*, 833 F. Supp. 1383 (N.D. Ind. 1993).................................53

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411 (6th Cir. 2011) ...........................................79

*Rodgers v. Claim Jumper Rest., LLC*, 2014 WL 1760959 (N.D. Cal. May 1, 2014) ...................52

*Ryder v. United States*, 515 U.S. 177 (1995) ...............................................................................165

*Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148 (9th Cir. 1998)....................................................56

*Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1999) .........................................................43

*Seidman v. OTS*, 37 F.3d 911 (3d Cir. 1994)........................................................................ passim

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ........................................................158, 160, 161

*Service v. Dulles*, 354 U.S. 363 (1957)..........................................................................................58

*St. Louis Fuel & Supply Co. v. F.E.R.C.*, 890 F.2d 446 (D.C. Cir. 1989) ..............................17, 92

*Sutherland v. Barnhart*, 322 F. Supp. 2d 282 (E.D.N.Y. 2004) ..............................................72, 76

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ...........................................49, 61, 103

*Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir.1994).....................49, 61, 103

*U.S. Steel Mining Co. v. Dir., OWCP*, 187 F.3d 384 (4th Cir. 1999).............................49, 61, 103

*United States v. Abel*, 469 U.S. 45 (1984) .....................................................................................43

*United States v. Barger*, 931 F.2d 355 (6th Cir. 1991).................................................................54

*United States v. Caceres*, 440 U.S. 741 (1979) ............................................................................60

*United States v. Crawford*, 60 F. App'x 520 (6th Cir. 2003) ......................................................167

*United States v. Dotson*, 799 F.2d 189 (5th Cir. 1986).................................................................60

*United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013)..............................................................60

*United States v. Harris*, 185 F.3d 999 (9th Cir. 1999)............................................................43, 46

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)............................................165

*United States v. Moore*, 917 F.2d 215 (6th Cir. 1990)...................................................46

*United States v. Summerlin*, 310 U.S. 414 (1940) ......................................................53

*United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977)...............................................60

*United States v. Valenzuela*, 88 F. App'x. 909 (6th Cir. 2004) ...............................54

*Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016) ..................................................165

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).................................55

*Yellow Freight Sys. v. Martin*, 954 F.2d 353 (6th Cir. 1992) ...................25, 34, 60

12 C.F.R. 308.20(a)...................................................................................................28

12 C.F.R. § 308.1–308.41 ........................................................................................166

12 C.F.R. §§ 308.1 *et seq.*........................................................................................166

12 C.F.R. § 308.7(b)(2)..............................................................................................51

12 C.F.R. § 308.18(a)...............................................................................................166

12 C.F.R. § 308.18(b)(2)......................................................................................25, 26

12 C.F.R. § 308.20(a)..................................................................................................25

12 C.F.R. § 308.29......................................................................................................51

12 C.F.R. § 308.30......................................................................................................51

12 C.F.R. § 308.35...............................................................................................16, 23

12 C.F.R. §308.35(a)(1)..................................................................................38, 44, 63

12 C.F.R. § 308.35(a)(3)..............................................................................................60

12 C.F.R. § 308.35(a)(4) and 308.36(e)......................................................................23

12 C.F.R. § 308.36(a)................................................................................................104

12 C.F.R. § 308.36(a)(1)..............................................................................................60

12 C.F.R. § 308.36(a)(2)....................................................................................3, 38, 43

12 C.F.R. § 308.36(d)..................................................................................................71

12 C.F.R. § 308.36(f)(3)..............................................................................................17

ix

12 C.F.R. § 308.39(a) ............................................................................................13

12 C.F.R. § 308.40 ..............................................................................................14

12 C.F.R. § 308.40(b) .........................................................................................170

12 C.F.R. § 308.41 ............................................................................................169

12 C.F.R. § 308.103(a) ......................................................................................166

12 C.F.R. § 308.144–.150 ...................................................................................56

12 C.F.R. § 308.145 .............................................................................................56

12 C.F.R. § 308.148 .......................................................................................57, 58

63 Fed. Reg. 30,226 (June 3, 1998) ..................................................................156

5 U.S.C. § 554 ....................................................................................17, 25, 166

5 U.S.C. § 556 ........................................................................................... passim

5 U.S.C. § 557(c)(3)(A) ............................................................................. passim

5 U.S.C. § 1202(d) .............................................................................................159

5 U.S.C. § 3105 ..................................................................................................163

5 U.S.C. § 7521(a) .............................................................................................159

12 U.S.C. § 1818(i)(2)(B) ...........................................................................156, 157

12 U.S.C. § 1818(i)(2)(G) ..................................................................................156

12 U.S.C. §1818(e)(1)(A)(ii) ..............................................................................59

12 U.S.C. § 1818(e)(1)(B) ..........................................................................133, 134

12 U.S.C. § 1818(e)(1)(B)(i)–(iii) .....................................................................132

12 U.S.C. § 1818(e)(4) ............................................................................... passim

12 U.S.C. § 1818(e)(C)(i) ..................................................................................154

12 U.S.C. § 1818(e)(C)(i), (ii) ...........................................................................145

12 U.S.C. § 1818(h)(1) ......................................................................................166

28 U.S.C. § 2462 ...............................................................................................167

**A344**

Fed. R. Civ. P. 3 .................................................................................166

Fed. R. Evid. 607 .............................................................................3, 38

Fed. R. Evid. 611(b) .....................................................................3, 38, 43

*In the Matter of Billy Proffit*, 1998 WL 850087 (FDIC Oct. 6, 1998) .........................140

*In the Matter of Dennis Shollenburg*, 2003 WL 1986896 (FDIC Mar. 11, 2003) ......................140

*In the Matter of James Leuthe*, 1998 WL 438323 (FDIC June 26, 1998) ..................................134

*In the Matter of John R. Lamm*, 2018 WL 2297269 (FDIC Mar. 20, 2018) ........................ passim

*In the Matter of Michael D. Landry, et al.*, 1999 WL 440608 (FDIC May 25, 1999) ..........60, 132

*In the Matter of Michael R. Sapp*, 2019 WL 5823871 (FDIC Sep. 17, 2019) ...................... passim

*In the Matter of Michael R. Sapp*, FDIC-13-477(e), FDIC-14-478(k) (Sept. 17, 2019) .............132

*In the Matter of Randolph W. Lenz*, 2003 WL 23273837 (FDIC Dec. 4, 2003) ..........................53

*In the Matter of Ronald J. Grubb*, FDIC-88-282k, 1992 WL 813163 (FDIC 1992)..................131

*Social Sec. Admin. v. Brennan*, 27 M.S.P.R. 242 (1985).............................................159

*Social Sec. Admin. v. Glover*, 23 M.S.P.R. 57 (1984) .............................................159

*Administrative Law Judges After Lucia*, 132 Harv. L. Rev. 1120 (2019) ..................................164

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1381 (3d ed. 2004) ......................................................................................52

Christopher B. McNeil, *Administrative Agency Litigation*.......................................1, 62

Joshua I. Schwartz, *The Irresistible Force Meets the Immovable Object: Estoppel Remedies for an Agency's Violation of Its Own Regulations or Other Misconduct*, 44 Admin. L. Rev. 653, 699–701 (1992) ......................................................................58

Stephen H. Schulman et al., *Michigan Corporation Law & Practice*, Duties of Directors and Officers, § 5.9 (2019) ......................................................................129

Mich. Comp. Laws Ann. §§ 440.8106, 440.9104(1), 440.9106 ..................................................94

Mich. R. Civ. P. 2.101(B) ...........................................................................166

**A345**

## I.    EXECUTIVE SUMMARY

The FDIC Board should reject the Recommended Decision submitted by ALJ McNeil because the pre-trial proceedings, the hearing, and the recommendation that followed are hopelessly infected with error.  ALJ McNeil has a dubious track record when it comes to adhering to the FDIC Board's directives and following the law, having been reversed before, including on interlocutory appeal in this matter.  He has, unfortunately, become the person that he described nearly a decade ago:  "[Y]ou might expect that the [administrative law] judge is going to decide your case impartially, based on the evidence presented, without favoring the government's side of the case . . . *But it would be a mistake to believe that the black robe, the raised dais, and the courtroom environment have created an independent adjudicator*." Christopher B. McNeil, *Administrative Agency Litigation,* 16 (emphasis added).  In this case, ALJ McNeil ignored the instructions of the FDIC Board and the constitutional requirements articulated by the Supreme Court, dispensed with fairness, and made one-sided rulings to achieve a pre-ordained outcome in favor of the government.

Respondent Harry C. Calcutt III ("Respondent" or "Calcutt") respectfully asks the FDIC Board to reject the recommendation and dismiss the Notice of Charges against him.  They are deeply flawed, both procedurally and substantively.  A decade has passed since the underlying events occurred, and Respondent has an accomplished record of safety and soundness before and since then.  Respondent has discharged his fiduciary obligations and shown wise stewardship as a director of two other highly rated, well capitalized, and profitable Michigan-based financial institutions, Central State Bank and State Savings Bank, that merged last year with the approval of the FDIC.  And Respondent has retired from day-to-day bank management, and has no plans to return.  Given the passage of time and lack of threat to the insurance fund, no need exists for any sanction, much less one of prohibition.

1

At a minimum, the Board should remand this case for a truly new hearing before a different, and unbiased, ALJ.  Before even reaching the merits, there are four procedural reasons why the FDIC Board would commit reversible error were it to follow the Recommended Decision:

**Denial of New Hearing.**  Contrary to the FDIC Board's mandate and the Supreme Court's clear instruction in *Lucia*, Respondent was denied a "new hearing."  ALJ McNeil impermissibly relied on the prior record and rendered the Supreme Court's directive and the FDIC Board's mandate illusory.  ALJ McNeil's approach was so egregious that the FDIC Board interceded at one point and ordered him to provide a "new hearing," which simply prompted him to circumvent that order as well.  ALJ McNeil began the "new hearing" by asking counsel to stipulate to including all testimony from the 2015 hearing.  Respondent refused and insisted he was entitled to a new proceeding untainted by what occurred in 2015.  Notwithstanding this objection, ALJ McNeil considered the 2015 testimony and 2015 recommended decision anyway, incorporating the 2015 testimony into the record over Respondent's objection.  At times, ALJ McNeil even used the 2015 record as a basis for his own questioning of witnesses, directing them to prior testimony as if on cross-examination.  Far from being an unbiased and neutral arbiter, ALJ McNeil closed his mind to the merits before the new hearing began and, in so doing, violated the FDIC Board's order and Respondent's constitutional rights.

**Outside the Notice.**  ALJ McNeil committed reversible error by recommending removal for reasons that go well beyond the claims and allegations set forth in the Notice of Charges—namely, the safety and soundness of the Bedrock Transaction and whether Respondent concealed the Transaction from the Bank's board and examiners.  Just two years earlier in the *Lamm* case, the FDIC Board rejected ALJ McNeil's recommendation and dismissed all charges because it

2

concluded that ALJ McNeil improperly went beyond the allegations in the Notice, holding that "[o]nly the specific acts of the Respondent alleged in the Notice are relevant and material to this proceeding." *In the Matter of John R. Lamm*, 2018 WL 2297269, at *6 (FDIC Mar. 20, 2018) (quotation omitted). ALJ McNeil repeated the same error in this proceeding. He denied Respondent's Motion in Limine seeking to limit Enforcement Counsel to the facts and theories pled in the Notice and then permitted Enforcement Counsel to advance numerous facts and claims outside the Notice of Charges during the hearing. ALJ McNeil relied upon these facts and claims to recommend Respondent's removal. Of the 20 summary findings of fact made by ALJ McNeil, at least 13 of them are fully or partially outside of the Notice. *See* Recommended Decision ("R.D."), at 3–7. Such findings are clear error.

**Prejudicial Evidentiary Errors.** ALJ McNeil made numerous evidentiary rulings that, individually, were erroneous and prejudicial and, cumulatively, affected Respondent's fundamental due process right to a fair hearing. In particular, he refused to allow Respondent's counsel to cross-examine three key witnesses called by Enforcement Counsel to reveal their bias, as was Respondent's right under the FDIC's Rules of Practice and Procedure and the Federal Rules of Evidence. Those rules clearly establish that "[e]vidence that would be admissible under the Federal Rules of Evidence is admissible in a proceeding conducted pursuant to this subject." 12 C.F.R. § 308.36(a)(2). The Federal Rules of Evidence, in turn, permit any party to "attack the witness's credibility," Fed. R. Evid. 607, and recognize that the scope of cross examination includes both the "subject matter of the direct examination ***and matters affecting the witness's credibility***," Fed. R. Evid. 611(b) (emphasis added). ALJ McNeil refused to follow these rules and prevented Respondent from cross-examining these witnesses to reveal their bias and attack their credibility, erroneously ruling that these topics were outside the scope of direct. In light of

these clear evidentiary errors, Respondent made offers of proof appended to the Recommended Decision.

In another reflection of clear evidentiary error, ALJ McNeil refused to allow Respondent to provide rebuttal testimony about admitted exhibits used by two experts called by Enforcement Counsel, who opined that Respondent lied to examiners.  The ALJ wrongly reasoned that Respondent could not testify about them because he did not list these particular exhibits in the simultaneous exchange of witnesses, witness statements, and exhibits.  In so ruling, ALJ McNeil created a one-sided record, abused his discretion, and committed clear error when he refused to allow Respondent to respond to evidence—including admitted exhibits—that Enforcement Counsel used at the hearing.  (In contrast, ALJ McNeil permitted Enforcement Counsel, over Respondent's objection, to introduce a new exhibit not on any list to cross-examine Respondent.)  The ALJ then impermissibly relied on this expert testimony to conclude that Respondent had concealed information from examiners, without having in the record Respondent's explanation of these documents.  Respondent's offer of proof shows that Respondent's testimony would have explained the context of the documents relied upon by the FDIC's experts, contradicting the ALJ's findings.  Such one-sided and clearly erroneous trial rulings warrant reversal because they prevented Respondent from presenting a defense.

ALJ McNeil also struck Respondent's affirmative defenses—without any legal basis—refusing to provide any hearing on Respondent's defenses regardless of what the facts might show.  During the hearing, ALJ McNeil did not allow Respondent's counsel to elicit any evidence on these topics and relegated counsel to making an offer of proof.  This was, again, clearly erroneous and impermissibly restricted Respondent's defense.

**ALJ Bias.**  ALJ McNeil had a fixed opinion on the merits of the case.  His bias pervaded the proceedings and the Recommended Decision.  ALJ McNeil misstated the facts, reached unsupported conclusions, and discounted or outright ignored evidence supportive of Respondent. To ensure the record would support his desired outcome, ALJ McNeil assumed the role of Enforcement Counsel, raising and sustaining objections and eliciting adverse testimony.  ALJ McNeil created a one-sided record through unfair (and erroneous) application of his own procedural rules.  He made improper and unnecessary credibility determinations.  And he misstated the evidence to support his pre-ordained outcome.  In sum, ALJ McNeil thwarted the defense at every opportunity, in flagrant disregard of Respondent's constitutional and procedural rights.  Respondent was denied a fair hearing.

*    *    *

Nothing can or should be salvaged from a process that was infected with this degree of bias and error.  But even if the Recommended Decision were not riddled with procedural error, the ALJ has still failed to recommend any basis to remove Respondent within the Notice.  In order to prohibit Respondent from banking, the FDIC must show misconduct "accompanied by at least one of the three prohibited effects and at least one of the two specified culpable states of mind."  *Seidman v. OTS*, 37 F.3d 911, 929 (3d Cir. 1994).  But ALJ McNeil has provided little-to-no analysis, and he failed to apply the facts to the statutory elements.  As the appended summary chart demonstrates, ALJ McNeil has not made any findings on all three essential elements that would support removal.  Not a single summary "finding of fact" on misconduct is logically accompanied by a finding of fact on effect and scienter.  R.D. at 3–7.  Because ALJ McNeil has not recommended any basis to remove Respondent, the Board should dismiss the proceeding.

5

Nor does substantial evidence support the ALJ's findings.  Respondent did not engage in any misconduct that was unsafe or unsound or breach his fiduciary duty by engaging in the Bedrock Transaction and the 2010 Transaction, and he did not conceal those Transactions from the board and examiners.  Further, Enforcement Counsel has not established the requisite effects or scienter accompanying the alleged misconduct.

**No Misconduct**.  Any fair evaluation of the Bedrock Transaction reflects that it was safe and sound and did not expose the Bank to undue risk of loss.  The Transaction was a rational response to help a borrower work through troubled debt.  In late 2009, the Nielson Family—a large debtor of the Bank—requested interim debt relief on their $38 million dollar loan portfolio, which was experiencing the negative effects of the Great Recession.  With the Nielsons promising to make good on all of their loans, the Bank made a small $760,000 loan, which was secured by new collateral at a loan-to-value ratio of 58%.  While the loan provided the funds to make eight months of loan payments, the Nielsons agreed to (and did) resume loan payments using their own funds at the end of the eight months.  Bank management believed the loan was in the best interests of the Bank, and nothing was illegal or improper about the loan.  To this day, the only "loss" the FDIC attributed to the loan was an unexplained $30,000 charge-off taken as part of the 2012 examination after the Nielsons subsequently quit paying their loans in 2011 (and had made at least $30,000 in payments to the Bank on the Bedrock Loan itself).

The other part of the Bedrock Transaction was the use of Pillay Collateral owned by the Nielsons to bring the Nielsons' loans current in December 2009 and again in December 2010.  As admitted by Cori Nielson (the CEO for the Nielson family investment office), drawing on the Pillay Collateral meant the liquidation of a valuable Nielson asset to pay their debt.  The Bank's receipt of $1.3 million in cash from a borrower claiming financial difficulty was beneficial to the

Bank, especially so given that the Bank's attorneys seriously questioned whether the Bank had, or even could, properly secure the collateral (a concern that later manifested as a reality when the Bank ultimately abandoned the remaining Pillay Collateral). The FDIC witnesses admitted it was preferable to use the collateral to pay debt owed to the Bank than lose it.

The Bedrock Transaction was also disclosed to and approved by the Bank's board of directors. Respondent fully explained not only the Bedrock Transaction to the Bank's board but also the interrelated nature and size of the Nielson lending relationship. The board of directors understood the true group nature of the loans to Nielson Entities, because it approved each of the Nielson loans when made. Additionally, the Reports of Examination ("ROEs") for the 2008 and 2009 examinations identified each Nielson loan by the loan amount and name of borrower, and the ROEs referred to the loans collectively. All Bank directors verified, reviewed, and acknowledged each ROE in writing. Ronald Swanson, a former director called by Enforcement Counsel, and two other former directors all testified that the board was informed about the status of the Nielson loans both before and during the November and December 2009 board meetings. The evidence also shows that the board verbally approved the Bedrock Transaction. There is no dispute that an increase in October 2009 delinquencies (almost $40 million) was reflected in the board report for November 2009. When this occurred, Swanson testified Respondent informed the board of three key points: first, the increased delinquencies were attributable to the Nielson debt; second, the Nielsons claimed some of their properties were underwater; and third, the issue with the Pillay Collateral was perfection of the security interest. The cure of that delinquency was reported in the December 2009 board report. According to Swanson, the cure of the delinquencies would have been discussed, although he did not recall specific details of that discussion ten years later. Respondent and Richard ("Dick") Jackson, the Bank's Executive Vice

7

President, also testified they discussed the Bedrock Transaction with the board and obtained verbal approval at the November and December 2009 board meetings. The FDIC failed to prove concealment from the board; at most, it simply established a lack of detailed memory of what was discussed, which is unsurprising given the staleness of the FDIC's claims.

Respondent also did not conceal the Transaction from regulators. His only contact with the regulators regarding the 2009 Bedrock Transaction occurred in September 2011 by which time the Bank had classified the Bedrock Loan as non-performing and had filed court foreclosure proceedings. Thus, in order to gin up a theory of concealment, the FDIC seeks to hold Respondent vicariously liable for the acts and omissions of others after the Transaction was consummated. But as made plain by the FDIC's own Notice of Charges, Respondent had nothing to do with any alleged concealment. Rather, the Notice alleges that Bill Green (the loan officer for the Nielson relationship) hid any issues with the Nielson lending relationship. To a lesser extent, the Notice also describes the conduct of Dick Jackson and the oversights of other Bank employees. The Notice does not allege facts connecting the conduct or oversight of these individuals to Respondent, and no testimony or document connects the acts and omissions of these individuals to Respondent. While some events went wrong regarding the handling of the Transaction, no evidence links those events to concealment by Respondent. For instance, the write-up of the Transaction should have preceded the December 2009 board meeting but did not occur until March 2010 because Credit Administrator Ian Hollands did not have the time to prepare it. Further, Hollands unknowingly mischaracterized the purpose of the loan as "working capital" because he used that term generically for lines of credit and the loan officer, Green, did not tell him anything to the contrary. And much of the confusion stems from Green's other failures. Green failed to place e-mails detailing the Transaction in the loan files; instead, he

A353

placed memos in the files extolling the Nielson loans as having always performed. Thus, when examiners reviewed the loan files associated with the Bedrock Transaction, the details were not apparent. Yet, not a single witness, document, or e-mail tied Holland's (in)actions or Green's concealment to Respondent. Enforcement Counsel did not even call Green as a witness. Notwithstanding these evidentiary gaps, ALJ McNeil erroneously concluded Respondent orchestrated the concealment, relying upon speculative opinions expressed by FDIC Case Manager Anne Miessner. As Miessner's opinions have no basis in any expertise and are pure speculation and as no other document or testimony establishes Respondent orchestrated any concealment, ALJ McNeil's conclusion is unfounded and rests on pure conjecture.

The only conduct pled in the Notice that ties directly to Respondent was credibly explained by the witnesses during the hearing, and their explanations were corroborated by contemporaneous documents. In 2010, Calcutt mistakenly answered two questions in his Officers Questionnaire incorrectly; he acknowledged this mistake and testified that it was an inadvertent oversight. And he allegedly misled examiners during a last-minute meeting in September 2011, in which the FDIC Case Manager tried to entrap him through a *de facto* deposition. Even so, the contemporaneous notes indicate that Respondent told examiners he was "guessing," because he was relying on information provided by Green when answering their questions. Neither of these provides the necessary predicate for such a draconian penalty.

**No Effects**. There was insufficient evidence to establish either loss or personal gain. As to loss, during the 2011 examination, EIC Gomez advised Miessner that there was no loss on the Bedrock Transaction based on then recently received appraisals. A year later while the FDIC was actively pursuing Respondent's removal, $30,000 of the $760,000 loan amount was inexplicably charged off in the 2012 ROE. No witness explained why the charge-off occurred.

9

In any event, charge-offs are accounting mechanisms and do not necessarily reflect actual loss. And such a minimal charge-off—just 4% of the loan amount—is legally insufficient to establish loss, particularly when weighed against more than a million dollars in loan and interest payments that the Bank gained from the Nielsons because of the loan.

Nor was there any gain to Respondent from the Bedrock Transaction.  He received no funds from the loan.  While the Bank later restated its Call Reports (resulting in income being moved from earlier years to later years), Respondent was still underpaid on his bonus, as admitted by Mark Smith, the lone witness on this topic—a fact that flatly contradicts ALJ McNeil's unsupported and unexplained conclusion.  ALJ McNeil also found that Respondent benefited because the Bank issued a dividend to the holding company in 2010 and 2011.  This conclusion, too, lacks any reliable evidentiary support.  The undisputed facts established that the holding company had sufficient funds to pay dividends in 2010 and 2011 even if no dividend had been paid by the Bank to the holding company, and that the holding company did not need the FDIC's permission to pay dividends because it was regulated by the OTS at the time.  Moreover, the Bank and the holding company filed consolidated financial statements, and thus dividends from the Bank to the holding company were not reported as taxable income to the holding company.  As a result, any dividend paid by the Bank to the holding company did not result in a change in the value of Respondent's stock in the holding company.

**No Scienter**.  Finally, Enforcement Counsel failed to prove scienter, leaving ALJ McNeil to attribute every act and omission of others to Respondent on the basis that, as CEO, he was responsible for the misdeeds of others.  The ALJ's implicit theory of vicarious liability has no place in an enforcement proceeding.  In an enforcement proceeding, the Respondent is accountable only for his own misconduct, as the FDIC must show that Respondent's own

10

conduct involved personal dishonesty or disregarded the safety of the Bank. Overall responsibility for the Bank operations does not equate to scienter. Respondent did not intentionally mislead the FDIC Board or examiners, and ALJ McNeil's conclusion on this element is as unsupported as his other findings.

*   *   *

The FDIC should dismiss the Notice of Charges against Respondent. At a minimum, Respondent is entitled to a new trial before a properly appointed, unbiased ALJ who will adhere to the directive that Respondent is entitled to a new—and fair—trial. That has not happened yet, and the FDIC Board should not embrace such a flawed, biased, and, frankly, contemptuous recommendation that disregards the Supreme Court's *Lucia* holding, the FDIC Board's "new hearing" mandate, and the FDIC's established rules governing enforcement proceedings.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

From 2000 to 2014, Respondent served as President and CEO of Northwestern Bank (the "Bank"), a successful community bank located in Traverse City, Michigan. *See* Respondent's Second Amended Answer, ¶¶ 1, 4 (May 22, 2019) [hereinafter "Answer"]. This proceeding concerns events from over a decade ago relating to the Bank's lending relationship with the wealthy Nielson family. The Nielson family owned Generations Management (sometimes called "Waypoint"), which managed a variety of business entities engaged in real estate, oil and gas, and construction (collectively, the "Nielson Entities"). Tr. 29 (Berden). As of 2009, the Nielson Entities had approximately $38,000,000 in loans at the Bank (the "Nielson loans"). Answer ¶ 8.

During the Great Recession, Cori Nielson and Autumn Berden—CEO and CFO of Generations/Waypoint Management, respectively—claimed that the Nielson Entities were experiencing financial difficulties and asked to restructure their loan portfolio. Answer ¶ 11. When some of the Nielson loans reached maturity on September 1, 2009, the Nielsons ceased

making payments on all of their loans. Tr. 937 (Nielson). To resolve the delinquencies, Bill Green—the Northwestern loan officer responsible for the Nielson loan portfolio—devised and negotiated the "Bedrock Transaction," with Respondent's consent. Answer ¶ 20. The Transaction was finalized in December 2009. Answer ¶ 25. It permitted the Nielsons to use $600,000 of collateral known as the "Pillay Collateral" to make three months of catch-up payments on the Nielsons' delinquent loans and extended a new, $760,000 loan to Nielson Entity Bedrock Holdings, LLC (the "Bedrock Loan") used to fund future loan payments, which was collateralized with additional property with a 58% LTV ratio. Answer ¶ 17; Stip. Tr. 1600 (Jackson).[1] A year later, when the Nielsons again decided not to honor their loan obligations, the Bank and the Nielsons agreed to use an additional $689,000 in Pillay Collateral, which again was used to make payments on past-due Nielson Loans (the "2010 Transaction"). Answer ¶¶ 44, 45.

In substance, the 2009 Bedrock Transaction and 2010 Transaction were significantly beneficial to the Bank. They resulted in voluntary payment of over $2.5 million in cash from the Nielson Entities, EC Ex. 67,[2] and allowed the Bank to reduce total principal for the Nielsons by about $2 million from December 2009 to December 2011 with the majority of the reduction attributable to real estate sales during that time, EC Ex. 77, at 8. All of this occurred during the Great Recession and while the Entities claimed financial difficulties.

Following approval of the Bedrock Transaction, Respondent left the details to Bill Green. Green was responsible for documenting the Transaction and maintaining the loan file for the Nielson Entities. For reasons unexplained in the record because the FDIC made the strategic

---

[1] Portions of the transcript of the 2015 hearing that the parties stipulated to including in the 2019 hearing are referred to herein as "Stip. Tr."

[2] Following the ALJ's naming convention, FDIC Enforcement Counsel's exhibits are labeled "EC" herein.

decision not to call Green to testify, Green did not fully discharge his responsibilities.  Based in large part on Green's failings, the FDIC brought a Notice of Intention to Remove from Office and Prohibit from Further Participation (the "Notice") against Respondent, Green, and Jackson.

A hearing was held on that Notice in 2015 before ALJ Miserendino, who created a record and authored a recommended decision.  While Respondent's exceptions to that recommended decision were pending, the Supreme Court issued its decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), which decided that the appointment of an SEC ALJ did not comport with the Appointments Clause of the U.S. Constitution.  Following that decision, the FDIC Board remanded and reassigned Respondent's case to a different ALJ "for a new hearing."  FDIC Resolution 085172, at 2 (July 19, 2018).  The case was reassigned to ALJ Christopher McNeil.

Instead of giving Respondent a new hearing, ALJ McNeil determined—over Respondent's objection—that the prior proceedings would serve as the "primary source of the evidentiary record."  Order re New Oral Hearing, at 2 (Mar. 19, 2019).  Respondent sought interlocutory review by the FDIC Board, which was granted, and the FDIC Board reversed the ALJ's ruling.  A hearing was then held in October 2019.  But despite the Board's Order, the ALJ still used the 2015 evidentiary record over Respondent's objection, claiming "[b]ecause this matter has already been presented through an evidentiary hearing, the record is for the most part already before me."  Tr. 11.  On April 3, 2020, ALJ McNeil recommended that the Board remove Respondent from banking and impose a $125,000 civil money penalty.  Respondent takes exception to ALJ McNeil's Recommended Decision.

## III.    LEGAL STANDARD

Respondent may take "written exceptions to the administrative law judge's recommended decision, findings, conclusions or proposed order, to the admission or exclusion of evidence, or to the failure of the administrative law judge to make a ruling proposed by a party."  12 C.F.R.

§ 308.39(a).  The Board of the Federal Deposit Insurance Corporation ("FDIC" or "Board") reviews all challenged decisions of the administrative law judge *de novo* based on its review of the entire record.  *See Burgess v. FDIC*, 871 F.3d 297, 303 (5th Cir. 2017); *see also* 12 C.F.R. § 308.40.

## IV.    A NEW HEARING IS REQUIRED BECAUSE ALJ MCNEIL EXCEEDED HIS AUTHORITY AND FAILED TO PROVIDE RESPONDENT A FAIR HEARING.

The FDIC Board remanded this case "for a new hearing."  FDIC Resolution 085172, at 2 (July 19, 2018).  This did not give the ALJ the unfettered ability to conduct the new hearing by his own rules.  Rather, the Board's Order in Pending Cases and Order on Motion for Interlocutory Review, the FDIC's Uniform Rules of Practice and Procedure, the Administrative Procedure Act, and ultimately the United States Constitution established the procedural requirements for the new hearing.  ALJ McNeil, however, ignored these rules, exceeded his authority, and failed to provide Respondent a new, fair hearing.  These failures warrant reversal for four key reasons.  *See In the Matter of First State Bank of Marlin*, FDIC ED&O ¶ 8013, at I-50 (FDIC-90-207a, Mar. 10, 1992) (reversing ALJ decision inconsistent with Board's Uniform Rules); *In the Matter of \*\*\* and \*\*\**, FDIC ED&O ¶5135 at A-1436–37 (FDIC-88-247k, May 30, 1989) (reversing ALJ decision that had no legal basis in Uniform Rules).

*First*, ALJ McNeil improperly exceeded his authority on remand by considering and relying upon the 2015 record gathered by an unconstitutional adjudicator.

*Second*, ALJ McNeil admitted evidence, made findings unrelated to the Notice of Charges, and recommended removing Respondent from banking for reasons outside the Notice despite statutory, regulatory, and constitutional authority that requires any basis for removal to be pled in the Notice.

*Third*, ALJ McNeil made evidentiary rulings, which, individually, were erroneous and prejudicial and, collectively, affected Respondent's fundamental due process right to a fair hearing.  For instance, ALJ McNeil fashioned his own evidentiary rules regarding cross-examination without any notice to Respondent and denied Respondent the right to cross-examine key FDIC witnesses to reveal their biases, all while ignoring the APA and the FDIC's Uniform Rules of Procedure.  He also prevented Respondent from testifying about admitted exhibits to rebut Enforcement Counsel's experts, who testified that those same exhibits demonstrated Respondent had misled examiners—despite the lack of any evidence that Respondent prepared or had knowledge of the contents of the exhibits and despite the fact that Respondent's first conversation with the examiners regarding the Bedrock Transaction did not occur until September 2011, by which time the Bedrock loan had been classified and was in collection.  And ALJ McNeil made pre-trial rulings that precluded Respondent from presenting his affirmative defenses that would have laid bare FDIC Case Manager Miessner's naked attempt to entrap him.

*Finally*, ALJ McNeil prejudged the case and was biased against Respondent.  He predetermined the outcome based on his review of the 2015 proceedings, and then rushed to judgment by denying Respondent his right to a new hearing, by abridging Respondent's right to defend himself through incorrect and one-sided evidentiary rulings, and by skewing the record against Respondent.  ALJ McNeil assumed the role of Enforcement Counsel and consistently misstated the evidence in further support of his prejudged conclusion.  For these reasons, the Board should reject his Recommended Decision and dismiss the Notice with prejudice.  At a minimum, it should grant Respondent a new hearing before a different ALJ.

### A.      ALJ McNeil Improperly Relied upon the 2015 Record.

*Finding: ALJ McNeil relied upon and incorporated the 2015 record over Respondent's multiple objections.  ALJ McNeil also allowed Enforcement Counsel to introduce the facts and theories not pled in the Notice over objection.  (R.D. at 5 & nn.22; R.D. at 12 ("The record now being*

*forwarded to the FDIC's Board of Directors consists of those exhibits presented in both the 2015 and 2019 hearings, along with the transcripts of testimony taken during those hearings and the briefs and arguments of counsel."); R.D. at 12–17 nn.36, 37, 40–42, 48, 52, 55, 56, 65, 66, 68– 73, 79, 85, 91, 93–96, 98, 99, 100, 104 (relying upon 2015 Joint Stipulations of Fact); R.D. at 68; R.D. at 92 n.710; R.D. at 100, 101 & n.783; Tr. 1253–61;Order Regarding the Parties' Motions in Limine, at 5 (Oct. 4, 2019).)*

### 1.    ALJ McNeil Should Have Limited His Recommended Decision to the 2019 Record.

An unconstitutionally appointed ALJ[3] held a hearing in this matter in 2015.  In *Lucia v. SEC*, the Supreme Court determined that the remedy for "an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official."  138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 188 (1995)).  Further, "[t]o cure the constitutional error, another ALJ . . . must hold the new hearing" because the prior, unconstitutionally appointed ALJ "cannot be expected to consider the matter as though he had not adjudicated it before."  *Id.*

Consistent with *Lucia*, the FDIC Board remanded and reassigned Respondent's case to a different ALJ "for a new hearing" before a constitutionally appointed ALJ.[4]  FDIC Resolution 085172, at 2 (July 19, 2018).  The Board also ordered that the new ALJ "conduct a new oral hearing in accordance with 12 C.F.R. § 308.35" if requested.  *Id.* at 4.  The sole exception was that the parties might supplement the record with "the written transcript of prior testimony of any witnesses for which the parties agreed to accept such testimony."  *Id.*  The FDIC Resolution did not provide any other exceptions for relying upon the 2015 hearing.  Yet ALJ McNeil

---

[3] For the reasons discussed below, neither ALJ Miserendino nor ALJ McNeil were appointed consistent with the Constitution in 2015.  *See generally Burgess v. FDIC*, 871 F.3d 297 (5th Cir. 2017).

[4] The ALJ is still appointed in a constitutionally defective manner because he is improperly insulated from Presidential removal, as discussed *infra* at Section VII.A

inexplicably ruled that Respondent was not entitled to a *de novo* hearing despite the clear

instruction from the FDIC Board:

> The second hearing is being conducted under the mandate from the FDIC Board.  The mandate is clear in that it provides Respondent with a new hearing by a new and properly appointed ALJ; but the hearing is not de novo.  The prior proceedings have not been deemed void ab initio, but instead serve as the primary source of the evidentiary record, subject to review and reconsideration by the new ALJ – Respondent offers no authority for finding otherwise.

Order Regarding New Oral Hearing, at 2 (Mar. 19, 2019).

Respondent sought interlocutory review by the FDIC Board to correct this error.  The

Board reversed the ALJ and instructed him to provide "a new oral hearing . . . on all issues that

were considered at the prior hearing."  *See* FDIC Decision and Order on Motion for Interlocutory

Review, 4–5 (June 20, 2019).  As a result, the ALJ should have limited his review and

preparation of the Recommended Decision to the 2019 testimony[5] and the 2015 testimony that

the parties agreed to accept as part of the 2019 record.

Not only does the Board's Resolution limit the ALJ to the 2019 record, so does the

Administrative Procedure Act.  Sections 556 and 557 of the APA define the requirements for an

agency adjudication on the record such as the enforcement action brought against Respondent.

*See* 5 U.S.C. §§ 554, 556, 557.  For such hearings on the record, the APA requires an agency

employee or ALJ to compile a record of the "transcript of testimony and exhibits" that

"constitutes the **exclusive** record for decision."  5 U.S.C § 556(e); *see also St. Louis Fuel &*

*Supply Co. v. F.E.R.C.*, 890 F.2d 446, 448 (D.C. Cir. 1989) (Ginsburg, J.) ("If an adjudication is

governed by section 554, it must feature," among other things, "the compilation of an exclusive

---

[5] The prior transcript may also have been part of the 2019 record to the same extent that depositions constitute part of the record.  *See* 12 C.F.R. § 308.36(f)(3) ("Only those portions of a deposition received in evidence at the hearing constitute a part of the record.").

record upon which the agency must base its decision."). Thus, when the Board provided Respondent "a new hearing" before a different ALJ, FDIC Resolution 085172, at 2, it necessarily required the compilation of a new record and that new record "constitutes the **exclusive** record for decision," 5 U.S.C. § 556(e) (emphasis added). For this reason, the ALJ could not consider portions of the record adduced during the 2015 hearing unless made part of the record compiled during the 2019 hearing.

### 2. The ALJ Violated the Board's Resolution and the APA by Relying on the 2015 Record over Respondent's Objection.

Respondent is entitled to a new hearing before a different ALJ because ALJ McNeil used the 2015 hearing as the touchstone for his decision. That is directly contrary to the Board's Resolution, the Order on Interlocutory Review, the APA, and the Supreme Court's holding in *Lucia*. From the beginning of the 2019 hearing, the ALJ made plain that he would rely upon the record created during the 2015 hearing despite the Board's orders to the contrary. To open the 2019 hearing, the ALJ claimed that "[b]ecause this matter has already been presented through an evidentiary hearing, the record is for the most part already before me." Tr. 11. The ALJ also took note that the prior ALJ "issued his recommended decision on June 6, 2017." *Id.* And, over Respondent's objection to a paper review and to incorporating the 2015 hearing transcripts into the record, *see* Tr. 11–13, the ALJ did so anyway, including "the transcripts of testimony taken during [the 2015 and 2019] hearings" in the record forwarded to the Board, R.D. at 12.

The ALJ also relied upon the 2015 witness testimony that the parties did not agree to accept as part of the 2019 record. The ALJ even made several recommendations based on such testimony **without identifying that he was doing so**. This kind of tacit reliance on the 2015 record is particularly insidious and prejudicial, as it is almost impossible to determine when the ALJ relied upon information he learned from reviewing the prior record or how it shaped his

views.  For example, the ALJ found that Respondent "breached [a fiduciary] duty by not familiarizing himself with [Call Reports that] he was signing" without any evidence in the 2019 record that Respondent signed any specific Call Report at issue.  R.D. at 101; Notice ¶ 73 (identifying Call Reports at issue as those filed "throughout the time period from late 2009 through mid-2012").  During the 2019 hearing, Respondent testified that he "may have signed" a Call Report "once in a blue moon," Tr. 1337 (Calcutt), and that he "did not recall" whether he signed the December 31, 2009 Call Report (the only one he was asked about), Tr. 1358 (Calcutt).  No evidence demonstrated that he signed the December 31, 2009 Call Report—or any other specific Call Report—as none was introduced into evidence by Enforcement Counsel.[6]

In the absence of any evidence, ALJ McNeil impermissibly reached back to Respondent's 2015 testimony "that the reports were 'simply presented to me for signature'" citing "Tr. at 1757 (Calcutt)" in order to find that Respondent had signed the Call Reports.  R.D. at 100 & n.783.  This was not a citation to the 2019 Transcript, as suggested by the citation format.  Instead, it is a citation to the 2015 transcript, but, problematically, the ALJ did not reveal that the crucial evidence he relied upon for his finding was from Respondent's testimony in 2015.  *See* R.D. at 100 n.783.[7]  Because the parties did not agree to include Respondent's testimony in the 2015 record, ALJ McNeil's reliance on it is improper.

---

[6] The lone exhibit used by Enforcement Counsel was a generic, blank signature page for Call Reports that Counsel downloaded from the internet.  *See* Tr. 1357 (Calcutt); EC Ex. 132. Enforcement Counsel never explained its failure to introduce into the record any of the Call Reports.  Presumably, Enforcement Counsel had access to the Call Reports, knew that Respondent did not sign the Call Reports at issue, *see* Notice ¶ 73, and chose ***not*** to introduce the Call Reports because they contradicted the FDIC's charges.  This failure to include any affirmative evidence showing Respondent signed the Call Reports at issue is dispositive.

[7] Whether or not this was intentional, it still violates the Board's Order in Pending Cases, as the parties did not agree to accept Respondent's 2015 testimony as part of the 2019 record.

As another example, the ALJ found that "Respondent received the benefit of . . . [an] artificially inflated dividend in 2010 and 2011" paid by the Bank's holding company, Northwestern Bancorp, to its shareholders.  R.D. at 5 & n.22.  In the portions of the Recommended Decision cited by the ALJ for this finding (Part II, §§ 4, 5T), the ALJ neither cites nor explains any evidentiary basis showing that Respondent received any portion of an inflated dividend *in 2010*.  Rather, the sole evidence in the 2019 record relates to the 2011 dividend.  *See* R.D. at 99; Tr. 783–87 (Miessner).[8]  During the 2015 hearing, Anne Miessner mentioned the 2010 dividend, but the parties did not agree to accept her 2015 testimony as part of the 2019 record.  Nonetheless, the ALJ appears to have, at least implicitly, relied on Miessner's 2015 testimony in order to remove Respondent.  As these examples demonstrate, the ALJ had fixed his mind against Respondent based on the 2015 record, and, as a result, the 2015 record irreparably tainted Respondent's supposedly new hearing.

At other times, ALJ McNeil unabashedly relied on the 2015 record.  In one instance, he found that the testimony of two former Northwestern Bank board members, Bruce Byl and Ron Swanson, had not "been clouded by time . . . due in part to the fact that both gave almost exactly the same sworn testimony in 2015."  R.D. at 68.  As to Byl, the ALJ is simply wrong because Byl did not testify in 2015.  As to Swanson, the parties did not agree to accept his 2015 written testimony pursuant to the Board's Resolution and thus the ALJ should not have reviewed it, much less relied upon it to make findings.  In other instances, the ALJ impermissibly relied upon Respondent's 2015 testimony.  For example, ALJ McNeil used Respondent's 2015 testimony to find that regulators were concerned that Respondent did not acknowledge that senior lender Bill

---

[8] For reasons discussed below, this finding is without factual support.

Green reported to him at the Bank.  *See* R.D. at 92 n.710.[9]  Similarly, the ALJ again relied upon

Respondent's testimony from 2015, finding "***[i]n testimony from neither hearing***, however, is

there any evidence that Mr. Calcutt actually consulted with those experienced people or took any

steps to ensure information presented in the [Call] Reports was accurate."  R.D. at 100 (emphasis

added).

     ALJ McNeil also used the 2015 testimony to elicit answers in conformance with his view

of the evidence.  For example, he used the 2015 testimony of Michael Doherty to cross-examine

him.  *See* Tr. 1253–61.  ALJ McNeil began, "I have some questions about your perceptions.  And

to start with let's go to the transcript [from the 2015 Hearing] at page 1573 and start with line

10."  Tr. 1253.  When he did not get an answer he wanted, ALJ McNeil referenced Doherty's

prior testimony again just a moment later.  Tr. 1255 ("Let's go back to the quote just so we have

it clear.  Page 1573 [of the 2015 Hearing transcript].").  And ALJ McNeil's cross examination

was designed to elicit answers to support his predetermined view formed after reviewing the

2015 record.  ALJ McNeil said that for the loans to Nielson Entities, "one of the weaknesses was

that there were no Personal Guaranties."  Tr. 1256–57.  He then attempted to get Doherty to

agree with his view that this was a weakness.  *Id.*  Similarly, ALJ McNeil parroted the FDIC's

2015 argument when he asked, "What troubled you about having this many of inter-related

loans, given the level of capital in the Bank?"  Tr. 1260.  Notably, Doherty did not testify about

---

    [9] The ALJ cites absolutely no evidence that any regulator had a "concern" about
Respondent's "apparent reluctance."  Rather, the ALJ discusses *Respondent's* testimony that Bill
Green reported to several committees within the Bank.  The ALJ goes on to speciously suggest
that this answer was part of an "effort to mislead this Tribunal" because Respondent clarified
that Bill Green reported to him directly as well as others within the Bank.  R.D. at 92.  Bill Green
reported directly—not exclusively—to Respondent as well as other committees within the Bank.
*See* Tr. 1361–62 (Calcutt).  This is yet another example of the ALJ's search for anything to
besmirch Respondent without any actual evidence; the ALJ claims there was a regulatory
concern without any evidence and then misconstrues Respondent's testimony.

"the level of capital in the Bank," but the ALJ framed the question in order to elicit an answer supporting his view.[10]  Reviewing and affirmatively using testimony from the 2015 hearing that the parties did not agree to accept violates the Board's Order in Pending Cases, the Supreme Court's decision in *Lucia*, and the APA's requirement that the hearing creates the exclusive record for decision.

In further contravention of the Board's Order, the ALJ also improperly admitted and relied upon the Joint Stipulations of Fact entered into between Respondent, former respondents Bill Green and Dick Jackson, and Enforcement Counsel prior to the 2015 hearing.  *See* Jt. Ex. 15 (Joint Stipulations of Fact, Feb. 2, 2015).  Respondent objected to admitting and binding him to the Joint Stipulations of Fact from the 2015 hearing because the FDIC Board ordered a new hearing on all issues—which necessarily included new stipulations—and because he sought modifications to the stipulations for the 2019 hearing to reflect the fact that neither Bill Green nor Dick Jackson were still respondents.  *See* Resp't Opp'n to FDIC Mot. in Limine, at 1–3 (Oct. 2, 2019).  Enforcement Counsel refused any modifications and instead requested that the ALJ bind Respondent to the 2015 Joint Stipulations of Fact.  *See* FDIC Mot. in Limine, at 2–6 (Sept. 6, 2019).  The ALJ granted this request, admitting and binding Respondent to the 2015 Joint Stipulations of Fact over Respondent's objection.  *See* Order Regarding the Parties' Motions in Limine, at 5 (Oct. 4, 2019).[11]  The ALJ found, "[n]o different outcome is warranted by the fact

---

[10] Doherty answered the question by stating that the issue was not the number of inter-related loans as compared with the level of capital with the bank.  Rather, the issue was that each entity "had individual collateral but following the money" and liquidity between entities was difficult.  Tr. 1260.

[11] The ALJ's reasoning is difficult to decipher because he conflated two separate stipulations that were at issue in the pre-trial motions.  One stipulation was the Joint Stipulations of Fact, to which Enforcement Counsel sought to bind Respondent over objection.  *See* Jt. Ex. 15.  The other stipulation incorporated the 2015 testimony of Dennis O'Neill and Charles Bird, portions of which Respondent sought to exclude consistent with the stipulation.  *See* Jt. Ex. 17 (testimony

that the FDIC Board issued its Decision and Order on a Motion for Interlocutory Review." *Id.* at 4. The ALJ then relied upon the Joint Stipulations of Fact to make "plenary" findings of fact based upon Joint Exhibit 15. *See* R.D. at 13–17 nn.40–42, 48, 52, 55, 64–66, 68–73, 79, 85, 91, 93–96, 98–100, 104. In turn, many of the ALJ's "summary" findings of "fact" turn on the "plenary" findings of fact. *See* R.D. at 4–7 nn.14, 18, 22, 25, 27, 29 (citing Part II, § 4, the plenary findings of fact).

Such reliance on the 2015 Joint Stipulations of Fact is improper, and Respondent therefore takes exception to every finding based on the 2015 Joint Stipulations of Fact. The Board provided Respondent with a new hearing, and the only exception for incorporating evidence adduced at the prior hearing was for written transcripts agreed upon by the parties. There was no allowance for binding Respondent to the 2015 Joint Stipulations of Fact as part of his new hearing. Moreover, part and parcel of a "new oral hearing in accordance with 12 C.F.R. § 308.35 on all issues" is the ability to enter into new stipulations of fact. *See* 12 C.F.R. § 308.35(a)(4) and 308.36(e). And entering into new stipulations of fact was critical to Respondent because Green and Jackson were no longer respondents in the case, narrowing the facts to which Respondent could—or would—stipulate.[12]

---

"shall be subject to prehearing motions . . . to exclude portions thereof from the record for the new oral hearing"). But the ALJ misconstrued Respondent's objection to the Joint Stipulations of Fact as his argument to exclude portions of O'Neill's and Bird's testimony, claiming that "Respondent opposes the continued reliance on these stipulations," referring to the stipulations regarding O'Neill's and Bird's testimony. Order re. Mot. in Limine, at 4. The ALJ continued, "there is no legal basis to disregard the parties' stipulation," thus (i) ignoring that Respondent expressly reserved the right to exclude portions of O'Neill's and Bird's testimony and (ii) binding Respondent to the Joint Stipulations of Fact *because* of the stipulation admitting O'Neill's and Bird's testimony. *Id.* at 4. Whether or not Respondent stipulated to O'Neill's and Bird's testimony has nothing to do with binding Respondent to facts to which he did not agree to stipulate. This decision was erroneous and Respondent takes exception.

[12] Additionally, as the Joint Stipulations of Fact are not properly part of the record, they cannot serve as the basis for numerous summary findings of fact made by the ALJ. Therefore,

In sum, because the ALJ relied on the 2015 record both implicitly and explicitly, relied upon 2015 witness testimony that the parties did not agree to accept, and bound Respondent to Joint Stipulations of Fact from 2015 over his objection, he violated the Board's Orders, the APA, and the Supreme Court's directive in *Lucia*.[13]  Under these authorities, Respondent was—and still is—entitled to a new hearing untainted by the prior 2015 hearing.  As a result, the Board should remand for a new hearing before a different ALJ.

### B.    ALJ McNeil Improperly Recommended Removing Respondent for Reasons Outside the Notice of Intent to Remove.

*Finding: ALJ McNeil allowed Enforcement Counsel to introduce evidence outside the Notice over Respondent's objections and recommended removing Respondent from banking for reasons outside the Notice.  (R.D. at 3–7 (Summary Findings of Fact 1, 2.c, 3, 4.b, 6, 8); Part II, Sections 5.B, 5.C, 5.H–5.K, 5.P.1, 5.P.3.a, 5.P.3.c, 5.P.3.d, 5.S, 5.T; Order re Mot. in Limine, at 1–2 (Oct. 4, 2019).)*

The ALJ impermissibly allowed testimony and evidence on issues not contained in the Notice and recommended removal for reasons and theories outside the Notice.  This violates both Respondent's procedural due process rights and the Board's holding that "only the specific acts of the Respondent alleged in the Notice are relevant and material to this proceeding.'"  *In the Matter of John R. Lamm*, 2018 WL 2297269, at *5 (FDIC Mar. 20, 2018) (quoting *In the Matter of Michael D. Landry, et al.*, 1999 WL 440608, at *25 (FDIC May 25, 1999)).  Because acts outside the Notice are not relevant to the proceeding, the Board should disregard any findings that are outside the Notice and, once certain findings are disregarded, the ALJ has failed

---

summary findings of fact 1.e, 2.c, 5.a, 6.b, 7.b, 8.b, *see* R.D. at 4–7, are unsupported by the record and cannot provide a basis for a removal and prohibition order or civil money penalty.

[13] Even if the Board does not consider any evidence outside of the record created during the 2019 hearing, a new hearing is still required because ALJ McNeil's credibility determinations were tainted by his review of the prior record and because the Board granted Respondent a new hearing, which he did not receive from ALJ McNeil.

to recommend any basis to remove Respondent.  *See* Appendix.  At a minimum, the Board should order a new hearing limited to the issues within the Notice.

### 1. The Notice Establishes the Boundaries in Administrative Proceedings.

The Notice determines the scope of the proceedings as well as the permissible conduct and legal grounds upon which the FDIC may seek to remove Respondent.  "To satisfy the requirements of due process, an administrative agency must give the party charged a clear statement of the theory on which the agency will proceed with the case." *Yellow Freight Sys. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992).  An agency "may not change theories in midstream without giving respondents reasonable notice of the change." *Id.* (quotation omitted).

Statutes, regulations, and Board decisions provide additional, heightened requirements for the content of a removal notice.  Section 8(e) states that the "notice of intention to remove" the respondent "shall contain a statement of the facts constituting grounds therefor." 12 U.S.C. § 1818(e)(4); *see also* 5 U.S.C. § 554(b).  The Board's regulations further require that "[t]he notice must set forth . . . [a] statement of the matters of fact or law showing that the FDIC is entitled to relief." 12 C.F.R. § 308.18(b)(2).  Interpreting these requirements, the Board has held that "***only*** the specific acts of the Respondent alleged in the Notice are relevant and material to this proceeding." *Lamm*, 2018 WL 2297269 at *6 (emphasis added) (quotation omitted); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").  While the scope of proceedings is strictly construed to the allegations in the Notice, the FDIC may amend the Notice at any time. *See* 12 C.F.R. § 308.20(a) ("The notice or answer may be amended or supplemented at any stage of the proceeding.").

According to the Board's decision in *Lamm*, the Notice must specifically allege the facts and reasons for removing Respondent from banking or imposing a money penalty.  In *Lamm*, the

notice alleged that the respondent engaged in several transactions designed to manipulate the bank's incentive compensation system, which increased his compensation. *See id.* at *1–2. The Notice also ***generally*** alleged that the respondent received incentive payments as a result of false entries in the bank's incentive management system. *Id.* at *2. The same ALJ as here, ALJ McNeil, recommended that the respondent be removed and prohibited from banking, that the FDIC impose a CMP, and that respondent pay almost $70,000 in restitution.

The Board rejected all three recommendations and dismissed the proceedings because of deficiencies in the Notice. *Id.* at *7. As to prohibition, the Notice "cite[d] no specific conduct occurring [within the limitations period], the effect of which was to provide financial gain or other benefit to the Respondent." *Id.* at *5. The Board also rejected enforcement counsel's reliance on the false entries in the incentive compensation system to show impermissible effect because the "***general*** allegation that Respondent received . . . unearned compensation" in connection with false entries "fails to satisfy the applicable Notice standards," as it lacked sufficient specificity to meet 12 U.S.C. § 1818(e)(4) and 12 C.F.R. § 308.18(b)(2). *Id.* at *5. The Board also found the recommended CMP unwarranted because the effects prong had not been satisfied. In so concluding, the Board rejected enforcement counsel's argument that there was a pattern of misconduct satisfying the effects prong because "the transactions alleged to constitute a pattern are not set forth in the Notice." *Id.* at *6. Finally, the Board rejected the ALJ's recommendation to order restitution because the Notice failed to allege specific transactions that unjustly enriched Respondent. *Id.* The Board found the mere identification of two transactions that may have unjustly enriched respondent insufficient because the Notice "fail[ed] to allege . . . ***how*** these transactions unjustly enriched Respondent" and contained "no explanation regarding how or even whether [those transactions] increased his incentive

26

compensation payment or by what amount." *Id.* According to the Board, "Enforcement Counsel cannot rely upon transactions that are not set forth in the Notice." *Id.*

### 2.    ALJ McNeil's Findings Are Outside the Notice.

Applying the principles of *Lamm* reveals that ALJ McNeil strayed far outside the Notice. Consistent with 12 U.S.C. § 1818(e)(4), the Notice "contain[s] a statement of the facts constituting grounds" for removal. It was drafted after several years of investigation, including the collection of e-mails and interviews with witnesses, and describes the conduct that could be a basis for removal against three respondents. The notice ***generally*** outlines purported misconduct—(i) the Bedrock Transaction, Notice ¶¶ 7–26; (ii) the failure to follow Bank policy regarding the documentation of the Bedrock Transaction, *id.* ¶¶ 27–38; (iii) engaging in the 2010 release of Pillay Collateral, *id.* ¶¶ 39–53; and (iv) various other "efforts to deceive bank regulators," *id.* ¶¶ 54–107. The Notice contains detailed descriptions of the actions taken by Green or Jackson, but does not attribute those actions to Respondent.[14] For example, the Notice describes efforts to deceive regulators by withholding documents but attributes that misconduct to Green; the Notice does not allege that Respondent was involved with the missing loan documents, *id.* ¶¶ 62–65, nor the officer memoranda placed in the loan files, *id.* ¶¶ 66–70.

Even a cursory review of the Notice reveals that it extensively specifies misconduct by the loan officer, Bill Green. For example:

> ¶ 31: "In March 2010, based on information that Green provided, the Bank's credit manager prepared a belated loan write-up."

---

[14] The ALJ does not analyze any of the language contained in the Notice, yet still attempts to expand its scope: The "Notice of Intention addressed actions attributed to all three Bank employees with respect to a Bank loan portfolio controlled by the Nielson family of Traverse City, Michigan." R.D. at 11. Contrary to the ALJ, the Notice attributed specific conduct to each respondent as discussed herein.

¶ 55: "Green took affirmative steps to conceal the true nature of the Bedrock Transaction."

¶¶ 56–57: Describing how Green routed the proceeds of the Bedrock Transaction.

¶ 62: "Green was responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans."

¶ 66: "Green drafted a number of memoranda and placed them in the loan files for certain Nielson Entities."

¶ 85: "Green assured the Nielson Entities that they would continue to deal with himself and Calcutt on the renewals of the loans being sold."

¶ 93: "[T]he examiners had numerous discussions with Green regarding the Nielson Entities."

¶ 98: "[A] memorandum from Green was presented to examiners which stated that the purpose of the Bedrock Transaction was to provide working capital for a subsidiary of Bedrock Holdings."

It also had a similar, but lesser, focus on Executive Vice President Dick Jackson:

¶ 76: "In the [November 14, 2009] letter, Jackson described several of the Nielson Loans as 'performing' loans despite the fact that they were in default at the time."

¶ 84: "Jackson communicated with the affiliate banks about the loans being sold."

¶ 94: "[E]xaminers specifically asked Green and Jackson about the purpose of the Bedrock Transaction, the December 2010 transaction, and whether the Nielson Entities had been experiencing financial difficulty.  Green and Jackson responded that they did not know or did not remember."

The misconduct specifically attributed to Respondent is narrowly circumscribed to allegations of misrepresentations in a Loan Officer's Questionnaire, consultation on Jackson's November 2009 letter, and deception during a September 2011 meeting.  *See* Notice ¶¶ 75, 78, 79–80, 93–107.  Enforcement Counsel declined to amend the Notice to particularize it to Calcutt's actions and then disregarded the Notice.  *See* 12 C.F.R. 308.20(a).  Enforcement

Counsel submitted proofs unrelated to the facts pled in the Notice and sought to hold Respondent vicariously liable for the actions of Green, Jackson and others even though their actions were not attributed to Respondent in the Notice nor connected to Respondent by any testimony or exhibit.

Because of arguments made by Enforcement Counsel, Respondent sought an order from ALJ McNeil limiting Enforcement Counsel to the facts and theories pled in the Notice, as required by the *Lamm* decision. *See* Resp't Mot. in Limine, at 1–6 (Sept. 6, 2019). ALJ McNeil disregarded the *Lamm* decision and summarily denied Respondent's motion, permitting Enforcement Counsel to introduce evidence and argue for removal on issues not raised in the Notice. *See* Order re Mot. in Limine, at 1–2 (Oct. 4, 2019).[15]

The ALJ has perpetuated that error in his Recommended Decision. ALJ McNeil made several summary findings of "fact" that are outside the Notice. *See* R.D. at 3–7 (Part I, Section 4, Findings of Fact).[16] He also made several specific findings that are outside the Notice.

**Summary Findings on Misconduct Are Outside the Notice**. Most of the ALJ's summary findings regarding unsafe and unsound practices are outside the Notice. In ***Finding of Fact 1.a***, ALJ McNeil recommends that the Board find that the 2009 Bedrock Loan was an unsafe practice because Respondent authorized it "***knowing*** that the proceeds would be paid to entities that lacked the ability to repay the funds as disbursed." R.D. at 3 (emphasis added). But

---

[15] Respondent brought two separate motions *in limine*: one to exclude certain evidence relating solely to Green and Jackson, as they were no longer respondents in this case; and another to require compliance with the Notice. The ALJ conflated the issues, denying Respondent's motion to require compliance with the Notice because "evidence concerning Green or Jackson relates to Respondent's action or failure to act." Order re Mot. in Limine at 2. This ruling is erroneous and Respondent therefore takes exception to it. The ALJ should have limited the case to the Notice.

[16] ALJ McNeil summarizes his principal findings in Part I, Section 4, which is entitled "Findings of Fact." *See* R.D. at 3–7. The findings are not limited to facts. Instead, this section provides McNeil's *only* findings as to whether Respondent's conduct supports a conclusion that Respondent violated Sections 8(e) and 8(i).

the Notice contains no allegations that the 2009 Bedrock loan was unsafe ***because*** Respondent ***knew in 2009 that the Nielson Entities lacked an ability to repay***.  The Notice actually contradicts ALJ McNeil's finding.  Instead of knowing the Nielson Entities could not repay the loan, the Notice alleges that "[e]ach of the Respondents . . . was aware," Notice ¶ 20, that "[t]he purpose of the Bedrock Transaction was to provide the funding necessary to bring current all of the past-due loans to the Nielson Entities and to provide a reserve sufficient to make payments for all of the loans to extend well into 2010," *id.* ¶ 18.  Additionally, the 2009 Bedrock Loan was not made to various entities that lacked the ability to repay the loan; rather, it was made to a single Nielson entity, Bedrock, which had assets, cash flow and the ability to repay the loan.  And the funds were "deposited in [special deposit] accounts[,] . . . used to fund payments on each of the Nielson Loans," *id.* ¶ 19, and "the Nielson Entities continued to make payments on the Nielson Loans," into 2011, *id.* ¶ 39.[17]

Similarly, ***Finding of Fact 1.b*** is absent from the Notice.  This finding states that the December 2010 use of collateral was unsafe because the funds were "paid to entities that lacked the ability to repay the funds as disbursed."  Once again, this finding is both inconsistent with the facts pled in the Notice and untrue.  Nowhere in the Notice does it allege that the 2010 funds were paid to entities that could not repay.  The Bank did not release the collateral—it received it.  The Bank used its security interest in the collateral to bring the Nielson loans current.  Further, as a receipt of collateral, the funds were neither "disbursed" nor "paid to entities."  Instead, "the released funds were . . . used to make payments on all of the past-due Nielson Loans and to bring

---

[17] The ALJ's finding also contradicts how Enforcement Counsel tried the case.  The FDIC's expert on the safety of the Bedrock Transaction, EIC Gomez, testified that the Bedrock Transaction was unsafe because of "weak credit administration," not because it was made to entities that Respondent *knew* could not pay.  *See* Tr. 283–85 (Gomez).

them current." Notice ¶ 45. It is also completely implausible to suggest that a voluntary payment of $689,000 to the Bank from entities allegedly suffering from financial difficulties is an unsafe practice, as accepting cash from debtors experiencing financial difficulties can only be a prudent course of action.[18] And the Notice does not allege that the release of the Pillay Collateral harmed the Bank's position as to other outstanding loans.

Most of the ALJ's summary findings regarding fiduciary duties are likewise outside the Notice. In ***Finding of Fact 1.d***, ALJ McNeil adopts another newly minted argument. *See* Resp't Mot. in Limine, at 3–4 (Sep. 6, 2019). According to the ALJ, "Respondent breached [the duty of care] by failing to exercise reasonable control and supervision over the Bank's affairs when he led the negotiations that resulted in the 2009 Bedrock Loan and the 2010 collateral release." R.D. at 4. But the Notice does not contain any allegations regarding Respondent's failure to supervise subordinates, much less that consummating the 2009 Bedrock Transaction and 2010 receipt of Pillay Collateral involved any failure to supervise. Indeed, how Respondent failed to supervise is completely unexplained in the Notice—and by the ALJ. And once again, the Notice contradicts the ALJ. Rather than allege Respondent was absent, it alleges that Respondent "participated in extensive discussions and negotiations" alongside Green. Notice ¶ 13.

Also outside the Notice is ***Finding of Fact 1.e***, which claims Respondent breached some undescribed fiduciary duty because he "failed to heed and effectively respond to repeated regulatory warnings regarding the Bank's Nielson Entities." R.D. at 4. Nowhere does the Notice explain how or what fiduciary duty Respondent breached because of a failure to heed regulatory criticism. Nor is such a claim fairly encompassed within ¶ 26 of the Notice, which

---

[18] Again, the ALJ contradicts the FDIC's expert on whether the release of Pillay Collateral was an imprudent banking practice. *See* Tr. 286 (Gomez).

factually states concerns of the 2008 and 2009 ROEs as part of the allegations that the Bedrock Transaction was an unsafe practice.  There are no allegations that Respondent ***failed to correct*** the deficiencies alleged in ¶ 26.

And with respect to ***Findings of Fact 1.c and 1.f***, the Notice does not allege that Respondent failed to disclose "the true nature of the Nielson Entities" or the "true condition of the entities."  R.D. at 4.  The Notice is limited to disclosures regarding the transactions with the Nielsons and some of Bill Green's failures to provide full information to the regulators.  The Board should not consider any of these recommendations because they are outside the Notice and violate the *Lamm* holding.

**Summary Findings on Effect Are Outside the Notice**.  Not only are most of the ALJ's summary findings on misconduct outside the Notice, so are many of his summary findings on effect.  The Notice specifically pled effects in two sections entitled "Respondents Caused Financial Loss to the Bank" and "Financial Gain to Calcutt."  *See* Notice, pp. 22, 24.  Nowhere in those sections does the Notice allege, as the ALJ claims in ***Finding of Fact 2.c***, that the use of $1.2 million in Pillay Collateral to the Bank "caused the Bank to suffer financial loss."  R.D. at 4–5.  To the contrary, the Notice alleges that the $1.2 million dollars was voluntarily paid to the Bank, which resulted in a benefit to the Bank.  *See* Notice ¶ 22 ("the Nielson Entities paid $600,000, the amount of collateral released by the Bank . . . ."); *id.* ¶¶ 44–45 ("the released [$690,000 of] funds were again used to make payments" to the Bank).

In addition, the Notice does not contain any allegations that would support ***Finding of Fact 3***, because the Notice does not contain specific allegations regarding how any misconduct created a risk of loss.  Although ¶ 108 generically states that "Respondents' handling of the Nielson Loans . . . placed the Bank at risk of suffering substantial additional loss," that fails to

provide sufficient specificity, as *Lamm* requires.  *See Lamm*, 2018 WL 2297269 at *5 ("general

allegation that Respondent received . . . unearned compensation" in connection with false entries

"fails to satisfy the applicable Notice standards").  Nor does the effects section allege the loss or

damage claimed in ***Finding of Fact 4.b***.  There are simply no allegations of other damage caused

by "prevent[ing] both the Board and the Bank's regulators to take timely action in 2009 to

address the risks occasioned by . . . concealment."  R.D. at 5.  As these findings are outside the

Notice, the Board should disregard them.

   **Summary Findings on Scienter Are Outside the Notice**.  The ALJ also finds that

Respondent was personally dishonest for numerous reasons not alleged in the Notice.  The ALJ's

claim in ***Finding of Fact 6.b*** that "Respondent envisioned and then implemented the means by

which proceeds apparently earmarked for the Bedrock Fund LLC would in fact be distributed to

multiple Nielson Entities" finds no support in the Notice.  *See* R.D. at 6.  Instead, the Notice

alleges, "Green advised the Nielson Entities to route the proceeds indirectly," not Respondent.

Notice ¶ 57.  Likewise, the Notice contradicts the ALJ's ***Finding of Fact 6.a*** that Respondent

"concealed documents showing the true condition of the loans."  R.D. at 6.  Again, "Green was

responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans,"

not Respondent.  Notice, ¶ 62.  Finally, the ALJ's finding that Respondent "falsely testified that

Board members had been fully apprised," R.D. at 6, is false, misconstrues the record, and, in any

event, is irrelevant because it says nothing about whether the conduct alleged in the Notice

involved personal dishonesty.

   **Summary Findings on Foreseeable Risk Are Outside the Notice**.  The ALJ makes two

summary findings regarding whether Respondent's actions created a reasonably foreseeable risk

to the Bank.  *See* R.D. at 7.  In ***Finding of Fact 8***, ALJ McNeil states that it was reasonably

foreseeable that the release of collateral would lead to financial loss when the loans "lacked personal guarantees" (8.a) and that it was reasonably foreseeable that "personal guarantees would be needed to protect the Bank against the risk of loss" (8.b).  But nowhere in the Notice is there anything about personal guarantees, the release of collateral leading to a financial loss, or the need to protect the Bank against the risk of loss.  This finding is outside the Notice and should be disregarded.

**Specific Findings of Fact Are Outside the Notice**.  Throughout the ALJ's discussion of Controverted Claims, *see* R.D., Part II, Section 5, at 18–115, he makes numerous "findings" that are found nowhere in the Notice.

In Section 5.B, ALJ McNeil recounts the History of Regulators' Concern with Northwestern Bank, R.D. at 26–29.  He relies upon this section for summary findings of fact 1.e and 6.b, *i.e.* for support that Respondent failed to heed regulatory criticism (1.e) and was personally dishonest for implementing a bookkeeping protocol (6.b).  But the Notice pleads neither.  It does not plead that Respondent breached any duty by failing to heed regulators' historical concerns nor does it plead anything about the bookkeeping protocol.  Instead, the Notice alleges that when "Respondents completed the Bedrock Transaction," they "ignored well-documented criticism from regulators during [past] examinations regarding the failure to obtain" certain documentation.  Notice ¶ 26.  In other words, the reference to past criticism is relevant to a pleaded issue—namely, the Bedrock Transaction—so it does not create a separate basis for removal.  *See Yellow Freight*, 954 F.2d at 358.  Further, Respondent's introduction of evidence showing strong CAMELS ratings prior to the arrival of Miessner does not open the door to all evidence regarding past regulatory criticism and new theories for removal.  *See* R.D. at 26.  Whether Respondent responded to regulatory criticism is a distinct issue from historically strong

CAMELS ratings.  Thus, evidence regarding regulatory criticism cannot form a basis for removal and is outside the Notice.

Throughout Section 5.C, ALJ McNeil finds numerous facts that are outside the Notice as it relates to Respondent.  He discusses Examiner Charles Bird's testimony regarding the loan documentation in the Bedrock Holdings file and officer memoranda written by Green, *see* R.D. at 29–31, but the Notice alleges these issues as to Green only, not Respondent, *see* Notice ¶¶ 62, 66.[19]  Similarly, ALJ McNeil discusses Miessner's testimony regarding Respondent's role in maintaining the loan files, *see* R.D. at 34–35, which is nowhere in the Notice and indeed contradicted by it.  ALJ McNeil also discusses regulators' conversations with Northwestern board members, *see* R.D. at 32 nn. 224, 225, but that is nowhere in the Notice.  Also outside the Notice is ALJ McNeil's discussion of Miessner's testimony that the loan files "obstructed the FDIC's ability to thoroughly and effectively examine and supervise the Bank" through offsite monitoring tools and otherwise, *see* R.D. at 35–36, and that there was a risk of loss because the Bank should "have been working towards actually resolving the problems," R.D. at 38 (quotation omitted).

In Sections 5.H to K, ALJ McNeil makes findings regarding a wide-range of facts, essentially putting the entire Nielson relationship on trial.  For example, ALJ McNeil discusses the Bank's concerns about the Nielson's lines of credit.  R.D. at 43.  He also discusses the Bank's response to the Nielson Entities' cash flow.  R.D. at 45–46.  ALJ McNeil makes findings

---

[19] Confusingly, in Section 5.H, ALJ McNeil includes a discussion regarding FDIC Examiner Dennis O'Neill's testimony regarding the completeness of the Bank's loan files.  *See* R.D. at 44–45.  This discussion bears no logical connection to the thrust of the section regarding the Bank's requests to the Nielsons to pay down and move their loans (a request made in response to regulatory criticism to reduce exposure to the Nielsons).  In any event, this discussion is likewise outside the Notice.

**A380**

regarding five Nielson Entities, four of which have nothing to do with this proceeding.  R.D. at 47.  Because the Nielson relationship as a whole and any alleged issues with that relationship are not alleged as a basis to remove Respondent, these findings are irrelevant.

In Section 5.P.1, ALJ McNeil discusses Director Byl's testimony regarding the composition and operation of the Bank's board.  *See* R.D. at 63–64.  Similarly, in Section 5.T, ALJ McNeil makes findings regarding the presentation of loans to the board.  The FDIC has not sought to remove Respondent from banking based on how the Bank's board operated.  As a result, that discussion goes beyond the Notice.

In Section 5.P.3.a, ALJ McNeil continues to make findings regarding a variety of topics outside the Notice.  First, he makes findings regarding a purported failure to inform the Board regarding the sources of funding for the Bedrock Loan.  *See* R.D. at 69.  The Notice, however, does not allege that the Board was uninformed about the sources of funding.  *See* Notice ¶ 37 (stating the issues the Board was uninformed about).  Second, ALJ McNeil discusses the lack of personal guarantees on the Nielson Loans.  R.D. at 70.  But, again, the FDIC does not seek removal for every potential issue with the Nielson loan portfolio, only those that are specified in the Notice.

In Section 5.P.3.c and P.3.d, ALJ McNeil again discusses various findings regarding missing loan documentation in the file.  This is outside the Notice with respect to Respondent, because the Notice alleges that Green was responsible for loan documentation.  Notice ¶ 62.

In Sections 5.S and 5.T, ALJ McNeil makes findings regarding regulators' concerns over Respondent's role in bank management, including the fact that the Bank had a flat organizational structure.  R.D. at 92.  As an initial matter, nothing in the Notice relates to Calcutt's control of the Bank, and therefore it cannot be considered.  Indeed, it would be a broad and unprecedented

expansion of the removal power to allow the FDIC to remove bank CEOs simply because of a disagreement over management style or organizational structure.  Further, the FDIC cannot remove Calcutt for his role at the Bank.  Regardless of whether the Bank had a flat management structure or Respondent was a significant presence in the Bank as the CEO and Chairman of the Board, this case is not about his management style.  Such allegations are absent from the Notice, and therefore they are irrelevant to this proceeding.

### C.   ALJ McNeil Made Erroneous and Prejudicial Evidentiary Rulings that Affected Respondent's Fundamental Due Process Right to a Fair Hearing

The Board should not rely upon the Recommended Decision because ALJ McNeil improperly restricted Respondent's presentation of evidence.  First, ALJ McNeil refused to allow Respondent's counsel to cross-examine three key witnesses called by Enforcement Counsel to reveal their bias, as was Respondent's right under the FDIC's Rules of Practice and Procedure, the Federal Rules of Evidence, the Administrative Procedure Act, and the United States Constitution.  Second, ALJ McNeil denied Respondent the right to present rebuttal testimony about admitted exhibits used by two experts called by Enforcement Counsel, who opined that Respondent lied to examiners based on those documents.  Third, ALJ McNeil struck Respondent's affirmative defenses—without any legal basis—finding that regardless of what the facts might show, the defenses could not be asserted and no evidence on the defenses would be allowed.  Fourth, ALJ McNeil made numerous other evidentiary rulings designed to favor the government and abridge Respondent's defense such as denying Respondent's motions *in limine* without analysis, allowing baseless and biased expert testimony from FDIC witnesses, and cutting off relevant and non-duplicative questioning.  For any one of these reasons, a new hearing is required.  Because these evidentiary rulings individually and collectively prejudiced Respondent's ability to defend himself, a new hearing is required.

1.      **ALJ McNeil Improperly Prohibited Respondent from Cross-Examining Key FDIC Witnesses Regarding Their Bias Against Respondent.**

**Finding**:  *ALJ McNeil limited Respondent's cross-examination of Autumn Berden, Cori Nielson, and Anne Miessner because the cross-examination was claimed to be outside the scope of direct testimony.  (R.D. at 129–44; Tr. 177–79; 874; 1012–13.)*

The FDIC's Uniform Rules of Practice, the Administrative Procedure Act, and the Constitution provide Respondent with the right to cross-examine witnesses called against him. And the scope of that cross-examination is not limited to the scope of direct.  Rule 36 of the FDIC's Uniform Rules provides that any "[e]vidence that would be admissible under the Federal Rules of Evidence *is admissible* in" FDIC enforcement proceedings.  12 C.F.R. § 308.36(a)(2) (emphasis added).  In turn, the Federal Rules of Evidence allow all parties to "attack the witness's credibility," Fed. R. Evid. 607, including by cross-examination on both "the subject matter of the direct examination *and matters affecting the witness's credibility*," Fed. R. Evid. 611(b) (emphasis added).  Rule 35 also provides that Respondent "has the right . . .  to conduct such cross examination as may be required for full disclosure of the facts" without limitation to the scope of direct.  12 C.F.R. §308.35(a)(1).  Similarly, the APA provides that Respondent "is entitled . . . to conduct such cross-examination as may be required for a full and true disclosure of the facts."  5 U.S.C. §556(d).  Failing to permit cross-examination is reversible error warranting a new hearing.  *See, e.g.*, *Ferguson v. FAA*, 352 F. App'x 192, 193 (9th Cir. 2009) ("It was error for the ALJ to curtail . . . cross-examination . . . on so many aspects of . . . testimony as to this central issue.").[20]

The ALJ improperly limited Respondent's right to cross-examine three key FDIC witnesses:  two Nielson principals, Autumn Berden and Cori Nielson, and FDIC Case Manager

---

[20] Respondent's counsel warned ALJ McNeil that refusal to allow cross-examination on bias was reversible error, but to no avail.  Tr. 185.

Anne Miessner. *See* R.D. at 129–44. Berden, Nielson, and Miessner are at the center of this case. During the relevant period, Berden and Nielson managed the Nielson Entities, and they were responsible for interfacing with Green at the Bank on behalf of those Entities. *See* Tr. 25–26 (Berden); Tr. 930 (Nielson). They testified to the Nielson Entities' businesses, their borrowing relationship with the Bank, the negotiation of the Bedrock Loan and use of Pillay Collateral, and communications with Respondent and Green. Miessner was the FDIC Case Manager with oversight responsibility for Northwestern Bank. *See* Tr. 709, 725 (Miessner). She was the FDIC's principal witness, testifying as a hybrid fact and expert witness. She testified to factual matters raised in the Notice and offered opinions on numerous topics such as whether the Bank accurately represented the Nielson borrowing relationship to the regulators, whether the Bank concealed the condition of the Nielson relationship, and whether Respondent's actions justify a civil money penalty. *See* FDIC Supp. Expert Rpt. of Anne Miessner (Aug. 23, 2019). The ALJ extensively relied upon all three witnesses' testimony throughout the Recommended Decision.

To challenge the truthfulness of their testimony, Respondent's counsel sought to elicit testimony and introduce documentary evidence showing their pervasive bias against Respondent. Demonstrating this bias is the compelling evidence that Berden, Nielson, and Miessner engaged in a scheme to remove Respondent from banking under the guise of a routine regulatory examination in 2011. *See* Tr. 177–87; Tr. 874–80; Tr. 1012–18; R. Ex. 97 at 3, 98–101, 102 at 5, 106, 107, 127–131, 133, 135–137, 140–141, 143–146, 175, 202–203, 205. The scheme stems from the witnesses' personal animosity towards Respondent, as well as their potential to benefit from Respondent's removal. The inability to cross-examine the witnesses for their bias caused

39

**A384**

Respondent severe prejudice because the cross-examination would have undermined the witnesses' veracity on numerous crucial points relied upon by the ALJ.

The scheme began when the Bank was seeking to protect itself and recoup potential losses from the Nielsons. At that time and in response to difficult negotiations and looming foreclosure, Cori Nielson threatened Respondent, "I can destroy your bank and I'm tempted to do it." *See* Tr. 1014 (offer of proof). Nielson and Berden worked to carry out this threat by compiling a one-sided set of correspondence into what became known as the "Nielson Binder," which was mailed to the FDIC and given to Anne Miessner. *See* Tr. 180 (Berden); Tr. 967 (Nielson); EC Ex. 3. Nielson and Berden created the binder to trigger regulatory scrutiny of Respondent and the Bank. *See* Tr. 1017. As Nielson stated in correspondence to Miessner, she wanted "a fresh face to talk to at the bank" for her own pecuniary benefit. R. Ex. 141.

Miessner was all too happy to help the Nielson's in their quest to remove Respondent, as she too wanted to remove Respondent from Northwestern Bank as a consequence of the animosity that developed during the 2010 examination. As soon as she received the Nielson Binder, Miessner began orchestrating a surreptitious and unauthorized investigation into the Bank and Respondent with the purpose of creating grounds for a Section 8(e) removal action. *See* Tr. 877–80 (offer of proof); Stip. Tr. 17–22, 53–54 (O'Neill). Miessner first embedded an FDIC investigator in the examination team. Stip. Tr. 199 (O'Neill); R. Ex. 93, 100. She also instructed all examiners on site at Northwestern Bank for the 2011 examination to take notes, which "will end up being crucial to our 8(e) investigation." R. Ex. 97.3. As the examination progressed, she wanted to make sure that Respondent was "on record" regarding the Nielson relationship "before it leaks that we are digging." R. Ex. 98; *see also* R. Ex. 99. When Meissner realized she did not have sufficient evidence to remove Respondent, she orchestrated a *de facto*

deposition of Respondent on September 14, 2011 in the guise of a routine regulatory meeting in order to create evidence to justify Respondent's removal. The *de facto* deposition was focused on the 2009 Bedrock Loan, which, by that time, the Bank had classified as nonperforming and placed with its attorneys for collection. Miessner did not notify Respondent that he was under investigation and that his inability to remember certain details would be used against him as a basis for removal. *See* R. Exs. 92, 97, 98 110, 111.

Miessner did not simply rely on her examination team, however, in the quest to remove Respondent. She also solicited and obtained evidence from Nielson and Berden. *See* R. Ex. 101 at 5; R. Exs. 124–27, 130, 136, 147. As part of this collaboration, Berden and Nielson formed a close, working relationship with the FDIC, particularly Miessner and Teri Gillerlain (the FDIC investigator embedded in the examination team). Their relationship became close enough that Nielson sought Miessner's and the FDIC's assistance in redirecting the Bank's efforts to collect rents on Nielson property in foreclosure—***to the detriment of the Bank***. As part of foreclosure on the Nielson loans in 2011, the Bank had exercised its assignment of rents clause designed to offset losses from the Nielsons' nonpayment of loans; but Nielson asked Miessner to help thwart the collection of rents. R. Exs. 128, 130, 133–135, 139–141, 143. Miessner took the extraordinary step of contacting the deputy director of the Michigan banking regulatory agency to see if the state of Michigan could intervene to protect the Nielsons at the Bank's expense. R. Ex. 143 (Miessner e-mail to G. Thielson asking, "Are there any state laws that can help redirect this situation?" on behalf of the Nielsons). FDIC examiner O'Neill characterized this behavior as "shocking." Stip. Tr. 754.

Following the 2011 examination, Berden and Nielson remained involved in the investigation into Northwestern Bank to advance the Nielson's financial interests. *See* R. Ex.

41

**A386**

205.  During a series of meetings between Berden, Nielson, Miessner, Gillerlain, and other FDIC personnel including FDIC Enforcement Counsel in the 2019 hearing, Miessner told Berden and Nielson that the Northwestern Board should have fired Respondent and that the Nielsons should look into whether they have legal standing to pursue claims against Respondent and Northwestern Bank.  *See id.*; Tr. 879–80 (offer of proof).  Miessner and Gillerlain stayed in touch with Nielson and Berden after the 2011 examination, keeping them up-to-date with the latest developments on the removal action against Respondent.  *See* R. Ex. 202, at 2 (Miessner sending Nielson and Berden "[a] little news to brighten your weekend" and telling them "you didn't hear it from me!"); R. Ex. 203 (Berden relaying to Nielsons an update from Teri Gillerlain that Respondent retired from the Bank's board and celebrating this fact as in their interest).

Thus, throughout the investigation of Respondent, Berden, Nielson, and Miessner threatened to destroy Respondent, created crucial evidence, schemed to remove Respondent from banking, demonstrated their personal animus towards Respondent, developed a close working relationship, put their interests over the Bank's interests, and became heavily involved in an improper investigation.  The ALJ prohibited cross-examination on all of this evidence solely because "cross-examination is limited to the scope of facts presented during direct examination." R.D. at 130; *see also* R.D. at 129 (excluding questions "address[ing] matters that had not been raised in direct examination . . . for that reason alone").  The ALJ cited no order, rule of evidence, regulation, or statute for the proposition that cross-examination is limited to matters adduced on direct, and his decision to create such a limitation was error.

As an initial matter, the ALJ's limitation on cross-examination should be reversed because it is inconsistent with the FDIC's Uniform Rules.  *See In the Matter of First State Bank of Marlin*, FDIC ED&O ¶ 8013, at I-50 (FDIC-90-207a, Mar. 10, 1992) (reversing ALJ decision

inconsistent with Board's Uniform Rules).  The Board's rules allow cross-examination on matters outside the scope of direct.  "Evidence that would be admissible under the Federal Rules of Evidence is admissible" in an FDIC enforcement action.  12 C.F.R. § 308.36(a)(2).  Under Federal Rule of Evidence 611(b), the scope of cross-examination includes both "the subject matter of the direct examination and matters affecting the witness's credibility."  As the Supreme Court has held, "bias is almost always relevant" under the Federal Rules of Evidence to assess "the accuracy and truth of a witness' testimony."  *United States v. Abel*, 469 U.S. 45, 52 (1984); *see also Davis v. Alaska*, 415 U.S. 308, 316–1 (1974) ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.") (quotation omitted).  That cross-examination for bias touches on matters outside of direct is no bar to admission: "Cross examination for bias is often on topics outside the scope of the direct examination, but that is not a reason to exclude inquiry into the potential bias."  *United States v. Harris*, 185 F.3d 999, 1008 (9th Cir. 1999).  Evidence of a witness's bias often includes personal or business relationships, personal animus towards a party, a witness's self-interest in the outcome, and/or involvement in the investigation.  *See Abel*, 469 U.S. at 52 ("Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest.");  *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999) (involvement in investigation qualifies as bias); Varieties of Bias, 3 Federal Evidence § 6:77 (4th ed.).  In cross-examining a witness for bias, the questioner is not limited to the witness's answers, but may also introduce extrinsic evidence.  *See Abel*, 469 U.S. at 51–52.

Here, the offers of proof demonstrate Berden's, Nielson's, and Miessner's bias because they (i) threatened to destroy Respondent, (ii) created crucial evidence, (iii) schemed to remove Respondent from banking, (iv) demonstrated their personal animus towards Respondent, (v) developed a close working relationship, and (vi) became heavily involved in an improper investigation. Such evidence "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand" is probative of the witness's credibility. *Davis*, 415 U.S. at 316; *see also Quinn v. Neal*, 998 F.2d 526, 531 (7th Cir. 1993) ("a trial judge has no discretion to prevent cross-examination about such a prototypical form of bias …."). As a result, factual evidence tending to show bias was admissible under the Federal Rules. That evidence should have been admitted at the hearing, and it was improper for the ALJ to prohibit questioning the witnesses regarding their bias and credibility.

Additionally, by refusing to allow Respondent to cross-examine on bias to undermine the testimony of Berden, Nielson and Miessner that was at odds with that of Respondent, ALJ McNeil improperly deprived Respondent of the opportunity to present a full and true picture of the facts. *See* 5 U.S.C. §556(d); 12 C.F.R. § 308.35(a)(1). Testimony related to Miessner's bias bears directly on the true objective of the September 14, 2011 meeting where she orchestrated a *de facto* deposition in service of an undisclosed (and to that point unauthorized) Section 8(e) removal action. Consideration of this evidence was critical to evaluating whether Respondent intentionally made false statements during the meeting and prohibiting it was prejudicial to Respondent.

The proffered cross-examination of Miessner was also required for a full and true evaluation of her credibility as a hybrid fact/expert witness. The same person who schemed to

44

remove Respondent and advance the Nielson's interests over the Bank's interests and wrote Cori Nielson on multiple occasions to celebrate progress in removing Respondent from the Bank was deemed to be fully credible as an expert by ALJ McNeil, without even allowing Respondent's counsel to cross-examine her on her obvious biases.  Miessner offered expert opinion testimony that involved hindsight judgment calls such as whether Respondent concealed facts or was involved in certain Bank operations.  *See, e.g.*, R.D. at 34–35, 58.  Numerous aspects of Miessner's opinions regarding the civil money penalties require subjective assessments about Respondent's mental state, including whether Respondent acted in "good faith" and whether the alleged misconduct was "intentional."  Needless to say, Miessner was adamant that Respondent purposefully acted in bad faith.  In short, Miessner's bias against Respondent and the scheme she orchestrated to remove him from banking undermines her credibility as a witness, and the ALJ's refusal to consider this evidence is reversible error.

Likewise, ALJ McNeil's refusal to permit Respondent to test the credibility of Berden and Nielson is indefensible.  The testimony related to the bias of Berden and Nielson bears directly on their characterization of Respondent as the decision-maker, their testimony about Respondent's concern over the intercompany borrowings, their testimony about what Respondent intended by the use of the term "red flags," Nielson's testimony related to her belief Respondent was concealing information from examiners, and their discussion regarding the creation of crucial evidence (the Nielson Binder), among other topics.  *See* R.D. at 19, 24–25, 46, 57.  They clearly had an ax to grind, having once threatened to "destroy" Respondent.  A full and fair disclosure of the facts requires cross-examination on these points.

Furthermore, the ALJ's unwarranted limitation on the scope of Respondent's cross-examination of adverse FDIC witnesses' bias violated Respondent's Fifth Amendment

Procedural Due Process rights.  "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."  *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970); *see also Greene v. McElroy*, 360 U.S. 474, 496–97 (1959).  "To hold otherwise would raise serious due process problems, since a defendant must be afforded reasonable opportunity to refute grave allegations brought against him in a civil suit.  Cordoning off a highly relevant area of inquiry such as the bias and prejudice of a complainant is repugnant to the principle of a fair trial."  *Ellis v. Capps*, 500 F.2d 225, 227 (5th Cir. 1974).  The evidence in Respondent's offers of proof should have been admitted because it goes directly to Berden's, Nielson's, and Miessner's deep-seated biases against Respondent.  The ALJ should not have abridged Respondent's right to cross-examine these adverse witnesses.

The ALJ disingenuously claims that "[n]othing in the order sustaining the objection prevented Respondent from introducing testimony" on witness bias because (i) "the questions would be permitted if they addressed subjects that had been raised during direct examination," and (ii) Respondent "needed only to include [each witness] in his list of witnesses and identify the topics she would be asked about and the documents she would be shown during her testimony."  R.D. at 129–130.  Yet, as pointed out by Respondent's counsel during the hearing, neither is required.  Tr. 179.

As discussed, no rule in the FDIC's regulations, the APA, or the Federal Rules of Evidence limits cross-examination to the scope of direct.  *See Harris*, 185 F.3d at 1008; *see also United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990) ("The subject matter of direct examination and issues of witness credibility are always open to cross-examination.").  Indeed, any such rule would encourage gamesmanship, because evidence showing a witness's bias is

unlikely to be "raised during direct examination."  FDIC Enforcement Counsel would not ask a witness about a scheme between FDIC examiners and borrowers that is detrimental to an FDIC-insured institution.  Nor would Enforcement Counsel raise issues such as the witness's personal animosity towards the Respondent, that witness's close relationship with FDIC investigators, that witness's involvement in the investigation of Respondent, or that witness's collusion over the creation of key evidence.  Indeed, Enforcement Counsel assiduously avoided any mention of the 2011 investigation and then sought to exclude it as outside the scope of direct.  The exclusion of this evidence was highly prejudicial and plain error.

Nor did anything legally require—much less put Respondent on fair notice—that he "needed . . . [to] identify the topics [the witness] would be asked about" on cross-examination. The ALJ's prehearing procedure Order of March 20, 2019, does not mention cross-examination. It also does not include the supposed limitation that cross-examination would be limited to direct examination.  The Order only restricted the scope of ***direct*** examination by the party calling the witness:  "During ***the direct examination*** of the witness . . . only those exhibits and page numbers identified in this prehearing submission may be presented to the witness ***by the party calling the witness***."  R.D. at 129 (quoting Order (Mar. 20, 2019) (emphasis altered)).  Had the Order notified Respondent that cross-examination would be limited to the scope of direct, then Respondent would have known to list Berden, Miessner, and Nielson as witnesses.  Instead, the Order required the filing of simultaneous witness and exhibit lists.  As the ALJ agrees, nothing in the Federal Rules of Evidence nor the Uniform Rules of Practice and Procedure required Respondent to create a witness list for cross-examination.  R.D. at 130.  And it would be fundamentally unfair to require Respondent to anticipate the FDIC's witnesses (who may or may not have been called at the hearing) and preemptively list the documents he intended to use for

impeachment.  The ALJ's limitation on Respondent's right to cross-examine adverse witnesses was severely prejudicial to Respondent and clear error.  The Board should order a new hearing to correct this error.

### 2.     ALJ McNeil Improperly Prohibited Respondent from Testifying about Exhibits Used by the FDIC That Were Admitted into Evidence.

*Finding:  ALJ McNeil did not allow Respondent to testify regarding admitted exhibits to rebut the testimony of FDIC witnesses, and he relied on the FDIC witnesses' testimony and the absence of a response from Respondent.  (R.D. 26 n.179; R.D. 33 & nn.230–34; R.D. 84 & nn.633–35; R.D. 89 & nn.679–85; R.D. 100 & n.788 (Findings of Fact Regarding Respondent's Impact on the Bank's Call Reporting); Tr. 1266–68; Tr. 1270–71; Tr. 1333.)*

ALJ McNeil required simultaneous identification of witnesses, witness statements and exhibits to be used on direct examination.  Supp. Prehearing Orders (Mar. 20, 2019).  Thus, it was impossible for Respondent to know which witnesses the FDIC would call and which exhibits the FDIC would identify that it might use.  Whenever Respondent's counsel attempted to use an exhibit on the FDIC's disclosure but not on Respondents' for rebuttal purposes, ALJ McNeil refused to allow testimony regarding that exhibit.  Specifically, he prohibited Respondent from testifying about FDIC Exhibits 22, 42, and 44—even after they had been admitted by the FDIC, and even though Respondent had direct, personal knowledge about the subject matter of those exhibits.  Yet when the FDIC attempted to use an entirely new exhibit ***not on anyone's disclosures*** to cross-examine Respondent, ALJ McNeil predictably allowed it.  Tr. 1391; Tr. 1418.

At the hearing, Enforcement Counsel questioned Miessner about the July 23, 2010 Management Exit Meeting and used FDIC Exhibit 22, which had been admitted into evidence.  *See* Tr. 752–53 (Miessner).  This document purported to reflect comments made by Respondent at the meeting.  Respondent viewed that meeting, which related to the 2010 ROE, to be of no relevance to the claims in the Notice and did not list FDIC Exhibit 22 in the exhibit list for his

testimony.  Nevertheless, to rebut Miessner's misleading interpretation, Respondent attempted to testify about FDIC Exhibit 22 and more generally about his understanding of the exit meeting. Tr. 1266–69 (Calcutt).  Even though FDIC Exhibit 22 was in evidence and even though the testimony was to rebut the testimony of Miessner, ALJ McNeil did not allow Respondent to testify about any issues related to the 2010 exam or the exit meeting because it was not contained in Respondent's Prehearing Statement.

Similarly, Respondent did not list FDIC Exhibits 42 and 44—a May 12, 2011 e-mail and a June 30, 2011 letter both authored by Dick Jackson—because they were not the subject of Respondent's defense and Respondent had moved to exclude them from evidence.  *See* Resp. Mot. in Limine, at 6 (Sept. 6, 2019).  ALJ McNeil denied Respondent's motion and permitted the exhibits in evidence.  *See* Order re Mot. in Limine, at 6 (Oct. 4, 2019).  Miessner then opined that Calcutt was aware of the exhibits and concluded he intentionally misled the examiners.  To rebut that testimony, Respondent sought to testify regarding the e-mail and letter.  Tr. 1270–71, 1333 (Calcutt).  ALJ McNeil sustained Enforcement Counsel's objection and refused to permit him to provide any explanation related to these admitted exhibits.  In a highly prejudicial finding, ALJ McNeil found that Respondent was aware of the letter and misled examiners because he permitted Miessner to testify to an unsupported, speculative opinion regarding the Respondent's knowledge[21] and then refused to allow rebuttal evidence from to Respondent regarding the exhibits.  R.D. at 38.

---

[21] *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 617 (6th Cir. 2010); *U.S. Steel Mining Co. v. Dir., OWCP*, 187 F.3d 384, 388–89 (4th Cir. 1999); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir.1994); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

Such rulings were contrary to law. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170–73 (1988) (finding district court abused its discretion in restricting examination by own counsel regarding document introduced on direct examination because "counsel was unable to counteract th[e] prejudicial impression by presenting additional information . . . ."). A new hearing is required to allow Respondent to testify regarding these exhibits and to have an unbiased fact-finder consider his testimony. *Id*. at 160. When Respondent stated that the testimony was rebuttal and Respondent could not be expected to anticipate Enforcement Counsel's case-in-chief given the simultaneous exchange of exhibit lists, ALJ McNeil responded that the 2015 trial should have put Respondent on notice. Tr. 1268. Yet, the proceeding before ALJ McNeil was supposed to be a new trial, and, in fact, Enforcement Counsel radically changed their presentation of evidence in the interim, including by using a new hybrid fact/expert witness, EIC Gomez, to testify about the 2011 examination as opposed to Miessner.

### 3.    ALJ McNeil Improperly Struck Respondent's Affirmative Defenses and Prevented Respondent from Introducing Relevant Evidence.

***Finding:*** *ALJ McNeil struck Respondent's affirmative defenses of laches, entrapment and due process and prohibited Respondent from introducing evidence to support those defenses. (Order re Motion to Strike Affirmative Defenses (July 3, 2019); Order re the Parties' Motions in Limine, at 6 (Oct. 4, 2019); R.D. at 119.)*

Respondent takes exception to the striking of, and to the prohibition of any evidence regarding, the affirmative defenses of laches, entrapment, and due process because it was contrary to law. To remedy this violation, the Board should order a new hearing on his affirmative defenses before a different, unbiased ALJ.

As an initial matter, the decision to strike Respondent's affirmative defenses lacks any legal basis. This is an administrative proceeding designed to give Respondent an opportunity to be heard in a full and fair hearing on the record. Striking pleadings as if they had never been made and depriving Respondent of the ability to present evidence and even argue his case

A395

undermines Respondent's constitutional and statutory rights to be heard. *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard.") (quotation omitted); 5 U.S.C. § 556. Furthermore, there is no legal mechanism to strike pleadings in FDIC enforcement proceedings. Not a single rule in the FDIC's Uniform Rules of Practice authorizes the ALJ to strike pleadings based on the contents of the pleading. The only pleadings that may be struck are those that lack a signature. *See* 12 C.F.R. § 308.7(b)(2). No rule even authorizes the ALJ to decide the case on the pleadings akin to Federal Rule 12(c) or 12(b)(6). The only time an ALJ may make findings prior to the hearing is upon a motion for summary disposition of the entire proceeding. *See* 12 C.F.R. § 308.29. But here, Enforcement Counsel did not file such a motion.

Perhaps the only conceivable legal basis for ALJ McNeil's order to strike was a partial order for summary disposition. But partial summary disposition of Respondent's affirmative defenses prior to the hearing was inconsistent with the rules. *See* 12 C.F.R. § 308.30 (if the administrative law judge determines that a party is entitled to summary disposition as to certain claims only, ***he or she shall defer submitting a recommended decision as to those claims***.") (emphasis added). It was also inconsistent with the ALJ's own orders in this case because it was filed out of time. *See* Notice of Hearing and Supplemental Prehearing Order, at 4 (Mar. 20, 2019) ("[D]ispositive motions shall not be considered timely if filed as a prehearing motion under this Order."). And, with respect to the Sixth and Seventh Affirmative Defenses (entrapment and due process), the ALJ's partial summary disposition was inconsistent with the FDIC's Order on Motion for Interlocutory Review. These Affirmative Defenses had been raised in the First Amended Answer over five years ago and were the subject of testimony at the 2015

trial.  The Order on Motion for Interlocutory Review required a "new oral hearing on all issues that were considered at the prior hearing," including affirmative defenses.  Order at 6.

Even in federal court where motions to strike are allowed, courts generally "disfavor[] motions to strike because they can be used as a means of causing delay in the judicial process." *Golemine, Inc. v. Town of Merrillville*, 652 F. Supp. 2d 977, 980 (N.D. Ind. 2009) (cited by Enforcement Counsel in their motion to strike).  Indeed, striking an affirmative defense is viewed as a "drastic remedy."  *Lakin v. Bloomin' Brands, Inc.*, 2018 WL 1399226, at *1 (E.D. Mich. Mar. 19, 2018), *quoting Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).  Thus, a motion to strike a defense as legally insufficient "will not ordinarily be granted unless the insufficiency is 'clearly apparent.'"  *Narragansett Tribe of Indians v. S. R.I. Land Dev. Corp.*, 418 F. Supp. 798, 801 (D.R.I. 1976) (cited by Enforcement Counsel in their motion to strike) (quoting *La. Sulphur Carriers, Inc. v. Gulf Res. & Chem. Corp.*, 53 F.R.D.458, 460 (D. Del. 1971).

Proving that a defense's insufficiency is clearly apparent requires "the moving party [to] demonstrate that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed."  *Rodgers v. Claim Jumper Rest., LLC*, 2014 WL 1760959, at *1 (N.D. Cal. May 1, 2014) (quotation omitted).  Even if "the defense seems to present a purely legal question, federal courts are very reluctant to determine disputed or substantial issues of law on a motion to strike."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1381, at 423–24 (3d ed. 2004) (collecting cases).  And even if an affirmative defense is insufficient, many federal courts require the moving party to show it "would be prejudiced by the inclusion of the defense."  *Bolton v. United*

52

*States*, 2013 WL 3965427, at *5 (W.D. Tenn. Aug. 1, 2013). The ALJ's order striking defenses did not meet any of these high requirements for a motion to strike, even if one were possible.

> ### a.    ALJ McNeil Erred in Striking the Fifth Affirmative Defense of Laches.

As a general proposition, the government is exempt from the consequences of its laches. *United States v. Summerlin*, 310 U.S. 414, 416 (1940). Yet, whether laches applies in any given circumstance does not depend on the fact that it is the government who brings suit. Instead, the applicability of laches against the government depends on the type of claim at issue. *See Resolution Tr. Corp. v. Vanderweele*, 833 F. Supp. 1383, 1388 (N.D. Ind. 1993), *as modified on reconsideration* (June 16, 1993) ("Because the applicability of laches against the government is determined on a case-by-case basis in this circuit, the court cannot find Mr. Johnson's laches defense inadequate as a matter of law."); *Resolution Tr. Corp. v. Gregor*, 1995 WL 931093, at *4 (E.D.N.Y. Sept. 29, 1995) ("Because of the uncertainty of the authority, the viability of laches and estoppel/waiver defenses in this context is an open and disputed question of law that the Court declines to decide on this motion."); *FDIC v. Gladstone*, 44 F. Supp. 2d 81, 84 (D. Mass. 1999); *Att'y Gen. v. PowerPick Player's Club*, 783 N.W.2d 515, 535–36 (Mich. Ct. App. 2010) ("the government was exempt from the consequences of its laches . . . has apparently been abrogated in Michigan, at least in part.") (quotations and citations omitted). Because the FDIC Board has held that a removal and prohibition order is a "form of equitable or remedial relief, in the nature of an injunction," the equitable doctrine of laches should be fully applicable. *In the Matter of Randolph W. Lenz*, 2003 WL 23273837, at *2 (FDIC Dec. 4, 2003); *cf. NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 893–94 (7th Cir. 1990) (Posner, J.) ("government suits in equity are subject to the principles of equity, laches is generally and we think correctly assumed to be applicable to suits by government agencies as well as by private parties."). In light of these

authorities, the ALJ could not have found that there were no questions of fact, that any questions of law were clear and not in dispute, and that under no set of circumstances could the defense succeed.

### b.    ALJ McNeil Erred in Striking the Sixth and Seventh Affirmative Defenses for Entrapment and Due Process.

The affirmative defenses of entrapment and violation of due process focus on a *de facto* deposition taken of Respondent on September 14, 2011 during the 2011 Examination.  In granting Enforcement Counsel's motion to strike these defenses, ALJ McNeil necessarily concluded that there were no questions of fact, that any questions of law were clear and not in dispute, and that under no set of circumstances could the defense succeed.  This is one more example of how ALJ McNeil made the trial as perfunctory and one-sided as possible.

"A valid entrapment defense requires proof of two elements:  (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity."  *United States v. Valenzuela*, 88 F. App'x. 909, 912 (6th Cir. 2004) (alteration and quotations omitted).  Entrapment is an issue for the trier of fact based on evidence addressed at trial.  *United States v. Barger*, 931 F.2d 355, 366 (6th Cir. 1991).  ALJ McNeil struck the defense as if ruling on a motion to dismiss:  "As presented, the Sixth Affirmative Defense fails ***to state the elements*** required when presenting an entrapment defense."  Order re Mot. to Strike, at 4 (July 3, 2019).  No rule or regulation allows the ALJ to decide whether the pleading is legally sufficient.  The Board should reject the ALJ's decision on this basis alone.

Furthermore, Respondent would have been able to adduce significant evidence demonstrating the entrapment.  Miessner set out to obtain the basis for a Section 8(e) action during the safety and soundness examination by entrapping Respondent into "false" statements to establish the personal dishonesty element of such a claim.  She did this surreptitiously and

with the assistance of the Nielsons.  The plan was laid out in numerous e-mails.  *See* R. Exs. 98, 99, 100, 101, 103, 107, 110, 112, 125, 126, 127, 133, 136.  At the September 14, 2011 *de facto* deposition orchestrated by Miessner, Respondent relied on the memory of Bill Green and acknowledged he was "guessing" at certain answers without carefully reconstructing the events through review of documents.  Had Respondent known this meeting was a deposition, he would have not have answered without being certain of his answers.  ALJ McNeil concluded that Respondent's answers to questions asked by the examiners at this *de facto* deposition regarding a loan made 21 months earlier were untruthful.

ALJ McNeil also improperly struck Respondent's due process defense.  Agencies must follow their procedures, and Miessner's unauthorized 8(e) investigation without an Order of Investigation is a textbook example of a failure to do so.  *See Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954) (agency is bound to follow its own interpretation, even if the statute might imbue it with broader authority);[22] *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (it "is an elemental principle of administrative law that agencies are bound to follow their own regulations"); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.").  There is a reason that investigations must be authorized and notice provided before depositions occur— this ensures that the investigators stay within boundaries and that a clear and unimpeachable record exists.  None of this happened in this case, although Respondent was barred from presenting evidence to prove this.

---

[22] *Superseded by statute on other grounds by Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1980 (June 25, 2020)

Here, the FDIC should be barred from asserting its claims because Case Manager Miessner questioned Respondent as part of an investigation seeking his removal and prohibition that she initiated without complying with 12 C.F.R. § 308.145, without notifying Respondent of the existence of the investigation, and without giving him the opportunity to consult with legal counsel before questioning him in a manner intended to elicit statements documented only by the examiners' subjective and biased recollections.  "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process."  *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (quotation omitted) (holding government violated due process rights in failing to comply with binding regulations that require an evidentiary hearing).  When the agency's procedural violation involves the right to counsel, the Respondent need not even demonstrate prejudice.  *See Montilla v. INS*, 926 F.2d 162, 166–69 (2d Cir. 1991).

Section 10 of the FDIA, 12 U.S.C. § 1820(a), allows the FDIC to examine an insured depository institution, including taking testimony under oath, but all within the confines of the Bank, as Examiner Dennis O'Neill testified.  *See* Stip. Tr. 199 (D. O'Neill).  The ALJ concluded based on O'Neill's testimony that examiners cannot go outside the Bank to gather information but investigators can.  R.D. at 118.  If the FDIC desires to undertake an investigation to look at information beyond the Bank, such as interviewing borrowers, it has to comply with 12 C.F.R. § 308.144–.150  As stated in the first sentence:  "The procedures of this subpart shall be followed when an investigation is instituted and conducted in connection with any open or failed insured depository institution."  *Id*. § 308.144.  "An investigation shall be initiated only upon an issuance of an order by the Board of Directors; or by the General Counsel, the Director of the

56

Division of Risk Management Supervision, the Director of the Division of Depositor and Consumer Protection, or their respective designees." *Id.* at § 308.145. This is a substantial right of Respondent's, as the triggering of an investigation notifies the target that he should inform himself about the relevant facts and retain counsel; indeed, triggering an investigation provides those targeted with a right to counsel. *Id.* § 308.148. Without allowing any evidence, ALJ McNeil erroneously concluded these procedures did not have to be followed. Order re Mot. to Strike, at 6–7 (July 3, 2019).

Contrary to these regulations, Miessner began the investigation in August 2011—well before the issuance of the actual order of investigation on April 14, 2012. *See* R. Ex. 185. As described above, there was significant evidence that was presented in the 2015 trial demonstrating that Miessner conducted an unauthorized investigation under the guise of a routine supervisory examination. *See* R. Ex. 112 (an investigation that took up most of the time allotted for examination). The FDIC used its investigatory procedures to go outside the Bank by maintaining consistent contact with Cori Nielson and Autumn Berden and using them as surrogates to gather information that FDIC examiners could not. *See* R. Exs. 100, 101, 103, 125, 126, 127, 133, 136. Respondent was prevented from pursuing this evidence by ALJ McNeil's Order Striking the Seventh Affirmative Defense.

The FDIC also failed to advise Respondent of his right to counsel pursuant to 12 C.F.R. § 308.148. This regulation provides that witnesses being asked questions in investigative proceedings may have counsel present and that counsel may advise the witness before, during, and after the testimony. *Id.* at § 308.148(b). As discussed, the meeting on September 14, 2011 was organized under the pretense that the FDIC was conducting a routine examination of the Bank. But it was truly designed to be a *de facto* deposition—literally to get Respondent "on

record"—and should have been subject to the strictures of 12 C.F.R. § 308.148.  Instead of seeking information in aid of the examination, the FDIC sought to get "Scrub on record . . . before it leaks that we are digging" and before he was able to consult with counsel.  R. Ex. 98.  The FDIC called an unnecessary "meeting" with Calcutt with very little notice.  *See* EC Ex. 110.  And the "record" from that meeting was a memo authored ***two days later*** by FDIC personnel who were charged with finding evidence to bring a Section 8(e) removal action (which varied in material ways from contemporaneous notes taken by an examiner from the Michigan OFIR).  By not informing Respondent of his right to counsel at this *de facto* deposition, as well as conducting an investigation disguised as an examination, the FDIC violated Respondent's due process rights and the *Accardi* principle.  *See Montilla*, 926 F.2d at 169.  This egregious misconduct requires dismissal, as the government's misconduct estops it from pursuing any claims against Respondent.  *See Service v. Dulles*, 354 U.S. 363, 389 (1957) (reversing discharge inconsistent with internal regulations); Joshua I. Schwartz, *The Irresistible Force Meets the Immovable Object: Estoppel Remedies for an Agency's Violation of Its Own Regulations or Other Misconduct*, 44 Admin. L. Rev. 653, 699–701 (1992) (violations of procedural regulations give rise to estoppel).

This defense was the subject of extensive testimony at the first hearing, as well as documentary evidence.  ALJ McNeil erred in striking the defense.

### 4.    ALJ McNeil Made Numerous Other Evidentiary Errors.

ALJ McNeil made many other evidentiary errors that require a new hearing.  Respondent takes exception to those evidentiary rulings, as they abridged Respondent's right to defend himself.  The following rulings require a new hearing.

***Finding:*** *ALJ McNeil denied Respondent's motions in limine that sought (i) to preclude the FDIC from relying on unpleaded claims outside the Notice of Charges, (ii) to exclude testimony and evidence related to Bill Green and Richard Jackson unrelated to Respondent, (iii) to exclude*

*evidence related to the September 14, 2011 de facto deposition of Respondent, (iv) to exclude certain portions of Dennis O'Neill's 2015 testimony, and (v) to exclude expert testimony of Anne Miessner and James Gomez.  (Order re the Parties' Motions in Limine (Oct. 4, 2019).)*

For the reasons discussed *infra* Section IV.D.1, Respondent takes the following

exceptions to the ALJ's denial of Respondent's motions in limine:

- The ALJ should have excluded evidence relating to Green and Jackson.  *See* Resp't Mot. in Limine, at 6–10.  Green and/or Jackson's actions are neither relevant nor material, because their actions have no bearing on whether Respondent himself "engaged or participated" in any "practice" that could be considered "unsafe or unsound" and the ALJ did not connect their actions to Respondent.  12 U.S.C. §1818(e)(1)(A)(ii); *accord Kim v. OTS*, 40 F.3d 1050, 1055 (9th Cir. 1994) ("a few relatively minor and technical violations of certain banking regulations [that] occurred while [respondent] was at [the bank's] helm" do not show scienter).  Thus, the ALJ should have excluded the following:

    (1)    Green's correspondence with Autumn Berden relating to disbursing and documenting the Bedrock Loan [EC Ex. 3];

    (2)    Green's routing of the Bedrock Loan funds [Jt. Ex. 13; EC Ex. 3; EC Ex. 7; EC Ex. 11; EC Ex. 109; R. Ex. 136, at 38–41; Stip. Tr. 53–66, 67–70, 107–112 (O'Neill)];

    (3)    Green's failure to maintain his loan files [EC Ex. 3; Stip. Tr. 74–75 (O'Neill); 788–805, 811–12, 820, 825–26, 830–35, 843–48, 865–68 (C. Bird)];

    (4)    The memoranda drafted by Green and inserted into the loan files [EC Ex. 20; Stip. Tr. 789–90, 813–30, 834–43, 850–68 (C. Bird)];

    (5)    Green's assurances to the Nielson Entities after the sale of Nielson loans to affiliates in 2010 [R. Ex. 40; Stip. Tr. 831–32 (C. Bird)];

    (6)    Green's statement that the Bedrock Loan was for "working capital" [Jt. Ex. 6; EC Ex. 15; Stip. Tr. 40 – 49, 54, 71, 157–58 (O'Neill)];

    (7)    The November 2009 letter to the Michigan OFIR that was authored by Jackson with input from Doherty [EC Ex. 5];

    (8)    The decision to exclude the Nielson Loans from external loan review [EC Ex. 12; EC Ex. 79; EC Ex. 121];

    (9)    Jackson's and Green's other allegedly misleading conduct or statements alleged to have misled examiners [EC Ex. 7; EC Ex. 11; EC Ex. 23; EC Ex. 24; EC Ex. 36; EC Ex. 42; EC Ex. 44; and EC Ex. 55 & Stip. Tr. 599–601 (O'Neill)].

- The ALJ should have excluded all evidence relating to the September 14, 2011 *de facto* deposition because the FDIC violated its own regulations in creating this evidence and concealed the meeting's true purpose. *See* Resp't Mot. in Limine, at 10–14; *United States v. Caceres*, 440 U.S. 741, 756–57 (1979); *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977); *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 593 (1st Cir. 2019).

- The ALJ should have excluded portions of the testimony of Dennis O'Neill. *See* Resp't Mot. in Limine, at 14–19. O'Neill's testimony on issues outside the Notice, interpreting Respondent's state of mind during the September 14, 2011 meeting, and interpreting the Nielson Binder (Ex. 3) should have been excluded from the record. O'Neill's testimony outside the record concerned Michigan's Unit Borrowing Rule, Stip. Tr. 115–21, possible loan arrangements with the Nielson family in early 2009, Stip. Tr. 121–26, and FDIC examiner conclusions at State Savings Bank, Stip. Tr. 168–72. *See Yellow Freight*, 954 F.2d at 357. O'Neill offered testimony regarding Respondent's state of mind during the September 14, 2011 *de facto* deposition at Stip. Tr. 199–206, 585–94, 716–18, 727–30, which should have been excluded. *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004); *United States v. Dotson*, 799 F.2d 189, 194 (5th Cir. 1986). Finally, O'Neill offered improper lay opinions regarding the information in the Nielson binder at Stip. Tr. 74–191, which should have been excluded. *See United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013); 12 C.F.R. § 308.35(a)(3).

- The ALJ erred by permitting Anne Miessner and James Gomez to testify as experts. Miessner should not have been permitted to testify as an expert because she conflated what Calcutt did with the actions of Green and Jackson; offered speculative opinions about Respondent's actions and intent without a methodology; and was biased against Respondent. Gomez should not have been allowed to testify because he speculated about Respondent's state of mind, lacked any basis supporting his opinions, and offered improper legal conclusions. *See* Resp't Mot. in Limine, at 19–23; *see also In re Rezulin*, 309 F. Supp. 2d at 547; *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (proper to exclude expert opinion based "on altered facts and speculation designed to bolster" litigants' position); *In the Matter of Michael D. Landry*, 1999 WL 440608, at *25 n.33 (FDIC May 25, 1999) ("it is preferable to avoid creating even an appearance of a conflict."); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (holding expert may not testify as to legal conclusions).

***Finding:*** *ALJ McNeil ended questioning on relevant, non-duplicative topics. (Tr. 673–78, 836, 856, 1053, 1058.)*

For the reasons discussed *infra* pages 71–73, 85 n.31, 118 n.53, and 121–22, the ALJ erred by ending questioning on relevant, non-duplicative topics. *See* 12 C.F.R. § 308.36(a)(1).

The ALJ erred by not allowing Mark Smith to testify regarding correspondence in the Plante

Moran Report that should have been previously identified by examiners. Tr. 673–78. The ALJ erred by not allowing Anne Miessner to testify regarding the risk of loss from the Bedrock Transaction within the context of the Great Recession and Nielson's decision to withhold payment. Tr. 836–37. Similarly, the ALJ erred by not allowing Miessner to testify regarding the basis for her opinion that the Bank did not intend to sell the loans to affiliate banks. Tr. 856. And the ALJ erred by not allowing Bruce Byl to testify that he did not review the Reports of Examination. Tr. 1053, 1058. A new hearing is required.

***Finding:*** *ALJ McNeil allowed Miessner and Gomez to offer expert testimony that was speculation and that opined on Respondent's intent over Respondent's objections. (Order re the Parties' Motions in Limine (Oct. 4, 2019); R.D. at 38; R.D. at 58 & n.432; R.D. at 83.)*

As set forth herein at pages 49 n.21, 69, 85 n.31, 102–04, 121–22, and 152, ALJ McNeil erred by allowing and relying upon Miessner's and Gomez's speculative expert testimony. "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir.1994); *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 617 (6th Cir. 2010) ("no matter how good experts' credentials may be, they are not permitted to speculate." (quotation omitted); *U.S. Steel Mining Co. v. Dir., OWCP*, 187 F.3d 384, 388–89 (4th Cir. 1999) (refusing to enforce agency action based on a speculative expert determination). "[E]xpert testimony about the Bank's intent" or Respondent's intent is "improper." *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 326 (E.D.N.Y. 2013). That is because testimony "about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). Because Miessner and Gomez speculate about intent and admit their opinions lack a sufficient factual basis, their opinions should have been excluded,

and it was improper for the ALJ to rely upon them. Their testimony should be excluded or disregarded by the Board.

### D. ALJ McNeil Was Biased Against Respondent.

***Failure to Make a Ruling:*** *Respondent requested that the ALJ order a new hearing because of the ALJ's bias against Respondent; ALJ McNeil did not address the request. (Resp't Post-Hearing Brief, at 45–47 (Jan 31, 2020).)*

The FDIC Board should not have any confidence in ALJ McNeil's Recommended Decision. To begin with, his decisions and recommendations have been rejected in the past. *See In the Matter of John R. Lamm*, 2018 WL 2297269 (FDIC Mar. 20, 2018) (rejecting ALJ McNeil's recommendation for CMP and removal); FDIC Decision and Order on Motion for Interlocutory Review, at 4–5 (June 20, 2019) (granting Respondent's petition for interlocutory review and reversing order denying Respondent new hearing). He also has been accused of prejudging the outcome in prior cases. In connection with an enforcement action brought by the Federal Reserve Board, ALJ McNeil issued an order saying he expected to rule in the Federal Reserve Board's favor on all issues before ever issuing a recommended decision, raising serious questions about proper procedure and his impartiality. *See* Victoria Finkle, *New Scrutiny for In-House Financial Court as Banker Faces Ban*, N.Y. Times (Aug. 21, 2017).[23] And his prior writings reveal his predisposition for the government. In his book on administrative litigation, ALJ McNeil wrote, "you might expect that the judge is going to decide your case impartially, based on the evidence presented, without favoring the government's side of the case . . . ***But it would be a mistake to believe that the black robe, the raised dais, and the courtroom***

---

[23] *Available at* https://www.nytimes.com/2017/08/21/business/dealbook/fed-in-house-court.html (July 23, 2020). Ultimately, the case was reassigned to ALJ Miserendino in light of *Lucia. See Jiampietro v. Bd. of Governors*, No. 18-2806 (2d Cir. Sep. 21, 2018), ECF No. 2.

***environment have created an independent adjudicator****.*" Christopher B. McNeil, *supra* p.1, at 16 (emphasis added).

ALJ McNeil embodied this sentiment throughout Respondent's proceedings, demonstrating anything but independence and clearly favoring the government. ALJ McNeil predetermined to remove Respondent based on the 2015 proceedings. *See supra* Section IV.A. Before intervention by the Board, ALJ McNeil denied Respondent his right to a new hearing because ALJ McNeil had made up his mind on the outcome based on the 2015 record. *See* Order Regarding New Oral Hearing (Mar. 19, 2019); FDIC Decision & Order on Motion for Interlocutory Review, at 4–5 (June 20, 2019). But even though the Board corrected ALJ McNeil's procedural error, it could not compel him to be open-minded. Instead of providing a fair, new hearing, ALJ McNeil sought to bolster the case against Respondent. He continued to rely on the 2015 record over objection. *See supra* Section IV.A. He allowed Enforcement Counsel to stray far outside the Notice. *See supra* Section IV.B. He abridged Respondent's ability to defend himself by making unsupported and incorrect evidentiary rulings. *See supra* Section IV.C. And he created a one-sided record skewed against Respondent, assumed the role of FDIC Enforcement Counsel, and consistently misstated the evidence in further support of his predetermined outcome. Because ALJ McNeil made up his mind by reviewing the 2015 hearing and then took actions demonstrating his desire to reach a predetermined outcome, Respondent should receive a new hearing.[24] *See* 5 U.S.C. § 556(b)(3) (hearings to be conducted "in an impartial manner."); *see also* 12 C.F.R. § 308.35(a)(1) ("Hearings shall be conducted so as to

---

[24] Respondent even requested that the ALJ recuse himself in post-hearing briefing. *See* Resp't Post-Hearing Brief, at 45 (Jan. 31, 2020). Notably, nowhere in the ALJ's Recommended Decision does he address Respondent's argument. In fact, ALJ McNeil does not even state that he approached the case fairly and impartially.

provide a fair and expeditious presentation of the relevant disputed issues."); *Goldberg*, 397 U.S. at 266–71 (due process requires an impartial decisionmaker); *Pharaon v. Bd. of Governors*, 135 F.3d 148, 155 (D.C. Cir. 1998).

### 1.    ALJ McNeil Was Biased Because He Created a One-Sided Record Skewed Against Respondent.

ALJ McNeil's rulings created a one-sided recorded that favored the FDIC.  He made these rulings both before and during the hearing with little analysis and even less legal support.  Given the lack of analysis and specious legal reasoning, the only conclusion is that ALJ McNeil decided to give the FDIC every advantage and abridge Respondent's ability to defend himself.

Prior to the hearing, ALJ McNeil erroneously denied all of Respondent's Motions *in Limine*, without meaningful analysis or due care.  Respondent filed several Motions *in Limine* in one Omnibus Motion.  Respondent sought (i) to preclude the FDIC from relying on unpleaded claims outside the Notice of Charges, (ii) to exclude testimony and evidence related to Bill Green and Richard Jackson unrelated to Respondent, (iii) to exclude evidence related to the September 14, 2011 *de facto* deposition of Respondent, (iv) to exclude certain portions of Dennis O'Neill's 2015 testimony (which the parties had stipulated to include, subject to this reservation), and (v) to exclude expert testimony of Anne Miessner and James Gomez.  *See* Resp't Omnibus Mot. in Limine (Sept. 6, 2019).

In less than a day-and-half from the filing of opposition briefs, ALJ McNeil denied all of Respondent's motions and granted almost all of the FDIC's.  *See* Order re Mot. in Limine (Oct. 4, 2019); Resp't Opp'n. to Mot. in Limine (Oct. 2, 2019).  This hasty Order contained little analysis and barely, if at all, engaged with Respondent's arguments.  For example, with respect to the testimony of Dennis O'Neill, Enforcement Counsel and Respondent stipulated that the

2015 testimony of O'Neill could be used as his testimony for the new trial, subject to

Respondent's Motion *in Limine*:

> 1. The testimony in the transcript from the hearing held in September 2015 of FDIC Examiners: a) Dennis P. O'Neill, as set forth in Volume I, pages 10 -209; Volume III, pages 584 – 692; and Volume IV, pages 702 – 757; and b) Charles H. Bird, Volume IV, pages 758 – 916, including all admitted exhibits, **subject to the provisions of paragraph 2** hereunder, shall be received into evidence and become part of the record for the new oral hearing in this matter presently scheduled to commence on October 29, 2019;

> 2. The testimony of FDIC Examiners Dennis P. O'Neill and Charles H. Bird described in paragraph 1. above, including all admitted exhibits, and subject to all objections made at the prior hearing that are hereby renewed **shall be subject to prehearing motions (e.g., motions in limine) to exclude portions thereof from the record for the new oral hearing and**

> 3. Any exhibit previously admitted through the testimony of Dennis P. O'Neill or Charles H. Bird that is excluded from their admitted testimony as a result of a motion in limine by Respondent, may be offered into evidence by the parties through other witnesses who will testify at the new oral hearing.

Joint Stipulation re Testimony of FDIC Examiners O'Neill and Bird (July 29, 2019) (emphasis

added).

In accordance with this reservation of rights, Respondent filed a Motion *in Limine* to

exclude portions of the O'Neill testimony on facts outside the Notice, his interpretation of

Respondent's state of mind during the September 14, 2011 *de facto* deposition, and his

interpretation of the implications of documents in the Nielson binder. *See* Resp't Mot. in

Limine, at 14–19. ALJ McNeil ignored Respondent's argument entirely. In a complete non-

sequitur, ALJ McNeil referred to a different stipulation (the Stipulations of Fact, which was the

subject of a different motion *in limine*), ignored all of Respondent's arguments, and then simply

denied Respondent's motion to exclude portions of O'Neill's testimony because "there is no

legal basis to disregard the parties' stipulation." Order re Mot. in Limine, at 4. ALJ McNeil

ignored that Respondent expressly reserved the right to challenge the testimony's admissibility, and his ruling reflects a lack of care to even review the stipulation that he quoted in the Order. *See id.* In fact, ALJ McNeil demonstrated that he did not even understand the stipulation. During the hearing, ALJ McNeil read paragraph 2 of the stipulation—including the portion allowing Respondent to challenge O'Neill's testimony via motions *in limine*—and said, "I need to understand what that means." Tr. 16. Issuing a hasty order in favor the government, while failing to engage with any of Respondent's arguments and to even review the stipulation, demonstrates the ALJ's bias.

Other examples abound. For instance, ALJ McNeil denied Respondent's Motion *in Limine* to separate the case against Respondent from that against Green and Jackson. As a consequence, ALJ McNeil held Respondent vicariously liable for their actions, even when there was no record evidence that tied their conduct to Respondent. This resulted in a trial that completely intertwined Calcutt, Green and Jackson as if they were one and the same. ALJ McNeil's Findings of Fact blamed Respondent even when no record evidence—testimony or exhibit—linked him to the action, but instead only described the role of Green or Jackson.[25]

As yet another example, Respondent's Omnibus Motion sought to exclude Expert Testimony from Anne Miessner and James Gomez. ALJ McNeil's Order makes no mention of Miessner at all and denies the Motion as to Gomez because the 2011 ROE is admissible—which has nothing to do with whether there was a basis for Gomez to testify as an expert. Indeed, ALJ

---

[25] For example, ALJ McNeil faulted Respondent in the following Factual Findings for: (3.a) failing to fully disclose the sources of funding for the Bedrock Loan (Green); (3.c) missing loan documentation (Green); (3.e) the effect of release of Pillay Collateral (Green); (3.f) failing to timely obtain financial statements (Green) (3.g) transferring loans to affiliate banks (Jackson). *See* R.D. at 69–85.

McNeil created a redundancy, allowing the ROE conclusions to be the basis of his findings and conclusions and also relying on Gomez's recitation of the same assertions that are set forth in the ROE.

Not only did he deny every motion filed by Respondent, ALJ McNeil reflexively favored the FDIC by granting its motions. As discussed *supra* notes 11 & 12, ALJ McNeil granted the FDIC's Motion *in Limine* to admit the 2015 Joint Stipulations of Fact over Respondent's objection. ALJ McNeil's reasoning is illogical at best. He decided to bind Respondent to the Joint Stipulations of Fact ***because*** of the stipulation admitting O'Neill's and Bird's testimony. Order re Parties' Motions in Limine at 3-4 (Oct. 4, 2019). But whether or not Respondent stipulated to O'Neill's and Bird's testimony has nothing to do with binding Respondent to facts to which he did not agree to stipulate.[26]

As another example, in ruling on the FDIC's Motion *in Limine*, ALJ McNeil granted the FDIC's Motion to prevent Respondent from presenting testimony about his banking activities at Central State and State Savings Bank (profitable, highly-rated, and well-capitalized banks) after Northwestern Bank was sold at a substantial premium to the market to show his lack of any risk to the banking sector. Also prior to the hearing, and as discussed *supra* Section IV.C.3, ALJ McNeil improperly curtailed Respondent's ability to present affirmative defenses. Such error curtailed Respondent's right to a hearing and further allowed ALJ McNeil to create a one-sided record against Respondent.

ALJ McNeil continued to reveal his true colors during the hearing, where he made numerous improper and prejudicial evidentiary rulings against Respondent. Notably, he did not

---

[26] As discussed herein, this was in error and Respondent takes exception. The Board should not rely upon the 2015 Joint Stipulations of Fact.

allow Respondent to cross-examine key witnesses on bias because he wrongly concluded that cross-examination was limited to the scope of direct.  *See supra* Section IV.C.1.  But not only was this legal conclusion grossly incorrect, ALJ McNeil's inconsistent application of his own rule reveals his bias.  When ALJ McNeil knew certain cross-examination would damage the FDIC's case (because of his review of the 2015 record), he prohibited testimony outside the scope of direct.  *See supra* Section IV.C.1.  But he allowed evidence during cross-examination outside the scope of direct when he decided it helped his predetermined outcome.  One illustration of this occurred during Respondent's cross-examination of Bruce Byl, a board member of Northwestern Bank.  Enforcement Counsel objected to certain questioning, and ALJ McNeil "agree[d] the questions are beyond the scope; let's concede that."  Tr. 1056–57. Nonetheless, he decided to allow the testimony because "I'm also finding that the information I'm getting now is useful . . . ."  Tr. 1057.  The ALJ relied upon the evidence adduced during this portion of cross-examination to support his findings.  *See* R.D. at 66 n.505.  Applying a rule inconsistently to disadvantage and antagonize Respondent while ignoring the rule when it assists the predetermined outcome is bias.

The same dynamic occurred with respect to ALJ McNeil's limitation on Respondent's right to rebuttal evidence.  As discussed earlier, ALJ McNeil improperly restricted Respondent's ability to testify regarding exhibits already admitted into evidence in order to rebut the charges against him.  *See supra* Section IV.C.2.  As with the ALJ's limitation on cross-examination, ALJ McNeil inconsistently applied this rule to favor the government.  On one occasion, when Enforcement Counsel sought to cross-examine Respondent with a new exhibit not on anyone's list, Respondent objected.  ALJ McNeil, however, admitted the exhibit.  When asked to explain his different ruling, ALJ McNeil referred to the latitude given in cross-examination—a latitude

he uniformly denied Respondent.  Tr. 1391.  Seeing the problem, Enforcement Counsel withdrew the exhibit, but too late to obscure ALJ McNeil's bias.  On another occasion, Enforcement Counsel sought to introduce an exhibit it had not even provided to Respondent in advance of the hearing.  *See* Tr. 1418–19 (discussing FDIC Exhibit 150).  Over Respondent's objection, the ALJ coached Enforcement Counsel to the question he was allowed to ask and then allowed Enforcement Counsel to cross-examine Respondent with a document not provided in advance.  Tr. 1419–20.  Such inconsistency is fundamentally unfair and biased.

### 2.    ALJ McNeil Assumed the Role of Enforcement Counsel at Times.

ALJ McNeil also demonstrated his bias and created a one-sided record by going out of his way to elicit testimony against Respondent and filling in gaps in Enforcement Counsel's case.  For example, Enforcement Counsel asked Miessner for her expert opinion on the amount of CMPs without establishing any foundation for her opinion.  At the completion of questioning of Miessner, including Respondent's cross-examination, ALJ McNeil filled in the gap.  Tr. 885–98.  He first asked what role she played in the analysis of CMPs and, when he received a nebulous answer, commented, "It sounds like you did most of the analysis…," to which Miessner again said she did some.  Tr. 886.  ALJ McNeil then proceeded to ask Miessner questions about each of the factors to be considered.  He literally conducted a direct examination of Miessner of every element in the CMP matrix.  Such questioning permitted a soliloquy of Enforcement Counsel's case with Miessner as the advocate.  The purpose, pure and simple, was to bolster the FDIC's case and dilute that of Respondent.  ALJ McNeil did this on other occasions as well, such as with his questioning of FDIC witness Mark Smith, Tr. 680–81, and Cori Nielson regarding her speculative interpretation of what Respondent meant by the term "red flags," Tr. 1021–22.

ALJ McNeil also supported Enforcement Counsel in their questioning of Michael Doherty, head of Credit Administration, who was called as a witness by Respondent. In doing so, ALJ McNeil showed how he prepared for upcoming witnesses by reviewing their 2015 testimony, and used that testimony to question the witness about his perception of events, Tr. 1253, what constitutes working capital, Tr. 1255, the lack of personal guarantees from the Nielsons, and the interrelatedness of the Nielson Entities, Tr. 1255–60 ("What troubled you about having this many inter-related loans, given the level of capital in the Bank?"). Quite simply, ALJ McNeil assumed Enforcement Counsel's role as an advocate for the FDIC.

Additionally, throughout the proceeding, the ALJ improperly sustained Enforcement Counsel's objections, created bases for objections on behalf of the FDIC, and prohibited Respondent from effectively cross-examining key witnesses—including experts—regarding their credibility. For example, Respondent's counsel sought to cross-examine an FDIC expert witness, James Gomez, regarding his opinion that Respondent **_knowingly_** concealed problems with the Nielson relationship testimony by excluding correspondence from the loan files. *See* FDIC Pre-Hearing Statement, Ex. D-2 ¶ 12 (Aug. 23, 2019); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). Specifically, Counsel for Respondent sought to ask whether that opinion would change if Respondent believed all documents were properly in the loan files. Tr. 300–03. The ALJ would not allow it because "[i]t didn't happen that way." Tr. 302. In other words, the ALJ did not allow exploration of this issue because he had already decided that Respondent knowingly concealed that the correspondence was not in the loan files.

As another example, the ALJ routinely cut off questioning that damaged the FDIC's case. As discussed *supra* Section IV.C.4, the ALJ shut down questioning on numerous occasions for

specious reasons.  *See, e.g.*, Tr. 677–78; Tr. 1053; Tr. 1302–03 (*infra* n.43).  For crucial FDIC

witnesses James Gomez and Anne Miessner, ALJ McNeil would even step in during cross-

examination to coach the witness or object on behalf of Enforcement Counsel.  *See, e.g.*, Tr. 304

(ALJ McNeil coaching witness to say he did not know whether a regulation prevented the

Bedrock Transaction); Tr. 305 (ALJ McNeil objecting for EC that question assumes facts); Tr.

306 ("He's answered the question."); Tr. 820, 834, 856 (ALJ McNeil objecting and instructing

witness not to answer and EC thanking the ALJ).  An ALJ may not coach witnesses or object for

Enforcement Counsel, as that is contrary to the FDIC Rules of Practice and Procedure.  *See* 12

C.F.R. § 308.36(d).  As another example, at times the FDIC and ALJ joined forces against

Respondent's Counsel.  When discussing the use of the prior hearing transcripts from 2015, the

following exchange occurred:

> THE COURT: And that's true across the board: If you think there is
> something from the record that you think I need to have, bring it to
> my attention that way.
>
> MR. HOVIS: Even though it's in the prior transcript?
>
> THE COURT: I have no problem with the prior transcript; you're
> the person having the problem.
>
> MR. BECK: You can't have it both ways, Barry.
>
> THE COURT: But I certainly am encouraging the parties rather than
> bring it to my attention here and now what was said back then, if
> you think there is something important that you want me to know
> about, particularly if there's inconsistencies, then you're entitled and
> I expect you to go and review the transcript from the first trial.

Tr. 868–69; *see also* Tr. 1418–20 (ALJ and FDIC counsel discussing the questions the FDIC

counsel may ask).

### 3.    ALJ McNeil Consistently Misstated the Evidence to Inaccurately Portray the Record.

Having predetermined to remove Respondent, ALJ McNeil's Recommended Decision presents a one-sided view of the facts and makes inappropriate credibility determinations that reflect hostility against Respondent.  Remand to a different, and impartial, ALJ is required.  *See Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 293 (E.D.N.Y. 2004) (remanding case to new ALJ because of ALJ's "unnecessary" credibility determinations and "selective consideration of evidence").

**Selective Portrayal of Evidence**.  Part V is full of examples of ALJ McNeil's selective and one-sided presentation of the evidence.  One glaring example is ALJ McNeil's mischaracterization of former director Bruce Byl's testimony to find that the Bank's board was unaware of the nature and extent of the Nielson relationship until after 2009.  R.D. at 81.[27]  Byl oddly testified that he was unaware of the interrelationship of the Nielson loan until sometime in 2012 after a meeting with the FDIC.  Tr. 1049–50.

There are several problems with this testimony, all of which ALJ McNeil conveniently ignores.  First, it lacks credibility.  The extent of the Nielson loans and the interrelationship of the borrowers was carefully discussed in the 2008 and 2009 ROEs.  Jt. Exs. 1 & 2.  As a board member, Byl signed the ROEs certifying he had read them.  Byl also testified:  "I reviewed them; I was very intrigued.  I had a deep-seated success in the Bank and I found them to be very interesting, and enlightening."  Tr. 1049.  Byl testified he was sure he had reviewed the 2008 ROE.  Tr. 1051.  But when shown the 2008 ROE identifying over $31 million in Nielson-related

---

[27] ALJ McNeil relies on former director Byl for this conclusion:  "Mr. Byl testified that at no time before the Bedrock loan application was presented to him did anyone at the Bank ever discuss the Nielson loans at any of the board meetings he attended, or with him separately as a board member."  R.D. at 67.

loans, Byl implausibly denied knowing of the Nielson Loans. Rather than allowing Respondent's counsel to probe this inconsistency, ALJ McNeil immediately shut down further questioning: "That's the end of the line of questioning." Tr. 1053. Byl also testified he remembered the 2009 ROE. Tr. 1053. Yet when shown pages from the ROE detailing $36 million in Nielson loans as special mention, he again denied knowing who the Nielsons were. Tr. 1057. ALJ McNeil again foreclosed any further questions related to these loans. Tr. 1058. Why did ALJ McNeil feel compelled to shut down questioning of Byl along these lines? The answer became clear in his Recommended Decision, which rested in part on the premise that Respondent kept board members in the dark about the Nielsons and the Bedrock Transaction.

Of the four board members who testified, Byl was the only board member to disclaim knowledge of the Nielsons. Byl's testimony conflicted with that of the other three Board members who testified and simply was not credible. Byl had approved every Nielson loan while a member of the board and, consistent with his obligations as a board member, reviewed several ROE's that specifically identified the Nielson loans. Respondent in his testimony testified that not only were the Board members fully aware of the Nielson relationship, but it was inconceivable any Board member could deny not knowing given the extensive discussion of the Nielson loans in the 2008 and 2009 ROEs. Tr. 1294 (Calcutt). The testimony of Swanson, another board member, was that the Board, in fact, knew about the Nielsen loans, yet ALJ McNeil mentioned this nowhere in reaching this conclusion. Tr. 534–37. This omission was no oversight. The Swanson testimony was featured in Respondent's post-hearing brief at page 7 and Reply Brief at pages 9 and 20. ALJ McNeil subsequently acknowledged the Swanson testimony: "Mr. Swanson stated by November 2009, if not before, he became aware that the Nielson aggregate debt was very substantial, in the $40 million range. He said that the matter

73

came up not as 'a question that I had, but Scrub Calcutt explained that this [i.e., the October 31, 2009 Commercial Loan Delinquency Report] is largely the Nielson credits.'" R.D. at 110 (footnote omitted); Tr. 523–24. Such an unexplained and selective portrayal of evidence reflects ALJ McNeil's bias.

As another example, ALJ McNeil found that "Respondent was aware of the June 30, 2011 letter from Mr. Jackson, was actively involved in contributing to the response, and knew at the time the letter was issued that it contained false and misleading information regarding the performance of the Nielson Entities loan portfolio." R.D. at 38–39; EC Ex. 44. There is not a scintilla of evidence that supports this conclusion. While Jackson's reaction to the "prudent banking criticism" was poorly worded, the letter in fact identified the problems with the Nielson relationship on page 8. EC Ex. 44 at 8. Moreover, there was no evidence linking Respondent to this letter. ALJ McNeil found that another letter authored by Jackson "concerns only Mr. Jackson" and is therefore "beyond the scope of this recommended decision." R.D. at 90. But for this letter, which also bore no connection to Respondent, ALJ McNeil permitted Miessner to speculate that Calcutt knew about the letter, Tr. 845, and then used her testimony as a bootstrap to conclude that Calcutt knew about alleged misstatements in the letter, R.D. at 58. Other than Miessner's self-evident speculation, there is no evidence in the record to support this finding. To compound the problem, ALJ McNeil later refused to allow Respondent to testify regarding the letter to rebut Miessner's speculation. Tr. 1302–03.

As a further example, ALJ McNeil concluded Respondent deceived Bank regulators by "knowingly issuing false Call Reports." R.D. at 39. This, too, lacks support in the record. Respondent had nothing to do with the preparation of Call Reports, which were prepared by CFO Tom Levi, had nothing to do with classification of assets, and was unaware of the contents of the

74

Call Reports.  Tr. 1245–46, 1301; Stip. Tr. 1621, 1635.  Enforcement Counsel did not offer the Call Reports as exhibits, and no witness or exhibit connects Respondent to the Call Reports withheld by Enforcement Counsel.  ALJ McNeil attributes the issuance of the Call Reports to Respondent despite the lack of any evidentiary support and ***by hiding that his sole evidence is from the 2015 hearing, which cannot be considered***.  *See supra* Section IV.A.2 n.6.  Such chicanery reveals ALJ McNeil's bias.

**Improper Credibility Determinations**.  Not only did ALJ McNeil mischaracterize the evidence, he also made improper credibility findings.  For example, ALJ McNeil concluded that Respondent's testimony that did not know how the funds from the Bedrock Transaction were routed through special deposit accounts in 2009 was inconsistent with his testimony regarding advice given on inter-company lending in 2008.  *See* R.D. at 42.  As an initial matter, there is nothing inconsistent because the testimony concerns different topics and time periods.  That Respondent provided advice related to responding to regulatory concerns due to inter-entity borrowing in 2008 does not mean that he was involved with how Bill Green decided to disburse a single loan a year later.  Stip. Tr. 48–53.  And as the evidence shows, Green worked with his assistant Dolores Haase as well as Autumn Berden to route the funds into special deposit accounts.  EC Ex 3.  Not a single e-mail or snippet of witness testimony shows Respondent's involvement with disbursement.  Rather than acknowledge this lack of evidence, ALJ McNeil besmirches Respondent's credibility based on a non-existent inconsistency to make an adverse finding.  That is improper bias.

ALJ McNeil also mounted an unjustified attack on Respondent's demeanor at the hearing.  According to ALJ McNeil, he "found nothing remarkable in the demeanor of any witnesses in this enforcement action that would support or take away from reliance on their

75

testimony." R.D. at 68. Despite this statement that demeanor evidence did not alter the credibility of any witness, he still found Respondent "evasive in response to some questions." This irrelevant finding shows ALJ McNeil's bias. *See Sutherland*, 322 F. Supp. 2d at 293.

Further, with respect to whether the phrase "working capital" adequately described the 2009 Bedrock Loan, ALJ McNeil claimed Respondent "equivocated" whereas another witness told the truth when they both gave the same testimony. R.D. at 61. Autumn Berden testified "[a] small portion" of the loan was for working capital while other portions were for other entities' working capital. *See* Tr. 104 (Berden). Respondent testified similarly—and accurately—stating that "working capital" "may have captured a portion" of the loan's meaning but not the entirety. Tr. 1307 (Calcutt). This is not an equivocal answer. It is an accurate, straightforward portrayal supported by the same testimony given by Berden. Only the ALJ's bias explains how he could find Respondent's testimony "evasive" while fully crediting similar testimony from a witness called by Enforcement Counsel.

While discussing personal guarantees, ALJ McNeil once again misconstrues the record in order to discredit and personally attack Respondent. ALJ McNeil claims, "Mr. Calcutt added that he did not believe guarantees would have improved the position of the Bank, although he offered no basis for this belief" and this belief "calls into question whether Mr. Calcutt has the requisite skill and knowledge to provide regulated banking services in any environment protected under the FDI Act." R.D. at 70, citing Tr. 1275 (Calcutt). ALJ McNeil misconstrues Respondent's testimony and his insinuation is baseless. Respondent stated that personal guarantees would not improve the position of the Bank in this situation because for "these individuals, much of their financial net worth was tied up in other LLCs or other entities" and thus "many of their assets weren't in their personal name." Tr. 1275 (Calcutt). Thus, contrary to

76

**A421**

ALJ McNeil's gratuitous invective, Respondent provided a reasoned, common-sense explanation why personal guarantees would not have meaningfully improved the Bank's position.

As another example of ALJ McNeil's unnecessary and gratuitous credibility findings, ALJ McNeil offered the irrelevant observation that he did not find Dick Jackson credible. *See* R.D. at 89–90. But Jackson was not even present at the hearing; nor is he a Respondent in this case, as he settled with the FDIC five years ago. Nonetheless, ALJ McNeil relies upon undescribed and uncited "preponderant evidence set forth above" to find that Jackson made a "material misrepresentation"—without discussing how it was material nor how it was a misrepresentation. Thus, once again, rather than confront or describe any evidence supporting his conclusion, the ALJ simply attacks the person to find against him. That is further evidence of bias.

Finally, ALJ McNeil attempted to bolster the credibility of FDIC witnesses improperly. He "found no evidence that recollections by either Mr. Byl or Mr. Swanson had been clouded by time – this may be due in part to the fact that both gave almost exactly the same sworn testimony in 2015." R.D. at 68. But Byl did not testify in 2015. The ALJ's credibility determinations should be rejected, and they further demonstrate his improper bias.

## V.    THERE IS NO BASIS TO REMOVE RESPONDENT BECAUSE THE ALJ's FINDINGS OF FACT ARE UNWARRANTED IN BOTH FACT AND LAW

### A.    Legal Standard

"Courts have recognized that the power to remove a bank officer is an extraordinary power that should be carefully exercised in strict accordance with the law." *Seidman v. OTS*, 37 F.3d 911, 929 (3d Cir. 1994). Thus, under Section 8(e) of the Federal Deposit Insurance Act, 12 U.S.C. § 1818(e), "before an agency regulating a banking institution can impose this ultimate administrative sanction on any banker, it must show by substantial evidence that: (1) the banker

has committed an unlawful ***act***; (2) ***the act*** has either an adverse effect on the regulated

institution or its depositors or confers a benefit on the actor and (3) ***the act*** is accompanied by a

culpable state of mind." *Seidman*, 37 F.3d at 929 (emphasis added). In other words, the FDIC

must show misconduct "***accompanied by*** at least one of the three prohibited effects and at least

one of the two specified culpable states of mind." *Id.* (emphasis added); *accord Oberstar v.*

*FDIC*, 987 F.2d 494, 500 (8th Cir. 1993).

### B.    ALJ McNeil's Recommendation Fails to Analyze and Connect the Statutory Elements Required to Justify Removal and Prohibition for Each Act.

***Finding***: *Respondent should be removed and prohibited from banking. (R.D. at 3–9; R.D. at 122–24; R.D. at 125; Findings of Fact 1, 2, 3, 4, 5, 6, 7, 8, & 9; Conclusions of Law 5, 6, 7, 8, 9, 10, 11, & 12.)*

ALJ McNeil's Recommended Decision provides a rudimentary analysis of the standard,

limited mostly to boilerplate as to whether the Board should issue a prohibition order. The

analysis runs only two-and-a-half pages. *See* R.D. at 122–25. The sole analysis on the

misconduct prong is, "[e]vidence detailed above established Respondent engaged in both unsafe

and unsound banking practices, and breached fiduciary duties he owed to the Bank." *Id.* at 122.

The same is true of the effects prong. *Id.* ("Enforcement Counsel have by preponderant evidence

established Respondent's misconduct caused the Bank to suffer, and made it probably [*sic*] that

the Bank would suffer, financial loss and other damage; and that Respondent received financial

gain because of his misconduct."). And with respect to the personal dishonesty, the ALJ

includes only two additional sentences. *See id.* at 123.

ALJ McNeil's failure to explain his "reasons or basis . . . on all the material issues of fact

[or] law" violates the APA. 5 U.S.C. § 557(c)(3)(A) (requiring reasoning for "[a]ll decisions,

including initial, recommended and tentative decisions"). ALJ McNeil "only listed the facts and

stated conclusions, but did not connect them in any rational way." *Dickson v. Sec'y of Defense*,

68 F.3d 1396, 1407 (D.C. Cir. 1995).  Given the lack of reasoning, Respondent cannot fully understand the basis for ALJ McNeil's ruling, which makes it all the more difficult to challenge substantively and which, in turn, inhibits the Board's ability to meaningfully review the recommendation and the evidence.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  Because there is no way to meaningfully challenge and review the ALJ's ruling without an adequate explanation, the Board should reject the ALJ's Recommended Decision entirely.

The only discernable analysis provided by the ALJ is his summary findings of fact.  *See* R.D. at 3–7.  These are confused, however, by the ALJ's citation to various sections in the opinion that often do not correlate to the findings, as discussed below.  More importantly, the ALJ fails to connect any of the effects or scienter with the claimed misconduct and thereby fails to recommend any valid basis upon which to remove Respondent.  Each basis of misconduct must be accompanied by both an effect and a scienter tied to that particular act.  *See Seidman*, 37 F.3d at 929.  "It is important . . . in imposing sanctions to separately compare the act under consideration with all of the elements of each category.  The [ALJ's] failure to do so is a source of many of the problems and much of the confusion in this case."  *Seidman*, 37 F.3d at 933, n.30.

Because of his failure to connect an effect or scienter with misconduct, ALJ McNeil fails to recommend any basis to remove Respondent.  In summary Findings of Fact 1.a, 1.b, and 1.d, the ALJ finds the Bedrock Transaction and 2010 Transaction releasing Pillay Collateral were unsafe practices and breached his fiduciary duty.  But the ALJ does not recommend any finding that the Respondent engaged in those Transactions with the requisite scienter; the ALJ's findings of scienter relate only to the alleged concealment.  *See* R.D. at 6 ("Respondent persistently concealed . . ."; "Respondent envisioned . . . protocols that would withhold [information] . . .";

79

A424

"Respondent . . . persistently ensured the true group nature of the Nielson Entities would be hidden . . ."; "Respondent's conduct – notably the continued concealment . . .").  As will be discussed, no facts show that those transactions were personally dishonest or demonstrated disregard for the Bank.

In Findings of Fact 1.c and 1.f, ALJ McNeil claims Respondent failed to disclose information to the Board and regulators.  The ALJ, however, has not identified any effect caused by that misconduct that is within the Notice.  Rather, the ALJ relies solely upon causing "other damage," which is not alleged.  *See* R.D. at 5 ("Respondent's actions in concealing the true nature . . . caused other damage to the Bank"); *supra* Section IV.B.  Further, the ALJ does not make any findings related to the reasonably foreseeable risk associated with the alleged concealment.  *See* R.D. at 7.

Finally, with respect to summary finding of fact 1.e regarding Respondent's claimed failure to heed regulatory criticism, that itself is not within the Notice nor has the ALJ made any findings connecting that failure to an effect or a scienter.  Because the ALJ has not recommended any basis within the Notice upon which to remove Respondent, the Board should dismiss the proceedings.[28]

### C.    Respondent Did Not Engage in Any Unsafe and Unsound Practices.

While Section 8(e) fails to define "unsafe or unsound practice," federal circuit courts and the Board have held that "an unsafe or unsound practice has two components: (1) an imprudent act (2) that places an abnormal risk of financial loss or damage on a banking institution." *Seidman*, 37 F.3d at 932; *In the Matter of Michael R. Sapp*, 2019 WL 5823871, at *13 (FDIC

---

[28] The Board should not correct this error.  The purpose of requiring ALJs to state their conclusions is to provide a meaningful opportunity to take exceptions with certain rulings to the Board.  5 U.S.C. § 557(c)(3)(A).  For the Board to write an opinion correcting this error without giving Respondent the opportunity to take exception negates this procedural right.

Sep. 17, 2019); *accord Dodge v. Comptroller of Currency*, 744 F.3d 148, 156 (D.C. Cir. 2014);

*Johnson v. OTS*, 81 F.3d 195, 201 n.8 (D.C. Cir. 1996). An imprudent act is one "that is contrary

to generally accepted standards of prudent operation." *In re Sapp*, 2019 WL 5823871, at *13

(quotation omitted). An "abnormal risk of financial loss or damage" to a bank is a risk that

threatens "the ***financial stability*** of the banking institution." *Seidman*, 37 F.3d at 928 (emphasis

added); *accord Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish v. Fed. Home Loan Bank Bd.*,

651 F.2d 259, 267 (5th Cir. 1981) (an "unsafe or unsound practice" is one that "threaten[s] the

financial integrity" of the bank); *Dodge*, 744 F.3d at 15 (misconduct must threaten the bank's

"financial integrity") (quotation omitted); *Johnson*, 81 F.3d at 204 ("Clearly, the fact that an act

results in an 'actual loss' does not, by itself, establish that the act posed an ***abnormal risk to the***

***financial stability or integrity of the institution***.") (emphasis added); *Hoffman v. FDIC*, 912

F.2d 1172, 1174 (9th Cir. 1990).

In the Recommended Decision, ALJ McNeil claims that Respondent engaged in three

unsafe and unsound practices. *See* R.D. at 3–4 (Findings of Fact 1.a, 1.b, and 1.c). Respondent

takes exception to these summary findings as well as their supporting sections, because the

evidence does not support that Respondent engaged in any unsafe and unsound practices.

### 1. Authorizing the 2009 Bedrock Loan Transaction Was Not an Unsafe and Unsound Practice

***Finding:*** *"Respondent authorized the 2009 Bedrock Loan transaction, knowing that the proceeds would be paid to entities that lacked the ability to repay the funds as disbursed." (Finding of Fact 1.a, R.D. at 3 & n.10; R.D. at Part II, Sections 5.A, C.1, G–L; Conclusion of Law 6; R.D. at 122.)*

In ***Finding of Fact 1.a***, ALJ McNeil recommends that the Board find Respondent

engaged in an unsafe practice when he "authorized the 2009 Bedrock Loan transaction, knowing

that the proceeds would be paid to entities that lacked the ability to repay the funds as

disbursed." R.D. at 3. For support, ALJ McNeil cites Part II, §§ 5.A, 5.C.1, and 5.G–L. *See*

R.D. at 3 n.10. Respondent takes exception to these portions of the Recommended Decision, as the evidence shows that the 2009 Bedrock Loan transaction—the disbursement of a $760,000 loan to Bedrock Holdings and payment of $600,000 Pillay cash collateral to the Bank—was ***not*** an imprudent act that threatened the Bank's financial stability.

### a.    The Bedrock Transaction Was Prudent.

The Transaction was a prudent act because it was the best alternative at the time. In late 2009, the Nielsons and the Bank were facing the perfect storm. Tr. 164 (Berden). The Bank was actively working to reduce its exposure to the Nielson relationship in response to regulatory criticism, while the Great Recession made that impossible. *Id.*; Tr. 1275–76 (Calcutt) (in response to regulatory criticism, the Bank "told [the Nielsons] about the issue and suggested they look for other financing"); Tr. 56–57 (Berden) (Nielsons tried to refinance at other banks but were unable because of the crashing real estate market). As their loans came due in September 2009, the Nielsons requested a reduction of debt service, short sales, loan forbearance, reduction in interest payments, and deeds-in-lieu of foreclosure. Tr. 129 (Berden); Tr. 986–87 (Nielson); EC Ex. 3, at 8. When the loans matured, the Bank could have accepted the Nielson's offer of deficiency waivers and deeds-in-lieu. But these options would have resulted in sure losses to the Bank. *See* Tr. 320–21 (Gomez) (testifying that bank taking of property typically diminishes the prospects for sale of the property and diminishes the price). Alternatively, the Bank could have foreclosed on the Nielson Loans at the nadir of the Great Recession and housing crisis. Foreclosure, however, presented tremendous uncertainty and sure losses. Tr. 304–05 (Gomez) (testifying that foreclosure is not a preferred outcome). Instead, the Bank pursued a third course—it agreed to the Bedrock Transaction as a means of working with the borrower and providing time for the economy to recover. Tr. 166 (Berden). In 2009, the FDIC was encouraging banks across the country to work with borrowers rather than institute foreclosure

82

proceedings. Tr. 305 (Gomez); Tr. 832–34 (Miessner).  Thus, given the choices facing the Bank, the Bedrock Transaction was the best option to minimize risk, reduce the possibility of losses, and work with the borrower during an unprecedented economic downturn.

In addition, the Transaction was prudent and in line with generally accepted banking procedures because it was properly underwritten and secured.  As to underwriting, the Bank properly evaluated Bedrock Holding's ability to repay the $760,000 loan.  Based on previous conversations with the Nielsons, the evidence showed that Bedrock had $30 million in assets and the Nielson Entities had $7 to $9 million in cash or cash equivalents. Tr. 34–35; EC Ex. 135; R. Ex. 2.  The Nielsons also reported in May 2009 that Bedrock's "annual cash flow available for debt service [was] now about $866,000." R. Ex. 15.  During conversations with the Nielsons in the fall of 2009, the Bank also requested and the Nielsons provided "Net income/Cash Flow analysis for Bedrock Holdings."  *See* EC Ex. 3, at 111.  According to that cash flow analysis and Autumn Berden, Bedrock showed "positive cash flow based on Bedrock itself and its investment in Team Services," which was another Nielson Entity.  Tr. 80 (Berden); *see also* EC Ex. 3, at 112; EC Ex. 38, at 11 (FDIC visitation report acknowledging that "[t]he cash flow analysis [for Bedrock] . . . was performed as of September 2009.").  Bank employee Ian Hollands also prepared a detailed cash flow, collateral, and financial analysis of Bedrock.  Jt. Ex. 6.  Examiner Bird reviewed the Bank's collateral and cash flow analysis, passed the loan as no regulatory concern of loss,[29] and had no problem with the absence of a global cash flow.[30]  Stip. Tr. 902–

---

[29] Mr. Bird's testimony that he would have flagged the overall Nielson lending relationship had he known the purpose of the Bedrock Loan does not change the fact that the Bedrock Loan itself was passed based on the strong underwriting and collateralization of the loan.  *See* Stip. Tr. 795–99 (Bird).

[30] That the Bank did not conduct a global cash flow analysis does not change the fact that the Bedrock Loan itself was properly underwritten.  There was no need for a global analysis of all Nielson Entities to understand the Nielson's financial ability to repay a small $760,000 loan,

03; Tr. 311–314 (Gomez); EC Ex. 20 at 12.  The loan was also well-secured as the Bank

received new collateral of over $2 million at 59% LTV (Bird calculated 58%).  Stip. Tr. 902–03;

Jt. Ex. 6.  And the Bank received updated appraisal information while discussing the Bedrock

Transaction with the Nielsons.  According to Autumn Berden, the amount of the Bedrock loan

increased from about $738,000 to $760,000 because "[w]e would have gotten a new appraisal on

the property and the Bank was willing to go up to 65 percent loan-to-value ratio, and [the

$760,000 loan] probably reflects the appraisal."  Tr. 87 (Berden).

   As the Eleventh Circuit held, "[t]aking corrective actions to minimize the risk of loss on

improvident loans is not conduct contrary to accepted standards of banking operations which

might result in an abnormal risk to a banking institution."  *Doolittle v. Nat'l Credit Union Ass'n*,

992 F.2d 1531, 1538 (11th Cir. 1993).  The Eleventh Circuit reversed the NCUA's prohibition

order:

> After Doolittle became aware of the problem loans, he took steps that he judged
> to be sufficient to prevent further escalation of the situation.  Hindsight reveals
> that he did not do enough, but he cannot be held to have breached his fiduciary
> duty [or engaged in an unsafe practice] simply because his underlings failed to
> follow his orders.  The loans were current at the time Doolittle took the actions for
> which he is now prosecuted.  When the loans defaulted, he informed the Board of
> Directors and took action to reduce Bay Gulf's losses.

*Doolittle*, 992 F.2d at 1537.  The same is true here.  Respondent engaged in the Bedrock

Transaction, believing it was prudent under the circumstances, and then trusted Bank employees

to properly document the Transaction.  He kept the board informed throughout, and when the

---

given the lack of personal guarantees, the Bank's reasoned judgment that the Nielson's new
management was posturing, Bedrock's cash flow as seen in the September 2009 cash flow
statements provided by the Nielsons, and in view of the newly obtained collateral.  Moreover, the
fact that certain Nielson Entities *received* funds from the Bedrock Transaction does not require
the Bank to evaluate those Entities' financial statements.  Only Bedrock was obligated to repay
the loan, so only its financial statements and cash flow needed to be evaluated.

situation became irreparable, Respondent caused the Bank to initiate foreclosure to reduce the Bank's losses.

### b. The Bedrock Transaction Did Not Create an Abnormal Risk to the Bank's Financial Stability.

Nothing in the Recommended Decision demonstrates that the well-secured Bedrock Transaction presented an abnormal risk of financial loss or damage that threatened the financial stability of a profitable, well-capitalized Bank. As an initial matter, whether a certain action creates a risk of financial instability cannot be assessed in a vacuum. Rather, the risks created by a certain action must be assessed in relation to then-existing risks created by other courses of action. If the risk of financial instability already existed or was the result of other actions, then a respondent's alleged act could not have entailed a reasonably foreseeable risk of financial instability for which he may be removed. *See Kaplan v. OTS*, 104 F.3d 417, 421 (D.C. Cir. 1997) (to prove an unsafe practice, the banking agency "must show . . . behavior that creates an undue risk to the institution . . . [and a]ny such risk must of course be reasonably foreseeable."); *de la Fuente v. FDIC*, 332 F.3d 1208, 1225–26 (9th Cir. 2003).

In the fall of 2009, the Nielsons withheld payment on all of their loan obligations to the Bank. EIC Gomez acknowledged that, at that point, the risk already permeated the relationship.[31] *See* Tr. 311 (Gomez) ("Q. The risk of the other loans, the [Nielson] relationship

---

[31] Despite allowing this testimony from Gomez, the ALJ ruled that Miessner's testimony regarding the "risk of loss [inherent] in 2009 in the Nielson portfolio regardless of the Bedrock Loan" was speculative. Tr. 836 (Miessner). Miessner, however, testified as an expert in the same vein that the Bedrock Transaction *increased* the risk of loss. Tr. 835–36. As an expert, Miessner already was speculating regarding her opinion on risk. Respondent's counsel should have been able to elicit testimony regarding the baseline risk from which the risk increased, but the ALJ foreclosed this line of questioning. Tr. 836–37. In any event, the only supportable conclusion is that the Nielsons' decision to stop making payments is the baseline risk, and the Bedrock Transaction *decreased* the risk associated with the Nielson portfolio by stabilizing the portfolio during the Great Recession.

already existed in December of 2009, did it not?  A. Yes, it did – yes, they did.").  The issue then is whether the Bedrock Transaction created a reasonably foreseeable risk to the financial institution against the backdrop of a borrower refusing to pay its obligations to the Bank unless the Bank reached an accommodation with the borrower.  The Bedrock Transaction did not create or exacerbate any such risk.  Rather, the Bedrock Transaction stabilized the Nielson lending relationship and allowed the Bank and the borrower to wait out the worst of the Great Recession.  *See* Tr. 166 (Berden).  As addressed above, the Bedrock loan was both properly underwritten and secured.  When the Bank "received 3 updated appraisals for Bedrock," in 2011 they "came back for more than . . . the bank's estimated value."  R. Ex. 166.  Gomez told Anne Miessner that the "Bedrock: [n]ew appraisals showed sufficient value.  **No loss.**"  R. Ex. 167 (emphasis added).  And the $760,000 Bedrock loan was a mere fraction of the Bank's overall $800+ million loan portfolio.  Clearly, a well-secured $760,000 loan did not threaten the Bank's financial stability.  *See Seidman*, 37 F.3d at 929 (bank's imprudent financial commitment of $375,000—at least $630,000 adjusted for inflation to 2009—was not an unsafe practice because it did not pose "such an abnormal risk that [the Bank's] financial stability was threatened").

Moreover, despite the allegations in the Notice that the decision to extend the Bedrock Transaction was riskier than foreclosing in 2009 because "the overall value of the collateral securing the Nielson Loans has significantly deteriorated," Notice ¶ 53, the FDIC failed to adduce any such evidence during the hearing.  EIC Gomez could not say whether the Bank recovered more or less money from the Nielsons as a result of the Bedrock Transaction.  Tr. 322.  And neither Gomez nor Miessner knew whether it was better to foreclose 2009 or 2011.  Tr. 321–22 (Gomez), 836 (Miessner).  As the Notice recognized, such evidence is critical to assessing whether the Bedrock Transaction presented an abnormal risk of loss as compared to the

available options and existing risks in 2009.  Without any evidence about available options and pre-existing risks, there is no basis to remove Respondent for authorizing the Bedrock Transaction.

Far from creating a risk, the Bedrock Transaction significantly benefited the Bank.  It resulted in the Bank receiving about $1.26 million in interest and principal payments from the Nielsons over the course of the next year.  *See* EC Ex. 67.[32]  The Bank also received $1,289,000 in Pillay Collateral, which was a significant benefit given the questions about the Bank's tenuous security interest.[33]  Gomez and Miessner both acknowledged that the Bank receiving the Pillay money voluntarily was a good thing and that it was better to use the Pillay Collateral to pay off the loans than to lose it because of the inability to perfect the Bank's interest.  Tr. 319–20 (Gomez).  As a result of receiving this money, the Transaction achieved the goal of reducing the Bank's overall exposure to the Nielson Entities.  Because of the Transaction, "[t]otal principal reductions for [the Nielson Entities was] just under $2 million from 12/31/09 to 12/31/11 with approximately $1.32 million of this attributable to real estate sales by" several Nielson Entities including Bedrock Holdings.  EC Ex. 77, at 8.  Given these substantial benefits, no reasoned analysis can support that the Bedrock Transaction was an unsafe and unsound practice.  To the contrary, even when the FDIC mandated aggressive write-downs on the Nielson debt (but not Bedrock), the Bank ***remained profitable and well capitalized*** throughout the worst economic recession since the 1930s.  Tr. 802–03; EC Ex. 79.  That is a testament to the Bank's safe and

---

[32] The Bank received $3.3 million from the Nielsons from September 2009 to December 31, 2010.  EC Ex. 67.  Less the Bedrock Loan and Pillay Collateral, the Nielsons paid about $1.26 to the Bank.

[33] *See* Tr. 377–78 (Bimber testifying, "There probably was not a proper perfection of a lien on [Pillay] . . . or if, if there were perfection, it's something that would involve great difficulty in enforcement" because of the odd structure of the Pillay Collateral).

effective underwriting procedures, negating any suggestion that the Bedrock Transaction was an unsafe or unsound practice.

### c.    ALJ McNeil Fails to Recommend Any Basis to Find the Bedrock Transaction Was Unsafe and Unsound.

ALJ McNeil completely ignored the foregoing evidence.  He instead recommended that the Board remove Respondent because Respondent supposedly "authorized the 2009 Bedrock Loan transaction, ***knowing that the proceeds would be paid to entities that lacked the ability to repay the funds as disbursed***."  R.D. at 3 (emphasis added).  The Board should reject the ALJ's recommendation for several reasons.

First, even assuming that Respondent authorized the Transaction knowing that the Nielson Entities would not repay the funds, the ALJ does not discuss how it created an undue risk to the Bank.  For the reasons just discussed, no evidence shows that the Transaction created an undue risk to the Bank.  The Bank's financial stability was not threatened, given the size of the loan and the Bank's strong security position.

Second, neither the Notice nor the evidence supports the ALJ's finding that Respondent *knew* the Nielson Entities would be unable to repay the funds.[34]  As discussed, the Notice contains no allegations that Respondent knew the Nielsons lacked an ability to repay the loan.  Rather, the purpose of the Bedrock loan was to help the Nielsons buy some time so they could resume making payments as their situation improved, which they did.  *See* Notice ¶¶ 18–20, 39.

The evidence adduced at the hearing also contradicts the ALJ's recommendation.  Respondent reasonably believed that the Nielsons could and would repay the Bedrock Loan.

---

[34] To the extent the ALJ's summary finding relates to the use and voluntary payment of $600,000 of cash collateral from Pillay Trading, such a finding is illogical.  The $600,000 was paid directly to the Bank as soon as it was released in order to bring the Nielson Loans current.  Thus, the $600,000 never left the Bank; it was not paid to entities that lacked an ability to repay the funds.

Based on prior representations by the Nielsons, Respondent understood they had "roughly $140 million of fair market value assets, but $112 million of book value assets . . . [and] they had 7- to $9 million in cash or cash equivalents." R. Ex. 2, at 2; Tr. 1273–74 (Calcutt). The Nielsons also reported in May 2009 that Bedrock's "annual cash flow available for debt service [was] now about $866,000." R. Ex. 15. The Nielsons made additional representations in May 2009 regarding their ability and willingness to pay down their debt such as "[a]lthough this economy is not a favorable environment, our business is holding up quite well." R. Ex. 12.

During the negotiations that led up to the Bedrock Transaction, even while saying they needed debt restructure, the Nielsons made numerous representations affirming their intention to repay the Bank in full on all of their debt if the Bank worked with them through the Great Recession. In an e-mail, Cori Nielson said, "it would be our intention to pay Northwestern fully 100% cash back" and that "our entities would resume payments until Northwestern is completely paid in full including the back interest." EC Ex. 3, at 89. Further, she stated that although Respondent "may believe that [the Nielson family] has cash sitting somewhere . . . [to] use for debt service," "[s]ome of our non-debtor entities/individuals may have a small amount of cash remaining . . . [and they] could be willing to loan/contribute the remaining available cash for the purpose of sustaining the basic operations of various of our entities through this recession. . . ." *Id.* at 90. In other words, Cori proposed that non-debtor family members and entities "loan/contribute" their cash to cover the debtor Nielson Entities' loan service to the Bank.[35]

---

[35] The ALJ's reliance on Ms. Nielson's testimony that the Nielsons "had no intention to do things that were not part of the documentation of the loans" is wrong. R.D. at 21. The contemporaneous documentation that she herself put together shows the Nielsons' intention to use money that they were not obligated to use to fund debt service. In fact, Cori Nielson told Bill Green, Mike Doherty, and Dick Jackson that the owners of Nielson Entities "have been funding their negative cash flow" during a 2010 meeting. R. Ex. 205, at 5.

Because of these conversations, Respondent "didn't have any doubts [the Nielsons' debt] would be repaid because they had communicated more than once that they would repay us." Tr. 1295 (Calcutt); *see also* Tr. 1283 (Calcutt) ("Q. What was your position overall with regard to what you expected the Nielsons to do in terms of honoring their obligation?  A. Well, knowing that they had significant financial resources, we expected them to repay their loans.  With interest."); Tr. 1282 (Calcutt) (Q. "[W]as it your belief that the family did have cash?  A. Yes.  Yes.").

Far from knowing that the Nielson entities could not repay the Bedrock Loan, Respondent—and everyone at the Bank—believed the Bedrock Transaction was in the best interests of the Bank.  Respondent testified, "at the time I thought it was the right thing to do to make the Bedrock Loan because they did have financial resources . . . ." Tr. 1296 (Calcutt). According to Respondent, he believed the Bedrock Transaction was the right thing to do "because it left the door open for [the Nielsons] finding another bank which we had requested, to refinance some of these loans.  It gave us time in hope that they would repay, pay off some of these loans or sell the underlying collateral for some of these loans and use the proceeds to pay the loan off.  And also they had Team Services' cash flow that we knew was there and that would have been available to service the debt, not to mention their oil and gas cash flow." Tr. 1297 (Calcutt).  Similarly, as the ALJ finds, Jackson testified that Bank management believed the "new young [Nielson] management . . . were kind of flexing their muscles, pushing their limits to see how much they could get away with [] the lender. . . . And that if we would take the time to work with them in good faith, you know, we could get over this and get them to see the light and come back and do what they had committed to do for us."  R.D. at 91–92 (quoting Stip. Tr. 1687–88 (Jackson)).

Additionally, the testimony of Berden and Nielson further shows that the Nielsons intended to repay the loan.  On cross-examination, Autumn Berden agreed with the statement, "[T]he hope was that by providing for this [Bedrock] loan where the Nielsons would pick up repayment again in April, the time would pass and that you would be able to sell property again; the market would improve and that everyone would be in a better economic position."  Tr. 166 (Berden).  Similarly, Cori Nielson testified that she intended that the Nielsons "are going to repay the Bank 100 percent" when "the economy is recovered and [the Nielsons] are now back on [their] feet."  Tr. 993 (Nielson); *see also* R.D. at 21 ("Ms. Nielson agreed [that] . . . if the Bank (through Mr. Calcutt) would work with her, it was her intention and objective to make sure the Bank got fully repaid.").  Moreover, there is no contrary evidence that the Nielsons ***did not intend*** to repay the loan.  It is thus farfetched to suggest that Respondent ***knew*** the Nielson entities lacked the ability to repay the funds when the Nielsons themselves communicated to the Bank that they would repay the Bedrock loan.

Finally, nothing in the specific sections cited by the ALJ for support demonstrates that the 2009 Bedrock Transaction was an unsafe and unsound practice.  *See* R.D. at 3 n.10, citing R.D. Part II, §§ 5.A, C.1, G–L.  As an initial matter, Part II, § 5.C.1 is irrelevant and concerns whether Respondent "engaged in other efforts to deceive Bank regulators . . . as alleged in Paragraphs 54 through 107 in the Notice of Intention."  R.D. at 39.

Part II, § 5.A contains no support for the ALJ's summary finding.  This section discusses the negotiation and consummation of the Bedrock Transaction.  *See* R.D. at 18–26.  If anything, the section demonstrates that Respondent believed the Nielsons would repay the Bedrock Loan.  The Recommended Decision finds that "during the relevant period, the [Nielson] holdings' value was approximately $112 million . . . and $80 million available for collateral purposes or for

payment on loans." R.D. at 19. It also finds that Cori Nielson sent Respondent an e-mail requesting the Bank "suspend monthly payments until our cash flow returns with the expectation that once the flow returned our entities would resume payments until Northwestern is completely paid in full including back interest." R.D. at 21. In accordance with the foregoing, the Recommended Decision also finds that "Mr. Calcutt . . . *testified that he had no doubt that the Bank would be repaid*, opining that statements to the contrary by Ms. Berden or Ms. Nielson constituted nothing more than posturing because they did have the funds." R.D. at 23 (emphasis added). This finding directly contradicts the ALJ's summary finding that Respondent *knew* the Nielson Entities would not repay the Bedrock Loan. As with the evidence above, both the Bank and the Nielsons reached this Transaction believing it was in their best interests and would be repaid once the economy recovered from the Great Recession.[36]

### 2. Authorizing the December 2010 Use of Collateral Was Not an Unsafe and Unsound Practice.

***Finding:*** *"Respondent authorized the December 2010 transaction by which funds held as collateral for the Bank were to be paid to entities that lacked the ability to repay the funds as disbursed." (Finding of Fact 1.b, R.D. at 4 & n.11; R.D. at Part II, Sections 5.C, F, L, P–R; Conclusion of Law 6; R.D. at 122.)*

In December 2010, the Bank received about $690,000 in cash collateral held by Pillay Trading LLC (the "Pillay Collateral") and used that money to bring current all of the Nielson loans that had been past due since September 2010. Answer ¶¶ 44–45. In summary ***Finding of Fact 1.b***, the ALJ recommends that the Board remove Respondent because he "authorized the December 2010 transaction by which funds held as collateral for the Bank were to be paid to

---

[36] Nor does Part II, §§ G–L relate to whether Respondent knew the Nielsons did not have the ability to repay the loan. Generally, §§ 5.G–L concern Respondent's advice to the Nielsons to upstream money to the owners of Nielson Entities rather than loan money between entities, the filing of correspondence between the Bank and the Nielsons in the loan file, and authorizing the payment of Pillay Collateral to the Bank. *See* R.D. at 41–50.

**A437**

entities that lacked the ability to repay the funds as disbursed." R.D. at 4. Relatedly, the ALJ finds that it "was reasonably foreseeable that the Bank's release of collateral securing impaired loans that lacked personal guarantees would lead to financial loss to the Bank." R.D. at 7 (Finding of Fact 8.a). Respondent takes exception to the ALJ's findings. The decision to receive payment of almost $690,000 of tenuously secured collateral from a borrower claiming financial difficulties is ***not*** an unsafe and unsound practice.

First, no evidence shows that the use of the Pillay Collateral was imprudent. *See Seidman*, 37 F.3d at 932. Rather, the evidence shows that (i) the voluntary payment of cash collateral to the Bank was a short-term accommodation designed to provide time to reach a long-term agreement, (ii) that it was fully disclosed and approved by the Board, and (iii) in the best interests of the Bank. As with the 2009 Bedrock Transaction, the Nielsons had decided to withhold all debt service payments when some of their loans matured in September 2010. *See* Answer ¶¶ 40–42. This again forced the Bank to decide whether to work with the borrower or simply foreclose. The Bank decided to engage with the Nielsons from September to December 2010 in hopes that they could reach a deal. Mike Doherty, Dick Jackson, and Bill Green conducted the negotiations, and Respondent attended a single meeting with Dale Nielson—father of Cori Nielson. *See* Answer ¶ 42; Tr. 1205–11 (Doherty); Tr. 1321–22 (Calcutt); Stip. Tr. 1630–33 (Jackson). During the negotiations, the Nielsons took bizarre and overly aggressive negotiating positions. In their first information-gathering meeting, the Nielsons gave the Bank "financial information that indicated that they had substantial liquidity. Millions of dollars." Tr. 1206 (Doherty). Nonetheless, the Nielsons claimed, "they did not expect any sales, real estate sales *for five years*. And . . . they were ***not going to make payments but rather use their liquidity to buy other businesses*.**" *Id.* (emphasis added); Stip. Tr. 1632–33 (Jackson) (testifying

to the same).  Attending on behalf of the Bank, Michael Doherty "was stunned," and he found it "[u]nbelievable that somebody that had liquidity, had income coming in wasn't going to make payments.  They were going to go out and spend it on additional businesses."  Tr. 1206–07 (Doherty).[37]  Rather than adhere to the obligations, the Nielsons wanted short sales—i.e. "have the Bank absorb any losses that would incur."  Tr. 1209 (Doherty).

Given these unacceptable requests, negotiations stalled, and, as Jackson updated the Board on December 3, 2010, the Bank decided to "inform[ the Nielsons] that if these loans which are now past due, are not renewed within the next 14 days[, the Bank] will take legal action to pursue collection."  R. Ex. 150; *see also* Tr. 537 (Swanson) (the Board "had discussions . . . about the Nielson credits" prior to receiving this e-mail from Jackson).  In response, Autumn Berden reached out to Bill Green in hopes of making a deal.  *See* EC Ex. 3, at 160 (noting Berden left Green a message on December 3 after Jackson's e-mail to the Board).  Ultimately, the Bank and the Nielsons resolved to give themselves time for further negotiation.  They agreed to a short-term renewal of the loans on the condition that the Nielsons use about $690,000 of the Pillay Collateral to the Bank to bring the loans current.

The Bank fully believed that the use and voluntary payment was in its best interests.  At that time, the Bank "understood there was some question by our attorneys about the security interest in" the Pillay Collateral.[38]  Tr. 1324–25 (Calcutt); *see also* R. Ex. 168 ("Pillay Trading

---

[37] ALJ McNeil credits none of this testimony, only reciting the biased testimony given by Autumn Berden.

[38] A review of the "Pledge Agreement," EC Ex. 10, demonstrates that the Bank's security interest was likely deficient.  The Pledge Agreement is simply a letter from one Nielson Entity to another.  This likely fails to establish control for cash collateral under Michigan law, as the money was held outside the Bank and there was no agreement from Pillay Trading LLC to comply with any directions from the Bank.  *See* Mich. Comp. Laws Ann. §§ 440.8106, 440.9104(1), 440.9106.  There is also no evidence that the Bank would be able to perfect its interest under Michigan law.  *See id.* at § 440.9312(2)(c).

money pledged for loans . . . has always been an issue as to perfection because of the way it is structured."). According to one of the Bank's attorneys, Bill Calcutt (Respondent's brother), the security interest "was really problematic" and he "didn't think [it] was sufficient perhaps under Article 9 or Article 8 of the U.C.C." Tr. 1152–53 (W. Calcutt). The Bank's other attorney, Fred Bimber, concurred: "There probably was not a proper perfection of a lien on [Pillay Collateral] . . . or if, if there were perfection, it's something that would involve great difficulty in enforcement . . . ." Tr. 378 (Bimber); *see also* Stip. Tr. 1664 (Jackson). These concerns were communicated to and understood by the board. Tr. 534–35 (Swanson). Given the tenuous lien, voluntarily receiving the Pillay Collateral was "like getting something for nothing." Tr. 1154 (W. Calcutt). Bank management agreed it was a benefit to receive the Pillay Collateral rather than potentially lose it. *See* Tr. 1326 (Calcutt) ("Q. Did you believe that that was a prudent decision for the Bank to make at the time? A. Yes, at the time and given what we were confident of, yes."); Stip. Tr. 1634 (Jackson) ("Q. And do you recall why it was the Bank felt that – or did you feel that was in the Bank's best interest at the time to release additional Pillay collateral and get the debt paid current and pay for a couple of months? A. Yes, I did. It was the Borrower's own money that we were using to bring the debt current and it was funds that, again, we believed to have a rather tenuous lien against."). Even Miessner agreed it was better to receive the cash collateral voluntarily paid by the Nielsons. *See* Tr. 832 (Miessner). The Bank hoped the voluntary payment of the Pillay Collateral would also be a short-term fix allowing for a later, long-term solution. *See* Tr. 1329 (Calcutt). Once renewals were complete and the Christmas and New Year's holidays passed, the Bank attempted to address the Nielson loan portfolio, but those negotiations were ultimately not fruitful. *See* Tr. 1329–30 (Calcutt).

The Bank's board also approved the renewals and release of collateral. According to board member Ron Swanson—called by the FDIC—"there were verbal discussions at board meetings almost every board meeting with an update" regarding "the Nielson credits . . . not being paid as agreed." Tr. 490 (Swanson). During the December 2010 board meeting, the "Board was advised that the renewals for the various matured Nielson related loans would be completed shortly. This action will eliminate the temporary increase of the delinquency ratio and provide benefit to net interest income for December." R. Ex. 58, at 2.[39] Those discussions included the voluntary payment of the Pillay Collateral to the Bank in December 2010 and renewal of the loans for a few months. *See* Tr. 1328 (Calcutt) ("Q. Did the Board discuss as a part of this approval process the release of the Pillay Collateral? A. Yes, I'm confident it was discussed. And the reasons for it.").[40] On this understanding, the board approved the renewal of the loans to Bedrock Holding at the meeting. *See* EC Ex. 30.

In sum, the receipt of the Pillay Collateral in 2010 was not imprudent because the Bank reasonably decided to work with a borrower to provide time for negotiations and accept $690,000 in tenuously secured collateral from a borrower claiming financial difficulties—all with board knowledge and approval.

---

[39] That the board minutes did not specifically reference the use of Pillay Collateral does not demonstrate the board failed to approve it. Swanson testified that the board always discussed the Nielson credits once they stopped paying, and all of those discussion are not included. *See* Stip. Tr. 1608 (Jackson) ("Quite often when we would have those discussions it was not documented in the board minutes."). The best evidence is the testimony regarding the board's discussions, which shows the board approved the use of Pillay Collateral.

[40] Swanson did not recall one way or the other whether the release of Pillay Collateral was discussed. *See* Tr. 539 (Swanson). The only testimony to the contrary is from Bruce Byl. Tr. 1030 (Byl). Byl, however, proved himself to be completely unreliable. Byl and Respondent have no relationship, as Byl "embezzled over a quarter million dollars from the Bank, and he betrayed the confidences of the Board . . . [by] taking what was discussed at board meetings and taking it outside the Bank." Tr. 1272 (Calcutt).

Second, no reasoned analysis can establish that *receiving* $690,000 from tenuously secured collateral created an abnormal risk to the Bank's financial stability. In its post-hearing briefing, Enforcement Counsel presented no evidence or even argument as to how the receipt of cash can create an abnormal risk of loss. Undeterred, the ALJ found that receipt of cash collateral was unsafe because it was "to be paid to entities that lacked the ability to repay the funds as disbursed." To the contrary, the Pillay Collateral was never to be paid to entities that lacked the ability to repay them. Instead, the money was paid directly to the Bank to bring loans current. *See* R.D. at 88 & n.667, citing Tr. 134–35 (Berden); *see also* EC Ex. 3, at 170 (Berden e-mail to Green, stating, "I can have the funds available by Wed, Dec 22. Since we would not be escrowing any future payments, we would just pay the loans directly . . . ."); EC Ex. 3, at 187 (Berden e-mail to Green, stating, "We are ready to make these payments tomorrow . . . . We do agree that payments on the amortizing loans will be first applied to interest due . . . and then the balance will be applied to principal."). The ALJ's rationale does not show that the receipt of cash in lieu of collateral is an unsafe practice.

The ALJ also claims that it was "foreseeable" that the use of collateral would lead to financial loss because there were no personal guarantees and the borrowers made it clear there were no other repayment sources. *See* R.D. at 7 (Finding of Fact 8.a). As addressed *supra* Section IV.B.2, the absence of personal guarantees is irrelevant and outside the Notice; in any event, the Nielsons had the resources to repay the loans. Again, it is nonsensical to say that the receipt of $689,000 as loan payments from the Nielson was unsafe or unsound or created foreseeable loss when the Bank was unlikely to recover the collateral in foreclosure due to the Bank's poor security position. It was better to receive the cash today rather than potentially lose it tomorrow.

To the extent the ALJ's findings can be interpreted to mean that the 2010 use of Pillay Collateral was unsafe because it masked issues with other Nielson loans, *see* R.D. at 91, that too strays beyond the Notice and fails to explain why the receipt of cash itself is an unsafe practice. As discussed, the receipt of cash in lieu of collateral was part of negotiations from September 2010 to June 2011, during which the Bank and the Nielsons attempted to resolve issues with the Nielson loan portfolio—just as Miessner said the Bank should have done, *see* Tr. 810 (Miessner).  The FDIC is not seeking Respondent's removal for attempting to negotiate a workout with the Nielsons.  The use of collateral to bring the loans current also did not by itself cause any increased risk but rather stabilized a difficult situation to leave room for additional negotiation as well as resulted in benefits to the Bank.

Third, Respondent takes exception to the specific sections that the ALJ cites to support summary Finding of Fact 1.b because the vast majority of them do not relate to the 2010 use of Pillay Collateral[41] and, to the extent portions do, they are contradicted by the evidence.  *See* R.D. at 4 n.11, citing Part II §§ 5.C, F, L, P–R.  Section 5.C is irrelevant as it relates to whether the FDIC has established "Paragraphs 54 through 107 in the Notice of Intention."  R.D. at 39. Section 5.F is also irrelevant because it relates to Respondent's accounting advice in April 2008, which is not at issue in the payment of the 2010 Pillay Collateral to bring the loans current. Section 5.L relates to an early discussion regarding the use of Pillay Collateral to pay down debt, and its relation to the 2010 release is unclear and unexplained.  Section 5.P is entitled "Bank Management's Misrepresentations Presented in the Commitment Review for the 2009 Bedrock Loan," which again has nothing to do with the 2010 release and voluntary payment to the Bank

---

[41] ALJ McNeil's failure to explain his reasoning in any logical fashion demonstrates his carelessness in authoring the Recommended Decision.  Rather than contend with the evidence, ALJ McNeil made findings to reach his preferred outcome, demonstrating his closed mind.

of the Pillay Collateral.  The vast majority of Section 5.R does not relate to the summary finding,

except for one finding regarding Gomez's opinion on page 91.  That finding on page 91 does not

establish the Pillay Collateral is unsafe for the reason discussed above.

Section 5.Q is the only section that relates to the use of collateral in 2010.  Yet, the

recitation of evidence is simply that the Nielsons wanted debt relief, which the Bank did not

want to give.  No evidence referenced in the discussion addresses whether use of the collateral

was unsafe.  In short, there is no evidentiary support for the notion that the 2010 receipt of Pillay

Collateral voluntarily paid to the Bank was imprudent or created an abnormal risk of loss.

### 3.    Respondent Did Not Intentionally Conceal Information About the Bank's Condition, the True Nature of the Nielson Entities Loan Portfolio, the 2009 Bedrock Loan, and 2010 Use of Collateral from the Bank's Board and Regulators.

**Finding:** *"Respondent repeatedly and knowingly failed to disclose to the Bank's Board and its regulatory examiners accurate and complete information about the Bank's condition and about the true nature of the Nielson Entities loan portfolio, including the 2009 Bedrock Loan transaction and the 2010 collateral release transaction benefitting the Nielson Entities." (Finding of Fact 1.c, R.D. at 4 & n.12; R.D. at Part II, Sections 5.F–G, O–R, & T; Conclusion of Law 6; R.D. at 122.)*

#### a.    The ALJ's Findings Are Unsupported by the Evidence.

In **Finding of Fact 1.c**, ALJ McNeil recommends that the Board remove Respondent

from banking because he "failed to disclose to the Bank's Board and its regulatory examiners

accurate and complete information about the Bank's condition and about the true nature of the

Nielson Entities loan portfolio, including the 2009 Bedrock Loan transaction and the 2010

collateral release transaction benefitting the Nielson Entities."  R.D. at 4.  For support, the ALJ

cites several sections from the Recommended Decision.  *See id.* at 4 n.12, citing R.D. Part II, §§

5.F–G, O–R, and T.  Throughout these sections, ALJ McNeil identifies several instances where

he claims that Respondent concealed information from the Board and from regulators: (i)

Respondent providing advice to upstream the funds rather than loan them between companies,

R.D. at 40–43; (ii) a letter authored by Dick Jackson to Michigan bank regulators, *id.* at 57–58; (iii) the May 2010 Officer's Questionnaire, *id.* at 58–59; (iv) the statement in the March 2010 board write-up that the Bedrock Loan was for "working capital" and the board's understanding of the Bedrock Transaction, *id.* at 61–69, (v) underwriting issues with the Nielson loans generally, R.D. at 69–73, (vi) a meeting on September 14, 2011 involving FDIC examiners and Respondent, *id.* at 73–77, (vii) missing loan documentation in the files for loans to Nielson entities, *id.* at 77–79, (viii) obtaining financial statements from Nielson Entities, *id.* at 81–83, (ix) the sales of loans to affiliate banks, *id.* at 82–86, (x) an exit meeting following the 2010 FDIC examination, *id.* at 89–92, and (xi) the Bank's general practice regarding loan presentations to the Bank's board, *id.* at 98–99. Respondent takes exception to each of these supposed instances of concealment. Either they are outside the Notice, no evidence demonstrates that Respondent was involved, or the evidence demonstrates that Respondent took certain actions with no intention to conceal information from the Board and/or from regulators.

**Upstreaming of Funds**. Respondent advised the Nielsons in 2008 that for both regulatory and tax reasons they should upstream the funds from Nielson Entities to the owners and then have the owners distribute the funds to other entities if needed instead of inter-company lending. The ALJ claims this advice was designed to mislead the Board and the regulators regarding a transaction that occurred more than one year later and was not even contemplated when the advice was given. *See* R.D. at 40–43. That is simply untrue, is outside the Notice, and outside the statute of limitations.

There is no evidence that Respondent's advice was designed to conceal the Nielson Entities' "true nature" from regulators. Both the Bank and regulators were well aware that the Nielsons used the cash flowing businesses to support those without cash flow and, indeed,

100

**A445**

Calcutt and Jackson expected the Nielsons would continue to do that. Because of the inter-company borrowings, the Michigan bank regulator, OFIR, raised the issue of the Unit Borrowing Rule in 2008. Although Berden testified that the Nielson entities were separate and legally distinct, R.D. at 48; Tr. 57, 59–61, 150–53 (Berden), the Bank did not deny the five entities were commonly controlled in response to the 2008 ROE. Jt. Ex. 1 at 12; *see also* Jt. Ex. 2 at 20–21 (Waypoint Management mentioned as interrelated borrower). Instead, the Bank asked the Nielsons to move the loans elsewhere and made loan sales to the affiliate banks in 2010 (as proposed in 2009) to try to mitigate OFIR's concerns about Michigan's Unit Borrowing Rule. Tr. 57, 153 (Berden); EC Ex. 3, at 67–68. This regulatory criticism prompted Respondent to suggest that the Nielsons upstream the money to the owners rather than lending it to each other. Jt. Ex. 1 at 22; Tr. 52 (Berden); Tr. 1276–77, 1308–09, 1365, 1373–74 (Calcutt). As Berden testified, the manner in which the companies administered intercompany borrowings was in no way improper, did not mean the entities were not separate, and did not undermine the legitimacy of the business transactions. Tr. 150–51. No one—Berden, Nielson or Calcutt—testified the purpose was to conceal anything. The purpose was to avoid a practice that OFIR concluded implicated the Unit Borrowing Rule. Respondent's suggestion, informed by his experience as a former CPA, and more than a year before the transaction that is the subject of this proceeding, was intended to more accurately reflect the separateness of the entities.

The ALJ's conclusion also falls outside the Notice, which does not allege that providing the upstreaming advice was designed to conceal information. Although the Notice alleges that the routing of the funds was part of a pattern of concealment, the structure of the Transaction was not the source of concealment. Bill Green structured the transaction to comply with the agreed practice of upstreaming funds instead of intercompany borrowings and to ensure that the money

never left the Bank.  Stip. Tr. 48–53 (O'Neill).  The concealment occurred because **Green**, not

Respondent, did not maintain his loan files properly and failed to include all of the e-mails with

Autumn Berden in the loan files that revealed the flow of funds.  There is no evidence that

Respondent knew any of this, and Calcutt denied having any knowledge thereof.  Tr. 1308

(Calcutt).

Finally, as the record reflects, Respondent gave the upstreaming advice on April 29,

2008.  The Notice was filed on August 20, 2013.  Thus, the advice is outside the five-year statute

of limitations applicable to FDIC enforcement actions, and cannot be considered in this

proceeding.  *See, e.g., de la Fuente v. FDIC*, 332 F. 3d 1208, 1219 (9th Cir. 2003); *Proffitt v.

F.D.I.C.*, 200 F.3d 855, 862 (D.C. Cir. 2000).

**Dick Jackson's 2009 Letter to Regulators**.  The ALJ's finding that Dick Jackson's

2009 Letter to the regulators demonstrates Respondent's intentional concealment is not

supported by the record.  No reliable evidence shows that the letter was designed to mislead

regulators or that Respondent authored or approved the letter.

On November 14, 2009, Jackson sent a letter to Michigan banking regulators responding

to the most recent Report of Examination, stating that several Nielson Entity loans were

"performing."  *See* Jt. Ex. 3.  There is contradictory evidence as to whether Jackson's statement

that several loans were "performing" was correct.  *See, e.g.*, *id.* at 3 ("Moxie, LLC – performing

loan; matures January 1, 2010.").  There is no definition of "performing loan" in the banking

regulations.  *See* Tr. 845 (Miessner).  According to Jackson, his "understanding of a performing

loan is one that has not yet become 90 days delinquent," so even if Moxie had not made

payments since September 1, Jackson believed the loan was performing as of November 14 and

until November 30. *See* Stip. Tr. 1617–18 (Jackson).[42] Jackson did not intend to mislead the regulators by this response. Stip. Tr. 1618–19 (Jackson). Rather, he "used the answers that Mike Doherty had provided to me and I had no reason to question them based on my understanding of the definition of non-performing." Stip. Tr. 1618. Therefore, direct evidence in the record demonstrates that this response was truthful to the best of Jackson's understanding.

In any event, whether or not ***Jackson's*** answer was truthful, his letter does not demonstrate that ***Respondent*** misled examiners. Respondent plainly did not author the letter; Jackson did. The only evidence relied upon by the ALJ linking Respondent to the letter was Miessner's testimony that Respondent reviewed the letter. *See* R.D. at 58. But her testimony is pure speculation, as she was not present, did not observe events, and did not even have a hearsay basis; as a result, it is not competent evidence. *See, e.g. Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 617 (6th Cir. 2010); *U.S. Steel Mining Co. v. Dir., OWCP*, 187 F.3d 384, 388–89 (4th Cir. 1999); *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir.1994); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004). Nonetheless, the ALJ credited this testimony despite the fact Miessner admitted, "I don't know specifically and . . . ***I don't have exact personal knowledge of [Respondent] reviewing this document***." Tr. 845 (Miessner) (emphasis added). And her supposed expertise in banking does not qualify her to speculate regarding who may or may not have reviewed a letter. Furthermore, the ALJ's finding that Respondent was involved in Jackson's 2009 letter cannot be reconciled with the ALJ's later finding that a letter sent by Jackson to the FDIC regarding the 2010 examination "concerns only Mr. Jackson" and is therefore "beyond the scope of this recommended decision" as it does not

---

[42] Jackson's statement was truthful by his understanding whether or not it comported with what Miessner felt performing should mean.

concern Respondent.  R.D. at 90.  The speculative testimony from Miessner does not change what is obvious to even the ALJ—letters authored by Jackson responding to regulators "concern[] only Mr. Jackson" and are outside the scope of this proceeding.

Even if Respondent reviewed and approved the letter—a proposition that is wholly unsupported in the record—there is no evidence he chose the word "performing" to intentionally mislead regulators.  Miessner has no idea whether Respondent believed the loans were performing (relying on the same definition as Jackson) or whether Respondent was relying on Jackson and Doherty to identify the loans properly.  The direct evidence in the record shows Jackson included the statement that certain loans were performing based on information he learned from Mike Doherty, not because Respondent wanted to mislead regulators.  *See* Stip. Tr. 1618.  And the ALJ prohibited Respondent from testifying about this letter in rebuttal even though Respondent's testimony regarding this letter would have been relevant and material evidence.  *See* Tr. 1302–03; *see also* 12 C.F.R. § 308.36(a).[43]  It is fundamentally unfair for the ALJ to exclude Respondent's own testimony on an issue and then use the absence of evidence to find Respondent intentionally misled regulators.

**May 2010 Officer's Questionnaire**.  Calcutt acknowledged that his answers to two of the questions in the Officer's Questionnaire were incorrect.  This was an oversight, and one for which he accepts responsibility.  As Calcutt testified, he used the prior version of the Officer's Questionnaire as a guide for his answers.  Tr. 1310–11 (Calcutt).  He believed that the prior version provided the correct starting point to answer the Questionnaire, and simply missed the intervening change in circumstances that warranted a different answer to two questions.  The ALJ has cited no authority that a mistaken answer in a questionnaire comes anywhere close to

---

[43] This evidentiary ruling was error, and Respondent takes exception to it.

satisfying the criteria for removal. And the ALJ has not connected this oversight with any adverse effect on the Bank, as required for removal. Bankers make mistakes, just as anyone else, but the consequences do not rise anywhere close to the draconian punishment sought by Enforcement Counsel for such a pedestrian, inadvertent mistake.

**March 2010 Write-Up and Board's Understanding of the Bedrock Loan**. ALJ McNeil mistakenly concludes that the loan write-up demonstrates Respondent's intentional concealment. *See* R.D. at 61–69 & 81.[44] That conclusion is unfounded because the evidence demonstrates that the Board verbally approved management's handling of the Nielson delinquencies in November and December 2009, that the loan write-up was delayed for reasons associated with Bill Green and year-end business, and that the contents of the write-up have nothing to do with Respondent. While the write-up could have been clearer (when judged in hindsight), it does not establish that Respondent misled the board or regulators regarding the Bank's condition, the "true nature" of the Nielson loan portfolio, the 2009 Bedrock Transaction, and the 2010 Pillay Collateral release. To the contrary, the evidence demonstrates that the board approved every Nielson loan, including the 2009 Bedrock Transaction and the use of Pillay Collateral in 2010 to bring the Nielson loans current.[45] The evidence further demonstrates that the board understood the Nielson relationship comprised a large, interrelated relationship at the Bank and that the board approved the 2009 Bedrock Transaction and the 2010 Transaction.

---

[44] The ALJ claims that the Bedrock Loan write-up for the board failed to disclose that "the release of the $600,000 Pillay Trading LLC proceeds" would leave "approximately $400,000 remaining from Pillay to serve as collateral." R.D. at 81, citing Jt. Ex. 6 at 1. This is false. On page two of the document cited by the ALJ (Jt. Ex. 6), the write-up identifies that release of $600,000 will "result[] in $400,000 of the Pillay Trading units to remain as collateral for this loan."

[45] *See supra* Section V.B.2 for a discussion of facts demonstrating the Board approved the 2010 collateral release and voluntary payment to the Board.

In November-December of 2009, the Board verbally approved the Bedrock Transaction and understood the Nielson relationship.  Prior to this time, several reports of examination—which the board members reviewed—mentioned the interrelated Nielson Entities.  *See, e.g.*, Jt. Ex. 2 at 20; Tr. 1294 (Calcutt) (the Nielson "loans were in every Report of Examination . . . and each director reviewed the Exam Reports.").  According to Bank board member Ron Swanson, the Nielson debt was a topic of discussion at virtually every Board meeting after the Nielsons ceased making payments in 2009.  Tr. 518, 521–24, 528, 539–40 (Swanson).[46]  Respondent explained to the Bank's board in November and December 2009 that the Bank's delinquencies increased ***by over $40 million*** because the Nielsons decided to withhold payment on their loans.  *See* R. Ex. 18, 20; Tr. 521–24 (Swanson).  While not being able to recall with specific detail events from ten years prior, Swanson understood the Nielson relationship and that "there were some questions about some properties that there was a dispute on," and "some issues relating to some of their, their properties being underwater."  Tr. 527 (Swanson).  ***Swanson also believed the board would have discussed how the problems with the Nielsons were resolved***.  Tr. 528 (Swanson) ("Is it your belief that there was discussion at the board meeting in December about how the problem with the Nielsons was resolved?  A. There likely would have been.").  As part of that solution, Swanson remembered that the reason for releasing the Pillay Collateral was related to concerns whether it was properly secured.  Tr. 534–35 (Swanson).  Swanson's sworn testimony fully corroborates that of Jackson and Calcutt that they obtained a verbal loan approval for the Bedrock Transaction in the November/December Board meetings.  Tr. 518, 521–24, 528,

---

[46] Swanson testified: "Q. Is it your belief – and by this time is it accurate that the Nielson credits were fairly commonplace topic of conversation at the board meetings?  A. Yes, at those board meetings around that time Scrub Calcutt would address the Nielson situation and bring the Board up to date as to what the management was doing to resolve the issue."  Tr. 539.

539–40 (Swanson); Tr. 1290–93 (Calcutt); Stip. Tr. 1611–12 (Jackson) ("To the best of my recollection, there was discussion at this meeting and several other meetings, and the Board was supportive of the actions that management was taking.").[47]

      The loan write-up does not establish that Respondent failed to inform the Bank's board and regulators regarding the Bedrock Transaction. Rather, the purpose of the write-up was to formalize the prior verbal approval and discussions for final ratification. *See* Tr. 1102–03 (Hollands) ("Q. So regardless of what you saw on the Bank's system regarding the loans having been extended on the system, you still needed to do formal write-ups for those write-ups to then be formally approved in the Bank's process? . . . THE WITNESS: Yes."). But the write-up was delayed by year-end business and by Green's lack of responsiveness. Ian Hollands, a credit analyst at the Bank, was responsible for preparing the write-up for the Bedrock Loan. *See* Jt. Ex. 6; Tr. 1082–83 (Hollands). As reflected in Hollands' testimony, he was under enormous stress related to other obligations he needed to attend at the Bank, the holidays, two external loan reviews, and a request for financial information from the Nielsons. *See* R. Exs. 24, 25, 26, 27, 29, 30, 31 (e-mails detailing Hollands attempting to secure information for the write-up from Bill Green); Tr. 1086–89, 1097–98 (Hollands); *see also* Tr. 530–31 (Swanson) (information in the loan write-up came from Green and delay "had to do with being very busy, didn't have time to put it together, something to that effect"). According to contemporaneous documentation, Hollands told Bill Green that he was "in a position that [he] can start working on a lot of these

---

[47] That Byl's testimony contradicts Swanson's, Jackson's, and Calcutt's does not establish that the Board failed to understand and approve the Bedrock Transaction. *See* R.D. at 66–67. Byl clearly has a poor memory of events from a decade ago, as he did not even recall reviewing the Bedrock Loan application or knowing about the Nielson loans until 2012 despite having reviewed every Nielson loan during his tenure on the Board and the 2008 and 2009 ROEs that specifically identified the commonality between the Nielson loans. Tr. 915–16, 1049–50 (Byl).

write-ups" for the Nielson loans on February 11, 2010.  R. Ex. 31.  The ALJ relates this testimony and facts demonstrating that Hollands actively sought information to put together the loan write-up but that Green failed to get him the information in a timely fashion.  *See* R.D. at 94–95.  Nothing in the record nor the Recommended Decision attributes the delay in preparing the write-up to Respondent.

Similarly, nothing in the record demonstrates that Respondent had anything to do with the information contained in the write-up.  Hollands prepared it based on information he eventually obtained from Green and from the borrowers' financials.  *See* R. Exs. 24–27, 29–31; Tr. 1086–89, 1097–98 (Hollands).  When Hollands prepared the write up, Green identified that the Bedrock Loan was a line of credit, and Hollands, in turn, listed the use as working capital as he always generically did for a line of credit loan.  Tr. 1106–07 (Hollands).  And although Doherty instructed Hollands to indicate that the loan approval was a ratification and Hollands knew that the loan had disbursed, Hollands overlooked that request and only included the dates of the Bedrock Loan as a December 2009 line of credit.  Tr. 1198 (Doherty).  Hollands did include the release of the Pillay Collateral but did not explain why the collateral was being released because Green did not tell him.  Tr. 1125 (Hollands).  Green could have fixed the write-up himself, as well.  After Hollands finished drafting it, he provided it to Green, but Green did not make any changes or provide more information.  Tr. 1108 (Hollands).

Because Enforcement Counsel chose not to call Green, there is no testimony from Green as to why he did not provide Hollands with more information nor testimony as to why he did not change the write-up.  While the use of working capital may not have fully captured the purpose

of the loan,[48] and the write-up could have more specifically detailed the reason for the uses of the Pillay Collateral, the evidence does not establish that Respondent had any role in this process—nor would anyone expect a CEO of an $850,000,000 to have a role in the process of writing up a loan.  If Green had been candid with Hollands and if Green had placed all of the borrower communications in the files, then there would be no present action.

After the Bedrock loan's write-up was complete, it was approved and signed by the Senior Loan Committee.  Tr. 1305 (Calcutt).  Because the loan had already been approved and funded, Mr. Calcutt did not read the write-up before signing.  Tr. 1307 (Calcutt).  After receiving the Senior Loan Committee's approval, it was transmitted to the board, which also approved the loan.  Jt. Ex. 6; Tr. 1305 (Calcutt).  The approval was noted in the Senior Loan Committee minutes for April 2010, which were prepared by Hollands following the Bank's standard practice of including approvals in the minutes after final documentation was completed.  EC Ex. 104, at 16.  These facts demonstrate that Respondent did not intentionally conceal information regarding the Nielson portfolio and the Bedrock Transaction from the board.  Enforcement Counsel did not prove Calcutt had any involvement in preparing the loan write-up.  While perhaps some documents could have been clearer, they were the responsibility of Green and Hollands and, at any rate, "a few relatively minor and technical violations" do not establish intentionality.  *Kim v. OTS*, 40 F.3d 1050, 1055 (9th Cir. 1994).

Finally, no evidence in the record even relates to withholding of information regarding the "Bank's condition."  Such a finding is irrelevant, outside the Notice, and improper.  The

---

[48]  Whether or not the phrase "working capital" was misleading is beside the point.  The issue—as the ALJ claims—is whether *Respondent* intentionally misled the Board.  Hollands' decision to use "working capital" does not demonstrate Respondent's intentions.

board routinely received substantial financial information and was well-apprised of the Bank's condition. *See, e.g.*, R. Ex. 22. That recommendation too should be rejected.

**Underwriting Issues with Nielson Loans**. Although the section is titled, "Failure to Fully Disclose the Sources of Funding for Bedrock Loan Service," ALJ McNeil does not discuss any actions taken by Respondent or any other person at the Bank. *See* R.D. at 69. Rather, he takes issue with several underwriting terms of the Nielson loan portfolio in general, including the source of repayment for the Bedrock Loan, the lack of personal guarantees on Nielson loans, and outdated appraisals for collateral securing Nielson loans. *See* R.D. at 69–73. Issues relating to the structural aspects of loans have no relevance or bearing on whether Respondent concealed information and are entirely absent from the Notice. Whether or not the Nielsons personally guaranteed their loans or the Bank had updated appraisals does not demonstrate Respondent intentionally concealed information from the Bank's board and regulators. Nor does the Notice include any allegations regarding these issues as a basis to remove Respondent. Therefore, ALJ McNeil's extraneous discussion is irrelevant and should be disregarded.

**September 14, 2011 Meeting**. The ALJ found that Respondent "had not been fully candid during a meeting held on September 14, 2011," a meeting held as part of the FDIC's 2011 examination of Northwestern Bank and also as part of Miessner's scheme to remove Respondent from banking. *See* R.D. at 73–77. The evidence shows, however, that Respondent did not intentionally conceal information from the examiners during this meeting.

As an initial matter, Respondent was summoned to this meeting with no time to prepare and little-to-no advance warning as to the topics to be discussed. And that was the point. Prior to the meeting, Miessner wanted to get Respondent "on record" "before it leaks that we are digging." R. Ex. 98. This was not a supervisory examination meeting; it was an interrogation

with an ulterior motive.  Miessner wanted Respondent on the record regarding "correspondence related to the Nielson credits," "the use of funds" of the Bedrock Transaction, "why the Board was not asked to approve the loans until March 2010," and "why the funds were dispersed [*sic*] was not disclosed to the Board," *id.*—not because she needed the information to understand the transaction, but because she wanted to set up a basis to remove him from banking.  The first time Respondent heard that the FDIC wanted to ask him these questions was on September 14—the day of the meeting.  Tr. 1336 (Calcutt).  Only four hours before the meeting was set to occur, Mark Smith—who was responsible for interfacing with the FDIC—e-mailed Respondent to tell him that the FDIC would like to meet with Respondent to discuss the exact same topics outlined in Miessner's e-mail, namely the documentation, use of proceeds, and board approval process of the Bedrock Transaction.  *See* EC Ex. 110.

Notably, the issues to be discussed were Green's responsibility to address following the Bedrock Transaction's consummation; they were not part of Respondent's ***approval*** of the Transaction prior to its consummation.  Respondent received virtually no advance notice and did not independently recall the details of the documentation, use of funds, and approval process for the Bedrock Transaction.  Tr. 1336 (Calcutt).[49]  He relied on Green as "the lending officer [who] would have had access to the loan files and could have researched this" to provide him with the answers to the FDIC's questions.  *Id.*  As a result, the answers that Respondent supplied were based on information provided to him by Green.  Because Enforcement Counsel made the

---

[49] ALJ McNeil rejected "Mr. Calcutt's testimony that at the time he received Mr. Smith's September 14, 2011 e-mail ([EC] Ex. 110) he had no independent recollection of the Bedrock Loan transaction."  R.D. at 76.  That was simply not Mr. Calcutt's testimony.  Rather, and as consistent with the foregoing, he testified that he did not have "any independent recollection ***of the details*** of the Bedrock Transaction."  Tr. 1336 (emphasis added).  Once again, ALJ McNeil misconstrues Respondent's testimony in order to make an adverse credibility determination that is false.

strategic decision not to call Green, the record contains no evidence as to whether Green prepared answers, researched the questions, or supplied accurate answers to Respondent.  As a result, even if Respondent's answers were incorrect, no evidence establishes that he intentionally gave such answers to conceal anything from the examiners.

In finding Respondent intentionally concealed information, the ALJ misconstrued the record to find that Respondent knew what was to be discussed at the September 14 meeting.  The ALJ claims that "Mr. Gomez had explained to Mr. Calcutt and others at the Bank why the Examiners needed all of the Bedrock Holding Company's materials."  R.D. at 74, citing R. Ex. 98.1.  But the ALJ's claim misconstrues the record.  EIC Gomez's questions were not about the documentation and disbursement of the Bedrock Loan; they were, instead, about the need for operational materials for Bedrock Holdings, e.g. stockholder lists, investments, and ownership percentages.  R. Ex. 98.  And as a subsequent e-mail in the same chain demonstrates—an e-mail completely ignored by ALJ McNeil—Gomez writes, "We did not get into the Bedrock loan or Pillay funds with Scrub."  R. Ex. 101.  Further, nothing about Respondent's September 7 meeting with Lisa Thompson at Michigan's banking agency nor the accrual memo written by Mark Smith would put Respondent on notice that the FDIC was interested in the documentation and disbursement of the Bedrock Transaction.  *See* R.D. at 73–74.  Rather, those meetings and discussions related to an accounting decision in 2010 as to whether the entire Nielson relationship should be put on non-accrual.  Discussions regarding the details, documentation, and disbursement of the Bedrock Transaction from a year prior did not arise.

The ALJ's claims that Respondent was untruthful in response to questions on three topics is also unsupported by record evidence.  *See* R.D. at 73–77.  First, to support his conclusion that Respondent misled examiners about the purpose of the Bedrock Loan proceeds, R.D. at 75–76,

ALJ McNeil relies upon a memo authored by Dennis O'Neill two days after the September 14, 2011 meeting for the purpose of ginning up a Section 8(e) proceeding, Jt. Ex. 11, rather than the contemporaneous notes of another bank examiner who attended the meeting, R. Ex. 105.  Those notes, taken by Lisa Thompson of the Michigan banking regulatory agency, show that Respondent was "*guessing* [the Bedrock Loan] was a working capital line."  R. Ex. 105 (emphasis added).  Quite simply, guessing is not intentionally misleading.  Even O'Neill's belated summary registered Respondent's uncertainty, noting his statement, "We are still digging into why no board approval is shown until March for a December loan…something is not right because we have a process for approving loans of this size."  Jt. Ex. 11 at 3.  Guessing or recollection based on information from Green does not amount to intentional deception.

Second, to support his conclusion that Respondent misled examiners about the existence of relevant correspondence, R.D. at 76–77, ALJ McNeil misrepresents the question posed to Respondent in order to claim Respondent intentionally deceived the examiners.  According to ALJ McNeil, the FDIC asked the Respondent "whether Mr. Calcutt had any correspondence either to or from the Nielsons regarding their proposed use" of the Bedrock Transaction.  R.D. at 76.  This implies that the question focused on whether Respondent had ever discussed the Bedrock Transaction with the Nielsons.  But that was not the question.  Rather, as the memo from O'Neill shows, the FDIC asked, "Does the CEO have correspondence to or from the Nielsons" regarding the Bedrock Transaction, "[h]as all CEO correspondence with the borrowers . . . been provided to the examiners," and "[d]o you maintain any working file of your own for Nielson?"  Jt. Ex. 11.  Contrary to the ALJ's mischaracterization, these questions focus on whether Respondent had correspondence in his possession at the time of the meeting—not whether there had been correspondence.  According to O'Neill's memo, Respondent answered

A458

this question truthfully: "No, I don't recall any.  It would be in the credit files if any because all the other officers here are copied on whatever I would have."  Jt. Ex. 11 at 3.  The Bank took the further step of providing "DVD's containing our e-mail," further demonstrating that Respondent was willing to provide the FDIC with everything he had.  *Id.*  Nothing about providing every single e-mail from within the Bank—including all of the correspondence with the Nielsons— shows that Respondent intended to mislead examiners by stating he did not have correspondence.  And as O'Neill admitted, Respondent's lack of involvement in maintaining loan files would make it reasonable for him to assume the loan files were accurately maintained.  Stip. Tr. 707, 726 (O'Neill).

Third, Respondent's statements regarding the use of the Pillay funds also were not misrepresentations, despite ALJ McNeil's conclusion to the contrary.  No evidence supports ALJ McNeil's finding that Respondent made a false statement about the 2010 use of Pillay Collateral.  R.D. at 77.  While Joint Exhibit 11 asks a question in terms of 2010, Jt. Ex. 11 at 4, O'Neill clarified on the record that Joint Exhibit 11 was incorrect and actually referred to 2009.  *See* Stip. Tr. 593 (O'Neill) ("correcting the question, this should be December of 2009").  Thus, no evidence reflects that Respondent made any statement with respect to the 2010 release of Pillay Collateral during this meeting.  Additionally, in response to examiner questions about Respondent's "understanding of *when* the Pillay funds were released," Respondent responded to the best of knowledge that he believed the Bank still had them.  Jt. Ex. 11 at 4 (emphasis added).  Others in Bank management also responded, disclosing that the Bank had $300,000 remaining after prior releases and an exchange of collateral.  *Id.*  That the Bank had released some of the Pillay Collateral does not render untruthful Respondent's answer to the best of his knowledge that the Bank still had collateral—a fact confirmed by others in management.  Nor is

Respondent's statement that the Nielsons used their vast investments to bring their loans current inconsistent with the fact that the Nielsons used their investment in Pillay Trading LLC to bring the loans current.  Most accurately, EIC Gomez reported to Miessner that the FDIC did not come any closer to getting clear answers from the meeting, (R. Ex. 107) because his answers were guessing or recollection.  Tr. 333–34 (Gomez).

Finally, even assuming there were any misstatements during the September 14 meeting, such statements are irrelevant because no harm to the Bank nor benefit to Respondent could possibly be related to the alleged misstatements.  The Bedrock Loan was placed on non-accrual in April, and the Bank started collection efforts in June or July 2011.  *See* Tr. 1332–33 (Calcutt). Thus, by the time the examiners met with Respondent on September 14, further concealing the transaction would not result in any losses on the Bedrock Loan, as the Loan was already in collection.  Nor would it result in any benefit to Respondent, because the Bank has stopped accruing interest on the Loan.  The Board should reject the findings.

**Missing Loan Documentation**.  The ALJ recommends that the Board remove Respondent because the loan files did not include documentation of the Bedrock Transaction and use of collateral in 2009.  *See* R.D. at 77–79.[50]  Respondent, however, was not responsible for ensuring that the loan file had full and accurate information.

As an initial matter, the ALJ's recommendation squarely contradicts the FDIC's Notice. In the Notice, the FDIC alleged that "Green was responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans."  Notice ¶ 62.  For this reason alone, the Board should reject the ALJ's recommendation.

---

[50] Although the title of Section 5.P.3.d suggests it relates to missing loan document, as it is entitled "Findings of Fact Regarding Missing Loan Documentation," that section does not appear to have anything to do with the loan files.

It is also indisputable (consistent with the Notice) that maintaining the loan files for Bedrock Holdings and other Nielson Entities was Green's responsibility. Tr. 1214, 1312–13 (Calcutt). Green was either a poor record-keeper or chose to withhold documents from the loan files. As EIC Gomez acknowledged, the Credit Department in general and Green specifically was responsible for putting documents in the loan files. Tr. 297–98 (Gomez); EC Ex. 89, at 1–5. Either way, a CEO of a bank has no duty to ensure the day-to-day maintenance of loan files. Even Miessner conceded that she "wouldn't expect the CEO to be physically placing documents in the file" and that "CEOs would rely on people to do their jobs," Tr. 842–43, although she then tried to walk that admission back by claiming that for "correspondence that came directly to Mr. Calcutt," "it was his responsibility to put that, to put those documents directly into the loan file himself," Tr. 843.[51] As Respondent testified, he never looked at the loan files. Tr. 1312–13 (Calcutt). Nothing rebuts Respondent's testimony. A management study conducted by FinPro found that it was apparent from its interviews that "[Calcutt] (a) doesn't look at loan files and (b) doesn't know where loan files are even located." EC Ex. 84, at 34. Whatever communications Calcutt received were forwarded to Green. Calcutt relied on Green to perform his job and accurately maintain the loan files. Tr. 1313 (Calcutt). Because Enforcement Counsel left an evidentiary void by not calling Green, there is no evidence why Green failed to discharge this responsibility. It is patently unfair to infer from this absence of evidence that Respondent bore some responsibility.

---

[51] The Board should not accept this unfounded assertion. Miessner's bias and desire to remove Respondent from banking is no reason to require every bank CEO in the United States to personally place his or her correspondence (whether others were copied or not) in the appropriate loan file. Senior executives can and do rely on subordinates to handle routine administrative tasks such as filing correspondence.

116

**A461**

Furthermore, while there is testimony from examiners O'Neill and Bird that correspondence regarding the Bedrock Transaction was not found in the loan files, the totality of evidence is not so clear. Dennis O'Neill, the examiner reviewing the Bank's Nielson files, took over from Bob Bush, who had been reviewing the files but was reassigned during the exam. O'Neill sent an e-mail to Miessner during the 2011 examination stating he "found binder-clipped to Bob's copy of the Settlement Outline, copies of correspondence going back to 2009 that he encountered in his review of the full collection of bank files for all 19 entities." R. Ex. 94, at 2. That included an "e-mail exchange dated 8-10-09 from Autumn Berden (borrower) to bank VP Bill Green describing the financial distress that the Nielson credits were experiencing and the need to restructure the loans." *Id.* Miessner responds, "Dennis – you refer to an 8-1-09 e-mail – is this correct or is it 8-1-10? Just want to verify since Bob told me there was no 2009 correspondence that would have tipped examiners off to the borrower distress situation." *Id.* at 1. Both Bush and O'Neill confirmed that this e-mail was in the Bank's files and correctly dated. *Id.* The e-mail came from Bush's review of voluminous correspondence that he described as "if it were stacked in one pile would be well over a foot tall." R. Ex. 87 at 2. This information was provided to him by Doherty. R. Ex. 89.[52] Bush copied what he "thought were the most critical but there is obviously much more that [he] didn't copy." *Id.* Assistant Regional Director David Mangian believed "that this file contained the primary information we received in the binder." R. Ex. 87.

Also contrary to the examiners' testimony that correspondence was not in the files, Mark Smith located significant amounts of correspondence in the Bank's files when searching for and

---

[52] Contemporaneously with the examination, the examiners could not recall how they handled this file. *See* R. Ex. 89.

providing documents to Plante Moran, a company investigating the Nielson loan portfolio. Plante Moran reviewed the Bank's relationship with the Nielson's, and "[a]ll information reviewed in conjunction with this investigation was provided by the Bank with our primary contact being Mark Smith." EC Ex. 77. According to Smith, he "gather[ed] all loan files, credit, supporting credit files and correspondence files, anything that I could find related to the Nielsons." Tr. 669 (Smith). Smith testified that correspondence was maintained by loan officers separately from the loan files. Tr. 672 ("When the Examiners request the files, we typically give them the loan files and related credit files. Credit analysis files but not correspondence file."). In the correspondence files reviewed by Plante Moran were numerous e-mails the examiners claimed were missing. For example, Plante Moran discussed several e-mails from Nielson, Berden, and Green in the fall of 2009 requesting that the Bank work with the Nielsons through the Great Recession and discussing the Bedrock Transaction. *See* EC Ex. 77, at 48–75. Shown an example e-mail, Mark Smith testified that he found the e-mail "in the correspondence file." Tr. 672.[53] That the FDIC examiners did not initially find the correspondence files related to the Bedrock Transaction during the 2011 examination is explained by the fact that the bank employee with whom they were dealing and whom Enforcement Counsel called as a witness for the FDIC, Mark Smith, had only been employed by the Bank for a few months at the time of the

---

[53] Realizing how damaging this testimony was to the FDIC's case, the ALJ jumped in to lodge an objection on behalf of Enforcement Counsel. *See* Tr. 673. The ALJ later claimed that "the gathering of material isn't relevant." Tr. 675. That is incorrect. The Bank did not employ Mark Smith at the time of the Bedrock Transaction. Tr. 385 (joining the Bank in 2011). So the fact that he knew where to find correspondence and gathered this material is relevant to whether the Bank's files contained the correspondence. Eventually, the ALJ shut down any questioning from Smith regarding the Plante Moran report. *See* Tr. 677–78. Respondent takes exception to this erroneous ruling. Enforcement Counsel asked Smith to testify about the Plante Moran Report, Tr. 590–91, so Respondent's cross-examination of Smith on the report was fair game and should have been allowed.

examination. Tr. 385 (Smith). The examiners received the correspondence files when they specifically asked Doherty, a longtime Bank employee. R. Ex. 89.

The ALJ's claim that the lack of documentation misled the examiners in drafting the 2011 report of examination is also incorrect. *See* R.D. at 78–79. The ALJ claims that Green's representations led examiners to reach the conclusion in a draft report that the failure to document Bedrock Loan "was a documentation oversight by management." *Id.* Bank management, however, drafted the passage cited by the ALJ in response to the FDIC's preliminary findings after the 2011 examination, not examiners. *See* Tr. 580 (Doherty). Thus, it is not evidence of the examiners being misled. Further, the response is contemporaneous evidence that "the Board was fully aware of [the Bedrock loan] prior to the disbursement of the loan, but documentation was lacking supporting the Board's approval in 2009." EC Ex. 52, at 2. "This was a documentation oversight by management." *Id.* Green included the statement regarding the documentation oversight. Tr. 580 (Doherty). And the entire management team that signed it believed these responses were true and accurate. Tr. 581 (Doherty). Thus, far from demonstrating that examiners were misled, it demonstrates that the Board approved the Bedrock loan and reasonably explained the issues with documentation.

**Financial Statements**. For unexplained reasons, ALJ McNeil claims that Green's failure to obtain financial statements for the Nielson Entities somehow constituted intentional concealment by Respondent. R.D. at 81–82. As an initial matter, Green, as the loan officer, was responsible for getting financial statements. R. Ex. 29. There is absolutely no evidence anywhere in the record that Respondent was responsible for collecting these statements. Moreover, the ALJ makes no finding that Respondent was responsible for the financial statements. Nor does ALJ McNeil explain why it was misleading or how Respondent

intentionally misled either the Bank's board or the FDIC by Green's failure to obtain financial statements in a timely fashion.

Further, the Bank need not have collected financial statements from all the ***recipients*** of the funds from the Bedrock Transaction. These other entities did not have an obligation to pay back the Bedrock Loan—only Bedrock did. Thus, their financial statements are irrelevant to the obligations owed by Bedrock to the Bank. As beneficiaries and not obligors, there is no reason to analyze their financial capabilities and ability to repay the proceeds from the Bedrock Loan.

**Loan Sales to Affiliate Banks**. ALJ McNeil recommends finding that Respondent concealed information from regulators because he authorized sales of certain Nielson loans to affiliate banks. *See* R.D. at 82–86. Respondent, however, did not intentionally conceal information when he implemented a pre-existing plan to respond to regulators' concerns by reducing the Bank's exposure to Nielson Entities.

In May 2009, Green recommended selling Nielson loans to the two affiliate banks as a way to reduce exposure to the Nielson debt. R. Ex. 206; Tr. 1316. A small fraction ($2 million) of the proposed sales occurred in May 2010, after the Nielsons resumed paying their loans and when Calcutt believed Cori Nielson would honor her promise to pay the Bank 100%. Thus, the loan sales of Nielson Entities NRJ LLC and Blueridge Holdings, LLC, among others, were contemplated a year earlier. R. Ex. 206.

The sales were legitimate transactions. Tr. 1319 (Calcutt); Stip. Tr. 1629–30 (Jackson). Calcutt and Jackson asked the presidents of two affiliated banks about purchasing the loans, and they expressed interest. The loan sales were fully documented by sales agreements that examiners overlooked while reviewing the Bank's files. R. Exs. 42 & 44. The board had no obligation to approve the sales and no evidence shows that the board was ever involved at any

level in loan sales. As examiner O'Neill testified, reducing the Nielson debt was a good thing and loan sales were one way to do that. Stip. Tr. 669–70. The loans were only repurchased because the Nielsons broke their promise and the repurchase facilitated the ability to pursue a global resolution. Tr. 1320 (Calcutt).

Although the ALJ improperly admitted the FinPro report (EC Ex. 84) and its conclusions parroted the 2011 FDIC ROE, the report discusses the loan sales with respect to Jackson and Jackson alone. The report identifies that Jackson was the person responsible for effectuating the loan sales. It also shows that any offer to repurchase the loans in the event of credit problems was not tied to Calcutt. EC Ex. 84 at 40. Likewise, nothing ties any of the communications between Green and Berden about the sale of the loans to Calcutt. Whatever Jackson or Green may have said, it did not reflect Calcutt's point of view that the sales were intended to be binding and that the repurchase occurred only because of the need for global resolution. Tr. 1319–20 (Calcutt). Moreover, the loans performed during the summer of 2010, as the Nielsons made payments from their own funds. Tr. 167 (Berden).

The ALJ also relies upon Miessner's "opinion that Respondent's conduct was misleading in regard to" the affiliate loan transactions, R.D. at 83, and her testimony "they didn't have any intention of leaving them actually sold." Tr. 855–56 (Miessner). Her opinion is baseless speculation on Respondent's intentions. No person has an expertise in mind-reading. *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."). As Miessner conceded, "I don't know what Mr. Calcutt believed at the time." Tr. 855 (Miessner). When Respondent's counsel pressed her for an evidentiary basis for her opinion, ALJ McNeil interjected on behalf of the FDIC and cut off questioning. *See* Tr. 856 (ALJ McNeil objecting

A466

"asked and answered" on behalf of the FDIC and instructing witness not to answer, even though she had not answered this question). The ALJ intentionally created an absence of evidence and found against Respondent because of that absence. It is improper for the ALJ to permit Miessner to testify to unsupported speculative opinions and then *sua sponte* prevent Respondent from examining Miessner about the basis for her opinions in order to find against Respondent.

**2010 Exit Examination**. In Section 5.R, the ALJ makes several findings irrelevant to the issue of Respondent's alleged intentional concealment and recommends Respondent's removal supposedly for failing to disclose the Bedrock Transaction during the 2010 examination meeting with FDIC EIC James Russell and Case Manager Miessner. *See* R.D. at 89–92. The Board should reject the ALJ's recommendations.

As an initial matter, Section 5.R is outside the Notice and should not be considered as a basis to remove Respondent. *See supra* Section IV.B. Moreover, the ALJ once again misconstrues evidence to reach his finding. The ALJ claims that "when the regulators raised questions about" "the regulators' concern regarding Waypoint/Nielson-entity loans that were maintained as interest-only loans," Respondent failed to disclose the Bedrock Loan Transaction. R.D. at 89. There was no discussion, however, about the entire Nielson relationship as the ALJ suggests. According to Miessner, during the meeting, the "Examiners were disclosing their concerns about *an income-producing property being on interest-only*," not the entire relationship. Tr. 758 (Miessner) (emphasis added). She further testified that there was no "further discussion by the Examiners [or Bank Management] regarding the Nielson or Waypoint Management . . . relationship concentration. The larger group." Tr. 759–60 (Miessner). Because the ALJ's premise—that Respondent had a duty to disclose the Bedrock Loan

transaction because examiners were asking about the entire relationship—is false, it is incorrect to fault Respondent for failing to mention the Bedrock Transaction during this meeting.

Further, the vast majority of Section 5.R has no obvious relevance to whether Respondent intentionally concealed information from the Bank's board or regulators. ALJ McNeil admits that his recitation of a letter Jackson wrote responding to concerns raised during the 2010 examination is outside the Notice and irrelevant. *See* R.D. at 90. The ALJ's duplicative discussion regarding underwriting issues with the Bedrock Loan's source of repayment, appraisals, and personal guarantees is likewise irrelevant. *Compare* R.D. at 90–91 *with* R.D. at 69–73 (discussing the same issues). The ALJ does not explain how these underwriting issues demonstrate intentional concealment by Respondent. While they may relate to the prudence of the Transaction (notably, the ALJ has not relied upon them for that basis, *see* R.D. at 3 n.10), the Bank's alleged inability to receive appraisals, financial reports, or personal guarantees on the entire Nielson loan portfolio has no relevance to whether Respondent took actions to conceal information during the 2010 exit examination or otherwise and is not fairly presented in the Notice.

**Loan Presentations to the Board**. In Section 5.T, ALJ McNeil finds that Respondent intentionally concealed information by virtue of the Bank's process for presenting loans to the board of directors. *See* R.D. at 98–99. This is found nowhere in the Notice and is therefore not an appropriate basis to remove Respondent. While loans were typically not discussed at board meetings, the directors had direct access to the loan officers to ask questions about the loans. Tr. 516–17 (Swanson). All directors approved every loan made to the Nielsons, including the 2009 Bedrock Transaction, and approved the use of the Pillay Collateral in 2010 to bring the Nielson loans current. There is no evidence that Respondent designed the board's loan-approval process

to conceal information from the board during the relevant time period.  Nor is there information that the process was used to conceal anything about the Bedrock Loan transaction, the Nielson Entities, or the release of Pillay Collateral.  To the contrary, "[e]very month [Bank management] shared plenty of information with the Board."  Tr. 1328 (Calcutt).

### b.    The ALJ Has Made No Finding of Risk to the Bank.

No testimony or evidence demonstrates that these instances of alleged concealment of information from the board and from regulators created any risk of insolvency to the Bank.  The FDIC has not adduced any evidence that the Bank was at risk of failure as a result of the actions and statements of Green and Jackson, or that Calcutt was aware of, participated in or authorized any of their actions and statements.  The evidence is to the contrary.  Even after the 2009 and 2010 Call Reports were amended as demanded by the FDIC, the Bank was still profitable and well-capitalized in 2009, 2010, and 2011, and, when the Bank was sold in 2014, the purchaser paid a substantial premium over book value for the Bank.

In sum, almost all of these alleged instances of concealment relate back to the poor documentation of the Bedrock Transaction.  Had Green properly maintained his loan files and secured ratification from the Bank's board in a timely fashion, none of the alleged instances of concealment would have occurred.  The evidence shows that Green acted alone.  *See* EC Ex. 38, at 9, 13 (discussing Green taking actions on the Nielson Relationship without approval from the board or senior management).  The record is devoid of any evidence as to why Green did what he did or any evidence connecting his actions to Respondent.  Despite the fact that Green was at the center of events, Enforcement Counsel elected not to call him as a witness.  This decision left an evidentiary void that the Recommended Decision cannot escape.  ALJ McNeil tries to fill that vacuum with speculation and illogical inferences that because ***Green*** took some action or failed to discharge his responsibilities, Respondent necessarily took that action or failed as well.  This

tacit theory of vicarious liability should be summarily rejected. The FDIC has failed to carry its burden to demonstrate that Respondent intentionally concealed information causing a risk of financial instability to the Bank.

### D. Respondent Did Not Breach His Fiduciary Duties to Northwestern Bank.

As CEO and Chairman, Calcutt owed Northwestern Bank a duty of good faith and a duty of loyalty. *Seidman v. OTS*, 37 F.3d 911, 933 (3d Cir. 1994). He had a long-standing reputation for excelling in the performance of his duties prior to Miessner becoming the Bank's case manager. In both the 2006 and 2007 Reports of Examination, the Bank's composite rating was 1 and management was rated 1. *See* R. Ex. 77, at 2, 5; R. Ex. 78 at 3, 5. Even in the midst of the Great Recession, the examiners in both the 2008 (Jt. Ex. 1 at 4) and 2009 (Jt. Ex. 2 at 8) examination cycles gave the Bank satisfactory composite and management ratings of 2, meaning they had "no material supervisory concerns." Jt. Ex. 2 at 3. In the 2009 ROE, the examiners went on to state: "[E]xecutive [M]anagement administer their duties in a satisfactory manner. The executive team is experienced and knowledgeable." Jt. Ex. 2 at 8. The evidence does not support ALJ McNeil's determination that a well-respected banker managing a successful bank was suddenly bent upon making an unsafe loan and concealing information from the Board and the FDIC about that loan.

ALJ McNeil made three findings of fact in erroneously concluding Respondent breached his fiduciary duty to the Bank. Respondent takes exception to each of these findings.

### 1. Leading the Negotiations of the 2009 Bedrock Loan Transaction and 2010 Use of Collateral Was Not a Breach of the Duty of Care.

*Findings: Respondent breached his fiduciary duty by authorizing the Bedrock Transaction and use of Pillay Collateral, creating a reasonably foreseeable risk that the Bank's use of collateral absent personal guarantees would lead to financial loss. (Findings of Fact 1.d, 8.a, and 8.b; R.D. at 4 & n.13; R.D. at 7 & nn.28, 29; R.D. at Part II, Sections 4, 5.D, N–P & T; R.D. at Part II, Conclusions of Law 5, 7; R.D. at 122–23.)*

In **Finding of Fact 1.d**, ALJ McNeil found that Respondent did not act prudently and diligently in permitting the Bedrock Transaction and use of the Pillay Collateral by the Bank to bring the Nielson loans current.  R.D. at 4.  This finding derives from the conclusion that the Transaction and use of the Pillay Collateral was unsafe and unsound.  "Whether one speaks of a breach of fiduciary duty or an unsafe or unsound practice, the common element that [the FDIC] must show is behavior that creates **an undue risk to the institution**."  *Kaplan v. OTS*, 104 F.3d 417, 421 (D.C. Cir. 1997) (emphasis added).  As discussed *supra* in Sections V.C.1 & 2, these Transactions were in the best interests of the Bank and were neither imprudent nor did they cause an undue risk of loss to the Bank, as determined by examiner Bird in 2010.  "This is not a case where a fiduciary engaged in imprudent lending activities or stood idle and allowed damage to increase."  *Doolittle v. Nat'l Credit Union Ass'n*, 992 F.2d1531, 1537 (11th Cir. 1993).  Rather, Respondent took what he "believed to be appropriate corrective actions," meeting his fiduciary obligations to the Bank.  *Id.*

ALJ McNeil went further and found that Respondent's actions in permitting the use of the collateral securing impaired loans that lacked personal guaranties would lead to financial loss and making the loans without requiring personal guaranties exposed the Bank to risk of loss.  *See* R.D. at 7 (Findings of Fact 8.a and 8.b).  Aside from the finding being outside the Notice, there are other fundamental problems with these findings.  First, the conclusion ignores the testimony of Cori Nielson and Respondent that the Nielsons had always refused to provide personal guaranties.  R.D. at 21; Tr. 983 (Nielson); Tr. 1275 (Calcutt).  Second, even though the Nielson lending relationship began in 2002, not until the 2010 ROE did the examiners even mention the lack of personal guaranties.  *See* R.D. at 13; EC Ex. 19 at 10.  As Cori Nielson made clear, given the Great Recession the Nielsons were unprepared to give the Bank concessions, including

personal guaranties.  Tr. 946–48.  Further, there was no evidence personal guaranties would have improved the Bank's position given the depth of the Great Recession.  *See* Tr. 1275 (Calcutt) (uncontradicted testimony that guaranties would have been valueless).

In sum, the Findings of Fact 1.d., 8.a., and 8.b are without evidentiary support.

### 2.    Respondent's Response to Regulatory Warnings Regarding the Nielson Entities Loan Portfolio Was Not a Breach of Fiduciary Duty.

**Finding:** *"Respondent also failed to heed and effectively respond to repeated regulatory warnings regarding the Bank's Nielson Entities portfolio, including concerns about the increasing concentration of the Nielson Loans, the failure to conduct a global cash flow analysis and global collateral analysis, and the persistent and deliberate failure to obtain updated financial statements and appraisals of the collateral securing the Nielson Entities Loans."  (R.D. at 4 & n.14; R.D. at Part II, Sections 4, 5.B–D, I, K–P; Conclusions of Law 5, 7; R.D. at 122–23.)*

In ***Finding of Fact 1.e***, ALJ McNeil found that Respondent breached his fiduciary duty to the Bank by failing to heed regulatory warnings regarding the Nielsons.  R.D. at 4.  First, this Finding is outside the Notice and must be disregarded.  *See supra* Section IV.B.2.  It is also untrue that Respondent did not heed regulatory warnings when engaging in the Bedrock Transaction.  No FDIC witness explained why there was a need for a global cash flow to support a $760,000 loan (one tenth of one percent of 1% of the Bank's loan portfolio).[54]  Hollands prepared a detailed cash flow analysis of Bedrock.  He performed a detailed analysis of the financials and collateral position for Bedrock.  Jt. Ex. 6.  As Doherty testified, the requirements for appraisals were in flux and the Bank tried to comply with those changing requirements.  Tr. 1096 (Doherty).  Had the Nielsons not ceased making payments in September 2010, the Bedrock Loan would have been a perfect example of how a bank should work with a borrower to preserve the integrity of the lending relationship.  In any balanced view, there is no way to reach the

---

[54] That the Bank did not conduct a global cash flow analysis does not change the fact that the Bedrock Loan itself was properly underwritten.  There was no need for a global analysis of all Nielson Entities to understand the Nielson's financial ability to repay a small $760,000 loan.

conclusion that the underwriting was contrary to regulatory guidance or Respondent breached his fiduciary duty in supporting the Bedrock loan. *See supra* Section V.C.1.

It is also untrue that Respondent failed to heed regulatory warnings about the size of the Nielson relationship. The Bank took numerous affirmative actions in response to regulatory warnings. As part of an effort to reduce the Nielson debt, Green recommended selling Nielson loans to the two affiliate banks. R. Ex. 206; Tr. 1315–16 (Calcutt). The Bank ultimately sold the loans, which Examiner O'Neill testified was good in concept as a way to reduce the Nielson exposure. Stip. Tr. 669–70 (O'Neill). Respondent also informed the Nielsons that the Bank would not accept any new Nielson loans. Tr. 45–47 (Berden). The Bank asked the Nielsons to make significant principal payments, move more cash into Northwestern Bank accounts, and provide statements to explain certain entities that did not have income or cash flow. Tr. 47–48 (Berden). The Bank specifically requested that the Nielsons move their loans to other banks. Tr. 57, 153 (Berden); EC Ex. 3, at 67–68. And the Bank hired Mark Smith as the director of Global Risk to respond to regulatory criticism. *See* Tr. 384 (Smith).

Finally, the ALJ does not explain how the claimed failure to heed regulatory criticism resulted in an adverse effect or a benefit to respondent, nor does the ALJ explain how it involved the requisite scienter. Absent any of the other elements, it is not a valid basis upon which to remove Respondent.

### 3.    Respondent Did Not Breach the Duty of Candor by Withholding Information from the Board and Regulatory Examiners.

***Finding:*** *"Respondent withheld from the Bank's Board and its regulatory examiners the true nature of the Nielson Entities, the true condition of the entities that were to benefit from the 2009 Bedrock Loan transaction and the 2010 collateral release transaction, the true course of the payment of the 2009 Bedrock Loan prior to Board approval of the loan, and the true course of the condition of the Entities that would benefit from the 2010 collateral release transaction."* *(R.D. at 4 n.15; R.D. at Part II, Sections 5.A–B, E–M; Conclusions of Law 5, 7; R.D. at 122–23.)*

In ***Finding of Fact 1.f***, ALJ McNeil found that Respondent breached his duty of candor

to the Bank's board and examiners regarding the true condition of the Nielson entities and the use of proceeds from the 2009 Bedrock Transaction and the 2010 release of Pillay Collateral. R.D. at 4.  The evidence is to the contrary.

A CEO and Chairman owes the bank a duty of loyalty, which includes a duty of candor in his dealings with the board of directors.  The duty of candor, however, is limited to transactions in which the officer "may derive a personal benefit."  *Seidman*, 37 F.3d at 935, n. 34 (quotation omitted).  It is undisputed that Calcutt did not derive a personal benefit from the Bedrock Transaction.  The proceeds of the Bedrock Transaction went to pay Bank debt, not Calcutt.  To the extent that the FDIC seeks a broader duty of candor, such an expansion is unwarranted and inconsistent with Michigan law.  State law defines the standard for whether a respondent breached his fiduciary duties under 12 U.S.C. § 1818(e).  *See Atherton v. FDIC*, 519 U.S. 213, 217–26 (1997); *Kaplan v. OTS*, 104 F.3d 417, 421 n. 2 (D.C. Cir. 1997).[55]  To the extent that the FDIC seeks to expand the scope of the duty of candor to all transactions in which the respondent does not have a personal interest, Michigan state law does not recognize such a duty.  *See* Stephen H. Schulman et al.*, Michigan Corporation Law & Practice*, Duties of Directors and Officers, § 5.9 n.81b (2019) ("There is no Michigan authority discussing a general 'duty of disclosure,' which appears to be a subset of the duties of care and loyalty.").  For that reason alone, this recommendation should be rejected.

---

[55] A finding that the Respondent violated a duty of candor established by federal law would set a federal rule of decision, requiring bank officers to discharge different fiduciary duties from others in their state—i.e. federal common law.  *See Atherton*, 519 U.S. at 219.  "There is no federal general common law."  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  For example, in *Atherton*, the Supreme Court held that federal common law does not provide the standard of care for officers and directors of federally insured savings institutions.  *Atherton*, 519 U.S. at 216.  Similarly, here, federal common law does not govern the standard of fiduciary duties for officers and directors of Northwestern Bank.

Moreover, the FDIC's claim that Calcutt concealed information from the board lacks evidentiary support. At the risk of redundancy, the 2008 and 2009 ROEs—which were shared with and acknowledged by board members—clearly explained the extent of the Nielson relationship. Jt. Exs. 1 & 2. Moreover, the board packages provided to directors in the October and November 2009 Board Reports highlighted and detailed the increase in delinquencies in the Nielson relationship and the resolution of those delinquencies. R. Ex. 22, at 2, 8; R. Ex. 23, at 2, 8. Calcutt, Jackson, and Swanson all concur that discussions about these delinquencies occurred. Tr. 518, 521–24, 528, 539–40 (Swanson); Tr. 290–93 (Calcutt); Stip. Tr. 1689–90 (Jackson). As Swanson testified, he would not have overlooked a trebling in the delinquency numbers in an aggregate of $40 million. ***Crucially, Swanson recalled being told that the delinquencies were attributable to the Nielson debt because of underwater properties and the release of Pillay related to the concern about perfection of the security***. Tr. 534–36. The fact that none of them can recall the precise details of the conversation at those board meetings reflects the passage of ten years before they testified, not obfuscation or an intent to mislead. Also, contrary to the ALJ's conclusion regarding misleading loan documentation, Respondent had nothing to do with the belated preparation of the loan write-up (fully explained by the contemporaneous e-mails between Green and Hollands as well as Hollands' testimony), or Hollands' generic use of the term "working capital," which Swanson confirmed was generally used for lines of credit. Tr. 536 (Swanson). There is no evidence that Respondent intentionally misled the Board.

The cases cited by the FDIC put into perspective the kind of conduct that results in the breach of fiduciary duty—conduct that is totally absent here—as well as the requirement that the duty of candor is limited to self-dealing transactions.

In *In the Matter of Ronald J. Grubb*, FDIC-88-282k, 1992 WL 813163 (FDIC 1992), the respondent, who was chairman, director, and 94% owner of the bank, proposed and personally benefited from numerous transactions in which his personal interests and the Bank's interests were in conflict, made loans in violation of Regulation O and without collateral, and caused the Bank to incur losses in excess of $600,000 on loans to him or related interests. *Id.* at *28–29. The Board concluded that respondent "failed to take even rudimentary precautions to protect the Bank's interests with respect to transactions from which he benefited." *Id.* at *28.

*de la Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003), also presents a very different scenario. When the Bank's board of directors was considering substitution of collateral for a loan, de la Fuente (a director) answered the board's questions, but intentionally withheld certain crucial facts he knew, as an interested party, about substituting what he knew to be inferior collateral, which not only increased the Bank's risk but ultimately caused the Bank to sustain a $700,000 loss. *Id.* at 1221. de la Fuente personally received a significant monetary benefit from the substitution of the collateral. *Id.* at 1221–22. By contrast, here, Respondent had no personal interest in the loan.

Finally, contrary to ALJ's Finding of Fact 1.f, Respondent owed no fiduciary duty to examiners, of candor or otherwise. The Ninth Circuit has expressly rejected such an argument, holding bank officers and directors, "like any other … director, was under no *fiduciary duty* to disclose the adverse facts to the agency investigators." *de la Fuente*, 332 F.3d at 1225. There is no basis in fiduciary law to require candor to regulators, much less to hold Respondent vicariously liable for the acts of others.

### E.    Respondent's Actions Did Not Result in an Adverse Effect on the Bank or Provide an Improper Benefit.

To prove the effect element, the FDIC must show either that "by reason of" the misconduct Northwestern Bank "has suffered or will probably suffer financial loss or other damage," the depositors "have been or could be prejudiced," or that Respondent "has received financial gain or other benefit by reason of" the alleged misconduct.  12 U.S.C. § 1818(e)(1)(B)(i)–(iii).  The statute requires that the effect be proximately caused by the misconduct.  *See Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (the phrase "by reason of" requires that the prohibited action proximately cause the effect); *de la Fuente*, 332 F.3d at 1223; *Kaplan*, 104 F.3d at 421.[56]  The effect must also have been reasonably foreseeable to Calcutt at the time of the alleged misconduct.  *See de la Fuente*, 332 F.3d at 1223.  In other words, the effect must accompany and be a foreseeable consequence of the alleged misconduct.  *See Seidman*, 37 F.3d at 929.

Without any discussion of the law, ALJ McNeil found that Respondent caused the Bank to suffer a loss, put the Bank at risk of loss, caused other damage to the Bank, and received financial gain.  *See* Findings of Fact 2, 3, 4, 5, R.D. at 4–5.  ALJ McNeil, however, fails to connect any cognizable effect to any misconduct by Respondent.  These findings are without

---

[56] While Respondent understands the Board recently decided that the statute does not require proximate cause, that decision is contrary to the cited Supreme Court and Federal Circuit precedent.  *See In the Matter of Michael R. Sapp*, FDIC-13-477(e), FDIC-14-478(k) (Sept. 17, 2019).  Further, the decision in *Landry* cited by the Board in *Sapp* is inapposite.  Whether or not *someone* "may have been more guilty" than others when participating in certain actions that caused a loss says nothing about whether *those actions* proximately caused a loss.  *Landry v. FDIC*, 204 F.3d 1125, 1139 (D.C. Cir. 2000).  In *Landry*, the respondent did not argue that the alleged misconduct was not the proximate cause of the loss.  Rather, he attempted to minimize his role in that misconduct.  By contrast, here, Respondent asserts that the Bedrock Transaction was *not* the proximate cause of losses.

evidentiary support and are outside the Notice.  Respondent therefore takes exception to the

ALJ's findings of fact on the effects prong.

### 1.    ALJ McNeil's Conclusions That the Bank Incurred a Loss or Was at Risk of Loss Lack Evidentiary Support.

**Finding:**  *Respondent caused the Bank to suffer financial loss and other damage, including $30,000 charge-off on the $760,000 loan, a $6.443 million loss on the other Nielson Loans, and $1.2 million in Pillay collateral that had supported the Nielson Loans.  (Findings of Fact 2.a, 2.b, and 2.c; R.D. at 4–5 & nn. 16–18; R.D. at Part II, Sections 4, 5.L–N, Q, P; Conclusion of Law 8; R.D. at 122.)*

In Finding of Fact 2, ALJ McNeil claims Respondent caused the Bank to suffer financial

loss.  *See* R.D. at 4–5.  Notably, ALJ McNeil fails to connect any specific misconduct with an

effect.  Rather, he vaguely asserts that Respondent's "actions identified in the above" resulted in

the loss.  Such a failure to explain his reasoning and connect a specific loss to a misconduct

violates Respondent's procedural rights and should be rejected.  *See* 5 U.S.C. § 557(c)(3)(A).

Furthermore, the ALJ's findings are without evidentiary support.  In ***Finding of Fact 2.a***,

ALJ McNeil concludes the "Bank suffered financial loss from the Bedrock [T]ransaction,

including a $30,000 charge-off on the $760,000 loan."  R.D. at 4.  But a $30,000 charge-off does

not mean that the Bank "has suffered" a financial loss.  12 U.S.C. § 1818(e)(1)(B).  As an initial

matter, there is no record evidence to explain the basis for the charge-off.  EIC Gomez was

unable to justify the charge-off in 2012 given three appraisals that established, as of October 2,

2011, there was no basis for loss.  Tr. 323–24; R. Ex. 166 ("We received 3 updated appraisals for

Bedrock.  And the appraisal came back for more than . . . the bank's estimated value."); *see also*

R. Ex. 165.  The FDIC's final position did not include a loss on Bedrock because the "[n]ew

appraisals showed sufficient value.  No loss."  R. Ex 209.  It is thus unclear why the Bank took a

charge-off three years after the loan was disbursed, what that charge-off reflects, and whether

that charge-off was the result of factors that had arisen during the three years since the loan's

disbursement.  Absent any explanation of the charge-off itself or how it is connected to Respondent's authorization of the loan three-years prior, the charge-off cannot support removal.

A charge-off is an accounting mechanism that reflects the creditor's belief that an amount of a debt is unlikely to be collected.  Contrary to the ALJ's finding, a charge-off does not reflect that a bank actually "has suffered" a loss.  12 U.S.C. § 1818(e)(1)(B).  Rather, when the magnitude of the charge-off is sufficiently large, it may establish that the bank "will probably suffer financial loss" at some point in the future.  *Id.*  But ALJ McNeil made no such finding that modest charge-off amounting to just 4% of the loan demonstrated that the Bank will probably suffer a financial loss.  Nor does any evidence establish that a $30,000 charge-off on the Bedrock Loan means the Bank "will probably suffer" financial loss.  Unlike *In the Matter of James L. Leuthe*, where "[s]uccessive examiners testified that when a bank is required to charge off one hundred percent of a loan classified 'Loss' or fifty percent of a loan classified 'Doubtful,' it results in a loss to the bank," 1998 WL 438323, at *15 (FDIC June 26, 1998), no testimony here establishes that a mere $30,000 charge-off—less than 4% of the total loan—demonstrates anything about actual or probable future loss.  And, to the extent that a $30,000 charge-off reflects an actual loss, the Bank did not lose $30,000 on the Bedrock Loan overall.  In fact, the Bank made over $30,000 in interest on the loan from September 1, 2009 to September 1, 2010, which fully offsets the charge-off.[57]  Miessner was unable to testify whether the Bank recovered all of the money it was owed on the loan.  Tr. 827 (Miessner).

Similarly, there is no evidence in the record that would support a finding that the Bedrock Transaction directly or proximately caused the Bank to lose money on its other loans to Bedrock

---

[57] The loan had a 4% interest rate floor.  *See* Jt. Ex. 6.  Over the course of the year, the Bank earned $30,400 in interest on the $760,000 loan.

Holdings, LLC or to any other Nielson Entity.  *See* R.D. at 89 n.677, citing EC Ex. 129; Tr. 381–

82 (Bimber).[58]  Bedrock Holdings had three separate loans totaling $7.5 million.  Only one of

these loans was the $760,000 loan that was part of the Bedrock Transaction and the subject of the

Notice.  No evidence attributes any of Bedrock Holding's losses to the Bedrock Transaction.  In

fact, despite trying to manufacture grounds for a Section 8(e) proceeding, R. Ex. 93, Dennis

O'Neill of the FDIC was "unable . . . to separate a loss for [the Bedrock Loan] from the loss

incurred on all three loans to Bedrock combined," R. Ex. 95.

In ***Finding of Fact 2.b***, the ALJ finds that the Bank lost $6.44 million on all of the

Nielson loans.  R.D. at 4.  This finding fails to acknowledge that the "loss" referred was the

amount the FDIC ordered the Bank to write down the Nielson loans after the 2011 examination,

and not an amount owed to the Bank that it was unable to collect from the Neilson Entities.  The

finding also fails to establish the effects prong because no evidence "supports a finding that the

bank would potentially suffer any loss . . . as compared to the likely outcome" of the status quo.

*de la Fuente*, 332 F.3d at 1225–26.  The FDIC failed to demonstrate a baseline from which the

Nielson collateral deteriorated.  Indeed, no evidence demonstrated that the Bank would have

been better off foreclosing on the Nielson lending relationship in the fall of 2009—the nadir of

the Great Recession—rather than when it did in 2011, particularly after receiving almost $2.5

million in additional payments from the Nielsons' own funds.  Both EIC Gomez and Case

Manager Miessner agreed it was impossible to say whether the Bank incurred more or less loss

---

[58] The ALJ mischaracterizes the Bank's foreclosure attorney Fred Bimber's testimony.  The ALJ claims that Bimber set the loss on the "foreclosure action against Bedrock Holdings LLC" at $1.8 million.  The foreclosure action, however, involved more than Bedrock Holdings.  It also included several other Nielson Entities.  The ALJ fails to explain how the Bedrock Transaction caused a loss to all of the other Nielson Entities involved in the foreclosure action.  *See* EC Ex. 129.

**A480**

by foreclosing in 2011 as opposed to 2009.  Tr. 322 (Gomez); Tr. 836 (Miessner).  Furthermore, nothing causally connects the charge-offs on the Nielson loan portfolio to any misconduct alleged, as no evidence demonstrates that the losses on the Nielson loans would not have happened absent the alleged misconduct.  The FDIC simply attempts to shoehorn effects from an economic crisis and a difficult borrower into a Section 8(e) violation against Mr. Calcutt.

Overall, the Bedrock Transaction did not result in an adverse effect to the Bank in any way.  Rather, it resulted in significant benefits.  Because of the Transaction, the Bank subsequently received $1.2 million in payments from the Nielsons and the voluntary payment of almost $1.3 million in Pillay Collateral.  It also allowed the Bank to reduce total principal for the Nielsons by about $2 million from December 2009 to December 2011 with the majority of the reduction attributable to real estate sales during that time, EC Ex. 77, at 8.  These significant financial benefits more than offset any alleged loss.  Examining the effects of Bedrock Transaction *in toto*, there is no adverse effect.  *See Seidman*, 37 F.3d at 929 (requiring the effects be tied to the alleged misconduct); *accord* 12 U.S.C. § 1818(e).

In ***Finding of Fact 2.c***, ALJ McNeil speciously claims that the Bank suffered financial loss because it used $1.2 million in Pillay collateral.  R.D. at 5.  It is impossible for the Bank to have lost money by ***receiving*** over $1.2 million dollars from the Nielsons.  The ALJ provides no explanation as to how this resulted in a loss.  To the extent ALJ McNeil's finding is predicated on the notion that the Bank lost money because collateral on other Nielson loans was depleted, that ignores (i) that the Bank ***received*** the money sooner, which is better than receiving it later, and (ii) that the Bank had a poor, tenuous security interest.  As discussed, given the tenuous lien on the Pillay Collateral, voluntarily receiving the Pillay Collateral was "like getting something for nothing."  Tr. 1154 (W. Calcutt).  Releasing a tenuous security interest in cash collateral in

136

**A481**

order to receive that cash collateral from a debtor claiming financial distress could not and did not result in a loss to the Bank, as the money came into the Bank.

**Finding:** *"Respondent's actions created a significant risk of loss to the Bank from the Bedrock Loan transaction and the 2010 collateral release. That risk includes risk occasioned by the Bank's entering into both transactions without conducting reasonable or prudent underwriting or credit administration practices – as by not requiring financial statements or timely collateral appraisals prior to loan disbursement to the Nielson Entities." (Finding of Fact 3; R.D. at 5 & n.19; R.D. at Part II, Sections 5.N–R; Conclusion of Law 8; R.D. at 122.)*

In **Finding of Fact 3**, ALJ McNeil found there was a risk of loss to the Bank because it entered into the Bedrock Transaction and 2010 Transaction. *See* R.D. at 5. As an initial matter, this conclusion is outside the Notice. Additionally, for the reasons discussed *supra* Sections V.C.1.a and b, the Transactions did not entail any risk of loss to the Bank. The Transactions were prudent and beneficial. Moreover, the ALJ's claim that the Bank failed to require financial statements or timely collateral appraisals has nothing to do with the Bedrock Transaction nor 2010 Transaction themselves, much less Respondent's conduct. These claims stem from examiner criticism of certain Nielson loans in prior examinations. *See, e.g.*, EC Ex. 48, at 30. With the exception of the Bedrock Transaction, the Bank had ceased making loans to the Nielsons as of early 2009. Thus, the criticism was only relevant as it related to loan **renewals**, not with respect to putting new money at risk. Given the Great Recession and the improbability of the Nielsons refinancing their loans with another lender, the Bank's choices were either to renew the loans or initiate foreclosure. R.D. at 49; Tr. 54, 152, 158–59. Foreclosure was a terrible option at the nadir of the Great Recession, especially when it was possible to reach a short-term work-out accommodation through the Transactions. Given the choices, the failure to receive financial statements or appraisals on renewals did not create a risk of loss.

Furthermore, the Transactions themselves involved sufficient underwriting, contrary to the ALJ's finding. With respect to the Bedrock Transaction, the evidence demonstrates that the

Bank received updated financials and an updated appraisal. *See* Tr. 80, 87 (Berden); EC Ex. 3, at 112; EC Ex. 38, at 11 (FDIC visitation report acknowledging that "[t]he cash flow analysis [for Bedrock] . . . was performed as of September 2009."). There also was no reason to conduct a global financial analysis or receive updated appraisals on the entire Nielson relationship, because only Bedrock was obligated to pay a small $760,000, which was well-secured with new collateral. With respect to the 2010 Transaction, there was no need to conduct a financial analysis nor get an appraisal, as the Transaction simply involved the Bank receiving $689,000 in tenuously secured collateral from a borrower claiming financial difficulties.

**Finding:** *Respondent's actions in concealing the true nature of the Bedrock Loan Transaction caused other damage, including investigative and auditing expenses and prevention of timely action to prevent the risks. (Findings of Fact 4.a & 4.b; R.D. at 5 & nn.20, 21; R.D. at Part II, Sections 5.P–V; Conclusion of Law 6; R.D. at 122.)*

In **Finding of Fact 4**, ALJ McNeil claims, "Respondent's actions in concealing the true nature of the Bedrock Loan Transaction caused other damage to the Bank." R.D. at 5. As an initial matter, as discussed *supra*, there are no allegations in the Notice that Respondent caused "other damage" to the Bank. As a result, it is not a proper basis upon which to remove Respondent. Moreover, such an allegation, even were it to be present in the Notice, would be too general to fairly put Respondent on notice of his alleged misconduct.

Additionally, the evidence contradicts Finding of Fact 4. Specifically, **Finding of Fact 4.a** states, "Respondent's lack of candor with both the Board and the Bank's examiners caused the Bank to incur investigative and auditing expenses." R.D. at 5. This is wrong for numerous reasons. As discussed, Respondent did not breach his duty of candor to the Board, nor is it possible for him to do so with respect to the regulators. *See supra* Section V.D.3. Further, the evidence contradicts that it is Respondent's lack of candor with the Board that caused the increased expenses. As the ALJ himself found, relying on Mark Smith's testimony, the Bank

incurred officer legal fees, legal consulting fees, increased audit fees, and increased FDIC assessments "'as a result of [the Bank's] CAMELS ratings' change." R.D. at 113, quoting Tr. 611–13 (Smith).

ALJ McNeil also disregards that the investigation expenses were not caused (proximately or otherwise) by any alleged misconduct. As courts have held, Section 8(e) requires the effect be a reasonably foreseeable consequence of the misconduct. *See de la Fuente*, 332 F.3d at 1223; *Kaplan*, 104 F.3d at 421; *accord Holmes*, 503 U.S. at 268. Here, the FDIC caused the Bank to incur investigation expenses, not Respondent. The FDIC's zeal to entrap Mr. Calcutt caused the Bank to incur expenses in order to defend itself and its officers against an unfounded Section 8(e) proceeding brought against them in the guise of a regulatory examination in 2011. As a result, the Bank had to hire counsel at Kus Ryan, a law firm, in order to defend itself against the charges and investigation. Further, the FDIC forced Northwestern Bank's board to hire Plante Moran, an accounting firm, and FinPro, a management firm, to conduct investigations of the Bank as part of a Consent Order. *See* Tr. 594 (Smith) ("Q. Was there a management study that was completed by the Bank? A. Yes. I believe that was required by the Consent Order."); Tr. 595 (The Plante Moran report "was prepared in response to the Consent Order"); *see also* Tr. 593 (Plante Moran report post-dates the Consent Order and was drafted in response to reports of examinations that led to Consent Order); EC Ex. 70, at 8. The FDIC also threatened civil money penalties against the Board if they failed to conduct the studies. Tr. 873 (Miessner); Tr. 1047 (Byl). Absent the threat and consent order, the Board would not have engaged Kus Ryan. Plante Moran, or FinPro.[59] In short, these expenses were caused directly by the Consent Order issued

---

[59] That the FDIC increased the Bank's assessments is also not an effect caused by the Bedrock Transaction. Had the Bank foreclosed on the Nielson loans in 2009, the CAMEL ratings would have declined even earlier than 2011 causing the increase in assessments earlier.

by the FDIC and the threats of Civil Money Penalties made by the FDIC to the Board and not by any lack of candor by the Respondent.

The increased expenses also are not legally cognizable as effects because they are simply the normal cost of investigating conduct that has not yet been determined to be wrongful.  As the FDIC Board has held, "[t]he incurring of legal fees is a normal and presumptively proper cost of doing business for a bank.  Therefore, the payment of such fees standing alone cannot be assumed to be enough to support a removal action that is based . . . on actual loss to the institution."  *In the Matter of Billy Proffit*, 1998 WL 850087, at *10 n.11 (FDIC Oct. 6, 1998). In other words, absent some additional, actual loss attributable to conduct adjudged independently wrongful outside of the FDIC proceeding, investigation and legal fees are not cognizable as losses.

For example, in *Proffit*, the Tennessee Supreme Court determined that the bank and the respondent had violated the law and had to pay punitive damages.  That judgment was the "unusual circumstance[]" that allowed the Board to also consider legal fees as an effect.  *Id.* Similarly, in *Shollenburg*, the Board determined that the Respondents' tax avoidance scheme met the *Proffit* effects test for legal and investigatory expenses, because the Bank paid, in addition to legal and investigatory fees, $152,799.85 to satisfy the tax responsibilities that respondents had unlawfully avoided under the tax laws, as determined by multiple auditors and tax experts.  *In the Matter of Dennis Shollenburg*, 2003 WL 1986896, at *12 (FDIC Mar. 11, 2003).  Nothing similar is true here.  The only expenses are those spent defending conduct that has yet to be judged unlawful.  It cannot be the case that costs incurred defending yourself and investigating

---

In sum, ALJ McNeil improperly concluded the Bank suffered loss as a consequence of the Bedrock Transaction.

alleged misconduct establish the effects prong.  Any other conclusion would render the effects prong superfluous and would incentivize banks to avoid investigating and working with the Board to correct alleged misconduct.

*Finding of Fact 4.b* states, "Respondent's concealment . . . prevented both the Board and the Bank's regulators [from taking] timely action in 2009 to address the risks occasioned by such concealment."  R.D. at 5.  This catch-all conclusion is not pleaded in the Notice and must be disregarded.  Nor does it have any basis in fact.  Both Gomez and Miessner acknowledged it was impossible to say whether the Bank incurred a greater or lesser loss by not foreclosing sooner. Tr. 322 (Gomez); Tr. 836 (Miessner).

## 2.    ALJ McNeil's Conclusions That Respondent Received a Benefit Lack Evidentiary Support.

*Finding: Respondent's actions resulted in financial gain, including benefit from a dividend and increase in his bonus payment.  (Findings of Fact 5.a & 5.b; R.D. at 5–6 nn. 22, 23; R.D. at Part II, Sections 4, 5.T–V; Conclusion of Law 9; R.D. at 122–23.)*

In *Finding of Fact 5*, ALJ McNeil concludes that Respondent's "actions identified above gave him financial gain and other benefits."  R.D. at 5.  He again fails to explain any reasoning or connect a specific loss to a claimed misconduct which violates Respondent's procedural rights, *see* 5 U.S.C. § 557(c)(3)(A), and lacks any basis in the record.  The Board should reject ALJ McNeil's recommendation.

In *Finding of Fact 5.b*, ALJ McNeil concludes that the funds from the Bedrock Transaction and 2010 Transaction "resulted in conditions with the Bank's net income that permitted Respondent to benefit from an artificially inflated bonus."  R.D. at 5.  According to ALJ McNeil, Respondent was overpaid $68,841 in 2009 and $59,858 in 2010.  ALJ McNeil never explains how he determined Respondent was overpaid—he simply buries these numbers in a footnote and cites EC Ex. 117 for support.  This is contrary to the record which clearly and

141

unequivocally demonstrates that after the Call Reports for 2009, 2010 and 2011 were amended (as demanded by the FDIC to increase the write-downs on the Nielson loans) ***Respondent was still owed a bonus $31,978***, which the Bank never paid him. EC Ex.117, at 2 ("Corrected Accrual Balance"—*i.e.* earned but not yet paid—for 12-31-11); Tr. 632–33 (Smith); Tr. 1347 (Calcutt).

Respondent was entitled to a bonus of 5.5 percent of the Bank's net income. *See* R.D. at 114, citing Tr. 1347 (Calcutt). Respondent voluntarily reduced his bonus to 4 percent of net income during the Great Recession. *See id.* At the 5.5 percent level to which Respondent was fully entitled, he was underpaid by $385,962. *See* EC Ex. 117. Respondent's voluntary decision to reduce his bonus payment cannot be a reason to find Respondent was overpaid. Further, even assuming it is proper to assess whether Respondent was overpaid using the 4 percent bonus calculation, Respondent was still underpaid for the relevant time period. In late 2012, the FDIC required the Bank to simultaneously restate its earnings in 2009, 2010, and 2011 over the Bank's objection. *See* EC Ex. 78. As a result of the restatement, the Bank's earnings decreased in 2009 and 2010 but increased in 2011. *See* EC Ex. 79. At the time of the adjustment, it showed that Calcutt was underpaid $31,978 on his bonus through year-end 2011. *See* EC Ex. 117, at 2.

Mark Smith gave the sole testimony on the benefit to Respondent. In accordance with the FDIC Exhibit 117, Smith testified that Respondent was ***underpaid*** by $31,978 for the bonus that he had earned through year-end 2011. According to Smith, Calcutt had accrued but not been paid the full amount ***after restatement***.

> Q. Yes, but you testified with regard to Mr. Calcutt being overpaid through 12-31-11. Did you not?
>
> A. Correct, what was accrued by the Bank in relation to Mr. Calcutt's bonus.
>
> Q. So what we see in looking in the column that is third to the left, total through 12-31-11. He had a beginning accrual of over $65,000.

That was an amount accrued on the books that had not been paid to him at the beginning of this period that carried into 2006, was it not?

A. It appears so, yes.

Q. And then the accrual for the year was $943,958 for all of those years on a combined basis. Correct?

A. Yes.

Q. And then there had been an error correction that resulted in a decrease of 14,273. Do you see that number?

A. I do.

Q. And then you have the amount that was paid to him, correct? 977,569?

A. Yes, over that timeframe.

Q. So when all of those numbers were added, he had a corrected accrual balance of $31,978. Did he not?

A. Yes.

Q. Alright, so if we could go to your testimony at the prior hearing at page 1117 --

A. Okay.

Q. -- and if you look at the question at line 7. Question: And then if we go down to the next section of numbers, you'll see that in the year 2011 Mr. Calcutt only was paid 50,000 in bonus, correct? Answer: According to this schedule, correct. Question: Alright, and then when we then run across the total through 9-30-12, we find that same $1,103,000 number we were looking at on the prior page. The amount after restatement that he was entitled to be paid and comparing that to the 977,000 he was paid, you would agree with me that even after the amount was restated, Mr. Calcutt was actually paid less than the amount he was entitled to under the Restated Call Reports. Your answer was. Answer: According to the schedule here, yes. That was the testimony you gave at that time?

A. Yeah.

Q. And that was based on the fact that there was still an accrued balance of over $31,000. Right?

A. Correct.

Tr. 631–33 (Smith). ALJ McNeil recognized this testimony but inexplicably disregarded it.

R.D. at 114.

In *Finding of Fact 5.a*, ALJ McNeil also concluded that Respondent received the benefit of a 2011 dividend from the Bank to its holding company because Respondent owned 10% of the stock of the Bank's holding company.  R.D. at 5, 99.  The Bank was a wholly owned subsidiary of the holding company, which filed consolidated tax returns and issued consolidated financial statements.  *See* EC Ex. 149, at 1.  Dividends paid by a subsidiary to a holding company issuing consolidated financial statements and filing consolidated tax returns do not appear in financial statements because they are treated as intracompany transfers and therefore do not affect the taxable income reported on the consolidated tax returns.  Because dividends do not affect taxable income, the fact that Respondent held stock in the holding company does not mean a dividend would have resulted in a benefit.  To the contrary, the payment of the dividend or the withholding of the dividend did not have any impact on the value of Respondent's stock in the holding company

Further, reliable evidence did not support the finding made by ALJ McNeil.  The undisputed facts established that the holding company had sufficient funds to pay dividends in 2010 and 2011 even if no dividend had been paid by the Bank to the holding company and that the holding company, which is regulated by the OTS, did not need the FDIC's permission to pay dividends.  Respondent testified the Holding Company would have paid a dividend to shareholders anyway, as it had ample resources to do so and no evidence was presented that the OTS would not have permitted the payment.  Tr. 1348–49 (Calcutt).  Calcutt's testimony is further supported by the fact that the Bank remained profitable even after restatement.  R. Ex. 182 at 4–6.  While Miessner testified she would have objected to the 2011 dividend if she had understood the Bedrock Transaction, that dividend was approved by the Bank's Board, not Respondent, and was paid by the Bank to the Holding Company, not to Respondent.  EC Ex. 48

at 15; Tr. 784–87.  Furthermore, according to Miessner, she approved the dividend based on the

Call Reports and information ***provided by Jackson***.  Tr. 785–87 (Miessner).  Respondent had

nothing to do with the Call Reports or the information provided by Jackson.  As a result, the

FDIC has failed to establish any causal connection between Respondent's actions and the

dividend.

### F.    Respondent Did Not Act with Personal Dishonesty or Willful or Continuing Disregard for Northwestern Bank.

Before the FDIC "may impose the ultimate sanction of a Prohibition Order against a

banker that forever bans him or her from working in the American banking industry, [it] must

show a degree of culpability well beyond mere negligence, *i.e.*, there must be a showing of

scienter." *Kim v. OTS*, 40 F.3d 1050, 1054 (9th Cir. 1994).  The third element of Section 8(e)

requires the FDIC to establish that Respondent's actions "involve[d] personal dishonesty" or

"demonstrate[d] willful or continuing disregard" for the Bank's safety and soundness.  12 U.S.C.

§ 1818(e)(C)(i), (ii).  This requires that the conduct be "more than inadvertent or technical."

*Oberstar v FDIC*, 987 F.2d 494, 502 (8th Cir. 1993).  As with the effects element, the

misconduct must involve personal dishonesty or demonstrate disregard for the Bank's safety and

soundness.  The FDIC failed to meet its burden.

### 1.    ALJ McNeil Fails to Attribute Any Improper Scienter to the Bedrock Transaction or 2010 Transaction.

The FDIC cannot rely on other conduct unrelated to the Bedrock Transaction or 2010

Transaction to meet the scienter prong.  Rather, the Transactions themselves must "involve"

personal dishonesty or "demonstrate" disregard.  There was none.

As an initial matter, there is no finding of scienter whatsoever with regard to the use of

Pillay Collateral in December 2010 to bring the Nielson loans current.  As discussed, the Bank

realized a significant benefit by the Nielsons using the collateral to pay debt given the recognized

problem with perfecting the security interest. Nothing about agreeing to accept cash collateral from a borrower claiming financial difficulties involved personal dishonesty or demonstrated disregard for the Bank.

The Bedrock Transaction also did not involve any personal dishonesty. It did not violate any law or regulation, and it did not involve any conflict of interest or self-dealing. Instead, it was beneficial for the Bank and prudently underwritten. In fact, Bank management believed it was in the Bank's best interests, *see* Tr. 1296 (Calcutt); Stip. Tr. 1687–88 (Jackson), and FDIC examiner Bird passed the Bedrock Loan without criticism, *see* Stip. Tr. 902–03 (Bird); EC Ex. 20 at 12. Nor did the Bedrock Transaction demonstrate any disregard for the Bank's safety and soundness. To the contrary, the Transaction *stabilized* the Nielson loan portfolio, allowed the Bank to accept $600,000 in tenuously secured cash collateral, and reduced the Bank's overall exposure to the Nielsons. *See* EC Ex. 67; EC Ex 77 at 8; Answer ¶ 17.

Nevertheless, in ***Finding of Fact 6.b***, ALJ McNeil finds personal dishonesty because the new "proceeds apparently earmarked for Bedrock Fund LLC would in fact be distributed to multiple Nielson Entities, using bookkeeping proceeds that would withhold…the true common nature of the Entities and their loan portfolio." R.D. at 6. This finding against Respondent lacks evidentiary support for at least three reasons. First, the Respondent recommended an alternative to inter-company loans in 2008 to address concerns expressed by state regulators regarding Michigan's Unit Borrowing Rule. This advice was intended to prevent a future violation of the Unit Borrowing Rule. When this advice was given in 2008, the Nielson loans were all performing and the Bedrock Transaction was not even contemplated. Nothing about Respondent's advice from a year earlier was intended to conceal the common nature of the Entities, which the examiners fully understood. Jt. Ex. 1 at 43, Jt. Ex. 2 at 37–38.

Second, the entire purpose of the Bedrock Transaction was to bring all loans current, which it did.  The ALJ and Enforcement Counsel have failed to find any evidence, provide any argument, or cite any authority that the Transaction violated a statute or regulation at the time it was authorized, much less that Respondent knew the Transaction was problematic at the time he authorized it.  In fact, there was no problem with the purpose and structure of the Bedrock Loan. Everyone believed it was in the Bank's best interests, and it was disclosed to and approved by the Senior Loan Committee and the Bank's board.  The problem was that Green apparently tried to conceal from the regulators the fact that the Nielson Entities—his primary loan customers— had stopped payment on all their loans.  He placed memos in the Nielson files.  He did not properly file and disclose his communications with the Nielsons regarding the defaults in their loan files.  And he did not fully disclose the true purpose of the loan to the credit analyst who prepared the loan write-up.  No evidence ties Respondent to what Green did, and Green's dishonesty does not make Respondent's authorization of the Bedrock Transaction personally dishonest or in disregard for the Bank's soundness.  *See Kaplan*, 104 F.3d at 422–24 (later actions by others do not make Respondent's decision to authorize a transaction an unsafe practice).

Third, according to the ALJ, Respondent "envisioned" the upstreaming of funds and communicated it to the Nielson during a meeting on April 29, *2008*.  At that time, no evidence shows that Respondent believed the Nielsons would default on their payments or that the Nielsons would request loan restructuring.  The advice to upstream funds in fact significantly predates the Nielsons' claims of financial difficulties and the Bedrock Transaction, which occurred in the fall of *2009*.  No evidence shows (nor is it even logical to suggest) that the Bedrock Transaction involved personal dishonesty because a year-and-a-half earlier Respondent

147

responded to a concern expressed by state regulators regarding the Michigan Unit Borrowing Rule by requesting that the Nielsons cease inter-company lending.  Quite simply, the two issues are entirely distinct.  Thus, it is improper to find that the Bedrock Transaction involves personal dishonesty based on an unconnected request to upstream the funds (particularly when evidence of that request is both outside the Notice and the statute of limitations, *see supra* Section V.C.1.c).

### 2.    Respondent Was Not Personally Dishonest by Concealing Issues with the Nielson Loans.

**Finding:** *"Respondent's actions identified above involved his personal dishonesty. Those actions include: (a) Respondent persistently concealed from both the Bank's Board and its regulatory examiners the true common nature of the Nielson Entities Loan portfolio, problems with that portfolio, and Respondent's efforts in dealing with the Nielson Family's decision to stop making payments on the loans in that portfolio, first in 2009, then in 2010, and finally in 2011. Respondent falsely answered questions presented to him during examinations in 2009, 2010, and 2011, concealed documents showing the true condition of the loans during that period, and falsely testified that Board members had been fully apprised of the nature of the Nielson Loan portfolio.  (b) Respondent envisioned and then implemented the means by which proceeds apparently earmarked for the Bedrock Fund LLC would in fact be distributed to multiple Nielson Entities, using bookkeeping protocols that would withhold from the Bank's own auditors and its examiners the true common nature of the Entities and their loan portfolio." (Findings of Fact 6; R.D. at 6 & nn. 24, 25; R.D. at Part II, Sections 4, 5.A–G, I–K, P, O–U; Conclusion of Law 10; R.D. at 122–23.)*

In **Finding of Fact 6.a**, ALJ McNeil claims that Respondent's actions involved personal dishonesty because he "persistently concealed from both the Bank's board and its regulatory examiners the true common nature of the Nielson Entities Loan portfolio, problems with that portfolio, and Respondent's efforts in dealing with the Nielson Family's decision to stop making payments on the loans in that portfolio" from 2009 to 2011.  R.D. at 6.

As an initial matter, ALJ McNeil does not explain which of Respondent's acts involve personal dishonesty.  His sole findings on scienter related to Respondent's alleged concealment is one, conclusory sentence: "Respondent knowingly concealed material information from the Bank's Board and its regulators and, and knowingly gave false and misleading answers to

questions presented during this time period." R.D. at 123. This is insufficient under the APA. *See Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995).

Furthermore, the ALJ's conclusions lack factual support. As to the claim that Respondent was personally dishonest in concealing information from the board, no evidence establishes that the Respondent made any misstatements, defrauded, or deceived the board. Nor does the evidence establish that Respondent concealed information from the Board. *See supra* at Section V.C.3.a (showing evidence does not establish Respondent intentionally concealed information). To the contrary, three of the four board members who testified stated the Bank's board was aware of the interrelated Nielson Entities prior to the Bedrock Transaction, problems with the Nielson loan portfolio, and solutions to the Nielson's tactical decision to withhold payments. FDIC witness Ron Swanson testified: "at those board meetings around [late-2009] Scrub Calcutt would address the Nielson situation and bring the Board up to date as to what the management was doing to resolve the issue." Tr. 539 (Swanson); *see also* Tr. 518, 521–24, 528, 534–35, 539–40 (Swanson). He further testified the resolution of the Nielson situation would have been discussed, and he recalled the concerns regarding the Bank's security interest in the Pillay Collateral. *See* Tr. 528, 534–36 (Swanson). This corroborates the testimony of board members Respondent and Jackson that the board was fully aware of the Nielson's interrelatedness, the Nielson's decision to withhold payment, and the Bank's response. *See* Tr. 1290–93 (Calcutt); Stip. Tr. 1612 (Jackson).

To support his personal dishonesty finding relating to the Bank's board, *see* R.D. at 6 n.24, the ALJ relies upon (i) the loan write-up for the Bedrock Loan, *id.* at 60–63, (ii) Bruce Byl's testimony, *id.* at 66–67, and (iii) loan presentations generally to the Board, *id.* at 98–99. First, it is undisputed that the loan write-up was Bill Green's and Ian Hollands's responsibility.

*See* R.D. at 95–96 (discussing Hollands working with Green to draft credit write-up for Bedrock

Loan).  And there is no evidence whatsoever that Respondent was involved with its drafting or

the language used in the write-up.  Thus, nothing about the write-up can establish that

Respondent was ***personally*** dishonest; the actions or inactions of others cannot establish that

Respondent was himself dishonest.  *See Kaplan*, 104 F.3d at 422–24; *Kim*, 40 F.3d at 1055.

Second, Bruce Byl's testimony that he did not know about the Nielson relationship until 2012 is

inconsistent with Swanson, Calcutt, and Jackson.  Byl's testimony should be discounted, because

he has an ax to grind with Respondent, as Respondent claims that Byl "embezzled over a quarter

million dollars from the Bank, and he betrayed the confidences of the Board . . . [by] taking what

was discussed at board meetings and taking it outside the Bank."  Tr. 1272 (Calcutt).  Third,

nothing about the Bank's internal processes for approving loans shows that Respondent lied or

defrauded the board so as to establish Respondent's personal dishonesty.  In other words, the

ALJ's disagreement with the Bank's legal loan-approval process is not the same as personal

dishonesty.

As to the finding that the Respondent was personally dishonest by concealing information

from the examiners, the ALJ primarily relies upon the same findings supporting his claim that

Respondent intentionally concealed information from the regulators.  *Compare* Finding of Fact

1.c, R.D. at 4 n.12 (citing R.D. Part II, §§ 5.F–G, O–R, and T) *and* Finding of Fact 1.f, R.D. at 4

n.15 (citing R.D. Part II, §§ 5.A–B and E–M) *with* Finding of Fact 6.a, R.D. at 6 n.24 (citing

R.D. Part II, §§ 5.F–I and O–U).  For the reasons discussed *supra* in Sections V.C.3.a and V.D.3,

the evidence shows that Respondent did not intentionally conceal any information from the

regulators, and thus he was not personally dishonest.  Furthermore, many of these alleged

instances of concealment were actions or inactions of others; for example: (i) a letter authored by

Dick Jackson to Michigan bank regulators, R.D. at 57–58; (ii) the March 2010 board write-up drafted by Hollands and Green, *id*. at 61–69, (iii) underwriting issues with the Nielson loans generally, *id.* at 69–73, (iv) Green's failure to document the Nielson loans, *id*. at 43–45, 77–79, (v) obtaining financial statements from Nielson Entities, *id*. at 81–83, and (vi) the Bank's general practice regarding loan presentations to the Bank's board, *id*. at 98–99.  Thus, to the extent the examiners were misled, that was not due to any action taken by Respondent.  Rather, Green and others failed to discharge their responsibilities.  Not a shred of evidence ties Respondent to what Green and others did.  As discussed, the actions or inactions of others cannot establish that Respondent was himself dishonest.  *See Kaplan*, 104 F.3d at 422–24; *Kim*, 40 F.3d at 1055; *see also Proffitt v. F.D.I.C.*, 200 F.3d 855, 866 (D.C. Cir. 2000) ("it seems that the 'culpability prong' could only be established by reference to the time of a wrongdoer's misconduct.") (Silberman, C.J., dissenting).

Likewise, the ALJ's other findings of concealment do not establish that Respondent was personally dishonest.  First, that Respondent advised the Nielsons to upstream funds during a meeting in 2008 is both logically and factually unconnected to any alleged concealment occurring in 2009 to 2011.  In 2008, the Nielson loans were performing, the regulators understood the interrelated nature of the Nielson entities, and nobody expected the Nielsons to withhold payments, resulting in the Bedrock and 2010 Transactions.  Thus, Respondent's advice to upstream funds has nothing to do with his scienter accompanying the alleged concealment.

Second, Respondent's reliance upon Green to answer questions asked by examiners at the *de facto* deposition on September 14, 2011 regarding a loan made in 2009 does not establish scienter.  Months before the meeting, the Bank had classified the 2009 Bedrock Loan as nonperforming and had turned it over to the Bank's attorneys for collection.  Respondent had no

reason to recall the details of this loan, no opportunity to refresh his memory regarding this loan before the *de facto* deposition, and no reason to know the significance the FDIC would attach to his answers to pre-planned questions designed to create a record for removal.  Respondent was given at most a few hours' notice of the topics for the meeting following a scheme to ensure Respondent did not know the FDIC was "digging."  Respondent framed his answers as his recollection or guessing because he did not recall the details of a transaction almost two years old, and the FDIC failed to establish a reliable record of his answers.  *See supra* Section V.C.3.a. Guessing to the best of one's recollection is not personal dishonesty.

Third, the implementation of a pre-existing plan to sell loans to affiliate banks in order to reduce the Bank's exposure to the Nielson loans (in response to regulatory criticism) does not establish personal dishonesty.  Green recommended selling the Nielson loans to affiliate banks in May 2009, and the Bank completed a portion of those sales a year later.  R. Ex. 206; Tr. 1316 (Calcutt).  The Bank did not try to hide the sales from examiners.  The sales were fully documented by sales agreements that examiners overlooked while reviewing the Bank's files.  R. Exs. 42 & 44.  And because Miessner cannot offer expert testimony on Respondent's intent, whether she believed Respondent was personally dishonest is beside the point (and indeed simply reveals her bias as well as the ALJ's evidentiary errors for relying on such testimony). *See In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

Fourth, Respondent made an inadvertent mistake by relying on prior versions of the Officer's Questionnaire for his answers.  But an inadvertent, technical mistake is insufficient to establish personal dishonesty.  *See Oberstar*, 987 F.2d at 502

Finally, some of the ALJ's findings on personal dishonesty cannot support a removal order under the statute. To support his finding of personal dishonesty, the ALJ claims that Respondent was personally dishonest because of his testimony during the 2019 hearing. *See* R.D. at 6. Similarly, the ALJ cites to additional findings that he did not cite in support his finding that Respondent intentionally concealed information. *Compare* R.D. at 4 n.12 and R.D. at 4 n.15 *with* R.D. at 6 n.24 (ALJ not citing sections 5.S and 5.U to support intentional concealment misconduct findings). But just as the actions of others cannot establish Respondent's scienter, later and unrelated actions by the Respondent—actions that the ALJ did not find to satisfy the first prong of the removal statute—cannot establish that other actions involved personal dishonesty. *See Kaplan*, 104 F.3d at 422–24; *Kim*, 40 F.3d at 1055; *see also Proffitt*, 200 F.3d at 866 ("it seems that the 'culpability prong' could only be established by reference to the time of a wrongdoer's misconduct.") (Silberman, C.J., dissenting). Thus, Respondent's testimony in 2019 certainly cannot support removal for alleged concealment from 2009 to 2011. Nor can other facts that the ALJ has not found to be misconduct. The *Bank's* responses to the aggressive regulatory positions taken by the FDIC during the 2011 examination do not evince *Respondent's* personal dishonesty.[60] Similarly, responses to the FDIC during the 2011 examination authored by Bill Green show nothing about Respondent's personal dishonesty. *Compare* R.D. at 107. Because the ALJ has not found certain actions satisfy the misconduct prong of the statute, they cannot be used to remove Respondent simply because they may

---

[60] For example, Bank management reasonably disagreed with the FDIC over whether the Bank could restore the Nielson loans to accrual status because the Bank expected the Nielsons to repay the loans in full. That open disagreement does not establish personal dishonesty. *See* R.D. at 103

A498

establish (they do not) the scienter prong.  12 U.S.C. § 1818(e)(C)(i) (misconduct must "involve

personal dishonesty").

In sum, no facts establish that Respondent intentionally sought to mislead regulators.

After an exhaustive investigation, Plante Moran concluded that "it would be difficult to conclude

there was deliberate intent by management to deceive the Board of Directors or regulatory

examiners in regards to the facts and circumstances surrounding the Nielson relationship."  EC

Ex. 77, at 29.  Even Miessner conceded she could come to no conclusion on intent either.  Tr.

887 (Miessner).  The Board should reject the ALJ's findings on personal dishonesty.

### 3. Respondent's Actions Did Not Demonstrate Willful and Continuing Disregard for the Bank.

***Finding:*** *"Respondent's actions identified above demonstrated both willful and continuing disregard for the safety or soundness of the Bank. Those actions include: (a) Respondent throughout 2009 to 2011 persistently ensured the true group nature of the Nielson Entities would be hidden from examiners and the Bank's own auditors, creating a risk to the Bank's safety and soundness. He willfully directed the disbursement of Bedrock loan proceeds and Pillay collateral without first securing Board approval, in direct and knowing violation of the Bank's loan policies. (b) Respondent's conduct – notably the continued concealment from the Bank's auditors, its Board, and its examiners, facts regarding the true condition of the Nielson Entities loan portfolio from September 2009 (when all payments stopped) throughout 2011 – hid the extent of the problems of the portfolio over an extended period of time. The concealed facts were exposed only when a representative of the borrower provided the Bank's regulators with copies of documents that should have been in the Bank's loan files for this portfolio. These disclosures established that Respondent had actively prevented the filing and maintenance of relevant borrower correspondence showing the truly fraught condition of the portfolio as it truly existed in 2009 and then throughout 2010 and 2011." (Findings of Fact 7.a & 7.b; R.D. at 6 & nn. 26, 27; R.D. at Part II, Sections 4, 5.A, E–L, O–R, T; Conclusion of Law 11; R.D. at 122 –24.)*

In ***Finding of Fact 7.a***, ALJ McNeil finds that Respondent disregarded the safety of the

Bank by hiding the interrelated nature of the Nielson entities from the examiners and the Bank's

auditors.  *See* R.D. at 6.  As an initial matter, it is false that Respondent hid that the Nielsons held

several loans at the Bank.  The examiners fully understood the interrelated nature of the Nielson

relationship, as it was discussed in the 2008 and 2009 ROEs.  *See* Jt. Ex. 1 at 12; *see also* Jt. Ex.

2 at 20–21 (Waypoint Management mentioned as interrelated borrower).  Further, the finding

**A499**

regarding auditors is unsupported.  ALJ McNeil cites no testimony or evidence that any auditor was misled or any information was hidden from an auditor, because no auditor testified.

To the extent ALJ McNeil suggests that the Bedrock Transaction and 2010 Transaction disregarded the Bank's safety because they were consummated without board approval, that is contradicted by the substantial evidence that the Transactions were prudent, beneficial, properly underwritten, approved by the Bank's board, and in the best interest of the Bank.  *See supra* Sections V.C.1 & V.C.2.[61]  These Transactions were designed to secure the Bank's safety and soundness by managing the risk created by the Nielson's strategic decision to foist their losses on the Bank.  Respondent believed the Bedrock Transaction and the 2010 use of the Pillay collateral to bring the Nielson loans current were in the Bank's best interest, and he approved those transactions as a member of the Bank's Senior Loan Committee and as a Director of the Bank to protect of the Bank's soundness.  Given that Respondent believed the Transactions were in the best interests of the Bank, he did not willfully disregard the Bank's soundness.  *See Oberstar*, 987 F.2d at 503.  And given that the FDIC has sought to remove Respondent separately for each Transaction, there is no continuing disregard as each Transaction occurred only once.

In ***Finding of Fact 7.b***, ALJ McNeil claims that Respondent's continued concealment by "actively prevent[ing] the filing and maintenance of relevant borrower correspondence" demonstrated both willful and continuing disregard for the Bank's soundness.  R.D. at 6.  As

---

[61] ALJ McNeil finds that the 2009 Bedrock Transaction was unsafe only because the Respondent did not secure formal Board approval before the loan was funded in the manner provided in the Bank's procedures for approval of loans in excess of $750,000 before the loan was funded.  The use of the Pillay Collateral in 2010 to bring the Nielson loans current was formally approved by the Board in advance, the approval was contemporaneously documented in the board minutes, and neither the 2010 Transaction nor its approval violated any law or Bank procedure.  Notably, ALJ McNeil does not find the financial terms of the Bedrock or 2010 Transactions themselves to willfully and continuously disregard the Bank's safety. In any event, any such finding would be contradicted by the evidence.

155

**A500**

discussed at length, Respondent did not take any actions that concealed the true condition of the Nielson Loan portfolio from anyone. *See supra* Section V.C.3. Instead, he trusted that Bank employees would discharge their responsibilities. And Respondent certainly had nothing to do with the filing and maintenance of the Bank's files, as that was Green's responsibility. *See id.*; *accord* Notice ¶ 62 ("Green was responsible for placing the relevant documents in the Bank's loan files for the Nielson Loans."). To establish scienter, the FDIC had to prove that Respondent took some action or ordered someone else to take some action with heedless indifference to the consequences. *See Kim*, 40 F.3d at 1054. There is no such evidence.

## VI.    CIVIL MONEY PENALTIES ARE UNWARRANTED

**Finding:** *The ALJ recommends that the Board should impose a Civil Money Penalty. (Findings of Fact 9.a & 9.b; R.D. at Part II, Section 6; R.D. at 124–25.)*

To assess a second tier civil money penalty, the FDIC must prove elements similar to removal and prohibition, with the exception that the FDIC need not prove scienter. The FDIC must show that (1) Respondent "recklessly engage[d] in an unsafe or unsound practice" or breached his fiduciary duty and (2) the practice or breach "is part of a pattern of misconduct . . . causes or is likely to cause more than a minimal loss to such depository institution; or results in pecuniary gain or other benefit" to Respondent. 12 U.S.C. § 1818(i)(2)(B). To determine whether the amount of the civil money penalty is appropriate, the ALJ must consider the mitigating factors in 12 U.S.C. § 1818(i)(2)(G), such as (1) the size of Respondent's financial resources; (2) Respondent's good faith; (3) the gravity of the violation; (4) the history of previous violations; and (5) such other matters as justice may require. In addition, the ALJ must consider the 13-factor analysis found in the Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Institutions Regulatory Agencies. *See* 63 Fed. Reg. 30,226 (June 3, 1998).

As an initial matter, the Board should not impose a civil money penalty because the ALJ has not recommended any particular basis upon which to assess a penalty.  Rather, the only analysis in the Recommended Decision related to civil money penalties is limited to one conclusory sentence: "Having considered the evidence in mitigation as reflected above, and for the reasons set forth above, I find that Enforcement Counsel have met their burden of establishing a legal and factual basis for a $125,000 civil penalty against Mr. Calcutt."  R.D. at 125.  It is improper for ALJ McNeil to "only list[] the facts and state[] conclusions, but [] not connect them in any rational way."  *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1407 (D.C. Cir. 1995).  As a result, ALJ McNeil has violated Respondent's procedural rights by failing to explain his "reasons or basis . . . on all the material issues of fact [or] law."  5 U.S.C. § 557(c)(3)(A).

Additionally, Respondent neither engaged in an unsafe and unsound practice nor breached his fiduciary duty to the Bank for the reasons discussed above.  Nor is there any competent evidence that Respondent should be assessed a civil money penalty.  The only expert testimony regarding the CMP came from Miessner, whose testimony Respondent moved to exclude, as impermissibly biased.  *See* Resp't Omnibus Motions in Limine, at 19.  From the day Miessner took over as case manager for Northwestern Bank, she has worked towards Mr. Calcutt's removal.  Moreover, Miessner was not the proper person to testify regarding CMPs, as examiner O'Neill actually prepared the CMP worksheet and the FDIC chose not to question him about it.

None of the acts or practices attributed to Respondent were engaged in recklessly.  12 U.S.C. § 1818(i)(2)(B).  "[A]n act is reckless if done in disregard of, and evidencing conscious indifference to, a known or obvious risk of a substantial harm."  *Cavallari v. Comptroller of*

*Currency*, 57 F.3d 137, 142 (2d Cir. 1995).  As discussed, the Bedrock Transaction and the 2010

Transaction (*see* Findings of Fact 1.a and 1.b, R.D. at 3–4) were reasonable responses to

borrower-created risk that were endorsed by Bank management and the Bank's board and that

resulted in numerous benefits to the Bank.  Because everyone believed that the Nielsons would

repay the well-secured $760,000 Bedrock Loan (including the Nielsons) and get past an

unforeseeably deep recession, *see supra* Section V.B.1.c, there is no basis to find that

Respondent disregarded or was indifferent to a known or obvious risk.  In short, accepting cash

from a borrower claiming distress and stabilizing a large loan portfolio, even if done in an

imprudent manner, is not reckless.  Furthermore, failing to disclose information about the

Nielson Entities and the Bank's condition to regulators or the board (*see* Finding of Fact 1.c) was

not recklessly unsafe.  Because Green was responsible for adequately documenting and

disclosing information, Respondent did not know or ignore any obvious risks.

For these reasons, the Board should not impose a civil money penalty.

## VII.    THE ALJ FAILED TO MAKE OTHER RULINGS PROPOSED BY RESPONDENT

### A.    The ALJ Is Improperly Shielded from Removal

**Finding:**  *The ALJ found that he is not unconstitutionally shielded from removal by the President of the United States.  (R.D. at 121.)*

Respondent understands that the Board has previously decided that FDIC ALJ's are not

unconstitutionally shielded from removal.  *See In the Matter of Michael R. Sapp*, 2019 WL

5823871, at *19 (FDIC Sept. 17, 2019).  Respondent respectfully maintains that the Board's

*Sapp* decision is incorrect in light of new Supreme Court precedent, and thus submits this

argument to give the Board an opportunity to correct its error and preserve it for appeal.

"[T]he Constitution gives the President 'the authority to remove those who assist him in

carrying out his duties'" with only limited exceptions.  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183,

2191 (2020) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513–14 (2010)).  In this case, the restrictions on removal of the FDIC's ALJs violate the President's constitutional authority to supervise the ALJs.

FDIC's ALJs may only be removed "for good cause established and determined by the Merit Systems Protection Board on the record after opportunity for hearing before the Board."  5 U.S.C. § 7521(a).  In applying this standard, the MSPB has "reserve[d] to itself the final decision on [whether] good cause exists and the appropriate penalty if it finds good cause."  *Social Sec. Admin. v. Glover*, 23 M.S.P.R. 57, 64 (1984).  And the MSPB has failed to remove ALJs even when the agency has established an ALJ's misconduct.  *See, e.g.*, *Social Sec. Admin. v. Brennan*, 27 M.S.P.R. 242, 248, 251 (1985) (pattern of disruptive conduct and refusal to follow office procedures support only a 60-day suspension, not removal); *Glover*, 23 M.S.P.R. at 80 (ALJ's "intemperate" remarks to supervisor supported only 120-day suspension, not removal).  The members of the Merit Systems Protection Board are themselves removable by the President "only for inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

This framework leaves the FDIC and the President with insufficient supervisory responsibility for the ALJs.  The FDIC is "not responsible for the [ALJ's] actions," but is only able to decide whether to initiate a removal action, thereby "delegat[ing] ultimate responsibility or the active obligation to supervise that goes with it" in violation of the Constitution.  *Free Enter. Fund*, 561 U.S. at 496–97 (quotation omitted).  The supervisory responsibility is even more impermissibly restricted, because the FDIC is an independent agency, meaning the FDIC Board is itself protected from removal by the President.  This creates a dual-layer removal protection from the President similar to the removal restrictions that the Supreme Court condemned in *Free Enter. Fund*, 561 U.S. at 492.

The restrictions on removal of the FDIC's ALJs are even greater than those restrictions considered in *Free Enterprise Fund* because the ALJs are part of a novel governmental structure that diffuses oversight responsibility between multiple agencies. *See Seila Law*, 140 S. Ct. at 2198. The FDIC's ALJs are hired and employed by a separate agency, the Office of Financial Institution Adjudication. Unlike most ALJ employed by a single agency, FDIC ALJs are shared with other agencies such as the Federal Reserve. *See Leuthe v. OFIA*, 977 F. Supp. 357, 359 (E.D. Pa. 1997) ("OFIA was the response to Congress' directive in Section 916 of FIRREA, 12 U.S.C. § 1818 note, that 'before the close of the 24-month period beginning on August 9, 1989, the appropriate Federal banking agencies and the National Credit Union Administration were to establish jointly their own pool of administrative law judges, and develop a set of uniform rules and procedures for administrative hearings'") (alterations omitted). Thus, the President cannot properly supervise the OFIA ALJs through any one agency head. Oversight is made even more difficult because, within the FDIC itself, the FDIC Board does not even oversee the Office of Financial Institution Adjudication. Rather, the FDIC Board delegated the oversight responsibilities for OFIA to the FDIC Board Chairman's Chief of Staff. The Chief of Staff, in turn, delegated authority to the Assistant General Counsel for the Corporate & Legal Operations Section of the Legal Division. *See* R. Ex. 199. This convoluted and diffused oversight of FDIC ALJs employed by OFIA impermissibly restricts the President's removal power, and therefore violates the Constitution. *See Seila Law*, 140 S. Ct. at 2203 (finding CFPB Director's for-cause removal productions unconstitutional because CFPB's novel structure ensured the "Director is neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is.").

Contrary to *Sapp*, *Free Enterprise* does not specifically exempt ALJs from the scope of its holding. As the Supreme Court stated in *Free Enterprise* itself, that opinion "does not address" ALJs. *Free Enter. Fund*, 561 U.S. at 507 n.10. It in fact left grave uncertainty about the removal restrictions afforded to ALJs. *See id.* at 542 (2010) (Breyer, J., dissenting) ("The potential list of those whom today's decision affects is yet larger" and includes ALJs); *accord Lucia*, 138 S. Ct. at 2061 (Breyer, J., dissenting) (discussing the continued uncertainty surrounding whether the restrictions on removal of ALJs are unconstitutional). Recently, the Supreme Court stated that its "precedents have recognized ***only two exceptions to the President's unrestricted removal power***." *Seila Law*, 140 S. Ct. at 2192 (emphasis added). Rather than create new exceptions, the *Free Enterprise* Court "declined to extend those [exceptions] to a new situation not yet encountered by the Court—an official insulated by two layers of for-cause removal protection." *Id.* at 2198 (quotation omitted). "In the face of that novel impediment to the President's oversight of the Executive Branch, [the Court] adhered to the general rule that the President possesses 'the authority to remove those who assist him in carrying out his duties.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 513–14). Here, the Board should adhere to the general rule that the President retains broad authority to remove those who assist him in carrying out his duties. *See Free Enter. Fund*, 561 U.S. at 492; *cf. also Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1338 (Fed. Cir. 2019) (severing removal protections for administrative patent judges to ensure the structure was constitutional).

The exceptions discussed in *Seila Law* also do not apply to FDIC ALJs. The ALJ is certainly not a principal officer of a "multimember expert agenc[y] that do[es] not wield substantial executive power." *Id.* at 2199–200. Nor is the ALJ like the independent counsel with limited tenure and jurisdiction appointed to investigate particular crimes by high-ranking

government officials in *Morrison v. Olson*, 487 U.S. 654 (1988); *see also Seila Law*, 140 S.Ct. at 2199–200 (finding an exception based on *Morrison* for "inferior officer[] with limited duties and no policymaking or administrative authority.").  To the contrary, FDIC ALJs do not have the same tenure limitations, and they "carry out important functions over which they exercise significant discretion."  *Burgess v. FDIC*, 871 F.3d 297, 302 (5th Cir. 2017).  The ALJs also assist the FDIC in "bring[ing] the coercive power of the state to bear on millions of private citizens and businesses, imposing . . . penalties through administrative adjudications and civil actions."  *Seila Law*, 140 S.Ct. at 2200–01.

For these reasons, the ALJ that presided over Respondent's first proceeding and the ALJ presiding over Respondent's supplemental proceeding were and are impermissibly protected from removal.  This proceeding should therefore be dismissed.

### B.     The Hearing Failed to Comply with *Lucia*.

**Finding:**  *The new hearing provided by the FDIC Board sufficiently remedied the Appointments Clause violation.  (R.D. at 120.)*

As with the removal argument, Respondent understands that the Board has previously decided that its procedure and Order in Pending Cases satisfied the requirements of *Lucia*.  *See Sapp*, 2019 WL 5823871, at *18.  Respondent respectfully maintains that the Board's *Sapp* decision is incorrect, and thus submits this argument to preserve it for appeal.

The supplemental proceeding established by the March 19 Order and the Board's Order in Pending Cases is inconsistent with the remedy required by *Lucia* for Appointments Clause violations.  A full, new hearing must be set.  At the outset, while the Board has not conceded that FDIC ALJs are inferior "Officers" under *Lucia*, the weight of authority clearly demonstrates that *Lucia* vindicated Respondent's timely challenge to ALJ Miserendino's constitutional authority. In a decision previously cited by Respondent, the Fifth Circuit Court of Appeals has held, "FDIC

ALJs are [] sufficiently important, and their discretion sufficiently significant, to render them Officers under *Freytag* [*v. Commissioner*, 501 U.S. 868 (1991)]" regardless of their lack of final decision-making authority. *Burgess v. FDIC*, 871 F.3d 297, 303 (5th Cir. 2017) (quotations omitted). Applying the two-part test to determine whether a federal employee is an "inferior Officer" within the meaning of the Appointments Clause, the Fifth Circuit first determined that an FDIC ALJ's position is established by law, because "the Administrative Procedure Act creates the ALJ position, and it describes ALJ functions, pay scale, and applicable hiring practices." *Id.* at 302 (citing 5 U.S.C. §§ 556, 557, 5372, 3105); *see also* Notice of Reassignment, at 5 (July 24, 2018) (appointing C. Richard Miserendino pursuant to 5 U.S.C. § 3105). Second, the Fifth Circuit held that FDIC ALJs carry out important functions over which they exercise significant discretion, because FDIC ALJs take testimony, conduct hearings, and rule on the admissibility of evidence. *See id.* at 303 n.39 (citing 12 C.F.R. § 308.5(b)). Indeed, their "broad authority to preside over agency adjudications and issue recommendations closely resembles . . . Magistrate Judges" who are Officers under the Appointments Clause. *Id.* at 302; *accord Lucia*, 138 S. Ct. at 2047–48 (applying *Freytag* analysis to SEC ALJs).

Similarly, the Sixth Circuit—the Circuit to which this proceeding may ultimately be appealed—followed *Lucia* to hold that Mine Commission ALJs are inferior officers within the meaning of the Appointments Clause and, as a result, the petitioner was entitled to a new hearing before a different ALJ. *See Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 679 (6th Cir. 2018). The Solicitor General also stated that *Lucia* applies to all ALJs who preside over adjudicatory proceedings.[62]

---

[62] *See* Memorandum from the Solicitor General re Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.) (July 2018), https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf (accessed

Under these authorities, it should be beyond doubt that FDIC ALJs are inferior Officers within the meaning of the Appointments Clause: their position is established by statute and they have broad, discretionary authority when presiding over adversarial hearings.[63]  This means that the FDIC Board must appoint its ALJs.  *See Jones Bros.*, 898 F.3d at 679.  But the FDIC has never argued nor demonstrated that ALJ Miserendino was properly appointed, despite ample reason to do so.  As the record evidence demonstrates, only after *Lucia* did the Board appoint its ALJs consistent with the Constitution.  *See* R. Exs. 190, 194–98 (documenting the FDIC's failure to appoint its ALJs until July 2018).  And in the past, the FDIC has conceded to the D.C. Circuit that its ALJs are not appointed in accordance with the Appointments Clause.  *See Landry v.FDIC*, 204 F.3d 1125, 1143 (D.C. Cir. 2000) (Randolph, J., concurring in part and in the judgment) ("the FDIC has . . . expressly abandoned the argument that the ALJ was appointed by the head of a department.").  Therefore, ALJ Miserendino's involvement in Respondent's first proceeding plainly violated the Appointments Clause.

"The only issue left is remedial."  *Lucia*, 138 S. Ct. at 2055.  "Appointments Clause remedies are designed not only to advance [the structural] purposes directly, but also to create incentives to raise Appointments Clause challenges."  *Id.* at 2055 n.5 (2018) (quotations and alterations omitted).  Thus, Respondent is "entitled" to a "new hearing" before a constitutionally-appointed ALJ.  *Id.* at 2055.  The "new hearing" must give Respondent "all the possibility for

---

Mar. 25, 2019); *see also* Recent Guidance, *Administrative Law-Appointments Clause-Solicitor General Issues Guidance on Administrative Judges-Guidance on Administrative Law Judges After Lucia*, 132 Harv. L. Rev. 1120 (2019).

[63] Whether the legal structure of the FDIC ALJs' appointment is constitutionally permissible is not a "factual" inquiry.  Respondent has been faulted for not including "proof" such as "statutes and regulations" akin to those cited in *Lucia*.  *See* Reassignment Review, at 4–5.  But statutes and regulations are not factual.  In any event, Respondent cited both *Burgess* and *Jones Bros.* that demonstrate ALJs are inferior officers within the meaning of the Appointments Clause.

relief that review by a properly constituted [ALJ] would have given him," *Ryder v. United States*, 515 U.S. 177, 187–88 (1995), and ensure that the ALJ "consider the matter as though he had not adjudicated it before," *Lucia*, 138 S. Ct. at 2055. This requires "fresh proceedings" before a different ALJ even if the agency "acted to cure this constitutional defect by having every Commissioner ratify the appointment of every administrative law judge." *Jones Bros.*, 898 F.3d at 679.

Only a completely new proceeding will provide Respondent with proper relief under *Lucia*, *Ryder*, and *Jones Bros*. *See* Resp't Objections to Pre-Hearing Actions, at 9–14 (Sep. 28, 2018). That is because, without a constitutional appointment, ALJ Miserendino could not lawfully exercise the power of his office, and everything he oversaw was void *ab initio*. *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1910 (2016) (participation of improper adjudicator "was an error that affected the . . . whole adjudicatory framework" requiring a new proceeding); *Freytag*, 501 U.S. at 879 (1991) ("defect in the appointment of the Special Trial Judge goes to the validity of the Tax Court proceeding."); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("defect in the examiner's appointment was an irregularity which would invalidate a resulting order"). And these void orders "critically shape[d] the administrative record." *Lucia*, 138 S. Ct. at 2053; *see also Burgess*, 871 F.3d at 303 ("An FDIC ALJ has the broad authority to admit or exclude evidence, permit discovery and shape the course and scope of a contested hearing."). Only starting anew cures the unconstitutional taint from the first proceeding. Indeed, the ALJ made clear that he would consider the prior transcript even though the parties had not stipulated to its admission and even though it was gathered by an unconstitutional adjudicator. Tr. 11–13; R.D. at 12.

Starting anew is also the only way to ensure compliance with the Administrative Procedure Act and the FDIC's own regulations.  In the context of agency adjudication, the "new hearing" required by *Lucia* can only mean applying the "rules of practice and procedure applicable to adjudicatory proceedings ***as to which hearings on the record*** are provided for by . . . section 8(e) of the FDIA."  12 C.F.R. § 308.1–308.41 (emphasis added).  This is because, as discussed above, all of ALJ Miserendino's actions are void *ab initio* and cannot simply be adopted or allowed to shape the second proceeding.  Thus, Respondent should receive the full panoply of procedures for a hearing to which he was entitled the first time.  *See* 12 U.S.C. § 1818(e)(4) (requiring a hearing); 12 U.S.C. § 1818(h)(1) (requiring hearings to comply with the Administrative Procedure Act); 5 U.S.C. §§ 554 & 556 (establishing procedures for adjudicative hearings); 12 C.F.R. §§ 308.1 *et seq*. (describing pre-hearing procedures).

Rather than provide the full panoply of procedures required to ensure a fair, new hearing before a constitutional adjudicator, the supplemental proceeding flows from all of the submissions and rulings from an unconstitutionally appointed ALJ.

### C.    The Statute of Limitations Bars this Proceeding.

***Finding:*** *The statute of limitations does not bar the proceedings.  (R.D. at 121–22.)*

To commence an enforcement proceeding, the FDIC must issue a Notice, serve the Notice upon Respondent, and file the Notice with OFIA.  *See* 12 C.F.R. § 308.18(a).  Unlike other commencement statutes, 12 C.F.R. § 308.18(a) has three specific subparts.  *Compare* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.") *with* Mich. R. Civ. P. 2.101(B) (same).  Absent a contrary indication from the Board (which never occurred here), the proceedings must be conducted under the OFIA ALJ's authority.  *See* 12 C.F.R. § 308.103(a) ("a hearing . . . shall be held before an administrative law judge of" OFIA).  But none of the ALJs employed by OFIA had been constitutionally appointed when the Notice was

issued, served, and filed on August 28, 2013.  Thus, the necessary ingredients to commencing

proceedings were absent: the filing of the Notice and a valid tribunal.  As a result, the proceeding

was never validly commenced against Respondent.

And now, it is too late.  FDIC enforcement actions under 12 U.S.C. § 1818 are subject to

the catch-all, five-year limitations period established in 28 U.S.C. § 2462.  *See*, *e.g.*, *de la*

*Fuente*, 332 F. 3d at 1219; *Proffitt v. FDIC*, 200 F.3d 855, 862 (D.C. Cir. 2000).  The Bedrock

Transaction at issue here occurred in November 2009.  The statute thus ran by November 2014.

Even assuming the discovery rule applies or the statute did not begin to run until all elements had

accrued, under the FDIC's theory that increased regulatory expenses resulted in a loss to the

Bank, the statute would have run by 2017, five years after the Bank incurred expenses for the

Plante Moran report.  EC Ex. 77 (Report dated Aug. 8, 2012); EC Ex. 117 (noting increased

expenses paid during 2012).  And even under the latest conceivable date—when the FDIC's

2012 Report of Examination recorded a charge-off on the Bedrock Transaction, EC Ex. 81; Tr.

1282 (Miessner)—the statute ran well before any ALJs were constitutionally appointed in July

2018.  Notably, the FDIC still has not properly filed the Notice with OFIA to commence the

action.  The FDIC is thus now barred from seeking Respondent's removal.  *Cf. United States v.*

*Crawford*, 60 F. App'x 520, 531 (6th Cir. 2003) (indictment filed after statute has run is not

timely).

## VIII.  THE BOARD SHOULD EXERCISE ITS DISCRETION TO DISMISS THE PROCEEDINGS OR STAY ANY ORDER PENDING JUDICIAL REVIEW.

The Board should exercise its discretion to end this case and dismiss the proceedings and

Notice against Respondent.  Even if the "grounds specified in [the] notice have been

established," the Board is not required to enter an order of prohibition; rather, the Board "***may***

***issue*** such orders of suspension or removal . . . or prohibition . . . ***as it may deem appropriate***."

12 U.S.C. § 1818 (e)(4); *see also Gully v. Nat'l Credit Union Admin. Bd.*, 341 F.3d 155, 160 & n.1 (2d Cir. 2003) ("Despite finding the criteria for a prohibition order satisfied, however, the [NCUA] Board decided not to issue such an order because of 'the unique circumstances' of [respondent's] case and the fact that she had eventually resigned from her position as manager of the [Bank].").

In this case, the Board should not impose a prohibition order because one is not needed to protect the insured institution nor the banking system as a whole. *See In the Matter of William Marvin Clark, Sr.*, 1991 WL 757819, at *11 (1991) (the purpose of a removal order is in part "to protect the insured institution . . . and the banking system as a whole."). It has been over a decade since the Bedrock Transaction, which was a one-off event involving a single loan to one borrower. It has also been over half-a-decade since Northwestern Bank was sold to another bank in Michigan at a substantial premium. After the sale, Respondent was not involved with that institution. And since that time, Respondent has successfully served—and continues to serve— as Chairman of the Board for State Savings Bank, a small community bank in Michigan, and as Chairman and CEO of the holding company, CS Bancorp (in which Respondent owns stock). Tr. 1350–51 (Calcutt). The ALJ prohibited Respondent from introducing evidence regarding (i) Respondent's effective leadership on the boards of State Savings Bank and CS Bancorp, (ii) State Savings Bank's strong CAMEL ratings, and (iii) the FDIC's approval of a merger between State Savings Bank and another Bank formerly wholly owned by CS Bancorp.[64] But suffice it to

---

[64] In the Order re the Parties' Motions in Limine, the ALJ granted Enforcement Counsel's motion to exclude evidence regarding Respondent's involvement with other banking institutions. *See* Order at 5–6 (Oct. 4, 2019). Respondent takes exception to this evidentiary error. Respondent's positive involvement with State Savings Bank, Central State Bank, and CS Bancorp is relevant and material to the factors that must be considered before imposing a Civil Money Penalty and the Board's discretion in removing Respondent. *See* Resp't Opp. to FDIC's Mot. in Limine, at 3–4 (Oct. 2, 2019).

say that State Savings Bank and CS Bancorp are highly rated and strong institutions that would be harmed if Respondent were prohibited from serving on the board. Further, there is no evidence that Respondent has or would impose any continuing risk to State Savings Bank or the Deposit Insurance Fund. Today, Respondent is 71 years old, and he will not return to any management function in banking. Tr. 1350 (Calcutt). Given these mitigating factors, there is simply no reason to prohibit Respondent from banking.

Furthermore, it is time for the Board to lay this matter to rest. For the reasons discussed herein, the allegations are without evidentiary support. And there have been two evidentiary hearings before two different ALJs four years apart. The 2015 hearing in this matter was constitutionally infirm, requiring a second hearing. The 2019 hearing was not only constitutionally infirm, it is replete with serious procedural errors and ALJ bias, necessitating at least a third hearing if not outright dismissal. Given Respondent's age and retirement from bank management, a third hearing after the Board's decision or after Respondent's appeal some years from now will do little to help achieve the FDIC's objectives in protecting the Deposit Insurance Fund. The Board should exercise its discretion and dismiss the Notice.

Finally, if the Board determines to issue an order of prohibition, it should stay that order pending judicial review. *See* 12 C.F.R. § 308.41. Even if the Board disagrees with Respondent's Exceptions, there are substantial issues warranting judicial review. Further, the Board need not remove and prohibit Respondent from banking with immediate effect because he does not participate in day-to-day management of any bank, and Northwestern Bank was sold years ago. The Board should stay the effectiveness of a final decision that includes any form of prohibition order.

## IX.    REQUEST FOR ORAL ARGUMENT

Pursuant to 12 C.F.R. § 308.40(b), Respondent hereby requests oral argument on his exceptions to the Recommended Decision.  There is good cause for oral argument.  The Recommended Decision spans 145 single-spaced pages written in buckshot fashion with little-to-no analysis of the actual statutory elements for removal.  The Recommended Decision also is riddled with error.  Additionally, the record is both voluminous and nuanced.  The issues raised in Respondent's exceptions involve complex, difficult, and weighty legal issues.  As a result, even though Respondent's exceptions extend 170 pages, it is impossible to cover every issue that may be of importance to the Board.  Furthermore, Respondent suggests that an oral presentation would help focus on the core issues in this case and allow Respondent's counsel to answer questions on areas of concern to the Board.  For these reasons, Respondent suggests that oral argument is warranted for good cause because the exceptions cannot adequately be presented in writing.

Dated: August 3, 2020

Respectfully submitted,

/s/ Barry D. Hovis

Barry D. Hovis
Walt J.R. Traver
MUSICK, PEELER & GARRETT LLP
601 California Street, Suite 601
San Francisco, CA 94108
Telephone: (415) 281-2000
Facsimile: (415) 281-2010
B.Hovis@musickpeeler.com
W.Traver@musickpeeler.com

/s/ Ryan T. Scarborough

Ryan T. Scarborough
William B. Snyderwine
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
rscarborough@wc.com
wsnyderwine@wc.com

*Attorneys for Respondent*

**A515**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that true and correct copies of the foregoing **RESPONDENT HARRY C. CALCUTT III'S EXCEPTIONS TO THE ADMINISTRATIVE LAW JUDGE'S RECOMMENDED DECISION ON REMAND AND REQUEST FOR ORAL ARGUMENT** was served on August 3, 2020 by electronic mail upon the following persons:

Robert Feldman, Executive Secretary
Valerie J. Best, Assistant Executive Secretary
Andrea Winkler, Acting Assistant General Counsel
Nicholas S. Kazmerski, Esq.
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, D.C. 20429
rfeldman@fdic.gov, vbest@fdic.gov, awinkler@fdic.gov, nkazmerski@fdic.gov

David Beck, Esq.
Marry Anne Benden, Esq.
Federal Deposit Insurance Corporation
300 S. Riverside, Suite 1700
Chicago, IL 60606
dbeck@fdic.gov, mbenden@fdic.gov

Gabrielle A. J. Beam, Esq.
Federal Deposit Insurance Corporation
1200 Walnut Street, Suite 2100
Kansas City, MO 64106
gabeam@fdic.gov

Bryan R. Sup, Esq.
Federal Deposit Insurance Corporation
1601 Bryan Street, Suite 1600
Dallas, TX 75201
bsup@fdic.gov

*/s/ William B. Snyderwine*

**A516**

# **APPENDIX**

| ALJ's Misconduct Finding | Is the Misconduct Within the Notice? | Did the ALJ Find a Reasonably Foreseeable Risk? | Did the ALJ find Effect Accompanying the Misconduct? | Did the ALJ Find Scienter Accompanying the Misconduct? | Did the ALJ Recommend Any Valid Basis for Removal? |
|---|---|---|---|---|---|
| *Finding of Fact 1.a*: The 2009 Bedrock Transaction was an unsafe practice. | Portions of the ALJ's findings are outside the Notice. *See* Exceptions at 29–30. | The ALJ finds a risk of loss was reasonably foreseeable because certain loans lacked personal guarantees, which is false and outside the Notice. *See* Exceptions at 33–34. | ALJ finds that an unsupported $30,000 charge-off establishes effect. *See* Exceptions at 133–35. | **NO** – *See* Exceptions at 145–48. | **NO** – ALJ has failed to recommend misconduct within the notice accompanied by the requisite scienter. |
| *Finding of Fact 1.b*: The December 2010 Transaction was an unsafe practice. | Portions of the ALJ's findings are outside the Notice. *See* Exceptions at 30–31. | The ALJ finds a risk of loss was reasonably foreseeable because certain loans lacked personal guarantees, which is false and outside the Notice. *See* Exceptions at 33–34. | The ALJ finds the Bank's receipt of $1.2 million resulted in a loss in the amount paid to the Bank. *See* Exceptions at 136–37. | **NO** – *See* Exceptions at 145–48. | **NO** – ALJ has failed to recommend misconduct within the notice accompanied by the requisite scienter. |
| *Finding of Fact 1.c*: Not disclosing information about the Bank's condition, Nielson loan portfolio, the Bedrock Transaction and 2010 Transaction to the Bank's Board and regulatory examiners was an unsafe practice. | Portions of the ALJ's findings are outside the Notice. *See* Exceptions at 32. | **NO** – The ALJ made no finding of reasonably foreseeable risk. *See* Exceptions at 124–25. | **NO** – The ALJ's findings are outside the Notice and not cognizable effects. *See* Exceptions at 137–41. | The ALJ attributes misconduct of others to Respondent in order to find scienter. *See* Exceptions at 148–56. | **NO** – ALJ has failed to recommend misconduct that created a reasonably foreseeable risk accompanied by the requisite effect within the Notice. |

b

**A518**

| ALJ's Misconduct Finding | Is the Misconduct Within the Notice? | Did the ALJ Find a Reasonably Foreseeable Risk? | Did the ALJ find Effect Accompanying the Misconduct? | Did the ALJ Find Scienter Accompanying the Misconduct? | Did the ALJ Recommend Any Valid Basis for Removal? |
|---|---|---|---|---|---|
| _**Finding of Fact 1.d**_: Respondent breached his fiduciary duty by failing to supervise when he led the negotiations that resulted in the Bedrock Transaction and 2010 Transaction. | **NO** – _See_ Exceptions at 31. | The ALJ finds a risk of loss was reasonably foreseeable because certain loans lacked personal guarantees, which is false and outside the Notice. _See_ Exceptions at 33–34. | ALJ finds an unexplained $30,000 charge-off and Bank's receipt $1.2 million is a loss. _See_ Exceptions at 133–37. | **NO** – _See_ Exceptions at 145–48. | **NO** – ALJ has failed to recommend misconduct within the notice accompanied by the requisite scienter. |
| _**Finding of Fact 1.e**_: Respondent failed to heed regulatory criticism regarding the Nielson Entity Loan Portfolio, breaching his fiduciary duty. | **NO** – _See_ Exceptions at 31–32. | **NO** – _See_ Exceptions at 78–80; 127–28. | **NO** – _See_ Exceptions at 78–80; 127–28. | **NO** – _See_ Exceptions at 78–80; 127–28. | **NO** – ALJ has failed to find misconduct accompanied by an effect or scienter. |
| _**Finding of Fact 1.f**_: Not disclosing information about the Bank's condition, Nielson loan portfolio, the Bedrock Transaction and 2010 Transaction to the Bank's Board and regulatory examiners was a breach of Respondent's fiduciary duty of candor. | Portions of the ALJ's findings are outside the Notice. _See_ Exceptions at 32. | **NO** – _See_ Exceptions at 124–25. | **NO** – The ALJ's findings are outside the Notice and not cognizable effects. _See_ Exceptions at 137–41. | The ALJ attributes misconduct of others to Respondent in order to find scienter. _See_ Exceptions at 148–56. | **NO** – ALJ has failed to recommend misconduct that created a reasonably foreseeable risk accompanied by the requisite effect within the Notice. |

c

**A519**