# In the United States Court of Appeals
# for the Sixth Circuit

---

HARRY C. CALCUTT III,
PETITIONER,

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,
RESPONDENT.

---

*ON APPEAL FROM A FINAL DECISION AND ORDER BY THE FEDERAL DEPOSIT INSURANCE CORPORATION*

---

**REPLY BRIEF OF PETITIONER HARRY C. CALCUTT III**

---

BARRY D. HOVIS
MUSICK, PEELER & GARRETT LLP
  *315 Montgomery St. 10th floor,*
  *San Francisco, CA 94104*

RYAN T. SCARBOROUGH
SARAH M. HARRIS
WILLIAM B. SNYDERWINE
KIMBERLY J. BROECKER
HELEN E. WHITE*
WILLIAMS & CONNOLLY LLP
  *725 Twelfth Street, N.W.*
  *Washington, DC 20005*
  *(202) 434-5000*
  *sharris@wc.com*
*Attorneys for Petitioner*
*Admitted in MA. Practice in the District of Columbia supervised by D.C. bar members pursuant to D.C. App. R. 49(c)(8).

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

I.     The FDIC's Structure Is Unconstitutional.............................2
       A.     The Board's Removal Restrictions ...............................2
       B.     FDIC ALJs' Multi-Layered Tenure Protections.........12

II.    The FDIC Failed to Remedy the Appointments Clause Violation .......19

III.   The FDIC Improperly Curtailed Cross-Examination...........21

IV.    The FDIC's Order Exceeds the FDIC's Statutory Authority ..............26
       A.     Statutory Misconduct ...............................................26
       B.     Causation..................................................................29
       C.     Non-Qualifying Effects..............................................31
       D.     Abuse of Discretion...................................................32

CONCLUSION......................................................................................33

# TABLE OF AUTHORITIES

Page

Cases:

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987) .....................................11

*Am. Wrecking Corp. v. Sec'y of Labor*,
351 F.3d 1254 (D.C. Cir. 2003) ...............................................24

*Arthrex v. United States*, 141 S. Ct. 1970 (2021)...............................13, 15, 16

*Buckley v. Valeo*, 424 U.S. 1 (1976).........................................................14

*Carr v. Saul*, 141 S. Ct. 1352 (2021) ...................................................2, 3

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ......................................... *passim*

*Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019)...................................30

*Doolin v. OTS*, 139 F.3d 203 (D.C. Cir. 1998)..........................................9

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .....................21

*FEC v. NRA Pol. Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) ......................8

*First State Bank of Wayne Cnty. v. FDIC*,
770 F.2d 81 (6th Cir. 1985)........................................................28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......................................................... *passim*

*Gully v. NCUA*, 341 F.3d 155 (2d Cir. 2003) ........................................28

*Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999).........................................22

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...................3, 4

*Hunt v. Marchetti*, 824 F.2d 915 (11th Cir. 1987)....................................21

*Jameson v. FDIC*, 931 F.2d 290 (5th Cir. 1991).......................................28

*Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018).............2, 3

*Joseph Forrester Trucking v. Dir., Office of Workers' Comp.
Programs*, 987 F.3d 581 (6th Cir. 2021).......................................3

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) ...................................12, 16, 19

*Matter of Seidman*, 37 F.3d 911 (3d Cir. 1994)........................................27

*N'Diom v. Gonzales*, 442 F.3d 494 (6th Cir. 2006)....................................23

*Parker v. Astrue*, 597 F.3d 920 (7th Cir. 2010)........................................24

*Ramspeck v. Fed. Trial Exam'rs Conf.*, 345 U.S. 128 (1953) .....................14

*Sch. Dist. of City of Pontiac v. Sachse*, 264 N.W. 396 (Mich. 1936)............29

*SEC v. Chenery*, 318 U.S. 80 (1943)......................................................20

Page

Cases—continued:

*Seila Law v. CFPB*, 140 S. Ct. 2183 (2020) ........................................... *passim*

*Ulrich v. U.S. Dep't of Treasury*, 129 Fed. App'x 388 (9th Cir. 2005) ........ 28

*Wiener v. United States*, 357 U.S. 349 (1958) ....................................... 7, 13

*Williams Gas Processing – Gulf Coast Co. v. FERC*,
   373 F.3d 1335 (D.C. Cir. 2004) ......................................... 20, 26

Statutes, Regulations, and Rules:

Civil Service Act of 1883, 47 Cong. Ch. 26, 22 Stat. 403 ........................ 14

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 ........ 14

Financial Institutions Reform, Recovery, and Enforcement Act of
   1989, Pub. L. No. 101-73, 103 Stat. 183 ........................................ 14

5 U.S.C. § 556(d) ..................................................................... 23

12 U.S.C.
   § 1812(a)(2) ....................................................................... 6
   § 1818(e) .......................................................................... 29
   § 1818(e)(1)(A)(ii) ............................................................. 26
   § 1818(e)(1)(B) .................................................................. 32
   § 1818(e)(1)(B)(i) .............................................................. 32

12 C.F.R.
   § 308.39 ........................................................................... 2
   § 308.39(b) ....................................................................... 2
   § 308.39(c) ....................................................................... 2

Fed. R. Evid.
   802 ................................................................................... 23
   804 ................................................................................... 23

Other Authorities:

1 Annals of Cong. 611-12 (J. Madison) ............................................. 16

*Constitutionality of the Commissioner of Social Security's Tenure
   Protections*, 45 Op. O.L.C. __, slip op. (July 8, 2021) ...................... 16

*Constitutionality of Statute Governing Appointment of United
   States Trade Representative*, 20 Op. O.L.C. 279 (1996) ..................... 7

Other Authorities—continued:

FDIC, 2013 Annual Report, Board of Directors (Mar. 14, 2014),
https://www.fdic.gov/about/financial-
reports/reports/2013annualreport/chpt6-03.html......................................9

