No. 20-4303

# In the United States Court of Appeals for the Sixth Circuit

———————————

HARRY C. CALCUTT III,
PETITIONER,

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,
RESPONDENT.

———————————

*ON PETITION FOR REVIEW OF A FINAL DECISION AND ORDER BY THE FEDERAL DEPOSIT INSURANCE CORPORATION*

———————————

**PETITION FOR REHEARING EN BANC OR PANEL REHEARING**

———————————

BARRY D. HOVIS
ATKINSON, ANDELSON, LOYA,
RUUD & ROMO
  *1050 Northgate Drive*
  *Suite 520*
  *San Rafael, CA 94903*

RYAN T. SCARBOROUGH
SARAH M. HARRIS
WHITNEY D. HERMANDORFER
KIMBERLY BROECKER
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *sharris@wc.com*

  *Attorneys for Petitioner*

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT IN SUPPORT OF EN BANC OR PANEL REHEARING ...................................................1

STATEMENT ...........................................................................................2

REASONS FOR GRANTING REHEARING ....................................7

I.     The Panel's No-Remand Holding Manifestly Warrants Review............7

II.    The Panel's Proof-of-Prejudice Requirement for Separation-of-Powers Challenges Independently Warrants Review ...........................15

III.   The Panel's Cross-Examination Holding Rests on Clear Factual Error ...........................................................................................19

CONCLUSION......................................................................................20

i

# TABLE OF AUTHORITIES

Page

Cases:

*Bhatti v. FHFA*, 15 F.4th 848 (8th Cir. 2021) ................................................17

*Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) ....................................................10

*BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency*,
    467 F.3d 871 (5th Cir. 2006)...........................................................................12

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ....................................................*passim*

*Collins v. Yellen*, 27 F.4th 1068 (5th Cir. 2022)...............................................18

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*,
    2022 WL 1577222 (E.D. Tex. Mar. 18, 2022) .............................................17

*De la Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003)..............................12, 13

*Dodge v. Comptroller of Currency*, 744 F.3d 148 (D.C. Cir. 2014) ..............14

*Doolittle v. Nat'l Credit Union Ass'n*,
    992 F.2d 1531 (11th Cir. 1993)......................................................................13

*FEC v. Akins*, 524 U.S. 11 (1998)....................................................................10

*Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*,
    769 F.3d 1127 (D.C. Cir. 2014) .....................................................................12

*Free Enter. Fund v. PCAOB*, 561 U.S. 477 (2010)..........................................3

*Golan v. Saada*, 142 S. Ct. 1880 (2022)...........................................................11

*Gonzales v. Thomas*, 547 U.S. 183 (2006) ...................................................9, 10

*Gui Cun Liu v. Ashcroft*, 372 F.3d 529 (3d Cir. 2004)..................................12

*INS v. Orlando Ventura*, 537 U.S. 12 (2002) ....................................................9

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ...................................................7

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017) .......................................13, 14

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) ................................................................4

*Maine Med. Ctr. v. Burwell*, 841 F.3d 10 (1st Cir. 2016) ..............................12

Page

Cases—continued:

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
    554 U.S. 527 (2008) ................................................................10

*Negusie v. Holder*, 555 U.S. 511 (2009) ...........................................11

*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969) .....................................11

*Osmani v. Garland*, 24 F.4th 617 (7th Cir. 2022) ..........................................12

*Port of Portland v. United States*, 408 U.S. 811 (1972)................................10

*PPG Indus., Inc. v. United States*, 52 F.3d 363 (D.C. Cir. 1995)................12

*SEC v. Chenery Corp. (Chenery II)*, 332 U.S. 194 (1947) ...............................8

*SEC v. Chenery Corp. (Chenery I)*, 318 U.S. 80 (1943) ..................1, 8, 11, 14

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020)........................................3, 14

*Smith v. Berryhill*, 139 S. Ct. 1765 (2019) .........................................9

*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984)..................................................11

*United States v. Schwarzbaum*, 24 F.4th 1355 (11th Cir. 2022) .................13

*United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir. 1989) ...................10, 11

Statutes, Regulation, and Rules:

5 U.S.C. § 706 ...................................................................................9

12 U.S.C.
    § 1812.................................................................................2, 3
    § 1818...............................................................................*passim*

Federal Rules of Appellate Procedure
    35...................................................................................14
    40.................................................................................2, 19

Other Authorities:

FDIC Formal & Informal Enforcement Actions Manual
    (June 2022)....................................................................3, 17

## INTRODUCTION AND STATEMENT IN SUPPORT OF
## EN BANC OR PANEL REHEARING

In administrative law as elsewhere, with great power comes great responsibility.  Agencies like the Federal Deposit Insurance Corporation (FDIC) can impose career-ending bans and ruinous monetary penalties through in-house agency proceedings.  To wield their immense authority, agencies must follow the law and operate within our constitutional structure.

One cardinal rule is that agencies must adequately justify decisions under the correct legal standards.  When agencies misinterpret the law, the Supreme Court has long held, courts cannot simply redo the analysis themselves.  *SEC v. Chenery Corp. (Chenery I)*, 318 U.S. 80, 94 (1943).  Thus, when the agency makes a legal error, other circuits remand for the agency to apply the right legal rule to the facts.

Here, the panel majority upheld an FDIC order barring petitioner Harry Calcutt from the banking industry for life—the death penalty of sanctions—despite faulting the FDIC's prolific legal errors.  The majority held that when an agency commits legal errors, the court should apply the right legal standard and check if the record might support affirmance.  Add.45-52.  That important ruling on a universal question of administrative law warrants en banc review.  As Judge Murphy's dissent observed, the majority's

1

"inexplicable" no-remand approach defies the Supreme Court's line of *Chenery* cases, splits with other circuits, and perversely rewards slipshod agency decision-making.  Add.90-91.

Another seminal separation-of-powers rule is that the President must retain control over removal of executive decisionmakers.  Yet, the panel opinion requires challengers to prove that the President's inability to remove subordinates at will inflicted "concrete" prejudice—an all-but-insurmountable standard—or the challenge automatically fails.  Add.26.  That holding independently warrants en banc review: it misinterprets *Collins v. Yellen*, 141 S. Ct. 1761 (2021), breaks with other circuits' approaches, and would bar constitutional challenges to plainly unlawful removal restrictions.

At very least, panel rehearing is warranted because the panel relied on a clear factual misapprehension in deeming harmless the administrative law judge's (ALJ) refusal to allow cross-examination of key witnesses.  *See* Fed. R. App. P. 40(a)(2).

## STATEMENT

1.  The FDIC is an independent agency headed by a five-member Board comprising three presidentially appointed and Senate-confirmed members; the CFPB Director; and the Comptroller of the Currency.  12 U.S.C.

§ 1812(a)(1). The Board's three appointed members serve fixed-length terms, *id.* § 1812(c), which courts have treated as precluding presidential removal except for cause. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 487 (2010) (assuming for-cause removal for fixed-term SEC Commissioners).

The FDIC exercises vast authority over the banking industry, acting as judge, jury, and executioner in administrative proceedings alleging violations of banking standards. After initial adjudication by an ALJ, the Board may "unilaterally issue final decisions awarding legal and equitable relief." *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020); 12 U.S.C. § 1818(a)-(b), (e), (i). The Board enjoys significant case-by-case discretion over sanctions ranging from cease-and-desist orders to hefty monetary penalties. Permanently barring a banker from banking is the nuclear option. 12 U.S.C. § 1818(e); FDIC Formal & Informal Enforcement Actions Manual 6-2 to 6-4, 6-12 (June 2022).

2. In 2012, the FDIC began investigating Great Recession-era transactions between Michigan's Northwestern Bank and its largest borrowers, the so-called "Nielson Entities."

The investigation targeted petitioner Harry Calcutt, Northwestern's 74-year-old former CEO. Cori Nielson, a Nielson-Entities manager, played a key

3

role.  Nielson told FDIC examiner Anne Miessner that she wanted "a fresh face to talk to at the bank"—not Calcutt, who had rebuffed Nielson's demands for loan concessions.  A604.  Miessner coordinated her investigation in a manner another FDIC examiner agreed was "shocking."  A529.

The FDIC issued a Notice of Intent to Remove Calcutt from the industry.  In 2015, an ALJ adjudicated the case.  That ALJ was unconstitutionally appointed under *Lucia v. SEC*, 138 S. Ct. 2044 (2018), so a new ALJ heard the case in 2019.  But that ALJ remained unaccountable to the Executive: at least four layers of for-cause tenure protection insulate that ALJ from presidential removal.  *See* Add.27, 30.  That ALJ also refused to allow Calcutt to cross-examine key FDIC witnesses about their apparent bias and irregular conduct, A318-33, and ruled against Calcutt in 2020.

3.  In December 2020, the Board issued a final order expelling Calcutt from the banking industry and imposing a $125,000 penalty.  The Board "may" issue a prohibition order only if a banker (1) willfully engaged in an "unsafe or unsound practice" or breached a fiduciary duty; (2) "by reason of" which; (3) the bank "suffered or will probably suffer financial loss," or other harms ensued.  12 U.S.C. § 1818(e)(1).  Monetary penalties require similar findings.

*Id.* § 1818(i)(2). The Board deemed all elements satisfied and considered the harsh penalties appropriate:

**Unsafe/unsound practice:** The Board centered its "unsafe or unsound practice" assessment on a single, imprudent act—Calcutt's approval as a board and loan committee member of a $760,000 stopgap loan—but never found that transaction abnormally risky to the bank's stability. A019-21. The Board's breach-of-fiduciary-duties analysis flowed from this finding. A023-26.

**By reason of:** The Board held that "an individual respondent need not be the proximate cause of the harm to be held liable." A026-27. Nor did the Board analyze but-for causation.

**Statutory harms:** The Board held Calcutt liable for over $8 million in harms, including $2 million in fees the bank paid to accountants and lawyers, A029-31; $6.443 million in *all* Nielson-related losses, which largely pre-dated any misconduct, A027-29; and Calcutt's portion of a dividend that the bank's holding company paid shareholders, A031-32.

4. On January 5, 2021, this Court issued an emergency stay of the FDIC's order. Add.15. In a 2-1 decision on June 10, 2022, the panel upheld the Board's order and vacated the stay.

5

a.   The majority agreed with the dissent that "the FDIC's order is riddled with legal error." Add.91 (Murphy, J., dissenting); *see* Add.39-50. The Board misinterpreted an "unsafe or unsound practice" under 12 U.S.C. § 1818(e)(1), Add.39, applied the wrong causation standard, Add.43-45, and counted harms that cannot qualify as a matter of law, Add.46-47. The panel called the Board's explanations "unconvincing" and unsupported by "specific evidence." Add.43, 47.

Yet the majority refused to remand to the agency. Based on its own review, the majority found that record evidence—including "connection[s]" that the agency "did not explicitly draw," Add.40—rendered the Board's errors harmless. Add.48-52. Thus, despite acknowledging that the Board's sanctions decisions are "discretionary" and knocking out most of the Board's cited financial harms, the majority did not remand for the Board to revisit Calcutt's draconian lifetime ban. Add.51-52.

Judge Murphy dissented because the majority's failure to remand violates "basic administrative-law principles." Add.90. He explained: "When an agency's decision rests on a collapsed legal foundation … [w]e must let the agency apply the proper law in the first instance." Add.90-91.

b.  The panel rejected Calcutt's constitutional challenges to the Board's and ALJ's for-cause-removal protections by interpreting *Collins v. Yellen*, 141 S. Ct. 1761 (2021), to foreclose challenges unless petitioners show "concrete" harm from removal violations.  Add.26.  The majority also expressed "doubt" that insulating ALJs from removal violates the Constitution.  Add.28-29; *but see Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) (declaring ALJ tenure protections unconstitutional).  Judge Murphy would have found no prejudice on different grounds.  Add.67-70.

## REASONS FOR GRANTING REHEARING

## I.    The Panel's No-Remand Holding Manifestly Warrants Review

Supreme Court precedent bars courts from taking the majority's path here:  affirming legally erroneous agency decisions based on courts' own application of the correct legal rule to record facts.  Instead, as every other circuit recognizes, courts must remand to the agency.  The majority's opposite no-remand holding makes this Circuit an outlier and rewards egregious agency errors while wresting away agencies' discretionary authority to ameliorate penalties on remand.

1.  The panel unanimously agreed that legal errors pervaded the FDIC's discretionary decisions to impose a lifetime industry ban and six-figure penalty.  Yet the majority declined to remand, instead embarking on its own

application of corrected legal standards to ferret out record facts that might support the agency's judgment on other grounds.  Add.49-51.

For instance, the agency never inquired whether statutory misconduct presented "abnormal financial risk" to the bank.  Yet, the majority itself "dr[e]w that connection" based on its assessment of the record.  Add.38-40. The agency also ignored statutory causation requirements, Add.43-45, and relied on millions of dollars in harms that do not legally qualify, Add.46-47. Yet, rather than let the agency make "notoriously difficult" judgments about whether Calcutt proximately caused qualifying harms, Add.44, the majority did its own review.  Add.45.  Then, despite deeming Calcutt responsible for only a fraction of identified harms, the majority assumed that because the agency still had statutory authority to impose the same penalties, the agency would necessarily do so.  Add.51-52.

2.  As Judge Murphy observed, the majority's approach contravenes bedrock Supreme Court precedents.  Add.90-91.  The longstanding *Chenery* rule generally prohibits courts from affirming agencies' discretionary decisions where the agency has "misconceived the law."  *Chenery I*, 318 U.S. at 94.  Courts should remand—not rehabilitate the decision "by substituting what it considers to be a more adequate or proper basis."  *SEC v. Chenery*

*Corp. (Chenery II)*, 332 U.S. 194, 196 (1947); *accord Smith v. Berryhill*, 139 S. Ct. 1765, 1779 (2019).

So pellucid is the rule that courts must remand rather than "deciding whether the facts as found fall within a statutory term" that the Supreme Court has summarily reversed contrary rulings repeatedly. *Gonzales v. Thomas*, 547 U.S. 183, 185-87 (2006) (per curiam). When the Ninth Circuit undertook its own inquiry into whether an asylum applicant satisfied the legal standard for showing changed home-country conditions, the Supreme Court held that refusal to remand flouted "every consideration that classically supports the law's ordinary remand requirement." *INS v. Orlando Ventura*, 537 U.S. 12, 13, 17-18 (2002) (per curiam). When the Ninth Circuit similarly resolved "in the first instance" another legal question the "agency ha[d] not yet considered"—whether the "facts as found" meant a "particular family" qualified for protection under the asylum statute—the Court summarily reversed again. *Gonzales*, 547 U.S. at 184-87.

Further, the Supreme Court has rejected the majority's grounds for refusing to remand. The majority believed that the Administrative Procedure Act's "substantial-evidence standard of review," 5 U.S.C. § 706(2)(E), compels courts to uphold agencies' orders if they might survive on proper legal

9

grounds. Add.51. But the Supreme Court instructs that courts must remand even if "it does not necessarily follow" from an agency's legal errors that the underlying decision "was incorrect." *Port of Portland v. United States*, 408 U.S. 811, 842 (1972); *accord FEC v. Akins*, 524 U.S. 11, 25 (1998). The substantial-evidence rule merely "governs … review of the agency's factual findings," and does not empower courts to apply the "correct legal view" to facts. Add.90 (Murphy, J., dissenting); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("'substantial evidence' … describe[s] how courts are to review agency factfinding").

The majority also considered a remand futile because, in its view, the agency could make the same findings under the proper legal standards. Add.52. But the Supreme Court deems remands futile only in "rare" circumstances, *Gonzales*, 547 U.S. at 186, where governing law "*required*" a certain result. *Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 544-45 (2008). The majority's citations confirm this. Take *United Video, Inc. v. FCC*, where the FCC's reasoning why a statute did not prohibit its rule was incorrect. 890 F.2d 1173, 1190 n.15 (D.C. Cir. 1989) (cited at Add.52). The D.C. Circuit declined to remand because the statute could *never* be read to prohibit the FCC's rule. *Id.* But remands remain imperative where,

as here, an order reflects discretionary judgments that only the agency can make, *id.* at 1190, or the agency applied the "wrong standards to the adjudication of a complex factual situation," *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969).

Finally, the majority held that, because the statute authorized the agency's draconian sanction, there was no need to ask if the agency would exercise its enforcement discretion the same way on remand.  Add.51.  But the Supreme Court considers the need for a remand at its zenith when the agency commits legal errors while reaching a "discretionary judgment."  *E.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 905-06 (1984); *cf. Golan v. Saada*, 142 S. Ct. 1880, 1895-96 (2022).  Assuming the agency would reimpose the same sanction, simply because it "might have" done so, *Chenery I*, 318 U.S. at 94, usurps the authority Congress vested in the agency to calibrate discretionary enforcement decisions.  *Negusie v. Holder*, 555 U.S. 511, 523-24 (2009); Add.90-91 (Murphy, J., dissenting).

3.  The majority's approach creates stark circuit splits.  Every other circuit would correct the agency's legal error, then remand.  A sampling:

- Both the D.C. and First Circuits hold: "[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."

11

*Maine Med. Ctr. v. Burwell*, 841 F.3d 10, 16 (1st Cir. 2016) (quoting *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995)); *see Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1139 (D.C. Cir. 2014).

- In the Third Circuit, where a court "ha[s] made a legal determination … that fundamentally upsets the balancing of facts and evidence upon which an agency's decision is based," it is "obliged to remand to the agency." *Gui Cun Liu v. Ashcroft*, 372 F.3d 529, 534 (3d Cir. 2004) (Alito, J.).

- In the Fifth Circuit, "[w]hen an administrative agency has made an error of law, the duty of the Court is to correct the error of law committed by that body, and, after doing so to remand the case." *BizCapital Bus. & Indus. Dev. Corp. v. Comptroller of Currency*, 467 F.3d 871, 874 (5th Cir. 2006) (citation omitted); *accord Osmani v. Garland*, 24 F.4th 617, 621 (7th Cir. 2022).

Sharpening the split, the majority's no-remand ruling breaks from other circuits' decisions in the agency-enforcement context.  The Ninth, Eleventh, and D.C. Circuits hold that if an agency's discretionary penalty rests in part on legal errors, courts must remand so the agency can decide if the original penalty remains appropriate.

In identical circumstances, the Ninth Circuit refused to affirm another FDIC lifetime ban after the agency erroneously counted some misconduct. *De la Fuente v. FDIC*, 332 F.3d 1208 (9th Cir. 2003).  Because the agency might "decline to reimpose" its "extraordinary" removal sanction "in the absence" of certain misconduct, the Ninth Circuit insisted that the agency consider

12

whether the lifetime-ban sanction "remains deserved." *Id.* at 1219, 1227; *see* Add.91 (Murphy, J., dissenting). Far from "suggest[ing]" that any legal error was harmless, Add.51, the Ninth Circuit refused to affirm despite the Board's statement that independent types of misconduct "standing alone" would support its decision. 332 F.3d at 1226.

The Eleventh Circuit likewise vacated and remanded an agency's lifetime-ban penalty after holding that the agency improperly classified certain conduct as unlawful. That court could "not assume" that the agency "would issue the same severe sanction" of removal "without all of the violations upon which it previously relied." *Doolittle v. Nat'l Credit Union Ass'n*, 992 F.2d 1531, 1538 (11th Cir. 1993); *accord United States v. Schwarzbaum*, 24 F.4th 1355, 1366-67 (11th Cir. 2022).

Similarly, the D.C. Circuit vacated and remanded an SEC lifetime-suspension order that relied "in part" on an improper theory of liability. *Lorenzo v. SEC*, 872 F.3d 578, 595-96 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1094 (2019). Because there could be "no assurance that the Commission would have imposed the same level of penalties in the absence of its" faulty liability finding, the D.C. Circuit held it "must remand to enable" the agency "to

reassess the appropriate penalties." *Id.* (citation omitted).[1]  Only this Circuit deprives petitioners and the agency of the chance to recalibrate penalties.

4.  Correcting the majority's no-remand approach is critical.  This Circuit is increasingly a forum for administrative-law challenges, yet the panel decision bucks black-letter law about remedying agency legal errors.  The availability of agency remands is a fundamental, outcome-determinative issue that should not turn on the happenstance of where petitioners can file.  *See* Fed. R. App. P. 35(b)(1)(B).

The majority's no-remand approach also transgresses the separation of powers.  When Congress validly vests discretionary enforcement decisions in an agency, courts usurp executive power by making their own decisions about appropriate penalties.  *Chenery I*, 318 U.S. at 88; *Seila Law*, 140 S. Ct. at 2200-01; *see* Add.90 (Murphy, J., dissenting).  Worse, the majority imposes a one-way ratchet: so long as a statute technically authorizes the harsher penalty, petitioners will never get a reprieve.

---

[1] The majority (at Add.51) invokes *Dodge v. Comptroller of Currency*, 744 F.3d 148, 152-59 (D.C. Cir. 2014).  *Dodge* rejected every claim of agency legal error, and thus did not involve any judicial applications of corrected legal standards to the record.

Meanwhile, the majority's "good-enough-for-government-work" approach encourages slipshod decision-making. Add.90 (Murphy, J., dissenting). Agencies could produce administrative gibberish, yet this Court would sustain the result so long as it can discern some record support under the right legal standard. This Court should not perversely reward legal violations by doing agencies' homework for them.

## II. The Panel's Proof-of-Prejudice Requirement for Separation-of-Powers Challenges Independently Warrants Review

The panel's separation-of-powers holding also cries out for review. Henceforth, this Circuit will automatically reject standalone constitutional challenges to restrictions on the President's ability to remove his subordinates absent "concrete" proof that removal restrictions cause prejudice. Add.26. But such proof will virtually never exist. Presidents generally do not announce that they want to fire subordinates, but cannot due to removal restrictions. The concrete-proof requirement misreads *Collins v. Yellen*, conflicts with other circuits' approach, and risks rendering separation-of-powers challenges to removal restrictions a dead letter. And this sweeping ruling would have been unnecessary had the panel simply followed *Chenery* and remanded.

1. *Collins* declared unconstitutional the for-cause removal restrictions on the Federal Housing Finance Agency's Director. 141 S. Ct at 1783-84.

15

Turning to remedies, *Collins* observed that the challengers "no longer have a live claim for prospective relief" because the agency revoked the complained-of action.  *Id.* at 1787.  Thus, "the only remaining remedial question concerns retrospective relief," *id.*, which *Collins* held depends on whether the Director's removal restrictions "inflicted harm."  *Id.* at 1789.  On that score, the challengers adduced no concrete proof, but alleged "the President might have replaced one of the confirmed Directors who supervised the implementation of" the challenged action, or that "a confirmed Director might have altered his behavior" in a helpful way.  *Id.  Collins* remanded for lower courts to consider prejudice.  *Id.*

Were the panel's reading of *Collins* correct, the challengers' lack of concrete proof of prejudice would have been dispositive.  Instead, *Collins* invalidated the removal restriction, then tackled remedies.  *Id.* at 1784-87. And, were the panel's "concrete" evidence requirement correct, *Collins* never should have remanded.  Instead, *Collins* held, because "*the possibility* that the unconstitutional restriction" harmed the challengers could not "be ruled out," lower courts must assess prejudice on remand.  *Id.* at 1789 (emphasis added). *Collins*'s reliance on "the possibility" of harm, *id.*, makes clear that a mere possibility of prejudice suffices to secure a remand.  *Contra* Add.25-26.

16

The panel's overbroad reading also disregards limitations on *Collins*'s reach. *Collins* only addressed retrospective remedies for "compensable" harms. *Id.* at 1787-89. But Calcutt seeks redress for prospective, ongoing harm from an injunction-like order that the agency can revise at any time. 12 U.S.C. § 1818(e)(7)(B); *see* Enforcement Manual 6-5. The panel reasoned "[t]hat distinction does not matter" because *Collins* discussed "harm" generally. Add.24-25. But *Collins* referred to "compensable harm" because "the only remaining remedial question" there "concern[ed] retrospective relief" for contractual claims. 141 S. Ct at 1787-89. Other courts thus read *Collins* not to require proof of "compensable harms" to obtain declaratory relief. *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 2022 WL 1577222, at *13 (E.D. Tex. Mar. 18, 2022).

2. The panel's holding conflicts with other circuits, which resolve the merits of removal challenges, then remand for further proceedings so long as specific allegations suggest some possibility of prejudice.

Take the Eighth Circuit, which remanded petitioners' removal challenge even without concrete evidence of prejudice. *Bhatti v. FHFA*, 15 F.4th 848, 854 (8th Cir. 2021). That court deemed sufficient petitioners' allegations that President Trump "would have removed and replaced" the Director during the

17

customary process of "select[ing] new leadership for virtually every non-independent federal agency at the outset of his Administration." Suppl. Br. of Pls.-Appellants 6-7, No. 18-2506 (Aug. 10, 2021).

The Fifth Circuit reasoned similarly in *Collins v. Yellen*, 27 F.4th 1068 (5th Cir. 2022). Rather than reject petitioners' harm showing, the court held that "questions surrounding retrospective relief" made it "clear that the prudent course is to remand" for further inquiry into prejudice. *Id.* at 1069.

Parting ways, the panel here dismissed Calcutt's prejudice allegations as "vague" and "generalized." Add.27. But Calcutt presented more robust prejudice allegations than these other challengers, explaining why the Board's tenure protections precluded changes in composition and why ALJ and Board tenure protections may have distorted handling of particular issues in his case. Reply 11-12. It is irrelevant that other circuits remanded to district courts, not agencies. *Contra* Add.27. The point stands either way: having shown a constitutional violation, some deeper inquiry into prejudice must follow.

3. The majority's prejudice-first, no-merits-later approach effectively forecloses standalone constitutional challenges to removal provisions. Unless petitioners brandish smoking-gun proof that the President would have removed the relevant official absent the removal restriction—proof that

18

virtually never exists—this Court will never resolve the constitutionality of removal restrictions in standalone challenges. Panels might not even resolve these constitutional questions when other errors warrant remands to the agency. This Court should reject a regime that would tolerate even blatantly unconstitutional agency structures indefinitely.

## III. The Panel's Cross-Examination Holding Rests on Clear Factual Error

At a minimum, panel rehearing is warranted to correct a significant factual error. Fed. R. App. P. 40(a)(2). The majority declined to resolve whether the ALJ erroneously barred Calcutt from cross-examining FDIC witnesses about their biases. Instead, the majority deemed any violation harmless because the ALJ and Board purportedly could access "substantially equivalent" bias evidence via "the 2015 record." Add.36.

That is plainly incorrect. As the FDIC's brief (at 39) acknowledged, that 2015 record evidence was *not* part of the 2019 record. An unconstitutionally appointed ALJ compiled the 2015 record. Thus, the Board ordered new proceedings before a properly appointed ALJ, who "must conduct a new oral hearing" if the parties object to reusing the old record and may only "accept the written transcript of prior testimony of any witnesses for which the parties agreed to accept such testimony." A091.