FDIC Bylaws (Sept. 17, 2019),
https://www.fdic.gov/about/governance/bylaws.pdf
art. I, § 2(a) ..........................................................................................5
art. I, § 6(d)..........................................................................................8
art. VI, § 4(a) .......................................................................................8

FDIC, Statement of FDIC Corporate Governance for Supervisory
Matters (Oct. 27, 2020),
https://www.fdic.gov/about/governance/supervisory-matters/ ................9

# INTRODUCTION

The FDIC's Board barred Mr. Calcutt from the banking industry and imposed immense monetary penalties after relying on ALJ findings. But both the Board and ALJ are unconstitutionally insulated from presidential control. Their extreme unaccountability prejudiced the agency's decision-making, producing an order that must be vacated. Further, the Board failed to remedy an Appointments Clause violation that tainted the whole proceeding. An unconstitutionally appointed ALJ conducted initial proceedings. Rather than ordering fresh proceedings to remedy the problem, the Board and ALJ recycled the prior evidentiary record and rulings.

Other Administrative Procedure Act violations abound. The Order rests on testimony from three key witnesses, yet the ALJ refused to allow Mr. Calcutt to cross-examine those witnesses about undisputed, eyebrow-raising conduct that would have compromised their credibility. The FDIC then exceeded its statutory authority by penalizing conduct that the FDIC Act does not prohibit, failing to require proximate causation, and punishing Mr. Calcutt for non-qualifying harms.

**ARGUMENT**

## I. The FDIC's Structure Is Unconstitutional

### A. The Board's Removal Restrictions

The President generally must be able to remove subordinates at will. The Supreme Court has recognized an exception for heads of "multimember expert agencies that do not wield substantial executive power." *Seila Law v. CFPB*, 140 S. Ct. 2183, 2199-200 (2020). But the FDIC's Board undisputedly exercises substantial executive power. Yet the President cannot remove three of its five members absent cause and faces other impediments to accountability, rendering the Board's structure unconstitutional.

1. The FDIC (at 15-16, 21) claims forfeiture under 12 C.F.R. § 308.39(b), but that issue-exhaustion regulation is inapplicable. Section 308.39 requires parties to identify to the Board errors or omissions *in the ALJ's ruling*, i.e., matters over which the ALJ had jurisdiction. *Id.* § 308.39(c). But "all administrative agencies" lack "authority to entertain a facial constitutional challenge to the validity of a law," as here. *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 673-74 (6th Cir. 2018).

Further, "structural constitutional challenges" are generally exempt from agency forfeiture rules, since "agency adjudications are generally ill-suited to address" such challenges. *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021).

And courts excuse forfeiture if raising the issue was futile. *Id.*; *Jones Bros.*, 898 F.3d at 674. Both exceptions apply here. The Board lacks expertise over the constitutionality of removal restrictions. Raising that challenge was also futile; the Board lacks jurisdiction to consider the constitutionality of statutes. Decision and Order, *Matter of The Bank of Hartford*, No. FDIC-92-212kk (Apr. 11, 1995). This case thus differs from cases requiring exhaustion of Appointments Clause challenges in circumstances where the agency could have granted relief by reassigning cases to constitutionally appointed ALJs. *E.g.*, *Joseph Forrester Trucking v. Dir., Office of Workers' Comp. Programs*, 987 F.3d 581, 591-92 (6th Cir. 2021). The Board could hardly invalidate its own tenure protections.

2. The FDIC's defense of its structure fails. First, the FDIC (at 18-19) portrays *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), as broadly endorsing tenure-protected multi-member agencies. But the Supreme Court has limited *Humphrey's* to a dubious, agency-specific exception. *Seila Law* explained: "*Humphrey's Executor* permitted Congress to give for-cause removal protections to" the FTC, "a multimember body that … was said not to exercise any executive power" because the FTC circa 1935 made reports to Congress and recommendations to courts. 140 S. Ct. at

2198-99. But "the Court's conclusion that the FTC did not exercise executive power has not withstood the test of time." *Id.* at 2198 n.2. *Seila Law* thus described tenure protections for a multi-member agency exercising *no* executive power as at the "outermost constitutional limits." *Id.* at 2199-200. *A fortiori*, tenure protections for the FDIC—which exercises vast enforcement and rulemaking powers—cross the line. Br. 22-24; WLF Br. 26-28.

The FDIC (at 19) says *Seila Law* "left intact the *Humphrey's Executor* exception for multi-member independent agencies" because the Court suggested that Congress might "convert[] the CFPB into a multimember agency." 140 S. Ct. at 2211. But that speculation about legislative remedies did not bless the hypothetical agency's constitutionality. Elsewhere, the Court concluded that *Humphrey's* created an "exception[] to the President's unrestricted removal power," *id.* at 2198, only "for multimember expert agencies that do not wield substantial executive power," *id.* at 2199-2200. That unequivocal statement controls here.

Second, the FDIC (at 18-19) contrasts single-headed and multi-member independent agencies, claiming unique constitutional problems with concentrating power in a single, unaccountable actor. But the President's removal authority does not merely protect against rival power centers. The

"diffusion of power" to multiple tenure-protected officers also "carries with it a diffusion of accountability" that thwarts presidential control. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010).

The FDIC (at 19) portrays multi-member independent agencies as less historically anomalous than single-headed counterparts. But multi-member agencies are a relatively recent departure from the Founding-era rule that principal officers are removable at will. *See Seila Law*, 140 S. Ct. at 2202-03. Their tenure restrictions have grown more problematic as the FDIC and other multi-member agencies have accumulated executive power over time.

Third, the FDIC (at 18) portrays its structure as unique. But five structural features obstruct presidential control:

- **Composition**. The FDIC agrees (at 14) that three of five Board members are removable only for cause. The FDIC (at 18) does not explain how two at-will members "provid[e] checks" when they can always be outvoted.