19

To preserve his argument that the Appointments Clause required a do-over, Calcutt objected to recycling Nielson, Berden, and Miessner's 2015 testimony, but reserved using that testimony for impeachment. A731-33; FDIC Br. 39; *accord* A264. But the new ALJ refused to let Calcutt use that 2015 testimony and related documents for impeachment, thus excluding this evidence from the 2019 record. A744-46; *see* A318-32. Because the panel's analysis depends on the erroneous assumption that the agency could and did access this 2015 evidence, its cross-examination holding warrants correction.

## CONCLUSION

This Court should grant the rehearing petition.

Dated: July 25, 2022                              Respectfully submitted,


                                                  /s/ Sarah M. Harris
                                                  Ryan T. Scarborough
                                                  Sarah M. Harris
                                                  Whitney D. Hermandorfer
                                                  Kimberly Broecker
                                                  WILLIAMS & CONNOLLY LLP
                                                  680 Maine Avenue SW
                                                  Washington, DC 20024
                                                  Telephone: (202) 434-5000
                                                  Facsimile: (202) 434-5029
                                                  sharris@wc.com

                                                  Barry D. Hovis
                                                  ATKINSON, ANDELSON, LOYA,
                                                  RUDD & ROMO
                                                  1050 Northgate Drive
                                                  Suite 520
                                                  San Rafael, CA 94903
                                                  Telephone:  (415) 281-2021
                                                  Facsimile:  (415) 281-2010
                                                  barry.hovis@aalrr.com

                                                  *Attorneys for Petitioner Harry
                                                  C. Calcutt III*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because it contains 3,887 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Expanded BT, size 14.

/s/ Sarah M. Harris
*Attorney for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 25, 2022, true and correct copies of the foregoing **PETITION FOR REHEARING EN BANC OR PANEL REHEARING OF PETITIONER HARRY C. CALCUTT III** was filed with Clerk for the United States Court of Appeals for the Sixth Circuit and served on the parties through the Court's electronic CM/ECF filing system.

_/s/ Sarah M. Harris_
*Attorney for Petitioner*

23

# ADDENDUM

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0122p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

HARRY C. CALCUTT III,

*Petitioner,*

*v.*

FEDERAL DEPOSIT INSURANCE CORPORATION,

*Respondent.*

⎫
⎪
⎪
⎬  No. 20-4303
⎪
⎪
⎭

On Petition for Review of an Order of the Federal Deposit Insurance Corporation;
Nos. FDIC-12-568e; FDIC-13-115k.

Argued:  October 20, 2021

Decided and Filed:  June 10, 2022

Before:  BOGGS, GRIFFIN, and MURPHY, Circuit Judges.
_____

### COUNSEL

**ARGUED:**  Sarah M. Harris, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Petitioner.  Michelle Ognibene, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Respondent.  **ON BRIEF:**  Sarah M. Harris, Ryan T. Scarborough, William B. Snyderwine, Helen E. White, WILLIAMS & CONNOLLY LLP, Washington, D.C., Barry D. Hovis, MUSICK, PEELER & GARRETT LLP, San Francisco, California, for Petitioner.  Michelle Ognibene, John Guarisco, FEDERAL DEPOSIT INSURANCE CORPORATION, Arlington, Virginia, for Respondent.  John M. Masslon II, WASHINGTON LEGAL FOUNDATION, Washington, D.C., Ilya Shapiro, CATO INSTITUTE, Washington, D.C., Michael Pepson, AMERICANS FOR PROSPERITY FOUNDATION, Arlington, Virginia, Andrew J. Pincus, MAYER BROWN LLP, Washington, D.C., Robert D. Nachman, BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP, Chicago, Illinois, for Amici Curiae.

BOGGS, J., delivered the opinion of the court in which GRIFFIN, J., joined.  MURPHY, J. (pp. 54–91), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

BOGGS, Circuit Judge.  Harry C. Calcutt III, a bank executive and director, petitions for review of an order issued by the Federal Deposit Insurance Corporation ("FDIC") that removes him from his position, prohibits him from participating in the conduct of the affairs of any insured depository institution, and imposes civil money penalties.  In addition to attacking the conduct and findings in his individual proceedings, he also brings several constitutional challenges to the appointments and removal restrictions of FDIC officials.

His first hearing in these proceedings occurred before an FDIC administrative law judge ("ALJ") in 2015.  Before the ALJ released his recommended decision, the Supreme Court decided *Lucia v. SEC*, 138 S. Ct. 2044 (2018), which invalidated the appointments of similar ALJs in the Securities and Exchange Commission ("SEC").  The FDIC Board of Directors then appointed its ALJs anew, and in 2019 a different FDIC ALJ held another hearing in Calcutt's matter and ultimately recommended penalties.

Broadly, Calcutt's claims fall into two categories.  First, he brings structural constitutional challenges, contending that: The FDIC Board of Directors is unconstitutionally shielded from removal by the President; the FDIC ALJs who oversee enforcement proceedings are also unconstitutionally insulated from removal; and the second hearing before a different ALJ failed to afford him a "new hearing," as mandated by *Lucia*.  In his second group of challenges, Calcutt attacks the procedure used and results reached in his post-*Lucia* adjudication.  He begins by contending that the ALJ abused his discretion by curtailing cross-examination about bias of the witnesses.  He then argues that the FDIC Board failed to find that he had committed misconduct that caused "effects" for Northwestern Bank, as the governing statute, 12 U.S.C. § 1818(e)(1), requires.  *See Dodge v. Comptroller of Currency*, 744 F.3d 148, 152 (D.C. Cir. 2014).

We deny his petition.  Calcutt's challenges to the removal restrictions at the FDIC are unavailing, because even if he were to establish a constitutional violation, he has not shown that

he is entitled to relief. *See Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021). We also conclude that his 2019 hearing satisfied *Lucia*'s mandate. As for the limits on cross-examination at that hearing, any error committed by the ALJ was harmless. Finally, there is substantial evidence in the record to support the FDIC Board's findings regarding the elements of § 1818(e)(1).

## I. BACKGROUND

### A. Overview of FDIC Enforcement Proceedings

Among other functions, the FDIC conducts examinations and investigations to ensure banks' safety, soundness, and compliance with statutes and regulations. *See* 12 U.S.C. § 1811. It has the authority to impose a range of enforcement remedies. *Id.* § 1818. These include removal and prohibition orders, in which the FDIC orders "an institution-affiliated party" to be removed from office or "prohibit[s] any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution." *Id.* § 1818(e)(1). An institution-affiliated party includes "any director, officer, employee, or controlling stockholder (other than a bank holding company or savings and loan holding company) of, or agent for, an insured depository institution." *Id.* § 1813(u)(1).

Section 8(e) of the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. § 1818(e), as amended by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), P.L. No. 101-73, § 903, 103 Stat. 183, 453–54 (1989), provides that FDIC may remove an institution-affiliated party from office or prohibit the party from participating in conducting the affairs of any insured institution upon establishing three elements: "(1) the banker committed an improper act; (2) the act had an impermissible effect, either an adverse effect on the bank or a benefit to the actor; and (3) the act was accompanied by a culpable state of mind." *De la Fuente v. FDIC*, 332 F.3d 1208, 1222 (9th Cir. 2003). First, the Board of Directors of the FDIC ("FDIC Board" or "Board") must find that the party has committed misconduct, including engaging in "any unsafe or unsound practice in connection with any insured depository institution" or committing "any act, omission, or practice which constitutes a breach of such party's fiduciary duty." 12 U.S.C. § 1818(e)(1)(A)(ii)–(iii). Second, the Board must find that at least one requisite effect has occurred, i.e., that "by reason of" the party's action, the insured depository

institution "has suffered or will probably suffer financial loss or other damage," its depositors have been or could be prejudiced, or the party has received financial gain or other benefit. *Id.* § 1818(e)(1)(B). Finally, the party must have had a culpable state of mind: The violation must be one that "involves personal dishonesty" or "demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution." *Id.* § 1818(e)(1)(C).

The FDIC may also issue civil money penalties ("CMPs") under a similar test. *See* 12 U.S.C. § 1818(i)(2). As relevant here, the agency may impose a "second tier" penalty of $25,000 per day of violation when a party "recklessly engages in an unsafe or unsound practice in conducting the affairs of [an] insured depository institution" or "breaches any fiduciary duty," and that action "is part of a pattern of misconduct," causes more than minimal loss to the institution, or benefits the institution-affiliated party. *Id.* § 1818(i)(2)(B).

To commence these enforcement proceedings, the FDIC first serves the party with a notice of intention to remove the party from office and/or prohibit that party from participating in other insured depository institutions. *See id.* § 1818(e)(1); *see also id.* § 1818(i)(2)(E)(i) (requiring notice for civil money penalty). The notice must contain a statement of facts establishing grounds for the removal and indicate a time and place for a hearing. *Id.* § 1818(e)(4). The institution-affiliated party may then appear at the hearing to contest the notice; failure to appear constitutes consent to the order. *Ibid.*

An ALJ conducts the adversarial hearing in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559. *See* 12 U.S.C. § 1818(h)(1) (requiring hearings to be "conducted in accordance with the provisions of chapter 5 of Title 5"). Under the applicable regulations, an ALJ presiding over a removal proceeding has "all powers necessary to conduct a proceeding in a fair and impartial manner and to avoid unnecessary delay," 12 C.F.R. § 308.5(a), including the power to "receive relevant evidence and to rule upon the admission of evidence and offers of proof," *id.* § 308.5(b)(3); "[t]o consider and rule upon all procedural and other motions appropriate in an adjudicatory proceeding . . . ," *id.* § 308.5(b)(7); and "[t]o prepare and present to the Board of Directors a recommended decision," *id.* § 308.5(b)(8).

The regulations also provide that evidence that would be admissible under the Federal Rules of Evidence is admissible in adjudicatory proceedings, *id.* § 308.36(a)(2), and that except as otherwise provided, "relevant, material, and reliable evidence that is not unduly repetitive is admissible to the fullest extent authorized by the Administrative Procedure Act and other applicable law," *id.* § 308.36(a)(1). If evidence meets this latter standard but would be inadmissible under the Federal Rules of Evidence, the ALJ may not deem the evidence inadmissible. *Id.* § 308.36(a)(3).

After the hearing, the ALJ must file and certify a record of the proceeding, including a recommended decision, recommended findings of fact, recommended conclusions of law, and a proposed order. *Id.* § 308.38(a). A party then has thirty days to file written exceptions for the FDIC Board's review objecting to particular matters or omissions in the ALJ's recommendations, but a failure to file an exception on a particular matter is treated as a waiver of that objection, and the Board need not consider any such objections that were not initially raised before the ALJ. *Id.* § 303.39.

The Board then reviews the ALJ's recommendations and issues a final decision. *Id.* § 308.40. Its review is "based upon review of the entire record of the proceedings," although it may limit its review to those arguments and exceptions that were raised by the parties. *Id.* § 308.40(c)(1). After the Board's final decision, a party may petition for review in the United States Court of Appeals for the District of Columbia Circuit or the circuit in which the institution's home office is located. 12 U.S.C. § 1818(h)(2).

**B. FDIC Composition and Structure**

The FDIC Board consists of five members: the Comptroller of the Currency, the Director of the Consumer Financial Protection Bureau ("CFPB"), and three additional directors who are appointed by the President with the advice and consent of the Senate. 12 U.S.C. § 1812(a)(1). The Comptroller of the Currency and the CFPB Director are also appointed by the President with Senate advice and consent. *Id.* § 2 (Comptroller of the Currency); *id.* § 5491(b)(2) (CFPB Director). The Board also incorporates a measure of partisan balancing, with a maximum of three directors permitted to be members of the same political party. *Id.* § 1812(a)(2).

The three members of the Board not appointed by virtue of another office serve fixed terms, and the parties agree that they are not removable at will. During the proceedings before the ALJs in this case, the CFPB Director also enjoyed for-cause protection from removal under 12 U.S.C. § 5491(c)(3); however, before the Board issued its final order, the Supreme Court held this removal restriction to be unconstitutional. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020). The Comptroller of the Currency's term lasts for five years "unless sooner removed by the President, upon reasons to be communicated by him to the Senate," and Calcutt concedes that this provision provides for at-will removal. 12 U.S.C. § 2. In practice, however, the FDIC Board has had several vacancies during the proceedings in Calcutt's case; additionally, at least one board member continued to serve after his term expired until a successor was appointed. *See* 12 U.S.C. § 1812(c)(3) (providing for continuation of service of appointed members after expiration of term before a successor is appointed).

The ALJs who hear FDIC removal and prohibition proceedings are part of a pool housed in the Office of Financial Institution Adjudication ("OFIA"), an interagency body established by FIRREA that presides over enforcement proceedings brought by the FDIC, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("FRB"), and the National Credit Union Administration ("NCUA"). *See* FIRREA § 916, 103 Stat. 183, 486–87 (codified at 12 U.S.C. §1818 note); 12 C.F.R. § 308.3 (defining OFIA as "the executive body charged with overseeing the administration of administrative enforcement proceedings" of OCC, FRB, FDIC, and NCUA).[1] These agencies signed an agreement that provides for cost-sharing and specifies that the FDIC is the "Host Agency," responsible for the employment of an office staff consisting of ALJs and administrative employees. *See* Ex. L to Emergency Motion for Stay Pending Review, at 1–6. The agreement also states: "Any change to the Office Staff personnel shall be subject to the prior written approval of all Agencies." *Id.* at 3. Two ALJs currently make up the pool in OFIA. *See Our Judges*, Office of Financial Institution Adjudication, https://www.ofia.gov/who-we-are/our-judges.html (last visited May 24, 2022).

---

[1]Initially, the Office of Thrift Supervision served as "host agency" for OFIA, but that agency's responsibilities were transferred to FRB, OCC, and FDIC in Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No 111-203, 124 Stat. 1376 (2010).

Until *Lucia*, these ALJs were not appointed by the FDIC.  After the Supreme Court held in *Lucia* that SEC ALJs were officers who must be appointed by the President, a court of law, or a head of department, *see* 138 S. Ct. at 2051–54, the FDIC Board then newly appointed the same ALJs without conceding that their previous appointments had been unconstitutional.  The FDIC ALJs may only be removed "for good cause" determined by the Merit Systems Protection Board ("MSPB") on the record after an opportunity for a hearing.  5 U.S.C. § 7521(a).  Members of the MSPB, in turn, may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d).

## C.  Calcutt's Actions at Northwestern Bank

With this background, we turn to the facts of the present case.  Calcutt was the President, CEO, and Chairman of the Board of Directors of Northwestern Bank (the "Bank"), which had its principal place of business in Traverse City, Michigan.  He also served as a member of the Bank's senior loan committee and as CEO of the Bank's holding company, Northwestern Bancorp.  The Bank was an insured state nonmember bank subject to the FDI Act, as well as associated regulations and Michigan state laws.  Calcutt retired from his positions at the Bank in 2013 and now serves as the Chairman of State Savings Bank in Michigan and its holding company.  Northwestern Bank was purchased by a competitor in 2014.

Under the Bank's management structure, twenty employees reported directly to Calcutt, including Richard Jackson, an Executive Vice President and board member.  A commercial-loan officer named William Green also worked for the Bank.

By 2009, the Bank's largest loan relationship was with a group of nineteen limited liability companies controlled by the Nielson family (the "Nielson Entities").  These businesses' activities involved development of real estate, holding vacant and developed real estate, and holding oil and gas interests.  At that time, the Bank's loans to the Nielson Entities (the "Nielson Loans") amounted to approximately $38 million.  The value of the Nielson Entities' holdings during this time was approximately $112 million, with $7–9 million in cash or cash equivalents, and $80 million available in real estate or oil and gas assets that could be used for collateral or loan-payment purposes.

As early as 2008, FDIC examiners identified several of the Nielson Entities as a single borrower and identified the Bank's loans to these businesses as a "concentration of credit"—defined as a lending relationship that exceeds twenty-five percent of a bank's Tier 1 capital. Although in practice the Nielsons could use cash derived from one entity to pay the loans of another entity, the loans were not cross-collateralized, meaning that the collateral in one Nielson Entity did not secure loans to other Nielson Entities, despite the common control. Neither were the loans supported by personal guarantees: If a Nielson Entity failed, the Bank could not compel the Nielsons to personally satisfy the obligation. Loans lacking personal guarantees were considered to be an exception to the Bank's commercial-loan policy.

In April 2008, Calcutt and Green met Cori Nielson, one of the managers of the limited-liability company that managed the Nielson Entities, and Autumn Berden, the chief financial officer of that company. Calcutt and Green requested that the Nielsons stop reporting transfers between Nielson Entities as intercompany loans on their balance sheets; instead, the bankers recommended that when an entity needed funds, another entity should distribute funds to its members, who could then loan or give the funds to the cash-strapped entity. Such a payment mechanism would not be reported to regulators as an intercompany transfer and would conceal the Nielson Entities' "common use of funds." According to the FDIC, over the following months this strategy also masked the interrelationship of the Nielson Entities and hid loans to Entities that had no positive cash flow by routing funds through other actors in the Nielson group.

The relationship between the Bank and the Nielsons began to deteriorate during the Great Recession. Although in May 2009 several of the Nielson Entities wrote to Calcutt stating that they had sufficient cash flow for debt service, by August multiple loans were past due. More were scheduled to mature on September 1. On August 10, Berden told the Bank that the Nielson Entities would need to restructure their loans, and on August 21, Cori Nielson made a similar communication. The Bank did not oblige, and the Nielson Entities stopped paying their loans on September 1.

Over the following months, the Nielsons and the Bank continued to negotiate, but their efforts were fruitless. The Nielsons sought measures such as debt forbearance, reduction of loan

payments, or deeds in lieu of foreclosure,[2] because ongoing problems in the real-estate market had diminished their ability to repay existing debts. Calcutt, on the other hand, later testified that he thought that the Nielsons were "posturing" and possessed sufficient funds to pay their loans. The Bank attempted to convince the Nielsons to refinance and provide greater payments on their loans. Cori Nielson later testified that in response to her communications, Calcutt expressed concerns about raising "red flags" to regulators about the Bank's relationship with the Nielson Entities. By November 30, 2009, several of the loans to the Nielson entities were automatically placed on nonaccrual status by the Bank, meaning that they were ninety days past due.

Also on November 30, the Bank and the Nielson Entities finally reached an agreement that would bring all the loans current. First, the Bank extended a loan of $760,000 to Bedrock Holdings LLC, one of the Nielson Entities (the "Bedrock Loan"), which would be used for the companies' future required loan payments until April 2010. After receipt of the loan, Bedrock Holdings transferred the funds into accounts at the Bank for other Nielson Entities. Second, the Bank agreed to release $600,000 worth of collateral in investment-trading funds that had been granted to it by another Nielson Entity, Pillay Trading LLC (the "Pillay Collateral").[3] This collateral release allowed the Nielson Entities to bring their past-due loans current. Finally, the Bank renewed the Nielson Entities' matured loans, including a loan of $4,500,000 to Bedrock Holdings. The parties refer to this agreement, which took effect in December 2009, as the "Bedrock Transaction." Consequently, the Nielson Entities' loans were removed from the Bank's nonaccrual list on December 1.

The FDIC Board would later find that the actions surrounding the Bedrock Transaction violated the Bank's commercial-loan policy. That policy required that "all commercial loans are to be supported by a written analysis of the net income available to service the debt and by written evidence from the third parties supporting the collateral value of the security," yet the Bank did not conduct these analyses or collateral appraisals prior to providing the Bedrock Loan

---

[2]Through a deed in lieu of foreclosure, "a mortgagee . . . take[s] a conveyance from the mortgagor in full or partial satisfaction and as a substitute for foreclosure." Restatement (Third) of Property (Mortgages) § 8.5 cmt. b (Am. Law Inst. 1997).

[3]As discussed below, a year later Northwestern Bank also released $690,000 in collateral from Pillay Trading LLC. We refer to the $600,000 and $690,000 disbursements together as the "Pillay Collateral."

and releasing the Pillay Collateral. At the 2019 hearing, however, Calcutt testified that he thought that the Bedrock Transaction was in the Bank's best interest, because it provided time for the Nielson Entities to pay off their debt and because he believed they had the resources to do so.

Moreover, the commercial-loan policy required approval by two-thirds of the board of directors for loans "where the total aggregate exposure is between 15 and 25 percent of the Bank's Regulatory Capital." *Ibid.* The loans to the Nielson Entities were approximately half of the Bank's Tier 1 capital, thereby qualifying for the voting requirement. According to the FDIC, however, the board did not approve the Bedrock Transaction until March 2010—approximately four months after the disbursements. The loan write-up for the Bedrock Transaction that was presented to the board in March 2010 also contained inaccurate information, including misstating the purpose of the Bedrock Loan as "working capital requirements" and omitting that the Bedrock Transaction had already occurred.

That loan write-up was prepared by a credit analyst based on information provided by Green, and Calcutt and Jackson both initialed the document. Before the FDIC, Calcutt argued that: (a) the write-up's errors and mischaracterization could not be attributed to him; (b) the board of directors was aware of the difficulties with the Nielson Entities in November 2009 because of materials it had received; and (c) the board of directors verbally approved the Bedrock Transaction in November and December 2009. The ALJ and FDIC Board, however, found against him on these points.

Calcutt's actions surrounding the FDIC's June 2010 examination of the Bank also attracted scrutiny. In May 2010, Calcutt signed an Officer's Questionnaire required by the agency. The first question required him to list the loans that the Bank had renewed or extended since the previous year's examination by accepting separate notes for the payment of interest or without fully collecting interest, as well as any loans made for the direct benefit of anyone other than the named recipients of the loans. On the questionnaire, Calcutt answered that he was not aware of any such loans. He later testified that these answers were incorrect in light of the Bank's activities with the Nielson Entities, but argued that the misstatements were "inadvertent and unintentional." (Brackets omitted.)

Additionally, Calcutt participated in a decision to sell several Nielson Entity loans to two of Northwestern Bank's affiliates in May 2010, shortly before the FDIC examiners were due to arrive. Green told Berden that he and Calcutt would continue to serve as the points of contact on those loans. In late September 2010, the Bank repurchased the loans, at which point the loans were delinquent and past maturity.

Despite these actions, by September 2010 the Nielson Entities' position remained precarious. Beginning on September 1, they again stopped making payments on their loans. Several additional months of negotiations ensued, and in December 2010 the parties agreed to an additional release of $690,000 of collateral from Pillay Trading LLC to fund the Nielson Entities' debt service from September 2010 to January 2011. The Bank's board of directors agreed to this arrangement. At the end of that period, however, the Nielson Entities yet again stopped making payments, and they have been in default since then.

### D. The 2011 Examination

Shortly before the FDIC's 2011 regular examination of the Bank was set to begin on August 1, 2011, Cori Nielson sent the agency a binder with approximately 267 pages of correspondence between herself, Berden, Green, and Calcutt. The binder's contents went beyond the correspondence that FDIC examiners had found in the Bank's loan file. According to Calcutt, Nielson's move also began a series of actions in which she and Berden improperly influenced the FDIC's Case Manager, Anne Miessner, and Miessner became biased against Calcutt while participating in the examination.

During his September 14, 2011 meeting with examiners from the FDIC and the Michigan Office of Financial and Insurance Regulation,[4] Calcutt made several false statements about the Bedrock Transaction. First, in response to a question about his understanding as to the purpose of the Bedrock Loan, Calcutt said that the funds were meant to provide "working capital" in connection with an acquisition of another business, although their true purpose was to help pay off the loans to Nielson Entities. Second, when examiners asked him about the release of the Pillay Collateral, he responded, "I thought we still had them," although he had authorized

---

[4]This agency has been renamed the Michigan Department of Insurance and Financial Services.

releases of the collateral in 2009 and 2010. Third, when queried about how the Nielson Entities managed to bring their loans current in December 2010, he answered that they used their "vast resources between oil, gas, and rentals," although the December 2010 release of Pillay Collateral was in fact used to satisfy these obligations.

In its 2011 examination, the FDIC also noted that the Nielson relationship "should have been reported as nonaccrual on quarterly Call Reports beginning no later than December 2009," and that its omission "has resulted in a material overstatement in earnings both in the form of falsely inflated interest income and of grossly understated provision expense." Calcutt signed the Call Reports, yet he later testified that he was not involved in their preparation.

Ultimately, the FDIC's 2011 examination report identified the Bank's failures in securing and analyzing the Bedrock Transaction, its reporting inaccuracies, and its misstatements during the examination. It ordered the Bank to charge off $6.443 million on the loans to Nielson Entities, which represented the amount that the Bank would be unlikely to collect.[5] On July 31, 2012, the Bank charged off an additional $30,000 specifically on the Bedrock Loan.

## E. Administrative Proceedings

1.    *The 2015 Hearing*

On April 13, 2012, the FDIC formally opened an investigation into the Bank's officers. Its investigation ended on August 20, 2013, and the agency issued a Notice of Intention to Remove from Office and Prohibit from Further Participation against Calcutt, Jackson, and Green, as well as a notice of assessment of civil money penalties (the "Notice"). In 2015, both Jackson and Green stipulated to orders prohibiting them from banking activity, and Jackson agreed to a $75,000 CMP. Calcutt proceeded to discovery and further administrative proceedings.

In September 2015, ALJ C. Richard Miserendino held an eight-day hearing on Calcutt's charges. Among the several witnesses who testified were Calcutt, Jackson, Nielson, Berden, Miessner, and Dennis O'Neill (one of the FDIC examiners). ALJ Miserendino released a

---

[5]The parties disagree about whether a charge-off necessarily qualifies as a loss. *See infra* at 45.

recommended decision on June 6, 2017. However, before the Board issued its final decision, it stayed the case pending the Supreme Court's decision in *Lucia*, because ALJ Miserendino had not been appointed by an agency head.

2.    *The 2019 Hearing*

Following *Lucia*, the FDIC Board formally appointed Miserendino and its other ALJ, Christopher B. McNeil, then remanded and reassigned each ALJ's pending cases to the other ALJ "for a new hearing and a fresh reconsideration of all prior actions, including summary dispositions, taken before the hearing." *See* FDIC Resolution Seal No. 085172, Order in Pending Cases (July 19, 2018). The Board permitted each new ALJ to conduct a paper hearing on remand, but if a party objected to the paper hearing, the Board ordered that the ALJ "must conduct a new oral hearing in accordance with 12 C.F.R. § 308.35, except that the ALJ may accept the written transcript of prior testimony of any witnesses for which the parties agreed to accept such testimony."

Calcutt's case was reassigned to ALJ McNeil, who stated that he would conduct an oral hearing and requested that the parties submit objections to ALJ Miserendino's prehearing rulings. In response, Calcutt asserted that the prior proceedings were entirely void under *Lucia* because the prior ALJ had not been appointed by an agency head. ALJ McNeil rejected this argument, and proceeded to request that the parties submit specific examples where the prior proceeding's outcome turned on evidence that should have been included or excluded, or "elements, such as witness demeanor, that are not readily determined from a review of the written record."