- **Staggered Terms**. The three tenure-protected appointees serve staggered six-year terms that begin upon confirmation and last until successors are confirmed. FDIC Bylaws art. I, § 2(a) (Sept. 17, 2019), https://www.fdic.gov/about/governance/bylaws.pdf. As with the CFPB

Director, a President might not get to replace any FDIC appointees during an entire administration (e.g., if a prior President filled three vacancies just before leaving office because appointees served past their terms' expirations). *Seila Law*, 140 S. Ct. at 2204.

- **Partisan Quotas.** The FDIC (at 20) touts "the bipartisan nature of the FDIC Board's membership," but barring the President from appointing more than three members of the same political party undermines the Board's responsiveness to the President. *See* 12 U.S.C. § 1812(a)(2); *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) ("The President must be able to remove … those who come from a competing political party who is dead set against [the President's] agenda").

- **Dual-Hatting**. The President can remove the Comptroller and CFPB Director from the FDIC only at the price of removing them from their principal posts. That all-or-nothing choice compromises the effectiveness of removal as a means of control. The FDIC (at 20 n.10) says officers often perform many duties, but identifies no other instance where Congress yoked together multiple agencies with disparate, non-germane responsibilities. That unusual structure goes beyond restricting the President's choice of principal officers, which is

generally unconstitutional. *Constitutionality of Statute Governing Appointment of United States Trade Representative*, 20 Op. O.L.C. 279, 280 (1996).

- **Budgetary Independence**. The FDIC, like the CFPB, operates independent of normal appropriations—an aggravating factor in *Seila Law*. 140 S. Ct. at 2204.

These restrictions prevent the President from "maintain[ing] a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch." *Collins*, 141 S. Ct. at 1784.[1]

3. The FDIC (at 16-17) alternatively defends its structure as of the December 2020 Order, when the Board had four members. The FDIC claims the President had adequate control then, because only one (the Board's chair) was tenure-protected. Two (the CFPB Director and Acting Comptroller) were removable at will. The final member's term expired, so he now serves at will.

---

[1] The FDIC (at 17 n.7) concedes that appointed Board members' fixed terms confer tenure protection under *Wiener v. United States*, 357 U.S. 349 (1958). *Collins* limits *Wiener* to purely adjudicatory agencies, 141 U.S. at 1783 n.18, and could be read to make Board appointees removable at will. Even if so, Mr. Calcutt is entitled to a remedy. The Executive Branch's longstanding interpretation that Board members are tenure-protected under *Wiener* shows that the Board enjoyed *de facto* tenure protections while pursuing this enforcement action, causing Mr. Calcutt harm. *See id.* at 1788.

That as-applied defense fails. First, for-cause restrictions on a single Board member are unconstitutional. The President must be able to remove principal officers because he has "lost confidence" in their judgment or disagrees with their policy preferences. *Collins*, 141 S. Ct. at 1787. A single, improperly insulated principal officer can prejudice agency decision-making and undermine the President's agenda regardless of whether that officer's vote is dispositive. *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 827-28 (D.C. Cir. 1993). Indeed, a single member can control Board decisions, because one member's vote can bind the Board. FDIC Bylaws art. I, § 6(d). Worse, the tenure-protected member here is the Board's chair, who unilaterally "overs[ees] … the direction and operations of each of the Corporation's various divisions and officers." *Id.* art. VI, § 4(a).

Second, the Board's December 2020 composition is not dispositive. The Board's unconstitutional structure harmed Mr. Calcutt throughout seven years of proceedings and continues inflicting harm. *See Collins*, 141 S. Ct. at 1781 (invalidating FHFA structure even though Acting Director removable at-will presided over challenged agency action).

For starters, the Board was unconstitutionally structured when it initiated proceedings in 2013. Four of its five members were tenure-protected:

the CFPB Director and the three appointed Board members.[2]  The FDIC (at 21) says the Board delegates decisions to initiate proceedings to a subcommittee.   But the tenure-protected Board Chair selects the subcommittee chair, who makes key decisions.  The subcommittee comprises direct subordinates to the other four Board members, preserving tenure-protected members' influence.   FDIC, Statement of FDIC Corporate Governance for Supervisory Matters (Oct. 27, 2020), https://www.fdic.gov/about/governance/supervisory-matters/.

The FDIC (at 22-23) contends that the Board's 2020 Order ratified the Notice, citing *Doolin v. OTS*, 139 F.3d 203 (D.C. Cir. 1998).  But *Doolin* explained "it is essential that the party ratifying" must "be able … to do the act ratified … at the time the ratification was made."  *Id.* at 213 (internal quotations omitted).   Here, the FDIC's 5-year deadline for initiating proceedings elapsed in 2018.  Br. 26.  The FDIC (at 23) requests equitable tolling, portraying Mr. Calcutt's constitutional challenges as an "extraordinary circumstance."  The FDIC cannot have it both ways, claiming to be the victim of its own unconstitutional structure while simultaneously

---

[2] FDIC, 2013 Annual Report, Board of Directors (Mar. 14, 2014), https://www.fdic.gov/about/financial-reports/reports/2013annualreport/chpt6-03.html.

defending its structure. Equitable tolling is also unwarranted because the FDIC does not dispute that FDIC examiner Miessner engaged in highly inappropriate conduct during the investigation. *Infra* pp. 21-26. Further, the Board issued interlocutory orders on July 24, 2018—when half of the Board's four members were tenure-protected—and June 20, 2019, when one of three members was tenure-protected.

The Board's Order also inflicts ongoing harm. The Order prevents Mr. Calcutt from participating in "the affairs of any insured depository institution … without the prior written consent of the FDIC," A046, and remains operative until the FDIC alters it, A047. The Board's unconstitutional structure thus perennially constrains Mr. Calcutt's opportunities for relief.