Calcutt then reasserted his argument that "the original proceeding was void *ab initio*" and objected to the inclusion of the record from the 2015 proceedings because the case "turn[ed] entirely on credibility assessments." In an order dated March 19, 2019, ALJ McNeil rejected these arguments, concluding that the second hearing would not be de novo, and that "[t]he prior proceedings have not been deemed void *ab initio*, but instead serve as the primary source of the evidentiary record, subject to review and reconsideration by the new ALJ." ALJ McNeil went on to observe that although credibility assessments were material to the decision of the case,

Calcutt had not established that a review of the 2015 hearing transcript would be hindered by an inability to view witnesses' demeanor. Finally, he rejected Calcutt's objections to the admission of several exhibits from the 2015 proceedings.

On March 20, 2019, ALJ McNeil released an additional prehearing order, which among other things specified that the parties should identify witnesses by May 15, 2019 and indicate each witness's expected testimony. The order specified that "during the evidentiary hearing, witness testimony will be limited to the descriptions provided in this summary." Calcutt sought an interlocutory appeal before the FDIC Board on ALJ McNeil's limitations on the oral hearing. The Board granted his request for a new oral hearing on all issues considered at the prior hearing, including live witness testimony, but it denied his request for an entirely new proceeding as untimely.

In the next prehearing order, ALJ McNeil granted enforcement counsel's motions to strike Calcutt's affirmative defenses of laches, entrapment, and examiners' violation of the agency's own procedural rules. Then, in response to the parties' motions in limine, he permitted introduction of Green and Jackson's testimony and the parties' stipulations at the 2015 hearing, among other evidentiary rulings.

The hearing lasted from October 29 to November 6, 2019. Calcutt was among twelve witnesses who testified. During the proceedings, Calcutt's counsel unsuccessfully attempted to cross-examine witnesses, including Berden, Miessner, and Nielson, about the theory that Miessner and the FDIC were biased against Calcutt due to their relationship with the Nielsons. In sustaining enforcement counsel's objections to this testimony, ALJ McNeil reasoned that these questions were outside the scope of direct examination, and that in accordance with his March 20, 2019 order, Calcutt could have identified these witnesses in a prehearing submission as subject to questioning about bias but failed to do so.

On April 3, 2020, ALJ McNeil issued the Findings of Fact, Conclusions of Law, and Recommended Decision on Remand (the "Recommended Decision"), finding that Calcutt's actions surrounding the Bedrock Transaction amounted to unsafe or unsound practices and breached his fiduciary duties of care and candor; that these actions caused the Bank to suffer

damages and financially benefitted Calcutt; and that the actions involved personal dishonesty and willful and continuing disregard for the Bank's safety and soundness. *See* 12 U.S.C. § 1818(e)(1). Finding that Calcutt's actions satisfied the requirements for a removal and prohibition order and civil money penalties, ALJ McNeil recommended that Calcutt be prohibited from banking and assessed a $125,000 CMP.

Calcutt filed exceptions to the FDIC Board, challenging many of these findings and conclusions. He also argued that the proceedings were invalid because the restrictions on ALJ McNeil's removal were unconstitutional, and because the new hearing granted after *Lucia* did not remedy the Appointments Clause violation in the previous proceedings before ALJ Miserendino. He did not argue that the Board was also improperly shielded from removal.

Upon review, the FDIC Board accepted ALJ McNeil's findings and conclusions, and on December 15, 2020, it issued a final Decision and Order to Remove and Prohibit from Further Participation and Assessment of Civil Money Penalties (the "Removal and Prohibition Order"). The Board concluded that Calcutt's involvement with the Bank's loans to the Nielson Entities, as well as his misrepresentations to regulators and the board of directors, were both unsafe and unsound practices and breaches of his fiduciary duties. *See* 12 U.S.C. § 1818(e)(1)(A). It also found that sufficient effects had occurred by reason of Calcutt's malfeasance: loan charge-offs; the Bank's increased investigative, legal, and auditing expenses; and Calcutt's receipt of dividends from the Bank's holding company that reflected the Nielson portfolio's inflated value. *See* 12 U.S.C. § 1818(e)(1)(B). And it concluded that Calcutt acted with the requisite culpability. *See* 12 U.S.C. § 1818(e)(1)(C). The Board similarly upheld ALJ McNeil's conclusions regarding the appropriateness of the civil money penalty. *See* 12 U.S.C. § 1818(i). Finally, it rejected Calcutt's exceptions regarding the ALJ's insulation from removal, the adequacy of the new hearing after *Lucia*, the ALJ's evidentiary rulings, the statute of limitations, and the ALJ's bias.

Calcutt petitioned this court for review the following day. On December 21, 2020, he moved for an emergency stay. A panel of this court granted the stay on January 5, 2021. We have jurisdiction over Calcutt's petition for review of the FDIC's order under 12 U.S.C. § 1818(h)(2).

## II.  STANDARD OF REVIEW

The judicial-review provisions of the APA apply to FDIC removal and prohibition orders and orders assessing CMPs.  12 U.S.C. § 1818(h)(2).  Accordingly, we must hold unlawful and set aside agency actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations"; "without observance of procedure required by law"; or "unsupported by substantial evidence." 5 U.S.C. § 706(2).  Furthermore, "due account shall be taken of the rule of prejudicial error." *Ibid.*; *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 664, 659–60 (2007) (explaining that this statutory language refers to a harmless-error rule).  Though a court does not "substitute its judgment for that of the agency" over decisions within the agency's delegated authority in applying the APA's arbitrary-and-capricious standard, the agency's conclusions must still be based on "reasoned decision making."  *Wollschlager v. FDIC*, 992 F.3d 574, 581–82 (6th Cir. 2021).

We review other agency determinations differently.  Questions of law are reviewed de novo, but we defer to an agency's interpretation of a provision in a statute that it is entrusted with administering, if (1) Congress has not "directly spoken to the precise question at issue," and (2) "the agency's answer is based on a permissible construction of the statute."  *N. Fork Coal Corp. v. Fed. Mine Safety & Health Rev. Comm'n*, 691 F.3d 735, 739 (6th Cir. 2012) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)).  And an agency's factual findings are reviewed for substantial evidence, which is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Gen. Med., P.C. v. Azar*, 963 F.3d 516, 520 (6th Cir. 2020) (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

## III. REMOVAL PROTECTIONS

Calcutt maintains that two features of the structure of the FDIC violate Article II and the separation of powers and thus compel invalidation of the agency's proceedings against him. First, relying principally on *Seila Law*, he argues that the members of the FDIC Board are unconstitutionally insulated from removal by the President. Second, he contends that the FDIC's ALJs are insulated by multiple levels of for-cause protection in contravention of the Supreme Court's holding in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010).

Neither alleged infirmity, however, compels invalidation of the FDIC proceedings against Calcutt. As the Court recently explained in *Collins v. Yellen*, even if an agency's structure unconstitutionally shields officers from removal, a party challenging the agency's action is not entitled to relief unless that unconstitutional provision "inflict[s] compensable harm." 141 S. Ct. at 1789. Calcutt has not demonstrated that the removal protections of the FDIC Board or the FDIC ALJs caused such harm to him.

### A. FDIC Board Structure

We first address Calcutt's challenge to the FDIC Board's structure. To start, we conclude that Calcutt has not forfeited this claim. However, Calcutt has not demonstrated that the purported constitutional infirmity inflicted harm. *See Collins*, 141 S. Ct. at 1789. Thus, he is not entitled to invalidation of the proceedings on this basis.

1. *Issue Exhaustion*

At the outset, we disagree with the argument by the FDIC that Calcutt has forfeited his challenge to the Board's removal protections by not raising it in his exceptions to the recommended decision of ALJ McNeil. This is a question of "issue exhaustion," a rule in many administrative contexts that requires a party to present an issue to an agency before pursuing judicial review on that issue. *Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021).

We have recognized three types of issue-exhaustion requirements. First, many "requirements of administrative issue exhaustion are largely creatures of statute." *Sims v. Apfel*, 530 U.S. 103, 107 (2000). Second, an agency's regulations may require exhaustion, *id.* at 108, so long as the regulations "comport with the statute" and are not applied arbitrarily, *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 747 (6th Cir. 2019). Third, a court may impose an issue-exhaustion requirement without either a statute or regulation. *Sims*, 530 U.S. at 108; *see Bryan*, 937 F.3d at 747–48 (describing "prudential exhaustion" and its unclear doctrinal source). In this last context, "[t]he desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Carr*, 141 S. Ct. at 1358 (quoting *Sims*, 530 U.S. at 109). This resemblance to an adversarial litigation in turn depends on "whether claimants bear the responsibility to develop issues for adjudicators' consideration." *Ibid.*

The FDIC argues that its regulations (namely 12 C.F.R. § 308.39(b)) compelled Calcutt to raise any Appointments Clause challenge to the Board's structure in his exceptions to the Recommended Decision before raising them before this court. Moreover, the agency adds, *Carr*'s limitation on imposing issue-exhaustion requirements in non-adversarial proceedings do not apply here, because Calcutt's adjudication was adversarial.

Calcutt responds that § 308.39(b) requires exhaustion only of issues over which the agency has jurisdiction, and that because agencies lack "authority to entertain a facial constitutional challenge to the validity of a law," he did not need to exhaust the removal issue before the ALJ or the Board. Reply Br. 2 (quoting *Jones Bros.*, 898 F.3d at 673); *see* 12 C.F.R. § 308.39(c)(1) (stating that exceptions "must be confined to the particular matters in, or omissions from, the administrative law judge's recommendations"). Relatedly, he argues that an agency proceeding is an inappropriate forum to consider a structural constitutional claim such as the Board's removability, because the Board has no special expertise in Appointments Clause jurisprudence and has previously disclaimed authority to entertain constitutional challenges to statutes, meaning that raising this issue before the Board would have been futile.

We think Calcutt has the better of the argument, and that in the "particular administrative scheme at issue" in this case, no statute, regulation, or prudential principle required him to raise

his challenge to the FDIC Board during the administrative proceedings. *Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 590 (6th Cir. 2021) (quoting *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975)). To begin with, the judicial review provision of the FDI Act, 12 U.S.C. § 1818(h), says nothing bearing on exhaustion. We have explained that a statute must contain language "directing parties to raise issues" before the agency in order to create a statutory issue-exhaustion requirement. *See Bryan*, 937 F.3d at 749; *Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 673–74 (6th Cir. 2018).

The applicable FDIC regulations hit closer to the mark. They provide that the "[f]ailure of a party to file exceptions . . . is deemed a waiver of objection thereto." 12 C.F.R. § 308.39(b)(1). This text might be read to create an issue-exhaustion requirement in light of our decision in *Bryan*, where we detected an issue-exhaustion requirement in a regulation requiring that a petition for review list "specific issues to be considered" for appeals from Black Lung Benefits Act adjudications to the Benefits Review Board. 937 F.3d at 749 (quoting 20 C.F.R. § 802.211(a)). However, there is an important difference between *Bryan* and this case. Calcutt raises a facial constitutional challenge to the FDI Act, and the FDIC has no power to invalidate its own organic statute; thus, it could never entertain Calcutt's separation-of-powers challenge to the FDIC Board in the first place. *See Jones Bros.*, 898 F.3d at 673–74 (reading statute not to impose issue-exhaustion requirement on facial constitutional challenges where agency could not "invalidate the statute from which it derives its existence and that it is charged with implementing"). True, we have explained that an agency may entertain certain facial constitutional challenges and therefore impose issue-exhaustion requirements where it has long asserted that authority. *See Joseph Forrester Trucking*, 987 F.3d at 588–89; *Bryan*, 937 F.3d at 753. But the FDIC Board has previously disclaimed the authority to determine the constitutionality of statutes. *See Matter of the Bank of Hartford*, No. FDIC-92-212kk, at A-2525 (FDIC Apr. 11, 1995), https://www.fdic.gov/bank/individual/enforcement/5223.html (last visited June 8, 2022)). Though the FDIC now offers a list of examples in which it has considered constitutional claims in adjudications, almost none of those decisions considered a constitutional challenge to the authority or structure of the FDIC, and the decision that did so—*Matter of \*\*\**,

No. FDIC-85-363e, 1986 WL 379631 (FDIC Apr. 21, 1986)—predates *Bank of Hartford*.[6]  And even if we recognize that the FDIC has asserted authority to decide *some* constitutional issues, we cannot say that this constitutes an established practice for the type of separation-of-powers claim at issue here.

A further consideration counsels against imposing an issue-exhaustion requirement here: Calcutt's challenge to the removal protections of the FDIC Board is a structural constitutional challenge over which the FDIC Board has no special expertise.  *See Carr*, 141 S. Ct. at 1360. And had Calcutt raised this challenge before the Board, his efforts would have been futile. *See id.* at 1361 ("[T]his Court has consistently recognized a futility exception to exhaustion requirements.").[7]  To illustrate, consider what remedy the Board could have offered if Calcutt had raised the issue and the Board had agreed that it was unconstitutionally shielded from removal.  The remedies granted by Article III courts, such as severing and striking the Board's for-cause protections from the FDIC's organic statute, would have been unavailable, because the Board, an agency of the Executive Branch, cannot edit its own organic statute.  *Cf. Seila Law*, 140 S. Ct. at 2207–09.  Similarly, the Board could hardly have told the President to treat it as if it had no protections from removal, since an agency cannot compel the President to act (let alone violate a statute).  Another possibility would be for it to vacate Calcutt's penalty, but that would not resolve the constitutional issue, because the removal restrictions would persist.  Requiring issue exhaustion in this situation would have been a pointless exercise.

In sum, Calcutt has not forfeited his claim that the FDIC Board is unconstitutionally insulated from removal.

---

[6]This is not to say that the FDIC has disavowed authority to address *any* constitutional claim.  As the FDIC notes, it has previously addressed Appointments Clause and separation-of-powers challenges to ALJs.  *See Matter of Sapp*, Nos. FDIC-13-477(e), FDIC-13-478(k), 2019 WL 5823871, at *18–19 (FDIC Sept. 17, 2019); *Matter of Landry*, No. FDIC-95-65e, 1999 WL 440608, at *27–29 (FDIC May 25, 1999); *Matter of Leuthe*, Nos. FDIC-95-15Ee, FDIC-95-16k,1998 WL 438323, *10–11 (FDIC June 26, 1998).  Those decisions, however, did not concern a separation-of-powers challenge to the FDIC Board.

[7]While the Supreme Court has cautioned that courts should hesitate to apply exceptions to mandatory exhaustion requirements in a *statute*, *see Ross v. Blake*, 136 S. Ct. 1850, 1857–58 (2016), that concern does not apply here because, as we have explained, the FDI Act does not clearly mandate an issue-exhaustion requirement.

2.    *FDIC Board Structure*

Calcutt would have us hold that the FDIC Board is unconstitutionally shielded from removal and therefore asks us to invalidate his entire proceeding.  Under the framework set out by the Supreme Court's recent separation-of-powers decisions, however, he is not entitled to invalidation of his proceedings.  *See Collins*, 141 S. Ct. at 1783–89; *Seila Law*, 140 S. Ct. at 2198–2204.  In particular, *Collins* indicates that Calcutt is not entitled to the relief he seeks, because he has not specified the harm that occurred as a result of the allegedly unconstitutional removal restrictions.  *See* 141 S. Ct. at 1788–89.

Article II of the Constitution states that "[t]he executive Power shall be vested in a President," U.S. Const. art. II, § 1, cl. 1, and requires the President to "take Care that the Laws be faithfully executed," *id.* art. II, § 3.  This language establishes a core principle of constitutional separation of powers: "[T]he President's removal power is the rule, not the exception." *Seila Law*, 140 S. Ct. at 2206; *see also Myers v. United States*, 272 U.S. 52, 163–64 (1926).

In *Seila Law*, the Court provided the framework for analyzing the constitutionality of a restriction on the President's removal authority.  140 S. Ct. at 2198.  At the first step, we ask whether an officer's tenure protection falls within an established exception to the general removal authority.  *Id.* at 2198.  As relevant here, one such exception, identified in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), permits for-cause removal protections for "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 140 S. Ct. at 2199–2200.[8]   To determine whether an agency falls within this category, we consider whether (a) the agency is a "body of experts," *id.* at 2200 (quoting *Humphrey's Ex'r*, 295 U.S. at 624); (b) the agency is nonpartisan or balanced along partisan lines, *ibid.*; and (c) the agency is closer to "a mere legislative or judicial aid" that "was said not to exercise any enforcement power," *id.* at 2199–2200, or rather an enforcement body that may "promulgate binding rules," "unilaterally issue final decisions awarding legal and equitable relief in

---

[8]The *Seila Law* Court also recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority" under *Morrison v. Olson*, 487 U.S. 654 (1988).  *See Seila Law*, 140 S. Ct. at 2199–2200.  However, this exception does not apply to the FDIC Board, which qualifies as the head of a department.  *See Free Enter. Fund*, 561 U.S. at 512–13 (explaining that multimember commissions can qualify as head of a department).

administrative adjudications," and "seek daunting monetary penalties against private parties on behalf of the United States in federal court," *id.* at 2200.

At the second step, if an agency structure does not fall within an established exception, we must determine "whether to extend those precedents to the 'new situation.'" *Seila Law*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund*, 561 U.S. at 483). In concluding that the CFPB Director was unconstitutionally shielded from removal, the *Seila Law* Court emphasized two key features: the historical novelty of an agency headed by a single director removable only for cause, and the inconsistency of this design with constitutional structure. *Id.* at 2201–04.

As for the historical inquiry, the Court canvassed American history and found only "modern and contested" examples of agencies headed by a single director who enjoyed good-cause tenure, such as the Federal Housing Finance Agency ("FHFA") Director, and a "one-year blip" during the Civil War in which the Comptroller of the Currency received for-cause protections. *Id.* at 2202; *see also Collins*, 141 S. Ct. at 1783 (holding that removal restriction for FHFA Director was unconstitutional, and that *Seila Law* was "all but dispositive" on the question).

As for the structural inquiry, the Court underscored that the constitutional scheme's combination of the separation of powers and democratic accountability foreclosed executive officers from exercising significant authority without direct presidential supervision. The Constitution emphasizes the division of power, but it also recognized the need for an "energetic executive" to respond quickly and flexibly to challenges. *Seila Law*, 140 S. Ct. at 2203 (discussing The Federalist No. 51 (James Madison) and The Federalist No. 70 (Alexander Hamilton)). To resolve these dueling priorities, the Constitution makes the President directly accountable to the American people through elections, allowing him to delegate authority to subordinate officials to complete the tasks of governance so long as that delegated authority "remains subject to the ongoing supervision and control of the elected President." *Ibid.* The CFPB Director's for-cause protections violated this structure because, by eliminating the President's ability to remove the CFPB Director at will, the CFPB concentrated power in a single officer while insulating him from presidential control. *Id.* at 2204. This infirmity was exacerbated by the CFPB Director's five-year term, which meant that "some Presidents may not

have any opportunity to shape its leadership," and the agency's independence from the normal appropriations process. *Ibid.*

We need not delve deeply into the *Seila Law* inquiry in this case, however, because *Collins* instructs that relief from agency proceedings is predicated on a showing of harm, a requirement that forecloses Calcutt from receiving the relief he seeks. *See* 141 S. Ct. at 1788–89. *Collins* concerned the Director of the Federal Housing Finance Agency, an agency with authority to regulate and act as the conservator or receiver of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac). *Collins*, 141 S. Ct. at 1770. Acting as the companies' conservator, the FHFA amended stock purchasing agreements with the Treasury Department, which altered the dividends that Fannie Mae and Freddie Mac were required to pay to Treasury in exchange for capital. *See id.* at 1772–75. Shareholders of the companies brought suit against the FHFA and the FHFA Director as a result. *See id.* at 1775. As relevant here, the shareholders argued that the statutory for-cause removal protection of the FHFA Director violated the separation of powers, *see id.* at 1778, and that therefore the amendment to the FHFA-Treasury agreement "must be completely undone," *id.* at 1787.

The Supreme Court agreed that the for-cause removal provision was unconstitutional, as its decision in *Seila Law* was "all but dispositive." *Id.* at 1783. Just as the CFPB in that decision presented a "novel context of an independent agency led by a single Director" whose for-cause removal protections "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control," so too did the single-director structure and removal protections in the FHFA unconstitutionally limit the President's removal power. *Id.* at 1783–84 (quoting *Seila Law*, 140 S. Ct. at 2192).

Yet although the removal restriction was unconstitutional, the Court held that the shareholders were not entitled to relief absent further findings by the lower courts. The shareholders were not entitled to a prospective remedy, because a subsequent agreement between the FHFA and Treasury had deleted the dividend formula that caused the alleged injury. *Id.* at 1779–80. As to retrospective relief for the claimed injury during the years that the dividend formula was in effect, the Court observed that "[a]lthough the statute unconstitutionally limited

the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office." *Id.* at 1787. Thus, the Director "lawfully possess[ed]" the power to implement the provision. *Id.* at 1788.

The Court explained that the shareholders would be entitled to relief if the unconstitutional removal restriction "inflict[ed] compensable harm," and it remanded the case to the Court of Appeals to conduct this inquiry. *Id.* at 1789. To establish such harm, the shareholders would need to show that the removal restriction *specifically* impacted the agency actions of which they complained:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the statute did not stand in the way. In those situations, the statutory provision would clearly cause harm.

*Ibid.* Several concurring Justices confirmed that a petitioner would have to establish that an unconstitutional removal protection specifically caused an agency action in order to be entitled to judicial invalidation of that action. *See id.* at 1789 (Thomas, J., concurring) (agreeing with majority's remedial analysis "that, to the extent a Government action violates the Constitution, the remedy should fit the injury"); *id.* at 1801 (Kagan, J., concurring in part and concurring in the judgment) ("I also agree that plaintiffs alleging a removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision."); *id.* at 1803 n.1 (Sotomayor, J., concurring in part and dissenting in part) (agreeing with majority's remedial discussion).

Calcutt attempts to distinguish *Collins* by observing that the decision concerned only retrospective relief, because the FHFA had already ended the challenged action, whereas Calcutt's Removal and Prohibition Order remains in effect and operates prospectively. That distinction does not matter here. The *Collins* inquiry focuses on whether a "harm" occurred that would create an entitlement to a remedy, rather than the nature of the remedy, and our determination as to whether an unconstitutional removal protection "inflicted harm" remains the same whether the petitioner seeks retrospective or prospective relief (particularly when we

review an adjudication that has already ended). *Collins*, 141 S. Ct. at 1789. In other words, *Collins* instructs that we must ask whether the FDIC Board's for-cause protections "inflicted harm," such as by preventing superior officers from removing Board members when they attempted to do so, or possibly by altering the Board's behavior. *Ibid*. The Removal and Prohibition Order's prospective effect does not change a court's ability to conduct that inquiry.

*Collins* thus provides a clear instruction: To invalidate an agency action due to a removal violation, that constitutional infirmity must "cause harm" to the challenging party. *Ibid.* Our sister circuits that have considered the question agree that this is the key inquiry. *See Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (explaining that "[a] party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party"); *Bhatti v. Fed. Housing Fin. Agency*, 15 F.4th 848, 854 (8th Cir. 2021) (identifying issue under *Collins* as whether unconstitutional removal restriction "caused compensable harm");[9] *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 (9th Cir. 2021) (stating that, under the "controlling" authority of *Collins,* "[a]bsent a showing of harm, we refuse to unwind the [agency] decisions below").

Calcutt has not demonstrated that the structure of the FDIC Board caused him harm. He first states that the FDIC Board's Removal and Prohibition Order "inflicts ongoing harm" by preventing him from participating in banking activities. Reply Br. 10. However, *Collins* does not say that *any* administrative penalty imposed by an unconstitutionally-structured agency must be vacated. Instead, the constitutional violation must have *caused* the harm. *See Collins*, 141 S. Ct. 1789 (identifying inquiry as whether "an unconstitutional provision . . . inflict[ed] compensable harm").

Calcutt also argues that the *possibility* that the FDIC would have taken different actions in his case, if the Board not been unconstitutionally shielded from removal, means that we should

---

[9]In *Bhatti*, the Eighth Circuit also remanded to the district court "to determine if the shareholders suffered 'compensable harm' and are entitled to 'retrospective relief.'" *Bhatti*, 15 F.4th at 854 (quoting *Collins*, 141 S. Ct. at 1789). This language does not conflict with our conclusion that *Collins* does not rest on whether relief is prospective or retrospective, because *Bhatti* concerned the same agency actions as *Collins* did. *See id.* at 852. Because the *Collins* Court recognized that only retrospective relief was available to Fannie Mae and Freddie Mac shareholders, the *Bhatti* court followed that precedent. *See ibid.*

vacate and remand.  Taken in isolation, some language in *Collins* might be read to support this view.  *See, e.g., ibid.* ("[T]he possibility that the unconstitutional restriction on the President's power to remove a Director of the FHFA could have such an effect [of inflicting compensable harm] cannot be ruled out.").  But such a broad reading would effectively eliminate any need to show that unconstitutional removal protections caused harm, because a petitioner could always assert a possibility that an agency with different personnel might have acted differently.  The *Collins* Court was not deterred from its holding by the very possibility that harm *might* occur; rather, it indicated that a more concrete showing was needed.

Calcutt also posits that if the FDIC Board had not been unconstitutionally insulated from removal, after *Lucia* it might have "altered [its] behavior," *ibid.*, and provided new proceedings as recommended by the Solicitor General, *see* Mem. from the Solicitor General to Agency General Counsels, Guidance on Administrative Law Judges after *Lucia v. SEC* (S. Ct.) 8–9, https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf  (last  visited May 24, 2022).  While failure to follow executive-branch policy could certainly help indicate that a removal restriction inflicted harm, that is not what happened here.  As we explain further below, the FDIC provided a new hearing to Calcutt consistent with *Lucia*.  *See infra* at 30–35. We also fail to see how the FDIC disregarded the Solicitor General's guidance.  The Solicitor General told agencies that while "a full soup-to-nuts redo of the administrative proceeding" was "the safest course" after *Lucia*, it was not the only course available:

> While litigants may be expected to argue otherwise, however, we do not believe a complete do-over is constitutionally required.  We believe that a 'new hearing' will be constitutionally adequate as long as the new ALJ is careful to avoid any taint from the prior ALJ's decision.  Thus, we do not think it is necessarily fatal if the new ALJ starts with the existing record in the proceeding (including hearing transcripts), much of which there would be little purpose in generating anew.

Mem. from the Solicitor General to Agency General Counsels 8–9.  Thus, we disagree with Calcutt's suggestion that the FDIC Board failed to follow executive-branch policy—let alone that it did so because of its removal protections.

Finally, Calcutt asks this court to remand to the FDIC to determine whether the removal restriction "inflicted harm" in his case, as the *Collins* court also remanded for further findings.