4. The FDIC contends that, under *Collins*, improper removal restrictions do not automatically void the Order. FDIC 28(j) Ltr. 1-2. But *Collins* is inapplicable. *Collins* confined its remedy analysis to *retrospective* relief; the FHFA had already superseded the challenged action. 141 S. Ct. at 1779-80. Here, the Order also operates prospectively, so Mr. Calcutt is entitled to a decision rendered by a fully removable Board. *See Free Enter. Fund*, 561 U.S. at 513 (petitioners entitled to future enforcement action "only by a constitutional agency accountable to the Executive").

Vacatur is further warranted because the FDIC's tenure protections are non-severable from the rest of the statute. *Collins'* retrospective posture obviated the need to consider severability. But here, severability questions are unavoidable; Mr. Calcutt faces ongoing harm from his continual restraint by an unconstitutionally structured agency. The FDIC Act contains no severability clause. The FDIC's assertion (at 1) that Congress intended the FDIC to be "independent" underscores the centrality of tenure protections to the agency's design. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

Even under *Collins*, when unconstitutional removal restrictions "inflict ... harm," affected parties are entitled to relief. 141 S. Ct. at 1789. Here, because the prospect that the removal restrictions inflicted harm "cannot be ruled out," *id.*, this Court should vacate and remand the Order. Absent removal restrictions, "the President might have replaced" Board members who oversaw the enforcement proceeding. *Id.* at 1789. Non-tenure-protected principal officers customarily resign when a new administration begins; Board members did not. It is anyone's guess what the FDIC's composition would look like had at-will removal been the rule since 2013.

Further, tenure-protected appointees "might have altered [their] behavior." *Id.* The United States conceded in 2018 that ALJ tenure protections are constitutionally suspect, Br. 31-32, and the Solicitor General recommended that agencies remedy *Lucia* violations with fresh proceedings, Br. 36-37. A fully accountable Board would have been far likelier to follow those positions; this Board ignored them.

At a minimum, *Collins* entitles Mr. Calcutt to a remand to the agency for discovery into whether "the unconstitutional removal restriction inflicted harm," 141 S. Ct. at 1789, including whether Board members' removal protections influenced their decision-making, whether the President was dissatisfied with their enforcement priorities, and whether different membership might have made a difference. Mr. Calcutt should have the opportunity to develop the record on this issue before further review by this Court, if necessary.

### B.     FDIC ALJs' Multi-Layered Tenure Protections

FDIC's ALJs are undisputedly inferior officers. But "the President can neither oversee [them] himself nor attribute [their] failings to those whom he can oversee." *Arthrex v. United States*, 141 S. Ct. 1970, 1982 (2021) (internal quotations omitted). As the United States previously acknowledged, even

dual-layered ALJ tenure protections raise severe constitutional concerns. Br. 32. The constitutional violation here is particularly plain: the President must cut through five layers of tenure protection to decide whether ALJs' conduct merits removal. Br. 29-31; WLF Br. 9-11; Chamber Br. 11-17.

1. The FDIC (at 24-27) justifies ALJ removal restrictions as long-established. But the FDIC's sources discuss a *single* layer of tenure protection for ALJs to preserve adjudicatory independence. Mr. Calcutt instead challenges FDIC ALJs' *multiple* layers of removal restrictions. The FDIC's acknowledgement (at 26) that even one layer of for-cause removal restrictions for ALJs "conflict[s] … with the President's implied power to remove officers at will" underscores that multiple layers of tenure protection "transform[]" ALJs' "independence" into impermissible unaccountability. *Free Enter. Fund*, 561 U.S. at 496-97. And "the unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem." *Arthrex*, 141 S. Ct. at 1983.[3]

---

[3] The FDIC's authorities are inapt. *Wiener v. United States*, 357 U.S. 349 (1958) (cited at FDIC Br. 24-25) upheld implied for-cause tenure protections for principal officers of an adjudicatory commission. But the Supreme Court has distinguished the "purely adjudicatory" commission there with agencies (like the FDIC) that carry out executive functions like "enforcement proceedings." *Seila Law*, 140 S. Ct. at 2199. *Buckley v. Valeo*, 424 U.S. 1, 140-41 (1976) (cited at FDIC Br. 25) was not about adjudicators. *Buckley* suggested the President "may not insist" that the FEC's "broad administrative powers"

History confirms the anomalousness of insulating Executive Branch adjudicators through multiple layers of tenure protection. The FDIC's byzantine ALJ tenure protections originated in 1989, when Congress mandated that four agencies jointly pool ALJs. Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, § 916, 103 Stat. 183. Dual-layered ALJ tenure protections date only to 1978, when Congress created the MSPB and made its heads removable for cause. *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), 92 Stat. 1111. Until then, the Civil Service Commission, whose heads were removable at will, decided whether to remove even independent agencies' ALJs. *See* Civil Service Act of 1883, 47 Cong. Ch. 26, § 1, 22 Stat. 403. Even a single layer of ALJ tenure protection is relatively recent; only in the 1946 Administrative Procedure Act did Congress afford ALJs *any* tenure protection. *Ramspeck v. Fed. Trial Exam'rs Conf.*, 345 U.S. 128, 130 (1953).

2. The FDIC (at 27-29) deems multiple layers of tenure protection permissible for inferior officers performing adjudicatory, rather than policymaking, functions. But, as inferior officers, ALJs undisputedly exercise

---

should "be delegated to an appointee … removable at will." But *Seila Law* confirmed that officers exercising "administrative authority" are not exempt from at-will removal. 140 S. Ct. at 2200-01.

"significant authority pursuant to the laws of the United States." *Arthrex*, 141 S. Ct. at 1980. And the President's duty to ensure faithful execution of the laws does not distinguish between types of executive power. "The activities of executive officers may take legislative and judicial forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the executive Power, for which the President is ultimately responsible." *Id.* at 1982 (internal quotations omitted).