We do not think this step is necessary. The record is sufficiently clear that the removal protections did not cause harm, and Calcutt provides only vague, generalized allegations in response. *See Decker Coal Co.*, 8 F.4th at 1137 (declining to remand where "the record is clear"). We also note that, unlike the *Collins* Court or the Eighth Circuit in *Bhatti*, we would be remanding to an agency rather than another court. *See Collins*, 141 S. Ct. at 1789 (remanding to court of appeals); *Bhatti*, 15 F.4th at 854 (remanding to district court to determine whether Fannie Mae and Freddie Mac shareholders suffered compensable harm entitling them to relief under *Collins*). We do not see how yet another proceeding before the FDIC would aid in developing the record on this point.

## B. FDIC ALJ Structure

Calcutt's separation-of-powers challenge to the removal protections of FDIC ALJs is unsuccessful for similar reasons as his challenge to the structure of the FDIC Board. First and foremost, even if we were to accept that the removal protections for the FDIC ALJs posed a constitutional problem, Calcutt is not entitled to relief unless he establishes that those protections "inflict[ed] compensable harm," and he has not made this showing. *Collins*, 141 S. Ct. at 1789. Second, even if he established that the removal protections caused him harm, *Free Enterprise Fund* explicitly excludes ALJs from its prohibition on multiple levels of for-cause removal protection, and thus, like *Seila Law*, it only provides weak support for his position. *See Free Enter. Fund*, 561 U.S. at 507 n.10.

To recall, FDIC ALJs can only be removed if the MSPB finds that there is "good cause" for removal on the record after an opportunity for a hearing. 5 U.S.C. § 7521(a). The President may remove MSPB members "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). Additionally, the FDIC ALJs are housed in an interagency body—the Office of Financial Institution Adjudication, or OFIA—composed of the FDIC, OCC, FRB, and NCUA. The memorandum of understanding for OFIA states: "Any change to the Office Staff personnel shall be subject to the prior written approval of all Agencies." *See* Ex. L to Emergency Motion for Stay Pending Review, at 3. According to Calcutt, OFIA's structure "magnifies the constitutional problem" by requiring all four member agencies to consent before "initiat[ing] ALJ removal proceedings." Br. of Petitioner 30.

We begin with the *Collins* issue. As previously discussed, that decision requires a showing that an unconstitutional removal restriction "cause[d] harm" to invalidate an agency action. 141 S. Ct. at 1789.[10] Here, again, Calcutt offers vague assertions that it "cannot be ruled out" that the multiple levels of for-cause removal protections insulating ALJ McNeil caused him harm, but a generalized allegation is insufficient for affording relief. Reply Br. 18 (quoting *Collins*, 141 S. Ct. at 1789). He also argues that had these removal restrictions not been in place, ALJ McNeil would have been more responsive to executive-branch policy, would have properly offered a new hearing after *Lucia*, and would not have issued a recommended decision that conflicted with the FDI Act. But those arguments are premised on the success of Calcutt's other claims of constitutional and statutory violations, and as we explain below, none of those claims succeed. *See infra* at 30–35, 37–53. Thus, he cannot rely on those allegations of harm, either.

An additional feature in this case further suggests that no harm was caused by the removal restrictions. Before *Lucia*, FDIC adjudications were performed by two ALJs who were not appointed by the FDIC Board: ALJ Miserendino and ALJ McNeil. After *Lucia* held that similar ALJs in the SEC were inferior officers who must be appointed by the President, a court of law, or a head of department, *see* 138 S. Ct. at 2051 (citing U.S. Const. art. II, § 2, cl. 2), the FDIC could have appointed new ALJs. However, it simply appointed the officials who had previously been acting as ALJs—including ALJ McNeil. In the specific circumstances of this case, where the FDIC newly appointed an ALJ when it had the option not to do so, it is unlikely that the restriction on the removal of the ALJ prevented the agency from pursuing a different path respecting Calcutt.

Even if relief were available, we doubt Calcutt could establish a constitutional violation from the ALJ removal restrictions. Though *Free Enterprise Fund* concluded that the two layers of for-cause protections enjoyed by the members of the Public Company Accounting Oversight Board were "incompatible with the Constitution's separation of powers," *Free Enter. Fund*,

---

[10] Even if the restrictions on the *removal* of FDIC ALJs were invalid, both parties agree that ALJ McNeil was validly *appointed*. Therefore, we need not address whether Calcutt would be entitled to relief on grounds specifically relating to McNeil's appointment. *See Collins*, 141 S. Ct. at 1787–88.

561 U.S. at 498, the Court took care to omit ALJs from the scope of its holding, *id.* at 507 n.10 ("[O]ur holding also does not address that subset of independent agency employees who serve as administrative law judges."). The Court explained that its decision did not apply to ALJs for several reasons: "Whether administrative law judges are necessarily 'Officers of the United States' is disputed," and many ALJs "perform adjudicative rather than enforcement or policymaking functions, . . . or possess purely recommendatory powers." *Ibid.* (citing *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) (statutory citations omitted)). Similarly, as then-Judge Kavanaugh explained in dissent in the District of Columbia Circuit proceedings, the for-cause protections of ALJs are distinguishable because agencies can choose not to use ALJs in adjudications; ALJs may not be officers (as the law stood at that time); and many ALJs perform adjudicatory functions that are subject to review by higher agency officials, which "arguably would not be considered 'central to the functioning of the executive Branch' for purposes of the Article II removal precedents." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (quoting *Morrison v. Olson*, 487 U.S. 654, 691–92 (1988)).

Other than the argument that ALJs are not officers, which *Lucia* forecloses, *see* 138 S. Ct. at 2053–54, these rationales still apply to the FDIC ALJs. First, the FDIC ALJs perform adjudicatory functions, and they file a recommended decision that is subject to review by the FDIC Board. *See Free Enter. Fund*, 561 U.S. at 496 n.10; *Free Enter. Fund*, 537 F.3d at 699 n.8 (Kavanaugh, J., dissenting); 12 C.F.R. § 308.38(a). Second, "Congress has not tied the President's hands and hindered his control over his subordinates here." *Decker Coal Co.*, 8 F.4th at 1133. Rather, the FDIC must conduct hearings "in accordance with the provisions of [the APA]," 12 U.S.C. § 1818(h)(1), and the APA permits an agency to choose whether to preside over an adjudication itself, allow one or more members to be presiding officers, or use an ALJ, 5 U.S.C. § 556(b). In short, though Calcutt is correct that *Free Enterprise Fund* left open whether it applied to ALJs, that decision's reasoning for exempting ALJs still extends to this case.

Calcutt and amicus Chamber of Commerce of the United States of America also argue that the structure of OFIA provides particularly egregious removal protections for FDIC ALJs

that violate the separation of powers. Under OFIA's governing memorandum of understanding, all the constituent agencies of OFIA—the FDIC, OCC, FRB, and NCUA—must approve "[a]ny change to the Office Staff personnel." Ex. L to Emergency Motion for Stay Pending Review, at 3. According to Calcutt, this provision means that each agency has veto power over any other agency's attempt to remove an ALJ. Exacerbating this problem, he adds, several of the agencies who must agree to removal also enjoy for-cause protection. *See* 12 U.S.C. § 242 (FRB); 12 U.S.C. § 1752a(c) (NCUA Board members serve fixed terms); *supra* at 6 (FDIC for-cause protections).

Although OFIA may present a "novel structure," *Free Enter. Fund*, 561 U.S. at 495, the *Free Enterprise Fund* exception for ALJs centers on their status as adjudicatory officials that issue non-final recommendations to an agency, and not on how many levels of removal protections they enjoy, *see id.* at 496 n.10. Consequently, OFIA does not present a reason for us to hold that the removal restrictions for FDIC ALJs violates constitutional separation of powers. More importantly, even if we were to find such a violation, *Collins* decisively precludes relief for Calcutt.

## C. Appointments Clause

The Appointments Clause requires that "Officers of the United States" be appointed by the President with the advice and consent of the Senate, but Congress may allow "inferior Officers" to be appointed by the President alone, by courts, or by heads of departments. U.S. Const. art. II, § 2, cl. 2. "[T]he 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed official.'" *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 188 (1995)). Calcutt argues that he did not receive this "new hearing," but he is wrong.

Calcutt states that the FDIC ALJs are "inferior Officers," and the FDIC does not contest this point. We agree that FDIC ALJs are inferior officers and that they were improperly appointed before *Lucia*. *Cf. Burgess v. FDIC*, 871 F.3d 297, 302–03 (5th Cir. 2017) (reasoning that FDIC ALJs are officers). Because they are inferior officers, the FDIC ALJs must be appointed by the President, a court, or the FDIC Board. U.S. Const. art. II, § 2, cl. 2. Prior to

2018, the FDIC Board did not appoint the ALJs, so their appointments were invalid.  *See Jones Bros.*, 898 F.3d at 679.

Calcutt and the FDIC also agree up to a point that the remedy for the prior Appointments Clause violation is "a new 'hearing before a properly appointed' official" distinct from the previous ALJ.  *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 188).  However, Calcutt argues that a new hearing must consist of an entirely new proceeding, where the new adjudicator starts from scratch and ignores the record from the prior proceeding.  He specifically objects to ALJ McNeil's admission of stipulations and transcripts from the 2015 proceedings, and he contends that ALJ Miserendino's procedural rulings in 2015 narrowed the scope of discovery in a manner that impacted the 2019 proceedings.  The FDIC, in contrast, contends that the "new hearing" requires only a new, independent evaluation of the merits of a case without limiting consideration of the prior record, and that therefore ALJ McNeil's use of the 2015 record was proper.

*Lucia* does not specify what features a "new hearing" must contain, other than a new adjudicator.  138 S. Ct. at 2055.  Other decisions addressing the remedies for Appointments Clause violations are similarly vague.  *See Ryder*, 515 U.S. at 188 (holding that petitioner "is entitled to a hearing before a properly appointed panel" of military court); *Jones Bros.*, 898 F.3d at 679 (holding that petitioner "is entitled to a new hearing before a constitutionally appointed administrative law judge" and remanding for "fresh proceedings").

Other decisions indicate that courts afford agencies more leeway on remand after Appointments Clause violations than Calcutt's all-or-nothing position suggests.  In *Lucia*, for example, the Supreme Court recognized that in situations where "there is no substitute decisionmaker" after an Appointments Clause violation, a new hearing before the original decisionmaker could be proper.  *Lucia*, 138 S. Ct. at 2055 n.5 (citing *FTC v. Cement Inst.*, 333 U.S. 683, 700–03 (1948)).  The Federal Circuit, after finding that administrative patent judges were invalidly appointed, also explained that it required a "new hearing" before a "new panel" of judges, but that it saw "no error in the new panel proceeding on the existing record" and left to the agency's "sound discretion" whether to "allow additional briefing or reopen the record in any individual case."  *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1340

(Fed. Cir. 2019), *vacated on alternate grounds and remanded sub nom. United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021).[11]  For its part, the Court of Appeals for the District of Columbia Circuit rejected a petitioner's claim that a new proceeding by a properly appointed official must involve entirely new proceedings that ignore the prior record.  *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d. 111, 117–19 (D.C. Cir. 2015).  Instead, that court concluded that a subsequent proceeding is valid when "a properly appointed official has the power to conduct an independent evaluation of the merits and does so," *id.* at 117, and that as a constitutional matter this "independent evaluation" could include a review of prior records and transcripts, *see id.* at 122.

This reluctance to adopt a bright-light rule makes sense.  To hold that all adjudications must start from zero after a judicial decision invalidating ALJ appointments would result in cumbersome, repetitive processes throughout the executive branch simply to produce findings and orders that would often be identical the second time around.  Moreover, as the District of Columbia Circuit observed, an "independent evaluation of the merits" does not require an ALJ to *ignore* all past proceedings: Independence is not a synonym for ignorance.  *See id.* at 121–23.[12]

Thus, our inquiry focuses on whether ALJ McNeil's consideration of the 2015 stipulations and testimony showed "sufficient continuing taint arising from the first [proceeding]" to demonstrate that the second proceeding was not "an independent, de novo

---

[11]We note that although the Supreme Court stated that a new hearing was unnecessary in *Arthrex*, it explained that Arthrex was not entitled to a new hearing before a new panel "[b]ecause the source of the constitutional violation is the *restraint on the review authority* of the Director [of the Patent and Trademark Office], *rather than the appointment* of [administrative patent judges] by the Secretary [of Commerce]."  *Arthrex*, 141 S. Ct. at 1988 (emphases added).  This decision thus did not reject the Federal Circuit's conclusion that, if the administrative patent judges' appointments had been invalid, a new hearing would be appropriate, including some consideration of the original record.

[12]Our dissenting colleague characterizes our approach as a cost-benefit balancing exercise.  *See* Dissent at 74.  But determining whether a new ALJ can conduct an "independent evaluation of the merits," *see Intercollegiate Broad. Sys.*, 796 F.3d at 117, involves analyzing the impact of those past proceedings on a current adjudication—an inquiry that bears little resemblance to a weighing of the relative costs and benefits of a new administrative proceeding.  Though we mention prudential considerations that favor our approach, we do not rely on them.  Instead, our conclusion rests on the principle illustrated in *Intercollegiate Broadcasting System* and other decisions that, following an Appointments Clause violation, a new proceeding affords adequate remedy when a new decisionmaker can independently consider the merits.  *See id.* at 117–20; *Arthrex*, 941 F.3d at 1340.

decision." *Id.* at 124 (citing *Fed. Election Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 708 n.5 (D.C. Cir. 1996)). No such ongoing impact occurred here.

First, ALJ Miserendino's general ability to shape the record at the 2015 hearing does not demonstrate that ALJ McNeil lacked independence. Calcutt implies that any decision at a prior proceeding that shapes the record of a later proceeding invalidates the latter's outcome. That goes too far. *See Intercollegiate Broad. Sys.*, 796 F.3d at 124 (explaining that "not every possible kind of taint is fatal because, if it were, there would be no way to remedy an Appointments Clause violation"); *Legi-Tech*, 75 F.3d at 708–09 (accepting that past Appointments Clause violation will have some impact on later proceedings, but refusing to restart administrative process). And where a party receives an opportunity to submit additional evidence and to specify alleged defects in the first proceeding, as the FDIC's order after *Lucia* provided here, the subsequent proceeding is even more likely to be independent.

Second, ALJ McNeil's reliance on stipulations that the FDIC, Calcutt, Green, and Jackson made during the 2015 proceedings before Green and Jackson settled did not taint the proceedings. Calcutt and amicus Washington Legal Foundation argue that the settlement altered the facts that Calcutt would have conceded. At most, however, the cases cited by the parties show that courts sometimes accept stipulations made in prior proceedings and sometimes do not, and that these decisions are reviewed for abuse of discretion. *See United States v. Kanu*, 695 F.3d 74, 78 (D.C. Cir. 2012); *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998); *Hunt v. Marchetti*, 824 F.2d 916, 918 (11th Cir. 1987). To the extent that these decisions about judicial proceedings apply to administrative adjudications, ALJ McNeil did not abuse his discretion. In *Waldorf*, the court specified that "a stipulation does not continue to bind the parties if they expressly limited it to the first proceeding or if the parties intended the stipulation to apply only at the first trial," 142 F.3d at 616, and in this case the parties had agreed to stipulations at the 2015 proceedings without expressly limiting the stipulations to those proceedings. Moreover, while stipulations from prior proceedings may be excluded if their admission would create a "manifest injustice," *Kanu*, 695 F.3d at 78, Calcutt did not deny that the stipulations were accurate, but rather argued that they were irrelevant or inappropriate to the new proceeding now that that his co-respondents had settled. The ALJ did not abuse his discretion by admitting the

stipulations when Calcutt had failed to show that their admission would produce manifest injustice and had failed to expressly limit their use to the prior proceedings.

Finally, Calcutt contends that ALJ McNeil and the FDIC Board's use of the record of the 2015 hearing hampered their ability to make an independent judgment. At the 2019 hearing, Calcutt objected to using that record for all but two witnesses,[13] except for impeachment purposes. ALJ McNeil indicated that he was willing to use the entire 2015 record for substantive as well as impeachment purposes, and he ultimately used that record at several points throughout the hearing and his recommended decision. The FDIC Board then referred to the 2015 record in its final decision at several points, including instances when the 2015 record was the only cited evidence. It also concluded that it could consider Calcutt's testimony during 2015 as either impeachment or substantive evidence.

This inclusion of the 2015 record also did not prevent ALJ McNeil and the Board from conducting an "independent evaluation of the merits." *Intercollegiate Broad. Sys.*, 796 F.3d at 122. To begin with, Calcutt's prior testimony likely qualifies as an opposing party's statement, despite his objection. *See* 12 C.F.R. § 308.36(a)(2) (permitting admission of evidence that would be admissible under Federal Rules of Evidence); *United States v. Cunningham*, 679 F.3d 355, 383 (6th Cir. 2012) (explaining that Federal Rule of Evidence 801(d)(2)(A) allows "a party's own statement to be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay"). Additional testimony from 2015 was corroborated by other evidence. The remaining isolated instances in which either ALJ McNeil or the Board relied on the 2015 record for substantive conclusions do not convince us that the agency was unable to independently consider the merits of Calcutt's case. And, if there was error at these points in its analysis, it was likely harmless due to the abundance of evidence in the record supporting the agency's decision. *See* 5 U.S.C. § 706(2); *see also infra* at 37–53.

In sum, *Lucia* required that Calcutt receive a new hearing, and that is what he got. A new hearing need not be from scratch; rather, the impact of the prior proceeding must be sufficiently muted that the new adjudicator can independently consider the merits. ALJ McNeil and the

---

[13]The parties agreed by stipulation to introduce the 2015 testimony of Dennis O'Neill and Charles Bird, two FDIC examiners.

FDIC Board did not abuse their discretion by admitting the 2015 materials when they remained capable of drawing their own conclusions about Calcutt's case.

## IV.  HEARING CHALLENGES

We now turn from Calcutt's structural constitutional challenges to his claims regarding the specifics of his 2019 hearing.  These fall into three categories: a challenge relating to the decision of the ALJ to limit cross-examination on bias at the hearing, a challenge to the substance of the FDIC Board's findings and conclusions, and an abuse-of-discretion challenge to the FDIC Board's choice of sanction.

### A.  Cross-Examination

Under the FDI Act and the APA, parties are entitled "to conduct such cross-examination as may be required for a full and true disclosure of the facts."  5 U.S.C. § 556(d); *see* 12 U.S.C. § 1818(h)(1) (requiring FDIC hearings to be conducted in accordance with APA adjudication procedures).  The FDIC's regulations provide that evidence which would be admissible under the Federal Rules of Evidence is also admissible in an enforcement hearing, 12 C.F.R. § 308.36(a)(2), and that evidence that would be inadmissible under the Federal Rules of Evidence is admissible in the hearing if it is "relevant, material, reliable, and not unduly repetitive," *id.* § 308.36(a)(3); *see id.* § 308.36(a)(1).  Calcutt argues that ALJ McNeil erred under these provisions by limiting cross-examination of Autumn Berden, Cori Nielson, and Anne Miessner regarding their purported bias against Calcutt, and that the Board erred by accepting these limitations.  The parties agree that neither Berden, Nielson, nor Miessner testified about bias at the hearing.

We review an ALJ's exclusion of evidence under an abuse-of-discretion standard.  *NLRB v. Jackson Hosp. Corp.*, 557 F.3d 301, 305–06 (6th Cir. 2009).  An abuse of discretion occurs when the ALJ "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact."  *B & G Mining, Inc. v. Dir., Off. of Workers' Comp. Programs*, 522 F.3d 657, 661 (6th Cir. 2008) (quotation marks omitted).

Yet, "due account must be taken of the rule of prejudicial error." 5 U.S.C. § 706(2); *see* 12 U.S.C. § 1818(h)(2) (providing that the APA governs review of FDIC enforcement proceedings). This language applies the federal harmless-error standard from civil cases. *See Shinseki v. Sanders*, 556 U.S. 396, 406–07 (2009). We employ a "case-specific application of judgment, based upon examination of the record," *id.* at 407, to determine whether the error "affect[ed] the substantial rights of the parties," 28 U.S.C. § 2111. An error is not harmless when, for example, an agency violates its own procedural rules and the petitioner shows that he "has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (quotation marks and emphasis omitted).

We need not reach whether ALJ McNeil abused his discretion in limiting cross-examination on the bias of Berden, Nielson, and Miessner, because even if he did, that error was harmless. As we have explained in the civil context, an adjudicator's erroneous exclusion of evidence is not prejudicial, and therefore is harmless, "if other substantially equivalent evidence of the same facts [was] admitted into evidence." *In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996) (quoting *Leonard v. Uniroyal, Inc.*, 765 F.3d 560, 567 (6th Cir. 1985) (alteration in original)). Thus, we recently observed that where a court excluded evidence of police interview transcripts but the record contained depositions of "most of the same witnesses" quoted in the transcripts, any error was harmless. *M.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 447 (6th Cir. 2021); *see also Smith v. Woolace Elec. Corp.*, 822 F. App'x 409, 417 (6th Cir. 2020) (potential error over excluding witness's testimony was harmless where plaintiff "introduced substantially equivalent evidence" through another witness's testimony).

ALJ McNeil and the FDIC Board had access to the 2015 record, which contained substantially equivalent evidence regarding Berden, Nielson, and Miessner's bias. *See supra* at 31–35. During those earlier proceedings, Calcutt's counsel examined Berden, Nielson, and Miessner about their bias and alleged collaboration. Other documents in the record were also relevant to bias, including an email where Nielson told Miessner about difficulties with Northwestern Bank, requested that the FDIC contact Michigan regulators, and stated, "I just wish there was a fresh face to talk to at the bank—all this collateral damage is meaningless"; an email

in which Miessner communicated with Michigan regulators regarding Nielson's request; Berden's handwritten notes from meetings with FDIC officials; and an email correspondence between Miessner, Nielson, and Berden about FDIC charges against Calcutt, titled "A little news to brighten your weekend."  Although further cross-examination would have allowed Calcutt to further develop his bias argument, the availability of these other materials indicates that the agency's factfinders possessed sufficient information regarding the possible bias of Berden, Nielson, and Miessner to render any error harmless.  Thus, the limits on cross-examination do not necessitate a new proceeding.

## B.  Substantive Challenges

As previously discussed, Section 8(e) of the FDI Act permits the FDIC to enter a removal and prohibition order against an institution-affiliated party after finding that three elements have been met: misconduct, effects, and culpability.  *See Dodge*, 744 F.3d at 152.  Misconduct occurs when a party has "directly or indirectly" violated a law or regulation, "engaged or participated in any unsafe or unsound practice" connected with an insured institution, or breached a fiduciary duty.  12 U.S.C. § 1818(e)(1)(A).  The requisite effects take place when, "by reason of" the misconduct, the insured institution "has suffered or will probably suffer financial loss or other damage," its depositors' interests are prejudiced, or the party "has received financial gain or other benefit by reason of" the misconduct.  *Id.* § 1818(e)(1)(B).  And the culpability element is met when the party's action "involves personal dishonesty" or "demonstrates willful or continuing disregard . . . for the safety or soundness" of the insured institution.  *Id.* § 1818(e)(1)(C).  We review the FDIC Board's factual findings for substantial evidence and set aside the agency's legal conclusions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Pharaon v. Bd. of Governors of Fed. Rsrv. Sys.*, 135 F.3d 148, 152 (D.C. Cir. 1998) (quoting 5 U.S.C. § 706(2)(A)).[14]

Calcutt argues that the FDIC exceeded its statutory authority by finding misconduct when none of his actions qualified under the statutory definitions, failing to demonstrate that any

---

[14]Though the FDIC Board's interpretation of Section 8(e) of the FDI Act may receive persuasive weight, at least one of our sister circuits has explained that the FDIC receives no *Chevron* deference to its interpretation of the Act, because several agencies administer that statute.  *Dodge*, 744 F.3d at 155.

effects resulted "by reason of" of the misconduct, and failing to identify qualifying effects. He therefore does not challenge the Board's finding as to his culpability, so we do not address that part of the Removal and Prohibition Order. He also challenges his civil money penalty only to the extent that the Board's reasoning for the penalty overlaps with its analysis supporting the Removal and Prohibition Order.

1.    *Misconduct*

As to misconduct, Calcutt maintains that the FDIC Board erred by determining that his actions constituted an "unsafe or unsound practice" or a breach of fiduciary duties under the statute.[15] We disagree.

a.  Unsafe or Unsound Practice

The FDI Act does not define an "unsafe or unsound practice," and the term is interpreted flexibly. *See Seidman v. Off. of Thrift Supervision (Matter of Seidman)*, 37 F.3d 911, 926–27 (3d Cir. 1994). However, courts have generally treated the phrase as referring to two components: "(1) an imprudent act (2) that places an abnormal risk of financial loss or damage on a banking institution." *Id.* at 932; *see also Michael v. FDIC*, 687 F.3d 337, 352 (7th Cir. 2012) (same); *Landry*, 204 F.3d at 1138 (identifying imprudent-act and abnormal-financial-risk components).

Calcutt emphasizes the financial-risk component and argues that the Bedrock Transaction did not pose an abnormal financial risk to Northwestern Bank. Along with amicus American Association of Bank Directors, he characterizes the Bedrock Transaction as a good-faith attempt to shore up one of the Bank's largest lending relationships during the tumult of the Great Recession by releasing collateral and extending a loan that amounted to only a fraction of the Nielson Entities' total debt. And even if the $760,000 loan and $600,000 in collateral were ultimately not collected, he says, that loss would have been insignificant, considering that the Bank's Tier 1 capital totaled more than $70 million.

---

[15]The FDIC does not argue that Calcutt's actions violated any explicit statute, regulation, cease-and-desist order, or other similar requirement. *Cf.* 12 U.S.C. § 1818(e)(1)(A)(i).

The FDIC responds that the statute does not require a finding of a threat to bank stability in order to find "unsafe or unsound" practice, and that "[c]ourts have affirmed prohibition orders based on unsafe and unsound practices with a much more limited effect." Br. of Respondent 46. That reading contradicts the analyses of our sister circuits in *Seidman*, *Michael*, and *Landry*, and the decisions that the agency cites in support of its interpretation are not convincing. *Ulrich v. U.S. Department of Treasury* is a Ninth Circuit memorandum in which the court concluded that a loan "fraught" with financial risk, not just a limited effect, was an unsafe or unsound practice. 129 F. App'x 386, 390 (9th Cir. 2005). Other decisions that the FDIC cites—*Gully v. National Credit Union Administration Board*, 341 F.3d 155 (2d Cir. 2003), *First State Bank of Wayne County v. FDIC*, 770 F.2d 81 (6th Cir. 1985), and *Jameson v. FDIC*, 931 F.2d 290 (5th Cir. 1991)—did not engage with the question of whether financial risk to the institution was necessary to demonstrate an unsafe or unsound practice. Still other cited decisions linked a finding of unsafe or unsound practices to abnormal financial risks, again controverting the FDIC. *See Gulf Fed. Sav. & Loan Ass'n of Jefferson Parish v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 264 (5th Cir. 1981); *Matter of \*\*\**, FDIC-83-252b&c, FDIC-84-49b, FDIC-84-50e (Consolidated Action), 1985 WL 303871, at \*9 (FDIC Aug. 19, 1985).