The FDIC (at 28-29) observes that ALJs cannot determine the validity of federal statutes or regulations, and usually cannot issue final decisions. But in executing their duties, ALJs "must interpret" multiple federal statutes, which "is the very essence of execution of the law." *Collins*, 141 S. Ct. at 1786 (internal quotations omitted). FDIC ALJs also preside over enforcement proceedings, a "quintessentially executive power." *Seila Law*, 140 S. Ct. at 2200; Cato Br. 5-8.

Thus, the Court just held that even though patent ALJs' duties "'partake of a Judicial quality as well as Executive,' APJs are still exercising executive power and must remain 'dependent on the President.'" *Arthrex*, 141 S. Ct. at 1982 (quoting 1 Annals of Cong., at 611-12 (J. Madison)). The Department of Justice likewise deemed the Commissioner of Social Security's for-cause

tenure protection unconstitutional, even though "adjudication is a primary function of the SSA." *Constitutionality of the Commissioner of Social Security's Tenure Protections*, 45 Op. O.L.C. __, slip op. at 9 (July 8, 2021).

The FDIC (at 27-30) would confine *Free Enterprise Fund* and *Seila Law* to policymaking officials. But *Free Enterprise Fund* broadly held that the President cannot "be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." 561 U.S. at 483-84. True, the Court reserved whether its holding extended to "that subset of independent agency employees who serve as administrative law judges." 561 U.S. at 507 n.10. But that reservation reflected the Court's uncertainty whether ALJs are inferior officers—a question *Lucia* settled. Br. 33-34.

*Seila Law* also undercuts the FDIC's position. The FDIC (at 29) points to *Seila Law*'s acknowledgement of an "exception" to the rule of at-will removal "for inferior officers with limited duties and no policymaking or administrative authority." 140 S. Ct. at 2199-200. But that exception shows that even *one* layer of ALJ tenure protection pushes the constitutional limits. Multiple layers are not a close call, especially since FDIC ALJs exercise "administrative authority" by rendering final decisions in False Claims Act

cases, "imposing" massive "penalties through administrative adjudications," *id.* at 2200-01, and interpreting federal statutes.

3. The FDIC (at 30-31) claims the agency could adequately supervise ALJs by revoking their appointments and withdrawing their authority to adjudicate FDIC proceedings. But "the various bureaucratic minutiae a President might use to corral agency personnel is no substitute for at will removal." *Seila Law*, 140 S. Ct. at 2207. "Broad power over [officers'] functions is not equivalent to the power to remove" them, even if that power includes "relieving [them] of authority," because "altering" the "powers of an agency as a whole is a problematic way control an inferior officer." *Free Enter. Fund*, 561 U.S. at 503-04.

The FDIC's proposal to supervise ALJs by revoking their appointments to FDIC adjudications illustrates these problems. Take an ALJ who issues opinions condemning the administration's banking policy. Keeping that ALJ on payroll sends a very different message from removal. Revoking an ALJ's appointment to FDIC adjudications also undermines the agency's functioning. The four agencies comprising OFIA share two ALJs. If the FDIC withdrew one appointment, a single ALJ would hear all FDIC matters. Recusals would halt the agency's work. Chamber Br. 15-19. Further, the FDIC could not

appoint another ALJ without approval from the three other agencies that pool ALJs. Br. 29-30; Ex. L to Pet'r's Mot. to Stay, at 4 (Dkt. 7).

4. As to remedies, Mr. Calcutt is entitled to proceedings before "a constitutional agency accountable to the Executive." *Free Enter. Fund*, 561 U.S. at 513; AFP Br. 21-23. The web of unlawful, overlapping tenure protections tainted the proceedings.

The FDIC contends that, under *Collins*, unconstitutional tenure protections would not void the Order. FDIC 28(j) Ltr. 1-2. But *Collins* only addressed *retrospective* remedies, *supra* p. 10. Regardless, the Order is invalid because the possibility that ALJ tenure protections affected agency decision-making "cannot be ruled out." 141 S. Ct. at 1788-89. The second ALJ refused to start proceedings anew to cure the Appointments Clause problem— a choice that a more-accountable ALJ would not likely make. And the ALJ took an expansive view of the FDIC's statutory powers, without regard to broader enforcement priorities or the circumstances of the Great Recession. At a minimum, Mr. Calcutt is entitled to a remand to the agency to conduct discovery into whether an agency more responsive to the President would have ruled differently.

## II.    The FDIC Failed to Remedy the Appointments Clause Violation

The FDIC does not dispute that Mr. Calcutt's first hearing occurred before an unconstitutionally appointed ALJ.  The FDIC (at 32) agrees that, under *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the remedy for an Appointments Clause violation is a new hearing before a different, constitutionally appointed adjudicator.  But instead of conducting fresh proceedings, the new ALJ and the Board adopted wholesale the record and various rulings created by an unconstitutionally appointed ALJ.  Br. 34-41, WLF Br. 16-17.

1.  The FDIC contends that Appointments Clause violations are fully remedied when "a properly appointed official" independently reconsiders the rulings and record the unconstitutionally appointed official made.  FDIC Br. 32-33 (citing pre-*Lucia* cases).   But *Lucia* requires more:   because Appointments Clause violations void the unconstitutionally appointed official's acts, a different constitutionally appointed adjudicator must hear proceedings as though the matter had not been adjudicated before.  138 S. Ct. at 2055 n.5. Regardless, neither the Board nor the second ALJ reviewed the first ALJ's acts *de novo*.  Instead, they treated the first ALJ's decisions as presumptively valid and improperly put the onus on Mr. Calcutt to establish prejudice.  A089, A095-A101.