Whether or not we interpret the statute to require a finding of *abnormal* financial risk, however, the FDIC's finding that Calcutt committed an "unsafe or unsound practice" is supported by substantial evidence. First, Calcutt does not address the Board's finding that he "repeatedly concealed material information about the Nielson Loans" from regulators, and that such misrepresentations "constitute unsafe or unsound practices." *See De la Fuente*, 332 F.3d at 1224 ("Failure to disclose relevant information to a government investigator can constitute an unsound banking practice."); *Seidman*, 37 F.3d at 937 (stating that "hindering [a financial regulatory agency] investigation is an unsafe or unsound practice").

Second, the record supports the FDIC Board's conclusion that Calcutt committed additional imprudent acts that posed an abnormal financial risk. In particular, the Board underscored that when the Nielson Entities indicated to the Bank that they would not be able to pay off their loans in 2009, Calcutt declined to seek additional financial information and instead approved the Bedrock Transaction, which extended further credit to the Entities and renewed the

outstanding $4.5 million in loans to Bedrock Holdings. The Board also found that Calcutt's actions violated the Bank's commercial-loan policy because he approved the Bedrock Transaction without either determining that the Nielson Entities had sufficient income to service their debt, obtaining personal guarantees on the loans, or receiving approval by a two-thirds majority of the board of directors.

Calcutt responds that such actions do not constitute "unsafe or unsound" practices absent abnormal financial risk to the Bank, and that his actions did not present such a risk. His first proposition may be correct. *See Seidman*, 37 F.3d at 932. However, Calcutt's actions concerned the Bank's largest lending relationship—the Nielson Entities—which represented approximately $38 million in loans and half of the Bank's Tier 1 capital. The FDIC Board had substantial evidence to find that his actions presented a risk in this context, even if it did not explicitly draw that connection. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998) (explaining that substantial-evidence test "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree which could satisfy a reasonable factfinder" (emphasis omitted)). We therefore hold that the FDIC Board did not err in determining that Calcutt engaged in unsafe or unsound practices.

  b. Breach of Fiduciary Duties

The FDIC Board also concluded that the misconduct element was satisfied because Calcutt breached his fiduciary duties of care and candor. *See* 12 U.S.C. § 1818(e)(1)(A)(iii). These duties are determined by state law rather than federal common law. *See Atherton v. FDIC*, 519 U.S. 213, 226 (1997) (holding that state law rather than federal common law defines standard of care for corporate governance); *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 511–12 (6th Cir. 2005). Under Michigan law, bank directors and officers have a fiduciary duty to act with the degree of care "that an ordinarily prudent person would exercise under similar circumstances in a like position." Mich. Comp. Laws Ann. § 487.13504(1) (2021). And in other contexts, Michigan courts have recognized that "[a] fiduciary has an affirmative duty to disclose" material facts relating to the fiduciary relationship to a principal. *Silberstein v. Pro-Golf of Am., Inc.*, 750 N.W.2d 615, 624 (Mich. Ct. App. 2008); *see also Lumber Vill., Inc. v.*

*Siegler*, 355 N.W.2d 654, 694–95 (Mich. Ct. App. 1984) (recognizing that courts may toll the statute of limitations for fraudulent concealment actions when a fiduciary fails to inform a principal of material facts relating to the claim, because "there is an affirmative duty to disclose where the parties are in a fiduciary relationship").

On appeal, Calcutt presents three arguments, none availing. First, he contends that he cannot have violated his duty of care, because his actions did not create an "undue risk" to the Bank. Br. of Petitioner 51 (quoting *Kaplan v. Off. of Thrift Supervision*, 104 F.3d 417, 421 (D.C. Cir. 1997)). This argument echoes his position that he did not commit an "unsafe or unsound" practice with regard to the Bedrock Transaction.[16] *See Landry*, 204 F.3d at 1138 (noting overlap in analyses of breach of fiduciary duties and unsafe or unsound practices). And it fails for the same reason as his unsafe-or-unsound claim: The record presents substantial evidence to support a finding of financial risk.

Second, Calcutt argues that the Board's finding that he failed to supervise his subordinates (namely Green, Jackson, and other Bank employees) does not indicate that he breached his duty of care. It is true that an officer does not necessarily violate a duty of care merely because subordinates failed to follow orders. *See Doolittle v. Nat'l Credit Union Admin.*, 992 F.2d 1531, 1537 (11th Cir. 1993); *see also Kaplan*, 104 F.3d at 422 (explaining that director's approval of plan that ultimately led other officers and directors to "dishonestly short circuit the required procedures" was not "remotely foreseeable" and did not "contribut[e] to any increased risk" to institution).

But even if Green, Jackson, and other employees committed many of the actions related to the Nielson Entities, Calcutt remains responsible if he knew about their actions and permitted them to occur. Failure to supervise subordinates breaches an officer's duty of care when the officer knows about subordinates' activities or buries his head in the sand. *See Hoye v. Meek*, 795 F.2d 893, 896 (10th Cir. 1986) (holding that bank director and president inadequately supervised subordinate, because "[w]here suspicions are aroused, or should be aroused, it is the

---

[16]We note that the Board also concluded that the December 2010 release of Pillay Collateral violated the duty of care, but it did not conclude that the collateral release constituted an unsafe or unsound practice. This difference between the two types of misconduct findings does not affect our analysis.

directors' duty to make necessary inquiries"). In *Doolittle*, for instance, the Eleventh Circuit clarified that an officer was not responsible for his subordinates' actions when he gave proper orders to them, they failed to follow those orders, and he attempted to take remedial measures, but that those circumstances did not present "a case where a fiduciary engaged in imprudent lending activities or stood idle and allowed damage to increase." 992 F.2d at 1537.[17]

The record provides substantial evidence that Calcutt knew about his subordinates' activities and permitted them to continue. For instance, in 2008, he was involved in discussions with Green and the Nielsons involving the suggestion that they change their methods of intercompany loans. Calcutt was aware of the Nielson Entities' difficulty in paying their loans, although he testified that he thought that they were "posturing." He received correspondence directly from the Nielsons. Berden testified that though Calcutt would not attend all meetings, Green often sought his approval before proceeding in negotiations. Calcutt had received a memo from Green in November 2009 describing the loan to Bedrock Holdings. He was aware of (and possibly participated in approving) the sale of Nielson Entity loans to affiliated banks. And Green reported directly to Calcutt. There was ample evidence for the FDIC Board to find that he had breached his duty of care by failing to supervise subordinates.

Finally, Calcutt resists the Board's conclusion that he breached his duty of candor to the Bank's board of directors by failing to timely disclose the information about the status of the Nielson Loans and the Bedrock Transaction. He asserts that the duty of candor requires corporate fiduciaries to "disclose only 'material information relevant to corporate decisions from which [the fiduciary] may derive a personal benefit,'" and that he did not have a personal interest in the Bedrock Transaction. Br. of Petitioner 53 (quoting *De la Fuente*, 332 F.3d at 1222 (alteration in original)). Even if we accept this framing of the duty, however, the FDIC concluded that Calcutt derived a personal benefit from misrepresenting the status of the Nielson

---

[17]Calcutt and amicus American Association of Bank Directors refer to the business-judgment rule and urge us not to fault Calcutt for taking what they characterize as reasonable, good-faith, but ultimately mistaken decisions in managing the Bank. Michigan courts have recognized that "[i]nterference with the business judgment of corporate directors is not justified by allegations that a different policy could have been followed." *Matter of Est. of Butterfield*, 341 N.W.2d 453, 462 (Mich. 1983). However, they also recognize that a breach of fiduciary duty merits judicial intervention. *Ibid.* The business-judgment rule thus does not prevent us from considering whether Calcutt breached fiduciary duties.

Loans to regulators, because he received dividends through the Bank's holding company that reflected the Bank's artificially inflated income. To the extent that substantial evidence supports the personal-benefit determination, the finding that Calcutt breached his duty of candor would also be sufficiently supported. In addition, even if Calcutt did not receive a personal benefit, the support for the Board's finding that he committed unsafe and unsound practices and violated the duty of care means that this error would be harmless. *See Sanders*, 556 U.S. at 407.

In sum, we decline to set aside the Board's conclusions that Calcutt met the misconduct element of the statute.

2. *Effects*

Under the FDI Act, the FDIC must find that "by reason of" Calcutt's misconduct, one or more of the following effects resulted: The Bank "has suffered or will probably suffer financial loss or other damage," its "depositors have been or could be prejudiced," or Calcutt "has received financial gain or other benefit." 12 U.S.C. § 1818(e)(1)(B). The FDIC Board found that three types of harms qualified under this provision: (1) a $30,000 charge-off to the $760,000 Bedrock Loan that the Bank recorded; (2) $6.443 million in other charge-offs that the Bank recorded on other Nielson Loans; and (3) investigative, legal, and auditing expenses that the Bank incurred. It also found that Calcutt received a financial benefit, because he received dividends from the Bank's holding company that would have been smaller had he reported the condition of the Nielson Loans and not approved the Bedrock Transaction or 2010 release of Pillay Collateral.

Calcutt commences by arguing that the Board erred by failing to read the statute's "by reason of" language to require proximate causation. In its final decision, the FDIC was unwilling to apply a proximate-causation standard, instead stating that "an individual respondent need not be the proximate cause of the harm to be held liable under section 8(e)."

Because Section 8(e) requires that a bank's loss or potential loss, or a party's benefit, occur "by reason of" the misconduct, it mandates proximate causation. 12 U.S.C. § 1818(e)(1)(B). Recently, we observed that "[t]he Supreme Court has repeatedly and explicitly held that when Congress uses the phrase 'by reason of' in a statute, it intends to require a

showing of proximate cause." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) (quoting *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 391 (7th Cir. 2018)). This interpretation has occurred in the context of other statutory schemes. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (civil RICO statute, 18 U.S.C. § 1964(c)); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (same); *Crosby*, 921 F.3d at 623 (Anti-Terrorism Act, 18 U.S.C. § 2333). The FDIC has not offered a reason why the phrase should not have the same meaning in Section 8(e), and "[i]n the absence of any statutory definition to the contrary, courts assume that Congress adopts the customary meaning of the terms it uses." *United States v. Detroit Med. Ctr.*, 833 F.3d 671, 674 (6th Cir. 2016) (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952)).

The FDIC alternatively argues that its formulation—that "by reason of" requires only "a causal 'nexus' between the misconduct and harm, or that harm was reasonably foreseeable"—is consistent with proximate causation. Br. of Respondent 50. This has some appeal; after all, it is notoriously difficult for judges to define proximate cause. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535–36, 535 n.32 (1983); *Crosby*, 921 F.3d at 623–24. We also recognize that in prior adjudications, the FDIC has concluded that a reasonably foreseeable loss "satisfies the 'effects' requirement." *Matter of Conover*, Nos. FDIC-13-214e, FDIC-13-217k, 2016 WL 10822038, at *22 (FDIC Dec. 14, 2016); *see also Matter of ****, 1985 WL 303871, at *114 (declining to characterize the causation standard as proximate cause). However, while reasonable foreseeability may be a necessary component of proximate causation, it is not sufficient: "substantiality, directness, and foreseeability are all relevant in a proximate cause determination," though these concepts may overlap. *Crosby*, 921 F.3d at 624.

The decisions cited by the FDIC as support for its view are consistent with a proximate-causation definition of "by reason of" that incorporates substantiality, directness, and foreseeability. In *De la Fuente*, for example, the Ninth Circuit held that a risk of loss must be "reasonably foreseeable," but did not conclude that reasonable foreseeability alone was enough for liability. 332 F.3d at 1223; *see also United States v. Gamble*, 709 F.3d 541, 549 (6th Cir. 2013) (holding that harms must be reasonably foreseeable to be proximately caused, but not

stating that reasonable foreseeability is sufficient). *Haynes v. FDIC*, a memorandum, seemingly treated "reasonably foreseeable" as interchangeable with "by reason of," but did so in a summary fashion that we do not consider persuasive. *See* 664 F. App'x 635, 637 (9th Cir. 2016). Although in *Landry*, the Court of Appeals for the District of Columbia Circuit recognized that an individual could be liable for the effects of misconduct even if he acted "only indirectly," the court was construing the misconduct element of Section 8(e). 204 F.3d at 1139; *see* 12 U.S.C. § 1818(e)(1)(A) (identifying relevant finding as whether a party has "directly or indirectly" committed misconduct). We do not read that decision to say that when it comes to the effects inquiry, reasonable foreseeability alone suffices to show causation.

With the causation standard established, we consider the statutory effects identified by the FDIC Board. We conclude that substantial evidence supports the conclusion that some—but not all—of the impacts to the Bank are "effects" under Section 8(e) and were proximately caused by Calcutt's misconduct.

    a. The $30,000 Charge-Off on the $760,000 Bedrock Loan

The charge-off on the loan to Bedrock Holdings, which was part of the Bedrock Transaction, is an effect under the statute. Calcutt argues that a charge-off does not reflect actual losses but rather estimates possible future loss, but the FDI Act is clear that a loss that a bank will "probably suffer" qualifies as an effect, 12 U.S.C. § 1818(e)(1)(B)(i). Similarly, an estimated loss is sufficient. *See Dodge*, 744 F.3d at 158 (explaining that effects requirement "is satisfied by evidence of either potential or actual loss to the financial institution, and the exact amount of harm need not be proven"); *Pharaon*, 135 F.3d at 157 (holding that FDIC Board need not "demonstrate the exact amount of harm"). Though Calcutt argues that some charge-offs are too small to constitute effects, we need not address this issue, because the FDIC supplemented its finding with respect to the $30,000 effect with several other findings of effects. And the record indicates that, because Calcutt participated extensively in negotiating and approving the Bedrock Transaction, his actions proximately caused the Bedrock Loan charge-off.

b.  Investigative, Auditing, and Legal Expenses

The FDIC Board also agreed with ALJ McNeil that Calcutt's misconduct caused the Bank to incur expenses by retaining a CPA firm and a legal firm to conduct work relating to the regulatory problems with the Nielson Entities relationship.  We conclude, however, that such professional fees are not "effects" under Section 8(e).  Banks regularly engage accounting and legal firms as part of their normal business, and we do not see how employing such businesses for additional services related to imprudent loans is meaningfully different from their run-of-the-mill engagements.

The FDIC Board reasoned that though legal fees "presumptively are a normal cost of doing business," they can constitute an effect when they "are coupled with other 'non-neutral indicia of loss,'" and that the Bank's payments to a CPA firm and loan charge-offs constituted such other non-neutral indicia.  *See Matter of Proffitt*, FDIC-96-105e, 1998 WL 850087, at *9 n.11 (FDIC Oct. 6, 1998) (considering "a [court] judgment of improper and illegal behavior" in a related lawsuit to be a non-neutral indicium).  We are unpersuaded by this rationale: If professional fees are not a loss unless they are coupled with other "non-neutral indicia of loss," then it may be that the fees do not have any independent significance.  The two FDIC decisions cited by the Board exemplify this problem, since in both instances banks suffered losses *in addition to* their payment of professional fees.  In *Matter of Proffitt*, the Board explained that "a judgment of improper and illegal behavior"—in that context, a court judgment awarding a bank to pay damages—plus legal fees could establish a qualifying loss.  *Id.* at *3, *9 & n.11.  And in *Matter of Shollenburg*, the bank suffered additional losses besides professional fees in order to satisfy tax laws that the respondents had violated.  *See* FDIC-00-88e, 2003 WL 1986896, at *12–13 (FDIC Mar. 11, 2003).

c.  $6.443 Million in Other Losses

Next, the Board found that Calcutt's actions cost the Bank $6.443 million in losses from other loans to the Nielson Entities, and that his approval of the release of approximately $1.2 million in Pillay Collateral prevented the Bank from using those funds to recoup part of those losses.  Apart from asserting that the Board failed to apply a proximate-causation standard,

Calcutt argues that under that standard, the $6.443 million loss does not count as an effect, because it represents a probable future loss from the entire Nielson Entity loan portfolio that would have occurred regardless of his actions, and because the $1.2 million in released collateral was used to pay off the Nielson Entities' debts, thereby benefitting the Bank.[18]

Only part of the $6.443 million in charge-offs can be described as an effect proximately caused by Calcutt's misconduct. Recall that the Nielson Entities indicated that they were unable to pay off debts as early as 2009. The Bank probably would have incurred *some* loss no matter what Calcutt did: Although multiple parties' actions can proximately cause the same outcome, the state of the Bank's relationship with the Nielson Entities suggests that Calcutt's actions did not substantially or directly contribute to *all* of its ultimate losses.

Additionally, the FDIC's explanation for considering the $1.2 million of released collateral in its loss calculation is unconvincing. In its decision, the FDIC Board reasoned that had Calcutt not participated in the release of the Pillay Collateral in 2009 and 2010, those funds would have been available to pay off debts owed by certain Nielson Entities that were secured by that collateral. But that view ignores that the release of Pillay Collateral was used to satisfy *other* Nielson Entity debts, and that the FDIC, in calculating the $6.443 million in losses, considered all of the Bank's loans to the companies together. We fail to see how the agency could reasonably consider the interrelatedness of the Nielson Entities in one part of its loss calculation and ignore those connections in another. Thus, the mere release of the $1.2 million in collateral does not qualify as an effect.

Nevertheless, there is substantial evidence that part of the $6.443 million in losses was an effect of Calcutt's actions. The record indicates that Calcutt, knowing that the Nielson Entities were near default and that they were a large lending relationship, extended credit and renewed loans to them while concealing these transactions and the scale of the problem from the Bank's board and from regulators. ALJ McNeil also found that, in 2009, the Nielson Entities had proposed loan renewals, forbearance, deeds in lieu of foreclosure, and other mechanisms to relieve their obligations. Though Calcutt may have thought that these options would have

---

[18]Calcutt also suggests that because the $6.443 million was recorded in charge-offs, it does not qualify as a loss. For the reasons previously discussed, this view fails. *See supra* at 45.

resulted in "sure losses" to the Bank, the FDIC could have concluded from the record that his decision to extend additional loans ultimately exacerbated the problem.

Additionally, there is substantial evidence that Calcutt's actions resulted in probable future losses to the Bank. *Cf.* 12 U.S.C. § 1818(e)(1)(B)(i) (permitting effects finding where bank "will probably suffer financial loss or other damage"); *Proffitt v. FDIC*, 200 F.3d 855, 863 (D.C. Cir. 2000) (noting that "the effect prong can be met by either potential or actual 'financial loss or other damage'"). Even if there were insufficient evidence that Calcutt's actions surrounding the Bedrock Transaction and 2010 release of Pillay Collateral caused an *actual* loss, his negotiation with the Nielson Entities and approval of loans despite indications that they would not be able to repay their debts was a direct, substantial, and foreseeable cause of a situation in which the Bank could suffer a potential loss. The record also shows that Calcutt's actions prevented the board and regulators from discovering and mitigating the probable losses from these activities. *Cf. Seidman*, 37 F.3d at 937 (noting, in the context of identifying an unsafe or unsound practice, that a chairman of a board of director's "attempt to obstruct the investigation, if continued, would pose an abnormal risk of damage" to the agency). Relying on board members' testimony and contemporaneous board minutes,[19] ALJ McNeil found that the board did not approve the loan to Bedrock Holdings until several months after the loan had already been made. And Miessner testified (despite Calcutt's theory that she was biased) that, in her opinion, misrepresenting the condition of the Bank's loans with the Nielson Entities exposed the Bank to additional risk. In these circumstances, we conclude from the record as a whole that Calcutt's actions proximately caused an actual and potential loss to the Bank—even if the loss did not amount to the total of $6.443 million.

d. Holding Company Dividends

Finally, the Board concluded that the dividends Calcutt received from the Bank's holding company qualified as a financial benefit that satisfied the "effects" element. *See* 12 U.S.C. § 1818(e)(1)(B)(iii) (providing that an effect is present when a party "has received financial gain or other benefit by reason of such violation, practice, or breach"). The holding company,

---

[19]ALJ McNeil also found that Calcutt's testimony regarding the timing of the board's approval of the Bedrock Transaction was not credible.

Northwestern Bancorp, wholly owned the Bank, and Calcutt held approximately ten percent of the shares in the holding company. In 2010 and 2011, the Bank paid dividends to Northwestern Bancorp. The holding company, in turn, paid a dividend to its shareholders. Calcutt argues that his alleged misconduct cannot have proximately caused a financial benefit, because Northwestern Bancorp operated independently from the Bank and had alternative sources of income; thus, even if the Bank's income appeared inflated due to the improper reporting of the Nielson Loans, it did not substantially affect the holding company's payout to shareholders.

As in the circumstance of the FDIC's categorization of the $6.443 million in losses, the record compels an answer somewhere in between the two parties' positions. On one hand, the FDIC did not point to specific evidence in the record showing that Northwestern Bancorp's dividends with certainty reflected the inflated earnings from the Nielson Entities. It simply assumed (and reasonably so) that the dividends paid by the holding company reflected the value of the dividends paid by the Bank. On the other hand, Calcutt does not really challenge the findings that the Bank paid a dividend to the holding company, nor that the Bank's dividend reflected its inflated representation of the Nielson Loans' performance. Rather, his position is that the holding company still might have paid out dividends from its other sources of income. He does not provide evidence (other than his own testimony, which is stated in general terms)[20] that the holding company had ever paid dividends over and above a reflection of the Bank's perceived performance. Absent such evidence, we are skeptical that the Bank's earnings did not impact its holding company's dividend payments. On balance, the evidence and common sense support the agency's position as to this effects finding.

    e. Cumulative Effects

In sum, the support for the effects findings made by the FDIC Board are mixed. Taken together, the $30,000 charge-off on the Bedrock Loan, some of the $6.443 million in other losses related to the Nielson Entities, and some of the dividend payments that Calcutt received from

---

[20]"Q. Did the holding company have sufficient capacity to make payments to shareholders regardless of whether there were dividends being paid by the Bank to the holding company?

A. [Calcutt:] Yes, for some years the holding company not only had its own assets that generated some income but it had a line of credit so it had capacity to make dividend payments to shareholders. Again, we were, we were laughed at a bit in the industry because we had one of the lowest dividend payout ratios that was recorded."

Northwestern Bancorp occurred "by reason of" his misconduct surrounding loan activities and misrepresentations to the Bank's board of directors and regulators. But the Bank's auditing and legal fees do not qualify as an effect, and Calcutt's actions may not have proximately caused some of the losses and dividend payments.

These conclusions lead to a further question: If some, but not all, of the FDIC's effects findings are supported, should the Removal and Prohibition Order be remanded? One might argue that had the FDIC only considered those effects for which the record presented substantial evidence, it would not have thought it appropriate to remove Calcutt from his banking positions and prohibit him from participation in the industry. Or, perhaps one might say that the whittled-down effects findings are sufficiently minimal to compel us to send the matter back to the agency for further findings and proceedings.

A remand is not necessary, for several reasons. To start, the text of the statute indicates that if substantial evidence supports the FDIC's finding as to *one* effect out of multiple possibilities, the fact that it fails to adequately support its other effects findings does not limit its power to issue a removal and prohibition order. Section 8(e)(1)(B) separates the categories of permissible effects by the disjunctive term "or": The agency must find that "by reason of" the misconduct,

> (i) such insured depository institution . . . has suffered *or* will probably suffer financial loss *or* other damage;
>
> (ii) the interests of the insured depository institution's depositors have been *or* could be prejudiced; *or*
>
> (iii) such party has received financial gain *or* other benefit . . . .

12 U.S.C. § 1818(e)(1)(B) (emphases added). Generally, "terms connected by a disjunctive [are] given separate meanings, unless the context dictates otherwise." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). For example, when a statute lists two activities connected by "or," the natural reading is usually that it applies to *either* activity. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018). Thus, the text of the FDI Act permits the FDIC to remove and prohibit a party (assuming that the misconduct and culpability elements are met) as long as the evidence supports a finding of one out of any of the options provided by Section

8(e)(1)(B).  Because we conclude here that substantial evidence supports several of the FDIC's effects findings, the statutory text indicates that the Removal and Prohibition Order should stand.

Additionally, other circuits have also suggested that when such a finding can be supported by one of several alternative bases, courts should deny petitions challenging the agency's order.  In *Dodge*, for example, the District of Columbia Circuit upheld an effects finding when substantial evidence supported the Comptroller of the Currency's conclusions that a bank's depositors could be prejudiced under Section 8(e)(1)(B)(ii) and that the petitioner received a financial benefit under Section 8(e)(1)(B)(iii)—even when the court declined to rely on the Comptroller's finding of potential harm to the bank under Section 8(e)(1)(B)(i).  744 F.3d at 158.  And in *De la Fuente*, the Ninth Circuit held that the FDIC Board "correctly concluded that De La Fuente's [sic] actions had an impermissible effect because he received financial benefit from the transaction *and/or* because the interests of [the bank's] depositors were prejudiced thereby."  332 F.3d at 1223 (emphasis added).  That is, the court suggested that even if the Board had incorrectly concluded that the petitioner received financial benefit, its separate finding of prejudice to depositors was sufficient to satisfy the effects element.

Finally, a remand would be in tension with the substantial-evidence standard of review for factual findings.  In conducting this review, we consider the whole record, 5 U.S.C. § 706(2), but we must uphold an agency's decision even if we "would decide the matter differently . . . and even if substantial evidence also supports the opposite conclusion."  *Gen. Med., P.C.*, 963 F.3d at 520 (quoting *Cutlip*, 25 F.3d at 286).  As we have explained, the record in this case provides substantial evidence to conclude that Calcutt's actions produced sufficient effects to merit the FDIC's sanction, even if some findings as to other effects were incorrect.  We cannot nitpick the agency's factfinding more than that.

Our dissenting colleague would nonetheless remand the petition to the FDIC, reasoning that only that remedy is consistent with the principle that courts may not uphold an agency's order "unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  While we do not question *Chenery*, that decision does not mean that a court must remand where the agency makes *any* legal error, especially where substantial evidence amply supports an agency's

findings. Remand is unnecessary where an agency's "incorrect reasoning was confined to that discrete question of law and played no part in its discretionary determination," and it reaches a conclusion that it was bound to reach. *United Video, Inc. v. FCC*, 890 F.2d 1173, 1190 (D.C. Cir. 1989); *see also Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1.*, 554 U.S. 527, 545 (2008) ("That [the agency] provided a different rationale for the necessary result is no cause for upsetting its ruling."). Reading *Chenery* so broadly as to compel remand in such circumstances would result in yet another agency proceeding that amounts to "an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (plurality op.). And it would risk contradicting the harmless-error rule in courts' review of agency action. *See Sanders*, 556 U.S. at 406–07.

Thus, we do not uphold the FDIC's order in this case simply by substituting our reasoning for the agency's discretionary determinations. Rather, our inquiry focuses on whether substantial evidence supports the FDIC's factual findings that the charge-offs, dividends, and other expenses were "effects" under the statute. Notwithstanding the agency's error in identifying the appropriate causation standard, and our conclusion that legal expenses do not qualify as "effects," the agency's findings clear this hurdle. We decline to remand the petition to the FDIC.