2. Even were prejudice required, Mr. Calcutt established it. First, the Board relied on Mr. Calcutt's testimony from the unconstitutional 2015 proceeding. The FDIC (at 36) is incorrect that the agency merely used the 2015 testimony "for impeachment purposes" to discredit Mr. Calcutt's 2019 testimony as to whether he signed Call Reports. The FDIC did not impeach Mr. Calcutt on the stand. Instead, the Board used that 2015 testimony as *direct evidence* for factual findings, without giving Mr. Calcutt an opportunity to explain any discrepancy—a classic example of prejudice. Br. 40; WLF Br. 17-18. The FDIC's claim of waiver (at 35-36) is frivolous. Mr. Calcutt has consistently objected to using testimony from an unconstitutional proceeding as *direct* evidence. Br. 36-38; A095-A101. The FDIC (at 34-35) claims harmless error based on other record sources for other findings. But this Court judges agency action by what *the Board* relied on, not *post hoc* alternatives. *SEC v. Chenery*, 318 U.S. 80, 88 (1943); *Williams Gas Processing – Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004).

Second, the agency relied on the parties' 2015 joint stipulations. The FDIC (at 34) claims no prejudice because Mr. Calcutt's counsel signed the stipulation. But that stipulation arose when two other respondents were still in the case. Their departure changed what facts (even otherwise uncontested

facts) a party might concede. Courts routinely decline to admit stipulations from prior proceedings given such changed circumstances. *E.g.*, *Hunt v. Marchetti*, 824 F.2d 915, 917-18 (11th Cir. 1987); WLF Br. 18-20.

Finally, the FDIC (at 33) sees no prejudice from relying on the first ALJ's procedural rulings. But crediting those rulings affected the scope of discovery and resulted in narrowed document production from key third parties like Cori Nielson and Northwestern. *See* A101.

3. The FDIC (at 33) says limiting the scope of the second hearing was not arbitrary and capricious because no statutes or regulations prescribe a "particular form for hearings on remand." That is non-responsive to Mr. Calcutt's objection. The Board's 2019 order promised "a new hearing and a fresh reconsideration of all prior actions," then the Board flipped positions without explanation, which is textbook arbitrariness. Br. 39; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016).

## III. The FDIC Improperly Curtailed Cross-Examination

The FDIC does not dispute that the APA and FDIC rules guarantee cross-examination encompassing matters affecting witness credibility. Nor does the FDIC dispute that its key witness, examiner Anne Miessner, engaged in inappropriate, biased conduct that violated FDIC rules, or that Nielson and

Berden triggered the FDIC investigation to replace Mr. Calcutt with someone willing to offer the Nielsons better repayment terms. Br. 42-43. Yet the ALJ refused to allow cross-examination about these witnesses' evident bias, depriving Mr. Calcutt of an adequate defense. Br. 41-46; AABD Br. 7-10.

1. The FDIC (at 37-38) downplays what happened. The ALJ did not just limit cross-examination to the scope of the FDIC's direct examination. The ALJ did so mid-hearing. The FDIC does not dispute that the ALJ's hearing rules gave no advance notice of cross-examination restrictions. Br. 45-46. Mr. Calcutt had no reason to think he had to designate Nielsen, Berden, and Miessner as his own witnesses. And when the ALJ limited cross-examination, the deadline to designate these witnesses as part of Mr. Calcutt's case-in-chief had elapsed. This case is thus the opposite of *Guttman v. CFTC*, 197 F.3d 33 (2d Cir. 1999) (cited at FDIC Br. 38). There, the party had a "full opportunity … to examine a witness's credibility" because the ALJ *invited* the party to call the witness in his case-in-chief despite limiting cross-examination. *Id.* at 39.

The FDIC (at 38-39) argues that Mr. Calcutt should have moved for a good-cause exception to the ALJ's deadline, but never identifies what "good cause" Mr. Calcutt could invoke. Relying on the ALJ's belated rule limiting

cross-examination would have been futile given the ALJ's nonsensical insistence (at A317, A320-22, A326) that his pre-hearing rules governing direct witnesses encompassed cross-examination—a position the FDIC does not defend.

The FDIC (at 39) alternatively contends that Mr. Calcutt should have asked to insert the 2015 transcript of his cross-examination of Berden, Nielson, and Miessner into the record. But the ALJ's *sua sponte* cross-examination rules barred this option. The 2015 transcript involved questions about bias, and the ALJ prohibited Mr. Calcutt from introducing documents or testimony "beyond the scope of direct examination." A322. Regardless, a cold transcript is no substitute for live cross-examination, especially on matters of bias, and thus violates the APA's guarantee of "such cross-examination as may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d); *accord* Fed. R. Evid. 802 & 804 (excluding hearsay testimony unless witness is unavailable).

2. The FDIC (at 40-43) claims harmless error, but reliance on unreliable evidence renders agency action arbitrary and capricious. *E.g.*, *N'Diom v. Gonzales*, 442 F.3d 494, 499-500 (6th Cir. 2006) (vacating and remanding where procedural error prevented admitting testimony that would have affected

asylum applicant's credibility); *Parker v. Astrue*, 597 F.3d 920, 922-23 (7th Cir. 2010) (vacating and remanding adverse benefits decision where ALJ made unsupportable credibility determination); *Am. Wrecking Corp. v. Sec'y of Labor*, 351 F.3d 1254 (D.C. Cir. 2003) (similar).

The FDIC does not dispute that Nielsen, Berden, and Miessner engaged in conduct exhibiting bias that impugned their credibility. The FDIC (at 43) claims harmless error because the Board purportedly did not "credit[] Berden, Nielson, or Miessner over [Calcutt] where there was not also other support in the record." But the problem was not just disbelieving Mr. Calcutt; cross-examination would have foreclosed crediting these witnesses at all.

Regardless, prejudicial errors are rampant even under the FDIC's too-narrow view. The Board accepted Nielson's accusation that Mr. Calcutt avoided restructuring the Nielsons' loans to avoid regulatory "red flags." A008. The Board rejected Mr. Calcutt's contrary testimony that he believed the Nielson Entities were "posturing," partly based on Nielson's assertion that Mr. Calcutt declined her offer of updated financials. *Id.*; *contra* FDIC Br. 40.