3. *Sanction*

Finally, Calcutt claims that the FDIC's order removing him from his position and prohibiting him from future banking activities is an abuse of discretion. Courts review a removal sanction for abuse of discretion. *Grubb v. FDIC*, 34 F.3d 956, 963 (10th Cir. 1994). A sanction constitutes an abuse of discretion when it "is unwarranted in law or without justification in fact." *Ibid.* (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86 (1973)) (quotation marks omitted). According to Calcutt, his penalty is "plainly excessive" in light of his subsequent, misconduct-free work for State Savings Bank, his age, and the harshness of the penalty. Br. of Petitioner 63. True, removal and prohibition are "extraordinary sanction[s]." *De la Fuente*, 332 F.3d at 1227. And, as Calcutt notes, the FDIC could have opted to proceed with only a cease-and-desist order or civil monetary penalty. But for the reasons we have explained, Section 8(e) clearly permits removal and prohibition for the actions that the FDIC

No. 20-4303                    *Calcutt v. FDIC*                    Page 53

alleges in this case, and the FDIC's conclusions are well supported.   The agency's sanction choice is not an abuse of discretion under these circumstances.

## V.  CONCLUSION

For the reasons above, we deny Calcutt's petition for review and vacate our stay of the FDIC's Removal and Prohibition Order.

———————————

**DISSENT**

———————————

MURPHY, Circuit Judge, dissenting.   After adjudging Harry Calcutt guilty of misconduct in the management of a bank, the Federal Deposit Insurance Corporation (FDIC) issued an order that would bar him from working in his profession and fine him $125,000. Calcutt challenges this order on constitutional and statutory grounds.   My colleagues reject all of his claims.   I agree with them on his constitutional claims but must part ways on his statutory ones.

Calcutt's three constitutional claims do not entitle him to relief.   He first alleges that Congress has unconstitutionally restricted the President's right to terminate (and so to control) the FDIC's Board of Directors.   But his argument rests on a misreading of the Board's enabling statute.   It gives the President complete authority to fire most of the Board's members.   Calcutt next argues that Congress at least gave one Board member and the FDIC's administrative law judges unconstitutional protections from removal.   Even assuming that this claim has merit, however, he fails to show why these unconstitutional *statutes* would entitle him to the relief that he seeks—vacatur of the FDIC's *actions* in his case as "void."   The Constitution itself requires no remedy.   And I would read recent Supreme Court precedent to bar his preferred remedy because that reading best comports with the historical practices that we should follow until Congress says otherwise.   Calcutt lastly notes that the first administrative law judge who heard his case had not been appointed in a manner that comported with the Constitution's Appointments Clause.   The Board agreed and gave him a new hearing before a new judge. Calcutt now claims that the Appointments Clause barred this new judge from relying on any evidence developed at the initial hearing.   But again, nothing in the Constitution required any remedy, let alone Calcutt's expansive one.

Calcutt's statutory claims are another matter.   The FDIC misread the statute on which it relied to sanction him.   Of most note, the FDIC cannot bar Calcutt from banking unless it proves that his bank will suffer a loss (or that he will receive a benefit) "by reason of" his misconduct. 12 U.S.C. § 1818(e)(1)(B).   As the Supreme Court has long made clear, the phrase "by reason

of" incorporates common-law principles of but-for and proximate cause. Yet the FDIC's order ignored but-for cause and disavowed proximate cause. In fact, the agency held Calcutt liable for his bank's entire loss from underwater loans even though the Great Recession likely would have caused the bank to suffer much (if not all) of this loss no matter what he did. Congress has given the FDIC "extraordinary power" to regulate private parties with only limited judicial oversight. *In re Seidman*, 37 F.3d 911, 929 (3d Cir. 1994). After *Stern v. Marshall*, 564 U.S. 462 (2011), one might wonder whether the agency exercises judicial power by adjudicating cases that deprive individuals of private rights. At the least, its significant authority should make us diligent to ensure that the agency has "turn[ed] square corners when" dealing with the regulated community. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021). Because the FDIC did not do so in this case, I would remand for it to apply the proper law. I thus respectfully dissent.

## I.  Background

Calcutt served for years as the President and Chairman of Northwestern Bank in Traverse City, Michigan. During his tenure, entities controlled by the Nielson family (the "Nielson Entities") became the Bank's largest borrowers with $38 million in loans. The Nielson Entities ran real-estate businesses that struggled during the Great Recession. They defaulted in September 2009. Two months later, the Bank entered into the "Bedrock Transaction" with the entities. It issued them another $760,000 loan and released to them $600,000 of funds held as a security interest. Yet things did not improve. The Nielson Entities again defaulted in September 2010. After the Bank released to them another $690,000 in secured funds, the entities defaulted a final time in January 2011. The Bank incurred $6.443 million in "charge-offs" (amounts unlikely to be collected) from the loans and $30,000 in charge-offs from the Bedrock Transaction.

These events led the FDIC to seek to "remove" Calcutt "from office" and to impose a "civil penalty" on him. 12 U.S.C. § 1818(e)(1), (i)(2)(B). The first administrative law judge who heard his case had been unlawfully appointed, so the FDIC assigned him a new judge. This judge found that Calcutt had committed many statutory violations and that the FDIC should bar him from banking and fine him $125,000. The FDIC agreed. It held that Calcutt had engaged in "unsafe or unsound practice[s]" and committed "breach[es]" of his "fiduciary dut[ies]" mainly in

connection with the Bedrock Transaction. *Id.* § 1818(e)(1)(A)(ii)–(iii). Among other misconduct, it found that he had violated the Bank's lending standards by agreeing to that transaction, had hid the transaction's true nature from the Bank's board of directors, and, perhaps most seriously, had lied to regulators about it. The FDIC also found that the Bank would likely suffer "financial loss" and that Calcutt had "received financial gain" "by reason of" this misconduct. *Id.* § 1818(e)(1)(B).

## II. Constitutional Claims

I agree with my colleagues that Calcutt's constitutional arguments all fall short. But my reasoning rests largely on different grounds.

### A. Restrictions on the President's Ability to Control the FDIC

Calcutt first argues that the FDIC's statutory scheme gives the President constitutionally insufficient control over the agency's exercise of executive power. Why? He assumes that the statute creating the FDIC's five-member Board of Directors bars the President from removing most of its members except "for cause." *See* 12 U.S.C. § 1812. This limit, Calcutt reasons, impairs the President's ability to command the "executive Power" and to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. He has a point. The Supreme Court recently found unconstitutional similar "for cause" limits on the President's ability to remove the Director of the Consumer Financial Protection Bureau (CFPB). *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197–2207 (2020). In response, the FDIC "does not dispute Calcutt's assumption" that § 1812 gives the Board these removal protections. Resp. Br. 17 n.7. But it argues that they pass muster under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), which upheld similar protections for the Federal Trade Commission (FTC). *Id.* at 626–30.

As an intermediate judge, I find this constitutional question difficult. On the one hand, *Humphrey's Executor* relied on the FTC's nonpartisan, multimember structure to uphold the provision limiting the President's ability to fire its commissioners. *Id.* at 624–25. The FDIC shares the same structure. *Compare* 12 U.S.C. § 1812(a)(1)–(2), *with* 15 U.S.C. § 41. And while *Seila Law* may well call *Humphrey's Executor* into doubt, lower courts must follow a case that is

directly on point even if another decision has undercut it.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

On the other hand, *Humphrey's Executor* may not be directly on point.  It also upheld the FTC's removal protections because, as the Court understood the FTC's duties in 1935, the agency undertook "no part of the executive power[.]"  295 U.S. at 628.  The FDIC, by contrast, performs core executive functions.  Here, it has essentially brought a civil-enforcement suit against Calcutt to ban him from banking and impose a hefty fine on him.  It thus is executing (i.e., carrying into effect) the law barring "unsafe or unsound" banking practices.  12 U.S.C. § 1818(e)(1)(A)(ii); *see* Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 537–40 (2005).  For executive officers of this kind, "the President's removal power [has been] the rule, not the exception."  *Seila Law*, 140 S. Ct. at 2206; *see Myers v. United States*, 272 U.S. 52, 111–75 (1926); Michael W. McConnell, *The President Who Would Not Be King* 161–69, 335–41 (2020).

But I see no reason to resolve the parties' constitutional debate because I do not read the FDIC's statutory scheme to implicate it.  Rather, I read the statute that creates the FDIC's Board (12 U.S.C. § 1812) as giving the President *full* power to remove all but one of the Board's five members.  Since the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Board has consisted of the Comptroller of the Currency, the CFPB's Director, and three other presidentially appointed members.  Pub. L. No. 111-203, § 336(a), 124 Stat. 1376, 1540 (2010); 12 U.S.C. 1812(a)(1).  All agree that the President may fire the Comptroller for any reason. 12 U.S.C. § 2.

So the President's ability to control the Board turns on whether he has free rein to fire its three appointed members.  The statute creating their offices provides: "Each appointed member shall be appointed for a term of six years."  *Id.* § 1812(c)(1).  This statute says nothing that expressly grants for-cause removal protections to these members.  Maybe the mere creation of a fixed-year term *implies* that the President may not remove them before their terms end?  That view raises a host of problems.  If read this way, wouldn't the text create an "absolute" ban on removal even if the President has an excellent reason (like fraud)?  *Parsons v. United States*, 167 U.S. 324, 343 (1897).  How can we read the text to include an implied gloss authorizing

some removals (for cause) on top of an implied restriction generally barring them? That is an awful lot of implications. And if we were to create this gloss, how do we decide what counts as adequate "cause"? Judicial intuition? Simply put, we would be legislating rather than interpreting if we read § 1812 to bar all but for-cause removals. *See Morgan v. Tenn. Valley Auth.*, 115 F.2d 990, 992–93 (6th Cir. 1940).

Historical context confirms that § 1812 does not interfere with the President's ability to remove the Board's appointed members. The provision establishing their six-year term dates to the creation of the FDIC in 1933. Banking Act of 1933, Pub. L. No. 73-66, § 8, 48 Stat. 162, 168. At that time, a "well-approved" "rule of" "statutory construction" directed courts to interpret laws that gave the President the power to appoint an executive officer as including the power to remove the officer. *Myers*, 272 U.S. at 119. So if a law was silent on removal, the President could terminate the officer for any reason. *See Shurtleff v. United States*, 189 U.S. 311, 316 (1903); *Parsons*, 167 U.S. at 338–39. The Congress that created the FDIC operated against this interpretive rule. *See Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021). And while the Court has since departed from the rule once, it relied on the "philosophy of *Humphrey's Executor*" to do so. *Wiener v. United States*, 357 U.S. 349, 356 (1958). That philosophy did not exist in 1933.

A constitutional concern points the same way. Before *Humphrey's Executor*, the Supreme Court had broadly held that Congress could not constitutionally limit the President's power to fire officers who are appointed with the advice and consent of the Senate. *See Myers*, 272 U.S. at 109–76. The FDIC was created between *Myers* and *Humphrey's Executor*—when the Court treated these removal protections as presumptively invalid. *Myers* "aroused wide interest," *Morgan*, 115 F.2d at 992, so Congress would have known that such protections raised "grave" constitutional "doubts," *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916). These concerns make it all the more implausible to read a law passed at this time as *silently* including them. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 545–46 (2010) (Breyer, J., dissenting). In short, the President has unfettered power to fire (and control) most of the FDIC's Board.

To be sure, both parties seem content to assume that the statute grants the Board protections from removal. *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). In a related case, the Supreme Court also assumed that another agency had these protections. *Free Enter. Fund*, 561 U.S. at 487. Yet parties cannot force courts to accept their stipulations of law. *See Young v. United States*, 315 U.S. 257, 258–59 (1942). Under basic avoidance principles, moreover, our power to address an unraised issue reaches its apex when parties ask us to resolve a weighty constitutional question that a statute might not present. *Cf. Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). That is especially true here. Calcutt's constitutional claim, if accepted, would take us right back to a statutory "severability" question: Which parts of the statute must we set aside as unconstitutional? *See Free Enter. Fund*, 561 U.S. at 508–10; John Harrison, *Severability, Remedies, and Constitutional Adjudication*, 83 Geo. Wash. L. Rev. 56, 88–89 (2014). If the removal protections are imaginary, this question has an easy answer. We should disregard those protections. Since we may have to consider this statutory issue even if we reach Calcutt's constitutional claim, we might as well reach it immediately. *See* William Baude, *Severability First Principles*, 109 Va. L. Rev. ____ (forthcoming 2023) (manuscript at 44–45).

\*

Even so, Calcutt responds, the President and Board *believed* that § 1812 contained removal protections. This belief, Calcutt argues, "shows that the Board enjoyed *de facto* tenure protections while pursuing this enforcement action, causing" him harm. Reply Br. 7 n.1. I agree that the executive branch likely read the statute this way. But why would "de facto" protections violate the law? Consider a hypothetical: Disagreeing with my reading, the President issues an order stating that he will adhere to for-cause removal rules for the Board due to his views of § 1812 and the Constitution. If we conclude that this order misreads § 1812 and that the statute would be unconstitutional if it imposed such protections, would the order violate the Constitution or statute?

I fail to see why it would violate the Constitution. Like the Supreme Court when resolving cases, the President must interpret the Constitution when performing his constitutional duties. *See Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 753 (6th Cir. 2019) (citing Frank H.

Easterbrook, *Presidential Review*, 40 Case W. Res. L. Rev. 905 (1990)).    Presidents have routinely done so.    When exercising his pardon power, President Jefferson pardoned those convicted under the Sedition Act of 1798 because he believed that the convictions violated the First Amendment.    *See New York Times Co. v. Sullivan*, 376 U.S. 254, 273–76 (1964).    When exercising his veto power, President Jackson vetoed a bill reauthorizing the national bank because he believed that Congress lacked the power to create it.    *See* Easterbrook, *supra*, at 909–10.    Like these powers, the removal power belongs to the President.    *See Seila Law*, 140 S. Ct. at 2197–98.    So what constitutional provision would the President offend by self-limiting this power?    If anything, a court's intrusion on his authority would raise the concerns.    If an injured bank customer had sued President Jackson over his national-bank veto, nobody (I hope) would claim that a court could enjoin the President's veto with a citation to *McCulloch v. Maryland*, 17 U.S. 316 (1819).    *See Collins*, 141 S. Ct. at 1794 (Thomas, J., concurring).    We would raise identical separation-of-powers problems if we intruded on the President's lawful exercise of the removal power with a citation to *Seila Law*.

Nor would this hypothetical executive order violate § 1812.    The statute gives the President the power to remove any of the Board's appointed members for any reason.    The President thus may *retain* any member for any reason—whether based on his reading of the statute or on the benefits of a civil-service system.    In this respect, the statute is not much different than a provision that sets the minimum process that an agency must provide.    That floor does not foreclose the agency from offering additional process.    *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543–49 (1978); *Al-Saka v. Sessions*, 904 F.3d 427, 432 (6th Cir. 2018); Easterbrook, *supra*, at 908.    So while § 1812 does not impose for-cause removal protections on the President, it also does not bar him from imposing those protections on himself.

Now adjust my hypothetical slightly: Before the FDIC acted in Calcutt's case, "suppose that the President had made a public statement expressing displeasure with actions taken by [its Board] and had asserted that he would remove [its members] if [§ 1812] did not stand in the way."    *Collins*, 141 S. Ct. at 1789.    If the President's (mis)reading of § 1812 does not violate the law once he knows that the courts will interpret it differently than he does, why would this

reading violate the law before he knows how they will interpret it?  I am not sure.  Yet I would leave open whether courts may vacate agency action as "arbitrary and capricious" under the Administrative Procedure Act (APA) if the President's reading tangibly affected the disputed action.  5 U.S.C. § 706(2)(A); *Collins*, 141 S. Ct. at 1794 n.7 (Thomas, J., concurring).  We need not decide this question because the APA tells us to take "due account" "of the rule of prejudicial error."  5 U.S.C. § 706.  Calcutt thus would have needed to show that any mistaken belief about the Board's removal protections harmed him (by, for example, affecting the Board's makeup).  *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010).  He presented no such evidence.

Calcutt responds that we should remand to the FDIC to allow him to seek discovery over whether any de facto protections harmed him.  That leads to my final point.  An FDIC regulation contains an issue-exhaustion rule that requires parties to raise all exceptions to an administrative law judge's decision with the Board.  12 C.F.R. § 308.39(b).  Calcutt concedes that he did not raise this facial constitutional challenge with the agency but says that exhaustion mandates categorically do not apply to those challenges.  I am not so confident.  Courts must tread lightly before creating implied exceptions to regulatory exhaustion rules (as opposed to judge-made ones).  *Bryan*, 937 F.3d at 751–52.  Yet I find the FDIC's *specific* regulation unclear as to whether its text even covers these types of challenges.  *Cf. id.* at 752.  I thus would leave this question for another day because exhaustion is a nonjurisdictional affirmative defense.  *See Jones v. Bock*, 549 U.S. 199, 211–12 (2007).  A rejection of Calcutt's claim on statutory grounds makes the issue unnecessary to decide.  *Cf. Woodford v. Ngo*, 548 U.S. 81, 101 (2006).  Apart from exhaustion, however, I see no reason why we should give Calcutt a redo to obtain discovery that he did not seek the first time around.

B.  Restrictions on Removal of the CFPB Director and Administrative Law Judge

Calcutt next challenges two unambiguous removal protections.  First, the law that created the FDIC's final Board member—the CFPB Director—gives the Director these protections.  12 U.S.C. § 5491(c)(3).  As noted, *Seila Law* found this provision unconstitutional.  140 S. Ct. at 2201–07.  And while the President could control all of the other Board members, Calcutt claims that Congress may not create a multimember agency with even one tenure-protected member.

Second, "dual for-cause limitations" on removal insulated the administrative law judge who heard Calcutt's case from presidential oversight. *Free Enter. Fund*, 561 U.S. at 492. The judge could be fired only if the Merit System Protection Board found "good cause," 5 U.S.C. § 7521(a), and the President could remove that entity's members only for cause too, *id.* § 1202(d). Calcutt claims that the Constitution bars the judge's "double insulation" from the President. *Compare Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129–36 (9th Cir. 2021), *with Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1113–18 (D.C. Cir. 2021) (Rao, J., concurring in part and dissenting in part).

I see no need to opine on the merits of these claims. We must distinguish the constitutional questions that Calcutt raises (do the removal statutes violate the Constitution?) from a separate remedies question (if so, do these defects entitle him to his requested relief?). As his proposed remedy, Calcutt asks us to vacate the FDIC's order as "void." But he fails to identify the source of law that requires (or permits) courts to treat the FDIC's *past actions* as void because potentially unconstitutional *statutes* attempted to insulate two of the FDIC's officers from the President's removal power. And my review of the relevant legal authorities leads me to conclude that Calcutt could not obtain this relief even if he successfully established the statutes' unconstitutionality.

1

Because Calcutt seeks relief for a constitutional violation, the Constitution provides the place to start on this remedies question. But it says almost nothing about remedies. *Cf. Hernandez v. Mesa*, 140 S. Ct. 735, 741–43 (2020); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–27 (2015). Except for a few provisions like the requirement to pay "just compensation" for a taking, *see Knick v. Township of Scott*, 139 S. Ct. 2162, 2171 (2019), the Constitution sets only limits on government conduct without prescribing specific relief for violations, *see* Alfred Hill, *Constitutional Remedies*, 69 Colum. L. Rev 1109, 1118 (1969). One thus will search Article II in vain for an explicit constitutional remedy that applies to an invalid removal provision.

Where else should we look?  The founders enacted the Constitution against the backdrop of a preexisting legal system with preexisting causes of action and remedies.  *See id.* at 1131–32. Before the founding, for example, this system often allowed equity courts to issue injunctions to stop "illegal executive action[.]"  *Armstrong*, 575 U.S. at 327; *Ex parte Young*, 209 U.S. 123, 150–51 (1908).  The Supreme Court has held that we may use these preexisting "judge-made" remedies to redress constitutional wrongs unless Congress displaces them.  *Armstrong*, 575 U.S. at 327–28.

But courts should not take this allowance too far.  The Constitution does not give us freewheeling power to adopt federal common-law remedies based on our views of wise policy. *See Hernandez*, 140 S. Ct. at 741–42 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). And the Court "disfavor[s]" remedies that are rooted in legislative-like choices about the best way to deter illegal acts.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citation omitted).

This dichotomy points the way here.  We lack an inherent power to treat the FDIC's actions as "void" because we think it would be a good idea.  *See Hernandez*, 140 S. Ct. at 741–42.  We instead must look to the causes of action and remedies that traditionally applied to claims like Calcutt's—that a statutory provision related to an office was illegal and that this defect rendered the officer's actions void.  When courts traditionally chose remedies for this sort of claim, they distinguished between two types of officers: a "de facto officer" in a lawful office (whose actions were enforceable) and a "mere usurper" in an unlawful one (whose actions were void).  Albert Constantineau, *A Treatise on the De Facto Officer Doctrine* §§ 5, 34, at 8–10, 52–53 (1910).

*De Facto Officer in Lawful Office*.  For centuries, parties have alleged that an officer was unlawfully holding (and performing the duties of) an office.  To give an example at the time of the founding, a party claimed that a sheriff could not hold that office because the sheriff had not lived in the county as long as the law required.  *State v. Anderson*, 1 N.J.L. 318, 324–28 (N.J. 1795).

English courts channeled these claims into a specific writ ("quo warranto") with a specific remedy (prospectively ousting the officer).  *See* 3 William Blackstone, *Commentaries*

*262–64; 2 Edward Coke, *Institutes of the Laws of England* 282, 494–99 (1642). American courts followed suit. Constantineau, *supra*, § 451, at 635 n.1; *State v. Parkhurst*, 9 N.J.L. 427, 437–38 (N.J. 1802). Three aspects of the quo warranto action deserve mention. For one, invalid officers caused public harms, so the government itself typically needed to sue them. *See Wallace v. Anderson*, 18 U.S. 291, 292 (1820). Yet private parties could sue on the government's behalf if they showed a unique interest. *See Newman v. United States ex rel. Frizzell*, 238 U.S. 537, 549–51 (1915). For a second, the remedy was exclusive. Constantineau, *supra*, § 451, at 635. A party disputing an officer's authority could not sue for an injunction "to restrain the exercise of official functions[.]" Floyd R. Mecham, *A Treatise on the Law of Public Offices and Officers* § 478, at 307 (1890). For a third, the remedy exists today. *See* D.C. Code § 16-3503. Parties may ask the Attorney General to seek this relief or request leave of court to seek it themselves— a process that may look "cumbersome" to modern eyes. *Andrade v. Lauer*, 729 F.2d 1475, 1497–98 (D.C. Cir. 1984) (Wright, J.).

Yet the process has always looked cumbersome. Rather than file a direct quo warranto suit to oust invalid officers, parties harmed by the officers' actions have tried to collaterally attack their qualifications in suits involving the actions. *Id.* at 1496. Since 1431, English courts have rebuffed these attacks under the "de facto officer doctrine." Constantineau, *supra*, § 5, at 8–10 (citing *The Abbé de Fontaine*, 1431 Y.B. 9 Hen. VI, fol. 32, pl. 3 (Eng.)); Clifford L. Pannam, *Unconstitutional Statutes and De Facto Officers*, 2 Fed. L. Rev. 37, 39–42 (1966). That doctrine treats the past actions of an officer with a colorable claim to office as valid whether or not the officer met all conditions to hold the office. Constantineau, *supra*, § 1, at 3–4. English courts introduced it "into the law as a matter of policy and necessity, to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office, without being lawful officers." *State v. Carroll*, 38 Conn. 449, 467 (1871).

American courts likewise adhered to the de facto officer doctrine as a corollary to the exclusive quo warranto remedy. *See Cocke v. Halsey*, 41 U.S. 71, 81–88 (1842); *Taylor v. Skrine*, 5 S.C.L. 516, 516–17 (S.C. 1815); *Fowler v. Bebee*, 9 Mass. 231, 234–35 (1812); *People ex rel. Bush v. Collins*, 7 Johns. 549, 554 (N.Y. 1811) (per curiam). Notably, these courts upheld

the actions of invalid officers who did not meet *constitutional* conditions on their offices. An officer might not have taken an oath. *Cf. Bucknam v. Ruggles*, 15 Mass. 180, 182–83 (1818) (per curiam). Or the officer might have been appointed in an illegal way. *Cf. Ex parte Ward*, 173 U.S. 452, 454 (1899). Or the officer might have flunked an eligibility requirement. Perhaps the officer was too young. *Cf. Blackburn v. State*, 40 Tenn. 690, 690–91 (1859). Or maybe the officer had been in the Congress that increased the office's salary before taking office. *Cf.* U.S. Const. art. I, § 6, cl. 2; William Baude, *The Unconstitutionality of Justice Black*, 98 Tex. L. Rev. 327 (2019); *In re Griffin*, 11 F. Cas. 7, 27 (C.C.D. Va. 1869) (No. 5,815). The same rules applied even if the officer held the office by reason of an unconstitutional *statute*. *See* Constantineau, *supra*, §§ 192–96, at 264–70. An early decision thus upheld the acts of an officer who had been appointed by the governor under a statute authorizing this appointment, even though the state constitution had required the legislature to elect the officer. *See Taylor*, 5 S.C.L. at 516–17; *Carroll*, 38 Conn. at 474; *see also State v. McMartin*, 43 N.W. 572, 572 (Minn. 1889); *Ex Parte Strang*, 21 Ohio St. 610, 615–18 (1871); *cf. Buckley v. Valeo*, 424 U.S. 1, 142 (1976) (per curiam).

   *Usurper in Unlawful Office*. Other times, parties have alleged that a generic office could not exist because it had been assigned "sovereign functions" that it could not possess. Mecham, *supra*, § 4, at 5. In one case, for example, a party alleged that a legislatively created "court" could not perform judicial duties because those duties had been vested in a wrongly abolished life-tenured court. *Hildreth's Heirs v. McIntire's Devisee*, 24 Ky. 206, 207–08 (1829); Jeffrey S. Sutton, *Who Decides? States as Laboratories of Constitutional Experimentation* 76–80 (2022).

   Courts granted much broader relief for this type of claim. Parties affected by an illegal office did not need to sue in quo warranto to dispute the officeholder's power to perform the challenged function. Parties instead could dispute the officer's conduct "in any kind" of suit. *Walcott v. Wells*, 24 P. 367, 370 (Nev. 1890); Mecham, *supra*, §§ 324–26, at 216–18. And the opposing party could not defend the officer's past acts using the de facto officer doctrine. Constantineau, *supra* §§ 34–36, at 51–55. The officer instead was "merely a usurper, to whose acts no validity can be attached[.]" *Norton v. Shelby County*, 118 U.S. 425, 449 (1886).