The FDIC (at 41) denies crediting Miessner over Mr. Calcutt. But the ALJ credited Miessner's testimony that Mr. Calcutt "active[ly] conceal[ed] … the condition of the Bank's loan portfolio." A226. Mr. Calcutt denied doing so,

testifying that "risks associated with" the Nielson loans were not "sufficient motivation for him to conceal the details of the Bedrock Transaction," A226 n.267, and that "there would just be no reason" to conceal anything from regulators, A230. Self-evidently, the ALJ rejected that testimony.

The ALJ likewise credited Miessner's testimony that a November 2009 letter contained material omissions about the Nielsons loans and that Mr. Calcutt reviewed that letter, A202-03, A246, despite conflicting testimony from Mr. Calcutt and another witness, A245-A247. The FDIC (at 41) says the ALJ made no express "credibility determination." But the ALJ plainly credited Miessner's version. And the ALJ credited Berden's testimony that Mr. Calcutt asked the Nielsons to change their accounting practices to avoid raising regulatory concerns, A229-A230, rejecting Mr. Calcutt's competing testimony, A230.

The FDIC (at 42-43) downplays its reliance on these witnesses, but the Board cited their testimony more than 40 times. For example, the Board relied on Miessner's testimony to find that Mr. Calcutt could not delegate responsibility for Call Reports, A017; concealed facts from regulators and obstructed supervision, A022; did not inform bank board members of problems with Nielson loans, A025; and received a personal benefit from alleged

misconduct, A031-32. The Board cited only these witnesses to find that Mr. Calcutt failed to adequately investigate the Nielsons' financials. A008.

The FDIC (at 42-43) points to other record evidence, but FDIC examiner Bird's testimony (which the Board cited alongside Miessner's, A015) does not alone support finding that Northwestern expected to retain control over certain loans sold to other banks. Bird merely described conduct that could hypothetically raise concerns. A015 (citing 2015 Tr. 831-32). Only Miessner discussed the actual loan sale. A015 (citing Tr. 857). Nor, *contra* FDIC Br. 42-43, would Examiner Gomez's testimony fill gaps. He testified about why particular disclosures are important for bank oversight, not Mr. Calcutt's specific intent. A739. Regardless, this Court reviews what the Board found, not hypothetical findings. *Williams Gas*, 373 F.3d at 1345.

## IV. The FDIC's Order Exceeds the FDIC's Statutory Authority

### A. Statutory Misconduct

1. Mr. Calcutt's vote to approve the Bedrock Transaction while serving on bank committees does not qualify as an "unsafe or unsound practice" under 12 U.S.C. § 1818(e)(1)(A)(ii). The FDIC does not dispute that the Transaction stabilized a critical lending relationship and never imperiled the bank's stability. Br. 47-50.

The FDIC (at 45) claims the parties "[p]osit the same" legal standard and just quibble over facts. False: Mr. Calcutt contends that unsafe or unsound banking practices must involve a risk that "threatens 'the financial stability of the banking institution.'" Br. 47 (quoting *Matter of Seidman*, 37 F.3d 911, 928 (3d Cir. 1994)). Mr. Calcutt does not contest that some practices may *risk* the bank's financial stability while not producing actual *loss*, *contra* FDIC Br. 45. But to justify prohibiting someone from their profession, the scale of the risk must be severe.

Notably, the FDIC (at 46-47) does not explain how the Bedrock Transaction, one-off deviations from a bank's loan policy, or certain underwriting errors by others present a risk. The FDIC instead offers a know-it-when-we-see-it interpretation, deeming some practices "inherently unsafe or unsound." That interpretation lacks any limiting principle and would create a circuit split. Reasonable disagreements over the prudence of business decisions made at the height of the Great Recession should not trigger career-ending penalties, especially without advance notice of the contours of "unsafe or unsound" practices. AABD Br. 10-12.

The FDIC's cited cases (at 46) underscore the anomalousness of treating the Bedrock Transaction as unsound. *Jameson v. FDIC*, 931 F.2d 290 (5th

Cir. 1991) and *Gully v. NCUA*, 341 F.3d 155 (2d Cir. 2003), involved blatant self-dealing, like charging family expenses to the bank or concealing a bonus. *Ulrich v. U.S. Dep't of Treasury*, 129 Fed. App'x 388 (9th Cir. 2005) concerned a bank's attempt to circumvent federal laws by capping loans. And *First State Bank of Wayne Cnty. v. FDIC*, 770 F.2d 81 (6th Cir. 1985), involved a half-dozen riskier bank-wide practices, including the absence of *any* loan-repayment enforcement program.

The FDIC (at 46-47) asserts that requiring "proof of a threat to the bank's stability" is inconsistent with the statute's separate "effect" requirement. But the two requirements are complementary. The "misconduct" prong captures the gravity of the risk. A bank director who wagers the bank's holdings in a Las Vegas poker game threatens the bank's stability, no matter the outcome. The "effect" requirement ensures that the FDIC can act even if the risk of disaster does not fully materialize—for instance, if the director loses $100,000 on the bet instead of $100 million.

2. Mr. Calcutt also did not breach his duty of care because voting to approve the Bedrock Transaction did not create "undue risk" to the bank. Br. 51-52. The FDIC (at 47) agrees that a breach requires risky conduct, but does not dispute that the Bedrock Transaction stabilized the lending relationship.

The FDIC (at 47) portrays the 2010 Pillay collateral release as risky, but the Board made no such finding, and releasing likely unsecured collateral in exchange for a cash paydown of loans is hardly risky. Nor does the FDIC explain how Mr. Calcutt's failure to supervise subordinates would breach the duty of care if the Bedrock Transaction was not unduly risky.