This rule extended to constitutional defects. The Supreme Court may have followed it as early as *United States v. Yale Todd* (U.S. 1794). *United States v. Ferreira*, 54 U.S. 40, 52–53 (1851) (note by Taney, C.J.). This unreported case addressed a law allowing pensions for disabled Revolutionary War veterans. The law ordered circuit courts to determine whether applicants were disabled and to send their findings to the Secretary of War. Circuit judges (including Supreme Court Justices) found that the law unconstitutionally gave courts executive power by making them the Secretary's administrators. *Hayburn's Case*, 2 U.S. 408, 410 n.* (1792). Given the law's benevolent goals, though, some judges awarded pensions by claiming to act as "commissioners." *See* Wilfred J. Ritz, United States v. Yale Todd *(U.S. 1794)*, 15 Wash. & Lee L. Rev. 220, 228–29 (1958). Congress ordered the Attorney General to seek Supreme Court review of pensions granted by judges "styling themselves commissioners." Act of Feb. 28, 1793, 1 Stat. 324, 325. In Yale Todd's case, the Court required him to return the funds. Ritz, *supra*, at 228–30. As others have noted, the Court may well have found the judges' actions void because they unconstitutionally undertook executive functions. *Ferreira*, 54 U.S. at 53 (note by Taney, C.J.); Keith E. Whittington, *Judicial Review of Congress before the Civil War*, 97 Geo. L.J. 1257, 1270–74 (2009).

Many decisions followed this remedial approach for claims that a legislative body had granted functions to an office that it could not lawfully possess. *See Town of Decorah v. Bullis*, 25 Iowa 12, 18–19 (1868); *Hildreth's Heirs*, 24 Ky. at 207–08; G. L. Monteiro, Annotation, *De Jure Office as Condition of De Facto Officer*, 99 A.L.R. 294 § III(a) (1935), Westlaw (database updated 2022). When, for example, a legislature assigned local-government functions to a board of commissioners that the state constitution vested in justices of the peace, the Supreme Court treated the board's actions as void. *Norton*, 118 U.S. at 441–49. It refused to apply the de facto officer doctrine because that doctrine required a valid ("de jure") office. *Id.* at 444–45.

The Supreme Court's modern cases also treat an officer's actions as void if the generic office could "not lawfully possess" the power to take them. *Collins*, 141 S. Ct. at 1788. The Court thus found invalid a bankruptcy judge's decision in a suit that an Article III court needed to resolve. *See Stern v. Marshall*, 564 U.S. 462, 503 (2011). And a plurality rejected the de facto officer doctrine when a party claimed that Congress assigned to Article I judges a duty

(sitting on circuit courts) that Article III judges must perform. *See Glidden Co. v. Zdanok*, 370 U.S. 530, 535–37 (1962) (plurality opinion); *cf. Bowsher v. Synar*, 478 U.S. 714, 732 (1986); *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 815 (1987) (Scalia, J., concurring in the judgment).

2

This "long history of judicial review" has relevance for Calcutt's request that we vacate the FDIC's order in his case because invalid removal protections shielded two of its officers. *Armstrong*, 575 U.S. at 327. To begin with, the history refutes the theory that the Constitution of its own force compels courts to treat as "void" any action taken by officers whose exercise of an office does not comport with a constitutional command. That view would treat the de facto officer doctrine *itself* as unconstitutional. Yet it formed part of the legal backdrop against which the founders enacted the Constitution. Near the founding, judges described the doctrine as "a well settled principle of law," *Bush*, 7 Johns. at 554, or "too well established to admit of a doubt," *Taylor*, 5 S.C.L. at 517. Nothing in the Constitution can be read to do away with it.

This history also highlights the key inquiry for deciding whether courts may vacate an officer's actions as a "judge-made remedy" when a statute unconstitutionally limits the President's removal authority. *Armstrong*, 575 U.S. at 327. Does the unconstitutional removal provision show that Congress vested "sovereign functions" in an invalid office that cannot possess them? *Mecham*, *supra*, § 4, at 5; *Norton*, 118 U.S. at 449. If so, courts should treat the officer's actions as void wherever they arise. Or is the removal provision "distinct from the provisions creating the . . . office" such that the office itself is valid "even assuming that the [removal provision] is" not? *McMartin*, 43 N.W. at 572; *Carroll*, 38 Conn. at 449. If so, courts should enforce the officer's acts in suits involving third parties (in contrast to suits between the government and the officer).

Unfortunately for Calcutt, his claim falls on the wrong side of this divide. He does not even argue that the two executive officers (the CFPB Director and administrative law judge) sat in offices that constitutionally "could not exist" (because, for example, the Constitution vested their duties in another branch). *Ashley v. Bd. of Supervisors of Presque Isle Cnty.*, 60 F. 55, 65

(6th Cir. 1893). Indeed, his argument's very premise—that Congress has illegally insulated the officers from the President—assumes that they perform *executive* functions. *Cf. Seila Law*, 140 S. Ct. at 2209. So I would treat the constitutional "condition" in this case (that an officer be accountable to the President) like other constitutional conditions the violation of which does not void an officer's acts. The condition is not much different than, say, a condition that an officer be of a certain age, *see Blackburn*, 40 Tenn. at 690–91, or be elected rather than appointed, *see* Constantineau, *supra*, § 192, at 264–65. If statutes departing from these mandates did not render an officer's actions void, I fail to see why an unconstitutional removal provision would. Under traditional remedial principles, then, Calcutt could not obtain the relief that he seeks in this case.

The "lack of historical precedent" to attack removal provisions in a suit like Calcutt's reinforces the conclusion that the provisions did not traditionally render an officer's actions void. *Seila Law*, 140 S. Ct. at 2201 (citation omitted). If any private party could collaterally attack removal provisions in any suit implicating an officer's acts, one would expect to see many of these suits. After all, Congress began to enact constitutionally dubious removal provisions shortly after the Civil War during President Johnson's administration. *See Myers*, 272 U.S. at 166–73. Yet Calcutt cites no historical example in which courts evaluated removal provisions in this type of litigation. So constitutional questions about the provisions lingered for decades. *Id.* at 173.

Challenges to the validity of removal provisions instead arose in employment disputes. *See Humphrey's Executor*, 295 U.S. at 618–19; *Myers*, 272 U.S. at 106; *cf. Shurtleff*, 189 U.S. at 311–12; *Reagan v. United States*, 182 U.S. 419, 424 (1901); *Ex parte Hennen*, 38 U.S. 230, 256–57 (1839). A discharged officer would sue to recover a salary (or seek reinstatement) on the ground that the termination violated a tenure-protection statute. *Myers*, 272 U.S. at 106. The government would respond that the statute could not restrict the President's power. *Id.* This different kind of suit required courts to resolve the constitutional question. Courts "almost universally recognized" that the de facto officer doctrine did not apply because the suit was between the government and the officer (not a third party) and because only valid officers could receive salaries. Constantineau, *supra*, § 236, at 331; 2 James Kent, *Commentaries on American Law* 355 n.2 (11th ed. 1867).

Modern precedent confirms my conclusion. The Supreme Court's recent cases have all held that unconstitutional removal provisions do not render the office to which they attach invalid or require courts to find actions taken by the officers void. *See Collins*, 141 S. Ct. at 1787–89; *Seila Law*, 140 S. Ct. at 2207–11; *Free Enter. Fund*, 561 U.S. at 508–10. Take *Free Enterprise Fund*. There, accountants under investigation by the Public Company Accounting Oversight Board filed an *Ex Parte Young* suit seeking to enjoin all of the Board's actions as void because of its removal protections. *See* 561 U.S. at 487, 491 n.2, 508. The Court agreed that various removal provisions unconstitutionally intruded on the President's authority. *Id.* at 492–98. But it refused to treat the Board's actions as void. *Id.* at 508–10. It held that the Board could perform the executive functions assigned to it despite the invalid removal provisions because they were "severable from the remainder of the statute." *Id.* at 508. The Court analyzed this issue in terms of "severability." *See id.* at 509. But it could just as well have reasoned that the unconstitutional *statutes* did not render the Board's *actions* void in third-party suits and so did not entitle the accountants to their requested remedy. *Cf. McMartin*, 43 N.W. at 572; Harrison, *supra*, at 73–75.

*Seila Law* fits a similar mold. The CFPB in that case issued a civil investigative demand seeking documents from a law firm. 140 S. Ct. at 2194. The firm refused to comply, so the CFPB filed a petition to enforce its demand. *Id.* The district court rejected the firm's request to deny the CFPB's petition on the ground that its Director's removal protections rendered all CFPB actions void. *Id.* After agreeing that the protections were unconstitutional, the controlling Supreme Court opinion again held that the invalid provisions were severable and did not render all CFPB actions void. *Id.* at 2208–11 (opinion of Roberts, C.J.). Admittedly, the opinion did not simply reject the law firm's remedy and affirm the enforcement of the CFPB's demand. Rather, it remanded for the lower courts to decide whether the demand had been "validly ratified" by a Director accountable to the President. *Id.* at 2211. This resolution might have implied that all CFPB actions (including the investigative demand) had been void *prior to* the Court's severance "remedy." *Id.* at 2208. But the Court has since clarified that *Seila Law* did *not* hold that the CFPB's prior actions were invalid and instead had left all remedy-related issues for the lower courts. *See Collins*, 141 S. Ct. at 1788.

Most recently in *Collins*, the Court expressly held that unconstitutional removal provisions do not render an officer's past actions void in suits by third parties. Headed by a director with removal protections, the agency in *Collins* served as the conservator to two large mortgage-financing companies. 141 S. Ct. at 1771–72. This agency entered into agreements with the Department of Treasury requiring the companies to pay large dividends to the Treasury. *Id.* at 1772–74. The companies' shareholders sued to compel the Treasury to return the dividends on the ground that the director's removal protections were unconstitutional and that they voided the agency's past acts (including the challenged agreements). *Id.* at 1775. Although the Court agreed that the removal protections were unconstitutional, *id.* at 1783–87, it rejected the broad remedy, *id.* at 1787–89. The Court found "no reason to regard any of the actions taken by the" agency "as void" simply because its head had been protected by invalid removal provisions. *Id.* at 1787.

All told, under traditional remedial rules, unconstitutional removal provisions do not render the offices to which they attach invalid and so do not allow courts to vacate the actions of officers as void in suits by third parties. This tradition compels me to reject Calcutt's proposed remedy.

3

I end with two disclaimers about things I need not decide. Disclaimer One: Congress may generally displace judge-made remedial principles. *Armstrong*, 575 U.S. at 327–29. Congress, for example, has sometimes restricted a court's power to grant *Ex Parte Young*'s injunctive relief for violations of federal law. *See id.* And *Bowsher* teaches that Congress may adjust the relief for structural constitutional claims too. There, the Court followed the statutory remedy once it found that Congress had illegally entrusted a legislative officer with executive duties. 478 U.S. at 734–35. Congress thus may permit courts to vacate actions taken by officers subject to unconstitutional removal protections even if traditional judge-made remedial limits would foreclose relief.

Has Congress done so here? The FDIC's statute incorporates the APA. 12 U.S.C. § 1818(h)(2). It orders a court to "hold unlawful and set aside agency action" that is "contrary to

constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2)(B). Perhaps this text could be read to allow courts to depart from traditional limits and vacate agency "actions" if a law has structured the agency in a way that is "contrary to constitutional right" or "power." *Id.*; *cf. Collins*, 141 S. Ct. at 1795 (Gorsuch, J., concurring in part). That the Constitution's structural principles exist to protect individual liberty could reinforce this reading that a structural problem is "contrary to constitutional right" within the meaning of the APA. *See Bond v. United States*, 564 U.S. 211, 220–24 (2011).

In most structural constitutional cases, however, a private party claims that the challenged action *itself* is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). So parties routinely allege that a prosecution violates the Constitution because the relevant law reaches conduct that Congress may not proscribe. *See, e.g.*, *Bond*, 564 U.S. at 224. Yet, as I have explained, an unconstitutional removal statute for an office would not necessarily render the officer's "actions" void and so would not necessarily render those actions "contrary to constitutional right." 5 U.S.C. § 706(2)(B). Perhaps the APA's text is thus best read to incorporate—not depart from—traditional remedial limits. *Cf. id.* § 702; Tom C. Clark, *Att'y Gen.'s Manual on the Admin. Proc. Act* 108 (1947).

And even if the APA expanded the available relief, recall that it requires courts to take "due account" "of the rule of prejudicial error." 5 U.S.C. § 706. The Court has read this text to adopt the harmless-error principles that "ordinarily apply in civil cases." *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009). Under those principles, constitutional errors can be harmless. *See O'Neal v. McAninch*, 513 U.S. 432, 440 (1995). Although *Collins* did not cite the APA, this harmless-error provision might be one way to understand its suggestion that third parties could seek relief for unconstitutional removal provisions if they showed that the provisions harmed them (that is, if they showed that the error was not harmless). 141 S. Ct. at 1788–89. At day's end, I would leave these statutory questions open. The parties did not address the APA's scope and focused only on whether the removal provisions rendered the FDIC's order unconstitutionally void. They did not.

Disclaimer Two: The parties *assume* that the FDIC performs only executive functions. Our resolution should not be taken to have impliedly adopted that premise. The FDIC did not

just *prosecute* this action. It also *adjudicated* the action—finding Calcutt guilty and imposing a punishment on him in the form of an end to his career and a $125,000 penalty. Once an Article III court finally enters the picture, moreover, it may review the FDIC's factual findings only under a deferential substantial-evidence test—a test that has been called more deferential than the one governing our review of a district court's factual findings. *See Dickinson v. Zurko*, 527 U.S. 150, 153 (1999).

Yet both Article III and the Due Process Clause generally require the government to follow common-law procedure (including, fundamentally, the use of a "court") when seeking to deprive people of their private rights to property or liberty. *See Stern*, 564 U.S. at 482–84; Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 569–70 (2007). At first blush, one might think that the FDIC has sought to deprive Calcutt of his "core private rights" to both. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 171 (2015) (Thomas, J., dissenting). According to Blackstone, Calcutt had a "property" interest in the thousands of dollars that the government seeks to take. *See* 1 Blackstone, *supra*, at *134–35. According to Coke, he had a "liberty" interest in continuing in his profession. *See* 2 Coke, *supra*, at 47. So perhaps the FDIC has undertaken judicial functions here—functions that the Constitution vests in courts. *See Stern*, 564 U.S. at 482–84. If the FDIC needed to file suit, moreover, the filing would have triggered the Seventh Amendment's right to a jury, which Justice Brennan made clear applies to suits seeking civil penalties. *See Tull v. United States*, 481 U.S. 412, 422–25 (1987).

The government traditionally has responded to this call for more "process" with the defense that its action seeks to vindicate "public rights," rights that need not be litigated in a court with a jury. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1373 (2018); *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450–51 (1977). And maybe Calcutt did not raise this argument here because a healthy amount of caselaw has accepted that defense in the banking context. *See Cavallari v. Off. of Comptroller of Currency*, 57 F.3d 137, 145 (2d Cir. 1995); *Simpson v. Off. of Thrift Supervision*, 29 F.3d 1418, 1422–24 (9th Cir. 1994). Yet this precedent predates the Court's recent instructions in cases like *Stern*, which held that the adjudication of a state tort claim required an

Article III court. *See* 564 U.S. at 487–501. And while *Stern* did not involve an agency, the Court "recognize[d]" that its cases may not provide "concrete guidance" on the scope of the public-rights doctrine in the administrative context. *Id.* at 494. Several Justices have also expressed concern with extending the doctrine too far. *See Oil States*, 138 S. Ct. at 1381–85 (Gorsuch, J., joined by Roberts, C.J., dissenting); *B & B Hardware*, 575 U.S. at 170–74 (Thomas, J., joined by Scalia, J., dissenting).

There must be *some* limit to the government's ability to dissolve the Constitution's usual separation-of-powers and due-process protections by waving a nebulous "public rights" flag at a court. When the government indicts a person for a crime, it also vindicates "public rights" that belong to the community. *Spokeo v. Robins*, 578 U.S. 330, 345 (2016) (Thomas, J., concurring) (citing Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695–700 (2004)). But the government cannot send people to prison using a hearing room rather than a court room or an administrative officer rather than a jury of peers. *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70 n.24 (1982) (plurality opinion). Why should this case be different simply because Calcutt must pay a civil penalty rather than a criminal fine? *Cf. Jarkesy v. SEC*, __ F.4th __, 2022 WL 1563613, at *2–7 (5th Cir. May 18, 2022). The FDIC one day must provide answers to these questions in a case that does not assume them.

## C. Remedy for Appointments Clause Violation

Calcutt lastly challenges the FDIC's remedy for an undisputed constitutional wrong. The Appointments Clause sets the ground rules for the appointment of officers. U.S. Const. art. II, § 2, cl. 2. It allows Congress to vest the power to appoint inferior officers in "the President," "Courts of Law," or "Heads of Departments." *Id.* In *Lucia v. SEC*, 138 S. Ct. 2044 (2018), the Court held that the SEC's administrative law judges are inferior officers who must be appointed by the President or the Commission. *Id.* at 2051–55. The parties agree that the FDIC's administrative law judges are likewise inferior officers, but Calcutt litigated his first hearing before a judge who had not been appointed by the President or FDIC. The FDIC thus granted Calcutt a "new" hearing before a different, lawfully appointed judge—the remedy that *Lucia* ordered. *See id.* at 2055. Calcutt argues that this remedy still fell short because the FDIC

allowed the second judge to use records, stipulations, and orders from the invalid judge's first hearing. According to him, the Appointments Clause required the second judge to ignore everything that occurred before.

To decide what *Lucia* meant by its "new hearing" remedy, my colleagues engage in a cost-benefit balance that resembles the Supreme Court's test for whether a court should suppress evidence in a criminal trial under the Fourth Amendment's "exclusionary rule." *Davis v. United States*, 564 U.S. 229, 236–38 (2011). They point out that Calcutt's remedy would impose heavy administrative costs (because it would require inefficient, duplicative processes). They add that it would offer few private benefits (because it is unnecessary to insulate the valid judge's decision from the first hearing's "taint"). Based on this prudential balancing, they reject Calcutt's claim that the second judge had to ignore items from the first hearing. Their balance seems reasonable enough. But I would reject Calcutt's view of *Lucia* based on structural grounds rooted in the best reading of the Appointments Clause and the Court's current approach to judge-made remedies.

At the outset, I do not mean to critique my colleagues for engaging in a cost-benefit inquiry. The Supreme Court's instructions in Appointments Clause cases may well be read to contemplate it. *See Lucia*, 138 S. Ct. at 2055 & nn.5–6; *Ryder v. United States*, 515 U.S. 177, 182–83 (1995). In *Ryder*, a court-martialed member of the Coast Guard had his conviction upheld by a panel that included judges whose appointments violated the Appointments Clause. 515 U.S. at 179–80. The Court of Military Appeals affirmed the panel's conviction under the de facto officer doctrine. *Id.* at 180. The Supreme Court reversed and refused to apply this doctrine. It held that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred." *Id.* at 182–83. Did *Ryder* look to the "original meaning" of the Appointments Clause to adopt this remedy and reject the de facto officer doctrine? *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1659 (2020). No, the Court rested on a sentence of pure policy: "Any other rule would create a disincentive to raise Appointments Clause challenges[.]" *Ryder*, 515 U.S. at 183.

The Court summarily found the "proper" remedy to be a second appeal before a lawfully constituted panel.  *See id.* at 188.

*Lucia* followed the same reasoning.  It noted that *Ryder* called for a new hearing before a properly appointed administrative law judge.  138 S. Ct. at 2055.  It then added a new requirement: an agency may not assign the case to the judge who initially heard it even if that judge had been properly appointed in the interim.  *Id.*  When responding to the claim that this "new judge" remedy was not needed to further the Appointments Clause's purposes, the Court reasoned that its remedies in this area have been "designed not only to advance those purposes directly, but also to create '[]incentive[s] to raise Appointments Clause challenges.'"  *Id.* at 2055 n.5 (quoting *Ryder*, 515 U.S. at 183).  In both cases, therefore, the Court chose a remedy to "incentivize" these claims.

This reasoning should look familiar.  The Court once expansively created judge-made remedies that would best promote the purposes of constitutional rights.  Although, for example, Congress has allowed damages claims *only* against state officers who violate the Constitution, 42 U.S.C. § 1983, the Court felt free to create a remedy allowing parties to seek damages from federal officers who violate the Fourth Amendment.  *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 395–96 (1971).  And although the Fourth Amendment says nothing about the rules of evidence in criminal trials, the Court created the exclusionary rule to "remov[e] the incentive to disregard" its ban on unreasonable searches.  *Mapp v. Ohio*, 367 U.S. 643, 656 (1961) (citation omitted).  *Ryder* bears the hallmarks of *Bivens* and *Mapp*.  It even discussed the exclusionary rule.  The Court noted that its cases have rejected that rule when the rule's costs (allowing criminals to go free) exceeded its benefits (incentivizing officers to obey the law).  *See Ryder*, 515 U.S. at 185–86 (citing *United States v. Leon*, 468 U.S. 897 (1984)).  Analogizing to this approach, *Ryder* foresaw no ill effects from granting an Appointments Clause remedy on direct appeal and suggested that this appellate relief would create "incentives to make such challenges."  *Id.* at 186.

Although *Ryder* might mesh well with *Mapp*, the Court in recent years has treated these types of judge-made innovations with a healthy dose of skepticism.  *See Hernandez*, 140 S. Ct. at 747.  The creation of remedies amounts to "lawmaking" that must balance the benefits of any

remedy against its costs. *Id.* at 741–42. Yet the Constitution reserves this task to Congress, not the courts. *See id.* As a result, the Court has all but held that *Bivens* was wrong and has refused to extend it to any other constitutional right for some 40 years. *See id.* at 742–43 (citing cases); *Abbasi*, 137 S. Ct. at 1856–58. It has also continued to narrow the scope of the exclusionary rule, acknowledging that it is a "judicially created remedy" that must be applied cautiously only in cases of clear police misconduct. *Davis*, 564 U.S. at 238 (citation omitted); *see, e.g.*, *Utah v. Strieff*, 579 U.S. 232, 237–38, 241 (2016); *Herring v. United States*, 555 U.S. 135, 140–44 (2009).

What do these principles mean for the issue that confronts us? I agree that *Ryder* and *Lucia* leave open whether a lawful judge at a "new 'hearing'" may rely on evidence developed at the invalid hearing or on orders entered by the invalid judge. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182–83). To resolve the ambiguity, I would read the cases in a way that best comports with the Constitution's "original meaning," *Aurelius*, 140 S. Ct. at 1659, and with the Court's recent guidance to act cautiously before expanding judge-made remedies, *Hernandez*, 140 S. Ct. at 747. When analyzed in that fashion, the FDIC's remedy more than sufficed.

The Appointments Clause does not compel Calcutt's conclusion that a valid judge must ignore all prior proceedings before an invalid one. If anything, the clause itself requires *no* remedy. The de facto officer doctrine broadly applied to claims like Calcutt's that an officer had been appointed by the wrong person. *See* Constantineau, *supra*, §§ 182–86, at 248–55. An English judge who sat on the first case to enforce the doctrine in 1431 "apparently recognized" its application in this setting. *Id.* § 182, at 248. American courts routinely relied on it when an officer was unconstitutionally appointed by, say, the governor rather than the legislature, *see Carroll*, 38 Conn. at 474 (discussing *Taylor*, 5 S.C.L. at 516–17), or the mayor rather than the governor, *see Strang*, 21 Ohio St. at 615–19. And if the Constitution requires some way in which to dispute an officer's right to an office, Congress left open the traditional (if narrow) quo warranto remedy. D.C. Code § 16-3503; *cf.* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv. L. Rev. 1362, 1366–67 (1953).

*Ryder* and *Lucia* thus must rest on a power to create judge-made remedies for constitutional violations. But we must act with caution when asked to expand these remedies because the weighing of the costs and benefits amounts to a legislative task, not a judicial one. *See Abbasi*, 137 S. Ct. at 1856–57. On the benefits side, Calcutt's remedy would certainly promote the purposes of the Appointments Clause. *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021). But no provision—not even a constitutional one—"pursues its purposes at all costs." *Hernandez*, 140 S. Ct. at 741–42 (citation omitted). And Calcutt's remedy comes with its burdens too. It would add to the "administrative costs" already associated with the new hearings. *Abbasi*, 137 S. Ct. at 1856. More fundamentally, courts long recognized that permitting parties to challenge an officer's validity *at all* in appeals of the officer's actions could create "endless confusion[.]" *Norton*, 118 U.S. at 441–42; *see* Constantineau, *supra*, § 4, at 7. That is why they channeled these challenges into special suits that would oust officers only *prospectively*, not into appeals that would reverse their actions *retrospectively*. *See* Constantineau, *supra*, § 451, at 635–36. I see no judicial mode of analysis that can resolve this legislative weighing of interests.

All told, the Court's cautious approach to judge-made remedies comports with traditional remedial practice governing challenges to the validity of an officer's appointment. *See Hernandez*, 140 S. Ct. at 742. I thus would not read *Ryder* and *Lucia* broadly to compel administrative judges to disregard all that occurred at a prior hearing. I would instead read them literally to compel a new hearing before a properly appointed judge. Calcutt got just that.

## III. Statutory Claims

In my view, Calcutt's statutory claims fare better. The statute allowing the FDIC to bar bankers from the industry requires it to prove three things: that a banker has engaged in a listed kind of misconduct, that the misconduct will harm the bank (or benefit the banker), and that the banker acted with a culpable state of mind. 12 U.S.C. § 1818(e)(1)(A)–(C). The statute allowing the FDIC to impose penalties largely covers the same terrain. *Id.* § 1818(i)(2)(B). Here, Calcutt argues that the FDIC failed to prove the "misconduct" and "effect" elements. I agree that the FDIC misread these provisions and would remand for it to reconsider the case under the proper law.

### A.  Misconduct

To remove Calcutt from the Bank, the FDIC first must prove that he engaged in one of three types of misconduct.  *Id.* § 1818(e)(1)(A).  Specifically, the statute allows the FDIC to remove an "institution-affiliated party" if that party "has, directly or indirectly":

(i)  violated—

    (I)  any law or regulation;

    (II)  any cease-and-desist order which has become final;

    (III)  any condition imposed in writing by a Federal banking agency in connection with any action on any application, notice, or request by such depository institution or institution-affiliated party; or

    (IV)  any written agreement between such depository institution and such agency;

(ii)  engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; or

(iii)  committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty[.]

*Id.*  The FDIC found that Calcutt violated the second and third clauses by engaging in "unsafe or unsound practice[s]" and committing "breach[es]" of his "fiduciary duty."  App. 18–26. (It imposed the $125,000 penalty for the same reasons.  *See* App. 35.)

1.  *Unsafe or Unsound Practice*.  The statute gives the FDIC the power to ban a banker from the profession if the banker has "engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution[.]" 12 U.S.C. § 1818(e)(1)(A)(ii).  Regulators have long defined the key phrase—"unsafe or unsound practice"—using a two-part test that courts have generally accepted.  *See First Nat'l Bank of Eden v. Dep't of Treasury*, 568 F.2d 610, 611 n.2 (8th Cir. 1978).  Under this test, an act qualifies as an unsafe or unsound practice if it conflicts with "generally accepted standards of prudent operation" and creates an "abnormal risk of loss or harm" to the bank.  App. 18 (quoting *Michael v. FDIC*, 687 F.3d 337, 352 (7th Cir. 2012)).