As for the duty of candor, the FDIC does not dispute that Mr. Calcutt had no self-interest in the Bedrock Transaction. Nor does the FDIC offer any case finding a breach that did not involve self-dealing. Instead, the FDIC (at 48) faults Mr. Calcutt for failing to apprise the bank's board, invoking a purported general duty to disclose material information under *Sch. Dist. of City of Pontiac v. Sachse*, 264 N.W. 396, 397 (Mich. 1936). But there, the fiduciary *was* personally interested and received a $2,500 personal benefit by "taking advantage of his position." *Id.*

### B. Causation

1. Section 1818(e)'s "by reason of" language requires finding proximate cause, i.e., proof that misconduct "directly led to existing or potential losses, or at least that … misconduct was a substantial factor that foreseeably produced those losses." Br. 53-54. But the Board concluded that Mr. Calcutt "need not be the proximate cause of the harm to be held liable." A026-A027.

The FDIC (at 49-51) claims to have applied "hallmarks of proximate cause" by requiring that it was reasonably foreseeable for Mr. Calcutt's conduct to have harmed the bank. The FDIC ignores this Court's precedents establishing that reasonable foreseeability alone does not establish proximate cause; "substantiality, directness and foreseeability are all relevant." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624 (6th Cir. 2019). The FDIC's out-of-circuit authorities (at 50-51) do not support a foreseeability-only test; they either reserve whether proximate cause is required or do not interpret the "by reason of" language. Br. 56 n.4 & 57. Mr. Calcutt never endorsed a foreseeability-only test. Br. 56; *contra* FDIC Br. 50-51. And the Board never even found it reasonably foreseeable that most alleged misconduct would cause harm. The Board made such a finding only with respect to investigative expenses. A031.

2. Under any causation standard, the Board must at least identify a nexus between misconduct and statutory "effects." But the FDIC failed to connect purported misconduct to Northwestern's 2011 charge-offs or financial benefits to Mr. Calcutt. Br. 57-59.

As to the 2011 charge-offs, the Board held Mr. Calcutt liable for $6.443 million in losses from charging off unpaid Nielson loans issued *before* the

Bedrock Transaction. The FDIC (at 53) departs from the Board's reasoning, arguing that the Bedrock Transaction and the Pillay collateral transaction "could have resulted in a loss to the Bank." But regardless whether *those transactions* produced potential losses, they cannot have produced $6.443 million in charge-offs arising from the Nielsons' non-payment of loans issued *before* those transactions. The FDIC (at 53) acknowledges "the Pillay collateral paid down other loans," but claims it was "reasonable for the Board to conclude that substituting collateral presented a potential for loss." But the Board found no such thing. A028-A029.

As to financial benefit to Mr. Calcutt, the Board never explained how approving the Bedrock Transaction caused the holding company, a separate entity from the bank, to pay dividends. The FDIC's response (at 54-55) refers to Board findings that the *bank* might not have paid the holding company dividends absent the Bedrock Transaction. That ignores Mr. Calcutt's point: the holding company could have disbursed a dividend regardless. Br. 59.

### C. Non-Qualifying Effects

Two of the Board's identified harms do not qualify as "financial loss or other damage" under 12 U.S.C. § 1818(e)(1)(B)(i). Br. 59-62. First, the Board improperly counted a $30,000 charge-off on the Bedrock Transaction. The

FDIC does not defend the Board's conclusion (at A027) that even tiny charge-offs establish actual loss as a matter of law. Instead, the FDIC (at 52) claims any charge-off is a loss the bank "will probably suffer" under section 1818(e)(1)(B). That interpretation would implausibly empower the FDIC to expel bankers for a potential $1,000 loss on a $10,000,000,000 loan. The better reading is that a bank "will probably suffer" loss only if the charge-off is non-negligible. Negligible sums are, by definition, likely recoverable. No evidence shows that a $30,000 charge-off would likely remain unpaid.

Second, the Board improperly held the bank's investigative expenses against Mr. Calcutt. The FDIC does not dispute that prudent banks should incur such expenses when the FDIC launches investigations. The FDIC (at 54) insists that "the Board may reasonably" count investigative expenses if the FDIC eventually determines bankers acted imprudently after investigation. Congress cannot possibly have intended to put banks and bankers in the impossible position of encouraging prudent expenses in response to FDIC investigations, then counting those expenses against them. AABD Br. 12.

### D. Abuse of Discretion

Mr. Calcutt made difficult decisions while successfully steering a bank through the Great Recession. The FDIC concedes that "the circumstances

here" do not "necessitat[e]" prohibiting Mr. Calcutt from the industry until this appeal ends. FDIC Stay Opp., Dkt. 12 at 5-6. The FDIC's draconian penalty risks skewing banks' decision-making processes. AABD Br. 2-3.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Board's order, or at a minimum remand to the agency for further proceedings.

Dated: July 21, 2021

Respectfully submitted,

/s/ Sarah M. Harris
Ryan T. Scarborough
Sarah M. Harris
William B. Snyderwine
Kimberly J. Broecker
Helen E. White*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
sharris@wc.com
*Admitted in MA. Practice in the District of Columbia supervised by D.C. bar members pursuant to D.C. App. R. 49(c)(8).

Barry D. Hovis
MUSICK, PEELER & GARRETT LLP
315 Montgomery St 10th Floor

San Francisco, CA 94104
Telephone: (415) 281-2021
Facsimile: (415) 281-2010
B.Hovis@musickpeeler.com

*Attorneys for Petitioner Harry C. Calcutt III*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,494 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, size 14.

_____/s/ Sarah M. Harris_____
*Attorney for Petitioner Harry Calcutt*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 21, 2021, true and correct copies of the foregoing **REPLY BRIEF OF PETITIONER HARRY C. CALCUTT III** was filed with Clerk for the United States Court of Appeals for the Sixth Circuit and served on the parties through the Court's electronic CM/ECF filing system.

/s/ Sarah M. Harris

*Attorney for Petitioner Harry Calcutt*