This test was not intuitive to me from a review of the text, so I looked into its origins. One court transparently identified its source: "Because the statute itself does not define an unsafe

or unsound practice, courts have sought help in the legislative history." *In re Seidman*, 37 F.3d 911, 926 (3d Cir. 1994). The Fifth Circuit started down this path. *See Gulf Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 651 F.2d 259, 263–65 (5th Cir. 1981). Rather than seek out the ordinary meaning of "unsafe or unsound practice," it jumped to a "lively" debate in the congressional record. *Id.* at 263. During this debate, the court noted, a few legislators had treated as "authoritative" a definition proposed by an agency chairman. *Id.* at 264. Under the chairman's view, the phrase covered "any action" that "is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk or loss or damage to an institution, its shareholders, or the agencies administering the insurance funds." *Id.* (citation omitted). The court accepted his view as law. *Id.* at 264–65.

This straight-from-the-legislative-history test has spread widely since. The few courts with reasoned analysis regurgitate the same bit of legislative history. *Seidman*, 37 F.3d at 926. Most others, though, simply cite other precedent for this test without considering its origins. *See Frontier State Bank v. FDIC*, 702 F.3d 588, 604 (10th Cir. 2012); *Michael*, 687 F.3d at 352; *Landry v. FDIC*, 204 F.3d 1125, 1138 (D.C. Cir. 2000); *Simpson*, 29 F.3d at 1425; *Doolittle v. Nat'l Credit Union Ass'n*, 992 F.2d 1531, 1538 (11th Cir. 1993); *Nw. Nat'l Bank v. Dep't of Treasury*, 917 F.2d 1111, 1115 (8th Cir. 1990).

I am troubled by this approach. The test springs from a mode of interpretation that no Justice on the Supreme Court would endorse today. In recent decades, the Court has given us clear marching orders: the answer to an interpretive question begins by identifying the ordinary meaning of Congress's words when read against their context and structure. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019); *Ross v. Blake*, 578 U.S. 632, 638 (2016). This "first canon" is also the "last" if the text has a clear meaning. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Here, however, courts have viewed the legislative history as both the beginning and the end of the analysis. *Gulf Federal* even claimed that the agency chairman's proposed test had been "adopted in both Houses"—by which the court meant that it had been read into the legislative record. 651 F.2d at 264 (citation omitted). "But legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1631 (2018). And the Court

has not been kind to other tests that developed in this manner. *See, e.g.*, *Food Mktg.*, 139 S. Ct. at 2364.

I am also troubled by this approach because courts have chosen it to create a "flexible" statute allowing regulators to address "changing business problems[.]" *Seidman*, 37 F.3d at 927. What does this even mean? If an agency condones a banker's "new business model," the agency can constrict the statute to give the banker a pass? *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725–26 (2017). But if the agency disapproves of a competitor's practice, it can expand the statute to punish the competitor? This accordion-like view of the rule of law has no place in our constitutional order—one in which the President lacks any "dispensing" prerogative. *Cf. Clark v. Martinez*, 543 U.S. 371, 382 (2005); McConnell, *supra*, at 115–19. If anything, this view has things backwards. This statute can deprive citizens of their property and livelihoods. So it would better align with our interpretive traditions if we construed the phrase "strictly" rather than flexibly. 1 Blackstone, *supra*, *88; *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). After all, the rule of lenity (the rule that we resolve ambiguities against the government) historically applied not just to criminal laws, but also to all laws considered "penal"—"that is, laws inflicting any form of punishment" like a civil penalty. *Wooden v. United States*, 142 S. Ct. 1063, 1086 n.5 (2022) (Gorsuch, J., concurring in the judgment). This statute fits that bill. *See Proffitt v. FDIC*, 200 F.3d 855, 860–62 (D.C. Cir. 2000). At the least, courts should give a phrase that affects core private rights its ordinary meaning—not a malleable one.

How might an ordinary banker interpret the phrase? The legislative history reaches any "imprudent act." *Seidman*, 37 F.3d at 932; *see Gulf Federal*, 651 F.2d at 264. Yet this definition does not adequately account for two parts of the actual text. For starters, the statute uses the word "practice," not "act." 12 U.S.C. § 1818(e)(1)(A)(ii). Those words mean different things. If an otherwise conscientious banker makes a single imprudent loan to a couple down on their luck, the banker might have engaged in an unsound "act." But nobody would say that the banker has made it a "practice" of issuing bad loans after just the one. This word includes a connotation of repetition (of *habitual* acts). The banker must have a habit of making bad loans (or, at the least, the bank must have that habit and the banker must "participate[] in" it). *Id.*; *cf. Nw. Nat'l Bank*, 917 F.2d at 1115. That is because a "practice" is a "habitual or customary performance,"

*American College Dictionary* 951 (1970), or a "habitual or customary action or way of doing something," *American Heritage Dictionary of the English Language* 1028 (1973).

The statute itself contemplates this distinction. One clause bars bankers from engaging in "any unsafe or unsound practice[.]" 12 U.S.C. § 1818(e)(1)(A)(ii). The next bars them from engaging in "any *act*, *omission*, or *practice*" that breaches their fiduciary duties. *Id.* § 1818(e)(1)(A)(iii) (emphases added). We presume that Congress meant different things when it used different words in clauses that sit right next to each other. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018). So even a single *act* or *omission* "that breaches [a] fiduciary duty" suffices for punishment, but only a *habit* of "unsafe or unsound" actions does.

Next, the statute does not cover every unsafe or unsound practice *in the abstract*. Rather, the practice must be "in connection with" a bank. 12 U.S.C. § 1818(e)(1)(A)(ii). The Supreme Court has recognized that this phrase has an "indeterminat[e]" scope. *Maracich v. Spears*, 570 U.S. 48, 59–60 (2013); *see Mont v. United States*, 139 S. Ct. 1826, 1832 (2019). If we read it broadly here, it could cover practices with the remotest of relations to banking—such as a banker's decision to speed to work every morning. *See Maracich*, 570 U.S. at 59. One regulator even thought that the phrase covered a decision to seek judicial review of the regulator's *own* regulatory decision. *Johnson v. Off. of Thrift Supervision*, 81 F.3d 195, 202 (D.C. Cir. 1996). Could Calcutt's decision to file a petition in this court also be an "unsound practice" because we reject his appeal? I would not read the statute this broadly. Courts instead must interpret the clause to adopt the "limiting principle" that best comports with the statute's context and structure. *See Maracich*, 570 U.S. at 59–60; *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387–91 (2014).

For the reasons that a D.C. Circuit decision has explained, I would read this clause to cover only "unsafe or unsound *banking* practices." *Grant Thornton, LLP v. Off. of the Comptroller of the Currency*, 514 F.3d 1328, 1332–33 (D.C. Cir. 2008). This definition "harmonizes" this subsection with the rest of § 1818. *Id.* at 1332. The section includes several other provisions that regulate unsafe or unsound practices "in conducting the business" of a bank, including one permitting the FDIC to issue cease-and-desist orders. 12 U.S.C. § 1818(b)(1). It would be odd to permit a limited remedy (a cease-and-desist order) only for

unsound banking practices but a severe remedy (removal from a bank) for any unsound practice with any connection to the bank. And a definition that covered only "banking" practices would exclude, for example, an outside auditor's deficient audit, *see Grant Thornton*, 514 F.3d at 1332–33, or a decision to seek judicial review.

All of this said, courts that apply a broad legislative-history test have recognized that their reading could lead to "open-ended supervision." *Gulf Fed.*, 651 F.2d at 265. So they compensate by adding a limiting principle that I do not necessarily see in the text either. They have read the phrase "unsafe or unsound practice" to require that an action pose a risk of *extreme* harm—one that threatens the bank's "financial stability," *Seidman*, 37 F.3d at 928, or "integrity," *Johnson*, 81 F.3d at 204 (quoting *Gulf Fed.*, 651 F.2d at 267). An "unsafe" practice (one that exposes the bank to "danger or risk") may well require a risk of *some* harm. 2 *Oxford Universal Dictionary* 2312 (3d ed. 1968). But the statute also covers an "unsound" practice in the disjunctive (a practice that is "not based on proven practice, established procedure, or practical knowledge"). *Webster's New International Dictionary* 2511 (3d ed. 1966). Perhaps the entire phrase "unsafe or unsound" may be one of those "doublets" that Congress uses to convey a single idea (like "aid and abet" or "cease and desist"). *Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012) (citing *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635–36 (2012)). Even still, I would not think that this text requires the risk of financial collapse. A loan officer at a massive bank who has followed a consistent pattern of making bad loans may have engaged in an "unsafe or unsound practice" even if the banker's portfolio cannot threaten the bank's existence.

Be that as it may, I would save the required financial-risk level for another appeal. When sanctioning Calcutt here, the FDIC did not apply my reading that the statute requires unsafe or unsound *banking practices*. I would remand for it to do so in the first instance. Most notably, the FDIC nowhere indicated that it must identify a banking "practice" as I read the phrase—i.e., a "habitual or customary action[.]" *American Heritage*, *supra*, at 1028. To the contrary, as Calcutt notes, the vast majority of its findings relied on a *single* loan—the Bedrock Transaction. It concluded, among other things, that Calcutt violated the Bank's lending policies and engaged in imprudent lending by approving that transaction. App. 19–21. It is not clear that Calcutt's actions with respect to this loan can rise to the level of an unsafe or unsound "practice."

This fact contrasts Calcutt's case with those that the FDIC cited—which involved a pattern of bad loans. *See, e.g.*, *First State Bank of Wayne Cnty. v. FDIC*, 770 F.2d 81, 82–83 (6th Cir. 1985).

2. *Breach of Fiduciary Duty*. The statute also gives the FDIC the authority to ban a banker from the profession if the banker has "committed or engaged in any act, omission, or practice which constitutes a breach of such party's fiduciary duty[.]" 12 U.S.C. § 1818(e)(1)(A)(iii). The parties' briefing on this portion of the statute raises more questions in my mind than it answers.

Start with a choice-of-law question. Citing *Atherton v. FDIC*, 519 U.S. 213 (1997), my colleagues and Calcutt suggest that the relevant state's corporate-governance law supplies the rule of decision for determining whether a banker has breached a "fiduciary duty" within the meaning of § 1818(e)(1)(A)(iii). (The FDIC does not enlighten us with its position on this choice-of-law subject.) I am skeptical that their reading is correct. The relevant portion of *Atherton* that they cite was not interpreting federal statutory language like the "fiduciary duty" text in § 1818(e). It was rejecting the claim that *purely* federal common law should supply the "corporate governance standards" for federally chartered entities. *See* 519 U.S. at 217–26. Here, by contrast, we must determine the proper "interpretation of a federal statute," not whether we may create federal common law. *Id.* at 218. And when a federal statute uses a common-law term of art, the Supreme Court generally interprets its language to adopt a uniform standard of conduct for all 50 states based on generic common-law concepts. *See, e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–55 (1998); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739–41 (1989). I might take that approach here. It would likely mean that we should interpret this phrase to codify the well-known duties of care and loyalty as they existed in this corporate-governance context at the time that Congress adopted this language in 1966. *See, e.g.*, Harry G. Henn, *Handbook of the Law of Corporations and Other Business Enterprises* 362–70 (1961); William J. Grange & Thomas C. Woodbury, *Corporation Law: Operating Procedures for Officers and Directors* § 268, at 286–87, § 311, at 325–26 (2d ed. 1964); Dow Votaw, *Modern Corporations* 63–64 (1965); Harold Koontz, *The Board of Directors and Effective Management* 84–86 (1967).

Turn to the substantive standards. The Board held that Calcutt had breached his duty of care to the Bank by acting incompetently in his approval of the Bedrock Transaction and in his failure to manage the Nielson Loans. App. 23–24. But from my review of the FDIC's order, I cannot even determine the substantive standards of conduct that it applied. Its order did not use the words "negligence" or "gross negligence." And for decades, courts have debated which of these standards the statute incorporates. Julie Andersen Hill & Douglas K. Moll, *The Duty of Care of Bank Directors and Officers*, 68 Ala. L. Rev. 965, 986–92 (2017). The Board also neglected to mention the traditional "business-judgment rule," the application of which is also contested. Patricia A. McCoy, *A Political Economy of the Business Judgment Rule in Banking: Implications for Corporate Law*, 47 Case W. Res. L. Rev. 1, 22–60 (1996). Yet another layer in this morass is that in the 1980s, Congress also adopted a "gross negligence" floor to govern the conduct of officers and directors in a related context. 12 U.S.C. § 1821(k); *see Atherton*, 519 U.S. at 226–28. That separate section's implications for § 1818(e) are unclear.

Yet I would not authoritatively answer these choice-of-law or substantive questions now. As I explain below, I would remand to allow the FDIC to reconsider whether Calcutt's misconduct was the cause of any of the claimed harms. On remand, I would give the FDIC a chance to clarify its views on these legal questions about the meaning of this fiduciary-duty statute.

B.  Causation

The statute next requires the FDIC to prove either that Calcutt's misconduct had the potential to harm the Bank or that Calcutt received a benefit from that misconduct. *See* 12 U.S.C. § 1818(e)(1)(B). This "effect" subparagraph provides in full:

(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

> (i)  such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;
>
> (ii)  the interests of the insured depository institution's depositors have been or could be prejudiced; or
>
> (iii)  such party has received financial gain or other benefit by reason of such violation, practice, or breach[.]

*Id.* The specific civil-penalty provisions on which the FDIC relied required similar "effects." *See id.* § 1818(i)(2)(B)(ii)(II)–(III); App. 34–35.

The FDIC misinterpreted the causation element in this subparagraph. To show why, I start with the causation basics. The common law has long recognized two types of causation: factual (or "but for") causation and legal (or "proximate") causation. *See* William L. Prosser, *Handbook of the Law of Torts* §§ 45–46, at 311, 321–22 (1941). But-for causation creates a simple rule. As its name suggests, it requires a plaintiff to show that an injury would not have occurred "but for" the defendant's wrongful conduct. *See Burrage v. United States*, 571 U.S. 204, 211–12 (2014); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013). Suppose, for example, that after a neighbor's dam breaks and floods a plaintiff's property, the plaintiff sues the neighbor for building the dam negligently. *See* Restatement (Second) of Torts § 432 illus. 2 (Am. L. Inst. 1965). But-for causation requires a court to ask whether the plaintiff would have suffered this injury (the flooding) in a counterfactual world in which the neighbor did not commit the wrongful act (the negligent construction). *See id.* § 432(1) & cmt. a. And if a once-in-a-century storm would have caused the flooding even if the neighbor had built the dam to perfection, the negligent construction did not cause the harm. *See id.* § 432 illus. 2; *Burrage*, 571 U.S. at 211–12.

Proximate causation arose from the premise that a factual-cause test alone would lead to excessive liability. Prosser, *supra*, § 45, at 312. Courts recognized that, "[i]n a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond." *Id.* They thus adopted "proximate cause" rules to cut off liability even if a defendant was a but-for cause of harm. *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). As one example, a defendant's conduct (say, its failure to keep a ship docked) may set in motion a chain of events that leads another party to negligently cause an injury (say, the captain incompetently runs the ship aground). *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832–34 (1996). Under a superseding-cause test, courts will not hold the defendant liable if the other party's negligence was unforeseeable. *Id.* at 837. As another example, a defendant's misconduct (say, stock manipulation) may directly harm one person (a stockbroker who goes bankrupt) and indirectly harm third parties (the stockbroker's creditors).

*See Holmes*, 503 U.S. at 262–63.  Under a directness test, courts will not allow the third parties to recover.  *Id.* at 271–72.

These common-law rules have significance in this case.  The Supreme Court presumes that Congress enacts statutory text with common-law concepts in mind.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014).  It thus has long read common-law causation rules into statutes that use causal language like "because of" or "results from."  *See Burrage*, 571 U.S. at 213–14; *Nassar*, 570 U.S. at 350–52.  Congress used one such phrase ("by reason of") here.  The FDIC must prove that the Bank suffered (or will likely suffer) a loss or that Calcutt received a benefit "by reason of" his misconduct.  12 U.S.C. § 1818(e)(1)(B).  So I would interpret this statute to require both but-for and proximate causation.  *See Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020); *Holmes*, 503 U.S. at 265–67.

But the FDIC has not adopted these causation rules.  Its enforcement orders have all but ignored but-for cause.  In fact, I have found only one such order that even used this phrase.  *See In re Adams*, 1997 WL 805273, at *5 (F.D.I.C. Nov. 12, 1997).  And it suggested that a "'but for' relationship" was *not* required.  *Id.* (quoting *ABKCO Music, Inc. v. Harrisongs Music Ltd.*, 772 F.2d 988, 995–96 (2d Cir. 1983)).  The FDIC also failed to mention but-for cause in this case.  It simply indicated: "An actual loss is not required; a potential loss is sufficient so long as the risk of loss to the Bank was 'reasonably foreseeable' to someone in [Calcutt's] position."  App. 26 (citations omitted).  The FDIC is correct that, unlike most statutes imposing liability for harm, this statute does not require a past loss.  It also applies if a bank "will probably suffer" a loss in the future "by reason of" the banker's misconduct.  12 U.S.C. § 1818(e)(1)(B)(i).  But it incorporates but-for cause all the same.  For a past loss, the FDIC must show that it "would not have occurred without" the misconduct.  *Nassar*, 570 U.S. at 347 (citation omitted).  For a future loss, the FDIC must show that the probability of loss would not have occurred without that misconduct.  *See id.*  The FDIC's jurisprudence leaves no hint that it adheres to these first-year torts-class concepts.

The FDIC's legal error is all the more pronounced for proximate causation.  For years, it has rejected outright any need to prove this causation.  *See Adams*, 1997 WL 802573, at *5; *In re*

***, 1985 WL 303871, at *114 (F.D.I.C. Aug. 19, 1985). It did so in this case too, noting that "an individual respondent need not be the proximate cause of the harm to be held liable[.]" App. 26–27. Confusingly, however, the FDIC suggested that the loss needs to be "foreseeable." App. 26, 31. Foreseeability is one component of the proximate-causation requirement that the FDIC said it was rejecting. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010). If the FDIC meant to imply that the statute incorporates *only* proximate cause's foreseeability element, it still erred. Proximate causation contains a group of concepts other than foreseeability. *See id.* So the Supreme Court has already rejected this type of argument that a federal statute contains only a foreseeability test. *See Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305–06 (2017).

*

Maybe we could overlook the FDIC's failure to identify the governing causation law if it correctly applied that law to Calcutt. But it did no such thing. The FDIC held Calcutt responsible for three injuries to the Bank and one benefit to him. The Bank incurred $6.443 million in charge-offs from the Nielson Loans. App. 27–29. It incurred a $30,000 charge-off from the $760,000 Bedrock Transaction. App. 27. And it paid its lawyers and accountants for work related to these loans. App. 29–31. Calcutt lastly received dividends from the Bank's holding company despite the loans' poor condition. App. 31–32. None of these "effects" sufficed.

As an initial matter, I agree with my colleagues that the FDIC failed to explain why the statute should even cover fees paid to lawyers or accountants. The statute reaches "financial loss or other damage" from Calcutt's misconduct. 12 U.S.C. § 1818(e)(1)(B)(i). It would be unusual to describe the money paid for these services as "financial loss" or "other damage." One does not normally use such terms to describe a payment of money for something of commensurate value. *Cf. Summit Valley Indus. Inc. v. Loc. 112, United Brotherhood of Carpenters & Joiners of Am.*, 456 U.S. 717, 722–23 (1982). The payment is more naturally described as an "expense" or "cost." Our country's litigation traditions reinforce this view. We have long followed the "American Rule" in which a plaintiff's legal costs are not recoverable "damages" even if the defendant's conduct is their but-for cause. *See Alyeska Pipeline Serv. Co.*

*v. Wilderness Soc'y*, 421 U.S. 240, 249–50 (1975) (citing *Arcambel v. Wiseman*, 3 U.S. 306 (1796)).  When a statute allows a plaintiff to recover "damages," then, courts do not read that phrase to cover attorney's fees—or other expert fees for that matter.  *See Summit Valley*, 456 U.S. at 722–23; *cf. W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88–92 (1991).  And the Court has stuck with this rule even if a law uses a phrase ("expenses") that is "capacious enough to include" these fees.  *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019).  So I would not read the text "loss" or "damage" to cover them here.

That leaves the other three "effects."  The FDIC did not apply basic causation rules to any of them.  Most tellingly, the FDIC held Calcutt responsible for all $6.443 million in charge-offs on the $38 million in Nielson Loans—that is, for the entire loss.  App. 27–28; *see id.* at 6–7.  But these loans were underwater in the aftermath of the Great Recession *before* Calcutt committed most of the identified misconduct.  App. 625–26.  As with my hypothetical about the negligently made dam, then, the FDIC needed to ask a "counterfactual" question: How much in charge-offs would the Bank have incurred if Calcutt had not engaged in that misconduct?  *Comcast*, 140 S. Ct. at 1015.  Suppose that the (hopefully) once-in-a-century recession would have caused $7 million in charge-offs if the Bank started collection efforts immediately because of the collapsed real-estate market.  If so, a decision to enter into the Bedrock Transaction would have helped (not harmed) the Bank.  And Calcutt's misconduct (for example, the failure to undertake the usual underwriting efforts, *see* App. 19) could not be described as a but-for cause of loss.  I see nothing in the record on appeal that would help answer this critical but-for question, confirming that the FDIC did not even ask it.

The same error underlies the FDIC's decision to hold Calcutt liable for the $30,000 charge-off for the Bedrock Transaction.  App. 27.  The FDIC did not consider the "counterfactual" of what would have occurred if Calcutt had not engaged in misconduct.  *Comcast*, 140 S. Ct. at 1015.  As a generic matter, the Bank suffered a total of $6.473 million in charge-offs on all Nielson Loans (including the Bedrock Transaction) and the FDIC needed to consider the amount of likely charge-offs without this transaction.  Would it have lost more?  Less?  The FDIC did not ask these questions.  More granularly, Calcutt told the FDIC that the administrative law judge had erred "by failing to tether the $30,000 charge-off (and other actual

and potential losses) to specific acts of misconduct[.]" App. 27. The judge found, for instance, that Calcutt breached his fiduciary duty of candor to the Bank's directors by failing to seek their preapproval for the Bedrock Transaction. App. 25–26. Suppose the directors would have approved the transaction even if he had done so. How could this specific misconduct have caused this harm? The FDIC responded that it was "unpersuaded" by this causation argument because the Bedrock Transaction was a "main focus" of the hearing and the judge catalogued Calcutt's many misdeeds in approving it. App. 27. This (non)response said nothing about causation—an element distinct from misconduct.

Both but-for and proximate-cause problems undergird the FDIC's decision that Calcutt benefited from his misconduct. He was the largest shareholder of the Bank's holding company, and the FDIC held that his misconduct allowed him to obtain a dividend from this company. App. 31–32. Its conclusion rested on the administrative law judge's finding that the Bank paid its own shareholder (the holding company) a $462,950 dividend in mid-2011 and that the FDIC would not have approved this payment (to the holding company) if it had known that the Nielson Loans were not performing. App. 287, 751. As a matter of but-for causation, the FDIC did not ask whether the holding company would have paid its shareholders the same dividend even if the FDIC had known of the Nielson Loans' true condition. *See Comcast*, 140 S. Ct. at 1015. It cites no testimony from the company's directors about what they would have done. And Calcutt testified that the holding company had sufficient assets to pay the dividend even if the Bank had paid it nothing. A580.

As a matter of proximate causation, the FDIC failed to consider a "directness" issue. If "by reason of" incorporates usual proximate-cause rules, it would require that Calcutt *directly* benefit from his misconduct. Under the FDIC's theory, though, the holding company was the direct beneficiary that received the dividend; Calcutt was an indirect beneficiary as a shareholder of that separate company. Is this a sufficiently "direct" benefit (analogous to a larger salary)? "The general tendency" in the law has been "not to go beyond the first step." *Bank of Am.*, 137 S. Ct. at 1306 (citation omitted). And this theory potentially rests on the "independent" decision of the holding company. *Hemi*, 559 U.S. at 15. But I would leave this question for the FDIC.

All told, I would remand for the FDIC—the fact finder—to apply the correct causation rules to the two charge-offs and the dividend payment in the first instance. My colleagues recognize many of the FDIC's legal errors but say there is no need to remand. I disagree. They first invoke the deferential substantial-evidence test. But that test governs our review of the agency's factual findings. *See Dickinson*, 527 U.S. at 162. I do not quibble with those. I take issue with the FDIC's failure to follow the proper causation law. The substantial-evidence test has nothing to say on that subject. And even the FDIC does not claim that we should defer to its legal views. *See Grant Thornton*, 514 F.3d at 1331; *cf. Epic*, 138 S. Ct. at 1629–30.

If anything, my colleagues' analysis runs afoul of basic administrative-law principles. When an agency's decision rests on a collapsed legal foundation, we cannot affirm the decision on the ground that the agency might have reached the right outcome under a correct legal view. We must let the agency apply the proper law in the first instance. *See Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 209–10. But my colleagues all but find facts by applying their view of the law to the record. Recall, for example, that the FDIC held Calcutt liable for all $6.443 million in charge-offs on the Nielson Loans—a finding that leaves no doubt that the agency erred. My colleagues do not defend this finding. They nevertheless say that the FDIC "could have" found that Calcutt's misconduct caused some *unquantified* percentage of the losses. Maj. Op. 48. But this "judicial judgment cannot be made to do service for an administrative judgment." *Chenery*, 318 U.S. at 88.

Even if we could now find Calcutt liable for an (unknown) loss amount on a good-enough-for-government-work approach, I would still remand. The statute says that the FDIC "may" seek to remove a banker—not that it *must* do so—when the other requirements are met. 12 U.S.C. § 1818(e)(1). It thus leaves the FDIC with discretion over whether to bar Calcutt "from working in his chosen profession for the remainder of his career." *Doolittle*, 992 F.2d at 1538. The amount of harm properly chargeable to Calcutt should influence its discretionary decision. The FDIC found removal proper after holding Calcutt responsible for well over $8 million (including professional fees and charge-offs). If, on remand, the FDIC were to find

that Calcutt's conduct caused a tiny fraction of this harm, it might reconsider its "draconian" sanction.  *Id.*  In fact, this logic led the Eleventh Circuit to remand a similar removal order so that a related agency could reconsider the order after the court jettisoned part of its reasoning.  *Id.*  Even a case that my colleagues cite issued this type of remand when it upheld only part of the FDIC's order—given the "extraordinary" nature of the sanction.  *De la Fuente v. FDIC*, 332 F.3d 1208, 1227 (9th Cir. 2003).  Because the FDIC's order is riddled with legal error, I find it inexplicable that we are not doing so here.

*   *   *

For these reasons, I respectfully dissent.